

Source: Bettmann/Getty Images

## Georgia's Enduring Racial Discrimination in Voting and the Urgent Need to Modernize the Voting Rights Act

*Report to the Judiciary Committee*
*United States Senate*
*April 20, 2021*



# Acknowledgments

This report is dedicated to the voters of Georgia, who continue to persevere in their pursuit of a just democracy and demand for full and equal access to the fundamental right to vote, despite the enduring obstacles placed in their path.

Fair Fight Action thanks the contributors to this report:

Lawrence & Bundy LLC

Jenner & Block LLP

Miller & Chevalier Chartered

Sandler Reiff Lamb Rosenstein & Birkenstock, P.C

Crowell & Moring LLP

Schulte Roth & Zabel LLP

Fair Fight Action also thanks The Brennan Center for Justice for sage advice and leadership in voting rights.

Finally, Fair Fight Action is grateful to the thousands of volunteers who have spent countless hours helping us tell the stories of Georgia's voters. These stories could not be told without you and we look forward to continuing this fight together.

# Table of Contents

**Executive Summary** — 1

**Section I:** Historical Background is Important to Understanding the Need for Continued Protection of Access to the Right to Vote — 5

**Section II:** If the Senate Adopts the House Formula, Georgia Will Again be Subject to Preclearance — 22

**Section III:** Georgia's Recent Elections Demonstrate that Voting Rights Violations Persist — 44

**Section IV:** Georgia's Recent Legislative Session Demonstrates that Attacks on Voting Rights Are Increasingly Aggressive and Persistent — 119

**Section V:** Congress Has the Robust Record Needed to Enact Renewed Voting Rights Legislation — 141

**Table of Authorities Cited in Report** — 144

**Table of Exhibits** — 173



# EXECUTIVE SUMMARY

The United States House of Representatives passed the John Lewis Voting Rights Advancement Act, H.R. 4, 116th Cong. (as passed by House, Dec. 6, 2019) ("VRAA"). Fair Fight Action, Inc. ("Fair Fight Action" or "FFA") addresses the House-passed legislation because, as of this writing, neither the House nor the Senate has introduced the bill in the 117th Congress. Fair Fight Action presents this report because there is an urgent and overwhelming need for Congress to bring the preclearance formula found in the Voting Rights Act of 1965, 52 U.S.C. §§ 10101, 10301–10314, 10501–10508, 10701–10702 ("VRA") into the modern era, to reinstate robust federal oversight over discriminatory voting practices, and to strengthen and protect voting rights—for all eligible voters in Georgia and nationwide.

If there ever was a time for Congress to "draft another [preclearance] formula," that time is now.[1] Until his death, Congressman John Lewis continued his unwavering fight to empower voters of color by advocating for passage of the VRAA. Fair Fight Action lifts up Congressman Lewis's memory and provides this report to support the record underlying renewed voting rights legislation. The report relies on recent events—from the last twenty-five years—for evidence of Georgia's continued efforts to suppress its own citizens' right to vote.[2]

This report is divided into five sections. Section I recounts the history of voter suppression in Georgia and begins with the State of Georgia's (the "State") earliest state constitution, ratified in 1777, with its specific exclusion of Black men from voting, and advances through Reconstruction, the Jim Crow era, and the adoption of the Voting Rights Act in 1965 ("VRA"). Then, the report describes the State's conduct while subject to the VRA's preclearance requirements, a phase that included DOJ's objections to 170 discriminatory voting changes between 1968 and 1996 and also included important litigation. The report includes a discussion of the past twenty-five years, the "reach back" time under the VRAA, and describes Georgia's recent history. That history includes repeated efforts to suppress the vote and intimidate voters of color throughout the State. Whether through the prosecution of the Quitman 10+2 in Brooks County on the Georgia – Florida border or the challenges to Black voters in Hancock County between Atlanta and Augusta, or moving polling locations to police stations as done both in

---

[1] *Shelby County v. Holder*, 570 U.S. 529, 557 (2013). The Court's decision in *Shelby County* is, at least in part, the impetus for the VRAA.

[2] Much of the data FFA provides has been collected in FFA's pending federal lawsuit *Fair Fight Action v. Raffensperger*, No. 1:18-cv-05391-SCJ, pending in the United States District Court for the Northern District of Georgia. In its 2018 lawsuit, Fair Fight Action and its co-plaintiffs, members of the faith-based community and an organization dedicated to empowering domestic workers, demonstrate how Georgia has implemented policies and procedures that suppress the right of Georgia's voters and have a disparate impact on voters of color in violation of the Fourteenth Amendment, Fifteenth Amendment, and the Voting Rights Act. Fair Fight Action presents this evidence to support its claims in large part through declarations of Georgia voters. The voters' individual stories help paint a comprehensive picture of one state's tireless efforts to suppress its citizens' right to vote.



Macon-Bibb County in central Georgia and in Jonesboro in Clayton County in metropolitan Atlanta, state actors have been unabashed in their efforts to limit access to the polls and restrict the right to vote.

The historical evidence continues in Section II, which outlines challenged voting rights violations that have occurred in the State since 1996 to demonstrate that Georgia more than meets the statewide coverage thresholds in the current version of the VRAA. Of course, Fair Fight Action recognizes these thresholds may change as the legislation moves through Congress. In this report, FFA tracks the current version for ease of demonstrating how that version could be applied. The violations discussed include DOJ's preclearance objections and voting rights litigation outcomes. Among other areas, the DOJ objections barred moving election dates to depress turnout for voters of color; adopting an earlier version of the State's notorious Exact Match policy; and implementing discriminatory redistricting plans. The report details recent litigation in which courts have determined that either the State of Georgia or its political subdivisions engaged in "voting rights violations" as that term is defined in the House version of the VRAA. While some violations involved challenges to local rules, such as moving to at-large elections that diminished the voting strength of people of color, others involved more systemic practices such as cancelling voter registrations when a would-be voter failed Exact Match. And the report highlights a pair of cases involving the rejection of absentee ballots for a voter's failure to write in the correct date of birth on an envelope. Two courts—one addressing the issue in Gwinnett County and one addressing the issue statewide—held the rejection of absentee ballots for failing to write in a date of birth or writing an incorrect date of birth likely violated Section 10101(a)(2)(B) of the VRA and enjoined rejection of ballots solely based on a missing or erroneous date of birth. These cases are of particular interest given that the most recent voting legislation in Georgia, Senate Bill 202 ("S.B. 202"), reimposes a date of birth requirement. The report cements Georgia's specific status as a jurisdiction meriting coverage as a jurisdiction with multiple violations over a specific period of time.

The report next turns to what has happened during recent elections, incorporating numerous experiences that voters have shared with Fair Fight Action. In Section III, the report addresses the suppressive features of Georgia's election system in areas where the VRAA promises increased federal oversight: Georgia's Exact Match policy, polling place changes and closures, and voter purges. The report explains further the traps in Georgia's Exact Match policy and how it impacts voters—and in particular voters of color—from registration to the polling place and focuses on polling place moves and closures, which have taken place in stunning numbers following *Shelby County*. These changes have disproportionately affected Black voters, who were twenty percent more likely to miss voting because of nothing other than increased distances to polling locations. The report examines Georgia's "list maintenance" procedures, under which Georgia's Secretary of State ("SOS") has purged—and continues to purge—thousands of voters from the rolls on the demonstrably false assumption the voters have moved away. In the second part of Section III, the report addresses additional features of Georgia elections that demonstrate the need for Congressional intervention. Here, the report highlights the outrageously long lines that have plagued myriad voting locations across the State in recent years. During the 2018 General Election, for example the lines to vote in Fulton County (Atlanta) were among the



longest in the country, and the voters who suffered the longest wait times disproportionately were voters of color. In addition, we describe the problems with inadequate voting supplies, provisional ballots, and voter intimidation perpetrated by the State itself—by sending threatening letters to voters, in exercising the State Election Board's ("SEB") investigatory powers, and through advancing false claims of voter fraud.

The penultimate section examines Georgia's recent legislation, S.B. 202, passed by both legislative bodies and signed into law the same day, March 25, 2021. S.B. 202 ostensibly was adopted to "restore confidence," but instead imposes further suppressive measures on Georgia's electorate. Inspired by false claims premised on scant evidence of fraud, S.B. 202 restructures the State's election apparatus and eliminates or restricts popular voting options—convenient drop boxes for example—while imposing new and exacting standards for applying for and casting absentee ballots. And the legislation limits access to provisional ballots. S.B. 202 also concentrates power over election administration in the hands of the highly partisan Georgia General Assembly. Lastly, as is now notorious, the legislation criminalizes handing a bottle of water to a voter standing in a long line under the hot Georgia sun.

S.B 202 continues Georgia's tradition of enacting laws and adopting policies that may appear racially neutral but are in fact discriminatory tools of voter suppression. This report demonstrates that S.B. 202 is a continuation of Georgia's abhorrent tradition of election laws, policies, and practices that have a racially disparate impact. It does not matter whether racial discrimination is written into the letter of the law. What matters is that voters of color disproportionately bear the burdens of the law in real life.[3]

The submission concludes by emphasizing that the report serves as yet another layer of what is already a robust Congressional record developed in response to the Supreme Court's directive in *Shelby County* that Congress should "start[] from scratch" in updating Section 4's coverage formula. Fair Fight Action offers this report to aid Congress as it continues to collect even more evidence—data, statistics, and reports from voters—to support a new coverage formula responsive to how voting rights have evolved, including how they have been suppressed, in recent history.

---

[3] *See, e.g.*, *Thornburg v. Gingles*, 478 U.S. 30, 43–46 (1986) (recognizing Congress's judgment that proof of discriminatory intent is not required to demonstrate discrimination in violation of the Voting Rights Act); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977) ("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face."); *Lane v. Wilson*, 307 U.S. 268, 275 (1939) ("[The Constitution] hits onerous procedural requirements which effectively handicap exercise of the franchise by the colored race although the abstract right to vote may remain unrestricted as to race."); *Davis v. Guam*, 932 F.3d 822, 833 (9th Cir. 2019) ("[I]n addition to facial racial distinctions, classifications that are race neutral on their face but racial by design or application violate the Fifteenth Amendment."); *Veasey v. Abbott*, 830 F.3d 216, 235–36 (5th Cir. 2016) (en banc) ("In this day and age we rarely have legislators announcing an intent to discriminate based upon race," but in reality, "neutral reasons can and do mask racial intent").



Fair Fight Action appreciates the opportunity to submit this report and is grateful for your commitment to ensuring free and fair elections and protecting voting access for all eligible voters.

## INTRODUCTION

It is an honor for Fair Fight Action to submit this Report and advocate for passage of the VRAA.[4] FFA is a Section 501(c)(4) nonprofit entity with the core mission of securing Georgians' voting rights. Fair Fight Action exists because the State of Georgia's actions, in enforcing and adopting suppressive and discriminatory laws, policies, and practices demand that organizations like FFA are vigilant, proactive, and persistent in combatting the threat to the fundamental right of all Americans to cast their votes. The VRAA is vital to alleviating the burden on the right to vote that states, like Georgia, are imposing to disenfranchise their own citizens.

Georgia Congressman John Lewis dedicated his life to uplifting and empowering marginalized groups with a particular emphasis on their right to vote. Congressman Lewis's grit and determination to advance voting rights compelled him to lead what was to have been a non-violent march across the Edmund Pettus Bridge in Selma, Alabama on March 7, 1965. On that bridge John Lewis, then a twenty-five-year-old civil rights activist, was mercilessly beaten by Alabama state troopers and sheriff's deputies. Congressman Lewis bore the scars of that day until his death last year. But those scars and the scars of countless other—often nameless—heroes led to the August 1965 passage of the Voting Rights Act. In the honor and memory of Congressman Lewis and the other brave and heroic fighters who walked with him Fair Fight Action urges passage of the John Lewis Voting Rights Advancement Act.

In the 116th Congress, the United States House of Representatives passed the VRAA. To date, neither the House nor the Senate has introduced the bill in the 117th Congress. There is an urgent and overwhelming need for Congress to modernize the VRA's preclearance formula into the modern era, to reinstate strong federal oversight over discriminatory voting practices, and to strengthen and protect voting rights—for all eligible voters in Georgia and nationwide.

---

[4] Fair Fight Action also supports passage of the For the People Act, H.R. 1, 117th Cong. (as passed by House, Mar. 3, 2021) ("FPA"). While the FPA does not solve all of the problems addressed in this report, the FPA coupled with the VRAA would override many of the voter suppression efforts that are underway across the country.



## SECTION I:

**Historical Background
is Important to Understanding
the Need for Continued Protection
of Access to the Right to Vote**

Source: Yoichi Okamoto/http://www.lbjlibrary.org





## Historical Background Is Important to Understanding the Need for Continued Protection of Access to the Right to Vote.

Georgia's record of voter suppression is as old as the State itself. The earliest version of the State's constitution, adopted in 1777, enshrined the exclusion of Black Georgians from voting.[5] Subsequent constitutions maintained Black disenfranchisement for over eighty years.[6] It was only after Georgia had to accept the registration of Black voters following the Civil War that Black citizens were not expressly and universally excluded from voting under the State's constitution.

During the post-Civil War Reconstruction period, the federal government took steps to rebuild the South and help ensure the rights of newly freed slaves.[7] One of the main components of Reconstruction was the military occupation of the former Confederate States. With the protection of the United States military and passage of the Civil War Amendments (the Thirteenth Amendment (1865), Fourteenth Amendment (1868), and Fifteenth Amendment (1870)), Black men were finally able to— and immediately did—participate actively in the political process. Even in Southern states, Black men exercised their right to vote and hold political office in relatively high numbers.[8] In Louisiana, Mississippi, and South Carolina, Black voter registration surpassed white voter registration.[9] In Georgia and Alabama, Black men totaled almost forty percent of all registered voters and exercised their right to vote in extraordinarily high numbers, exceeding ninety percent in many elections.[10]

---

[5] Expert Report of Dr. Adrienne Jones at 2, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Aug. 15, 2019), ECF No. 92 ("Jones Report") (attached as Exhibit 1). Dr. Jones is an Assistant Professor of Political Science at Morehouse College. She holds a J.D. from  the Univ. of Calif. Berkeley School of Law and a Ph.D. from City Univ. of New York. Fair Fight Action submitted all of the expert witness reports referenced herein in *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391, pending in the United States District Court for the Northern District of Georgia. All of the experts have survived Defendants' *Daubert* challenges.

[6] *Id.*

[7] *See* Barbara Finlay, *The Roots of Voter Fraud in America*, HISTORYNET (Dec. 2016), https://www.historynet.com/the-roots-of-voter-fraud-in-america.htm. Fair Fight Action has attached as exhibits to this report publicly available documents, as well as documents that FFA has collected. For other documents, Fair Fight Action has provided a hyperlink.

[8] U.S. COMM'N ON CIVIL RIGHTS, AN ASSESSMENT OF MINORITY VOTING RIGHTS ACCESS IN THE UNITED STATES 15-16 (2018), https://www.usccr.gov/pubs/2018/Minority_Voting_Access_2018.pdf (specific pages referenced attached as Exhibit 2)..

[9] *Id.* at 16.

[10] *Id.*



Yet, this seeming period of freedom was short-lived as many white people, especially in Southern states, vehemently opposed equality. Following the election of a moderate number of Black candidates to the State legislature and ratification of the Fourteenth Amendment, Georgia was readmitted to the Union in 1868.[11] State actors, however, took numerous, often brutal, steps to maintain a white electorate.[12] Just two months after the State was readmitted, white people forcibly excluded Black officeholders from the State legislature.[13] The Ku Klux Klan organized in the State, and Georgia experienced extreme voting-related violence.[14] Georgia was expelled temporarily from the Union and required to submit to military supervision.[15]

The Hayes-Tilden Compromise, or the Compromise of 1877, ended Reconstruction and the political progress Black people had made. The Republican Party, the party of President Abraham Lincoln, agreed to remove federal troops from the South in exchange for solidifying support for Republican candidate Rutherford B. Hayes as president over Democratic candidate Samuel Tilden.[16] Southern Democrats who, as part of the compromise, committed to protect the civil rights of Black Americans quickly reneged on that promise.

The federal government's abandonment of Black people in the South resulted in Jim Crow, a period of terror lasting nearly 100 years. So-called Jim Crow laws further subjugated and oppressed Black people, despite and in the face of post-Civil War constitutional protections.[17] Besides acts of physical intimidation and violence, Jim Crow laws caused a dramatic decline in the political participation and enfranchisement that Black people experienced during Reconstruction.[18] During Jim Crow, to be Black,

---

[11] Ex. 1, Jones Report at 3.

[12] *Id.* at 3, 15–16.

[13] *Id.* at 3.

[14] *Id.*

[15] *Id.* Two years later, in 1870, the state was readmitted upon re-ratifying the Fourteenth Amendment and ratifying the Fifteenth Amendment. *Id.*

[16] *Compromise of 1877*, HISTORY.COM (Nov. 27, 2019), https://www.history.com/topics/us-presidents/compromise-of-1877; *United States Presidential Election of 1876*, ENCYCLOPEDIA BRITANNICA (Oct. 31, 2020), https://www.britannica.com/event/United-States-presidential-election-of-1876.

[17] Ex. 2, AN ASSESSMENT OF MINORITY VOTING RIGHTS ACCESS IN THE UNITED STATES at 17.

[18] *Id.* at 17-20.



especially in the South, meant living in daily fear, knowing that rights and life itself could be obliterated at the whim of the white "upper caste,"[19] and for an act as benign and innocent as an alleged whistle.[20]

Throughout Jim Crow, Georgia was a leader in voter suppression. "[N]o state was more systematic and thorough in its efforts to deny or limit voting and office holding by African Americans after the Civil War."[21] The State adopted "virtually every one" of the traditional methods used to block Black voters from exercising the franchise, including "literacy and understanding tests, the poll tax, felony disenfranchisement laws, onerous residency requirements, cumbersome registration procedures, voter challenges and purges, the abolition of elective offices, the use of discriminatory redistricting and apportionment schemes, [and] the expulsion of elected Blacks from office."[22] Because election results in Georgia were essentially determined at the primaries, using a whites-only primary effectively excluded Black voters from participating.[23] And Georgia's county unit voting system, which assigned different voting power to urban, town, and rural counties, further devalued the Black vote.[24] Due to these tactics, while fifty-eight Black legislators were seated in the period from Reconstruction through 1907, no Black Georgian won another legislative seat for the next fifty-five years.[25]

Georgia made pronounced efforts to restrict voter registration during the Jim Crow era. In 1908, Georgia enacted a statute that restricted voter registration to (1) people who served in a war on behalf of the United States or the Confederacy, or their descendants (the "grandfather clause"); (2) people of "good character" who understood the duties and obligations of citizenship; (3) people able to read and write a paragraph of the federal or state constitution; or (4) certain property owners.[26] In 1949, after its whites-

[19] *See generally* Isabel Wilkerson, *Caste: The Origins of Our Discontents* 37 (2020) (ebook).

[20] *The Murder of Emmett Till*, PBS, https://www.pbs.org/wgbh/americanexperience/features/till-timeline/.

[21] Ex. 1, Jones Report at 4 (quoting Laughlin McDonald, A VOTING RIGHTS ODYSSEY: BLACK ENFRANCHISEMENT IN GEORGIA 2 (2003)).

[22] *Id.* (quoting McDonald, A VOTING RIGHTS ODYSSEY at 3).

[23] *Id.* at 4, 21. Even after the Supreme Court struck down a Texas whites-only primary, Georgia persisted in its use of a whites-only primary system until it was specifically struck down by a federal court. *Id.* at 22-23. *See also Smith v. Allwright*, 321 U.S. 649 (1944); *King v. Chapman*, 62 F. Supp. 639 (M.D. Ga. 1945).

[24] Ex. 1, Jones Report at 4. The county unit voting system was in effect from 1917 until 1963, when the Supreme Court's interpretation of the "one person, one vote" principle required Georgia to abolish the county unit system. *Id.* at 4-5.

[25] Robert A. Holmes, *Georgia Legislative Black Caucus*, NEW GEORGIA ENCYCLOPEDIA (Feb. 11, 2005), https://www.georgiaencyclopedia.org/articles/government-politics/georgia-legislative-black-caucus.

[26] Expert Report of Dr. Peyton McCrary at 13, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ, (N.D. Ga. Aug. 15, 2019), ECF No. 339 ("McCrary Report") (attached as Exhibit 3). Peyton McCrary is a historian in the Civil Rights



only primary system was struck down, Georgia passed an even more restrictive re-registration law that required all voters to pass a literacy test.[27] And in 1957, following several years of often violent resistance to the Supreme Court's 1954 decision in *Brown v. Board of Education*, 347 U.S. 483 (1954) Georgia made passing the literacy test even harder by increasing the number of correct answers required from ten to twenty.[28] The tests included questions that were "difficult for even the best educated person to answer."[29] Because of the other racially discriminatory policies of the Jim Crow era—including the segregated schools that were the subject of *Brown*—Black voters were substantially disadvantaged. The tests were often unfairly administered by whites with little education themselves.[30]

In 1965, John Lewis was twenty-five years old and had lived under the oppressive thumb of Jim Crow. Yet, he was not deterred from his mission of advancing the opportunity for Black people to exercise their constitutional right to vote. Despite threats from state troopers and sheriff's deputies, John Lewis and 600 other people marched over the Edmund Pettus Bridge in Selma, Alabama.[31] What culminated when Alabama's police force brutally attacked the peaceful protesters is now known as "Bloody Sunday." John Lewis suffered a skull fracture and at least fifty-eight people were hospitalized.[32]

Yet the suffering of John Lewis and those he marched with underwent in order to demand equal access to the ballot was not in vain. The march on the Edmund Pettus Bridge was broadcast around the nation. White Americans in Northern and Western states, who were not familiar with—or were indifferent or even hostile to—the plight and oppression of Black people in the South, were confronted with live coverage exposing the deadly reality of Black people's daily lives. Faced with the realities of the second-class citizenship Southern Black people were forced to endure, President Lyndon B. Johnson acted swiftly on the VRA.

---

Division of the United States Department of Justice and a Professorial Lecturer in Law at George Washington University Law School. He is a leading expert on the preclearance process.

[27] *Id.* at 14.

[28] *Id.*

[29] *Id.* at 15.

[30] *Id.*

[31] National Archives, *John Lewis – March from Selma to Montgomery, 'Bloody Sunday', 1965*, *in* EYEWITNESS: AMERICAN ORIGINALS FROM THE NATIONAL ARCHIVES, https://www.archives.gov/exhibits/eyewitness/html.php?section=2 (last accessed Apr. 2, 2021) (attached as Exhibit 4).

[32] *Id.*



President Johnson signed the VRA into law on August 6, 1965, only five months after Bloody Sunday,[33] stating "it is wrong—deadly wrong—to deny any of your fellow Americans the right to vote in this country."[34] Among the many key provisions of the VRA was Section 5, which imposed a process known as preclearance. Under Section 5, "any change with respect to voting in a covered jurisdiction—or any political subunit within it—cannot legally be enforced unless and until the jurisdiction first obtains the requisite determination by the United States District Court for the District of Columbia or makes a submission to the Attorney General."[35] To obtain approval for any voting change required the covered jurisdiction to prove "the proposed voting change does not deny or abridge the right to vote on account of race, color, or membership in a language minority group."[36] "Covered jurisdictions" for Section 5 preclearance were determined by the preclearance formula. Georgia was subject to preclearance under the coverage formula for the entire time it was in effect, from 1965 until the Supreme Court's 2013 decision in *Shelby County*, which gutted the preclearance process.

Unsurprisingly, given Georgia's long history of state-led voter suppression, Georgia Congressional representatives vehemently opposed the VRA.[37] And, after the VRA was passed, Georgia initially refused to comply. Because the VRA prohibited literacy tests, Georgia state actors turned to at-large election schemes and other systemic changes to dilute Black voters' power.[38] In 1966, for example, the State legislature reduced the number of illiterate voters one person could assist from ten to one.[39] Using the new VRA preclearance scheme, the United States Department of Justice ("DOJ") objected, finding "no valid basis" for the restriction, "particularly in light of the fact that one of the effects of the Voting Rights Act [was] to increase the number of illiterate voters in" Georgia.[40] That Georgia submitted the law for preclearance at all was an aberration: despite adopting hundreds of voting changes between 1965 and

---

[33] Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 445.

[34] *President Johnson's Special Message to Congress: The American Promise*, LBJ PRESIDENTIAL LIBRARY (Mar. 15, 1965), http://www.lbjlibrary.org/lyndon-baines-johnson/speeches-films/president-johnsons-special-message-to-the-congress-the-american-promise.

[35] *About Section 5 of the Voting Rights Act*, U.S. DEP'T JUST. (Sept. 11, 2020), https://www.justice.gov/crt/about-section-5-voting-rights-act (attached as Exhibit 5).

[36] *Id.*; 52 U.S.C. §§ 10301 *et seq*.

[37] Ex. 1, Jones Report at 5.

[38] *Id.* at 6.

[39] Ex. 3, McCrary Report at 17.

[40] Letter from Stephen J. Pollack, Assistant Att'y Gen., C.R. Div., to Arthur K. Bolton, Att'y Gen., State of Georgia (July 11, 1968), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-1010.pdf (attached as Exhibit 6). Georgia attempted to make a similar change again in 1981, and DOJ again objected. Ex. 3, McCrary Report at 17-18.



1968—laws and local procedural changes subject to preclearance under Section 5 of the Act—the State of Georgia and its political subdivisions submitted only one to DOJ for review.[41]

In the years following passage of the VRA, Georgia political leaders sanctioned numerous discriminatory practices that tested the law's application. In the 1970s, courts struck down several at-large systems challenged for creating inequitable access to the franchise.[42] Despite these rulings, Georgia continued to exclude voters of color. Following the 1980 census, Georgia attempted to institute a redistricting plan that would maintain white majority voting strength.[43] DOJ objected, and Georgia sought to overturn that objection. The federal district court reviewing Georgia's application sided with DOJ, finding the plan had a racially discriminatory purpose.[44] The court explicitly found that one of the plan's architects was "a racist."[45] Ultimately, DOJ interposed more than 150 objections to discriminatory voting changes in Georgia from 1968 through 1996.[46]

By the early 2000s, Georgia had undergone a substantial realignment of its party system.[47] Georgia's demographics were also changing; between 1990 and 2016, the State's white population declined from seventy-one to sixty percent.[48] Republicans had achieved control of state government through accelerated movement of whites into the party and—in light of routine support for Democratic candidates by voters of color—had strong incentives to limit voting power for people of color.[49] It was in this context that Georgia state representatives led opposition to the 2006 reauthorization of the VRA.[50] State legislators and other leaders also predictably instituted several new policies and practices that suppressed the vote of people of color.

---

[41] Ex. 1, Jones Report at 6.

[42] *Id.* at 7.

[43] *Id.* at 8.

[44] *Id.* at 8-9.

[45] *Id.* (citing *Busbee v. Smith*, 549 F. Supp. 494, 500 (D.D.C. 1982), *aff'd mem.* 459 U.S. 1166 (1983)).

[46] Voting Determination Letters for Georgia, U.S. Dep't Just. (Aug. 7, 2015), https://www.justice.gov/crt/voting-determination-letters-georgia (attached as Exhibit 7). Ultimately, DOJ objected to more than 170 voting-related changes but withdrew about twenty. Objections lodged after 1996 are discussed further in Section II of this report.

[47] Ex. 3, McCrary Report at 28-30.

[48] *Id.*

[49] *Id.* at 8, 37-38.

[50] Ex. 1, Jones Report at 9-10.



As one example, DOJ historian Dr. Peyton McCrary found that Georgia's current voter registration process bears a "striking resemblance" to Jim Crow policies.[51] Georgia's "methodologically obsolete" Exact Match program[52] is part of the State's flawed implementation of the 2002 Help America Vote Act of 2002, 52 U.S.C. §§ 20901-21145 ("HAVA") requirement that states use electronic database matching to create a voter verification program.[53] Even though HAVA does not require states to deny voter registration to people whose information does not exactly match the information already on file in the State's databases, Georgia's implementation of the HAVA requirement does just that.[54] This regime creates a substantial obstacle to equal access to voting for people of color.[55]

In 2009, when preclearance was still in effect, DOJ objected to the "Exact Match" voter verification program, finding that the "state's process does not produce accurate and reliable information and that thousands of citizens who are in fact eligible to vote under Georgia law have been flagged" as ineligible.[56] The impact of the program fell disproportionately on voters of color. Based on one metric cited by DOJ, voters of color had their registration applications rejected at rates that far exceeded the rejection rates for whites.[57]

Despite the evidence of discrimination, Georgia made only modest reforms to the procedures for implementing the Exact Match policy and moved ahead with seeking preclearance from a federal court in the District of Columbia.[58] Then-Georgia Attorney General Thurbert Baker, one of only four Black Georgians to ever hold a statewide elected office, declined to sue the United States to allow Georgia to implement its Exact Match policy. As a result, then-Governor Sonny Perdue appointed a private

---

[51] Ex. 3, McCrary Report at 7.

[52] Because of the impact of Georgia's Exact Match policy on Georgia's voters, particularly Georgia's voters of color, FFA discusses the policy in several sections throughout this report.

[53] *Id.* at 54.

[54] *Id.* at 56-57.

[55] *Id.* at 7, 54.

[56] *Id.* at 60 (quoting Letter from Loretta King, Acting Assistant Att'y Gen., Civ .Rights. Div., to Thurbert E. Baker, Att'y Gen., State of Georgia (May 29, 2009), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_090529.pdf (attached as Exhibit 8)).

[57] *Id.* at 61-62 (citing Ex. 8, Letter from Loretta King (May 29, 2009)).

[58] *Id.* at 62-63.



Attorney General to bring the suit.[59] Ultimately, DOJ did not pursue an objection to the revised version of the program, and it went into effect.[60]

Suppressive activities only increased after the federal government again abandoned voters of color. In 2013, the United States Supreme Court held in a five-to-four opinion, that the preclearance formula in the VRA was unconstitutional because "Congress did not use . . . a coverage formula grounded in current conditions."[61] In a scathing dissent, Justice Ruth Bader Ginsburg decried the majority's reasoning, famously stating "[t]hrowing out preclearance when it has worked and is continuing to work to stop discriminatory changes is like throwing away your umbrella in a rainstorm because you are not getting wet."[62] After *Shelby County*, Georgia implemented some of the most significant voting restrictions in the country. "The United States Commission on Civil Rights found that, among the states previously subject to preclearance under the VRA, Georgia was the only state that had implemented voting restrictions in every category the Commission examined: imposing strict voter ID requirements; requiring documentary proof of U.S. citizenship; purging voters from registration rolls; cutting early voting; and closing or relocating polling locations."[63]

Following the *Shelby County* decision, the Exact Match program continued essentially untouched until 2016. The Secretary of State's Exact Match program, however, was not codified in state statute or regulation and was never widely publicized.[64] It was only after the National Association for the Advancement of Colored People ("NAACP") sued the State of Georgia in 2016 that the Secretary of State's Exact Match administrative policy directive was laid bare. Ultimately, that case, which is discussed in greater detail in Section II, settled with the Secretary of State's agreement that voter registration applications that failed the Exact Match protocol would be placed in pending, rather than cancelled, status, and that voters would be given an opportunity to cure a mismatch or confirm their identity.[65]

---

[59] *Id.* at 62 (citing Ewa Kochanska, *Georgia Files Lawsuit Against U.S. Justice Department*, ATLANTA EXAMINER (June 23, 2010)). *See also* Shannon McCaffrey, *Georgia Attorney General Thurbert Baker Refuses to File Suit Over Voter Checks,* NORTHWEST GEORGIA NEWS (Apr. 22, 2010), https://www.northwestgeorgianews.com/rome/news/georgia-attorney-general-thurbert-baker-refuses-to-file-suit-over-voter-checks/article_58f3c7ba-727e-5432-af22-dd25152074dc.html

[60] *Id.* at 63; *see also Georgia v. Holder*, 748 F. Supp. 2d 16 (D.D.C. 2010).

[61] *Shelby County*, 570 U.S. at 557.

[62] *Id.* at 590 (Ginsburg, J., dissenting).

[63] *See* Allie Gottlieb, *The Struggle for Voting Rights in Georgia*, THE REGULATORY REVIEW (Jan. 4, 2021), https://www.theregreview.org/2021/01/04/gottlieb-struggle-voting-rights-georgia/ (citing Ex. 2, U.S. COMM'N ON CIVIL RIGHTS, AN ASSESSMENT OF MINORITY VOTING RIGHTS ACCESS IN THE UNITED STATES at 369 (2018)).

[64] Ex. 3, McCrary Report at 64.

[65] Settlement Agreement at 3, *Ga. State Conf. of NAACP v. Kemp*, No. 2:16-cv-00219-WCO (N.D. Ga. Feb. 8, 2017), http://www.projectvote.org/wp-content/uploads/Settlement-Agreement-NAACP-v.-Kemp-2.9.17-1.pdf; Stipulation of



Shortly after the settlement, however, the Georgia legislature adopted a new law that was integrated into the state's voter verification process and which "undermined equitable implementation of the settlement."[66] Despite knowledge of the racially discriminatory effect of Exact Match, the State left its basic procedures in place.[67] Had this program been subject to preclearance, DOJ would likely have determined the program to be objectionable.[68] Additional litigation has challenged the current version of the Exact Match program as implemented by the Secretary of State, and the judiciary has found it likely to impose severe burdens on individuals flagged and placed in pending status due to citizenship status.[69] Litigation challenging the program continues to today. As one expert explains:

> The current pattern has its analogue in the system of voter registration in the Jim Crow era before 1965. The difficulty African Americans faced in dealing with the complexities of the literacy test used by Georgia between 1945 and 1965 – coupled with the continuing racial disparity in income, and education documented by the U.S. Census of 1950 and by [ ] recent Census data . . . – closely resembles the difficulty [] voters [of color] face in dealing with Georgia's voter verification system since 2008.[70]

Georgia's voter registration verification program is but one example of the many ways that the State's unrelenting history of voter suppression impacts Georgia voters today. Jim Crow-esque voter intimidation tactics also are widespread. For example, Georgia counties have deployed police expressly to challenge Black electors' eligibility to vote. Over-policing of voter activities is a tried and true state-sanctioned voter intimidation tactic.[71] In 2015, for instance, the Hancock County Board of Elections and Registration ("BOER") challenged the registrations of  "more than 180 black Sparta citizens—a fifth of

---

Dismissal, *Ga. State Conf. of NAACP v. Kemp*, No. 2:16-cv-00219-WCO (N.D. Ga. Mar. 28, 2017), ECF No. 60 (attached as Exhibit 9); Ex. 3, McCrary Report at 79-80.

[66] Ex. 3, McCrary Report at 80.

[67] *Id.* at 81.

[68] *Id.*

[69] *Id.* at 82-89; *Ga. Coal. for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018).

[70] Ex. 3, McCrary Report at 98-99.

[71] For example, in the 1960s, police regularly arrested Student Nonviolent Coordinating Committee ("SNCC") workers that organized with Southern, majority-Black communities around voter registration. Additionally, when SNCC organized a Freedom Day in October 1963 to encourage Black voter registration, white lawmen refused to allow people to leave the line and return. Emilye Crosby, *The Selma Voting Rights Struggle: 15 Key Points from Bottom-Up History and Why It Matters Today* 5-6, https://www.teachingforchange.org/wp-content/uploads/2015/01/15-Points-The-Selma-Voting-Rights-Struggle.pdf (last visited Apr. 7, 2021).



the city's registered voters—by dispatching deputies with summonses commanding them to appear in person to prove their residence or lose their voting rights."[72] No state law required that law enforcement hand-deliver the documents; rather, the BOER arranged the personal service as a "courtesy" to the white private citizen who had challenged the voters.[73] The move left the targeted electors predictably fearful, and some voters requested to be removed from the roll of registered voters.[74] To date, no other state has executed such an extreme electoral maneuver—precisely the act that, pre-*Shelby County*, would have required approval from DOJ before it could be put into effect.[75]

Law enforcement and other government authorities also engage in overt voter intimidation. On the first day of early voting for Georgia's 2018 midterm elections, Jefferson County officials blocked a bus that Black Voters Matter ("BVM") had chartered to transport forty senior citizens from a community center to the polls.[76] County officials claimed the voter outreach event was "political activity," which is barred at county-sponsored events. As BVM co-founder LaTosha Brown noted, however, the organization is non-partisan and none of the materials on the bus endorsed any particular candidate.[77] Ms. Brown called the incident a clear-cut case of "voter suppression, Southern style."[78] Just over a week later, a state trooper ticketed Cordele City Commissioner Royce Reeves, Sr., a Black man, for parking his

---

[72] Michael Wines, *Critics See Efforts by Counties and Towns to Purge Minority Voters From Rolls*, N.Y. TIMES (July 31, 2016), https://www.nytimes.com/2016/08/01/us/critics-see-efforts-to-purge-minorities-from-voter- rolls-in-new-elections-rules.html.

[73] Compl. for Injunctive and Declaratory Relief ¶ 92, *Ga. State Conf. of NAACP v. Hancock Cnty. Bd. of Elections & Registration*, No. 5:15-cv-00414 (M.D. Ga. Nov. 3, 2015), ECF No. 1 (attached as Exhibit 10). The BOER extended no such courtesy to the Black private citizen who, in an effort to determine whether the BOER had taken a selective approach to voter challenges, challenged 27 mostly non-Black registered voters whom he believed to be ineligible to vote. *Id.* ¶¶ 9, 189.

[74] Michael Wines, *Critics See Efforts by Counties and Towns to Purge Minority Voters From Rolls*, N.Y. TIMES (July 31, 2016), https://www.nytimes.com/2016/08/01/us/critics-see-efforts-to-purge-minorities-from-voter-rolls-in-new-elections-rules.html.

[75] *Id.*

[76] Mark Niesse, *Black Senior Citizens Ordered Off Georgia Bus Taking Them To Vote*, ATLANTA J.-CONST. (Oct. 17, 2018), https://www.ajc.com/news/state--regional-govt--politics/black-senior-citizens-ordered-off-georgia-bus-taking-them-vote/42lZxIGOF1uFo637TEc9jP/.

[77] Kira Lerner, '*This is Live Voter Suppression': Black Voters Matter Blocked from Taking Seniors to Vote*, THINKPROGRESS (Oct. 15, 2018), https://thinkprogress.org/georgia-black-voters-matter-bus-blocked-from-taking-seniors-to-vote-a3c3e6580c5b/.

[78] *Id.* According to Ms. Brown, the intimidation extended to reporting on the suppression efforts as well—because the chairman of the Jefferson County Board of Commissioners owns the only local furniture store, the individuals involved in the incident feared retaliation and "not a single senior wanted to speak on the record to the media about what happened." Anjali Enjeti, *Voter Intimidation Is a Real Threat to the 2020 Race*, ZORA (Sept. 19, 2019), https://zora.medium.com/voter-intimidation-is-a-real-threat-to-the-2020-race-80ea56b4a108.



limousine on the wrong side of the road while waiting to take voters to the polls.[79] Although he immediately agreed to move his car, eight more law enforcement vehicles arrived at the scene within minutes.[80]

Georgia counties also deploy law enforcement to intimidate voters and move polling locations to police precincts. In 2016, the Board of Elections in Macon-Bibb County tried to move a polling location whose voters were ninety percent Black to the local police precinct.[81] Local advocates collected signatures from twenty percent of active, registered voters in the county to successfully stop the move.[82] During a 2019 municipal election, the Clayton County Board of Elections moved the sole polling location for the City of Jonesboro, where Black individuals make up sixty percent of the population, to the local police station.[83] In a letter demanding reconsideration of the decision, the Georgia ACLU wrote, "Forcing voters to cast their ballots under the steely gaze of armed law enforcement officers all but amounts to government-sponsored voter intimidation."[84] A letter from local civil rights organizations highlighted the strained relationship between Black Jonesboro citizens and the local police department, which has faced allegations of police brutality and mistreatment for years and enforces a citywide ordinance declaring sagging pants an act of "disorderly conduct."[85] As Kristen Clarke, currently on leave from her position as

---

[79] Charles Bethea, *Are Police Targeting Get-Out-the-Vote Efforts in Georgia?*, NEW YORKER (Nov. 1, 2018), https://www.newyorker.com/news/dispatch/are-police-targeting-get-outthe-vote-efforts-in-georgia.

[80] *Id.*

[81] Letter from the Georgia State Conf. of the NAACP, Georgia Coal. for the Peoples' Agenda and the Lawyers' Comm. for Civ. Rights Under Law to Jeanetta Watson, Macon-Bibb Cnty. Bd. of Elections Supervisor, and Reginald B. McClendon, Assistant Cnty. Att'y (Apr. 13, 2016), https://lawyerscommittee.org/wp-content/uploads/2016/04/Objection-to-Sheriffs-Office-Polling-Location.4.13.16.pdf.

[82] Stanley Dunlap, *Macon-Bibb Polling Location OK'd After Sheriff's Precinct Nixed*, TELEGRAPH (May 16, 2016), http://www.macon.com/news/local/article77920442.html.

[83] Letter from the Georgia Coal. for the Peoples' Agenda, Georgia State Conf. of the NAACP, New Georgia Project and the Lawyers' Comm. for Civ. Rights Under Law to Alfred Dixon, Mayor Pro Tem of the City of Jonesboro, Shauna Dozier, Clayton Cnty. Dir. of Elections, and Members of the Jonesboro City Council and Clayton Cnty. Bd. of Elections and Registrations (Oct. 7, 2019), https://assets.documentcloud.org/documents/6463506/Objection-to-Change-of-Poll-Location-10-7-19.pdf.

[84] Letter from Aklima Khondoker et al., ACLU of Georgia, to Shauna Dozier, Dir. of Elections, and Members of the Clayton Cnty. Bd. of Elections and Registration (Oct. 8, 2019), https://www.acluga.org/sites/default/files/field_documents/clayco_letter.pdf.

[85] Letter from the Georgia Coal. for the Peoples' Agenda, Georgia State Conf. of the NAACP, New Georgia Project and the Lawyers' Comm. for Civ. Rights Under Law to Alfred Dixon, Mayor Pro Tem of the City of Jonesboro, Shauna Dozier, Clayton Cnty. Dir. of Elections, and Members of the Jonesboro City Council and Clayton Cnty. Bd. of Elections and Registrations (Oct. 7, 2019), https://assets.documentcloud.org/documents/6463506/Objection-to-Change-of-Poll-Location-10-7-19.pdf.



President and Executive Director of Lawyers' Committee for Civil Rights Under the Law, noted, "The police department is far from the kind of neutral location where all people would feel free to vote."[86]

In 1982, Congress revised Section 2 of the VRA in response to the Supreme Court's decision in *City of Mobile v. Bolden*,[87] in which the Court held that proof of a Section 2 violation required evidence of a discriminatory intent or purpose. The 1982 revision clarified that only discriminatory effect—and not intent or purpose—was required.[88] The Report of the Senate Judiciary Committee that accompanied the legislation listed circumstances that might indicate a Section 2 violation. These circumstances included "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise participate in the democratic process."[89] Another circumstance was "[t]he extent to which the jurisdiction's minorities are discriminated against in socioeconomic areas, such as education, employment, and health."[90] The events outlined above underscore a shameful catalogue of official discrimination, one that leads inexorably to the conclusion, explored in the next section of this Report, that the coverage formula in the VRAA will reach the State of Georgia.

Georgia's pattern of state-sanctioned voter suppression is further evidenced by attempts to punish efforts to increase Black turnout with high-profile investigations and aggressive prosecutions for non-criminal behavior. In 2010 and 2011, a dozen individuals, including three elected officials, were arrested for alleged voter fraud in a Brooks County school board election, an election that saw increased Black absentee voter turnout.[91] In a highly publicized investigation, the District Attorney brought 120 felony charges against the individuals and conducted a four-year investigation, despite a lack of evidence to

---

[86] Michael Harriot, *White City Council in Majority Black City Quietly Moves Only Voting Location to Police Station*, THE ROOT (Oct. 8, 2019), https://www.theroot.com/white-city-council-in-majority-black-city-quietly-moves-1838888108.

[87] 446 U.S. 55 (1980).

[88] Voting Rights Act 1982, Amendments, Pub. L. No. 97-205, 96 Stat. 131.

[89] S. Rep. No. 97-417 at 28–29 (1982). *See also Thornburg v. Gingles*, 478 U.S. 30, 36-37 (1986).

[90] S. Rep. No. 97-417 at 28-29 (1982).

[91] Jon Ward, *How a Criminal Investigation in Georgia Set an Ominous Tone for African-American Voters*, YAHOO NEWS (Aug. 6, 2019), https://news.yahoo.com/how-a-criminal-investigation-in-georgia-set-a-dark-tone-for-african-american-voters-090000532.html ("Yahoo Quitman"); *A Georgia Voter Fraud Prosecution and Voter Suppression*, EQUAL JUST. INITIATIVE (Aug. 16, 2019), https://eji.org/news/georgia-voter-fraud-prosecution-ploy-suppress-Black-votes/ ("EJI Quitman"); Ariel Hart, *Voting Case Mirrors National Struggle*, ATLANTA J.-CONST. (Dec. 13, 2014), https://www.ajc.com/news/state--regional-govt--politics/voting-case-mirrors-national-struggle/seFGcSydGzV2IxD6DcyiVK/ ("AJI Quitman"); Spencer Woodman, *Top Georgia Officials Are Going After Black Leaders who Organized Voters*, VICE (July 15, 2014), https://www.vice.com/en/article/av4nzb/the-quitman-10-2-and-voter-suppression-in-modern-georgia-715 ("Vice Quitman").

**SECTION I:   HISTORY OF VOTER SUPPRESSION**

support the charges and despite that the alleged conduct did not clearly violate the law. The charges did not result in any guilty verdicts.[92]

Brooks County has a history of racial violence and resistance to racial equality. The Equal Justice Initiative found that the county had the third-highest number of lynchings in Georgia between 1877 and 1950.[93] White families in the county resisted the desegregation of schools in the 1950s, leading to many white students being sent to all-white private schools. Today, the effects of discrimination remain and are still seen in the public schools, where the students are majority Black, despite Black people being a minority in the county.[94]

Over several elections between 2009 and 2010, three Black women were elected to seats on the seven-member Brooks County school board, leading to the first-ever Black majority on the board.[95] The candidates had sought to increase Black voter turnout and organized an absentee ballot effort after a 2005 law made absentee ballots more widely available.[96] The 2010 primary alone saw four times the number of absentee ballots ever voted in the county[97] and three times as many Black voters as each of the previous two midterm elections.[98]

As noted above, in 2010, the State arrested twelve individuals (three elected official and nine political allies), who became known as the "Quitman 10+2." Almost a year later, and despite a lack of proof or any clear basis in the text or intent of the law, the District Attorney charged the individuals with 120 felonies for voter fraud, carrying at least twenty years in prison for each individual.[99] The Quitman 10+2 were accused of "unlawful possession of ballots" and "interfering with an elector," although their actions were completely legal and the State lack any justification for filing charges.[100] For instance, "some

---

[92] Id.

[93] EJI Quitman, https://eji.org/news/georgia-voter-fraud-prosecution-ploy-suppress-Black-votes/.

[94] Yahoo Quitman, https://news.yahoo.com/how-a-criminal-investigation-in-georgia-set-a-dark-tone-for-african-american-voters-090000532.html.

[95] Id.

[96] EJI Quitman, https://eji.org/news/georgia-voter-fraud-prosecution-ploy-suppress-Black-votes/.

[97] Vice Quitman, https://www.vice.com/en/article/av4nzb/the-quitman-10-2-and-voter-suppression-in-modern-georgia-715.

[98] EJI Quitman, https://eji.org/news/georgia-voter-fraud-prosecution-ploy-suppress-Black-votes/.

[99] Id.

[100] Yahoo Quitman, https://news.yahoo.com/how-a-criminal-investigation-in-georgia-set-a-dark-tone-for-african-american-voters-090000532.html.



voters told investigators they received assistance in filling out their ballot, but most said they were simply given help to vote the way they wanted. . . . Prosecutors also charged the defendants with taking unlawful possession of ballots when they delivered sealed ballots to the post office for others, including family members, even though the law clearly states that it is legal to deliver a ballot for a family member."[101]

This investigation became widely publicized and the individuals were portrayed as criminals in local and national media. Mug shots were displayed on newspaper front pages and broadcast on both local TV and Fox News.[102] Many were harassed, and some lost their jobs.[103]

Only one individual, who was an active campaign volunteer and the sister of one of the elected women, was ever brought to trial. After two mistrials, she was acquitted of all nineteen counts in 2014.[104] Three months later, all remaining charges against the Quitman 10+2 were dropped.[105] Still, the State Election Board refused to close the case and indicated that it might recommend more criminal proceedings,[106] until the State Attorney General provided guidance clarifying that mailing absentee ballots on behalf of others was not against the law.[107]

Years later, one of the Quitman 10+2 suggested that the incident caused members of the Black community, and particularly older people, to be so intimidated they have avoided voting since 2010.[108]

---

[101] EJI Quitman, https://eji.org/news/georgia-voter-fraud-prosecution-ploy-suppress-Black-votes/.

[102] *Id.*

[103] *Field Hearing on Voting Rights and Election Administration in Georgia before Subcomm. on Elections of the Comm. on House Admin. of the House of Representatives*, 106th Cong. 12 (Feb. 19, 2019) (statement of Stacey Abrams, CEO and Founder, Fair Fight Action), https://www.govinfo.gov/content/pkg/CHRG-116hhrg37653/html/CHRG-116hhrg37653.htm (attached as Exhibit 11).

[104] Yahoo Quitman, https://news.yahoo.com/how-a-criminal-investigation-in-georgia-set-a-dark-tone-for-african-american-voters-090000532.html.

[105] *Id.*; see also Adam Floyd, *'Quitman 11' Charges Dropped*, VALDOSTA DAILY TIMES (Jan. 8, 2015), https://www.valdostadailytimes.com/news/local_news/quitman-11-charges-dropped/article_951d07fe-97b0-11e4-b1c7-6f4e16c25190.html.

[106] Yahoo Quitman, https://news.yahoo.com/how-a-criminal-investigation-in-georgia-set-a-dark-tone-for-african-american-voters-090000532.html.

[107] The Mere Possession of Another's Absentee Ballot Does Not Constitute Unlawful Possession of an Absentee Ballot Under Either O.C.G.A. § 21-2-385(a) or § 21-2-574, Op. Georgia Att'y Gen. 2016-2 (June 15, 2016), https://law.georgia.gov/opinions/2016-2 (attached as Exhibit 12).

[108] Yahoo Quitman, https://news.yahoo.com/how-a-criminal-investigation-in-georgia-set-a-dark-tone-for-african-american-voters-090000532.html.



Indeed, *Yahoo News* found a dip in Black participation rates since 2010, although voting rates overall remain higher than in pre-2010 elections.[109]

The Georgia legislature will, similarly, continue to do everything it can to stop voters of color from having a voice. In March 2021, driven by unsupported and false allegations of mass voter fraud, and over the objections of election officials, advocates, and voters, Georgia's governor signed S.B. 202 into law. S.B. 202 is a sweeping omnibus law of restrictive voting provisions, that, among other measures, provides unlimited challenges to other voters' eligibility to vote and creates criminal penalties for providing free food and water to voters standing in line.[110] Providing food and water to voters in line, or line warming, is especially important in a state where voters in counties with high numbers of people of color have had to suffer standing in lines for up to ten hours—in the sweltering heat or pouring rain—with no seating or protection from weather—to exercise their constitutionally protected right to vote.[111]

Similar to the removal of federal troops from the South after the Hayes-Tilden Compromise, which ended Reconstruction and ushered in 100 years of domestic terror on Southern Black people, the *Shelby County* decision's gutting of Section 5 has left voters of color in states like Georgia with weak federal protection from state-sponsored voter suppression, discrimination, and disenfranchisement. Yet, one thing is clear: those suppressive and discriminatory tactics never disappeared; rather, without the oversight of the federal government, they are back in full force. Just as Jim Crow laws further subjugated and oppressed Black people, so too these new election laws overwhelmingly affect people of color. The new laws leave Georgia's voters subject to the whims of their so-called political leaders who have demonstrated they will implement no shortage of oppressive tactics to retain political power within a quickly changing demographic. "Politics is a zero-sum game,"[112] and some Georgia politicians are trying to win that "game" by cheating. Rather than convincing the electorate of the merits of their policies and their ability to lead, these politicians have unconstitutionally stacked the deck against Georgia's voters of color, who, historically have not supported their politics.

---

[109] *Id.*

[110] 2021 Ga. Laws Act 9 ("S.B. 202") § 33 (attached as Exhibit 13).

[111] Anastasia Tsioulcas, *Georgia Voters Face Hours-Long Lines At Polls On First Day Of Early Voting*, NPR (Oct. 12, 2020), https://www.npr.org/2020/10/12/923090987/georgia-voters-face-hours-long-lines-at-polls-on-first-day-of-early-voting; Sam Levine, *More Than 10-Hour Wait and Long Lines as Early Voting Starts in Georgia*, THE GUARDIAN (Oct. 12, 2020), https://www.theguardian.com/us-news/2020/oct/13/more-than-10-hour-wait-and-long-lines-as-early-voting-starts-in-georgia.

[112] Jane C. Timm, *In Supreme Court, GOP Attorney Defends Voting Restrictions by Saying they Help Republicans Win*, NBC NEWS (Mar. 2, 2021, 1:21 p.m. EST), https://www.nbcnews.com/politics/elections/supreme-court-gop-attorney-defends-voting-restrictions-saying-they-help-n1259305 (quoting Michael Carvin, counsel for Petitioners Arizona Republican Party, in oral argument before the Supreme Court of the United States in a case challenging restrictive voting laws in Arizona as violating Section 2 of the VRA. *Arizona Republican Party v. Democratic Nat'l Comm.*, No. 19-1258 (Mar. 2, 2021)).



And the discrimination does not stop at voting. Not all incidents of racial animus are as sensational as the criminal charges brought in Brooks County, but the incidents are compelling and serve as vivid evidence of the discrimination that Georgia must still confront. In Cobb County, for example, there have been several recent allegations of racism in the School District. As described in a piece by the local National Public Radio outlet, "In March 2017, a student at North Cobb High School posted a racist rant on social media, threatening to kill Black students.[113] In November 2017, a teacher at South Cobb High School reportedly threatened to hang Black students if they did not stop talking.[114] Both incidents prompted protests and despite parents and students calling for a dialogue on race, the Cobb County School Board failed even to pass a proposed Resolution to Condemn Racism."[115] In another incident, reports surfaced in 2018 that Geye Hamby, the white Buford City School Board superintendent for over a decade, had been recorded making racist rants, which included statements such as: "(expletive) that (n-word). I'll kill these (expletive)—shoot that (expletive) if they let me."[116] The statements attributed to Hamby were publicly released in 2018 when offered into evidence in a race discrimination lawsuit against Hamby and the school system and Hamby resigned.[117] In yet another example, the Douglas County Commission Chairman Tom Worthan, who had spent five years as a commissioner and an additional two years as the Chairman, had been recorded making racist comments about Black candidates and leaders. Worthan reportedly stated that governments run by Black individuals "bankrupt you," and that if Black Sheriff's candidate Tim Pounds were elected, "he would put a bunch of blacks in leadership positions" and "I'd be afraid he'd put his black brothers in positions that maybe they're not qualified to be in."[118]

---

[113] Martha Dalton, *Group Asks Cobb School Board to Address Racism Concerns, Equity in Schools*, WABE (Sept. 3, 2019) https://www.wabe.org/group-asks-cobb-school-board-to-address-racism-equity-in-schools/.

[114] *Id.*

[115] Larry Felton Johnson, *Democratic School Board Nominees Release Resolution Condemning Racism*, COBB CNTY. COURIER (Sept. 29, 2020), https://cobbcountycourier.com/2020/09/democratic-school-board-nominees-condemning-racism/.

[116] Bill Rankin, *Exclusive: Buford Schools Superintendent Recorded in Racist Rant, Lawsuit Says*, ATLANTA J.-CONST (Aug. 21, 2018), https://www.ajc.com/news/local/lawsuit-buford-schools-superintendent-recorded-racist-rant/xywRl237UbhMvGUO4EBunN/.

[117] Isabel Hughes, *Lawsuit: Former Buford Superintendent Geye Hamby led district by 'Fear and Intimidation'*, Gwinnett Daily Post (Jan. 6, 2019), https://www.gwinnettdailypost.com/local/lawsuit-former-buford-superintendent-geye-hamby-led-district-by-fear-and-intimidation/article_2c295c0b-e2e8-556f-b62f-fbdfa80a3a22.html; *see also* Complaint *Ingram v. Buford City School District*, 1:18-cv-03103-ELR (N.D. Ga. June 27, 2018), ECF No. 1 (linking to recording) (attached as Exhibit 14).

[118] Ernie Suggs, *Douglas Leader's Racial Comments Spark Calls that He Resign*, ATLANTA J.-CONST. (Nov. 8, 2016), https://www.ajc.com/news/local/douglas-leader-racial-comments-spark-calls-that-resign/AVjoe8BDCXLsut6OBPjIHI/.



**SECTION 5 KEEP IT ALIVE**

Source: Richard Ellis/Getty Images

**SECTION II:**

If the Senate Adopts the House Formula, Georgia Will Again be Subject to Preclearance



FAIR FIGHT ACTION



## If the Senate Adopts the House formula,
## Georgia will Again be Subject to Preclearance.

The rolling coverage formula the House passed in the 116th Congress recognizes that voters are at particular risk of disenfranchisement in jurisdictions where there have been a large number of recent voting rights violations. It is therefore no surprise that Georgia more than meets the statewide coverage thresholds. Critically, the fact that Fair Fight Action analyzes Georgia history against the provisions of the House-passed bill unequivocally does not constitute an acknowledgement that the current version is the only acceptable coverage formula. The formula may evolve as the legislation progresses toward passage. Fair Fight Action simply uses the current version, shaped to address multiple violations over a specific period of years, as a logical framework for a preclearance structure.

The current rolling coverage formula requires statewide preclearance in two circumstances: if, in the previous twenty-five calendar years, (1) there have been at least fifteen "voting rights violations" in the state, or (2) there have been at least ten "voting rights violations" in the state and one violation was committed by the state itself.[119]

The coverage formula requires reliable and recent evidence, and the VRAA is very specific about what qualifies as sufficient evidence. "Voting rights violations" arise in two circumstances: (1) the preclearance process; and (2) litigation. For purposes of the Act, "voting rights violations" are narrowly defined as (i) DOJ preclearance objections (that have not been withdrawn or overturned) or denials of declaratory judgments seeking preclearance; (ii) final judicial findings (not reversed on appeal) that the right to vote was denied or abridged "on account of race, color, or membership in a language minority group" in violation of the Fourteenth or Fifteenth Amendment, or in violation of the VRA; or (iii) settlements of constitutional or VRA-based voter discrimination claims that result in a change to the challenged practice.[120]

A.    <u>Georgia's Recent History Qualifies the State for Preclearance Coverage.</u>

Georgia's long and well-documented record of voting rights violations has not spared modern voters. In the past twenty-five years, practices that deny or abridge the right to vote because of race, color, or membership in a language minority group have been proposed or enacted at the local, county, and

---

[119] VRAA § 3(b)(1). Jurisdictions that have not engaged in discriminatory practices can file a declaratory judgment action seeking to "bail out" from coverage. *See id.* § 3(b)(2)(B); 52 U.S.C. § 10303. Of course, as the legislation proceeds toward passage, the number of years may decrease, the breadth of qualifying violations may grow, and Congress may consider different approaches. Fair Fight Action's report chronicling Georgia's dreadful history of preventing voters of color easy access to the polls is relevant to and supportive of any structure Congress may adopt.

[120] VRAA § 3(b)(3).



state levels. Federal courts, the Attorney General, and private litigants have been forced to step in to protect Georgia voters against these abuses. Despite this evidence, in 2013, when the Supreme Court in *Shelby County* invalidated the preclearance coverage formula, Chief Justice John Roberts ignored that deep racial disparities still existed and found that because preclearance was effective in reversing disenfranchisement, the county no longer needed preclearance.[121]

A review of publicly available records and preclearance activities demonstrates that Georgia readily meets the requirements under either part of the VRAA's coverage formula, with over fifteen identifiable qualifying "voting rights violations" in the past twenty-five years, and with several violations committed by the State of Georgia itself. Since 1996, the relevant look back period under the VRAA, there have been at least twelve DOJ objections to voting changes in Georgia; at least two final judgments finding a violation of the VRA due to a discriminatory voting practice in Georgia; and at least seven settlements resulting in Georgia or one of its counties changing a discriminatory voting practice. This record more than meets the substantial thresholds in the VRAA.[122]

- **DOJ Preclearance Objections.**

Even with no preclearance requests made in the eight years since the *Shelby County* decision, DOJ's objections over the preceding seventeen years alone would meet the coverage formula. In the past twenty-five years, DOJ has lodged objections to at least twelve voting changes, including two against the State.

The two recent objections interposed directly against the State of Georgia both arose in the five years preceding *Shelby County*. In both cases, DOJ found that Georgia had attempted to implement new laws that would have a retrogressive and disproportionate impact on voters of color. Most recently, in 2012, Georgia submitted for preclearance an amendment to the Georgia election code that required all nonpartisan elections for members of consolidated governments to be held in conjunction with the July primary, rather than in November. DOJ objected, finding the change would impact Augusta-Richmond County, in which Black voters had just become a majority.[123] Because Black voters were less likely to vote

---

[121] 570 U.S. at 551.

[122] This report does not endeavor to identify each and every settlement or unreported case that resulted in a "voting rights violation" as defined in the House version of the legislation. It is clear, however, that Georgia's record triggers the coverage formula—despite the high number of violations required and the strict parameters for the evidence that counts.

[123] Letter from Thomas Perez, Ass't Att'y Gen., to Dennis R. Dunn, Deputy Att'y Gen., State of Georgia (Dec. 21, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_121221_0.pdf (attached as Exhibit 16). After *Shelby County,* the legislature further moved the election from July to May. A group of plaintiffs sued under Section 5 of the VRA, arguing that DOJ's objection blocked changes to the election date. The court disagreed, finding that the objection was unenforceable as a result of *Shelby County. See Howard v. August-Richmond County*, 1:14cv-00097, 2014 WL 12810317, at *3 (S.D. Ga. May 13, 2014). The court did not, however, overturn the objection or rule on its underlying merits. *See id.*



in July, DOJ determined the effect of the change was to depress turnout for voters of color and further, the State had not sustained its burden of showing a lack of discriminatory purpose or effect.[124]

Three years earlier, in 2009, DOJ lodged an objection to a version of Georgia's voter verification program, discussed in greater detail in Section II of this report. DOJ found that the "seriously flawed" program, which improperly removed voters from the rolls, disproportionately affected voters of color.[125] DOJ made this finding based on the "actual results of the state's verification process" because Georgia had violated Section 5 of the VRA by not seeking preclearance before implementing the program.[126]

DOJ has also blocked county and city-level changes with a discriminatory effect, purpose, or both. In the past twenty-five years, DOJ has objected to seven redistricting plans that reduced the number of majority-minority districts or eliminated them altogether or otherwise decreased opportunity for voters of color to elect their candidates of choice.[127] For example, in 2012, Long County submitted

---

[124] Ex. 16, Letter from Thomas Perez, Ass't Att'y Gen., to Dennis R. Dunn, Deputy Att'y Gen., State of Georgia (Dec. 21, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_121221_0.pdf.

[125] Ex. 8, Letter from Loretta King (May 29, 2009), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_090529.pdf.

[126] *Id.*; *see also Morales v. Handel*, No. 1:08-cv-03172, 2008 WL 9401054, at *8 (N.D. Ga. Oct. 27, 2008) (finding the voter verification program was a change affecting voting and issuing an injunction because the Secretary of State had not submitted it under Section 5 of the VRA as required). After DOJ denied preclearance, Georgia brought a declaratory judgment action seeking to overturn DOJ's objection. Before the court ruled on the merits, Georgia revised the program and DOJ stated that it would not object to the revised version. *See Georgia v. Holder*, 748 F. Supp. 2d 16, 18 (D.D.C. 2010).

[127] Letter from Thomas E. Perez, Ass't Att'y Gen., to Andrew S. Johnson, Esq. & B. Jay Swindell, Esq. (Aug. 27, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_120827.pdf (attached as Exhibit 17) (objecting to Long County redistricting plan); Letter from Thomas E. Perez , Ass't Att'y Gen., to Michael S. Green, Esq., Patrick O Dollar, Esq. & Cory O. Kirby, Esq. (Apr. 13, 2012), https://www.justice.gov/sites/default/ files/crt/legacy/2014/05/30/l_120413.pdf (attached as Exhibit 18) (objecting to Greene County's redistricting plan because it eliminated two districts in which voters of color had an ability to elect their candidates of choice); Letter from Thomas Perez, Ass't Att'y Gen. to Walter G. Elliot, Esq. (Nov. 30, 2009), https://www.justice.gov/sites/default/files/ crt/legacy/2014/05/30/l_091130.pdf (attached as Exhibit 19) (objecting to Lowndes County redistricting plan that added two single-member districts, resulting in a change from minority voters having the ability to elect a candidate of choice in one out of three districts to one out of five districts); Letter from Ralph T. Boyd, Jr., Ass't Att'y Gen., to Wayne Jernigan, Esq., Phillip L. Hartley, Esq. & Cory O. Kirby, Esq. (Oct. 15, 2002), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2690.pdf (attached as Exhibit 20) (objecting to Marion County School District plan that reduced the number of districts in which Black voters had the ability to elect candidates of choice); Letter from J. Michael Wiggins, Acting Ass't Att'y Gen., to Robert T. Prior, Esq. (Aug. 9, 2002), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_020809.pdf (attached as Exhibit 21) (objecting to Putnam County redistricting plans reduced from the benchmark the number of districts with majority Black voting populations); Letter from J. Michael Wiggins, Acting Ass't Att'y Gen., to Al Grieshaber, Jr., Esq. (Sept. 23, 2002), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2680.pdf (attached as Exhibit 22) (objecting to City of Albany's redistricting plan for the city board of commissioners, finding it forestalled the creation of a majority Black district without justification); Letter from Bill Lann Lee, Acting Ass't Att'y Gen., Civ. Rights Div., to James M. Skipper, Jr., Esq. (Jan. 11, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2630.pdf (attached as Exhibit 23)



for preclearance a new districting plan for its boards of commissioners and education. The proposed plan decreased Black voters' overall opportunity to elect a candidate of their choice to either of the two five-member boards—although the total Black population in the county had increased from 21.6 to 25.5 percent—because the proposed plan reduced the voting power of Black persons in that district.[128]

DOJ also objected to two changes to election methods that would have added numbered posts and majority vote requirements.[129] As DOJ pointed out, "[n]umbered posts frustrate single-shot voting . . . a method used by Black voters to circumvent the refusal of white voters to support candidates that the minority community supports."[130] In one case, involving the City of Ashburn, DOJ relied on historical evidence because Ashburn had implemented numbered posts without seeking DOJ preclearance. DOJ observed that under the old system, by finishing in third place in a citywide election where the top three vote-getters gain office, a Black candidate would have been elected; however, under the numbered posts system, the same Black candidate lost because he was not the single top vote-getter for the specific numbered post he sought.[131]

Finally, in a "highly unusual" case, DOJ objected to modification of a specific Black voter's registration and candidate eligibility. The voter was the Chair of the Randolph County Board of Education. Despite a judicial ruling to the contrary, the county proposed moving that individual from a district where seventy percent of voters were Black to a district where seventy percent of voters were

---

(objecting to Webster County redistricting plan because it reduced the population of people of color in three majority Black single-member districts).

[128] Ex. 17, Letter from Thomas E. Perez, Ass't Att'y Gen., to Andrew S. Johnson, Esq. & B. Jay Swindell, Esq. (Aug. 27, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_120827.pdf.

[129] Letter from Lann Lee, Acting Ass't Att'y Gen., Civ. Rights Div., to Melvin P. Kopecky, Esq. (Mar. 17, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2640.pdf (attached as Exhibit 24); Letter from Ralph F. Boyd, Jr., Ass't Att'y Gen., Civ. Rights Div., to Tommy Colemen, Esq. (Oct. 1, 2001), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2650.pdf (attached as Exhibit 25). Numbered posts is a voting method in which a multi-winner election (for example, several open city council seats)—instead of those seats being filled by the number of candidates needed who obtain the highest number of votes—is made into single-winner elections in which each seat is "numbered," the candidates run for a particular seat, and the voters are allowed to vote for each seat. Because Black voters are often in the minority, changing the election to numbered posts decreases the likelihood that the candidate that Black voters want can win any of the seats.

[130] Ex. 25, Letter from Ralph F. Boyd, Jr., Ass't Att'y Gen., Civ. Rights Div., to Tommy Colemen, Esq. (Oct. 1, 2001), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2650.pdf.

[131] *Id.*

white.[132] DOJ found that the change was directed at "disturb[ing] an incumbent officeholder" and denied preclearance.[133]

- <u>Litigation Judgments and Settlements.</u>

Consistent with the substantial number of DOJ objections to Georgia's discriminatory voting changes, the past twenty-five years have also seen a steady stream of litigation asserting voting rights violations committed by Georgia state and local actors. Courts in at least nine cases have ruled Georgia and/or its political subdivisions engaged in "voting rights violations" that meet the exacting definitions that appear in the House version of the VRAA.

Despite the high standards applied to voter discrimination claims, at least two cases have resulted in a final judgment that a practice within the State of Georgia violated the VRA. In a 2018 ruling, a federal court found that Sumter County's redrawn school board district map, which reduced the number of single-member districts and added two new at-large districts, violated Section 2.[134] The plaintiff claimed the new map diluted the voting strength of Black voters. The court agreed, finding that the "infringement of black voters' right to vote in Sumter County is severe."[135] The court specifically found there was a "glaring lack of success for African American candidates running for county-wide office, both historically and recently, despite their plurality in voting-age population."[136] And the low rate of Black turnout was attributable to the indisputable history of discrimination in Sumter County and in Georgia.[137] A court made a similar finding in 1997 after a bench trial on claims challenging the City of LaGrange's at-large city council district plan. Noting that LaGrange and Georgia had a long history of discrimination, the court found the plan violated Section 2 of the VRA because it deprived citizens of color of the opportunity to elect candidates of their choice.[138]

---

[132] Letter from Wan J. Kim, Ass't Att'y Gen., to Tommy Coleman, Esq. (Sept. 12, 2006), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2700.pdf (attached as Exhibit 26).

[133] *Id.*

[134] *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297 (M.D. Ga. 2018), *aff'd* 979 F.3d 1282 (11th Cir. 2020).

[135] Permanent Injunction Order, *Wright v. Sumter Cnty. Bd. of Elections and Registration*, No. 1:14-cv-00042-WLS, 2018 WL 7365178, at *3 (M.D. Ga. Mar. 30, 2018) (attached as Exhibit 27).

[136] *Wright*, 301 F. Supp. at 1324.

[137] *Id.*

[138] *Cofield v. City of LaGrange*, 969 F. Supp. 749 (N.D. Ga. 1997).



At least seven other lawsuits asserting discriminatory voting practices have ended with agreements that have caused the defendants to abandon or alter the challenged voting practice. And at least two have been against the State of Georgia itself. First, in 2016, a group of plaintiffs sued challenging the Secretary of State's administrative policy directive that required cancellation of voter registration applications due to the State's Exact Match policy. The plaintiffs alleged that the matching protocol resulted in a far higher voter registration cancellation rate for Black applicants than it did for white applicants.[139] Similar discriminatory effects were apparent in comparing citizen verification rates for other communities of color with those of whites.[140] The plaintiffs moved for a preliminary injunction, but before the hearing the Secretary of State agreed to interim relief. Ultimately, the case settled with the Secretary of State's agreement that voter registration applications that failed the Exact Match protocol would be placed in pending, rather than cancelled, status, and that voters would have an opportunity to cure the mismatch or confirm their identity.[141]

In a 2018 case, faced with undeniable proof of discriminatory impact, the Secretary of State again agreed to settle prior to judgment. There, a group of plaintiffs challenged application of a Georgia state law that restricted who could be a language interpreter in state and local elections. The plaintiffs alleged that the law violated the First and Fourteenth Amendments, and Sections 2 and 208 of the VRA. The matter resolved within days, after the defendants agreed to a settlement that permanently enjoined enforcement of the law.[142]

At least five additional cases involving constitutional and VRA Section 2 challenges to Georgia counties' practices have resulted in similar changes. Three involved changes to voting power for people of color through movement to at-large elections or via a discriminatory redistricting plan:

- In 1999, residents of Marion County sued challenging the at-large elections for the Marion County Commission. Black citizens made up over forty percent of the total population of the county, but had never succeeded in electing a candidate of their choice to the three-member commission. After DOJ filed a similar action, the cases were consolidated, and the parties settled. The court entered a consent order finding the plaintiffs had demonstrated a likelihood of success on their claim that the plan diluted the voter strength of people of color.

---

[139] Ex. 3, McCrary Report at 77–78.

[140] *Id.*

[141] Settlement Agreement, *Ga. State Conf. of NAACP*, No. 1:16-cv-00219-WCO (N.D. Ga. Feb. 8, 2017), http://www.projectvote.org/wp-content/uploads/Settlement-Agreement-NAACP-v.-Kemp-2.9.17-1.pdf; Ex. 3, McCrary Report at 79-80.

[142] *See* Complaint, *Kwon v. Crittenden*, No. 1:18-cv-05405-TCB (N.D. Ga. Nov. 27, 2018), ECF No. 1 (attached as Exhibit 28); *see also* Consent Order, *Kwon*, No. 1:18-05405-TCB (N.D. Ga. Nov. 29, 2018), ECF No. 7 (attached as Exhibit 29).

FAIR FIGHT ACTION

**SECTION II:    VOTING RIGHTS VIOLATIONS**

As part of the settlement, the parties agreed to a new plan that would contain three single-member districts, one of which was majority Black.[143]

- In 2011, plaintiffs challenged Fayette County's at-large method of electing boards of commissioners and education. Each board comprised five at-large seats. Plaintiffs claimed that the at-large system effectively meant that no Black candidates would be elected to either board and violated Section 2 of the VRA.[144] The parties settled before trial.[145] The settlement discarded the five at-large seats and replaced them with four seats elected from single-member districts and one at-large seat.[146]

- In 2016, plaintiffs challenged the Emanuel County districting plan for school board elections. Plaintiffs alleged that the plan violated Section 2 of the VRA. On December 8, 2016, the parties informed the court of their agreement to resolve the matter and that Emanuel County would be redrawing its map, including creating two majority-minority single-member districts.[147]

Two additional cases involved improper challenges to voters' registration or ability to vote. Both cases implicated Georgia's provisions that allow citizens to call any other voter's eligibility into question.[148] If the Board of Registrars concludes there is probable cause for a challenge to a voter's

---

[143] *Marion County, Georgia to Change its Method of Election in an Agreement with the Justice Department*, DEP'T OF JUST. (June 6, 2000), https://www.justice.gov/archive/opa/pr/2000/June/320cr.htm (describing terms of settlement) (attached as Exhibit 30).

[144] Consent Order, *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, No. 11-cv-00123-TCB (N.D. Ga. Jan. 28, 2016), ECF No. 289 (attached as Exhibit 31); *see also Fayette Settlement Key Points*, LDF, https://naacpldf.org/document/fayette-settlement-key-points.

[145] The District Court found a Section 2 violation on summary judgment, but the Eleventh Circuit later vacated that judgment, requiring the lower court to conduct a bench trial. *Ga. State Conf. of NAACP v. Fayette Co. Bd. of Comm'rs*, 775 F.3d 1336 (11th Cir. 2015).

[146] Ex. 31, Consent Order, *Ga. State Conf. of NAACP*, No. 11-cv-00123-TCB (N.D. Ga. Jan. 28, 2016), ECF No. 289.

[147] Fourth Consent Motion to Stay Proceedings, *Ga. State Conf. of NAACP v. Emanuel Cnty. Bd. of Comm'rs*, No. 16-cv-00021-JRH-GRS (S.D. Ga. Dec. 8, 2016), ECF No. 37 (attached as Exhibit 32); Order on Stipulation of Dismissal, *Ga. State Conf. of NAACP v. Emanuel Cnty. Bd. of Comm'rs*, No. 16-cv-00021-JRH-GRS (S.D. Ga. May 16, 2017), ECF No. 40 (attached as Exhibit 33).

[148] Two provisions of the Georgia Code provide for voter challenges: O.C.G.A. § 21-2-229 (attached as Exhibit 34), which permits any elector in a given county to bring a pre-election challenge to a fellow elector at any time to strike them from the rolls, and O.C.G.A. § 21-2-230 (attached as Exhibit 35), which permits any elector to challenge the right of another elector to vote in a particular election. Georgia's recent legislation provides that there is no limit on how many challenges any one individual can bring and requires a hearing on a challenge under § 21-2-229 to take place within ten days of serving notice of the challenge. *See* Ex. 13, 2021 Ga. Laws Act 9 (S.B. 202) §§ 15–16. In other words, "[l]awful voters targeted by



eligibility in a particular election, the registrars notify the poll workers at the challenged voter's precinct of the voter's challenged status. When the voter arrives to cast a ballot, the poll workers will inform the voter of the voter's status and the voter will have the opportunity to prove eligibility to the Board.[149] This "opportunity" involves either conducting a hearing on Election Day before polls close—forcing the voter to wait to cast her ballot until the resolution of the dispute—or allowing the voter to cast a "challenged" ballot, which will be subject to invalidation if the Board concludes that the voter is ineligible.[150]

Although the challenge provisions may appear to serve a legitimate function in the abstract, the provisions have frequently been used to harass and suppress voters—particularly voters of color—and jeopardize their valid registrations. In one case, DOJ sued Long County, alleging the county forced forty-five non-white voters whose right to vote had been challenged on citizenship grounds, to attend a hearing and provide proof of eligibility to vote, even though there was no evidence calling into questions their citizenship.[151] The district court ultimately entered a Consent Decree that required the county to re-train their election officials and notify the challenged voters there was no evidence to support the challenge and they could vote.[152]

Abuses of the challenge process have continued apace. In 2015, the Hancock County Board of Elections and Registration relied on the challenge procedures to systematically challenge roughly twenty percent of the County's electorate. This process was ultimately blocked by litigation, but not before substantial damage was done.

According to the Complaint, then-BOER Vice Chairwoman Nancy Stephens, a white resident of the seventy-one percent Black Hancock County, filed voter challenges as a private citizen.[153] Using access she had as a BOER member, Stephens compared voters' registration addresses with the address on voters'

---

indiscriminate challenges will now be forced to quickly arrange to defend their qualifications before a government board or risk disenfranchisement and removal from the registration rolls." *New Georgia Project v. Raffensperger*, No. 1:21-cv-01229-JPB, 2021 WL 1158043 (N.D. Ga. Mar. 25, 2021).

[149] Ex. 35, O.C.G.A. § 21-2-230(c).

[150] *Id.* § 21-2-230(h)–(i).

[151] *See* Consent Decree, *United States v. Long County*, No. 06-cv-00040-AAA (S.D. Ga. Feb. 10, 2006), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/long_cd.pdf (attached as Exhibit 36).

[152] *Id.*

[153] Ex. 10, Complaint at 14, *Ga. State Conf. of NAACP v. Hancock Cnty. Bd. Of Elections and Registration*, No. 5:15-cv-00414-CAR (M.D. Ga. Nov. 3, 2015) ECF No. 1.



drivers' licenses to identify potential mismatches.[154] At a BOER meeting, Stephens presented a list of the (all Black) voters she was challenging, and also presented a second list of challenged voters.[155] When the BOER held a special meeting to consider the sixteen challenges, Stephens made and seconded motions for probable cause on her own challenges, and voted for probable cause on all sixteen.[156] The BOER found probable cause for five of the challenges and scheduled a second meeting to consider cancelling those five voters' registrations.[157] Then, after concerns were raised about the propriety of Stephens filing challenges, a private citizen, Don Bevill, took up the mantle.[158] While most of Bevill's challenges failed for a clear lack of substantiating evidence, he did remove thirty voters from the rolls.[159]

The voters placed on these challenged lists were severely burdened, intimidated, and too often wrongfully purged from the voter rolls. First, the BOER partnered with the Hancock County Sheriff's office to issue summonses to challenged voters, even sending deputies to voters' homes.[160] In a county with much higher arrest rates for Black residents than white residents, using police was an overt show of force, and Black voters perceived it as such.[161] Moreover, Hancock County is one of the poorest counties in the State, with an average per capita income of $16,704.[162] Many of the challenged voters lived outside

---

[154] *Id.* at 14.

[155] *Id.*

[156] *Id.* at 15.

[157] *Id.*

[158] Bevill's challenges bore a striking resemblance to Stephens's challenges. *Id.* at 2. Bevill brought roughly 119 challenges against registered voters, the vast majority of them Black. *Id.* at 16. At the hearings, Bevill presented little to no evidence to substantiate his suspicions that these voters were ineligible. *Id.* at 17-18. Nonetheless, three BOER members voted to find probable cause in several of these challenges, over the objections of both Black BOER members. *Id.* at 18.

[159] *Id.* at 18, 22, 23.

[160] Neima Abdulahi, *Ga. County Under Microscope, Accused of Suppressing Black Votes*, 11 ALIVE (Aug. 5, 2016), https://www.11alive.com/article/news/politics/elections/ga-county-under-microscope-accused-of-suppressing-black-votes/85-288453664.

[161] Michael Wines, *Critics See Efforts by Counties and Towns to Purge Minority Voters from Rolls*, N.Y. TIMES (July 31, 2016), https://www.nytimes.com/2016/08/01/us/critics-see-efforts-to-purge-minorities-from-voter-rolls-in-new-elections-rules.html?smid=url-share.

[162] *QuickFacts: Hancock County, Georgia*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/hancockcountygeorgia/PST040219 (last visited Apr. 8, 2021) (attached as Exhibit 37).



the city and could not afford to miss work to attend the hearing, much less secure legal advice.[163] One challenged voter, Johnny Thornton, was a former agent of the U.S. Drug Enforcement Agency who lived on a catfish farm twenty minutes outside the town of Sparta—the address at which he worked, resided, and received his bills, and which is displayed on his driver's license.[164] Thornton was able to hire an attorney, who informed the BOER that Thornton was unavailable to attend the hearing. The BOER purged him from the rolls anyway.[165] Another challenged voter, Troy Harden, attended the hearing to ensure that he was not purged from the rolls. Once Harden insisted that he was an eligible voter, the BOER determined that the driver record the BOER used to determine probable cause to remove Harden was actually a record for an unrelated voter.[166] Had Harden not attended, the BOER may well have persisted in its error.

Hancock County's application of these voter challenges was by no means racially neutral. One concerned citizen, Larry Webb, who is Black, learned of Bevill's challenges and took it upon himself to raise similar challenges to white Hancock residents. Whereas the BOER had worked closely with Bevill to provide him access to voters' registration information and drivers' license addresses, and to the Election Superintendent and Hancock County Sheriff's Department, the same BOER members proved obstructionist with Webb's complaints, repeatedly adding procedural hurdles and refusing to consider his challenges.[167]

Ultimately, a group of plaintiffs brought claims under, among other things, the Fourteenth Amendment, Section 2 of the VRA, and the National Voter Registration Act of 1993, 52 U.S.C. §§ 20501-20511 ("NVRA"). After years of litigation, a federal court entered a Consent Decree enjoining the BOER's actions.[168] The Consent Decree prohibited the BOER from engaging in discriminatory

---

[163] Michael Wines, *Critics See Efforts by Counties and Towns to Purge Minority Voters from Rolls*, N.Y. TIMES (July 31, 2016), https://www.nytimes.com/2016/08/01/us/critics-see-efforts-to-purge-minorities-from-voter-rolls-in-new-elections-rules.html?smid=url-share.

[164] *Id.*

[165] *Id.*

[166] Ex. 10, Complaint at 24, *Ga. State Conf. of NAACP v. Hancock Cnty. Bd. Of Elections and Registration*, No. 5:15-cv-00414-CAR (M.D. Ga. Nov. 3, 2015) ECF No. 1 at 24.

[167] *Id.*

[168] Avery Braxton, *Lawsuit Now Mandates Monitoring of Hancock County Elections*, 13WMAZ (Oct. 31, 2018), https://www.13wmaz.com/article/news/local/lawsuit-now-mandates-monitoring-of-hancock-county-elections/93-609769958; *see also* Order on Joint Motion for Entry of Consent Order, *Ga. State Conf. of NAACP*, No. 5:15-cv-00414-CAR (M.D. Ga. Mar. 30, 2018), ECF No. 71 (attached as Exhibit 38).



challenges and required strict adherence to specific procedures going forward.[169] The Consent Decree also required the BOER to submit to judicial oversight, including allowing an examiner to review the BOER's list maintenance and voter challenge processes.[170] The court retained jurisdiction for at least five years to resolve any issues arising from the BOER's actions or the independent examiner's recommendations.[171] But as one editorial noted, "[i]t shouldn't take a federal lawsuit for election officials to see it's a bad idea to send sheriff's deputies knocking on doors while determining whether registered voters are eligible."[172]

The problems with voter challenges did not end with Hancock County or that litigation. In the 2020 election cycle, private organizations took advantage of Georgia's voter-challenge law to harass voters—with the approval of Georgia officials. These organizations heeded President Trump's unfounded, disingenuous, and dangerous invocations of voter fraud to challenge voters en masse. After a historic Presidential Election with record voter turnout among people of color, True the Vote, a Texas-based nonprofit (and outgrowth of the Tea Party movement) that claims to combat voter fraud,[173] trained its sights on Georgia. In December 2020, True the Vote announced that the group had "partnered" with Georgians across all counties to challenge voters in the run-up to the January 2021 U.S. Senate runoff elections—elections that would decide which party would control the Senate.[174] True the Vote systematically challenged the eligibility of hundreds of thousands of Georgia voters, relying not on individualized circumstances, but rather on the U.S. Postal Service's National Change of Address ("NCOA") registry, which is known to be inaccurate.[175] Not content to merely file these challenges and let the process run as intended, True the Vote also established "voter integrity" hotlines, recruited poll watchers, and established a $1 million reward for successful reports of "election malfeasance."[176]

---

[169] Ex. 38, Order on Joint Motion for Entry of Consent Order at 3-4, *Ga. State Conf. of NAACP*, No. 5:15-cv-00414-CAR (M.D. Ga. Mar. 30, 2018), ECF No. 71.

[170] *Id.*

[171] *Id.*

[172] *Editorial: Voting Rights in Hancock County Still Hard-Fought*, SAVANNAH NOW (Mar. 11, 2017, 9:07 p.m.), https://www.savannahnow.com/opinion/editorial/2017-03-11/editorial-voting-rights-hancock-county-still-hard-fought.

[173] Suevon Lee, *A Reading Guide to True the Vote, the Controversial Voter Fraud Watchdog*, PROPUBLICA (Sept. 27, 2012), https://www.propublica.org/article/a-reading-guide-to-true-the-vote-the-controversial-voter-fraud-watchdog.

[174] *True the Vote Partners with Georgians in Every County to Preemptively Challenge 364,541 Potentially Ineligible Voters*, TRUE THE VOTE (Dec. 18, 2020), https://truethevote.org/true-the-vote-partners-with-georgians-in-every-county-to-preemptively-challenge-364541-potentially-ineligible-voters/.

[175] First Amended Complaint for Declaratory and Injunctive Relief at 2-3, *Fair Fight Inc. v. True the Vote, Inc.*, No. 2:20-cv-00302-SCJ (N.D. Ga. Mar. 22, 2021), ECF No. 73 (attached as Exhibit 39).

[176] *Id.*



Moreover, True the Vote members threatened that "[i]f the Georgia counties refuse[d] to handle the challenges of 366,000 ineligible voters in accordance with the law," they would "release the entire list" to the public.[177]

True the Vote's efforts were sanctioned by high-ranking Georgia officials. In December 2020, True the Vote announced that it had partnered with the Georgia Republican Party ahead of the runoffs.[178] Secretary of State Brad Raffensperger explicitly endorsed True the Vote's tactics, saying that "the Elector Challenge is a vehicle under our law to ensure voter integrity. I support any effort that builds faith in our election system that follows the proper legal procedure."[179] And in one county, Muscogee County, the Chair of the County Republican Party himself submitted a mass challenge against over 4,000 Muscogee voters.[180] While many counties rejected True the Vote's mass challenges, finding that the organization's method of identifying purportedly ineligible voters was unreliable, some counties permitted the challenges to proceed.[181] Ben Hill County's Board of Elections voted 2-1 to find the challenges regarding 152 voters supported by probable cause and moved the voters into "pending hearing" status, which forced them to vote provisional ballots.[182] Muscogee's Board of Elections voted 3-1 to find probable cause for the approximately 4,000 challenged voters (exempting only overseas voters).[183]

Declarations of voters submitted in court show that many of these voters were challenged in error:

---

[177] *Fair Fight, Inc. v. True the Vote, Inc.,* No. 2:20-cv-302-SCJ (N.D. Ga. Dec. 29, 2020), ECF No. 11-3 (attached as Exhibit 40)..

[178] Bill Barrow, *GOP Activist's Voter Challenges Raise Questions in Georgia,* ASSOCIATED PRESS (Dec. 22, 2020), https://apnews.com/article/georgia-elections-political-organizations-voter-registration-atlanta-3a8989df44c323ce798e0a5d34eb9876.

[179] *True the Vote Partners with Georgians in Every County to Preemptively Challenge 364,541 Potentially Ineligible Voters,* TRUE THE VOTE (Dec. 18, 2020), https://truethevote.org/true-the-vote-partners-with-georgians-in-every-county-to-preemptively-challenge-364541-potentially-ineligible-voters/.

[180] *See* Pls.' Mem. of Law in Supp. of Mot. for Temporary Restraining Order at 6, *Majority Forward v. Ben Hill Cnty. Bd. of Elections,* No. 1:20-cv-0026-LAG (M.D. Ga. Dec. 27, 2020), ECF No. 5-1 (attached as Exhibit 41).

[181] *Id.*; *see also* Ex. 39, First Amended Complaint for Declaratory and Injunctive Relief at 18, *Fair Fight, Inc. v. True the Vote, Inc.,* No. 2:20-cv-00302-SCJ (N.D. Ga. Mar. 22, 2021), ECF No. 73.

[182] Ex. 41, Pls.' Mem. of Law in Supp. of Mot. for Temporary Restraining Order at 11, *Majority Forward,* No. 1:20-cv-00266 (M.D. Ga. Dec. 27, 2020), ECF No. 5-1.

[183] *Id.* at 11–12.



- Nakeitha Essix, a Muscogee resident, has been registered at her home since 2011.[184] While on a trip to Colorado, she lost her wallet. To get a replacement debit card sent to her in Colorado, Nakeitha changed her mailing address to her location in Colorado.[185] Because of this temporary change, she could cast only a provisional ballot, as her eligibility had been challenged.[186] She was told that someone would call her to cure her ballot, but as of her declaration, no one had contacted her with further information.[187] As Ms. Essix put it, "[i]t cannot be that I lose my right to vote in Georgia by simply misplacing my wallet."[188]

- Gamaliel Warren Turner, Sr., a Black veteran and contractor with the U.S. Navy, was dispatched to California in late 2019.[189] To keep receiving his mail while on temporary work assignment, he submitted a temporary change of address.[190] He did not register to vote in California nor did he notify Georgia of any intent to change his citizenship to California.[191] Mr. Turner owned his home in Columbus, Georgia, at all relevant times, continued paying utilities while in California, and retained his Georgia driver's license.[192] He did, however, ask that his Georgia ballot be mailed to his California address.[193] When his ballot did not arrive, he inquired and learned that he was a challenged voter—no one provided him any

---

[184] Declaration of Nakeitha Essix, *Majority Forward*, No. 1:20-cv-00266 (M.D. Ga. Dec. 27, 2020), ECF No. 5-6 (attached as Exhibit 42). Ms. Essix's Declaration, along with those of Mr. Turner and Ms. Lewis, were publicly filed in the *Majority Forward* case and are therefore provided here without redaction.

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] *Id.*

[189] Declaration of Gamaliel Warren Turner, Sr., *Majority Forward.*, No. 1:20-cv-00266 (M.D. Ga. Dec. 27, 2020), ECF No. 5-4 (attached as Exhibit 43).

[190] *Id.*

[191] *Id.*

[192] *Id.*

[193] *Id.*



information on the steps he had to take to rebut the challenge.[194] As of December 24, 2020, he had not yet received his absentee ballot for the January 5, 2021 Senate runoff election.[195]

- Debra Lewis, a Ben Hill County resident has been registered in Georgia since she turned 18. In 2018 and 2019, Ms. Lewis began to travel regularly between her permanent residence in Georgia and Missouri, where her boyfriend lived. In 2019, she temporarily changed her mailing address to Missouri "to save [her] friends the trouble of forwarding [her] mail while [she] was away." She never planned to remain in Missouri and did not register to vote there or otherwise indicate a desire to change her residency. She maintained her Georgia driver's license and continued to pay utilities at her Georgia residence. In October 2020, she changed her mailing address back to her Georgia permanent residence. When Ms. Lewis attempted to vote in person on December 28, 2020, she was told that she was not allowed to vote that day and, instead, would need to attend a hearing on election day to prove her residency. She did not have time to do so. As Ms. Lewis put it, "It seems like there must have been a mistake for my name to end up on a list of challenged voters."[196]

These efforts not only constitute blatant partisan manipulation, but also reflect state-sanctioned voter intimidation—even when unsuccessful in actually disenfranchising voters. True the Vote publicized the challenged voters' names and addresses in December 2020—at the very same time that supporters of President Trump were issuing death threats to Georgia election officials.[197] Other voters expressed fears of being targeted, threatened, or doxxed.[198] Voter challenges exert a severe chilling effect on voters' willingness and ability to vote. These effects are more pronounced on voters of color, given not only their

---

[194] *Id.*

[195] *Id.*

[196] Declaration of Debra Lewis, *Majority Forward*, No. 1:20-cv-00266 (M.D. Ga. Dec. 29, 2020), ECF No. 21 (attached as Exhibit 44).

[197] Amy Gardner & Keith Newell, '*Someone's Going to Get Killed': GOP Election Official in Georgia Blames President Trump for Fostering Violent Threats*, WASH. POST (Dec. 1, 2020), https://www.washingtonpost.com/politics/georgia-official-trump-election/2020/12/01/f1d5c962-3427-11eb-b59c-adb7153d10c2_story.html; Sean Keenan, *An Atlanta Election Worker Is in Hiding After a Claim that He Tossed a Ballot. His Boss Says the Claim Is False*, N.Y. TIMES (Nov. 6, 2020), https://nyti.ms/3p7oNDe.

[198] Declaration of [Redacted], *Fair Fight, Inc. v. True the Vote, Inc.*, No. 2:20-cv-302-SCJ (N.D. Ga. Jan. 1, 2021), ECF No. 26 (attached as Exhibit 45); Declaration of [Redacted] #2, *Fair Fight, Inc. v. True the Vote, Inc.*, No. 2:20-cv-302-SCJ (N.D. Ga. Jan. 1, 2021), ECF No. 26 (attached as Exhibit 46).



disproportionate targeting, but also their histories with police and with state-sanctioned disenfranchisement.[199]

- <u>Additional Evidence Demonstrates that Georgia Remains Rife with Voting Rights Abuses.</u>

Besides evidence of improper challenges, there are numerous examples of voting rights abuses that do not meet the VRAA's narrow evidentiary standards, but nonetheless demonstrate Georgia's extensive recent history of voting rights violations. Several recent cases have resulted in preliminary injunctions against challenged practices.[200] Although those recent cases may not have resulted in a qualifying "final judgment" or settlement agreement under the VRAA, the issuance of a preliminary injunction means that courts found it likely that the defendants committed a voting rights violation.[201] That Georgia continues to engage in discriminatory voting rights practices and these practices continue to be the subject of meritorious lawsuits, further confirms that Georgia will continue to be a hotbed of voting rights violations—and that future violations will continue to feed into the rolling coverage formula for years to come.

Highlighting election officials' indifference to voting rights is a recent policy regarding absentee ballot rejections. The State initially allowed eligible voters' absentee ballots to be rejected with no way to remedy the rejection. Only after federal courts intervened to protect voters' rights did the State reform its absentee ballot procedures to provide safeguards to ensure that valid absentee ballots were counted.

Broadly speaking, Georgia used the same absentee ballot verification scheme from 2007 to 2018. One federal judge explained the verification process as involving: (1) a voter would submit an absentee ballot application through mail, fax, email, or in-person, any time between 180 days before the election and the Friday before the election; (2) the county registrar or absentee ballot clerk would determine whether the individual requesting the ballot was eligible to vote by comparing their identifying

---

[199] *See* Michael Wines, *Critics See Efforts by Counties and Towns to Purge Minority Voters from Rolls*, N.Y. TIMES (July 31, 2016), https://www.nytimes.com/2016/08/01/us/critics-see-efforts-to-purge-minorities-from-voter-rolls-in-new-elections-rules.html.

[200] There were several examples in the 2018 election cycle alone. *See, e.g.*, *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) (issuing preliminary injunction against rejection of absentee ballots without notice and an opportunity to cure); *Ga. Coal. for the People's Agenda*, 347 F. Supp. 3d at 1251 (issuing preliminary injunction requiring individuals placed in pending registration status due to citizenship questions to vote a regular ballot by furnishing proof of citizenship); *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga. 2018) (issuing preliminary injunction requiring counties to count absentee ballots with incorrect birthdates).

[201] There also are a number of pending cases that raise constitutional and VRA claims related to statewide and systemic voting rights abuses and have yet to be decided. Among these are Fair Fight Action's challenge to the systemic maladministration of Georgia's elections, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga.).



information and signature to the information and signature on record, and deny the application if there was not a match; (3) the voter would complete the absentee ballot, including signing the oath of the elector and filling in other information on the oath envelope about the voter's identity; and (4) county officials would once again review the signature and identifying information to determine whether to accept the ballot.[202]

This process was rife with pitfalls for voters. Voters' ballot applications or ballots could be rejected if a county official determined that the voter's signature did not match the signature on file, or if the voter forgot to write their year of birth (or mistakenly put the current year instead of their year of birth) on the absentee ballot envelope. Although a voter could request another absentee ballot or vote in person even once an absentee ballot was rejected, those "remedies" were not always possible, and voters experienced hurdles in curing their ballots. Below are just a few examples of problems voters faced in trying to vote absentee in 2018.

- In 2018, seventy-two-year-old voter Dinesh requested an absentee ballot so he would not have to stand in a long line to vote. He returned his ballot in person to a county employee and waited while the employee matched his signature against the signature on file. That employee told Dinesh he did not need to do anything more to make his ballot count. But on November 8, 2018, he learned that his absentee ballot had been rejected for missing his year of birth—and that nothing could be done to correct the error. He was told his vote was not counted.[203]

- Thires learned that his absentee ballot had been rejected due to writing the current year instead of year of birth on the ballot. The county never informed him of a problem with the ballot or provided a mechanism to cure the error. As Thires put it, "I am incredulous that my vote could be rejected for something as simple as a wrong birth year on an absentee ballot if all the other information and signature match my voter registration information."[204]

---

[202] See Martin, 341 F. Supp. 3d at 1329-30; O.C.G.A. §§ 21-2-381 (attached as Exhibit 47), 21-2-384 (attached as Exhibit 48), 21-2-386 (attached as Exhibit 49) (2018).  The appended exhibits include changes adopted in 2019 via H.B. 316.

[203] Declaration of Dinesh [last name redacted] ¶ 3 (attached as Exhibit 50). Over the years, Fair Fight Action has collected thousands of declarations from people who contacted Fair Fight Action, describing long lines, poorly trained poll workers, missing absentee ballots, purged voter registrations without the voter receiving notice, and inaccurate voter registration records that threatened a voter's ability to vote. The stories express, in voters' own words, their sadness, frustration, and anger that their home state would trample their most fundamental right. But, besides the anger, the stories also present triumph and show the lengths to which many voters have gone to vote. Fair Fight Action shares these stories so you can visualize how Georgia's decisions post-Shelby County have had real-life effects on people's lives and right to vote. With the exception of declarations of voters who have spoken publicly, the declarations FFA has collected and now submits with this report are redacted to protect the declarants' privacy. Some declarations appear more than once in the report.

[204] Declaration of Thires [last name redacted] ¶¶ 4–6 (attached as Exhibit 51).



- Vicki helped her eighty-seven-year-old mother, who is blind, with the absentee ballot process. Vicki's mother is committed to voting and had never had a ballot rejected before, but was told that her ballot had been rejected for the November 2018 General Election due to signature mismatch. Vicki and her mother received inconsistent information about whether the ballot had been counted.[205]

For the November 2018 General Election, multiple voter protection groups sounded the alarm that certain counties—most notably Gwinnett County, the second-largest county in Georgia—may have been disproportionately rejecting absentee ballots, and that absentee ballot rejections appeared to be disproportionately affecting voters of color.[206] The data supported the groups' concerns. Per an analysis of absentee ballot rejection data across the 100 Georgia counties that reported any rejected absentee ballots, Black voters were more likely than white voters to have their absentee ballots rejected in seventy percent of those counties.[207]

After voters and voting rights organizations filed suit to protest the absentee ballot rejection process, federal courts ultimately acted to ensure eligible Georgia absentee voters would have their ballots counted for the November 2018 General Election. In *Martin v. Kemp*, U.S. District Court Judge Leigh Martin May first held that the plaintiffs had established a likelihood of success on a claim that the statutory scheme described above violated constitutional due process protections given the absence of a procedure for curing a signature mismatch issue for rejected absentee ballots or applications.[208] The State already had a structure in place for allowing voters to "cure" the validity of provisional ballots, so the burden on the State would be minimal—and the importance of allowing "all eligible voters" to vote outweighed any additional burdens on the State.[209]

---

[205] Declaration of Vicki [last name redacted] ¶¶ 4–8 (attached as Exhibit 52).

[206] *See* Curt Devine & Drew Griffin, *Georgia County Tosses Out Hundreds of Minority Absentee Ballots*, CNN POLITICS (Oct. 21, 2018), https://www.cnn.com/2018/10/20/politics/gwinnett-county-absentee-ballots; Mark Niesse & Tyler Estep, *High Rate of Absentee Ballots Thrown Out in Gwinnett*, ATLANTA J.-CONST. (Oct. 16, 2018), https://www.ajc.com/news/state--regional-govt--politics/high-rate-absentee-ballots-thrown-out-gwinnett/azdOsCxX2X6mT8PTrgZlJI/.

[207] *See* Expert Rebuttal Report of Daniel A. Smith at 22-23, *Fair Fight Action Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (March 4, 2020), ECF No. 259 (attached as Exhibit 53).

[208] *See Martin*, 341 F. Supp. 3d at 1337–41 (N.D. Ga. 2018).

[209] *See id.*; *see also Martin v. Kemp*, Nos. 18-cv-4776-LMM, 2018 WL 10509482 (N.D. Ga. Oct. 25, 2018) (entering terms of preliminary injunction); *Ga. Muslim Voter Project v. Kemp*, Nos. 18-14502-GG, 18-14503-GG, 2018 WL 7822108 (11th Cir. Nov. 2, 2018) (denying stay pending appeal); *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019) (opinions related to Eleventh Circuit's denial of stay of preliminary injunction). Judge May also issued an opinion after this opinion denying a motion for preliminary injunction on additional statewide relief relating to absentee ballots. *See* Permanent Injunction Order, *Martin v. Kemp*, No. 18-cv-04776-LMM (N.D. Ga. Nov. 2, 2018), ECF No. 41 at *3–5 (attached as Exhibit 54).



After Judge May's decision addressing rejections for signature mismatch, the problems continued regarding rejection for date of birth issues. Then, on November 12, 2018, the Secretary of State issued an Official Election Bulletin to counties to the effect that Georgia law did not mandate the automatic rejection of any ballot lacking the voter's place or date of birth, but did not instruct counties they must accept ballots with such immaterial inaccuracies or omissions.[210] One State Election Board Member vigorously objected, noting that the Bulletin cited advice from the Georgia Attorney General but "completely omit[ted]" guidance from the Georgia Attorney General to the effect that federal law, in that Board Member's words, "prohibits rejection of a ballot when the omitted information is immaterial."[211]

Shortly after that bulletin was issued, Judge May granted a temporary restraining order against Gwinnett County because county officials were rejecting absentee ballots solely due to omitted or erroneous birth years.[212] There, the court held that the plaintiffs had established a likelihood of success on the merits of their argument that the rejection of an absentee ballot based solely on a missing or inaccurate birth year violated Section 10101(a)(2)(B) of the Civil Rights Act, which "forbids the practice of disqualifying voters 'because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting.'"[213] The court also determined that a voter's "ability to correctly recite his or her year of birth on the absentee ballot envelope is not material to determining said voter's qualifications under Georgia law"—especially since county officials would have already confirmed the voter's eligibility to vote during the absentee ballot application process.[214] Judge May observed that the Georgia Supreme Court had already explicitly recognized that Georgia law "does not mandate the automatic rejection of any absentee ballot lacking the elector's place and/or date of birth," and that other counties did not require voters to provide their years of birth to have their ballots accepted.[215] As in the

---

[210] Official Election Bulletin (Nov. 12, 2018), *Martin v. Kemp*, No. 1:18-cv-04776-LMM, ECF No. 54 at 15-16 (attached as Exhibit 55).

[211] *See* Email from David Worley to Jansen Head, et al. (Nov. 13, 2018), State-Defendants-00018630 (attached as Exhibit 56).

[212] *See Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) This is the same case number as *Martin v. Kemp*. The name of the lead defendant changed because now-Governor Kemp resigned his office as Secretary of State following the election.

[213] *Id.* at 1308 (quoting 52 U.S.C. § 10101(a)(2)(B)).

[214] *Id.* at 1308-09.

[215] *See id.* at 1309 (quoting *Jones v. Jessup*, 279 Ga. 531, 533 n.5 (2005)).

earlier *Martin* decision, Judge May recognized that "the public interest is best served by allowing qualified absentee voters to vote and have their votes counted."[216]

Despite Judge May's order enjoining Gwinnett County from rejecting absentee ballots for missing or incorrect dates of birth (when a voter's eligibility had already been determined), Georgia statewide officials did not immediately act to ensure that other counties did not reject ballots on similar immaterial grounds. The same State Election Board Member who had objected to the original Official Election Bulletin discussed above reiterated his concerns in the wake of Judge May's order, asking the Secretary of State to issue new guidance based on the order that counties were required under federal law to accept ballots with immaterial errors or omissions in the date of birth.[217] The Secretary of State declined to issue that clarification, deciding "not [to] take any action until we see what the Court orders" in other pending statewide litigation.[218]

In that other pending litigation, *Democratic Party of Georgia, Inc. v. Crittenden*, U.S. District Judge Steve C. Jones rectified the problem on a statewide basis for the November 2018 General Election. The court granted a preliminary injunction enjoining the Georgia Secretary of State "from certifying the State Election results until she ha[s] confirmed that each county's returns include the counts for absentee ballots where the birthdate was omitted or incorrect."[219] In the opinion, Judge Jones specifically noted the court's "concern[]" about "Secretary Crittenden's discretionary instructions to county officials . . . concerning the verification of absentee mail-in ballots," observing that "[w]hile Gwinnett County is now under one instruction from Judge May to count absentee mail-in ballots that contain a birth year error or omission, the other 158 counties in Georgia have been given the impression that they have the complete discretion to either count such ballots or reject them entirely."[220] Judge Jones, following the rationale in Judge May's decision, determined the plaintiffs had shown a likelihood of success on the argument that rejecting absentee ballots for missing or incomplete dates of birth violated Section 10101(a)(2)(B) of the Civil Rights Act.[221]

---

[216] *Id.* at 1310-11.

[217] *See* Email from David Worley to Jansen Head, et al. (Nov. 13, 2018), State-Defendants-00018634 (attached as Exhibit 57).

[218] *See* Email from Robyn Crittenden to David Worley, et al. (Nov. 14, 2018), State-Defendants-00988362 (attached as Exhibit 58).

[219] *Democratic Party of Ga., Inc.*, 347 F. Supp. 3d at 1347.

[220] *Id.* at 1340-41.

[221] *Id.*



Following these federal court decisions reshaping the absentee ballot verification process for the 2018 General Election, the State briefly took steps in the right direction. House Bill 316 ("H.B. 316"), which purported to enact various election "reforms" in the wake of the 2018 General Election, implemented a process by which voters could "cure" problems with their absentee ballot applications and absentee ballots.[222] It also amended the content of the absentee ballot oath to eliminate the requirement that voters provide their year of birth.[223] In addition, the Secretary of State and members of the State Election Board entered into a settlement agreement in March 2020 in response to litigation brought by the Democratic Party of Georgia, the Democratic Senate Campaign Committee, and the Democratic Congressional Campaign Committee.[224] As part of that agreement, the State Election Board agreed to promulgate a rule requiring prompt notifications to voters of the rejection of absentee ballots.[225] The Secretary of State also agreed to issue an Official Election Bulletin directing counties to require signatures to be found to be a mismatch by at least two of three election officials before being rejected.[226] Despite these additional measures to facilitate absentee voting, voters nonetheless face substantial hurdles to cure their ballots. For example, Edward is a Cobb County voter who serves as caretaker for his brother and his sister-in-law, who suffered a stroke and therefore signs documents with an X. Even though Edward's sister-in-law was able to vote absentee without a problem for the November 2020 General Election, her ballot was rejected for the subsequent runoff election. Edward had difficulty getting clear information from the county or the State about why the rejection had happened or what could be done, even when he explained that he had witnessed both signatures.[227]

These small but seemingly positive developments for voters in Georgia were short-lived. As discussed in more detail in Part IV, recent changes to Georgia law reimpose the date-of-birth requirement for absentee ballots and require the date of birth on the ballot to match the date on record. Further, Georgia has again changed the method of verifying the identity of voters requesting absentee ballots, shifting away from signature match entirely. These changes and other changes to the absentee ballot process will create new barriers to absentee voting more likely to affect voters of color.

The obstacles voters face in verifying absentee ballots must be considered in tandem with other problems voters face when attempting to vote absentee. During the past several elections, many voters

---

[222] *See* Ex. 47, O.C.G.A. §§ 21-2-381, Ex. 49, 21-2-386 (2019).

[223] *See* Ex. 48, O.C.G.A. § 21-2-384.

[224] *See* Compromise Settlement Agreement and Release, *Democratic Party of Ga., Inc. v. Raffensperger*, No. 19-cv-5028-WMR (N.D. Ga. Nov. 6, 2019), ECF No. 56-1 (attached as Exhibit 59).

[225] *See* Ga. Comp. R. & Regs. § 183-1-14-.13 (attached as Exhibit 60).

[226] *See* Ex. 59, Compromise Settlement Agreement and Release, *Democratic Party of Ga.*, No. 19-cv-5028 (N.D. Ga. Nov. 6, 2019) at 3–4.

[227] *See* Declaration of Edward [last name redacted] ¶¶ 3–15 (attached as Exhibit 61).



have not received their absentee ballots with sufficient time to be assured that the voters could return those ballots by the election—or never received their ballots.[228] Some of those voters went to great lengths to return their ballots in time or to vote in person.[229] Other voters have had difficulty cancelling their absentee ballots to vote in person—such as when they received the ballots too late or received damaged ballots—or had to vote provisionally.[230] Still other voters had additional difficulties, such as being able to access drop boxes,[231] experiencing delays because they were incorrectly listed in the system as already voting absentee, or repeatedly being told in multiple elections that their registration information was not in the system for them to request absentee ballots. Of note, the intersection between communities of color and voters with physical challenges often adversely impacts voters of color who are doubly hampered in their ability to vote because, as Margo details, the simple act of reaching a drop box to deposit a ballot—if a drop box is even available—can be a test.

---

[228] *See* Declaration of Aria [last name redacted] ¶¶ 7–9 (attached as Exhibit 62); Declaration of Amanda from DeKalb [last name redacted] ¶ 12 (attached as Exhibit 63); Declaration of Sharonda [last name redacted] ¶¶ 3–5 (attached as Exhibit 64); Declaration of Mykel [last name redacted] ¶¶ 3–8 (attached as Exhibit 65); Declaration of Heath [last name redacted] ¶¶ 3–7 (attached as Exhibit 66); Declaration of Alexandra [last name redacted] ¶¶ 3–13 (attached as Exhibit 67); Declaration of Madison [last name redacted] ¶¶ 4–9 (attached as Exhibit 68); Declaration of Stephanie [last name redacted] ¶¶ 3–20 (attached as Exhibit 69); Declaration of Maria [last name redacted] ¶¶ 3–7 (attached as Exhibit 70); Declaration of Tabatha [last name redacted] ¶¶ 3–16 (attached as Exhibit 71); Declaration of Mustapha [last name redacted] ¶¶ 3–13 (attached as Exhibit 72); Declaration of Sue [last name redacted] ¶¶ 3–6 (attached as Exhibit 73); Declaration of Kendall [last name redacted] ¶¶ 3–5 (attached as Exhibit 74); Declaration of Christie [last name redacted] ¶¶ 3–13 (attached as Exhibit 75); Declaration of Katrina [last name redacted] ¶¶ 3–5 (attached as Exhibit 76); Declaration of Jacqueline [last name redacted] ¶¶ 3–6 (attached as Exhibit 77); *see also* Declaration of LeeAnn [last name redacted] ¶ 6 (attached as Exhibit 78) (volunteer assisting with cancelling absentee ballots noted that college students came to vote in person because they had not received their absentee ballots).

[229] *See, e.g.*, Declaration of Pamela from Fulton [last name redacted] ¶¶ 3–14 (attached as Exhibit 79) ("It has taken 40 emails, six Twitter messages, and ten phone calls to ensure my constitutional rights are met."); Declaration of Annie [last name redacted] ¶¶ 6–41 (attached as Exhibit 80) (voter drove from Massachusetts to Georgia to vote in the November 2020 General Election after her ballot did not arrive in time to return it, then had to call the county office multiple times to address delays with ballot for the January 2021 Senate runoff).

[230] *See* Declaration of Patricia from Cobb [last name redacted] ¶¶ 4–7, 10, 13 (attached as Exhibit 81); Declaration of Reuben [last name redacted] ¶ 15 (attached as Exhibit 82); Declaration of Donna from Haralson [last name redacted] ¶¶ 3–16 (attached as Exhibit 83); *see also* Declaration of Jane [last name redacted] ¶ 13 (attached as Exhibit 84) (describing problem witnessed as a poll worker); Declaration of Phyllis [last name redacted] ¶ 16 (attached as Exhibit 85) (same); Declaration of Karen [last name redacted] ¶¶ 7–11 (attached as Exhibit 86) (describing problems witnessed as a poll watcher).

[231] *See* Declaration of Margo [last name redacted] ¶¶ 3–10 (attached as Exhibit 87) (describing difficulty with wheelchair access to drop box); Declaration of Keosha [last name redacted] ¶¶ 3–5 (attached as Exhibit 88) (recounting experience with ballot being rejected for being late after being placed in drop box before the deadline on Election Day).



**SECTION III:**

**Georgia's Recent Elections Demonstrate that Voting Rights Violations Persist**

Source: Jason Armond / Los Angeles Times via Getty Images





## Georgia's Recent Election History Demonstrates that Voting Rights Violations Persist.

Georgia has emerged as a key election battleground. The 2018 and 2020 statewide elections were hotly contested, with record-breaking turnout. This massive turnout is striking, given the decade-long voter suppression efforts waged in Georgia. Throughout the 2010s, the State repeatedly changed the rules for who can vote, where, and how—forcing voters to struggle to access the franchise and overcome hurdles to register, stay registered, and finally cast their ballots.

The 2018 Gubernatorial Election between former Georgia House Minority Leader Stacey Abrams and then-Secretary of State Brian Kemp was the closest gubernatorial race in Georgia in over fifty years.[232] The contest drew nearly four million voters, with Kemp winning by roughly 55,000 votes.[233] Just two years later, however, Georgia voters of color voted in historic numbers. Given the preference of voters of color for Democratic candidates, in the 2020 election, former Vice President Joe Biden won the State's sixteen Electoral College votes by roughly 11,800 votes—a 0.234 percent margin[234]—marking the first time a Democratic presidential candidate won the State in nearly thirty years.[235] Both November Senate races—the special election between Reverend Raphael Warnock and then-Senator Kelly Loeffler, and the regularly scheduled election between Jon Ossoff and then-Senator David Perdue—required January runoff elections.[236] Both Democratic challengers narrowly won.[237]

Faced with the growing competitiveness of statewide elections, Georgia implemented changes to State election laws and practices that hindered certain voters. For example, under then-Secretary Kemp's

---

[232] Alan Blinder & Richard Fausset, *Stacey Abrams Ends Fight for Georgia Governor with Harsh Words for Her Rival*, N.Y. TIMES (Nov. 16, 2018), https://www.nytimes.com/2018/11/16/us/elections/georgia-governor-race-kemp-abrams.html?smid=url-share.

[233] *Id.*

[234] Georgia Election Results, N.Y. TIMES, https://www.nytimes.com/interactive/2020/11/03/us/elections/results-georgia.html (last visited Apr. 4, 2021).

[235] Nate Cohn et al., *Detailed Turnout Data Shows How Georgia Turned Blue*, N.Y. TIMES: THE UPSHOT (Nov. 17, 2020), https://www.nytimes.com/interactive/2020/11/17/upshot/georgia-precinct-shift-suburbs.html.

[236] Richard Fausset & Nick Corasaniti, *Georgia Recertifies Election Results, Affirming Biden's Victory*, N.Y. TIMES (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/us/politics/georgia-recertify-election-results.html.

[237] Alana Wise, *Jon Ossoff Wins Georgia Runoff, Handing Democrats Senate Control*, NPR (Jan. 6, 2021), https://www.npr.org/2021/01/06/952417689/democrat-jon-ossoff-claims-victory-over-david-perdue-in-georgia-runoff.



leadership, "750,000 more names were purged between 2012 and 2016 than between 2008 and 2012,"[238] and another 668,000 in 2017 before Kemp's own race for governor.[239] Many of these voters were purged under the State's "Use It or Lose It" provision, which removed voters who had changed addresses, but often ensnared unsuspecting voters who had maintained their residences.[240] Meanwhile, the Secretary of State's office continued to employ the stringent voter verification policy of "Exact Match."[241] As Leader Abrams observed in late 2018, "Georgia citizens tried to exercise their constitutional rights and were still denied the ability to elect their leaders."[242]

As previously mentioned, Fair Fight Action took on the mission to tell the stories of Georgia residents who were denied a free and fair opportunity to vote. In the last two years, Fair Fight Action gathered thousands of compelling declarations. Some of these declarations underpin Fair Fight Action's lawsuit against ongoing voter suppression, and they all preserve a record of injustices and assure voters that their experiences and hardships matter. The hurdles voters have had to overcome are varied, and derive from official policies and unofficial practices. These include Georgia's repeated changes to the rules about what documentation voters must show to successfully register to vote and cast their ballots, the Secretary of State's aggressive approach to purging voters from the rolls based on minor inaccuracies, and its practice of holding voter registration applications in limbo for trivial typographical errors. These declarations paint a stark portrait of dysfunction in elections across the State, which this Section details.

While Georgia and its counties have enacted laws, policies, and practices making it harder to vote and easier to deny the franchise to eligible voters, the Secretary of State's office has redoubled its efforts to harass or intimidate registered voters. In December 2020, for example, the Secretary of State's office wrote to 8,000 Georgia voters who had requested absentee ballots for the January 2021 Senate runoff

---

[238] Jonathan Brater et al., *Purges: A Growing Threat to the Right to Vote*, BRENNAN CTR. FOR JUST. (July 20, 2018), https://www.brennancenter.org/sites/default/files/2019-08/Report_Purges_Growing_Threat.pdf at 4.

[239] Khushbu Shah, *'Textbook Voter Suppression': Georgia's Bitter Election a Battle Years in the Making*, THE GUARDIAN (Nov. 10, 2018), https://www.theguardian.com/us-news/2018/nov/10/georgia-election-recount-stacey-abrams-brian-kemp.

[240] Maya T. Prabhu & Mark Niesse, *22,000 Reinstated to Voting Rolls as Georgia Attorneys Defend Purge*, ATLANTA J.-CONST. (Dec. 20, 2019), https://www.ajc.com/news/state--regional-govt--politics/000-reinstated-voting-rolls-georgia-attorneys-defend-purge/c4fp7iGVwnVr4WEbR1uulJ/.

[241]NAACP Legal Def. Fund, Democracy Defended: Analysis of Barriers to Voting in the 2018 Midterm Elections 9 (Sept. 6, 2019),https://www.naacpldf.org/wp-content/uploads/Democracy_Defended__9_6_19_final.pdf.

[242] Alan Blinder & Richard Fausset, *Stacey Abrams Ends Fight for Georgia Governor with Harsh Words for Her Rival*, N.Y. TIMES (Nov. 16, 2018), https://www.nytimes.com/2018/11/16/us/elections/georgia-governor-race-kemp-abrams.html?smid=url-share.



election and were identified as having filled out a change of address notice.[243] Although it is possible for a voter to both change her mailing address and still vote in Georgia (for example, when attending an out-of-state school), the official letters warned voters of criminal penalties if they fraudulently voted.[244] Similarly, the State Election Board has often exercised its authority to investigate voters and organizations conducting third-party voter registration efforts, rather than to investigate and rectify the maladministration of elections. The State Election Board's investigations often linger for years while failing to update the voter. Such tactics send a powerful and threatening message to voters, instilling fear and dampening turnout.

Voters also face hurdles that stem from pervasive under-resourcing and under-investment in elections, which disproportionately affect communities of color. These challenges include, but are not limited to: the mass closures of polling places, forcing more voters to cast their ballots at fewer locations; polling places equipped with too few voting machines, or with malfunctioning and broken machines; inadequate supplies of emergency paper ballots at polling locations; and poorly trained poll workers who fail to offer voters provisional ballots, and sometimes even deny eligible voters' legitimate requests for provisional ballots. These shortages all worked together in predictable ways to cause chaos and unprecedented lines at Georgia's polling places in the 2018 and 2020 elections, severely burdening those voters who waited for hours and disenfranchising those who could not make that sacrifice.

This Section recounts the pervasive obstacles voters were forced to overcome to exercise their constitutional right to vote, elevates some, though by no means all, of those voters' stories, and displays the many shortcomings of the Georgia's top election officials in permitting—or worse, actively causing—these conditions.

A.   During the 2018 Gubernatorial Election and Continuing Through the Most Recent Election Cycle, Voters in Georgia Experienced Voter Suppression in Areas "Covered" Under the VRAA.

1.   Exact Match—Changes in Documentation or Qualifications to Vote.

HAVA requires that each state implement a uniform voter registration list and verify the accuracy of voter registration information and directs states to do so by entering into an agreement to match the information in its voter registration database with information in the state motor vehicle authority

---

[243] Michael King, *Georgia Officials Contact 8k People Who May Have Moved Out of State but Requested Ballots for Jan. 5 Election*, 11 ALIVE (Dec. 22, 2020), https://www.11alive.com/article/news/politics/elections/8000-contacted-who-may-have-moved-but-requested-runoff-ballots/85-a1af6cc8-7789-41db-ade5-8983c71865d1.

[244] *Id.*



database.[245] HAVA does not specify what information must be matched between the databases or how the state should use that information to verify voter registrations.[246]

Georgia's Exact Match policy takes voter verification to an extreme. The State compares each registrant's citizenship status, first name, last name, date of birth, and either the registrant's driver's license number or the last four digits of the registrant's Social Security Number ("SSN") with information about the registrant in either Georgia's Department of Driver Services ("DDS") database, or, if the individual does not provide a state driver's license number with the registration, with information in the federal Social Security Administration ("SSA") database.[247]

Any mismatch leads to a voter's registration application being placed in limbo, requiring the applicant to take additional steps before that person may vote. "If even a single letter, number, hyphen, space, or apostrophe does not exactly match the information in the state or federal database"[248] to which the voter registration is compared, the registration is flagged. A mere misspelling in the state or federal databases, difference in the way names are entered in the databases, or error in data entry from a voter registration form can prevent an eligible voter from voting.[249] This takes place under the guise of voter verification.

The citizenship data Georgia uses is likewise unreliable because of outdated information in the DDS database. Individuals who are lawfully present in the United States are eligible for a Georgia driver's license regardless of citizenship status, and need not update their citizenship information with DDS after becoming naturalized citizens. As a result, naturalized citizens may be listed in State DDS records as non-citizens, triggering a citizenship non-match if they register to vote using their driver's license number.[250]

If a voter registration is flagged for a citizenship non-match, the registrant must present proof of citizenship before the voter will be allowed to cast a ballot. The State prescribes the forms of proof

---

[245] *See generally* 52 U.S.C. § 21083(a).

[246] *See id.*

[247] *See* Expert Report of Kenneth Mayer at 8-9, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ, ECF No. 238 ("Mayer Report") (attached as Exhibit 89).

[248] *See* Lawyers' Comm. for Civ. Rts. Under L, *Voting Advocates Announce a Settlement of "Exact Match" Lawsuit in Georgia*, 866 OUR VOTE, https://866ourvote.org/press-releases/voting-advocates-announce-a-settlement-of-exact-match-lawsuit-in-georgia/.

[249] *See* Ex. 89, Mayer Report at 6.

[250] *See id.* at 11, 20-21 (explaining the high risks of inaccuracy associated with the use of driver's license files to screen for citizenship). Proof of citizenship is not required to vote but, if provided to state or county election officials, can override a citizenship non-match.

allowed. If a voter registration is flagged for a non-match on any other field (i.e., an ID non-match), the registrant must present proof of identification before the voter will be allowed to cast a ballot.[251] The registrant must present such proof, sometimes within a limited period of time, even if the registration was incorrectly flagged.[252]

Exact Match is a largely uncodified State policy. Nowhere does State or federal law dictate such a stringent match.[253] Georgia's unwritten Exact Match policy effectively imposes voter registration and eligibility requirements far more stringent than what HAVA prescribes.[254]

Over the years, the Exact Match policy has resulted in the suspension or outright cancellation of thousands of voter registrations for reasons untethered to actual voter verification. This has remained the case even as the Exact Match policy has evolved. While legal challenges in court and advocacy in the State legislature have forced modifications to the policy over the last few years, Exact Match continues to impose a substantial and racially disproportionate burden on the right to vote.

    *a.*     *The Justice Department's Denial of Preclearance for Exact Match*

In 2009, DOJ denied preclearance to Georgia's Exact Match policy.[255] DOJ explained that the policy did "not produce accurate and reliable information" and cited testimony "that an error as simple as transposition of one digit of a driver license number can lead to an erroneous notation of a non-match across all compared fields."[256] In denying preclearance, DOJ observed that "[t]he impact of these errors falls disproportionately on [] voters [of color]."[257]

---

[251] *See* Ex. 3, McCrary Report at 79.

[252] *See id.*

[253] *See* Aug. 16, 2019 30(b)(6) Deposition of Chris Harvey, Ga. Sec'y of State Elections Dir., *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ, ECF No. 507-1, Tr. 238:12-240:11 (attached as Exhibit 90).

[254] 52 U.S.C. § 21083(b) (explaining that new voters who submit a voter registration application by mail, and have not previously voted in a federal election in a state, must provide a current and valid photo identification or present "a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter," when they vote for the first time). *See also* Congressional Research Service, *Voter Registration: Recent Developments and Issues for Congress* (Jun. 10, 2020), https://fas.org/sgp/crs/misc/R46406.pdf (attached as Exhibit 91).

[255] Ex. 8, Letter from Loretta King (May 29, 2009), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_090529.pdf.

[256] *Id.*

[257] *Id.*



In 2010, Georgia once again sought preclearance of its Exact Match policy.[258] Its proposed procedure called for daily monitoring of the voter verification process and prompt notice to registrants who could not be verified through Exact Match.[259] DOJ agreed to preclear the process.[260] From 2010 to 2016, however, the State failed to abide by its pledge to "carefully monitor" the Exact Match process to prevent errors in determining voter eligibility and the inaccurate suspension of voter registrations.[261]

> b.   Early Iterations of Exact Match

As Exact Match was originally conceived and implemented, registrations with any trivial mismatch, were placed in "pending" status. Registrants were then given forty days to verify their eligibility. After forty days, the pending voter registrations would be cancelled, and the individual could not vote—even if they were eligible and the mismatch was through no fault of their own.[262]

The notification letter sent to voters whose registrations were cancelled had multiple issues: (1) "the letter did not indicate what fields in the application failed to match, or whether data entry errors by state employees might explain the failure of information to match";[263] (2) the letters did not "provide any instruction to the applicants about what they should do if the information they originally provided in their voter registration applications was correct";[264] and (3) "the letters fail[ed] to inform applicants that they will not be able to vote in an upcoming election unless they submit a new application before the close of registration."[265]

In September 2016, a coalition of civil and voting rights groups sued Georgia, challenging Exact Match as unlawful under the VRA and the First and Fourteenth Amendments to the United States

---

[258] *See* Ex. 3, McCrary Report at 62.

[259] *See id.* at 63.

[260] "Georgia HAVA Verification" Presentation, Ga. Sec'y of State, State-Defendants-00114398, at State-Defendants-00114404 (attached as Exhibit 92); Ex. 3, McCrary Report at 62-63; "Georgia HAVA Verification" Presentation, Ga. Sec'y of State, State-Defendants-00131676, at State-Defendants-00131682 (attached as Exhibit 93).

[261] Ex. 3, McCrary Report at 69.

[262] Stanley Augustin, *Voting Rights Advocates File New Federal Voting Rights Lawsuit Challenging Georgia's Restrictive Exact-Match Voter Registration Verification Scheme*, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Sept. 14, 2016), https://lawyerscommittee.org/voting-rights-advocates-file-new-federal-voting-rights-lawsuit-challenging-georgias-restrictive-exact-match-voter-registration-verification-scheme; *see also* Ex. 3, McCrary Report at 70.

[263] Ex. 3, McCrary Report at 70.

[264] *Id.* at 74.

[265] *Id.* at 75.



Constitution. The groups that challenged this early iteration of Exact Match were the Lawyers' Committee for Civil Rights Under Law, Project Vote, Campaign Legal Center, Voting Rights Institute of the Georgetown University School of Law, filing on behalf of the Georgia State Conference of the NAACP, Georgia Coalition for the Peoples' Agenda, and Asian Americans Advancing Justice – Atlanta.[266]

As the lawsuit explained, the State had cancelled voter registrations submitted by non-white applicants for verification failure at rates significantly higher than white applicants. Of the approximately 34,874 voter registration applicants whose applications were cancelled between July 2013 and July 2016 for a failure to verify, only 13.6 percent identified as white.[267]

In 2017, the State agreed to settle.[268] Under the settlement agreement, Georgia agreed not to automatically cancel voter registration applications that failed Exact Match and instead to place them in "pending" status without an expiration date.[269] Shortly after this settlement, in 2017, the State legislature enacted H.B. 268, which provided that a voter whose registration was not verified would have twenty-six months to verify their identification before the registration would be cancelled.[270]

    *c.*    *2018 Election Cycle*

Even with the 2017 changes, Exact Match continued to disproportionately burden voters of color and became a flashpoint in the 2018 Georgia Gubernatorial Election. Administration of Exact Match fell under the purview of then-Secretary of State Kemp, who was overseeing the 2018 election while running for Governor.

---

[266] *Id.* at 77-78; Kate Brumback, *Lawsuit: Georgia Voter Registration Process Violates the Law*, ASSOCIATED PRESS (Sept. 14, 2016), https://apnews.com/article/5dca86cf28114b23b94e4a3891da1d64; Press Release, *Voting Rights Advocates File New Federal Voting Rights Lawsuit: Georgia Challenging Georgia's Restrictive Exact-Match Voter Registration Process Violates the LawRegisration Verification Scheme*, ASIAN AMERICANS ADVANCING JUSTICE, ATLANTA (Sept. 14, 2016), https://us2.campaign-archive.com/?u=c07af679cb8d889c8f33cb996&id=8612c7128e..

[267] Press Release, *Voting Rights Advocates File New Federal Voting Rights Lawsuit: Georgia Challenging Georgia's Restrictive Exact-Match Voter Registration Process Violates the LawRegisration Verification Scheme*, ASIAN AMERICANS ADVANCING JUSTICE, ATLANTA (Sept. 14, 2016), https://us2.campaign-archive.com/?u=c07af679cb8d889c8f33cb996&id=8612c7128e..

[268] Stanley Augustin, *Voting Advocates Announce a Settlement of "Exact Match" Lawsuit in Georgia*, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Feb. 10, 2017), https://lawyerscommittee.org/voting-advocates-announce-settlement-exact-match-lawsuit-georgia.

[269] *Id.*

[270] *See* O.C.G.A. § 21-2-220.1(d)(4) (attached as Exhibit 94).



Before the election, the *Associated Press* reported that Secretary Kemp's office had placed 53,000 registrations in "pending" status under the Exact Match policy.[271] Black applicants accounted for seventy percent of the voter registrations in "pending" status, despite comprising only 31.6 percent of the State's voting-age population.[272] Many of the suspended voter registrations were associated with voters in urban areas with high Black populations.[273] In places with smaller Black populations, the percentage of Black voters whose registrations had been placed in "pending" status often exceeded the percentage of Black residents.[274]

In October 2018, civil rights groups again sued Georgia challenging the Exact Match policy as unlawful under the VRA, the NVRA, and the First and Fourteenth Amendments to the United States Constitution.[275] As the lawsuit explained, a preliminary review of data produced by the Secretary of State in July 2018 indicated that approximately 51,111 voter registrations were in "pending" status for reasons related to Exact Match. Approximately eighty percent of the pending registrations were submitted by applicants of color; fewer than ten percent of the registrations in "pending" status were submitted by applicants who identified as white.[276]

The civil rights groups sought a preliminary injunction against the State's enforcement of its citizenship match requirement in the November 2018 election, highlighting evidence of the policy's disproportionate impact on communities of color:

> [AAPI] applicants constitute 27.0 percent of those flagged as non-citizens even though they comprise only 2.1 percent of Georgia's registered voter pool; Latino applicants constitute 17.0 percent of those flagged as non-citizens even though they comprise 2.8

---

[271] P.R. Lockhart, *Georgia Put 53,000 Voter Registrations on Hold, Fueling New Charges of Voter Suppression*, Vox (Oct. 12, 2018), https://www.vox.com/policy-and-politics/2018/10/11/17964104/georgia-voter-registration-suppression-purges-stacey-abrams-brian-kemp.

[272] Brentin Mock, *How Dismantling the Voting Rights Act Helped Georgia Discriminate Again*, Bloomberg City Lab (Oct. 15, 2018), https://www.bloomberg.com/news/articles/2018-10-15/how-georgia-s-exact-match-program-was-made-possible.

[273] P.R Lockhart, *Georgia, 2018's Most Prominent Voting Rights Battleground, Explained*, Vox (Nov. 6, 2018), https://www.vox.com/policy-and-politics/2018/10/26/18024468/georgia-voter-suppression-stacey-abrams-brian-kemp-voting-rights.

[274] *Id.*

[275] Don Owens, *Civil Rights Groups Sue Georgia Secretary of State Brian Kemp to Cease Discriminatory 'No Match, No Vote' Registration Protocol*, Lawyers' Committee for Civil Rights Under Law (Oct. 11, 2018), https://lawyerscommittee.org/civil-rights-groups-sue-georgia-secretary-of-state-brian-kemp-to-cease-discriminatory-no-match-no-vote-registration-protocol.

[276] Complaint., *Ga. Coal. for People's Agenda, Inc. v. Kemp*, No. 1:18-cv-04727-ELR (N.D. Ga.Oct. 11, 2018) ECF No. 1 (attached as Ex. 95).



percent of Georgia's registered voter pool; and white applicants constitute only 13.7 percent of those flagged as non-citizens even though they comprise 54.0 percent of Georgia's registered voter pool.[277]

Just four days before the election, a federal court granted the injunction, requiring the State to allow naturalized citizens to vote if they presented proof of citizenship to deputy registrars or poll managers.[278]

   *d.*   *Impact of Exact Match on Voter Registration Efforts*

The faulty mechanics of Exact Match likely affect voters who register to vote by submitting paper forms more often than voters who register to vote at DDS. When a voter turns in a paper voter registration form, there is a greater likelihood of a mismatch between the name, date of birth, or driver's license number/SSN, than when registering to vote at DDS, since the DDS record and voter registration record are created using the same information. One reason for this is the potential for data entry errors by state and county election officials when information from paper voter registration forms is entered into the State's voter registration database.

In recent election cycles, the efforts of third-party voter registration and mobilization groups appear to have been stymied by Exact Match. Groups have sought to mobilize voters of color excluded from the electoral process by holding registration drives and helping people register to vote. But these registrations—often submitted by Black voters—are frequently placed on hold because of Exact Match. This is no accident.

In 2014, the New Georgia Project reported that it had submitted over 81,000 voter registration applications before the election—many from young voters of color—only to discover that over 40,000 of the registrants were not on the State's voter rolls.[279] It was not clear whether these voters were suspended due to Exact Match or other registration issues; whether the voters were notified; whether these voters were restored to the rolls; or whether the voters cast even provisional ballots at the polls.

Before the 2018 Gubernatorial Election, Candice Broce, a spokesperson for then-Secretary of State Kemp, said that more Black registrants were in "pending" status than white registrants because

---

[277] *Ga. Coal. for People's Agenda*, 347 F. Supp. 3d at 1263.

[278] *Id.* at 1269.

[279] *See* Andrew Prokop, *Did 40,000 Voter Registration Application Forms in Georgia Just Disappear?*, VOX (Oct. 31, 2014), https://www.vox.com/2014/10/31/7132171/georgia-missing-voter-registration-applications-lawsuit; Hansi Lo Wang, *Concern Over New-Voter Registration In Georgia Ahead of Election*, NPR (Oct. 22, 2014), https://www.npr.org/sections/codeswitch/2014/10/22/357998924/concern-over-new-voter-registration-in-georgia-ahead-of-election.



Black voters register to vote using paper registration forms more often. According to a *Reuters* report, "Broce blamed voter registration groups such as the New Georgia Project," which holds registration drives, "for registering voters predominately with paper forms, and then turning in 'incomplete, illegible, or fraudulent forms.'"[280] *Reuters* reported that its own analysis of Georgia's "pending" voter list at the time found that "[B]lack voters landed on the list at a far higher rate than white voters even though a majority of Georgia's voters are white."[281] The State was inclined to fault the people filling out the forms rather than the officials processing the forms—or the policy itself—for the errors.[282]

> e.   *Voter Experiences in the 2018 Election*

Individual voters' experiences illustrate the burdensome and discriminatory effects of Exact Match.

Because of canvassing that sought to encourage early voting in the November 2018 election, almost eighty-year-old Gwinnett County resident Cam Thi voted for the first time.[283] Assisted by a Vietnamese translator and community organizer, Cam Thi discovered that her voter registration was not active. When Cam Thi contacted the Gwinnett County Board of Elections, she was informed that she had to visit the county board in person to prove her citizenship. The Board also told her that her name was not an "exact match" in the database and that her gender was incorrectly listed as male. After searching for and locating her naturalization paperwork, the voter and her translator drove to the Gwinnett County Board of Elections. There, they learned that Cam Thi's registration was inactive because one space was missing from her name. After nearly a full day's delay, the Board corrected that issue and she cast a ballot.

Dr. Carlos del Rio, a DeKalb County resident and then the Chair of the Department of Global Health at the Rollins School of Public Health at Emory University, had a similar experience at the polls.[284] In 2018, when he arrived at his polling place on Election Day, Dr. del Rio was told he was not registered to vote. After showing the poll worker the Georgia "My Voter Page" ("MVP") showing his registration, Dr. del Rio was told that the discrepancy between his last name on his voter registration and that of his Georgia driver's license posed a problem. After asking someone else at the polls, the poll

---

[280] Tim Reid & Grant Smith, *Missing Hyphens Will Make it Hard for Some People to Vote in U.S. Election*, Reuters (Apr. 11, 2018), https://www.reuters.com/article/us-usa-election-laws-insight/missing-hyphens-will-make-it-hard-for-some-people-to-vote-in-u-s-election-idUSKBN1HI1PX.

[281] *Id.*

[282] *Id.*

[283] Declaration of Cam Thi [last name redacted] (attached as Exhibit 96) (describing effect of registration issues on Cam Thi's ability to cast a ballot).

[284] Declaration of Dr. Carlos del Rio (attached as Exhibit 97).



worker told Dr. del Rio that "for this time we will allow you to vote." This experience is striking given that Exact Match is not meant to be deployed at the polls, but instead should be used only for the State's registration verification process.

Gary, a Fulton County resident who served as a statewide poll watcher, reported that he "spoke with at least six voters who had been told they did not appear on the Dougherty County rolls who had hyphens or apostrophes in their names, or non-traditional spellings of their names."[285] He informed these voters they might be found on the voter registration rolls if the poll worker checked the poll books using the first initial and last names of the voters. At least five voters agreed to try again. In each case, the poll worker eventually did locate the voter on the rolls and allowed him or her to cast a regular ballot.

Yotam Oren became a naturalized U.S. citizen in 2017.[286] After his ceremony, he completed a Georgia voter registration form and included a copy of his naturalization certificate. He does not recall if he was ever informed by the State if he needed to update his citizenship status with DDS. Sometime later, the Fulton County voter registration office sent him a letter indicating that his voter registration was in pending status and that he would need to show proof of citizenship to vote. Mr. Oren understood from the letter, and from checking with the SOS website, that he could bring proof of citizenship to the polling station when he voted. Yet, when he went to vote early with his U.S. passport, he encountered resistance from poll workers unable to grant him "active" status. Only after an additional telephone call to the Fulton County voter registration office and another trip to the same polling place was his status changed; only then was he able to cast his first vote as a U.S. citizen.[287] "This entire experience was unnecessarily time-consuming, confusing and frustrating," Mr. Oren said. "I imagine that many 'pending' voters would give up and not vote when faced with the same barrier I encountered when I tried to vote the first time as a United States citizen."[288]

Exact Match's broken citizenship match process has even ensnared native-born citizens. When Kia, a Henry County resident born in Virginia and who had voted in Georgia for 18 years, went to vote on Election Day 2018, she was told that she was not an active registered voter because she was not a U.S.

---

[285] Declaration of Gary [last name redacted] (attached as Exhibit 98).

[286] Ari Berman, *A Federal Court Just Ruled That Thousands of Eligible Voters in Georgia Must Be Allowed to Vote*, MOTHER JONES (Nov. 2, 2018), https://www.motherjones.com/politics/2018/11/a-federal-court-just-ruled-that-thousands-of-eligible-voters-in-georgia-must-be-allowed-to-vote-brian-kemp-stacey-abrams/.

[287] *Ga. Coal. for People's Agenda*, 347 F. Supp. 3d. at 1262.

[288] Ari Berman, A Federal Court Just Ruled That Thousands of Eligible Voters in Georgia Must Be Allowed to Vote, MOTHER JONES (Nov. 2, 2018), https://www.motherjones.com/politics/2018/11/a-federal-court-just-ruled-that-thousands-of-eligible-voters-in-georgia-must-be-allowed-to-vote-brian-kemp-stacey-abrams/

citizen.[289] Kia was never offered a provisional ballot, and, because it was late in the day, she could not cast her vote.

    *f.*  *Exact Match Today*

  In 2019, the State legislature modified its Exact Match policy as part of House Bill 316 ("H.B. 316"). H.B. 316 altered the policy only in part—by changing the label for the category in which voters flagged for an ID non-match are placed. It did not change the overly stringent matching process that Exact Match requires to verify a voter registration. And it did not change the burdens placed on voters when their registrations are placed in limbo—correctly or incorrectly—to verify their identity or citizenship.

  As Exact Match operates today, if the State cannot verify a registrant's citizenship, that registrant is placed in "pending" status. The registrant must produce proof of citizenship to state or county election officials and the election officials must remove the "pending" flag from the voter registration before the voter may cast a ballot. The voter must produce proof of citizenship within twenty-six months of the registration being placed in "pending" status or else the voter registration is cancelled.[290] And when these cancelled voters show up at the polls, there is nothing to do to have their ballot count—whether the voter knew of the citizenship non-match or whether a voter is actually a citizen.

  If Exact Match yields a non-match on any criterion other than citizenship, the voter registration is placed in "Missing ID Required," or "MIDR" status. The registrant must produce proof of identification to state or county election officials, and the election officials must accept the identification and remove the MIDR flag from the voter registration before the individual may cast a ballot. As was the case before H.B. 316, a voter registration can be placed in MIDR status even for a trivial misspelling, mismatch, hyphen, or spacing difference between the way the individual's name is listed in the two databases.[291]

  Curing false Exact Match flags poses its own barriers. Driver's license and state ID possession rates are lower among communities of color, both nationally and in Georgia.[292] The cure process depends on voters knowing they must present certain types of identification or proof of citizenship at the polls to

---

[289] Declaration of Kia [last name redacted] (attached as Exhibit 99).

[290] *See* State Training Presentation re: Special Topics of the Month, Verification Changes due to H.B. 316 State-Defendants-0095888 at 0095898, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Aug. 5, 2020), ECF No. 507-2 at 25 (attached as Exhibit 100) (displaying sample letter sent to voters placed in "pending" status for a citizenship non-match following H.B. 316); Ex. 94, O.C.G.A. § 21-2-220.1.

[291] *See* Ex. 89, Mayer Report at 5-7. Dr, Mayer's report predates the adoption of H.B. 316.

[292] *See id.* at 13.



be moved from "pending" status to "active" status or to have an MIDR flag removed. But not all voters receive notice when their registrations are flagged by Exact Match.[293] Perhaps unsurprisingly, of the 3,672 residents in pending status in July 2019, only 429 (thirteen percent) had been restored to active status by January 2020.[294]

The racial disparities in the State's implementation of Exact Match are striking. Voters of color are vastly overrepresented among those affected by the policy. One expert found that voters of color were between six and ten times more likely to be in MIDR status than white registrants.[295] The disparities between the demographic make-up of individuals in "pending" status (due to citizenship non-matches) and overall voter registration numbers are similarly stark. As of January 2020, 75.7 percent of all registrants in "pending" status were people of color. Meanwhile, thirteen percent of registrants in "pending" status identified as white, while whites make up 52.9 percent of all active registrants in Georgia.[296]

The geographic distribution of voters affected by Exact Match is similarly uneven, in a manner correlated with the racial composition of Georgia's 159 counties. Over two-thirds of registrants in MIDR status live in five counties that contain less than one-third of all registrants.[297] The highest rate of voters in MIDR status (Fulton County) is 135 times larger than the lowest rate of voters in MIDR status (Treutlen County).[298] With one exception, the counties with the highest rate of voters in MIDR status are majority-minority counties.[299]

    2.    <u>Changes that Reduce, Consolidate, or Close Voting Locations.</u>

Since the Supreme Court's 2013 *Shelby County* decision,[300] Georgia has been a leader among the states racing to close, consolidate, or relocate polling places—often in areas with significant representation of people of color. This is not a new tactic. From the start of Jim Crow until enactment of

---

[293] *See, e.g.,* Email from G. Saleh to J. Simmons (Oct. 17, 2016), State-Defendants-00155223 (attached as Exhibit 101) ("I provided a copy of my citizenship [documents] and have not heard on the status of my registration. It has been [a] few months . . . I am at odds as to what may have gone wrong with my application.").

[294] *Id.*

[295] *See* Ex. 89, Mayer Report at 19, 25.

[296] *Id.* at 24.

[297] *Id.* at 29.

[298] *Id.*

[299] *Id.*

[300] *Shelby County*, 570 U.S. at 529.



the VRA, moving polling places without notice was a favorite disenfranchisement method. And while the VRA required Georgia to submit proposals for preclearance, DOJ rejected proposed changes to polling places at least seven times—including as recently as the mid-1990s. In 2015, after *Shelby County,* the Georgia Secretary of State's office gave counties the green light to close their polling places.[301] These closures, concentrated in a few counties, have disproportionately affected voters of color—particularly Black voters. These voters rarely receive notice of changed or closed polling locations, wait in long lines, navigate confusing and flawed directions, and travel farther to exercise their constitutional right to vote.

Georgia has a long history of closing or moving polling places, particularly affecting neighborhoods with more Black voters. During the Reconstruction Era, white Georgians resisted the expansion of the franchise through a variety of means. Besides using the more obvious tools of intimidation and violence, local governments also disenfranchised Black Georgians by abruptly relocating their polling places. Professor Adrienne Jones, an attorney and Assistant Professor of Political Science at Morehouse College has explained: "Polling places were established at significant distances from black communities and common modes of transportation to access polling places were destabilized at election time."[302] Further, "[p]olling places were moved without notice."[303]

That pattern persisted into the late twentieth century. During the years the VRA required Georgia to submit any proposed changes to its election procedures to DOJ for preclearance, counties repeatedly attempted to either consolidate polling places or move them to locations hostile to Black voters. DOJ repeatedly rejected such attempts, often concluding that the change was likely to have retrogressive impacts on voters of color. In 1968, for example, Webster County attempted to consolidate four polling places into one. DOJ denied preclearance, noting that it would burden 296 voters, of a total of approximately 800 voters, who voted at the polling places slated to be closed.[304] In 1974, Jones County attempted to move one polling place; DOJ denied preclearance because it would "require[] a significant number of electors in the Davidson-Burden District to travel an additional 3 ½ miles, in order to vote."[305] In both 1978 and 1992, Georgia counties attempted to move polling places from municipal buildings to private clubs. In both instances, DOJ objected because the clubs had reputations as all-white

---

[301] Leadership Conf. Ed. Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote* 32 (Sept. 2019), http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf ("*Democracy Diverted*").

[302] Ex. 1, Jones Report at 15.

[303] *Id.*

[304] Voting Determination Letter from Stephen J. Pollak, Ass't Att'y Gen., to Jesse Bowles (Dec. 12, 1968), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-1030.pdf (attached as Exhibit 102).

[305] Voting Determination Letter from J. Stanley Pottinger, Ass't Att'y Gen., to Judge George E. Crawford, Jones Cnty. (Aug. 12, 1974), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-1380.pdf (attached as Exhibit 103).



clubs that did not accept Black members.[306] And in 1995, Jenkins County proposed moving a polling place from a central urban location to a rural parcel of land in a predominantly white neighborhood, with little to no access by public transportation. DOJ again objected, finding that the county was forty-one percent Black and that the disparities in socioeconomic status—most notably the fact that thirty-eight percent of Black households lacked a vehicle—and the county's failure to consult the Black community when analyzing the change counseled against approving the proposal.[307]

As soon as the Supreme Court invalidated the VRA's preclearance formula, Georgia counties consolidated their polling places in ways that would not have passed preclearance. The Georgia Secretary of State's office, which staunchly disclaims any authority over counties' polling place decisions, instructed counties during an early 2015 training session to "begin the plan of consolidation . . . [n]ow."[308] The training explicitly emphasized that counties were "no longer required to submit polling place changes to the Department of Justice for preclearance"—yet failed to mention any of the counties' ongoing obligations to comply with the VRA.[309]

The counties eagerly heeded the Secretary of State's instructions. According to one national study, Georgia has closed at least 214 polling places since *Shelby County*, dividing those voters among the counties' remaining locations.[310] These closures constituted nearly eight percent of the State's polling places, spread across fifty-three counties.[311] Georgia holds the dubious honor of having closed higher percentages of polling places than any other state in the study and having the top five counties nationwide in terms of the percentage of polling places closed: Lumpkin (eighty-nine percent), Stephens (eighty-eight percent), Warren (eighty-three percent), Bacon (eighty percent), and Butts (eighty

---

[306] Voting Determination Letter from Drew S. Fays III, Ass't Att'y Gen., to Judge David M. Proctor, Camden Cnty. (Aug. 4, 1978), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-1710.pdf (attached as Exhibit 104); Voting Determination Letter from John R. Dunne, Ass't Att'y Gen., to Judge Charlotte Beall (Oct. 28, 1992), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2400.pdf (attached as Exhibit 105).

[307] Voting Determination Letter from Deval L. Patrick, Ass't Att'y Gen., to William E. Woodrum, Jenkins Cnty. Att'y (Mar. 20, 1995), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2610.pdf (attached as Exhibit 106).

[308] *Democracy Diverted* at 32.

[309] *Id.* at 18.

[310] *Id.*

[311] Mark Niesse & Maya T. Prabhu, *Voting Precincts Closed Across Georgia Since Election Oversight Lifted*, ATLANTA J-CONST. (Sept. 4, 2018), https://www.ajc.com/news/state--regional-govt--politics/voting-precincts-closed-across-georgia-since-election-oversight-lifted/bBkHxptlim0Gp9pKu7dfrN/.



percent).[312] The trend is clear; the majority of Georgia's counties had more registered voters per polling place in 2018 than in 2014.[313]

Even this troubling description understates the scale of the problem. Given the uneven distribution of polling place closures across the State, certain counties were hit far harder than others. Eighteen counties closed over half of their polling places.[314] Seven counties have been left with a single polling place, including Lumpkin County (which is 284 square miles), and Lanier County (which is 200 square miles and twenty-four percent Black).[315] When Lanier County was considering closing seventy-five percent of its polling places in 2016, the county's sheriff expressed his concern about the loss of convenient polling locations for the county's residents, remarking the county's population had nearly doubled during his tenure.[316] The precise problems that DOJ repeatedly cited when denying preclearance have been borne out in Georgia's recent pattern of polling place closures over the last six years.

These numbers, while striking on their own terms, fail to capture Georgia's polling location transformation. Dr. Michael Herron, a Professor of Government at Dartmouth College, identified 459 polling places used in 2014 that did not exist in 2018.[317] This number includes both completely closed polling places and polling places that were relocated. Completely closing polling places imposes a more direct and obvious harm on voters: by forcing greater numbers of voters to cast their ballots at fewer locations, closures prompt longer wait times and greater confusion. But the relocation of polling places, even if the number remains fixed, can have similarly severe effects on voters. (DOJ presumably recognized this fact when it denied preclearance to simple relocations in addition to outright closures.[318])

The suppressive effect of poll closures and relocation is quantifiable. A 2019 analysis by the *Atlanta Journal-Constitution* revealed that the "average Georgia voter's distance to a polling place more

---

[312] *Democracy Diverted* at 15.

[313] Expert Report of Michael C. Herron at 47-48, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ, ECF No. 241 ("Herron Report") (attached as Exhibit 107).

[314] *Democracy Diverted* at 31.

[315] *Id.* at 33.

[316] Terry Richards, *Lanier May Close 3 of 4 Voting Precincts*, VALDOSTA DAILY TIMES (June 28, 2016), https://www. valdostadailytimes.com/news/local_news/lanier-may-close-of-voting-precincts/article_6cf02c80-93ce-51df-86c6-3b4a692acc18.html.

[317] Ex. 107, Herron Report at 44.

[318] Ex. 106, Voting Determination Letter from Deval L. Patrick, Ass't Att'y Gen., to William E. Woodrum, Jenkins Cnty. Att'y (Mar. 20, 1995), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2610.pdf.



than doubled from 2012 to 2018."[319] The same study concluded these tactics "likely prevented an estimated 54,000 to 85,000 voters from casting ballots on Election Day" in 2018.[320] And the impact hit Black voters the hardest, as they were twenty percent more likely to not vote because of long distances to polling places.[321]

Kenneth, a resident of Cobb County, Georgia, was one of the many Georgia voters affected by the relocation of polling locations.[322] Kenneth explained that his polling location had been at the Turner Chapel AME Church in Marietta—the church where he was a member.[323] This polling location was only a block and a half away from where he lived.[324] But before the 2016 Presidential election, Kenneth discovered that his polling location had been relocated and was now six miles away.[325] He explained that the new polling location was "a hindrance to get to . . . instead of my church down the road."[326] Tameche, a Cobb County voter who similarly had voted at a polling place near her home for years, was assigned to a new polling place for the June 2020 Primary Election. The new polling place was in an area she was not familiar with and the new site lacked clear signage. Tameche struggled to find the polling place on Election Day, and had to repeatedly drive up and down the road as he searched.[327]

Carol, a Clay County voter, lives in one of the poorest counties in Georgia, in a majority-Black neighborhood. In 2018, Carol recalls, Clay County closed all but one of its polling places. She recalls that many of her neighbors, most of whom do not have cars, could walk to their previous polling place. Because of the closures, however, Carol estimates that many of her neighbors would have to travel up to fifteen miles to vote, and many people in her neighborhood simply could not afford the money for gas, even if they could find someone to give them a ride. Carol only discovered the poll closure on Election Day, when an officer informed her. Carol spent her day driving her neighbors to the new polling location and, sometimes, helping them cast their ballots. Carol worries that because of the closures, confusion,

---

[319] Mark Niesse & Nick Thieme, *Precinct Closures Harm Voter Turnout in Georgia, AJC Analysis Finds*, ATLANTA J.-CONST. (Dec. 16, 2019), https://www.ajc.com/news/state--regional-govt--politics/precinct-closures-harm-voter-turnout-georgia-ajc-analysis-finds/11sVcLyQCHuQRC8qtZ6lYP/.

[320] *Id.*

[321] *Id.*

[322] Declaration of Kenneth [last name redacted] (attached as Exhibit 108).

[323] *Id.* ¶ 3.

[324] *Id.*

[325] *Id.*

[326] *Id.*

[327] Declaration of Tameche [last name redacted] ¶ 3 (attached as Exhibit 109).



and pervasive underfunding of elections in her community, many in her community "don't believe in voting because they believe it doesn't matter."[328] Lottie, another Clay County voter, says her closest polling place is an hour's drive away. Her previous polling place was on the same street as her home. After her polling place closed, Lottie recalls, many elderly neighbors simply could not make the trek to the farther polling place, as most do not have cars.[329]

As recently as last year, Georgia voters have had their polling locations changed or closed without being notified. In Banks County, Georgia, Robbie received a new registration card with a new polling location in 2020.[330] According to his registration, he was re-assigned to vote at New Salem United Methodist Church in Commerce, Georgia.[331] When Robbie went to the church to vote in the primary election, however, he quickly realized that no voting was taking place at the location.[332] After driving throughout the county, he identified a small sign in "medium-high grass" directing voters to the Banks County Recreation Department in Homer, Georgia.[333] After searching for the polling location and then, once he found it, waiting in line for over an hour, Robbie finally voted.[334]

Statewide, roughly eighteen percent of Georgians who remained at the same residence between 2014 and 2018 were registered at a new polling place for the 2018 election.[335] Polling place closures and relocations do not affect all voters equally. Four Georgia counties had all new polling places in 2018, having closed all of their previous polling sites between 2014 and 2018.[336] This means that every resident in those counties had to find and navigate a new polling location. Roughly twenty counties closed over half of their polling places.[337] Fifty-eight counties, meanwhile, closed no polling places.[338] These disparities were not racially neutral. Professor Herron relied on census data to identify racially

---

[328] Declaration of Carol from Clay [last name redacted] ¶¶ 3-8 (attached as Exhibit 110).

[329] Declaration of Lottie [last name redacted] ¶¶ 3-6 (attached as Exhibit 111).

[330] Declaration of Robbie [last name redacted] ¶ 4 (attached as Exhibit 112).

[331] *Id.*

[332] *Id.* ¶ 5.

[333] *Id.* ¶ 6.

[334] *Id.* ¶ 7.

[335] Ex. 107, Herron Report at 60.

[336] *Id.* at 44-45.

[337] *Id.* at 45.

[338] *Id.* at 44.



homogenous neighborhoods (meaning neighborhoods 95–100 percent white or 95–100 percent Black) and observed that Black registered voters in racially homogenous neighborhoods were more likely to have their polling places changed.[339] Indeed, Black voters in 100 percent Black neighborhoods were 3 percent more likely to have to report to a new polling place than white voters in 100 percent white neighborhoods.[340] Professor Herron also measured the racial disparities in another way: when he identified each polling place as either majority-Black or non-majority-Black and compared the rates of closure, he found that 17.68 percent of non-majority-Black polling places closed, while 20.3 percent of majority-Black polling places closed.[341]

The patterns of the polling location closures were evidently not racially neutral. But Professor Herron's research also indicates that the effects of these closures—even had the closures been more evenly distributed—are also not racially neutral. His findings show, first, that *all* voters whose polling places changed were less likely to vote in the next election than voters whose polling places remained the same.[342] More strikingly, his findings also show that among voters whose polling places changed, Black voters were twice as likely as white voters not to vote in the next election.[343] Thus, the effect on Black voters is twofold: first, Black voters are more likely to be affected by the closures, and second, the turnout effects are more pronounced. Georgia's rampant closure of polling places therefore has disproportionately affected Black voter turnout.

Georgia's intentional targeting of majority-Black communities for polling location changes is evident in the recommendations of the Secretary of State's preferred election consultant, Mike Malone. In 2018, the SOS recommended counties considering consolidating polling places hire Malone, who proposed polling place closures in eleven predominantly Black neighborhoods.[344] One county, Randolph, planned to close seven of the nine polling places serving the county's sixty percent Black voters across its

---

[339] *Id.* at 49-51.

[340] *Id.*

[341] *Id.* at 54–55. Professor Herron then conducted the same analysis, comparing polling places with a Black supermajority (meaning 60 percent of registered voters at that polling place) to those without, and found that 20.73 percent of polling place with a Black supermajority closed, as compared to 17.76 percent of those without a Black supermajority. *Id.* at 56.

[342] *Id.* at 70.

[343] *Id.*

[344] Doug Richards, *Consultant Behind Plan to Close Randolph Co. Polling Places Did it Before, But Not on This Scale*, 11 ALIVE (Aug. 20, 2018), https://www.11alive.com/article/news/local/consultant-behind-plan-to-close-randolph-co-polling-places-did-it-before-but-not-on-this-scale/85-585898906; Matt Vasilogambros, *Polling Places Remain a Target Ahead of November Elections*, PEW RSCH. TRS.: STATELINE (Sept. 4, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/09/04/polling-places-remain-a-target-ahead-of-november-elections.



428 square miles.[345] Randolph County is a rural agricultural community in the southwest Georgia area considered part of the "Black Belt"—a region historically known for its fertile black soil, its cotton plantations, and its violent reliance on slaves.[346] The Randolph County proposal generated a national outcry, prompting Randolph County to fire Malone and the Board of Elections to reject the proposal.[347] Malone's proposals, however, were implemented in ten other counties.[348] In 2019, Randolph County successfully closed three of the nine contested precincts with little fanfare.[349]

Problems caused by State and county decisions to target communities of color for polling location changes are exacerbated by the documented failure of several counties to provide adequate notice to voters about their new polling places. Counties that move or close polling places are expected to order new precinct cards for the affected voters, informing them of the change in location. Several counties, however, ordered precinct cards only for voters in "active" status, declining to order them for voters in "pending" status.[350] The distinction between "active" and "pending" matters because voters in pending status are still eligible to vote—as the Secretary of State's office reminded those counties.[351] The counties nevertheless declined to inform eligible voters of the change. Just as troubling, Secretary of State "IT tickets" from 2019 reflect that precinct cards sent in the 2018 election were poorly designed, causing

---

[345] Victor Blackwell et al., *Elections Board Takes Less than a Minute to Reject Proposal to Close 7 of 9 Polling Places in Majority-Black County*, CNN (Aug. 24, 2018), https://www.cnn.com/2018/08/24/us/randolph-county-polling-closures-vote/index.html; Johnny Kauffman, *Georgia County Votes to Keep Polling Places Open After Intense Scrutiny*, NPR (Aug. 24, 2018), https://www.npr.org/2018/08/24/641556969/georgia-county-votes-to-keep-polling-places-open-after-intense-scruitney.

[346] Johnny Kauffman, *Georgia County Votes to Keep Polling Places Open After Intense Scrutiny*, NPR (Aug. 24, 2018), https://www.npr.org/2018/08/24/641556969/georgia-county-votes-to-keep-polling-places-open-after-intense-scruitney; Anna Maria Barry-Jester, *Patterns of Death in the South Still Show the Outlines of Slavery*, FIVETHIRTYEIGHT (Apr. 20, 2017), https://fivethirtyeight.com/features/mortality-black-belt/.

[347] Victor Blackwell et al., *Elections Board Takes Less than a Minute to Reject Proposal to Close 7 of 9 Polling Places in Majority-Black County*, CNN (Aug. 24, 2018), https://www.cnn.com/2018/08/24/us/randolph-county-polling-closures-vote/index.html.

[348] Matt Vasilogambros, *Polling Places Remain a Target Ahead of November Elections*, PEW RSCH. TRS.: STATELINE (Sept. 4, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/09/04/polling-places-remain-a-target-ahead-of-november-elections.

[349] Mark Niesse, *Precinct Closures in Rural Georgia Approved by County Elections Board*, ATLANTA J.-CONST. (Aug. 19, 2019), https://www.ajc.com/news/state--regional-govt--politics/precinct-closures-rural-georgia-approved-county-elections-board/cDHVxWR6F6547qexIsYjNI/.

[350] *See* Email from Melanie Frechette, Ga. Sec'y of State's Office, to Ralph Jones, Fulton County (July 9, 2018), State-Defendants-00468982 (attached as Exhibit 113); Email from Leigh Combs, Ga. Sec'y of State's Office, to Shauna Dozier, Clayton County (Sept. 11, 2019), State-Defendants-00095374 (attached as Exhibit 114).

[351] Ex. 113, Email from Melanie Frechette, Ga. Sec'y of State's Office, to Ralph Jones, Fulton County (July 9, 2018).

many to be delivered to the polling places themselves (as opposed to the voters) or to be returned as undeliverable.[352]

Many voters did not receive pre-election notice of their changed location ahead of time. Several voters learned when they happened to check online or hear from friends.[353] Others had even harder times:

- Dayle, a Fulton County voter, checked the State's "My Voter Page" twice before attempting to vote in her district's Special Election in September 2020. MVP directed her both times to the David Howard Middle School. When she arrived, however, no one was at the middle school, nor were there any signs to vote. There were signs, however, at the Senior Center across the street. When Dayle went to the Senior Center on a hunch, she learned this was in fact her correct polling place. The poll workers could not explain why MVP had told her to go to a different location.[354]

- Ryan, a Cobb County voter, checked MVP the week before the June 2020 election to confirm his polling place, writing down the address to be sure. The morning of Election Day, he attempted to confirm his polling place online, only to learn that MVP was down. He and his partner drove to the polling place they had written down. After waiting in line for three hours—during which MVP continued to be nonfunctional—Ryan was informed that he was at the wrong polling place. Ryan's partner, with whom he lives, was told he was at the right polling place. The poll worker could not explain why Ryan's polling place was changed at the last minute, or why he would be assigned to a polling place different from that of another member of his household. When the poll worker refused to give Ryan a provisional ballot, he was forced to drive to another location and try again.[355]

- Jason, a Fulton County voter, received a notice two months before the June 2020 election that his polling place had changed. When Jason arrived at the new polling place on Election Day, however, he found a sign redirecting him to another polling place across town. He drove to the

---

[352] *See, e.g.*, Helpdesk Request from Sherie Jeffries to Chris Harvey (Oct. 30, 2019), State-Defendants-00295594 (attached as Exhibit 115) ("Many precinct cards are being delivered to polling places instead of the voter addresses printed on the precinct cards. The number of addresses present on the precinct cards is confusing the United States Postal Service (USPS) automated mailing systems."); Letter from Chris Harvey, Ga. Sec'y of State's Office Elections Dir., to Jordan Fuchs, Deputy Sec'y of State, at 2 (Jan. 22, 2019), State-Defendants-00200645 (attached as Exhibit 116) ("Redesign voter precinct cards to be fully compliant with USPS standards . . . .").

[353] *See, e.g.*, Declaration of Brandi [last name redacted] ¶¶ 11-12 (attached as Exhibit 117) (learning from friends on Facebook); Declaration of Jonathan [last name redacted] ¶¶ 4-5 (attached as Exhibit 118) (checking MVP by chance); Declaration of Shannon W. from Fulton [last name redacted] ¶ 4 (attached as Exhibit 119) (same).

[354] Declaration of Dayle [last name redacted] ¶¶ 3-6 (attached as Exhibit 120).

[355] Declaration of Ryan [last name redacted] ¶¶ 4-8, 12-13 (attached as Exhibit 121).

new location only to be told that he had to vote at yet another polling place, where he waited for over two hours to cast his ballot.[356]

- Stephen, a Fulton County voter, arrived at his usual polling place for the 2016 General Election only discover that it was closed. He had received no notice of its closure, nor had he been directed to another place to vote. A man sitting at the closed polling place gave Stephen a list of other polling places nearby, including a church half a mile away. But when Stephen went to the church as the man had suggested, that polling place, too, was closed. At this second location, he was directed to a reception hall back in the direction he had come from, where Stephen eventually voted. While waiting in line, Stephen learned that four precincts had been consolidated into this one polling place, causing a major bottleneck.[357]

- A poll watcher in DeKalb County, Suzanne, was stationed at a polling place that served two precincts for the 2018 General Election. The distinction between the two precincts was crucial, as it affected which line the voter should wait in. But the voter registration cards for the voters at this polling place distinguished between the two precincts in a very subtle way: one precinct was designated "Mary Lin LE" and the other "Mary Lin EE." No one had explained this distinction to the voters, however, and so the vast majority thought they were in the Mary Lin precinct, when in fact they were not. Suzanne witnessed this confusion cause many voters to wait in the wrong line for hours.[358]

- A poll watcher in DeKalb County, Carol, was sent to a longstanding polling place closed for the 2020 General Election to direct voters to their new location. On Election Day, she directed confused voters from the old polling place to the new polling place up the road. A volunteer hand-wrote the only signage to tell voters what was happening.[359]

- Another poll watcher in DeKalb County, Caren, was posted at Miller Grove Middle School on election day for the 2020 General Election, a former polling place, directing voters to their correct polling places. During her shift, she helped several voters find their correct locations, serving as the first person to tell them that their polling place had changed. One voter, a man with mobility issues, had come on foot as he did not own a car. Because the voter did not have a

---

[356] Declaration of Jason [last name redacted] ¶¶ 3-8 (attached as Exhibit 122).

[357] Declaration of Stephen [last name redacted] ¶¶ 4-5, 8 (attached as Exhibit 123).

[358] Declaration of Suzanne [last name redacted] ¶¶ 7-9 (attached as Exhibit 124).

[359] Declaration of Carol from DeKalb [last name redacted] ¶¶ 4-5, 10-11 (attached as Exhibit 125).

phone, Caren worked with him for half an hour to try to help him figure out where to go and how to get there without a car.[360]

Failure to notify voters can have severe consequences for voters, including disenfranchisement. For the 2018 General Election, Antoinette, a resident of Chatham County, Georgia, arrived at her local polling location after leaving work, like many voters.[361] By the time Antoinette arrived at her old polling location, and was told of her new polling location, it was too late.[362] She did not have enough time to travel to the new polling location before it closed and she could not vote.[363] Inexplicably, Antoinette's wife and daughter, who lived at the same address, voted at the polling location where Antoinette was turned away.[364]

Other voters had similar negative experiences:

- Shanterrie, a Fulton County voter, prides herself on always voting. Despite the pandemic, she was determined to vote in the June 2020 primary election. She took her four-year-old granddaughter to her usual polling place, riding the bus because she does not own a car. Upon arriving, however, she saw a sign on the door saying that the polling place had moved—the first Shanterrie had heard of this change. The bus that would have taken her to the new polling location, however, had been discontinued. Successfully making it to the polls would have required her and her four-year-old granddaughter to take a different bus and then walk another half hour in the June heat and rain. Shanterrie could not vote.[365]

- Joshua, a Fulton County voter, went to his polling place in August 2020 to vote in the primary runoff. Upon arriving, he was given a provisional ballot without explanation. Confused, he asked if he was in the wrong location. The poll worker informed Joshua he was in the correct location, but that the precinct had merged with another precinct, and the voters from his former precinct had not been added to the voting machines yet. Joshua was not given the opportunity to cast a standard ballot and had to vote provisionally instead.[366]

---

[360] Declaration of Caren [last name redacted] ¶¶ 3-9 (attached as Exhibit 126).

[361] Declaration of Antoinette [last name redacted] ¶ 3 (attached as Exhibit 127).

[362] *Id.*

[363] *Id.*

[364] *Id.*

[365] Declaration of Shanterrie [last name redacted] ¶¶ 2-6 (attached as Exhibit 128).

[366] Declaration of Joshua [last name redacted] ¶ 3-6 (attached as Exhibit 129).

- Erika, a Fulton County voter, had to vote at a new polling place in the 2018 General Election. While waiting in a five-hour long line, Erika learned from her fellow voters that at least two other polling places had been closed and consolidated into her new polling location.[367]

- April, a Fulton County voter, waited in line at her polling place for two hours to vote in the 2018 Gubernatorial Election. She learned that part of the reason for the delay was that many voters who usually voted at the Ponce Library had been directed to her polling place instead. April found this particularly odd given that the Ponce Library had been open as an early voting site just a few days before, and remarked this was likely to be highly confusing to voters.[368]

Georgia's post-*Shelby County* history reflects rapid and concentrated poll closures and relocations. The spree of closures starkly contrasts with DOJ's repeated refusal to preclear such proposals under the VRA before 2013. The changes have been made in predominantly Black neighborhoods and have an inordinate impact on Black voters, hindering citizens' ability to cast a ballot. And Georgia's counties have been derelict in their duties to lessen the harmful effects of polling place changes, failing to disseminate prompt or accurate information, and sometimes even foregoing notice. The Secretary of State's office has provided little to no help. The failures have instead left voters with no help in tracking down their new polling places. Polling place closures have become a key tool in Georgia's attempt to suppress the votes of its citizens.

  3. <u>Voter Purges—Changes to Maintenance of Voter Registration Lists.</u>

    *a.* *Voter Purge Laws and Policies that Apply in Georgia*

Although federal law mandates that states maintain accurate voter registration lists, Georgia has engaged in massive voter purges—removing thousands of voters from its voter rolls with questionable justification—under the guise of maintaining the accuracy of its voter registration database. The VRAA's promise of increased federal oversight in this arena would help guard against further detrimental changes to this already broken system.

As the law stands, two federal statutes provide the key rules that states must follow in conducting voter purges: NVRA and HAVA. NVRA requires that any state purge practice must be "uniform, non-discriminatory, and in compliance with the Voting Rights Act of 1965,"[369] and imposes limitations on election officials as to when and how registrants can be removed based on a change of address.[370] HAVA

---

[367] Declaration of Erika [last name redacted] ¶ 3 (attached as Exhibit 130).

[368] Declaration of April [last name redacted] ¶ 3 (attached as Exhibit 131).

[369] 52 U.S.C. § 20507(b)(1).

[370] *Id.* § 20507(d)(1)-(2).



requires that statewide computerized voter registration databases conform to minimum standards of accuracy.[371] HAVA imposes these standards to ensure voter registration records are accurate and regularly updated.[372] Unfortunately, these laws have not stopped Georgia from engaging in voter purges that systematically disenfranchise registered voters who remain eligible to vote.

Certain voter purge processes are relatively non-controversial—for example, removing voters from the rolls when they confirm that they have moved out of state. But Georgia's process for removing voters from the rolls on the assumption they have moved is deeply flawed.

Georgia law provides a two-step process for purging voters from the rolls on the assumption they have moved. First, registered voters are moved from "active" status to "inactive" status. Second, in odd-numbered years, the voters in inactive status are moved to "cancelled" status.[373] Once voters are moved to cancelled status (purged from the rolls), they cannot vote without submitting a brand-new voter registration application before the deadline to vote in an election. These voter registration deadlines are typically about a month before each election.[374] Thus, when voters are purged without realizing it and later arrive to vote as normal, there is nothing that can be done to cast a ballot that will be counted. The only option for these purged voters is to forego voting or to cast a provisional ballot that will be rejected.[375] This is true even for voters who can prove that they did not actually move, belying the State's unsupported justification for purging them from the voter rolls in the first place.[376]

Under Georgia law, a registered voter can be flagged for this purge process for three reasons: (1) having not voted or not had other forms of contact with election officials for a certain period of time, (2) having filed a National Change of Address form according to the Secretary of State's vendor,[377] or (3)

---

[371] *Id.* § 21083(a)(2)(A).

[372] *Id.* § 21083(a)(4).

[373] O.C.G.A. § 21-2-235 (attached as Exhibit 132).

[374] *2021 State Elections & Voter Registration Calendar*, GA. SEC'Y OF STATE, https://sos.ga.gov/admin/uploads/2021_State_Calendar_(Short).pdf (last visited Apr. 2, 2021) (attached as Exhibit 133).

[375] O.C.G.A. §§ 21-2-418(a) (attached as Exhibit 134), 419(c)(3) (attached as Exhibit 135).

[376] Even after voters learn they have been removed from the rolls, they sometimes face great difficulty reregistering. *See generally* Declaration of Caroline [last name redacted] (attached as Exhibit 136) (describing several unsuccessful attempts to reregister to vote in time for the June 2020 election).

[377] The Secretary of State has chosen a vendor called Total Data Technologies, locted in Omaha, Nebraska, to identity which registered Georgia voters have filed an NCOA form with the U.S. Postal Service. *See* Suppl. Expert Report of Michael P. McDonald at 6 & n.7, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Apr. 8, 2020), ECF No. 293 ("Supplemental McDonald Report") (attached as Exhibit 137). This vendor's results have been grossly inaccurate, flagging thousands of voters as having submitted an NCOA form when in fact they did not. *See* Expert Report of Michael P.



having their election mail returned to the sender.[378] State law requires that voters in all three of those categories be mailed an address-confirmation notice and then moved to inactive status if there is no response within thirty days.[379] Then, all inactive voters who do not vote or have another form of contact with election officials during a period spanning the next two general federal elections are purged from the rolls.[380] In 2019, the State began mailing address-confirmation notices to inactive voters before executing the purge.[381] But the State has never notified voters after they are deregistered. And even though the Secretary of State's Elections Director has testified that "there are a lot of people that don't check their mail," the Secretary of State's Office chooses not to use the email addresses or phone numbers it has on file to notify voters about the purge.[382]

A particularly problematic component of this process stems from Georgia's "Use It or Lose It" law, which allows the State to move voters first to inactive status and then to cancelled status solely because of their failure to vote or have other specified forms of contact with election officials.[383] Georgia enacted this law in the early 1990s, following the adoption of the NVRA.[384] DOJ initially objected to the law, informing State officials "in a letter that the new law was 'directly contrary to the language and purpose of the NVRA and is likely to have a disproportionate adverse effect on [] voters [of color] in the

---

McDonald at 17, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Feb. 18, 2020), ECF No. 240 ("McDonald Report") (attached as Exhibit 138).

[378] O.C.G.A. §§ 21-2-233 (attached as Exhibit 139), 234 (attached as Exhibit 140). Yet, sometimes voters are flagged even though, to the best of their knowledge, none of the three reasons specified in Georgia law should apply to them. *See, e.g.*, Declaration of Melissa [last name redacted] ¶¶ 9, 13 (attached as Exhibit 141); Declaration of Joel [last name redacted] ¶¶ 8–10 (attached as Exhibit 142); Declaration of Allison [last name redacted] ¶¶ 5–7 (attached as Exhibit 143).

[379] Ex. 140, O.C.G.A. § 21-2-234(c)(2). However, voters do not always read these notices or receive them at all. *See, e.g.*, Declaration of Carolyn [last name redacted] ¶¶ 19–20 (attached as Exhibit 144); Declaration of William [last name redacted] ¶¶ 10 (attached as Exhibit 145).

[380] Ex. 132, O.C.G.A. § 21-2-235(b).

[381] *Id.*

[382] Transcript of Proceedings Before the Hon. Steve C. Jones at 79, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Dec 19, 2019), ECF No. 615 (attached as Exhibit 146) (testimony of Chris Harvey).

[383] Ex. 140, O.C.G.A. §§ 21-2-234(a), (c)(2), 235(b); *see also* Paul M. Smith, *"Use It or Lose It": The Problem of Purges from the Registration Rolls of Voters Who Don't Vote Regularly*, ABA (Feb. 10, 2020), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/voting-rights/-use-it-or-lose-it---the-problem-of-purges-from-the-registration0.

[384] *See* Angela Caputo et al., *They Didn't Vote . . . Now They Can't*, APM Reps. (Oct. 19, 2018), https://www.apmreports.org/story/2018/10/19/georgia-voter-purge.

state.'"[385] In the decades since, the law has authorized the removal of hundreds of thousands of voters from Georgia's rolls.

> ### b.   Georgia Has Used Voter Purges to Disenfranchise Registered Voters

The practical effect of Georgia's voter purge process has been disenfranchisement of registered voters who otherwise should have been able to vote. Three notable characteristics of Georgia's voter purge process lead to this result. First, Georgia's process does not accurately identify people who have moved; the process is particularly error-prone when voters are purged only because of lack of contact with election officials. Second, Georgia's process does not effectively notify people when voters are removed from the rolls. Third, Georgia's process does not provide any recourse. Purged voters have no opportunity to cast a ballot that will count if they do not learn they were purged before trying to vote.

For more than a decade, these deficiencies have operated to disenfranchise countless voters in Georgia who had been properly registered and did nothing to deserve being purged from the rolls.[386]

> ### i.   2010 to 2016

Former President Barack Obama's presidential campaign generated substantial enthusiasm and caused a surge in voter registration. From 2006 to 2008, the total number of registered voters in Georgia grew by eighteen percent.[387] This growth was driven in large part by Black registrations, which increased by thirty percent—362,000 new Black voters were added to the rolls in just two years.[388] This period also saw a dramatic increase in the registrations of other voters of color.[389]

In response to the high turnout in 2008, Georgia aggressively removed voters from the rolls. From 2010 to 2018, then-Secretary of State Kemp purged well over a million voters—often under the

---

[385] *Id.* Letter from Deval L. Patrick, Ass't Att'y Gen. to Dennis R. Dunn, Sr., Ass't Att'y Gen. (Oct. 24, 1994) (attached as Exhibit 147).

[386] Georgia's mismanagement of its voter rolls extends beyond the particular voter purge process described in this section: registered Georgia voters frequently encounter roadblocks to voting because of incorrect information in the State's database indicating that they are not registered at the address they provided to election officials or no longer registered at all. *See, e.g.*, Declaration of Roxahne [last name redacted] ¶ 3 (attached as Exhibit 148); Declaration of Johnny [last name redacted] ¶¶ 6–7 (attached as Exhibit 149); Declaration of Gahalam [last name redacted] ¶ 4 (attached as Exhibit 150); Declaration of Khalidah [last name redacted] ¶¶ 7–8 (attached as Exhibit 151); Declaration of Andre [last name redacted] ¶¶ 4–16 (attached as Exhibit 152); Declaration of Rashidah [last name redacted] ¶¶ 7–8 (attached as Exhibit 153).

[387] *See* Angela Caputo, *et al.*, *They Didn't Vote . . . Now They Can't*, APM REPS. (Oct. 19, 2018), https://www.apmreports.org/story/2018/10/19/georgia-voter-purge.

[388] *Id.*

[389] *Id.*

**SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION**

"Use It or Lose It" law.[390] While Georgia's overall population grew between November 2012 and October 2016, the number of registered voters dropped from over 5.35 million to 5.17 million.[391] Georgia purged voters at a much higher rate during this period than it had previously: "Georgia purged twice as many voters—1.5 million—between the 2012 and 2016 elections as it did between 2008 and 2012."[392]

The pernicious effect of the soaring number of purged voters can be seen in the increase in provisional ballots cast in Georgia. When voters appear at the polls not knowing they have been purged, their only option is to cast a provisional ballot (which ultimately will not be counted).[393] Unsurprisingly, the rate at which provisional ballots were cast in Georgia increased in 2010 and 2014 as voter purge rates "correspondingly increased."[394]

### ii.   2017 to 2018

Following the surge in turnout for President Obama's 2008 election, voter participation lagged nationwide; over 100 million Americans of voting age did not cast ballots in 2016.[395] Because of the time frame set by Georgia's Use It or Lose It law, voters who cast ballots in the high-turnout 2008 election but skipped subsequent elections—and did not otherwise contact election officials—would have been purged before 2018.

---

[390] *See* Mark Niesse, *Changes Coming to Georgia Purges, Vote Counts and Voting Machines*, ATLANTA J. CONST. (Mar. 19, 2019), https://www.ajc.com/news/state--regional-govt--politics/measure-would-change-georgia-purges-vote-counts-and-voting-machines/lk1muv5jrC5SXI1wt29dzN/.

[391] *See* Tony Pugh, *Georgia Secretary of State Fighting Accusations of Disenfranchising Minority Voters*, McCLATCHY DC (Oct. 7, 2016), https://www.mcclatchydc.com/news/politics-government/article106692837.html.

[392] Jonathan Brater et al., PURGES: A GROWING THREAT TO THE RIGHT TO VOTE, BRENNAN CTR. FOR JUST. 1 (2018); *see also* Angela Caputo et al., *They Didn't Vote . . . Now They Can't*, APM REPS. (Oct. 19, 2018), https://www.apmreports.org/story/2018/10/19/georgia-voter-purge. *See* Geoff Hing, *Georgia Purged About 107,000 People From Voter Rolls: Report*, WABE (Oct. 19 2018), https://www.wabe.org/georgia-purged-about-107000-people-from-voter-rolls-report/ ("In the 2010 election cycle, when Kemp first took office, nearly 379,000 people were removed in counties across the state, according to data the state reported to the U.S. Election Assistance Commission. By 2014, the number of voters cancelled increased by more than 35 percent, to 517,000, according to state data.").

[393] *See* Ex. 134, O.C.G.A. § 21-2-418(a); Exhibit 135O.C.G.A. § 419(c)(3).

[394] Jonathan Brater et al., PURGES: A GROWING THREAT TO THE RIGHT TO VOTE, BRENNAN CTR. FOR JUST. 4 (2018) ("[P]rovisional ballots, which are given to voters who are missing from the voter rolls, had a statistically significant relationship to purge rates in previously covered jurisdictions").

[395] *See* Angela Caputo et al., *They Didn't Vote . . . Now They Can't*, APM REPS. (Oct. 19, 2018), https://www.apmreports.org/story/2018/10/19/georgia-voter-purge.



In 2017, in anticipation of the 2018 Gubernatorial Election in which then-Secretary of State Kemp would be a candidate, Georgia purged nearly 670,000 voters.[396] One report found that "in six of every 10 counties across Georgia, [B]lack voters were cancelled at a higher rate than their white peers for inactivity. And in more than a quarter of those counties [B]lack voters were removed at a rate 1.25 times their white peers."[397] These voters were never informed that they had been purged from the rolls. Without realizing they had been purged, many of these voters arrived to vote in 2018 only to be told they were no longer on the rolls. Their only option was to cast a provisional ballot, which ultimately would be rejected.[398]

iii. *2019 to Present*

H.B. 316, which was enacted in April 2019, modestly altered Georgia's voter purge process. Rather than moving active registrations to inactive status after a three-year gap in voting or contact with election officials, Georgia now makes this status change after a five-year period of no contact. In addition, the law now requires the State to send notice between thirty and sixty days before the purge.[399]

Despite these changes, Georgia's voter purges have continued apace: for the December 2019 purge, 313,243 voters were placed on the State's list of voters subject to cancellation.[400] Later, faced with Fair Fight Action's legal challenge to the purge, Georgia restored to the rolls about 22,000 of those voters.[401]

But many more voters were not restored to the rolls, despite having done nothing to warrant being ensnared in a process ostensibly about deregistering people who have moved out of Georgia. Worse yet, many of these voters—who did not actually move—received no notice that they would be purged.

[396] Ben Nadler, *Voting Rights Become a Flashpoint in Georgia Governor's Race,* AP NEWS (Oct. 9, 2018), https://apnews.com/article/fb011f39af3b40518b572c8cce6e906c.

[397] *See* Angela Caputo et al., *They Didn't Vote . . . Now They Can't*, APM REPS. (Oct. 19, 2018), https://www.apmreports.org/story/2018/10/19/georgia-voter-purge.

[398] *See, e.g.*, Email from Deb Cox, Lowndes Cnty. Official, to Chris Harvey, Sec'y of State Empl. (Nov. 14, 2018), State-Defendants-00055300 (attached as Exhibit 154) (showing that one county rejected 93 ballots in the 2018 election for "NOACT2GE," i.e., No Activity for 2 General Elections, which is code for the purge process).

[399] Ex. 132, O.C.G.A. § 21-2-235(b).

[400] Ex. 138, McDonald Report at 4.

[401] Maya T. Prabhu & Mark Niesse, *22,000 Reinstated to Voting Rolls as Georgia Attorneys Defend Purge*, ATLANTA J.-CONST. (Dec. 20, 2019), https://www.ajc.com/news/state--regional-govt--politics/000-reinstated-voting-rolls-georgia-attorneys-defend-purge/c4fp7iGVwnVr4WEbR1uulJ ("The 22,000 records that are being moved back into inactive status are people who last had contact with the voter registration system between January and May 2012," the secretary of state's office said in the press release).



For example, Kilton of Warner Robbins, Georgia, was purged in 2019.[402] Kilton had lived at the same address for over fifty years, but had not voted in recent elections.[403] Due to his recent inactivity, Georgia added Kilton to the 2019 voter purge list.[404] Typical of many voters, Kilton never received notice that he was on the purge list despite the State-law notice requirement—rather, he first learned of his status when he was told by a representative of Fair Fight Action.[405]

Likewise, Clifford had lived at the same Fulton County address for over thirty years when he discovered that he was on the voter purge list.[406] Clifford had not voted in recent elections, but he still wished to remain on the rolls.[407] Like other Georgia residents, Clifford never received notice from the Secretary of State's office about his voter status or his pending removal from the rolls.[408] Instead, Clifford first learned that he was on the voter purge list via notification from Fair Fight Action.[409] David of Richmond County had the same experience.[410] Even though he had not moved, he was purged in 2019 and did not find out about his status until notification by a Fair Fight Action staff member.[411]

Chryshawn's story is yet another example.[412] Chryshawn, who had lived at the same Fulton County address for approximately ten years, tried to vote early in October 2020, but a poll worker said that she was not registered to vote.[413] Chryshawn never received notice from the State about being

---

[402] Declaration of Kilton [last name redacted] ¶¶ 2, 5 (attached as Exhibit 155).

[403] Id. ¶¶ 3, 4.

[404] Id. ¶¶ 4, 5.

[405] Id. ¶¶ 5, 6.

[406] Declaration of Clifford [last name redacted] ¶¶ 3, 6 (attached as Exhibit 156).

[407] Id. ¶¶ 4, 7.

[408] Id. ¶ 6.

[409] Id.

[410] Declaration of David [last name redacted] ¶¶ 2, 5 (attached as Exhibit 157).

[411] Id. ¶ 5.

[412] Declaration of Chryshawn [last name redacted] ¶ 4 (attached as Exhibit 158).

[413] Id. ¶ 5.



purged, nor was Chryshawn informed that the law required a brand new registration application to be submitted before the deadline.[414]

The expert reports prepared by Professor Michael McDonald in *Fair Fight Action v. Raffensperger* explain the flaws in Georgia's purge process that have given rise to these voters' stories. According to Professor McDonald's analysis of the 2019 voter purge, at least 59,866 of the voters purged in 2019 for their failure to have contact with election officials had *not* actually moved from their voter registration address.[415] On top of that, 14,732 voters flagged for the 2019 purge because they filed a NCOA form with the U.S. Postal Service had not actually filed one.[416] And many voters who did file a NCOA form had done so for a change of business address or a change of their P.O. Box—not a change of their residential address.[417] But Georgia's policy was to purge these voters from the rolls anyway.

B.    Georgia Voters Experience Other Significant Roadblocks when Voting.

The VRAA—and similar legislation—is critical to mitigating Georgia's pervasive disenfranchisement of voters—and in particular Black, brown, and poor voters—and curbing the official practices of polling place closures and unjustifiable restrictions on voter registrations and eligibility. But these problems represent only some of the hurdles Georgians face when attempting to make their voices heard. The significance of legislation like the VRAA can be understood only within the broader context of the additional obstacles eligible voters face. Although not every way a State may interfere with voting rights is directly addressed by the VRAA, the existence of additional impediments to voting drive home the need for Congress to act to provide robust federal protections.

Ultimately, Georgia voters must overcome obstacles at nearly every stage of the voting process. They must work to make sure their registrations count and are not cancelled arbitrarily. They must navigate shifting polling locations and precincts, or the unpredictable absentee ballot process. And, as this Section details through just a small selection of individual voters' stories, Georgians face substantial obstacles while—and after—they vote.

Voters must wait in sluggish, hours-long lines, exacerbated by under-resourced and under-trained poll workers. These lines are especially burdensome on elderly voters, who may not know or be told they can advance to the front, or voters who must go to work or school. Voters endure even longer waits if a polling machine malfunctions or if there are not enough machines or electronic poll books to handle the crowds attempting to vote. Once voters make it to the front of the line, they may be told there is an

---

[414] *Id.* ¶ 6.

[415] Ex. 138, McDonald Report at 17.

[416] *Id.*

[417] Ex. 137, Supplemental McDonald Report at 6-8.



unexpected problem with their registration (even if they confirmed their registration status before going to vote) or that they are at the wrong polling location. Often, voters facing these circumstances are not given the opportunity to vote provisionally despite being eligible to do so. Compounding the effects of these problems, election officials have fomented a climate of suspicion toward voters, resulting in individual voters being harassed or targeted in myriad ways. Georgia's is not a healthy election system but not for the reasons that some disingenuously contend. Even with the anticipated reforms of the VRAA on the horizon, there is still significant work to be done.

    1.   <u>Long Lines</u>

    Long lines and delays at polling places make it difficult for voters to cast their ballots. As the Secretary of State reports, voter registration in Georgia has been on the rise for the last two decades. The number of registered voters in Georgia has climbed from over four million in November 1998 to over 7.6 million by November 2020.[418] Despite their eagerness to participate in the electoral process, Georgians often confront an insurmountable hurdle when they show up to vote: egregiously long lines and wait times. In the past few elections, long lines have been exacerbated by the State providing inadequate or malfunctioning voting machines, unresponsive electronic poll books, insufficient emergency paper and provisional ballots at polling places, inadequate training of poll workers, flawed registration data, and insufficient polling locations. According to an analysis of state and local records by Georgia Public Broadcasting and *ProPublica*, the average number of voters packed into polling locations in the nine metropolitan Atlanta counties increased by nearly forty percent from 2012 to 2020—from approximately 2,600 to over 3,600 voters per polling location.[419]

    The State has failed to take adequate measures to address these issues and prevent long lines from burdening Georgians' right to vote, particularly in communities of color.

[418] *Historical Voter Registration Statistics, State of Georgia, 1998 to Present*, GA. SEC'Y OF STATE, https://sos.ga.gov/admin/ uploads/Voter_Registration_Statistics_03032021.pdf (last visited Apr. 11, 2021) (attached as Exhibit 159).

[419] Stephen Fowler, *Numbers Have Soared, and Their Polling Places Have Dwindled.*, PROPUBLICA (Oct. 17, 2020), https://www.propublica.org/article/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-their-numbers-have-soared-and-their-polling-places-have-dwindled (explaining that "Georgia law sets a cap of 2,000 voters for a polling place that has experienced significant voter delays, but that limit is rarely if ever enforced").

## SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION

The experiences of voters in recent presidential elections is illustrative. In the November 2016 election, countless voters faced long lines at their polling places and ultimately were unable to cast a ballot:

- In Fulton, Gwinnett, DeKalb, and Cobb Counties—the most populous in the state—Georgians waited over two hours to vote, and in Gwinnett County at least three people collapsed from heat exhaustion while waiting in line during early voting.[420]

- Gwinnett County voter Derrick arrived at his polling place at 6:55 a.m., finding between thirty and fifty people already in line. At 7:45 a.m., a poll worker emerged and reported that none of the machines were working and that a poll worker had been dispatched to obtain new cards for the machines in hopes of rectifying the issue. Another poll worker estimated that it would take one and a half to two hours to address the problem. Within five minutes, over seventy people in line—approximately ninety percent of those present—left the polling place. The cards finally arrived at 9:40 a.m,. and Derrick cast his ballot after waiting nearly three hours to do so.[421]

Election Day 2018 was no better. Once again, the State failed to take adequate action to prevent intolerably long lines and wait times. Across the State, voters waited as long as four and a half hours to vote. Some voters waited in line multiple times on Election Day because they could not continue waiting the first time:

- Cobb County voter Tunnizia left her home at 6:30 a.m. on Election Day and waited for one hour at her polling place until she had to leave the line to go to work. She returned during her lunch break at 2:20 p.m. and remained in line for over three hours before finally being allowed to vote at 5:30 p.m. Because she was only allowed a one-hour lunch break, she lost two hours of pay while waiting in line to vote.[422]

- Gwinnett County voter Jeffery arrived at his polling place at 8:45 a.m., discovering at least 125 people in line to vote. No one had voted because the machines were malfunctioning, and when additional machines were brought in, those machines did not work either. The poll workers later

---

[420] Barrett Holmes Pitner, Opinion, *Early Voting Lines Are So Long, People Are Fainting. That Harms Democracy*, THE GUARDIAN (Oct. 19, 2016), https://www.theguardian.com/commentisfree/2016/oct/19/early-voting-lines-georgia; *see also* Tony Thomas et al., *Some Wait Several Hours as Early Voting Begins in Georgia*, WSB-TV (Oct. 17, 2016), https://www.wsbtv.com/news/politics/early-voting-begins-across-state/458139151 (explaining that for the first two weeks of early voting, Gwinnett County had only one location open during business hours).

[421] Declaration of Derrick [last name redacted] ¶ 4 (attached as Exhibit 160).

[422] Declaration of Tunnizia [last name redacted] ¶ 4 (attached as Exhibit 161).



sent for new cards for the machines. Over four hours later—at 12:49 p.m.—Jeffery finally cast his ballot.[423]

- Chatham County voter Hollie first arrived at her polling place in the morning and waited one hour and twenty minutes before having to leave for a meeting. She returned after her meeting but had to wait an additional four and a half hours in line before voting.[424]

Long lines drove many Georgians away from the polls before they could see the inside of their polling places, let alone vote:

- Chatham County voter Kevin went to vote at 9:00 a.m., but left because of the long line. He returned at 1:00 p.m. and observed about twenty people leaving the line. Kevin counted approximately 128 people in front of him. He left the line because he estimated at the pace the line was moving, it would take eight hours for him to vote because only two of the seven machines at the polling place were working. He returned to the polling place at 4:30 p.m. and voted a regular ballot after waiting for an hour and a half.[425]

- Gwinnett County voter Velma, who was wearing a boot because of a broken toe, waited in line for two hours and forty-five minutes to vote. She observed fifty people leave without voting because the line was too long.[426]

- Shannon, a poll watcher in Fulton County, observed several voters leaving because of the long wait times. Many "indicated that they would have difficulty returning," or had to leave because they had arrived with young children—"to expose them to voting"—who could not wait for hours.[427]

- Barbara, a poll watcher in Chatham County, saw many voters leave a line that had grown to be four hours long by 4:00 p.m. Barbara spoke with one woman who had waited for two hours by

---

[423] Declaration of Jeffery [last name redacted] ¶ 3(attached as Exhibit 162).

[424] Declaration of Hollie [last name redacted] ¶ 4 (attached as Exhibit 163).

[425] Declaration of Kevin from Chatham [last name redacted] ¶ 3 (attached as Exhibit 164).

[426] Declaration of Velma [last name redacted] ¶ 3 (attached as Exhibit 165); Declaration of Patricia [last name redacted] ¶ 4 (attached as Exhibit 166) (describing a 3.5-hour wait and observing her neighbor and others leave before voting because of the long lines).

[427] Declaration of Shannon G. from Fulton [last name redacted] ¶¶ 6–7 (attached as Exhibit 167).

the time the clock struck 8:00 p.m. and had to leave without voting because she had to be at work at 4:00 a.m. and had to put her kids to bed.[428]

- Angel, a poll watcher in Fulton County on election day in November 2018, observed "dozens of people leave the line in frustration" because wait times averaged two to four hours throughout the day, due to "insufficient staff to assist voters and an inadequate number of operable voting machine[s] to handle the volume of the combined polling places."[429]

- Sharman, a poll watcher in Cobb County, observed twenty to twenty-five voters who "got very close to the front of the line," but ultimately "had to abandon the line to pick up their children from daycare or return to work." Wait times averaged from one and a half to two and a half hours at the polling place.[430]

Many people did not have the option to wait in an hours-long line and thus were unable to vote:

- Fulton County voter Ann waited for an hour to vote but due to health issues that made it difficult for her to stand for long periods of time, including a pinched nerve, she was forced to leave without voting.[431]

- Fulton County voter Arnaud arrived at his polling place at noon and waited half an hour to vote; he was told it would take another hour due to the long line, but Arnaud had to return to work. He returned at 4:00 p.m. and waited half an hour but was told that the wait would be two to three hours. He left and again returned at 6:30 p.m., at which point he could not even find a parking space for his car. He was told the wait time to vote was three to four hours. Due to the long wait times and his inability to find parking, Arnaud could not vote.[432]

- When Chatham County voter Pamela arrived at her polling place at 7:00 a.m., she found that the line to vote was already so long that most of the parking lot, a nearby field, and the street were being used for the line. She waited for thirty minutes before leaving out of a concern for her safety because of how people were lined up by the gutters in the street as cars passed. She returned at 1:30 p.m. By then, approximately 200 people were lined up in the parking lot and field, many seated on the hot pavement. She waited for two hours, moving only half the distance in that time.

---

[428] Declaration of Barbara from Chatham [last name redacted] ¶10-11 (attached as Exhibit 168).

[429] Declaration of Angel [last name redacted] ¶ 4 (attached as Exhibit 169).

[430] Declaration of Sharman [last name redacted] ¶¶ 6-7 (attached as Exhibit 170).

[431] Declaration of Ann [last name redacted] ¶¶ 3-5 (attached as Exhibit 171).

[432] Declaration of Arnaud [last name redacted] ¶ 4 (attached as Exhibit 172).



At 2:30 p.m., she heard voters who had just voted say they had been at the polling place since 10:30 a.m. Eventually, she had to leave when it was time for her son to come home from school. She returned for the third time at 6:30 p.m. and again saw people lined up in the parking lot and the street. Unable to find a parking spot and concerned about waiting in line in the street in the dark, she went home without having the chance to cast a ballot.[433]

● Chatham County voter Noell went with her six-year-old daughter to vote at 5:00 p.m. She asked an officer at the polling place how long the wait was, and the officer told her that if she were about twenty yards ahead in line, the wait would be three hours and fifteen minutes. Noell could not wait over three hours with her six-year-old daughter, and was forced to leave before casting a ballot.[434]

Long wait times plague polling places in Georgia for several reasons, including equipment problems. In the 2018 election, the State failed to ensure polling places were given sufficient emergency paper ballots to use in the event of voting machine malfunctions. The State also failed to provide adequate instructions to poll workers on how to use emergency paper ballots to address persistently long lines.[435] Voters waited in lines for hours without ever being offered emergency paper ballots, even when voting machines stopped working. Moreover, the State failed to provide an adequate number of provisional ballots to accommodate the increase in their usage given the aforementioned polling location closures and consolidations:

● Chatham County voter Atlas had voted at his regular polling place for years. In the November 2018 election, after waiting in line from 6:40 p.m. to 9:43 p.m., he was told he was at the wrong polling place. The polling place was out of provisional ballots, and he was told he could not vote at the other polling place because its line had closed.[436]

● Margaret was a poll watcher in Fulton County. Around 4:45 p.m., the locations she was observing ran out of envelopes for provisional ballots. Envelopes were not delivered until 5:20

---

[433] Declaration of Pamela from Chatham [last name redacted] ¶ 4 (attached as Exhibit 173).

[434] Declaration of Noell [last name redacted] ¶ 4 (attached as Exhibit 174).

[435] Poll Worker Manual, Ga. Sec'y of State (2018), State-Defendants-00146399 (attached as Exhibit 175); *see also* Poll Worker Manual, Ga. Sec'y of State (2016), State-Defendants-00095472 (attached as Exhibit 176).

[436] Declaration of Atlas [last name redacted] ¶¶ 4, 6–7 (attached as Exhibit 177).



p.m., causing voters to wait between ten to forty additional minutes to seal their ballots on top of initially waiting to vote for at least an hour and a half.[437]

● Barbara was a poll watcher in Chatham County. When she asked the poll manager if the polling place had enough provisional ballots, he responded that they had enough because they had only eight or nine provisional voters for an election. The polling place ran out of provisional ballots by early evening. Four individuals who had already been in line for four hours were forced to wait again for delivery of additional provisional ballots.[438]

Flawed registration data has further compounded long lines and wait times. In the 2018 election, numerous voters showed up at polling places in their counties of residence only to learn, after waiting in line for hours, that they were assigned to vote at another polling place. The result was voters forced to wait in line at multiple polling places, further exacerbating wait times across the state. These problems largely occurred due to outdated data in the State's voter registration system, as well as insufficient notice to voters about their assigned polling places for the 2018 election. Inadequate poll worker training made matters even worse. The State did not educate poll workers on how to manage historically long lines; as a result, poll workers were not sure of how to handle voters assigned to a polling location other than the one at which they had arrived:

● Fulton County voter Dawn, who had lived in the County for fourteen years at the time of the 2018 election, waited two hours to vote before a poll worker scanned her identification and told her she was registered in Gwinnett County and would have to vote there. Dawn drove to Gwinnett County, where she had not lived for years, and waited another twenty minutes to vote.[439]

● Gwinnett County voter Talisha had been notified of her assigned polling place in 2016 and had voted there that year. In 2018, she went to the same polling place; she did not receive a notice that the polling location had changed. She waited in line for two hours. It was not until she got to the front of the line that poll workers informed her she was not at her assigned polling place. Talisha explained that she could not go to the reassigned polling place because of childcare responsibilities and had to vote provisionally.[440]

● Henry County voter Blakke checked her polling place online and learned that she had to go to the courthouse to vote. She received no notice by mail that she had been assigned to a different

---

[437] Declaration of Margaret [last name redacted] ¶ 3 (attached as Exhibit 178).

[438] Ex. 168, Declaration of Barbara from Chatham [last name redacted] ¶¶ 4, 9, 11.

[439] Declaration of Dawn [last name redacted] ¶ 4 (attached as Exhibit 179).

[440] Declaration of Talisha [last name redacted] ¶ 3 (attached as Exhibit 180).



polling place. At the courthouse, however, she was told that she was not at the correct polling place and was sent to a different location. Blakke traveled there and waited for over two hours. And yet, when she got to the front of the line, she was again told that she was not at the right place. Because Blakke had to go to work and had child care responsibilities, she could not go to a different polling place and had to vote provisionally.[441]

● Cobb County voter Jessica waited for one and a half hours with her daughter before a poll worker told her she could not vote unless she first drove to another location to void an absentee ballot she had requested but not used. After calling an election protection hotline, she learned that she had the right to vote provisionally at the polling location. Jessica returned to the polling place, asked to void the absentee ballot and cast a provisional ballot.[442]

● Melanie, a poll watcher in Gwinnett County, observed "numerous occasions where no voters were voting at all while the line was held up" with poll workers searching for voters in the computers.[443]

● Mollye, a poll watcher in Fulton County, observed so many voters (who had already waited hours) being told that they were at the wrong polling place that a bus was chartered to drive them to the correct location.[444]

These voters' stories reflect a broader problem in the administration of elections in Georgia. A nationwide study of wait times at polling places in the 2018 election, conducted by researchers from the Bipartisan Policy Center and the Massachusetts Institute of Technology, found that Fulton County, Georgia, had the longest wait times of 3,119 polling places studied.[445] Remarkably, the average wait time in Fulton County was two and a half times the national average.[446] Fulton County stood out not just compared to polling places in other states in 2018, but also compared to polling places in other states

---

[441] Declaration of Blakke [last name redacted] ¶ 3 (attached as Exhibit 181).

[442] Declaration of Jessica [last name redacted] ¶ 4 (attached as Exhibit 182).

[443] Declaration of Melanie [last name redacted] ¶ 8 (attached as Exhibit 183).

[444] Declaration of Mollye [last name redacted] ¶ 3 (attached as Exhibit 184).

[445] THE 2018 VOTING EXPERIENCE: POLLING PLACE LINES, BIPARTISAN POL'Y CTR. 8, 34 (Nov. 2019), https://bipartisan policy.org/wp-content/uploads/2019/11/The-2018-Votin-Experience.pdf (the report states that "Georgia" had the longest wait times; however, the report only analyzed data from Fulton County, confirming that these results were indeed for Fulton County).

[446] *Id.*



with large turnout increases in 2018.[447] Since other states with "equally large turnout increases saw relatively minor increases in their wait times," the researchers concluded that states like Georgia that "experienced big-wait-time increases in 2018 [had] pushed the resources at hand, mainly check-in locations and voting machines, to their capacity limits or beyond."[448]

Long wait times attributable to inadequate resources and poll worker training continued in the June 2020 primary election.[449] Voters waited as long as seven hours to vote. Multiple postelection analyses of long lines and wait times confirmed that these burdens on the franchise were disproportionately experienced by voters of color. According to an analysis by the *Atlanta Journal-Constitution*, approximately eleven percent of voting sites in Georgia closed over an hour late. "Black voters bore the brunt of long lines and late closings in overcrowded, understaffed and poorly equipped polling places. Only sixty-one percent of majority Black precincts closed on time compared with eighty percent of mostly white precincts."[450] One expert analysis similarly concluded that "long lines . . . were disproportionately experienced by minority voters."[451] Specifically that analysis found, "[a]mong polling places where minorities made up over 90 percent of registered voters, 36 percent were forced to stay open over one hour past the specified closing time to accommodate long lines."[452] In contrast, "[a]mong polling places where whites made up over 90 percent of registered voters, less than 3 percent of polling places were required to stay open late in order to accommodate long lines."[453] Wait times mirrored these racial disparities: "In polling places where minorities constituted more than 90 percent of active registered voters, the average minimum wait time in the evening was 51 minutes. When whites constituted more than 90 percent of registered voters, the average as around six minutes."[454] It quickly became clear that

---

[447] *Id.* at 10, 16.

[448] *Id.* at 10.

[449] *See* Stephen Fowler, *'It Was Very Chaotic': Long Lines, Voting Machine Issues Plague Georgia Primary*, NPR (June 9, 2020), https://www.npr.org/2020/06/09/873054620/long-lines-voting-machine-issues-plague-georgia-primary (detailing the widespread problems across Georgia during the June 2020 election, including situations where "problems with voting machines . . . led officials to use backup paper provisional ballots – until those quickly ran out," "delay[s] in opening after poll managers were not given correct access codes to set up the touchscreen ballot-marking devices that print out a paper ballot with a voter's choices," "reports of equipment being delivered to the wrong locations and delivered late," and "reports of poll workers not understanding setup or how to operate voting equipment").

[450] *Id.*

[451] Expert Report of Dr. Jonathan Rodden at 2, *Anderson v. Raffensperger*, No. 1:20-cv-03263-MLB, (N.D. Ga. Sep. 1, 2020), ECF No. 93-61 (attached as Exhibit 185).

[452] *Id.* at 3.

[453] *Id.*

[454] *Id.*

the disparate wait times were caused by the uneven distribution of a wide variety of polling place difficulties. "[T]he prevalence of relatively serious polling place difficulties was more than three times greater in majority-minority polling places than in majority-white polling places."[455]

The *Atlanta Journal-Constitution* concluded that high turnout did not "fully explain why voters in mostly Black communities experienced longer waits," since "[m]ajority Black polling places with significant turnout – more than 400 voters – closed an average of 49 minutes later than smaller precincts," while "similar locations with mostly white voters closed just four minutes later."[456]

Once again, some voters could not wait for hours to vote and therefore had to leave before casting their ballots.

- Fulton County voter Kimberley arrived at her polling place at 6:15 p.m. and waited for over six hours—until 12:30 a.m.—to vote. When she finally reached the check-in booth, she was told she was at the wrong precinct and offered a provisional ballot. While waiting in line, she observed several people in line in front of her leave before voting.[457]

- Fulton County voter Lazar waited for seven hours—from 9:00 a.m. to 4:00 p.m.—to vote. While waiting, Harris observed several cars arrive to the parking lot and immediately leave after the putative voters realized how long the line was.[458]

- Kimberley and Lazar were not alone: numerous other voters experienced similarly long waits—lasting up to the length of a full workday—and observed people leaving lines during the full-day waits to vote. [459]

- Fulton County voter Darra drove by her polling place in the morning and saw a line longer than she had ever seen before, so she returned later with her mother. When she returned at 5:00 p.m.,

---

[455] *Id.*

[456] *See* Mark Niesse & Nick Thieme, *Extreme Voting lines expose where Georgia primary failed*, ATLANTA J-CONST. (July 28, 2020), https://www.ajc.com/politics/extreme-voting-lines-expose-where-georgia-primary-failed/YQUMSTEBVFAY7CR7UQOQEHSVLI.

[457] Declaration of Kimberely [last name redacted] ¶¶ 6–11 (attached as Exhibit 186).

[458] Declaration of Lazar [last name redacted] ¶¶ 4, 6–7 (attached as Exhibit 187).

[459] *See* Declaration of Joseph [last name redacted] ¶¶ 14, 24 (attached as Exhibit 188) (describing waiting seven hours to vote and watching numerous people leave the line before voting); Declaration of Shari [last name redacted] ¶¶ 4-17 (attached as Exhibit 189) (describing waiting seven hours to vote and casting a ballot after 10:00 p.m.); Declaration of Elizabeth [last name redacted] ¶ 4 (attached as Exhibit 190) (describing waiting more than five hours to vote and observing many other potential voters leave the line before voting, in part because of a forty-five-minute rain storm); Declaration of Catherine [last name redacted] ¶¶ 3-4, 9 (attached as Exhibit 191) (describing waiting more than five hours to vote, watching one other potential voter leave before voting, and only a few machines being used because of the slow speed of the check-in process for voters); *see*



she was shocked to see a line that extended down the street including people who had been waiting since 12:30 p.m. Her sixty-five-year-old mother could not stand for multiple hours and learned there would be an approximately three-hour wait until there would be a spot at which she could lean on something. There was nowhere to sit, so Darra's mother left without voting. Darra finally voted at approximately 10:00 p.m., five hours after she had arrived.[460]

- Darra's polling place, Christian City, an assisted living community south of Atlanta, was the last polling place in Georgia to close, well after midnight.[461] According to the *Atlanta Journal-Constitution*, there were 642 voters throughout the day at the polling location, and the last voter was not checked in until 12:21 a.m.[462] The polling place is within Union City, an Atlanta suburb nearly eighty-eight percent Black.[463]

- Fulton County voter Lucille, who was seventy-one years old, arrived at 9:00 am to vote before work. She had to leave for work before reaching the front of the line. She returned at 4:00 p.m.,

---

*also* Declaration of Katherine [last name redacted] ¶¶ 8-9 (attached as Exhibit 192) (describing waiting for more than six hours to vote); Declaration of Ian [last name redacted] ¶¶ 3-4 (attached as Exhibit 193) (describing waiting in line for an hour and a half in the morning before having to leave for work, and coming back at 3:30 p.m. and waiting in a line that was approximately a quarter of a mile long and took three hours); Declaration of Kimberly [last name redacted] ¶¶ 9, 18 (attached as Exhibit 194) (explaining a six-hour wait and comparing the six voting machines at the polling place to the eighteen to twenty voting machines to which she was accustomed at her usual voting place); Declaration of Kyla [last name redacted] ¶¶ 7, 9 (attached as Exhibit 195) (describing a five-hour wait to vote at a polling place in a "predominantly black area of town"); Declaration of Christina from Fulton [last name redacted] ¶¶ 6, 8 (attached as Exhibit 196) (describing a wait time of more than four hours to vote and explaining that "[i]f you were lucky enough to find a place to park, you then had to walk a long way to get to the end of the line," which made her "worried for any senior citizen that might be forced to walk for [sic] that distance to vote"); Declaration of Allison S. from Fulton [last name redacted] ¶¶ 3 (attached as Exhibit 197) (describing having waited four and a half hours to vote); Declaration of Thomas [last name redacted] ¶ 33 (attached as Exhibit 198) (describing a wait of more than five hours to vote); Declaration of Brianna [last name redacted] ¶¶ 5-6 (attached as Exhibit 199) (describing a four-hour wait to vote, exacerbated by a medical disability making it difficult for her to stand for extended periods of time); Declaration of Grace [last name redacted] ¶¶ 7–8 (attached as Exhibit 200) (describing her experience of waiting an hour to vote before having to leave for work); Declaration of Alli [last name redacted] ¶ 11 (attached as Exhibit 201) (documenting lines over five hours long).

[460] Declaration of Darra [last name redacted] ¶¶ 4–7, 10, 13 (attached as Exhibit 202).

[461] *See* Mark Niesse & Nick Thieme, *Extreme Voting lines expose where Georgia primary failed*, ATLANTA J-CONST. (July 28, 2020), https://www.ajc.com/politics/extreme-voting-lines-expose-where-georgia-primary-failed/YQUMSTEBVFAY7CR7UQOQEHSVLI (listing several polling places in Fulton and DeKalb Counties closing well after 10:00 p.m. in the June 2020 election).

[462] *Id.*

[463] Stephen Fowler, *Why Do Nonwhite Georgia Voters Have to Wait in Line for Hours? Their Numbers Have Soared, and Their Polling Places Have Dwindled*, PROPUBLICA (Oct. 17, 2020), https://www.propublica.org/article/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-their-numbers-have-soared-and-their-polling-places-have-dwindled

when the line was shorter; nevertheless, the line hardly moved for the following hour and Lucille had to go home because she could not wait outside due to the heat at that hour. She returned at 6:30 p.m., only to find the line longer than when she had left. She physically could not wait in the line and left, hoping to return before 9:00 p.m., when the polls closed. Lucille ultimately could not return to the poll.[464]

- Chatham County voter Matthew went to vote at 2:00 p.m. There were only five people in line, but only one of the four voting machines was working. When Matthew got to the machine to vote, it also stopped working. The poll worker asked the people waiting to come back later. At approximately 4:00 p.m., Matthew had to go to work and asked for a provisional ballot.[465]

- Fulton County voter Canute immigrated to the United States in 2012 and became a naturalized citizen in February 2019.[466] Canute was eager to vote in his first election and attempted to apply for an absentee ballot three times to minimize potential exposure to the COVID-19 virus and protect his family members.[467] When he received no response by June 5, 2020, he went to vote in person for the June 2020 Primary.[468] He found over 200 people in line when he arrived at his polling place at 3:50 p.m.[469] He waited for nearly five hours, mostly outside in the rain.[470] Canute recalled watching a gentleman who had trouble walking and standing sit on the wet ground until the next time the line moved.[471]

- DeKalb County voter Raye learned that his precinct voting location had been moved without notice. When he arrived at his new location, he found that three polling locations had been consolidated, though each precinct had a separate area for voting.[472] Raye waited nearly an hour

---

[464] Declaration of Lucille [last name redacted] ¶¶ 6, 8–9 (attached as Exhibit 203); *see also* Declaration of Kiplyn [last name redacted] ¶¶ 11-12, 17 (attached as Exhibit 204) (explaining that her eighty-one-year-old father waited more than three hours to vote early in the June 2020 primary election and was not offered the opportunity to advance in line or be seated during the wait outside the polling place on the basis of his age).

[465] Declaration of Matthew [last name redacted] ¶¶ 3, 5 (attached as Exhibit 205).

[466] Declaration of Canute [last name redacted] ¶ 3 (attached as Exhibit 206).

[467] *Id.* ¶ 4.

[468] *Id.* ¶ 5.

[469] *Id.*

[470] *Id.* ¶¶ 5-9.

[471] *Id.* ¶ 6.

[472] Declaration of Raye [last name redacted] ¶ 4-5 (attached as Exhibit 207).



and a half to vote.[473] He observed that the precinct lines for the two primarily white precincts were much shorter and better managed, with ten to twelve active poll workers and easy access to voting machines, whereas his precinct—which was a predominantly Black precinct—had only two intake poll workers and was much more cramped.[474]

Again, in 2020, voters were not consistently offered the opportunity to vote by provisional or emergency ballot when appropriate. Even where provisional ballots were offered, polling places often ran out of ballots or envelopes:

- Fulton County voter Nolan waited in line at a polling place where voting hours were extended and stayed in line to vote a provisional ballot. Nolan overheard the poll manager saying that the polling place had run out of provisional ballot envelopes, and voters were told to fold their ballots in half and place them in a bag without external envelopes. As Nolan put it: "It made me feel like I was witnessing voter suppression in action. Why were there not enough envelopes? I felt like all the ballots in that bag would not be counted. They could be tampered with. There were about 100 people behind me yet to vote."[475]

- DeKalb County voter Meredith tried to vote in person after not timely receiving her absentee ballot. She had learned that she could cancel her absentee ballot at her polling place and vote in person. After waiting for two hours in line, she was told that she could not vote on the machines because she had requested an absentee ballot, and that the polling place did not have the paperwork to allow her to cancel her absentee ballot. When she asked for a provisional ballot, she was told the polling place had no provisional ballots either and that individuals could only vote on the machines. Meredith had to leave for work and could stay no longer. As Meredith explained afterward, "It was very discouraging. I think a lot of people didn't even try to vote, because it was too hard."[476]

And again, many of these problems were due to grossly inadequate poll worker training:

- Before the June 2020 election, Anthony of Gwinnett County was asked to be a poll manager at a polling place.[477] He was "apprehensive about taking on the responsibility" because he had "zero experience," but he was assured that he "would be working with six other poll workers and that

---

[473] Id. ¶ 7.

[474] Id. ¶ 10.

[475] Declaration of Nolan [last name redacted] ¶¶ 3–7 (attached as Exhibit 208).

[476] Declaration of Meredith [last name redacted] ¶¶ 2, 4, 9-12 (attached as Exhibit 209).

[477] Declaration of Anthony [last name redacted] ¶ 8 (attached as Exhibit 210).



there would be experienced poll workers" at the polling place.[478] Anthony received "pitiful" training that "didn't make up for [his] lack of experience." As he explained,

> I didn't receive, for example, any meaningful training on how to handle Election Day voters who had received, but not submitted absentee ballots. Nor did I receive any meaningful training on how to handle provisional ballots. And I received only a passing mention about what to do if a voter who showed up at the polling place wasn't listed on the voter list loaded to our Poll Pads. Managers did have a big binder they could reference on Election Day that apparently had a lot of this information in it—but it was about the size of a Webster's Dictionary and, unless you knew where to look, almost impossible to find what you needed. And more fundamentally, I never learned, during training or otherwise, how to set up a polling place or how and why we move voters from one station to the next. The closer we got to June 9th, the less prepared I felt.[479]

o   Anthony explained that his polling location was supposed to receive the equipment, including the voting machines, on the Friday before Election Day, but no one showed up. No one could tell him where the machines were or when they would arrive. Late Monday night, he received an email that if his polling location had not yet received equipment, they were to use the backup emergency paper ballots, of which the location had a limited supply.[480]

o   On Election Day, Anthony opened the polling place without ballot marking devices, scanners, printers, voting machines, or the backup power supply needed to run this equipment. Some voters who showed up left when they learned that they would be using paper ballots. Over four hours after the polls opened, at 11:30 a.m., the polling place received all of its equipment.[481]

o   Anthony was told there would be six other poll workers, but there were only three; likewise, he was told two Assistant Managers must be on site, but there was only one. None had any experience. Nor were any election officials available at the phone number

---

[478] *Id.*

[479] *Id.* ¶ 9.

[480] *Id.* ¶ 10.

[481] *Id.* ¶ 11.

he had been given to call if problems occurred, which number he dialed several times. As Anthony recalled, "I just wish we had more help."[482]

o   Less than an hour before the polls closed, the polling place was told that if the polling place had used emergency ballots during the day, the poll workers had to scan them individually into a voting machine; if the machine rejected an emergency ballot, the poll workers had to duplicate the ballots by hand and scan the duplicate. The poll workers had received no training on this process and this was the first time Anthony had heard about duplicating votes by hand. The poll workers did not feel comfortable duplicating ballots and provided any ballots that the machine did not accept to the county elections office instead of duplicating them.[483]

o   Anthony continued to complete the closing procedures late into the night, but was cut short when a county elections official called him around midnight and told him to "stop whatever [he] was doing, throw everything, including ballot materials, into a bag, and bring to the County elections office."[484]

Voters faced similar difficulties in the 2020 General Election.

● Chatham County voter Donna planned to vote early in the 2020 election. She arrived at her polling place at 8:15 a.m. on October 12, 2020, and found a line wrapped around the building.[485] She estimated a thousand people were waiting in line. She took eight hours and thirty-five minutes to vote.[486] As Donna waited, she observed the difficulties faced by the other voters in line.[487]

---

[482] *Id.* ¶ 12.

[483] *Id.* ¶ 13.

[484] *Id.* ¶ 14.

[485] Declaration of Donna from Chatham [last name redacted] ¶ 4 (attached as Exhibit 211).

[486] *Id.* ¶ 10.

[487] *Id.* ¶¶ 5-8.



  o Donna saw a mother waiting with her daughter for her daughter's first voting experience but who had to eventually leave after three hours in line to go to work.[488]

  o Donna saw an older gentleman who had waited in line for five hours pass out from the heat. Others in line offered him water and an ambulance arrived, but he declined to go in the ambulance, wanting to vote. He was eventually taken to a shorter line, with blood still on his forehead.[489]

  o About four hours into waiting, Donna noticed that new people stopped joining the line after seeing long lines and fewer places to park.[490]

  o When Donna reached the inside of the polling place, she noticed that the "hold-up seemed to be at the point where people had to verify their ID," and there were only six stations with poll pads for checking voters in.[491] There were ten ballot marking devices and two scanners.[492]

● Clayton County voter Alvin went to vote early and waited approximately five and a half hours to cast a ballot.[493] Alvin, who was sixty-six years old, went to vote with a friend, who was eighty-one years old, but was "not told that [they] could wait in a shorter line for elderly voters," and "[t]here was no place to sit while waiting in in line."[494] Alvin observed approximately 1,000 people in line to vote when they arrived, and he witnessed about twelve people leave the line while he was waiting.[495]

● Houston County voter Keli went to vote on the first day of early voting for the 2020 General Election and arrived at 7:50 a.m.[496] When she arrived, "the line wrapped around the three sides of

---

[488] *Id.* ¶ 5.

[489] *Id.* ¶ 6.

[490] *Id.* ¶ 7.

[491] *Id.* ¶ 9.

[492] *Id.*

[493] Declaration of Alvin [last name redacted] ¶ 4 (attached as Exhibit 212).

[494] *Id.* ¶ 5.

[495] *Id.* ¶¶ 6-7.

[496] Declaration of Keli [last name redacted] ¶ 4 (attached as Exhibit 213).



the courthouse."[497] The polls opened at 8:00 a.m.[498] Keli went with her two sons, who were also eligible to vote.[499] They waited in line for nearly seven hours, and Keli had to make up the missed day of work by working additional hours for three days.[500]

- Gwinnett County voter Eddie had a similar experience. He arrived at his polling place during early voting for the 2020 General Election at 7:30 a.m. and did not cast his ballot until 4:15 p.m.—nearly nine hours later.[501] "By [his] estimates, roughly 90 to 95 percent of the people in line were [people of color]."[502] Once he was inside the building, it took him forty-five minutes to cast his vote using a ballot marking device.[503] Only four of the thirteen machines were being used.[504]

- Clayton County voter Donna went to vote on the first day of early voting.[505] She arrived at 7:23 a.m., and the polls opened at 8:00 a.m.[506] She waited nearly five hours to vote, departing the polls at 12:17 p.m.[507] She observed that the ballot drop box was "covered in plastic" and locked when three voters attempted to turn in their ballots; that only two people could vote at once at various points because of malfunctioning voting machines, and that at least six people left the line while she was waiting.[508] When Donna communicated with her friends who lived north of her, she

---

[497] *Id.*

[498] *Id.*

[499] *Id.* ¶ 5.

[500] *Id.* ¶¶ 6, 14.

[501] Declaration of Eddie [last name redacted] ¶ 4 (attached as Exhibit 214).

[502] *Id.* ¶ 5.

[503] *Id.* ¶ 6.

[504] *Id.* ¶ 7.

[505] Declaration of Donna from Clayton [last name redacted] ¶ 4 (attached as Exhibit 215).

[506] *Id.*

[507] *Id.* ¶ 12.

[508] *Id.* ¶¶ 12-14.

heard they voted in twenty or thirty minutes, and felt her long wait time was tied to the fact that she lives and votes in a predominantly Black community.[509]

● Cobb County voter Melanie arrived at 6:50 a.m. and left at 5:30 p.m.—having waited in line for over ten and a half hours to vote.[510] During the day, poll workers informed people waiting in line that cars parked in the neighborhood were being towed, which appeared to cause people to leave the line.[511]

● Fulton County voter Jenny, who was sixty-seven years old, waited over three hours to vote.[512] Because of her medical condition, she could not walk home after standing in line for so long.[513] She saw another woman in line pass out and require medical attention during the wait.[514]

● Fulton County voter Zoee waited for five hours to vote early in the 2020 General Election, finding "no written or oral instruction" for voters about how to use new voting machines.[515]

● Fulton County voter Barbara waited over five and a half hours to vote early in the 2020 General Election, finding only four working voting machines of the ten inside the polling place and only

---

[509] *Id.* ¶ 14.

[510] Declaration of Melanie from Cobb [last name redacted] ¶¶ 7, 25 (attached as Exhibit 216).

[511] *Id.* ¶¶ 20-21.

[512] Declaration of Jenny [last name redacted] ¶ 8 (attached as Exhibit 217).

[513] *Id.* ¶ 8.

[514] *Id.*; *see also* Declaration of Regina [last name redacted] ¶ 16 (attached as Exhibit 218) (describing an eight-hour wait, after which "there were still approximately 500 people in line" and which led to "aches and pains" from which it took "three days to recover").

[515] Declaration of Zoee [last name redacted] ¶ 15 (attached as Exhibit 219).

two poll workers at the check-in desk, where the "poll workers admitted that they were understaffed [and] spread too thin."[516]

● Chatham County voter Dorothy waited to vote for nearly eight hours.[517] While waiting, she observed emergency medical technicians ("EMTs") be called for someone inside the building. EMTs were called again for someone waiting in line who had fallen and hit his head, apparently due to dehydration; that person was taken to the hospital.[518]

● Numerous other voters experienced similarly burdensome wait times and lines to vote in the 2020 General Election.[519]

Voters in the January 2021 Senate runoff election once again faced unacceptably long lines.[520]

2.      Voting Machines

Despite rising voter registration numbers, the State has failed to properly supply the counties with adequate and working voting machines and electronic poll books to meet voters' needs. This failure has contributed to long lines at polling places, delays in voting, and effective disenfranchisement.

The Secretary of State knows insufficient numbers of working voting machines could contribute to, if not outright cause, hours-long lines for voting. This is not new. During the 2016 election, the Secretary of State received numerous complaints from voters who waited hours to vote or could not vote

---

[516] Declaration of Barbara from Fulton [last name redacted] ¶ 5, 9 (attached as Exhibit 220); *see also* Declaration of RT [last name redacted] ¶¶ 5, 7 (attached as Exhibit 221) (explaining a wait of more than five hours to vote, and being told by the poll manager that "they didn't expect this large of a turnout, the people working the poll were new, they didn't have enough people for this poll, and that they were experiencing similar under staffing [*sic*] issues and delays at all the Clayton County polls").

[517] Declaration of Dorothy [last name redacted] ¶ 10 (attached as Exhibit 222).

[518] *Id.* ¶¶ 5-6.

[519] *See* Declaration of Bryan [last name redacted] ¶¶ 23, 27 (attached as Exhibit 223) (explaining a seven-hour wait to vote on the first day of early voting); Declaration of Varana [last name redacted] ¶¶ 3, 6 (attached as Exhibit 224) (describing a wait of more than eight hours to vote); Declaration of JoAnne [last name redacted] ¶ 5 (attached as Exhibit 225) (explaining a wait of more than four hours on the first day of early voting and describing how she had to work until 9:00 p.m. that night "to offset how long [she] had waited"); Declaration of Matt [last name redacted] ¶¶ 4, 13 (attached as Exhibit 226) (describing five-hour wait to vote); Declaration of Courtney from Cobb [last name redacted] ¶ 10 (attached as Exhibit 227) (describing a five-and-a-half-hour wait to vote); Declaration of Jamie [last name redacted] ¶ 5 (attached as Exhibit 228) (describing an eight-hour wait to vote).

[520] *See* Declaration of Anceta [last name redacted] ¶¶ 5, 9 (attached as Exhibit 229) (describing a four and a half-hour wait to vote during early voting for the runoff election and describing how there were "only 10 ballot machines at [the] location and 2 polling locations in Coweta County with a population of approximately 150,000 people").

## SECTION III:    GEORGIA'S SYSTEMIC SUPPRESSION

because of a lack of working voting machines.[521] Despite this knowledge, the Secretary of State failed to adequately address this problem and continued the practices that led to inadequately provisioned polling locations. The Secretary of State operates a website from which county officials can order election supplies,[522] and the Secretary of State is further responsible for sending these supplies to the counties.[523] The Secretary of State does not always supply the counties with the requisite amount of materials, and ultimately decides how many voting machines, printers, electronic poll books, and other related supplies the counties will receive.[524]

Though functionally responsible for voting supplies received by each county and though uniquely positioned to understand how county-by-county decisions may affect the State, the Secretary of State does not substantially aid the counties in determining how many supplies to order.[525]

The Secretary of State's failure to properly furnish the counties with voting equipment, despite its knowledge of the delays this failure could cause, resulted in hours-long lines and citizens being unable to vote.

- Chatham County voter Kevin arrived at his voting location at 9:00 a.m. on election day in 2018 and observed that only seven voting machines were available for use, which resulted in voters waiting over an hour to vote. This wait time increased during the day as the number of operating machines decreased.[526]

- Angel of Fulton County, a citizen observer, noted that a voting location had only three operable voting machines at the start of the day, when "[g]iven the anticipated voter volume, there should have been 10-12." While five additional machines were later brought to this voting location,

---

[521] *See, e.g.,* Email to Election Complaints from R. Hancock (Nov. 9, 2016), State-Defendants-00330810 (attached as Exhibit 230) (voter complaint of two-hour wait, with only six voting machines for hundreds of people); Email to Election Complaints from C. Hatcher (Nov. 8, 2016), State-Defendants-00332339 (attached as Exhibit 231); Deposition of Chris Harvey, *Fair Fight Action, Inc. v. Raffensperger,* No. 1:18-cv-05391-SCJ (N.D. Ga. Dec. 5, 2019) Tr. 286:18-20 (confirming long lines, attached as Exhibit 232); Ex. 215, Declaration of Donna from Clayton [last name redacted] ¶ 13 (observing that only a few of the sixteen voting machines at her voting location were working properly).

[522] Ex. 90, Aug. 16, 2019 C. Harvey 30(b)(6) Dep. 161:17-162:12.

[523] 30(b)(6) Deposition of Chris Harvey, Ga. Sec'y of State Elections Dir., *Fair Fight Action,* No. 1:18-cv-05391-SCJ (N.D. Ga. Jan. 6, 2020) Tr. 10:3-11:12 ("Jan. 6, 2020 C. Harvey 30(b)(6) Dep.") (attached as Exhibit 233).

[524] Ex. 90, Aug. 16, 2019 C. Harvey 30(b)(6) Dep. 170:1-20; Ex. 233, Jan. 6, 2020 C. Harvey 30(b)(6) Dep. 20:17-21:21.

[525] Ex. 90, Aug. 16, 2019 C. Harvey 30(b)(6) Dep. 170:1-20.

[526] Ex. 164, Declaration of Kevin from Chatham [last name redacted] ¶ 3; *see also* Declaration of Amanda from Clayton [last name redacted] ¶ 8 (attached as Exhibit 234) (noting poll workers' statements that not all of the voting machines were being used, though they were not broken).

## SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION

Angel observed that no machines came with the proper equipment to make them operable. Angel observed dozens of voters leave the line out of frustration, and believed that hundreds of voters could not cast their votes because of the problems at this location.[527]

- Anthony, a Poll Manager for Gwinnett County during the June 2020 primary, was forced to open the voting location without voting machines, ballot marking devices, scanners, printers, or backup power supply. Though the poll location was supposed to receive this equipment the Friday before Election Day, it did not arrive until over four hours after the polls opened. Anthony observed voters leaving the polling location after being told that they would have to use a paper ballot to vote.[528]

Many voters who stood in hours-long lines to vote on Election Day in November 2018 observed that their polling places had fewer voting machines than in past elections.

- Cobb County voter Tunnizia—who stood in line for hours and lost two hours of pay because of the long line to vote—observed there were only six regular voting machines and one ADA-accessible voting machine, and recalled there had been twice as many machines at their polling place in the 2016 General Election.[529]

- Fulton County voter Tobias arrived at the voting location around 8:30 a.m. and waited for one hour in the rain, and two additional hours inside, before being able to vote. A regular voter since 2002, Tobias observed there were only about ten voting machines, "considerably fewer than previous elections."[530]

- Cobb County voter Jennifer, a regular voter for over a decade, waited for two hours to vote. Unlike in previous elections, where there were more machines at the polling location, Jennifer

---

[527] Ex. 169, Declaration of Angel [last name redacted] ¶ 4; *see also* Declaration of Scott [last name redacted] ¶¶ 8-10 (attached as Exhibit 235) (observing only one scanner available for every seventeen voting machines and voters forced to use provisional ballots); Declaration of Shana [last name redacted] ¶ 11 (attached as Exhibit 236) (observing only one scanner for seven voting machines).

[528] Ex. 210, Declaration of Anthony [last name redacted] ¶¶ 10-11; *see also* Declaration of Tyre [last name redacted] ¶ 5 (attached as Exhibit 237) (observing that poll workers were "clearly" not prepared to operate the voting machines and noting poll manager's statement that voting machines did not arrive until the night before Election Day).

[529] Ex. 161, Declaration of Tunnizia [last name redacted] ¶ 4.

[530] Declaration of Tobias [last name redacted] ¶ 3 (attached as Exhibit 238).

**SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION**

observed only seven regular voting machines and one machine that was ADA-accessible, a lower number of machines than in past elections.[531]

- Fulton County voter Sara arrived at her voting location fifteen minutes before it opened and waited six hours to vote. Though her voting location always had six voting machines, Sara observed only two machines in operation. One of these two machines broke down after Sara had been in line for two hours.[532]

- Fulton County voter Kimberly waited for over six hours before entering the voting center. Once finally inside, Kimberly observed that the location had only six voting machines, even though there had been eighteen to twenty machines in every prior election.[533]

In addition to failing to furnish equipment, the Secretary of State failed to provide adequate training on the proper use of new voting machines. Because the Secretary of State did not timely provide a poll worker manual and new voting equipment, Fulton County had to delay its training schedule, leaving the county with just over a month to prepare for the March 2020 primary election.[534] Similarly, with less than two months before a primary, Bulloch County had yet to receive over 180 new voting machines, and could not train its 150 poll workers without the devices.[535] These failures led to preventable election day machine issues—issues about which the Secretary of State was already aware due

---

[531] Declaration of Jennifer from Cobb [last name redacted] ¶ 3 (attached as Exhibit 239).

[532] Declaration of Sara [last name redacted] ¶¶ 5-6 (attached as Exhibit 240).

[533] Ex. 194, Declaration of Kimberly [last name redacted] ¶¶ 9, 18.

[534] Candace Wheeler, *Closer Look: Fulton Elections Director Talks 2020 Voting; Atlanta City Councilmember Responds to Tensions Between US and Iran*, WABE (Jan. 9, 2020), https://www.wabe.org/episode/closer-look-fulton-elections-director-talks-2020-voting-city-councilmember-farokhi-responds-to-tensions-between-us-and-iran.

[535] Al Hackle, *So Far Just 2 New Voting Machines*, STATESBORO HERALD (Jan. 3, 2020), https://www.statesboroherald.com/local/so-far-just-2-new-voting-machines.

SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION

to pilot tests conducted in November 2019.[536] As late as June 2020, many poll workers did not know how to assemble, let alone operate, the new voting machines.[537]

- For example, Walter, who served as a poll manager at a Fulton County polling place during the June 2020 election, stated that his polling place "needed twice as many voting machines, printers and poll pads," than it had, and that "each poll should have 1-2 technicians assigned there full time to troubleshoot."[538]

    3.    <u>Provisional Ballots</u>

Georgia voters have also experienced significant hurdles to voting provisionally—despite provisional ballots' critical role as a "failsafe" mechanism to ensure that eligible voters can cast a ballot when they otherwise could not do so.[539] Voter experiences make clear that poll workers are not trained

---

[536] Mark Niesse & Alan Judd, Election Fiasco Reveals Flaws with Georgia's New Voter System, ATLANTA J.-CONST. (June 14, 2020), https://www.ajc.com/news/state--regional-govt--politics/election-fiasco-reveals-flaws-with-georgia-new-voting-system/FoZjtLGPYccOrHzXHiPbDL/; see also Declaration of Mariel [last name redacted] ¶ 20 (attached as Exhibit 241) (observing that voting machines remained down more than two hours after polls opened); Declaration of Wynne [last name redacted] ¶¶ 6-7 (attached as Exhibit 242) (observing that the poll workers did not have much guidance or information on how to troubleshoot the voting machines).

[537] Id.; see also Declaration of Shea [last name redacted] ¶ 5 (attached as Exhibit 243) (observing, as poll watcher, that only two poll workers were present when voting opened, neither of whom had any training on the new software or knew how to set it up); Declaration of Benjamin from Fulton [last name redacted] ¶ 16 (attached as Exhibit 244) (noting poll worker's statement that they were not allowed to do a "dry run" of the voting machines before primary day); Declaration of Gail [last name redacted] ¶ 8 (attached as Exhibit 245) (observing that the voting location was understaffed and included poll workers who were "fumbling around and did not seem to know what was going on"); Declaration of Courtney from Gwinnett [last name redacted] ¶ 6 (attached as Exhibit 246) (observing a poll worker unsuccessfully attempting to unplug and re-plug a faulty voting machine); Declaration of Christina from Chatham [last name redacted] ¶¶ 5, 7 (attached as Exhibit 247) (reporting that some fellow poll workers had not been trained on voting equipment and that poll workers were not trained on issues that may arise with voting equipment); Declaration of Amy [last name redacted] ¶ 3 (attached as Exhibit 248) (observing that poll workers did not know how to resolve issue with voting machines, with problem persisting for multiple hours); Declaration of Ramon [last name redacted] ¶ 9 (attached as Exhibit 249) (observing poll workers attempting to get help because they could not resolve issues with machines); Declaration of Andrea from Fulton [last name redacted] ¶ 8 (attached as Exhibit 250) (observing that poll workers did not know how to turn on the lights in the building, further delaying voting); Declaration of Amanda from Fulton [last name redacted] ¶¶ 10-16 (attached as Exhibit 251) (observing poll workers failing to inform voters that paper ballots need scanning).

[538] Declaration of Walter [last name redacted] ¶¶ 6 (attached as Exhibit 252).

[539] See, e.g., Provisional Ballots, NAT'L CONF. OF STATE LEGISLATURES (Sept. 17, 2020), https://www.ncsl.org/research/elections-and-campaigns/provisional-ballots.aspx; Provisional Ballots, MIT ELECTION DATA SCI. LAB, https://electionlab.mit.edu/research/provisional-ballots (last visited Apr. 27, 2021).

adequately to do the on-the-ground work of administering provisional ballots. And, as a result, eligible Georgians have lost the opportunity to vote.

    *a.*    *Background on Provisional Ballots*

The basic premise behind a provisional ballot is that if a voter's eligibility cannot be immediately determined, that voter may cast a provisional ballot and record a vote that will be counted if election officials later determine the voter is eligible. In some jurisdictions—like Georgia, until recent legislation—provisional ballots also serve to allow voters to vote outside their assigned precincts.

Provisional ballots are so important to protecting the vote that HAVA mandates their use nationwide.[540] HAVA provides:

> If an individual declares that such individual is a registered voter in the jurisdiction in which the individual desires to vote and that the individual is eligible to vote in an election for Federal office, but the name of the individual does not appear on the official list of eligible voters for the polling place or an election official asserts that the individual is not eligible to vote, such individual shall be permitted to cast a provisional ballot,

consistent with HAVA's other requirements.[541] Under HAVA, "[a]n election official at the polling place shall notify the individual that the individual may cast a provisional ballot in that election."[542] Further, "[a]t the time that an individual casts a provisional ballot, the appropriate State or local election official shall give the individual written information that states that any individual who casts a provisional ballot will be able to ascertain under the system established [by HAVA] whether the vote was counted, and, if the vote was not counted, the reason that the vote was not counted."[543]

Because provisional ballots are administered by poll workers to individual voters, effective poll worker training is critical to ensure that voters' rights are protected.[544] The Election Assistance Commission (EAC) recommends "[p]roviding hands on training to poll workers on how to issue and process provisional ballots" and "[u]tiliz[ing] real Election Day scenarios so the poll workers may have an

---

[540] *See, e.g., id.*

[541] 52 U.S.C. § 21082(a).

[542] *Id.*

[543] *Id.*

[544] *See Election Management Guidelines*, U.S. ELECTION ASSISTANCE COMM'N 157, https://www.eac.gov/sites/default/files/document_library/files/Election-Management-Guidelines-Provisional-Ballots.pdf (attached as Exhibit 253) ("[P]oll workers will administer any internal elections office policies and procedures for provisional voting on Election Day.").



opportunity to think through the procedures and policies and actually complete the necessary paperwork prior to an actual election."[545] As the EAC puts it:

> A local election official knows that poll workers need access to simple, easy-to-use tools to help answer voters' questions on Election Day. When a voter's name cannot be located on the registration list, a poll worker should know to treat that individual as a potential provisional voter. Although it is always preferable for an eligible voter to cast a regular ballot that will not need further validation after he or she leaves the polls, poll workers must provide provisional ballots consistently and without hassle, when appropriate.[546]

Unfortunately, Georgia's processes have not ensured that poll workers provide provisional ballots "consistently and without hassle." The result is that eligible voters have to fight to get their votes counted, or, in the worst cases, are turned away without voting at all. While practices that are already in place would not be directly affected by the VRAA, they are yet another example of the need for substantial reforms to Georgia's election processes.

    *b.    Voter Experiences with Provisional Ballots in Georgia*

In Georgia, provisional ballots are governed by State law and by State Election Board rules. Georgia voters have historically been entitled by law to cast provisional ballots in a number of circumstances, including when: (1) voters who cannot be found on the rolls state a good faith belief they are registered in the county where they are trying to vote; (2) voters do not have the required identification (including the identification required because of the Exact Match policy); (3) voters appear to be registered in a precinct other than the one where the voters are attempting to vote and do not have time to go to the correct polling place; and (4) polling places are kept open by court order after hours.[547]

Critically, provisional ballots in Georgia actually work—if they are properly administered. For a variety of reasons, voters in Georgia may have issues with their voter registrations that are outside their control. For example, voters may register to vote at the Georgia Department of Driver Services, only to have those registrations fail to transfer to the appropriate election officials.[548] In certain cases, voters'

---

[545] *Quick Start Management Guide: Provisional Ballots*, U.S. ELECTION COMM'N 7–8 (Oct. 2008), https://www.eac.gov/sites/default/files/document_library/files/Quick_Start-Provisional_Ballots.pdf (attached as Exhibit 254).

[546] *See* Ex. 253, *Election Management Guidelines, Chapter 16, Provisional Ballots,* U.S. ELECTION ASSISTANCE COMM'N 158, https://www.eac.gov/sites/default/files/document_library/files/Election-Management-Guidelines-Provisional-Ballots.pdf.

[547] *See* Ex. 134, O.C.G.A. §§ 21-2-418; Ga. Comp. R. & Regs. 183-1-12-.18 (attached as Exhibit 255). As discussed in more detail in Section IV, Georgia law was recently amended to require voters to only cast ballots within their assigned precincts.

[548] *See, e.g.*, Helpdesk Request from John Hallman (Jan. 22, 2018), State-Defendants-00224899 (attached as Exhibit 256) (IT ticket from SOS employee noting that one county appeared not to have received registration applications from Driver Services for voters whose last names started after the letter 'S'); Helpdesk Request from John Hallman (Feb. 19, 2018), State-

information may be improperly "merged" with other voters' information or with old voter records, resulting in inaccurate information about voters' current county of residence or other identifying information.[549] Similar discrepancies may apply to voters' designated polling places.[550]

Provisional ballot administration by poll workers requires poll workers to be trained to understand the importance of provisional ballots to remedy the above issues. It also requires them to be prepared to affirmatively offer provisional ballots—as required by HAVA—to voters who otherwise may not know they have the ability to vote provisionally. Georgia voters' experiences make clear that these messages are not being conveyed adequately to poll workers.

In 2018 and then again in 2020, voters were turned away—without being offered provisional ballots—when they did not appear on the rolls or appeared to be registered in a different county.

- Andrea was a poll watcher at a Gwinnett County polling place for the November 2018 General Election. She observed "voters who were turned away and not permitted to vote when the poll workers could not locate the voter's registration in the Express Poll." Such voters were not given provisional ballots unless they asked for them.[551]

- Delaney, a Cherokee County voter, is a disabled veteran who uses a service dog in daily life. For the November 2018 General Election, she, her husband, their eight-year-old son, and her service dog went to vote. Her husband was told that he was in the correct location and could vote. Delaney, however, was told that she was assigned to vote in a different polling location; her address on file was a different address from her husband's address and at a location where she had never lived. She was never offered a provisional ballot and "had no idea that casting such a ballot

---

Defendants-00225242 (attached as Exhibit 257) (IT ticket from SOS employee stating that some Driver Services registrations appeared not to be available in a county's system).

[549] *See, e.g.*, Email from Rachelle Thurmond, Dawson Cnty. Official, to Melanie Frechette, Sec'y of State Empl. (June 11, 2018), State-Defendants-00468910, at State-Defendants-00468910–11 (attached as Exhibit 258) (discussing voter whose information had been "merged" with a voter in another county); Email from John Hallman, Sec'y of State Empl., to Brenda Hodges, Charlton Cnty. Official (Jan. 27, 2017), State-Defendants-00158872, at State-Defendants-00158872 (attached as Exhibit 259) ("We constantly receive calls from counties complaining that other counties have incorrectly merged records, so we thought we would encourage the registrars to work together.").

[550] *See* Email from DeKalb Cnty. Voter to Elections Complaint Alerts Account (Nov. 8, 2016), State-Defendants-0023499 (attached as Exhibit 260) (complaint from voter who was repeatedly sent between multiple polling places); Email from Alpharetta Voter to SOS Contact Alerts Account (Apr. 18, 2017), State-Defendants-00193941 (attached as Exhibit 261) (complaint from voter who was told that the polling place listed for her registration on the website was the incorrect location).

[551] Declaration of Andrea from DeKalb [last name redacted] ¶ 6 (attached as Exhibit 262).

was an option." She and her family traveled to another polling location—and again waited in line—so that she could vote.[552]

- Gary was a poll watcher at Sumter and Dougherty County polling locations for the November 2018 General Election. At one Dougherty County polling location, he "observed voters being turned away and told that they did not appear on the rolls." He spoke with some of these voters after they left the polling place, and noticed that several voters he spoke to had "hyphens or apostrophes in their names, or non-traditional spellings of their names." After he spoke with several of these voters, five voters agreed to ask the poll worker to look at the database again, and ultimately voted on voting machines. Gary also noticed problems with voters who were told they were in the incorrect precinct: "Poll workers variously, without apparent consistency, turned voters away without offering them a provisional ballot or offered a provisional ballot with the verbal warning that the voter's provisional vote likely would be rejected."[553]

- James, a Gwinnett County voter, attempted to vote in the November 2018 election and was told he had not voted in the two previous General Election cycles and therefore was not properly registered to vote. He had voted in both 2012 and 2016. He was not offered a provisional ballot and could not vote.[554]

- Robin was a poll watcher at a Clayton County polling location for the November 2018 General Election. She saw voters being sent to other polling locations without being offered provisional ballots, and voters who said they had come from other locations without being offered provisional ballots at those other locations—including voters "who had come to this precinct from another location and were sent away from this location as well without ever being offered a provisional ballot." She also saw "many people who were told that their name was not on the registration roll even though they believed they were registered to vote, had voted in the past, and had not moved or otherwise altered their voter registration status," who similarly were not offered provisional ballots.[555]

- Ayesha, a Henry County voter, attempted to vote in the November 2018 General Election, having most recently voted in 2016. She was told that her name was not showing up in the system and that she needed to re-register. The poll workers appeared to have no record of her voting history in Henry County; instead, they only had a record of her address from when she

---

[552] Declaration of Delaney [last name redacted] ¶¶ 2, 6–8 (attached as Exhibit 263).

[553] Ex. 98, Declaration of Gary [last name redacted] ¶¶ 3–7, 10.

[554] Declaration of James [last name redacted] ¶¶ 2–3 (attached as Exhibit 264).

[555] Declaration of Robin [last name redacted] ¶¶ 4–7, 10 (attached as Exhibit 265).

lived in a different county. Ayesha was never offered a provisional ballot and ultimately could not vote.[556]

- Angela, a Paulding County poll watcher during the November 2018 General Election, observed various voters being sent away for being in the wrong polling place or precinct, including relatively close to poll closing. In one case, she saw a voter who had been turned away for not being on the precinct's rolls—and who was not offered a provisional ballot—point out that the voter's roommate *was* allowed to vote at that same precinct. Angela was concerned that it appeared that voters of color were being turned away more frequently, while white voters were being given provisional ballots.[557]

- Suzanne, a Chatham County poll watcher for the November 2018 General Election, also observed that when voters were listed on the rolls for another precinct, they were not offered provisional ballots even when it was close to closing time. One Board of Elections employee said he did not encourage provisional ballots because they were "too cumbersome and voters would not make the effort to go to the Registrar's Office within 3 days."[558]

- Candace, a Glynn County voter, waited in the rain with her daughter to vote at their regular polling place for the June 2020 primary. Candace was first told there was a problem with her driver's license and then told that her registration could not be found. Once her registration was located, she was told at 6:50 p.m. she was at the wrong polling place. It was ten minutes before the polls closed, and she would not have been able to reach the purportedly correct polling place in time to vote. Candace's daughter was also told that she was assigned to a different polling place, but that polling place was closer and Candace's daughter was able to drive to that location and vote. Neither Candace nor her daughter was ever offered a provisional ballot.[559]

- Therese, an assistant poll manager in Cobb County for the November 2020 General Election, expressed concern that poll workers were instructed to tell people who were listed as registered in a different precinct "that they had to leave and vote at their former precinct and complete a change of address form there."[560]

---

[556] Declaration of Ayesha [last name redacted] ¶ 3 (attached as Exhibit 266).

[557] *See* Declaration of Angela [last name redacted] ¶ 3 (attached as Exhibit 267).

[558] Declaration of Suzanne from Chatham [last name redacted] ¶¶ 5–6 (attached as Exhibit 268).

[559] Declaration of Candace [last name redacted] ¶¶ 3–8 (attached as Exhibit 269).

[560] Declaration of Therese [last name redacted] ¶¶ 3, 5–8 (attached as Exhibit 270). This same person noted that at her polling place, poll workers had to call the county registrar every time an absentee ballot had to be cancelled or a voter had an address or name problem, causing delays. *See id.* ¶ 10.

**SECTION III:    GEORGIA'S SYSTEMIC SUPPRESSION**

Other voters knew to ask for provisional ballots, but were turned away or otherwise discouraged from casting those ballots.[561]

- Benjamin was a poll worker at a Muscogee County polling place for the November 2018 General Election. He observed poll workers at two precincts fail to offer provisional ballots to voters in the wrong precinct, instead telling them to travel to the precincts where they were listed on the voter rolls. When Benjamin told voters who had been turned away to request provisional ballots, the voters "were refused again," on the premise that provisional ballots should be given only to voters in the wrong precinct close to closing time. He asked an election supervisor who came to one of the polling locations he observed about provisional ballots, and "[s]he indicated to [him] that the poll workers were under no obligation to inform people that they could vote a provisional ballot but agreed that if asked they should provide the ballot."[562]

- Eunice, a DeKalb County voter, had voted at the same polling location for the three years she had lived in the county. When she attempted to vote there for the November 2018 General Election, she was told she was not on the voter rolls and could not vote. She knew to ask for a provisional ballot, but was told that if she used a provisional ballot, it would only be thrown out. She ultimately left without voting.[563]

- Frank, a Lee County voter, moved to the county in 2011 and registered to vote in 2018 at a voter registration drive after not voting for several years. When he attempted to vote in the November 2018 General Election, he was told that he was registered to vote in his prior county of residence. Despite asking for a provisional ballot, he was told that he needed to travel to his former county of residence.[564]

- Colleen was a poll watcher at a Fulton County polling location for the November 2018 General Election. She observed a voter stand in line for about an hour, be told she was at the wrong precinct, request a provisional ballot several times because she had to go to work, and then be

---

[561] Some voters faced the opposite issue: they were not told that if they cast a provisional ballot in a different county than where they were registered, their ballot would not be counted for any races—including statewide races, or they were forced to vote provisionally for improper reasons. Jennifer, a Hall County poll worker, expressed concerns that the Secretary of State was instructing counties not to tell voters that their out-of-county ballots would not be counted. Declaration of Jennifer from Hall [last name redacted] ¶¶ 3–12 (attached as Exhibit 271). Relatedly, Phyllis, a Troup County poll worker for the November 2018 election, expressed concern that she was being told that people needed to vote provisional ballots even for minor spelling errors or similar issues. *See* Ex. 85, Declaration of Phyllis [last name redacted] ¶ 11–14.

[562] Declaration of Benjamin from Maryland [last name redacted] ¶¶ 5–6, 8, 10 (attached as Exhibit 272).

[563] Declaration of Eunice [last name redacted] ¶¶ 2–4 (attached as Exhibit 273).

[564] Declaration of Frank [last name redacted] ¶¶ 4–9 (attached as Exhibit 274).

denied a provisional ballot. The voter was told that she should go to the correct polling place, and Colleen heard the poll manager say that the voter had been "too lazy" to go to her polling place of record.[565]

- Kelly was a poll watcher at a Fulton County polling location for the November 2018 General Election. She saw many voters who were told they were in the wrong precinct, but said they had been voting at the same location for years. She also observed poll workers reject a voter's request to vote provisionally, and spoke with another voter who said she had been turned away earlier that day. She also saw and heard from a poll worker that some voters had seen on the Secretary of State's website or on a formal communication information indicating they were supposed to vote at the location, but the "official" database said otherwise. The poll workers appeared to think there was a "Fulton County rule" that no provisional ballots could be issued before 5:00 p.m.[566]

- Martha, another poll watcher in Fulton County for the November 2018 General Election, observed that when voters were told they were in the incorrect precinct, some were not told about the provisional ballot option, while others were told the ballot likely would not be counted.[567]

- Alexus, a Fulton County voter, arrived to vote for the November 2018 General Election only to be told that she was listed as registered in a different location and with a different middle name. Alexus was informed about the option of voting a provisional ballot, but then was told by another poll worker they would not know how to process the provisional ballot because Alexus appeared to be registered in two precincts. Alexus ultimately did not vote.[568]

- Christina, a Bryan County voter, voted in 2017, 2018, and 2019. When she attempted to vote for the June 2020 primary, she was told that her registration showed her as registered in a different county, with a different birthdate. She was told that she could cast a provisional ballot if she wanted, but because the birthdate on her registration in the voter rolls did not match her birthdate, the ballot would probably not be accepted. Christina ultimately did not vote in that election.[569]

---

[565] Declaration of Colleen [last name redacted] ¶¶ 3(c)–(i) (attached as Exhibit 275).

[566] Declaration of Kelly [last name redacted] ¶¶ 5, 9 (attached as Exhibit 276).

[567] Declaration of Martha [last name redacted] ¶¶ 8–12 (attached as Exhibit 277).

[568] *See* Declaration of Alexus [last name redacted] ¶ 4 (attached as Exhibit 278).

[569] Declaration of Christina from Bryan [last name redacted] ¶¶ 2–3, 7–8, 10 (attached as Exhibit 279).

## SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION

Poll workers are supposed to tell provisional ballot voters how to check the status of their ballots,[570] but this did not always occur.

- Shannon was a poll watcher at a Fulton County polling location for the November 2018 General Election. She did not witness any voters being told how to cure a provisional ballot, and observed voters being told that "of course" their ballots would count.[571]

- Chris, a Fulton County voter, confirmed registration on the Secretary of State's website before voting in the November 2018 General Election. When Chris went to vote, poll workers said the registration address was an address from eight years prior. Chris could cast a provisional ballot, but was not given any information about how to correct any deficiency in the ballot or how to ensure that the vote was counted.[572]

- Allen, a Cobb County voter, and his wife both changed their voter registrations at DDS after they moved. Although Allen's wife could vote, Allen was told he was in the wrong precinct. He could cast a provisional ballot, but was not given information about whether and how to cure his provisional ballot.[573]

- Julia, a Cobb County voter, moved shortly before the November 2020 General Election. Even though she worked to ensure that her new registration was accurate before the election, she was told on Election Day she was still registered in her prior county of residence. Eventually, she was told she had to vote provisionally, but Julia could not ensure that her vote was counted.[574]

- Dominic, a Fulton County voter, moved at the end of August 2020 and "almost immediately" registered to vote in the new location. When Dominic went to vote on September 29, 2020, poll workers could not find his registration. Not only did Dominic experience difficulty voting at the provisional ballot table as a person with cerebral palsy; he was given no privacy while filling out the ballot. Then, when he asked how to check that the ballot would be counted, he was not given any instructions for how to do so and was told not to worry.[575]

---

[570] *See* 52 U.S.C. § 21082(a).

[571] Ex. 167, Declaration of Shannon G. from Fulton [last name redacted] ¶¶ 3, 12.

[572] Declaration of Chris [last name redacted] ¶ 3 (attached as Exhibit 280).

[573] Declaration of Allen [last name redacted] ¶ 3 (attached as Exhibit 281).

[574] Declaration of Julia [last name redacted] ¶¶ 3–7, 10–14 (attached as Exhibit 282).

[575] Declaration of Dominic [last name redacted] ¶¶ 3–10 (attached as Exhibit 283).



- Kevin, a Fulton County voter, had become a naturalized citizen before the June 2020 primary, but was told that because of COVID-19, he was not fully in the system and would need to vote a provisional ballot. He was eventually told that his provisional ballot had not been counted because the county's records—incorrectly—indicated that he was registered in a different county or was at the wrong polling place.[576]

Georgia election officials have not done enough to ensure that provisional ballots do their job of serving as a failsafe to protect eligible voters' ability to cast their ballots. And the situation is about to get worse. As detailed in Section IV of this report, several voters whose stories are described above would no longer be eligible to cast provisional ballots; under Georgia's new statutory landscape, voters are not able to cast a provisional ballot before 5:00 p.m. if they are listed as registered at a different precinct in the same county as the precinct where they attempt to vote. Far from ensuring that every eligible voter can cast a vote, Georgia continues to make it more difficult.

4.    Voter Intimidation

Eligible voters have immense difficulty casting their votes for a variety of reasons, whether because of barriers to registering or staying registered, waiting in line for hours to vote, asking for a provisional ballot only to be denied, or the myriad other issues described above. Rather than addressing these problems, Georgia's election officials have resorted to baseless insinuations of fraud or impropriety to further intimidate voters and voting rights organizations.

a.    Threatening Letters to Voters

The Georgia Secretary of State's office has sent intimidating letters to voters who have requested absentee ballots, but were flagged as having filled out a NCOA form with the U.S. Postal Service. These letters from State election officials threaten voters with potential criminal penalties and can have a chilling effect on voter participation—particularly among voters from communities that have been treated unjustly by the criminal justice system.

In December 2020, the Secretary of State's office sent threatening letters signed by Elections Director Chris Harvey to 8,000 Georgia voters who requested absentee ballots to vote in the January Senate runoff election but were flagged as having filled out a NCOA form requesting a change to an out-of-state address.[577] In January and February, the office sent letters signed by Chief Investigator Frances Watson to a similar set of people—voters who had voted by absentee ballot in the November election,

---

[576] Declaration of Kevin from Fulton [last name redacted] ¶¶ 3–16 (attached as Exhibit 284).

[577] Letter from Chris Harvey, Elections Director, to electors identified on NCOA voting list (Dec. 15, 2020) (attached as Exhibit 285).

but were flagged as having completed a NCOA form.[578] These letters, warning voters they could be breaking the law by voting, are thinly-veiled attempts to deter eligible Georgia voters temporarily residing out-of-state from voting in Georgia elections, despite that every Georgia resident may vote by mail and have the ballot sent to an out-of-state address. In response to an open records request for the list of voters who received such letters, the Secretary of State's office stated that the letters are associated with "an open case and the information . . . is in regards to a pending and ongoing investigation."[579]

b.    *December 2020 Letters*

The December 2020 letters, sent just three weeks before the runoff election, threatened voters with potential criminal penalties, reminding them they could be guilty of a felony if they cast a ballot in the runoff. The State's purported justification for sending the letters was that these voters had filled out a NCOA form for an out-of-state address.[580] However, in a letter to members of Congress refuting claims of voter fraud in the 2020 election, Secretary of State Brad Raffensperger emphasized that the NCOA data-matching used by President Trump's allies to allege that many ineligible voters cast ballots was "known to be unreliable and produce a preponderance of false positives."[581] As Secretary Raffensperger acknowledged, filling out a NCOA form indicating a new out-of-state address does not establish that a person is ineligible to vote in Georgia: "There are many people who live out-of-state who are still completely legitimate Georgia residents, including military and overseas citizens, people in government service, college students, temporary workers on assignment somewhere else, and voters temporarily caring for family [sic] others, etc."[582]

Although the letters acknowledged that out-of-state voters might still be eligible to vote in Georgia and stated that "[r]eceipt of this letter does not mean that you are not deemed to be a valid Georgia resident or voter," their practical impact was to put these voters on notice that their conduct was suspect in the eyes of the Secretary of State's office.[583] The SOS press release announcing the letter

---

[578] Letter from Frances Watson, Chief Investigator, to electors identified on NCOA voting list (Jan. 15, 2021) (attached as Exhibit 286); Letter from Frances Watson, Chief Investigator, to electors identified on NCOA voting list (Feb. 15, 2021) (attached as Exhibit 287).

[579] Email from ORR Administration to Nick [last name redacted] (Mar. 31, 2021) (attached as Exhibit 288).

[580] *Secretary of State Brad Raffensperger Protects Runoffs From Out Of State Voters*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/secretary_of_state_brad_raffensperger_protects_runoffs_from_out_of_state_voters (last visited Apr. 5, 2021) (attached as Exhibit 289).

[581] Letter from Brad Raffensperger, Ga. Sec'y of State, to Members of Congress at 8 (Jan. 6, 2021), https://sos.ga.gov/admin/uploads/Letter%20to%20Congress%20from%20Secretary%20Raffensperger%20(1-6-21).pdf (attached as Exhibit 290).

[582] *Id.* at 9.

[583] Ex. 285, Dec. 15, 2020 C. Harvey Letter to to electors.

**SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION**

initiative framed it as preventing voter fraud and guarding against attempts "to undermine the integrity of the vote in Georgia."[584] Referring to a vaguely defined group of voters, Secretary Raffensperger said, "[W]e will find you and we will prosecute you to the fullest extent of the law."[585] Raffensperger also cited these letters in an interview with *Newsmax* in defense of his efforts to make sure "bogus residents" do not vote in Georgia.[586] The Secretary of State sent these letters to all voters it had identified as filling out a NCOA for an out-of-state address, potentially reducing their participation in the election, despite knowing that most of these voters were eligible to vote in the runoff election. For example, one voter who received such a letter, a college professor at a Georgia university who lived temporarily in another state due to the pandemic, could have been intimidated into sitting out the election even though she maintained residency in Georgia and lawfully requested an absentee ballot for the runoff.[587] These letters undoubtedly deterred voters who are already disproportionately targeted by the criminal justice system, particularly Black voters.

Georgia's NCOA match process has been plagued by serious problems. While the State has not revealed the exact NCOA matching techniques used to identify the voters for December 2020 letters, the State's past processes for conducting such matching suggests these letters were likely sent to many voters who were improperly flagged as having completed a NCOA for a change of residential address when they had not. As one expert concluded, "the Secretary of State's match process systematically casts too wide a net and does so unnecessarily."[588] Multiple flaws in the Secretary of State's NCOA match process can cause Georgia voters to be erroneously flagged as ineligible, including:

- Using mailing addresses instead of residential addresses;

- Using first and last names for individual matches without additional identifying criteria like birthdates that would distinguish between voters with the same name;

- Not incorporating first names into family matches and not requiring entire address fields to match for individual and family matches (which can trigger, for example, NCOA removal

---

[584] Ex. 289, *Secretary of State Brad Raffensperger Protects Runoffs From Out Of State Voters*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/secretary_of_state_brad_raffensperger_protects_runoffs_from_out_of_state_voters (last visited Apr. 5, 2021).

[585] *Id.*

[586] Eric Mack, *Brad Raffensperger to Newsmax TV: Georgia Voter ID Law a Line of Fraud Defense*, NEWSMAX (Dec. 26, 2020), https://www.newsmax.com/newsmax-tv/georgia-brad-raffensperger-secretary-of-state-election-fraud/2020/12/26/id/1003192/.

[587] Email from Ellen [last name redacted] to Fair Fight Action (Dec. 31, 2020) (attached as Exhibit 291).

[588] Ex. 137, Supplemental McDonald Report at 5.

SECTION III:    GEORGIA'S SYSTEMIC SUPPRESSION

procedures for all "Smiths" in an apartment complex even though only one "Smith" has moved away); and

● Using business change-of-addresses rather than residential addresses.[589]

Using flawed procedures and under dubious pretenses, the Secretary of State sent letters to thousands of voters, threatening felony charges if they voted in the runoff election. The State's actions constitute voter intimidation,[590] as the potential threat would only come to pass if these voters mailed in their ballot, and operated as a targeted effort to influence the electorate for a particular election. It is no accident this tactic was employed after Democrats flipped Georgia in November and when the January runoffs would decide control of the United States Senate.

   c.    *January and February 2021 Letters*

In January and February, the Secretary of State's office sent similar letters to voters it identified as having cast an absentee ballot in the November 2020 election and flagged as having filed a NCOA form based on NCOA matching.[591] These letters had an even greater potential to intimidate voters than those sent out in December, because they included a "NCOA voter questionnaire" that asked voters to state whether they were a current resident of Georgia. If voters answered yes to the question, they were asked "to provide a brief statement as to how [they] meet the qualifications for a Georgia Voter."[592] The instructions to "complete the included questionnaire and return [it] as soon as possible"[593] suggest that filling out the form was required, although there is no Georgia law requiring that voters who are temporarily out of state justify their residency status to the Investigations Division of the Secretary of State's office.

The impact of the "NCOA voter questionnaire" on voters' registration status is unclear. Whether or how a voter answers the questionnaire could result in further investigation and the consequences of not returning the questionnaire are unspecified. The letters' lack of information and clarity exacerbates the chilling effect. This effect is even more pronounced when considering the letters are targeted at those who voted by absentee ballot in the 2020 election, an election that saw many voters, especially those from communities of color, vote by mail for the first time.

---

[589] *Id.* at 6-8.

[590] Voter intimidation is prohibited under federal law. *See* 52 U.S.C.A. § 10101.

[591] Ex. 286, Jan. 15, 2021 F. Watson Letter to electors; Ex. 287, Feb. 15, 2021 F. Watson Letter to electors.

[592] *Id.*

[593] *Id.*

## SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION

5.   <u>The State Election Board Systematically Intimidates Voters and Voter Registration Organizations.</u>

    a.   *The Georgia State Election Board's Lack of Transparency Regarding Investigations is Intimidating.*

The Georgia State Election Board "is an administrative agency having authority over elections matters."[594] The Secretary of State prescribes specific duties and obligations for the SEB, including the duty to "investigate, or authorize the Secretary of State to investigate, when necessary or advisable the administration of primary and election laws and frauds and irregularities in primaries and elections and to report violations of the primary and election laws either to the Attorney General or the appropriate district attorney who shall be responsible for further investigation and prosecution."[595] The State Election Board also promulgates rules to ensure fairness and uniformity in the practices of all local election officials.[596] The Secretary of State's investigations unit conducts the SEB's investigations.[597]

Notwithstanding these investigative responsibilities, there are no explicit rules, nor any publicly available guidance, about the process and timeline of the SEB's investigations and hearings on election complaints. Deposition testimony from Secretary of State representatives gives some insight into the SEB's investigation process: once a matter has been investigated, the investigations unit provides the investigation report, and a summary of that report, to the State Election Board for consideration.[598] At its meetings, the SEB reviews the investigation reports and determines the next steps.[599] The SEB can vote to issue a letter of instruction to the county or individuals determined to have violated election laws or SEB

---

[594] "Election Law for Non-Lawyers, MEOC Municipal Course # 2," Presentation, Ga. Sec'y of State, State-Defendants-00107570, at State-Defendants-00107603 (attached as Exhibit 292).

[595] O.C.G.A. § 21-2-31 (attached as Exhibit 293); *State Election Board: Elections*, GA. SEC'Y OF STATE, sos.ga.gov/index.php/elections/state_election_board (last visited Apr. 5, 2021).

[596] *State Election Board*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/state_election_board (last visited Apr. 9, 2021) (attached at Exhibit 294) (acknowledging these duties); Elections Division Transition Memo: SOS Description of Duties, Ga. Sec'y of State, State-Defendants-00149713, at State-Defendants-00149715 (attached as Exhibit 295);.

[597] Ex. 90, Aug. 16, 2019 C. Harvey 30(b)(6) Dep. 84:3-13 (explaining that investigations that go to the SEB are investigated by the SOS investigations unit and presented to the SEB); *id.* at 115:14-116:10 (explaining that Investigation Division of the SOS handles investigations for elections); *SEB Meeting Minutes*, GA. SEC'Y OF STATE (Apr. 3, 2018), https://sos.ga.gov/admin/files/SEB_Meeting_Minutes_April%203,%202018%20(SIGNED).pdf (attached as Exhibit 296); *SEB Meeting Minutes*, GA. SEC'Y OF STATE (Sept. 11, 2018), http://sos.ga.gov/admin/files/SEB%20Meeting%20Minutes_ September_11_2018.pdf (attached as Exhibit 297).

[598] Ex. 90, Aug. 16, 2019 C. Harvey 30(b)(6) Dep. 112:14-23.

[599] *Id.* at 110:20-112:23.

rules.[600] These letters of instruction may merely copy and paste a provision of Georgia law and instruct the offender "to refrain from further violations of the Georgia Elections Code and State Election Board rules and regulations."[601] The SEB is also authorized to, and usually does, refer investigated matters to the Georgia Attorney General's office or to a district attorney for further investigation and/or criminal proceedings.[602]

Because of the lack of rules and formal processes, the State Election Board frequently allows cases to languish for years.[603] Voters with pending cases are not told their cases may be heard years later, and they may not even receive an update from the SEB for several years.[604] There is also no prescribed standard for the referral of cases to the Attorney General's office or to a district attorney. The lack of information, alone, causes intimidation and fear amongst voters.

For instance, during a meeting held in February 2021 regarding a 2016 complaint against an individual voter who mistakenly voted, not realizing that he was ineligible, the voter's ex-wife testified that when she spoke with the Secretary of State's investigator, "he never informed me that a hearing would come. He made me feel as if everything was okay, and then four [] years later, I receive[d] this information in the mail" that the case would be heard at the SEB meeting in February 2021.[605] She further testified, "I called and spoke to the [SOS] trying to rectify the situation and whatever it was that we needed to do. I was then instructed that I needed to send an email . . . to remove [the respondent] from the voter registration list, and I did that. I followed all the instructions that were given. [The

---

[600] *See SEB Meeting Transcript*, GA. SEC'Y OF STATE (Apr. 3, 2018), https://sos.ga.gov/admin/uploads/04%2003%202018% 20-%20SEB%20-%20ATLANTA,%20TRANSCRIPT.pdf (attached as Exhibit 298); *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Sept. 11, 2018), https://sos.ga.gov/admin/uploads/stateelectionboard9.11.pdf (attached as Exhibit 299).

[601] *See* Letter of Instruction to Evie Roberts, Toombs Cnty. Bd. of Elections and Registration from Candice Broce, Ga. Sec'y of State (July 10, 2015) State-Defendants-00842626 (attached as Exhibit 300) (letter of instruction for failure to issue a provisional ballot).

[602] *See, e.g.*, Ex. 293, O.C.G.A. § 21-2-31(5); *SEB Meeting Minutes*, GA. SEC'Y OF STATE (Aug. 21, 2019), http://sos.ga.gov/ admin/files/August%2021,%202019%20(SIGNED).pdf (attached as Exhibit 301); Ex. 299, *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Sept. 11, 2018), https://sos.ga.gov/admin/uploads/stateelectionboard9.11.pdf.

[603] *SEB Meeting MinutesTranscript*, Ga. Sec'y of State (Feb. 10, 2021), http://sos.ga.gov/admin/uploads/State _Election_Board_Feb_10,_2021_-_Transcript.pdf (attached as Exhibit 302); *SEB Meeting MinutesTranscript*, Ga. Sec'y of State (Feb. 17, 2021), https://sos.ga.gov/admin/uploads/Transcript_-_February_17,_2021.pdf (attached as Exhibit 303); *SEB Meeting MinutesTranscript*, Ga. Sec'y of State (Sept. 10, 2020), https://sos.ga.gov/admin/uploads/September_10,_2020_(SEB_Transcript).pdf. (attached as Exhibit 304).

[604] Ex. 302, *SEB Meeting Transcript*, GA. SEC'Y OF STATE, 76:21-77:10 (Feb. 10, 2021), http://sos.ga.gov/admin/uploads/State _Election_Board_Feb_10,_2021_-_Transcript.pdf.

[605] *Id.*

respondent] has never voted again."[606] She also testified that she was never made aware what the Attorney General's office was or of the potential outcomes if the case was referred to the Attorney General's office.[607] And she provided testimony explaining how her ex-husband accidently registered to vote.[608] Despite her testimony, the State Election Board voted to refer the case to the Attorney General's office and to the local district attorney.[609]

Transcripts from the State Election Board's meetings in 2020 and 2021, meetings at which the SEB heard election complaints, confirm the SEB revisited dozens of cases stemming from election complaints made in 2016 and 2017.[610] Minutes also confirm the SEB members gave no rationale for the lag in hearing these cases, nor explained why they referred the case to the Attorney General's Office or district attorney or the significance of a referral.[611]

> b.   *The SEB Investigates Without Evidence to Intimidate Voters and Voter Outreach Organizations.*

The SOS has used the SEB to conduct baseless investigations of voter registration and voter outreach organizations to dissuade them from registering new voters. This intimidation tactic is not new.[612]

In 2012, after the Asian American Legal Advocacy Center ("AALAC") published an open letter demanding that Georgia ensure new citizens could vote, then-Secretary of State Kemp informed the

---

[606] *Id.* at 77:6-17.

[607] *Id.* at 78:2-10.

[608] *Id.* at 75:24-78:10.

[609] *Id.* at 80:10-22.

[610] Ex. 302, *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Feb. 10, 2021), http://sos.ga.gov/admin/uploads/State_Election_Board_Feb_10,_2021_-_Transcript.pdf; Ex. 303, *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Feb. 17, 2021), https://sos.ga.gov/admin/uploads/Transcript_-_February_17,_2021.pdf; Ex. 304, *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Sept. 10, 2020), https://sos.ga.gov/admin/uploads/September_10,_2020_(SEB_Transcript).pdf.

[611] *Id.*

[612] In 2010, then-Secretary Kemp's office targeted individual get-out-the-vote activists in Quitman, Georgia. *See* Spencer Woodman, *Register Minority Voters in Georgia, Go to Jail*, NEW REPUBLIC (May 5, 2015), https://newrepublic.com/article/121715/georgia-secretary-state-hammers-minority-voter-registration-efforts. Specifically, four weeks after a primary in which the county elected its first majority-Black school board, investigators, along with officials from the Georgia Bureau of Investigation, went door-to-door making arrests of activists without a trace of evidence of actual voter fraud. *Id.* The case focused on voting organizers "improperly possessing voters' materials." *Id.* Four years later, all charges were either dropped or cleared. *Id.*



organization it was launching an investigation into how the AALAC registered voters.[613] The investigation targeted the AALAC for technical issues—such as whether canvassers had people's explicit, written consent to photocopy their registration forms before mailing the originals to the elections office—but there was no evidence of fraud.[614] The nearly two-and-a-half year investigation ended with a finding of no violations.[615]

Similarly, in 2014, then-Secretary of State Kemp began a criminal investigation into the New Georgia Project alleging fraud.[616] Prior to the SEB investigating the allegations, Kemp announced that "preliminary inquiry revealed . . . significant illegal activities including . . . forged vote[r] registration applications."[617] Notably, now-Governor Kemp admitted under oath he made this statement before any adjudication of the claims against the New Georgia Project.[618] The SEB investigated the allegations of forged signatures and incomplete voter registration forms.[619] It took nearly three years for SEB investigators to issue a formal finding of no wrongdoing by the New Georgia Project; yet, when the SEB later heard the case against the remaining respondents on September 20, 2017, it was still titled as against the "New Georgia Project" as the lead respondent.[620] Styling the case as "New Georgia Project" was merely a smear and intimidation tactic against the organization. And despite the SEB referral of the

---

[613] *Id.*

[614] *Id.*

[615] *Id.*

[616] *Id.*

[617] Kristina Torres, *Voter Registration Fraud Alleged at Democratic-Backed Group*, ATLANTA J.-CONST. (Sept. 10, 2014), https://www.ajc.com/news/state--regional-govt--politics/voter-registration-fraud-alleged-democratic-backed-group/1oDWNijMJZQAYO2D88ZHHN/; Deposition of Brian Kemp Jan. 8, 2020, 100:4-104:3, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ, ECF No. 481-1, (attached as Exhibit 305).

[618] Ex. 305, Kemp Dep., *Fair Fight Action, Inc.*, No. 1:18-cv-05391-SCJ, Jan. 8, 2020, Tr. 103:23-104:3.

[619] *SEB Meeting Transcript*, GA. SEC'Y OF STATE, 38-39 (Sept. 20, 2017), https://sos.ga.gov/admin/uploads/September_20,_2017_Transcript.pdf (attached as Exhibit 306); Kristina Torres, *Georgia AG Gets 53 Forms in Probe of Voter Registration Group*, ATLANTA J.-CONST. (Sept. 20, 2017), https://www.ajc.com/news/state--regional-govt--politics/georgia-gets-forms-probe-voter-registration-group/MhhTWfqOh3cdkdoTVmwiYI/; Mark Niesse, *Voting Groups Call Georgia Investigations Empty Partisan Attacks*, ATLANTA J.-CONST. (Feb. 8, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECNBPKVDMG4A5MFQ/.

[620] Ex. 306, *SEB Meeting Transcript*, GA. SEC'Y OF STATE 58 (Sept. 20, 2017), https://sos.ga.gov/admin/uploads/September_20,_2017_Transcript.pdf; Mark Niesse, *Voting Groups Dismiss Probes by State as Partisan Attacks*, ATLANTA J.-CONST. (Feb. 10, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECN-BPKVDMG4A5MFQ/.

**SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION**

remaining case to the Attorney General's office for potential prosecution, the Attorney General's office never filed charges.[621]

This intimidation tactic recurred after the 2020 General Election. On November 30, 2020—ahead of Georgia's January 5, 2021 Senate runoff election—Secretary Raffensperger announced his office was investigating several voter registration organizations, including America Votes, Vote Forward, Operation New Voter Registration, and the New Georgia Project, alleging these organizations registered deceased individuals and submitted improper registration applications.[622] Specifically, "Secretary Raffensperger accused Vote Forward of attempting to register a dead woman in Alabama as a voter in Georgia, the New Georgia Project of sending registration forms to people in New York, and Operation New Voter Registration Georgia of telling college students to temporarily change their residency to Georgia."[623] Yet, in his press release alleging these election violations, Secretary Raffensperger provided no evidence to support his claims.[624] Over two months after launching the investigations, the only evidence made public was against the New Georgia Project, and the evidence demonstrated no wrongdoing.[625] The supposed evidence was a tweet from a New Yorker who received a package of postcards telling Georgians how to register to vote online.[626] The postcards were intended for a volunteer to send to Georgia residents

---

[621] Ex. 306, *SEB Meeting Transcript*, GA. SEC'Y OF STATE 58 (Sept. 20, 2017), https://sos.ga.gov/admin/uploads/September_20,_2017_Transcript.pdf; Mark Niesse, *Voting Groups Dismiss Probes by State as Partisan Attacks*, ATLANTA J.-CONST. (Feb. 10, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECN-BPKVDMG4A5MFQ/.

[622] David Wickert, *Georgia Investigates Voter Registration Groups*, ATLANTA J.-CONST. (Nov. 30, 2020), https://www.ajc.com/politics/election/georgia-investigates-voter-registration-groups/YHEWSZLOYNEWZPYSHWAPJ QFNFQ/; *Secretary Raffensperger Launches Investigation Into Groups Encouraging Fraudulent Registrations*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/secretary_raffensperger_launches_investigation_into_groups_encouraging_fraudulent_r egistrations (last visited Mar. 31, 2021) (attached as Exhibit 307).

[623] Joseph Choi, *Georgia Secretary of State Opens Investigation into Voter Registration Groups*, THE HILL (Nov. 30, 2020), https://thehill.com/homenews/state-watch/528012-georgia-secretary-of-state-opens-investigation-into-voter-registration.

[624] Ex. 307, *Secretary Raffensperger Launches Investigation into Groups Encouraging Fraudulent Registrations*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/secretary_raffensperger_launches_investigation_into_groups_encour-aging_ fraudulent_registrations (last visited Mar. 31, 2021); Mark Niesse, *Voting Groups Call Georgia Investigations Empty Partisan Attacks*, ATLANTA J.-CONST. (Feb. 8, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECNBPKVDMG4A5MFQ/.

[625] Mark Niesse, *Voting Groups Call Georgia Investigations Empty Partisan Attacks*, ATLANTA J.-CONST. (Feb. 8, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECNBPKVDMG4A5MFQ/.

[626] *Id.*

SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION

and were delivered to the wrong address in New York. Such election mailings are normal and permissible; no illegal activity occurred.[627]

To date, the State Election Board has heard only the case against the New Georgia Project, which also named now-Senator Reverend Raphael Warnock as a respondent after the SEB—astonishingly and mistakenly listed him as the organization's CEO.[628] Prior to the SEB meeting, no SEB investigators contacted the New Georgia Project.[629] Yet, at the SEB meeting where the complaint was heard, the SEB investigator claimed that, in 2019, the New Georgia Project "violated State law by not handing in 1,268 voter registration applications within the ten days required under state rules."[630] After reading the investigator's findings, and without hearing from anyone from or on behalf of the New Georgia Project, the SEB referred the case to the Attorney General's office for further investigation and potential prosecution.[631]

Georgia's election officials continue to investigate baseless allegations of fraudulent activity. On April 2, 2021, Georgia election official Gabriel Sterling expressly stated that the Secretary of State's office intends to investigate anyone who was offered a cure for an absentee ballot that did not follow through and cure it—approximately 2,500 individuals—while admitting that only "a handful quite honestly" might actually have been attempts to vote improperly.[632]

---

[627] *Id.*

[628] Ex. 302, *SEB Meeting Transcript*, GA. SEC'Y OF STATE 110-13 (Feb. 10, 2021), http://sos.ga.gov/admin/uploads/State _Election_Board_Feb_10,_2021_-_Transcript.pdf; Sam Levine, *'Intimidation Tactic': Georgia Officials Investigate Groups That Mobilized Black Voters*, THE GUARDIAN (Feb. 12, 2021), https://www.theguardian.com/us-news/2021/feb/12/georgia-voting-rights-stacey-abrams.

[629] Ex. 302, *SEB Meeting Transcript*, GA. SEC'Y OF STATE 110 (Feb. 10, 2021), http://sos.ga.gov/admin/uploads/State _Election_Board_Feb_10,_2021_-_Transcript.pdf; Mark Niesse, *Voting Groups Call Georgia Investigations Empty Partisan Attacks*, ATLANTA J.-CONST. (Feb. 10, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECN-BPKVDMG4A5MFQ/.

[630] Mark Niesse, *Voting Groups Call Georgia Investigations Empty Partisan Attacks*, ATLANTA J.-CONST. (Feb. 8, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECNBPKVDMG4A5MFQ/. *See also* Sam Levine, *'Intimidation Tactic': Georgia Officials Investigate Groups That Mobilized Black Voters*, THE GUARDIAN (Feb. 12, 2021), https://www.theguardian.com/us-news/2021/feb/12/georgia-voting-rights-stacey-abrams.

[631] *Id.*; Ex. 302, *SEB Meeting Transcript*, GA. SEC'Y OF STATE 110-13 (Feb. 10, 2021), http://sos.ga.gov/admin/uploads/State _Election_Board_Feb_10,_2021_-_Transcript.pdf.

[632] Meidas Touch Podcast, *Unedited: Gabriel Sterling Accepts Challenge to Debate Georgia Voter Bill with MeidasTouch* at 38:55-39:25, YOUTUBE (April 2, 2021), https://www.youtube.com/watch?v=cHvzaEAEQdU.

FAIR FIGHT ACTION

| SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION |

Baseless investigations are indisputably an intimidation tactic. Such investigations force organizations to re-allocate resources intended to invest in voter registration towards lawyers and defense costs.[633] The CEO of the New Georgia Project explained: "[e]very dollar that we have to spend to defend ourselves against the nuisance and partisan investigations is a dollar that we aren't able to put into the field to register new voters and have high-quality conversations about the power of their vote and the importance of this moment."[634] Generating baseless investigations attempts to deter these organizations from their mission of registering voters, especially voters of color.

6.   Georgia Officials Have Created a False Narrative about Voter Fraud.

The Georgia Secretary of State's office operates a "Voter Fraud Hotline" for individuals to submit information about suspected voter fraud.[635] The hotline dates to at least 2012,[636] but has recently received increased attention: the Secretary of State's webpage prominently features the hotline (with a button labeled "REPORT FRAUD") as part of its Secure the Vote initiative.[637] This webpage touts Georgia's elections as "among the most secure in the nation," but urges the reader to "Do Your Part" and report "questionable election-related activity" to the hotline.[638]

The focus of the Secure the Vote initiative's on voter fraud aligns with the Secretary of State's other recent actions to promote the voter fraud hotline. When the Secretary's office announced its intent to send letters to 8,000 individuals who may have moved out-of-state but had requested an absentee ballot ahead of the January 2021 runoff election, the office urged "citizens" to use the hotline "to report questionable elections activity."[639] The office used the same language in a press release warning that "every single allegation of voter fraud" would be "thoroughly" investigated and that anyone who comes to

---

[633] Sam Levine, *'Intimidation Tactic': Georgia Officials Investigate Groups That Mobilized Black Voters*, THE GUARDIAN (Feb. 12, 2021), https://www.theguardian.com/us-news/2021/feb/12/georgia-voting-rights-stacey-abrams.

[634] *Id.*

[635] *Stop Voter Fraud*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/stop_voter_fraud (attached as Exhibit 308).

[636] *See* Jim Walls, *Absentee Ballots Abused*, ATLANTA J.-CONST. (Aug. 11, 2012), https://www.ajc.com/news/local-govt--politics/absentee-ballots-abused/EwNLkw1aQoEcly2mxKpwYJ/ (reporting that individuals may call the hotline to report possible fraud).

[637] Claire Simms, *Georgia Launches 'Secure the Vote' Education Campaign*, FOX 5 ATLANTA (Dec. 6, 2019), https://www.fox5atlanta.com/news/georgia-launches-secure-the-vote-education-campaign; SECURE THE VOTE , https://securevotega.com (last visited Apr. 4, 2021).

[638] *Fact Check*, SECURE THE VOTE, https://securevotega.com/factcheck/ (last visited Apr. 4, 2021).

[639] Ex. 289, *Secretary of State Brad Raffensperger Protects Runoffs from Out of State Voters*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/secretary_of_state_brad_raffensperger_protects_runoffs_from_out_of_state_voters (last visited Apr. 4, 2021).

**SECTION III:   GEORGIA'S SYSTEMIC SUPPRESSION**

Georgia intending to commit voter fraud "will be prosecuted."[640] For example, the State legislature recently passed a law that included a provision requiring the Secretary of State's contact information to be printed on all absentee ballots, to encourage the reporting of "any unauthorized person requesting to observe the elector voting his or her ballot or the elector's voted ballot or any unauthorized person offering to deliver or return the voted ballot to the board of registrars."[641]

Continuing these efforts to stoke fear of voter fraud, and with no evidence that absentee ballot fraud was common or a serious threat to the integrity of Georgia elections, in April 2020, Secretary of State Raffensperger launched an "Absentee Ballot Fraud Task Force."[642] The task force appears to have met only once, in late May 2020, and has never published any reason to be concerned about absentee ballot fraud in Georgia.[643] Although Secretary Raffensperger announced an investigation into up to 1,000 possible instances of double-voting in September 2020, Secretary of State General Counsel Ryan Germany emailed Task Force members noting that the Secretary's office knew of "at least one" voter who voted twice intentionally, but that "[o]ther people likely voted twice inadvertently or because they were not sure if their absentee ballot had been returned on time by the mail service."[644] The Secretary's public statements drew condemnation, including from former Georgia Secretary of State Cathy Cox, who said

---

[640] *Secretary Raffensperger Warning: 'Moving' to Georgia Temporarily in Order to Vote in Jan. 5 Runoff is Illegal and Will Be Prosecuted*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/ secretary_raffensperger_warning_moving_to_georgia_temporarily_in_order_to_vote_in_jan_5_runoff_is_illegal_and_will_be _prosecuted (last visited Apr. 4, 2021) (attached as Exhibit 309).

[641] Ex. 13, S.B. 202 § 27.

[642] *See* Mark Niesse, *Georgia Elections Chief Launches Effort Against Mail-in Voting Fraud*, ATLANTA J- CONST. (Apr. 6, 2020), https://www.ajc.com/news/state--regional-govt--politics/georgia-elections-chief-launches-effort-against-mail-voting-fraud/uKcFoPbbLnFC0A4nXihaLI/. The myth of pervasive voter fraud has been soundly debunked by all serious investigations into its existence. In Georgia, an independent monitor reported to the State Election Board that after 250 hours of onsite observation in Fulton County in 2020 and 2021 he did not witness any action that "involved dishonesty, fraud or intentional malfeasance." *Raffensperger Sends More Voting Cases to Prosecutors*, GA. SEC'Y OF STATE (Feb. 18, 2021), https://sos.ga.gov/index.php/elections/raffensperger_sends_more_voting_cases_to_prosecutors (attached as Exhibit 310). In an investigation into absentee ballots in Cobb County in December 2020, the Secretary of State and investigators from the Georgia Bureau of Investigation found that election officials had a 99.99 percent accuracy rate in terms of signature verification, and after reviewing the 15,000 ballots, they identified "[n]o fraudulent absentee ballots." GA. SEC'Y OF STATE INVESTIGATIONS DIVISION, GA. SEC'Y OF STATE/ GA. BUREAU OF INVESTIGATION ABM SIGNATURE AUDIT REPORT (Dec. 29, 2020), https://sos.ga.gov/admin/uploads/Cobb%20County%20ABM%20Audit%20Report%2020201229.pdf (attached as Exhibit 311).

[643] Email from Chris Channell, Task Force Member, Glynn Cnty., Ga. to American Oversight (Oct. 6, 2020) (attached as Exhibit 312).

[644] Email from Ryan Germany, General Counsel, Ga. Sec'y of State, to Brad Rigby et al., Members of Absentee Ballot Fraud Task Force (Sept. 8, 2020) (attached as Exhibit 313).

the actions sought to "sow chaos and cast doubt," and that the Secretary "seems to have already pre-judged these matters."[645]

Georgia's efforts to manufacture evidence of voter fraud provide critical context for the latest wave of voter-suppression legislation in Georgia as these suppressive tactics of voter fraud allegations have an outsize impact on voters of color.[646] Georgia demonstrated this in its previous efforts to prosecute voter fraud, including its baseless investigations of (i) a dozen Black voting rights activists in Brooks County (who were later acquitted), (ii) the AALAC (which was cleared of wrongdoing after over two years of investigation), and (iii) the New Georgia Project (where no evidence of criminal activity was found).[647]

---

[645] Beau Evans, *Georgia Secretary of State Faces Backlash Over Double-Voting Claims*, AUGUSTA CHRON. (Sept. 9, 2020), https://www.augustachronicle.com/story/news/politics/elections/state/2020/09/09/georgia-secretary-of-state-faces-backlash-over-double-voting-claims/43139411/.

[646] *See* Vann Newkirk II, *Voter Suppression is Warping Democracy*, THE ATLANTIC (July 17, 2018) https://www.theatlantic.com/politics/archive/2018/07/poll-prri-voter-suppression/565355/ (reporting survey results that ten percent of Hispanic voters reported they or someone in their household were bothered at the polls when trying to vote). *See also* Alexandra Hart & Shelly Brisbin, *Analysis Finds People of Color Account for 72% of Election Fraud Cases Brought by the Texas Attorney General*, TEX. STANDARD (Mar. 25, 2021) https://www.texasstandard.org/stories/analysis-finds-people-of-color-account-for-72-of-election-fraud-cases-brought-by-the-texas-attorney-general/ (reporting seventy-two percent of fraud investigations by the Texas Attorney General were brought against Black and Hispanic defendants, most of them women, and eighty-six percent involved alleged offenses in counties with mostly nonwhite and Hispanic populations).

[647] Rebekah Barber, *Is Georgia's Secretary of State Unjustly Targeting Voting Rights Activists Again?*, FACING SOUTH (Oct. 4, 2017), https://www.facingsouth.org/2017/10/georgias-secretary-state-unjustly-targeting-voting-rights-activists-again.



## SECTION IV:

**Georgia's Recent Legislative Session Demonstrates that Attacks on Voting Rights Are Increasingly Aggressive and Persistent**

Source: Elijah Nouvelage/Getty Images



FAIR FIGHT ACTION

**SECTION IV:   S.B. 202: SUPPRESSION REVISITED**

## Georgia's Recent Legislative Session Demonstrates that Attacks on Voting Rights Are Increasingly Aggressive and Persistent.

For further proof that attacks on voting are an escalating threat to the rights of Georgians of color, one need look no further than the State's recently ended legislative session. Because of the historic turnout for the 2020 election and the 2021 Senate runoff, and fueled by the groundless allegations of voter fraud discussed above, lawmakers had renewed vigor. The Georgia General Assembly, like state legislatures across the country, worked quickly to both limit voting and consolidate power.

While S.B. 202—the final result of over dozens[648] of hastily developed bills—affects all Georgia voters, it will be felt most acutely by the State's voters of color. Provisions such as the ID requirement, reduced minimum early vote for runoff elections, limited access to drop boxes, and prohibition of most out-of-precinct voting may go largely unnoticed by Georgia voters with adequate resources and time to navigate the complex requirements. However, the additional barriers will disenfranchise thousands of Georgians whose votes should matter just as much.[649]

Other provisions of S.B. 202 give the State legislature outsized control of voting resources, voting-related prosecutions, and election certification.[650] S.B. 202 grants the General Assembly power to appoint the majority of the State Election Board.[651] By gaining control of the State Election Board, which can unilaterally fire and replace county election officials,[652] the General Assembly will have new power to oversee and influence the outcome of elections.[653] To be clear, the Georgia legislature has empowered itself to interfere with election results it does not like, even as the FBI continues to round up seditionists

---

[648] Christopher Alston, *There Are a Lot of Voting Bills in the Georgia General Assembly. Here's What You Need to Know.*, WABE (Feb. 25, 2021), https://www.wabe.org/there-are-a-lot-of-voting-bills-in-the-georgia-general-assembly-heres-what-you-need-to-know/.

[649] *See* Fredreka Schouten, *Here's Why Voting Rights Activists Say Georgia's New Election Law Targets Black Voters*, CNN (Mar. 26, 2021), https://www.cnn.com/2021/03/26/politics/georgia-voting-law-black-voters/index.html (explaining how Black voters will be disproportionately and negatively impacted by these provisions).

[650] *See generally* Ex. 13, S.B. 202; Zack Beauchamp, *Georgia's Restrictive New Voting Law, Explained*, VOX (Mar. 26, 2021), https://www.vox.com/22352112/georgia-voting-sb-202-explained.

[651] Ex. 13, S.B. 202 § 5; O.C.G.A. § 21-2-30(a) (attached as Exhibit 314).

[652] Ex. 13, S.B. 202 § 6; O.C.G.A. § 21-2-33.1(f) (attached as Exhibit 315).

[653] *See* Domingo Morel, *As Georgia's New Law Shows, When Black People Gain Local Power, States Strip That Power Away*, WASH. POST (Apr. 1, 2021), https://www.washingtonpost.com/politics/2021/04/01/georgias-new-law-shows-when-black-people-gain-local-power-states-strip-that-power-away/.

**SECTION IV:   S.B. 202: SUPPRESSION REVISITED**

who stormed our nation's Capitol and spilled blood for similarly not agreeing with the 2020 General Election results.[654]

Georgia lawmakers' efforts to suppress the vote and seize electoral power demonstrate the fight for voting rights is a critical point and Federal action is urgently needed to protect voting rights. The Georgia legislature's fast-tracked, massive overhaul of elections could likely have been stopped in its tracks had Georgia remained subject to preclearance under the VRA. Meaning, many of these newly passed provisions would have required preclearance by either the Department of Justice or a federal court before becoming law. Instead, this bill was rushed through the State legislature. With only white men in the room, the legislation was signed behind closed doors and in front of a painting of a slave plantation while a Black lawmaker was arrested for knocking on the door.[655]

And the Georgia General Assembly is not alone in this strategy. Georgia's efforts to roll back voting rights can also be seen in state legislatures across the country.[656] As the *New York Times* recently reported, "Nationwide, [] lawmakers in at least eight states . . . are angling to pry power over elections from secretaries of state, governors and nonpartisan election boards."[657] Despite not finding evidence of voter fraud or other abusive voting practices, state legislatures are rapidly introducing legislation designed to curb early voting practices popular during the COVID-19 pandemic and, by most accounts, practices that worked well.[658] According to the Brennan Center for Justice, in the first twelve weeks of 2021, legislators in forty-three states filed over 361 bills to make it more difficult to vote, primarily seeking limits on mail voting and imposing stricter voter ID requirements.[659] *FiveThirtyEight* has identified at

---

[654] *See, e.g.,* Derek Hawkins, *Ex-Officer Texted 'We Stormed the Capitol' During Jan. 6 Riot, Feds Say, and Tipsters Turned Him In*, WASH. POST (Apr. 3, 2021), https://www.washingtonpost.com/nation/2021/04/03/former-utah-police-capitol-riot/ (describing the recent arrest of someone who allegedly took part in the mob that breached the Capitol on January 6, 2021).

[655] Rebecca Shabad, *Georgia Legislator Arrested For Protesting Voting Law Says Signing Of Bill 'Far More Serious Crime'*, NBC NEWS (Apr. 1, 2021), https://www.nbcnews.com/politics/politics-news/georgia-legislator-arrested-protesting-voting-law-says-signing-bill-far-n1262748.

[656] Gabby Birenbaum, *State GOPs Have Already Introduced Dozens of Bills Restricting Voting Access in 2021*, VOX (Jan. 29, 2021), https://www.vox.com/22254482/republicans-voter-suppression-state-legislatures (discussing efforts across the nation to roll back voting rights).

[657] Nick Corasaniti, *Republican Lawmakers in at Least 8 States Are Vying for More Power over How Elections Are Run*, N.Y. TIMES (Mar. 25, 2021), https://www.nytimes.com/2021/03/25/us/republican-lawmakers-in-at-least-8-states-are-vying-for-more-power-over-how-elections-are-run.html.

[658] *See id.* (noting that voter turnout in 2020 was at the highest level in 100 years partially because of expanded vote-by-mail).

[659] *State Voting Laws*, BRENNAN CTR. FOR JUST., https://www.brennancenter.org/issues/ensure-every-american-can-vote/voting-reform/state-voting-laws (last visited Mar. 31, 2021).

**SECTION IV:   S.B. 202: SUPPRESSION REVISITED**

least fifty-three more bills introduced since the Brennan Center reported its findings.[660] As Myrna Pérez, the director of the Brennan Center's Voting Rights and Elections Program, observed: "[a]bsentee ballots have been largely uncontroversial when they were used by older, whiter [] Americans," but "as soon as communities of color started [using them] . . . we're starting to see restrictions."[661]

    A.   <u>There Is Scant Evidence of Fraud to Justify Georgia's New Restrictions.</u>

       S.B. 202's stated purpose is to address the "significant lack of confidence in Georgia election systems."[662] But State lawmakers propped up the "big lie" of voter fraud and election rigging,[663] and then used the intended result that many voters are "concerned about allegations of rampant voter fraud"[664] as an excuse to limit voting. As investigations into the 2020 election and the longer course of history have demonstrated, voter fraud is exceedingly rare.[665]

       Sweeping national studies confirm that voter fraud—other than as a political talking point and new wedge issue—is not a problem in American elections.[666] For instance, a much-ballyhooed Commission to investigate voter fraud, established by President Trump after the 2016 election, abruptly disbanded in 2018 after finding no significant fraud.[667] Likewise, in a sweeping survey of alleged voter fraud, the Brennan Center for Justice found it was more likely an individual would be struck by lightning

---

[660] Alex Samuels et al., *The States Where Efforts to Restrict Voting Are Escalating*, FIVETHIRTYEIGHT (Mar. 29, 2021), https://fivethirtyeight.com/features/the-states-where-efforts-to-restrict-voting-are-escalating/.

[661] *Id.*

[662] Ex. 13, S.B. 202 § 2.

[663] Dahlia Lithwick, *Why Republicans Are Still Holding Onto the Big Lie,* SLATE (Feb. 26, 2021), https://slate.com/news-and-politics/2021/02/republicans-cpac-stolen-election-lie.html.

[664] Ex. 13, S.B. 202 § 2.

[665] *See, e.g., The Myth of Voter Fraud,* BRENNAN CTR. FOR JUST., https://www.brennancenter.org/issues/ensure-every-american-can-vote/vote-suppression/myth-voter-fraud (last visited Apr. 5, 2021); Andy Sullivan, Joseph Ax, *Explainer: Despite Trump Claims, Voter Fraud is Extremely Rare. Here is How U.S. States Keep it That Way*, REUTERS (Sept. 9, 2020), https://www.reuters.com/article/us-usa-election-voter-fraud-facts-explai/explainer-despite-trump-claims-voter-fraud-is-extremely-rare-here-is-how-u-s-states-keep-it-that-way-idUSKBN2601HG.

[666] *See id.*

[667] Michael Tackket & Michael Wines, *Trump Disbands Commission on Voter Fraud*, N.Y. TIMES (Jan. 3, 2018), https://www.nytimes.com/2018/01/03/us/politics/trump-voterfraud-commission.html.



than impersonate another at the polls.[668] The same is true, the Brennan Center later noted, for vote-by-mail fraud.[669] For example, in Oregon, a state that conducts its elections by mail,[670] the Brennan Center found there have only been roughly a dozen instances of fraud among 100 million mail-in ballots received since 2000.[671] In another national survey, this time by the Walter J. Cronkite School of Journalism and Mass Communications at Arizona State University, researchers found the rate of voter fraud from 2000 - 2012 was "infinitesimal."[672] In Georgia between 2000 and 2012, there were only twenty-seven allegations of individuals casting an ineligible vote.[673] After reviewing national voter fraud allegations since 2000, Professor Lorraine Minnite found that "[v]oter fraud is a politically constructed myth" and that misinformation about voter fraud is often meant "to persuade the public about the need for more administrative burdens on the vote."[674] This tactic was on full display in the 2021 session of the Georgia General Assembly.

The specific context of this legislation is important. The widespread, multi-front attack took place immediately after the most scrutinized election in American history. The former president and his supporters lobbed unsupported (and unsupportable) accusations about the merit of votes from cities with substantial Black populations such as Philadelphia, Detroit, Milwaukee, and Atlanta[675] while mounting at least forty-two legal challenges to the Presidential Election results, which all failed.[676] On March 8, 2021,

---

[668] Justin Levitt, *The Truth About Voter Fraud*, Brennan Ctr. for Just. 3, 4, 6 (2007), https://www.brennancenter.org/sites/default/files/2019-08/Report_Truth-About-Voter-Fraud.pdf.

[669] Wendy Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, Brennan Ctr. for Just. (Apr. 10, 2020), https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud.

[670] Tiffany Camhi, *How Oregon Became the First State to Vote by Mail in a Presidential Election,* OPB (Jun. 19, 2020), https://www.opb.org/news/article/history-vote-by-mail-oregon-elections/.

[671] Wendy Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, Brennan Ctr. for Just. (Apr. 10, 2020), https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud

[672] Natasha Khan & Corbin Carson, *Comprehensive Database of U.S. Voter Fraud Uncovers No Evidence that Photo ID Is Needed*, News21 (Aug. 12, 2012), https://votingrights.news21.com/article/election-fraud/.

[673] *See Election Fraud in America*, News21 (Aug. 12, 2012), https://votingrights.news21.com/interactive/election-fraud-database/.

[674] Lorraine Minnite, The Myth of Voter Fraud 6, 10 (2007).

[675] Aaron Morrison et al, *Trump Election Challenges Sound Alarm Among Voters of Color*, ABC News (Nov. 23, 2020), https://abcnews.go.com/Politics/wireStory/trump-election-challenges-sound-alarm-voters-color-74345706.

[676] Jacob Shamsian and Sonam Sheth, *Trump and His Allies Filed More than 40 Lawsuits Challenging the 2020 Election Results. All of Them Failed.*, Bus. Insider (Feb. 22, 2021), https://www.businessinsider.com/trump-campaign-lawsuits-election-results-2020-11.



the Supreme Court rejected—unanimously and without comment—the last of these election appeals.[677] No evidence of voter fraud was ever presented.

Nowhere have these claims of voter fraud been more investigated than in Georgia. The State counted ballots cast in the Presidential Election three separate times, and found no evidence of even minimal fraud.[678] And Georgia election officials have stood by the results after every count. For instance, three weeks after the 2020 General Election, Secretary of State Raffensperger stated that "Georgia's voting system has never been more secure or trustworthy" and "the truth is that the people of Georgia – and across the country – should not have any remaining doubts" about who won the election.[679] He continued to refute claims of voter fraud in a letter to Congressional representatives on January 6, 2021—the day of the insurrection against the Capitol—reaffirming that after "diligently investigating all claims of fraud or irregularities" his office found "nowhere close to sufficient evidence to put in doubt the result" of the election.[680] Numerous other high-ranking Georgia election officials, such as Lieutenant Governor Geoff Duncan, Secretary of State General Counsel Ryan Germany, and Secretary of State Chief Operating Officer Gabriel Sterling also defended the integrity of Georgia's elections against spurious claims of fraud.[681]

[677] Lawrence Hurley, *U.S. Supreme Court Dumps Last of Trump's Election Appeals*, REUTERS (Mar. 8, 2021), https://www.reuters.com/article/us-usa-court-election-idUSKBN2B01LE.

[678] Kate Brumback, *Georgia Again Certifies Election Results Showing Biden Won*, ASSOCIATE PRESS (Dec. 7, 2020), https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a.

[679] Brad Raffensperger, Opinion, *Georgia's Election Results Are Sound*, WASH. POST (Nov. 21, 2020), https://www.washingtonpost.com/opinions/2020/11/21/brad-raffensperger-georgia-results-2020-election-trustworthy/.

[680] Ex. 290, Letter from Brad Raffensperger, Ga. Sec'y of State, to Members of Congress at 1-2 (Jan. 6, 2021), https://sos.ga.gov/admin/uploads/Letter%20to%20Congress%20from%20Secretary%20Raffensperger%20(1-6-21).pdf.

[681] *See* Greg Bluestein, *Duncan Pushes Back on False Voter Fraud Claims: "We're Better Than This*,*"* ATLANTA J.-CONST. (Dec. 1, 2020), https://www.ajc.com/politics/politicsblog/duncan-pushes-back-on-false-voter-fraud-claims-were-better-thanthis/GSNRMYELPBBADHZ5RQ7LDTVHCE/; Amy Gardner & Paulina Firozi, *Here's the Full Transcript and Audio of the Call Between Trump and Raffensperger*, WASH. POST (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgiavote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html; Scott Pelley, *Georgia Secretary of State Describes Call Where Trump Pressured Him to Find Evidence of Voter Fraud*, CBS NEWS 60 MINUTES (Jan. 10, 2021), https://www.cbsnews.com/news/georgia-election-brad-raffensperger-60-minutes-2021-01-10/.

FAIR FIGHT ACTION

SECTION IV:   S.B. 202: SUPPRESSION REVISITED

B.   The Georgia General Assembly's Response to an Election that Saw Record Turnout and Withstood Intense Public Scrutiny Was to Limit Voting.

The highly scrutinized 2020 election saw unprecedented turnout in Georgia, despite a global pandemic.[682] Almost 5 million Georgians voted in November.[683] This was partially a result of record-setting early voting turnout, where in the forty-five days before the election 2,418,550 Georgians cast their ballots.[684] It was also due to a twenty-five percent increase of Black registered voters since 2016.[685] The turnout for the runoff election on January 5, 2021, was likewise unprecedented, with over 4.4 million Georgians casting their vote—more than double the previous record for a runoff in the State.[686] Black voters in particular turned out for the runoff in significant numbers, growing from 27.8 percent of the State electorate in November to 30.9 percent in January.[687]

Rather than celebrate this unprecedented civic engagement, members of the Georgia General Assembly immediately turned to enacting measures that would bring the turnout rate back down. On January 7, 2021, just two days after the runoff election and one day after the insurrection, Speaker David Ralston set up a Special Committee on Election Integrity to be chaired by Representative Barry Fleming, a longtime opponent of voting rights.[688] A flurry of bills grounded in baseless claims of election fraud

---

[682] *See Georgia Election Results*, POLITICO (Jan. 6, 2021), https://www.politico.com/2020-election/results/georgia/.

[683] *Id.*

[684] *Georgia Breaks All-Time Voting Record*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/georgia_breaks_all-time_voting_record (last visited Mar. 31, 2021) (attached at Exhibit 316).

[685] Luis Noe-Bustamante & Abby Budiman, *Black, Latino and Asian Americans Have Been Key to Georgia's Registered Voter Growth Since 2016*, PEW RSCH. CTR. (Dec. 21, 2020), https://www.pewresearch.org/fact-tank/2020/12/21/black-latino-and-asian-americans-have-been-key-to-georgias-registered-voter-growth-since-2016/.

[686] Nathaniel Rakich et al., *How Democrats Won the Georgia Runoffs*, FIVETHIRTYEIGHT (Jan. 7, 2021), https://fivethirtyeight.com/features/how-democrats-won-the-georgia-runoffs/.

[687] Ross Williams, *Record Turnout Among Black Voters Could Help Georgia Reshape the Nation*, GA. PUB. BROAD. (Jan. 11, 2021), https://www.gpb.org/news/2021/01/11/record-turnout-among-black-voters-could-help-georgia-reshape-the-nation.

[688] Emil Moffatt, *Speaker Ralston Announces Election Integrity Committee That Will Focus on 'Moving Forward'*, WABE (Jan. 7, 2021), https://www.wabe.org/speaker-ralston-announces-election-integrity-special-committee-that-will-focus-on-moving-forward/; Stephen Fowler, *In Georgia County, Elections Bills Have Consequences*, NPR (Mar. 27, 2021), https://www.npr.org/2021/03/27/981354303/in-georgia-county-elections-bills-have-consequences (describing how Representative Fleming lost his job as an attorney for Hancock County because of his record on voter suppression legislation). *See also* Timothy Pratt, *The Lawyer Behind Georgia's New Anti-Voting Law*, THE NATION (Apr. 8, 2021), https://www.thenation.com/article/politics/georgia-voting-law-barry-fleming/.

FAIR FIGHT ACTION

## SECTION IV:   S.B. 202: SUPPRESSION REVISITED

followed.[689] Despite Georgia persistently ranking as the worst state for COVID-19 vaccination rates,[690] Georgia Senate lawmakers focused on reviving Georgia's dark past of racist voting laws, with nearly one-quarter of the bills listed for the "Crossover Day" between the chambers devoted to voter suppression legislation.[691]

The procedures around these "election integrity" bills were confusing and opaque. Committees met without advance notice and debated bills never made available online.[692] Sometimes committee meetings were live streamed, sometimes they were not.[693] Guidelines for public testimony were either not published or inconsistent.[694] For example, the original version of House Bill 531 ("H.B. 531") was posted only one hour before the Special Committee's first hearing[695] and less than twenty-four hours before its second hearing.[696] The substantial amendments to that bill, many of which are in the final iteration S.B. 202, were also routinely published late or not at all.[697]

State lawmakers rushed the legislative process around S.B. 202 at every step. On March 8, 2021, the Secretary of State's Bipartisan Task Force for Safe, Secure, and Accessible Elections made known its

[689] *See* Jewel Wicker, *Here's What's Going on with Voting Legislation in Georgia and Why Opponents Say It's Clear "Voter Suppression"*, ATLANTA MAGAZINE (Mar. 11, 2021), https://www.atlantamagazine.com/news-culture-articles/heres-whats-going-on-with-voting-legislation-in-georgia-and-why-opponents-say-its-clear-voter-suppression/.

[690] Jeff Amy, *Georgia to Vaccinate Adults Over 55, Those with Conditions*, ASSOCIATED PRESS (Mar. 10, 2021), https://apnews.com/article/public-health-emergency-management-georgia-coronavirus-pandemic-5584d52bbb5d116c40499c2a9b0e39cc.

[691] Stephen Fowler, *A Dozen Voting Bills, Citizen's Arrest Overhaul Survive 2021 Crossover Day*, GPB (Mar. 9, 2021), https://www.gpb.org/news/2021/03/09/dozen-voting-bills-citizens-arrest-overhaul-survive-2021-crossover-day. *See also* Georgia Senate Rules Calendar, https://www.legis.ga.gov/api/document/docs/default-source/senate-calendars/20212022/rules-calendar-2021-legislative-day-28.pdf?sfvrsn=cac7ebff_2 (attached as Exhibit 317).

[692] Complaint ¶¶ 164, 167, *Sixth District v. Kemp*, No. 1:21-cv-01284 (N.D. Ga. Mar. 29, 2021), , ECF No. 1 (attached as Exhibit 318).

[693] *Id.* ¶ 167.

[694] *Id.* ¶ 161.

[695] Nathaniel Rakich, *All the Ways Georgia Could Make It Harder to Vote*, FIVETHIRTYEIGHT (Feb. 25, 2021), https://fivethirtyeight.com/features/all-the-ways-georgia-could-make-it-harder-to-vote/.

[696] *See Special Committee On Election Integrity – Archives*, Georgia House of Representatives, https://www.house.ga.gov/Committees/en-US/ElectionIntegrityArchives.aspx (last visited Apr. 6, 2021) (linking to video of meeting on Thursday, Feb. 18, the day that bill was introduced, and next meeting on Friday, Feb. 19); *see also* Ex. 318, Complaint ¶ 166, *Sixth District v. Kemp*, No. 1:21-cv-01284 (N.D. Ga. Mar. 29, 2021).

[697] Ex. 318, Complaint ¶ 166, *Sixth District v. Kemp*, No. 1:21-cv-01284 (N.D. Ga. Mar. 29, 2021).

concern "that the legislative process is proceeding at a pace that does not allow for full examination of all factors that must be considered."[698] The General Assembly pressed on.[699] When the public participated in some of these meetings, many raised concerns about the bills' disproportionate impact on voters of color.[700] The General Assembly declined to conduct any meaningful analysis.[701] When a state representative raised the prospect of analyzing the bill's fiscal impact, which experts say could be over $19 million,[702] the leaders ignored the request.[703] Lieutenant Governor Duncan unilaterally ruled that no analysis of the fiscal impact of the bill needed to be done because it would not exceed $5 million, despite providing no evidence to support his ruling.[704] One State Senator said that he was "making stuff up as [he] went" because "isn't that how laws are made?"[705] On March 25, 2021, S.B. 202 passed the Georgia House of Representatives, was voted on by the Senate hours later, and reached the Governor's desk by the end of the day.[706]

When Governor Kemp signed the bill into law only seventy-nine days after the historic January 2021 Senate runoff election, he did so behind closed doors and in front of a painting of an antebellum

---

[698] *Id.* ¶ 170.

[699] *Id.* ¶ 171.

[700] *See, e.g., Special Committee on Election Integrity Monday, Feb. 22 Meeting*, GEORGIA HOUSE OF REPRESENTATIVES, https://livestream.com/accounts/25225474/events/8729747/videos/217887713 (video of public comment on H.B. 531); *see also* Complaint, *Georgia State Conf. of NAACP v. Raffensperger*, No. 21-cv-01259 (N.D. Ga. March 28, 2021), ¶¶ 94-97 (attached as Exhibit 319).

[701] Ex. 319, Complaint, *Georgia State Conf. of NAACP,* No. 21-cv-01259 (N.D. Ga. March 28, 2021), ¶¶ 104-06.

[702] *See* Fiscal Analysis by Voting Rights Lab: https://votingrightslab.org/wp-content/uploads/2021/02/Fiscal-Impact-of-GA-SB-241.pdf. *See also* Discussion of Passage on the Senate Floor, https://www.youtube.com/watch?v=QVzKEHqNxuY, Time stamps 6:12:40 and 6:19:00.

[703] Ex. 318, Complaint, *Sixth District*, No. 21-cv-01284 (N.D. Ga. Mar. 29, 2021), ¶ 171.

[704] *Id.*

[705] Georgia State Senate, *Senate Committee on Ethics Mar. 3, 2021 Meeting*, YOUTUBE (Mar. 3, 2021), https://www.youtube.com/watch?v=UOw2QUTlDUM&list=PLBFf_azbJKlX3zfkwMv-DC0N9mqLKHDD-&index=12; *see also* Complaint, *VoteAmerica v. Raffensperger,* No. 21-cv-01390 (N.D. Ga. Apr. 7, 2021), ¶ 99 (attached as Exhibit 320).

[706] *Georgia Senate Bill 202*, LEGISCAN, https://legiscan.com/GA/bill/SB202/2021 (last visited Apr. 6, 2021); *see also* Stephen Fowler, *Georgia Governor Signs Election Overhaul, Including Changes To Absentee Voting*, NPR POLITICS (March 25, 2021), https://www.npr.org/2021/03/25/981357583/georgia-legislature-approves-election-overhaul-including-changes-to-absentee-vot.



Georgia plantation.[707] Just outside, Representative Park Cannon—who was excluded from the ceremony—was arrested for knocking on the door.[708] As the Editorial Board of the *Atlanta Journal-Constitution* observed, "the world will long remember the shameful scene of a state lawmaker – a Black woman – being dragged down a Gold Dome hallway by white state troopers Thursday because she dared bang on the door of a governor who chose to lock himself away while signing this legislation and livestreaming about it."[709]

C.    <u>Provisions of S.B. 202 Make it More Difficult for Voters, Particularly Those of Color, to Cast Their Ballots in Ways that Are Convenient, Popular, and Secure.</u>

S.B. 202 imposes new and unjustified limitations on Georgians' voting options. People often have difficulty getting off work, arranging for childcare, securing transportation, standing in hours-long lines, or otherwise taking an unpredictable and potentially substantial amount of time to vote, particularly when there are limited days, hours, or locations for voting. These burdens are not felt equally.[710] To get the best possible participation of the entire electorate, which should be the goal in any democracy, it is essential to offer many secure voting options. In 2020, Georgia voters used absentee voting and early voting more than ever before, which contributed to the historic turnout.[711]

Voting by mail, for example, is a flexible option and should be available to any eligible voter regardless of circumstances.[712] Voting by mail allows voters to take their time and research candidates and

---

[707] Natasha Chen & Theresa Waldrop, *Black Voter Says a Painting at Georgia Governor's Voter Bill Signing Shows the Plantation Where Her Family Worked for Generations*, CNN (Mar. 28, 2021), https://www.cnn.com/2021/03/28/us/georgia-callaway-plantation-painting-trnd/index.html.

[708] Rebecca Shabad, *Georgia Legislator Arrested For Protesting Voting Law Says Signing Of Bill 'Far More Serious Crime'*, NBC NEWS (Apr. 1, 2021), https://www.nbcnews.com/politics/politics-news/georgia-legislator-arrested-protesting-voting-law-says-signing-bill-far-n1262748.

[709] Opinion, *Our View: Marching Backward into History*, ATLANTA J.-CONST. (Mar. 26, 2021), https://www.ajc.com/opinion/our-view-marching-backward-intohistory/KERD4OAURNFRNOQUZPKZNTBXF4/.

[710] *See* Jeff Cockrall, *Chicago Booth Scholar Pushes Companies to Take Substantive Step Toward Change*, UCHICAGO NEWS (Aug. 4, 2020), https://news.uchicago.edu/story/why-paid-time-voting-can-help-address-racial-inequities ("Black and Latinx Americans are more likely to be low-wage workers, which means they are less able to afford to forgo lost wages in order to vote"); Sendhil Mullainathan, *For Racial Justice, Employees Need Paid Hours Off for Voting*, NY TIMES (Jun. 12, 2020), https://www.nytimes.com/2020/06/12/business/for-racial-justice-employees-need-paid-hours-off-for-voting.html.

[711] Mark Niesse, *Early Voting Brought Record Turnout in Georgia Ahead of Election Day*, ATLANTA J-CONST. (Oct. 31, 2020), https://www.ajc.com/politics/early-voting-brought-record-turnout-in-georgia-ahead-of-election-day/76JRESFLMVEYBGX2J7AAGKABQ4/.

[712] *See* Abigail Abrams, *Mail Voting Boosted Turnout for Voters with Disabilities. Will Lawmakers Let It Continue?*, TIME (Feb. 18, 2021), https://time.com/5940397/2020-mail-voting-accessibility/; Kim Eckart, *UW Political Science Expert on the Value of*



issues, which can be especially helpful to voters whose language facility may be limited.[713] And in a global pandemic—though at any time—the option to vote by mail benefits public health. With additional incentives related to COVID-19, 1.3 million 2020 voters used Georgia's vote by mail process—a record number.[714] And Black voters disproportionately voted absentee in 2020 with nearly thirty percent of Black voters casting their ballot by mail, compared to only twenty-four percent of white voters.[715]

Despite the popularity of vote-by-mail in 2020—or, arguably, because of it—S.B. 202 needlessly cuts the period to request an absentee ballot by more than half.[716] It also restricts the ability of non-profit organizations to distribute absentee ballot applications,[717] imposing a new requirement that Georgians requesting an absentee ballot must list their date of birth along with their driver's license or state-issued voter ID number.[718] If the voter has neither a Georgia driver's license nor a Georgia state ID, the voter may use the other acceptable forms of ID,[719] but the voter must include a copy of that alternative form of ID.[720] Proponents of the legislation acknowledged that some voters did not have a driver's license or state ID.[721] But, they claimed, that applied to only three percent of the voters.[722] The problem with that

---

*Mail-In Voting*, UNIV. OF WASH. NEWS (Sept. 4, 2020), https://www.washington.edu/news/2020/09/04/uw-political-science-expert-on-the-value-of-mail-in-voting/.

[713] *See* Ex. 318, Complaint, *Sixth District*, No. 21-cv-01284 (N.D. Ga. Mar. 29, 2021), ¶ 13.

[714] *Georgia Early Voting* Statistics, U.S. ELECTIONS PROJECT, https://electproject.github.io/Early-Vote-2020G/GA.html (last visited Apr. 6, 2021); *see also* Ex. 318, Complaint, *Sixth District*, No. 21-cv-01284 (N.D. Ga. Mar. 29, 2021), ¶¶ 140-43.

[715] *Id.*

[716] Ex. 13, S.B. 202 § 25; *see also* Ex. 47, O.C.G.A. § 21-2-381(a)(1)(A)(This is the statute that will be amended adopting the shorter period of time).

[717] *See generally* Ex. 320, Complaint ¶ 8, *VoteAmerica*, No. 1:32-cv-01390 (N.D. Ga. Apr. 7, 2021).

[718] Ex. 13, S.B. 202 § 28; *compare* O.C.G.A. § 21-2-385(a) (attached as Exhibit 321).

[719] *See* O.C.G.A. § 21-2-417(c) (attached as Exhibit 322).

[720] Ex. 13, S.B. 202 § 28; *compare* Ex. 321, O.C.G.A. § 21-2-385(a).

[721] *See, e.g., Special Committee on Election Integrity Friday, Feb. 19 Meeting* at 26:40-26:52, GEORGIA HOUSE OF REPRESENTATIVES, https://livestream.com/accounts/25225474/events/8729747/videos/217751717 (in a committee hearing on H.B. 531, Chairman Barry Fleming acknowledges only ninety-seven percent of Georgians have a driver's license or state ID number); Meidas Touch Podcast, *Unedited: Gabriel Sterling Accepts Challenge to Debate Georgia Voter Bill with MeidasTouch* at 35:19-35:38, YOUTUBE (Apr. 2, 2021), https://www.youtube.com/watch?v=cHvzaEAEQdU. (Georgia elections official Gabriel Sterling states that three percent of Georgia voters do not have a driver's license or state ID).

[722] *See id.*; *see also* Mark Niesse, *Georgia Moves Toward ID Numbers to Verify Absentee Voters*, ATLANTA J.-CONST. (Mar. 15, 2021), https://www.ajc.com/politics/georgia-moves-toward-id-numbers-to-verify-absentee-voters/ K3XW5WYNCJHKDJ7BWG3CLMIHIY/.



position is, according to the SOS, there are 7,389,343 registered voters in the State.[723] If three percent of those registered voters must submit a copy of alternative identification, that means over 221,000 people will need access to printers, scanners, or copiers. This need to be able to access electronics presents an additional, unnecessary burden that will disproportionately affect the older voters, lower income voters, and voters of color, who are less likely to have the required ID numbers or resources—physical or electronic—to send a copy of an ID, yet who are equally eligible to vote.[724] "To get most state-issued voter ID cards, people are still required to produce documents including birth certificates or social security cards, which can be costly to obtain.[725] Many elderly African Americans who were born in the Jim Crow South, when hospitals often refused black patients, don't have these otherwise common forms.".[726]

This law also limits the ability of absentee voters to utilize drop boxes.[727] As election Official Gabriel Sterling conceded, going forward there will be fewer drop boxes and the drop boxes will be in less convenient locations.[728] While the law requires that each county have a drop box, it also inexplicably restricts their number: counties are limited to the "lesser of either one drop box for every 100,000 active registered voters in the county or the number of advanced voting locations in the county."[729] In 2020, there were ninety-four drop boxes across metropolitan Atlanta in Fulton, Cobb, DeKalb, and Gwinnett

---

[723] *Voter Registration Statistics*, GA. SEC'Y OF STATE, sos.ga.gov/index.php/Elections/voter_registration_statistics (last visited Apr. 7, 2021) (attached as Exhibit 323).

[724] *See* Ex. 318, Complaint, *Sixth District*, No. 21-cv-01284 (N.D. Ga. Mar. 29, 2021), ¶ 206; Ex. 319, Complaint, *Ga. State Conf. of NAACP*, No. 21-cv-01259 (N.D. Ga. Mar. 28, 2021), ¶84; *see also* Sari Horwitz, *Getting a Photo ID So You Can Vote is Easy. Unless You're Poor, Black, Latino or Elderly.*, WASH. POST (May 23, 2016), https://www.washingtonpost.com/politics/courts_law/getting-a-photo-id-so-you-can-vote-is-easy-unless-youre-poor-black-latino-or-elderly/2016/05/23/8d5474ec-20f0-11e6-8690-f14ca9de2972_story.html (discussing how obtaining a photo ID "can be far more difficult than it looks" and that elderly, Black, Latino, and low-income residents are most likely to be impacted by voter ID laws).

[725] Brentin Mock, *Like It or Not, Voter ID is Not Working*, BLOOMBERG CITYLAB (Mar. 3, 2016), https://www.bloomberg.com/news/articles/2016-03-03/voter-id-laws-simply-are-not-working-in-texas-alabama-and-georgia.

[726] *Id.*

[727] *See* Ex. 13, S.B. 202 § 26; *compare* O.C.G.A. § 21-2-382(c)(1) (attached as Exhibit 324).

[728] Meidas Touch Podcast, *Unedited: Gabriel Sterling Accepts Challenge to Debate Georgia Voter Bill with MeidasTouch* at 8:51-9:11, YOUTUBE (Apr. 2, 2021), https://www.youtube.com/watch?v=cHvzaEAEQdU.

[729] *See* Ex. 13, S.B. 202 § 26; *see also* Ex. 324, O.C.G.A. § 21-2-382(c)(1).



counties,[730] where Black voters had a large impact on the election results.[731] Now, this new law caps the number of drop boxes in those counties at twenty-three, a seventy-five percent decrease.[732] This one-per-100,000 restriction also poses a problem for Georgia's many rural counties that are geographically large but sparsely populated.

For the drop boxes that will be placed, the law so limits access that it renders them almost useless.[733] The drop boxes must be at the office of the Board of Registrars or ballot clerk or inside early voting locations.[734] They will be unavailable in the three days before the election[735] when a mailed ballot is less likely to arrive by the 7:00 p.m. Election Day deadline—i.e., when the boxes are most useful.[736] And the drop boxes are only accessible during the hours early voting takes place,[737] making them a largely duplicative and useless resource for those with difficulty taking time out of their schedules to vote during standard business hours. The requirement that the boxes be guarded by an "an election official or his or her designee, law enforcement official, or licensed security guard"[738]—rather than a 24/7 security camera—is a needless taxpayer burden that provides yet another opportunity for Black voters in Georgia to be intimidated while exercising their right to vote, recalling the Jim Crow era yet again.[739]

---

[730] Nick Corasaniti & Reid J. Epstein, *What Georgia's Voting Law Really Does*, N.Y. TIMES (Apr. 2, 2021), https://www.nytimes.com/2021/04/02/us/politics/georgia-voting-law-annotated.html.

[731] Kat Stafford et al., *'This is Proof': Biden's Win Reveals Power of Black Votes*, ASSOCIATED PRESS (Nov. 9, 2020), https://apnews.com/article/election-2020-joe-biden-race-and-ethnicity-virus-outbreak-georgia-7a843bbce00713cfde6c3fdbc2e31eb7 ("Almost half of Biden's gains came from the four largest counties – Fulton, DeKalb, Gwinnett and Cobb – all in the Atlanta metro area with large Black populations.").

[732] Nick Corasaniti & Reid J. Epstein, *What Georgia's Voting Law Really Does*, N.Y. TIMES (Apr. 2, 2021), https://www.nytimes.com/2021/04/02/us/politics/georgia-voting-law-annotated.html.

[733] *See* Ex. 13, S.B. 202 § 26; *compare* Ex. 324, O.C.G.A. § 21-2-382.

[734] *Id.*

[735] *See* Ex. 13, S.B. 202 § 26 (providing that drop boxes "shall be closed when advanced voting is not being conducted at that location"); *compare* O.C.G.A. § 21-2-385(d).

[736] *See* Astrid Galvan & Christina A. Cassidy, *Ballot Drop Boxes Seen as a Way to Bypass the Post Office*, ASSOCIATED PRESS (Aug. 18, 2020), https://apnews.com/article/41706cd2f7b03452d0bfb9efca3e76e3.

[737] *See* Ex. 13, S.B. 202 § 26; *compare* Ex. 324, O.C.G.A. § 21-2-382(c)(1).

[738] *Id.*

[739] *See* Ex. 318, Complaint, *Sixth District*, No. 21-cv-01284 (N.D. Ga. Mar. 29, 2021), ¶ 214.

**SECTION IV:   S.B. 202: SUPPRESSION REVISITED**

The General Assembly imposed these new restrictions on absentee ballots despite the total absence of evidence of voter fraud in the 1.3 million ballots cast in 2020.[740] Chairman of the Special Elections Integrity Committee Barry Fleming likened absentee ballots to the "shady part of town down near the docks" where the "chance of being shanghaied" is significant.[741] But he cannot substantiate his racist rhetoric. Given the lack of a legitimate problem, there is no justification for these measures that will effectively strip thousands of Georgia voters of the ability to vote.

Some early in-person voting is also needlessly restricted. The law prohibits the use of mobile voting units except in emergencies.[742] Mobile voting units, which are used as supplemental polling locations during early voting and on Election Day, serve to increase access and counteract long lines. In 2020, Fulton County, where the population is forty-four percent Black,[743] used two mobile voting units. The units "made stops at twenty-four different locations, including several Black churches, during the advance voting period ahead of the election."[744] The units provided a convenient option for voters in their neighborhoods.[745] Again, the law establishes a new limitation despite no evidence of any problems, and it is difficult to imagine any motive other than limiting the number of ballots received.

The voter challenge provision of S.B. 202 risks mass disenfranchisement of Georgia voters. The legislation explicitly allows an individual to challenge an unlimited number of voters[746] and sanctions counties that refuse to comply with mass challenges.[747] As laid out above in Section II, voter challenges

---

[740] *See id.* at ¶143; *Georgia Early Voting* Statistics, U.S. ELECTIONS PROJECT, https://electproject.github.io/Early-Vote-2020G/GA.html (last visited Apr. 6, 2021).

[741] Barry Fleming, *Guest Column: Republican Party Wins on Election Day, and Future is Bright*, THE AUGUSTA CHRONICLE (Nov. 15, 2020), https://www.augustachronicle.com/story/opinion/columns/guest/2020/11/15/guest-column-republican-party-wins-on-election-day-and-future-is-bright/43155971/.

[742] Ex. 13, S.B. 202 § 20, *compare* O.C.G.A. § 21-2-266(b) (attached as Exhibit 325).

[743] *QuickFacts: Fulton County, Georgia*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fultoncountygeorgia (last visited Mar. 31, 2021) (attached as Exhibit 326).

[744] Ex. 318, Complaint, *Sixth District*, No. 21-cv-01284 (N.D. Ga. Mar. 29, 2021), ¶ 175, ECF No. 1; *see also Early Voting Starts Today & Fulton Mobile Voting Units Hit the Streets*, FULTON CNTY (Oct. 12, 2020), http://fultoncountyga.gov/news/2020/10/12/early-voting-and-fulton-mobile-voting-units-hit-the-streets.

[745] *See* Stella Mackler, *Mobile Voting Units Offer Convenience*, THE SOUTHERNER ONLINE (Nov. 4, 2020), https://thesoutherneronline.com/78479/news/new-fulton-county-mobile-voting-units/.

[746] Ex. 13, S.B. 202 § 15; *compare* Ex. 34, O.C.G.A. § 21-2-229(a).

[747] Ex. 13, S.B. 202 § 15; *compare* Ex. 34, O.C.G.A. § 21-2-229(f).

**SECTION IV:   S.B. 202: SUPPRESSION REVISITED**

have historically been used to disenfranchise voters of color.[748] And just a few months ago, a Texas-based organization frivolously challenged the eligibility of 364,000 Georgia voters two weeks before the Senate runoff election.[749]

Voters will also be disenfranchised on Election Day because S.B. 202 requires that, before 5:00 p.m. lawful voters will only be allowed to vote in the polling location to which they are assigned; any attempt to vote in another precinct – even in the same county – will be invalid.[750] Previously, voters who went to the wrong precinct within their county could vote a provisional ballot, which would be tallied for the races in which they were eligible to vote.[751] This is by far the most common reason for voting provisionally and these out-of-precinct ballots often make up the majority of the provisionals actually counted because they are "self-curing," meaning no more action is required of the voter.[752] Restricting this opportunity will disproportionately affect Black voters who are more likely to cast provisional ballots.[753]

And in part because of the law's limitations on absentee voting, ban on mobile voting units, and other provisions, Georgia's historically long Election Day lines will grow even longer. But the law reduces the ability of organizers to alleviate that burden through the practice known as "line warming." S.B. 202 now makes it a crime for volunteers to hand water or food to voters waiting in line[754]—despite that

---

[748] *See also* Zachary Roth, *The Caged Ballot: Why the GOP is Poised to Create Large-Scale Voting Chaos This Year*, NEW REPUBLIC (Mar. 30, 2020), https://newrepublic.com/article/156861/republican-voter-suppression-tactics-trump-2020.

[749] Mark Niesse, *Eligibility of 364,000 Georgia Voters Challenged Before Senate Runoff*, ATLANTA J.-CONST. (Dec. 22, 2020), https://www.ajc.com/politics/eligibility-of-364000-georgia-voters-challenged-before-senate-runoff/3UIM DOVRFVERXOJ3IBHYWZBWYI/; Russ Bynum, *Group Says It's Challenging Residency of 364K Georgia Voters*, NEWS JAX (Dec. 19, 2020), https://www.news4jax.com/news/georgia/2020/12/19/group-says-its-challenging-residency-of-364k-georgia-voters/.

[750] Ex. 13, S.B. 202 § 34; *compare* Ex. 134, O.C.G.A. § 21-2-418(a).

[751] *See* Nick Corasaniti & Reid J. Epstein, *What Georgia's Voting Law Really Does*, N.Y. TIMES (Apr. 2, 2021), https://www.nytimes.com/2021/04/02/us/politics/georgia-voting-law-annotated.html.

[752] *Id.* (noting that in Fulton County, sixty-six percent of accepted provisional ballots were from out-of-precinct voters); Provisional Ballots, GEORGIA VOTER GUIDE, https://faq.georgiavoter.guide/en/article/provisional-ballots (last visited Apr. 8, 2021) (describing how a voter does not need to take any action after voting provisionally at the wrong precinct within the correct county).

[753] *See* Zachary Roth, Report: *Minorities More Likely to Cast Provisional Ballots*, MSNBC (Oct. 30, 2014), https://www.msnbc.com/msnbc/report-minorities-more-likely-cast-provisional-ballots-msna447721 (reporting that a Center for American Progress report found that people of color were forced to cast provisional ballots at a significantly higher rate than whites in 2012).

[754] Ex. 13, S.B. 202 § 33.

## SECTION IV: S.B. 202: SUPPRESSION REVISITED

Georgia had the longest voting lines in the country in 2020. The line warming provision has rightfully garnered enormous public criticism since the bill was passed.[755] It is easy to see why. Many individuals, non-profit organizations, and companies rally around the right to vote.[756] It should be a non-partisan issue. Supporting others exercising that right by providing drinks and snacks is a feel-good, community-building practice that benefits both volunteers and voters and harms absolutely no one. One Georgia voter described "the large number of people walking around giving out water, raincoats, and snacks to people waiting in line to vote" as "[t]he one good thing about my [voting] experience."[757] Another voter, who waited almost five hours, noted that, even though everyone was understandably frustrated, "there was a camaraderie and feeling that people were looking out for each other" when neighbors brought bottled water and homemade chocolate chip cookies.[758] Georgia law already prohibits partisan electioneering[759]—the line warming provision is needlessly cruel and blatant voter suppression.

While S.B. 202 makes it harder to vote generally, its effect is especially pronounced during a runoff election—itself relic of Jim Crow designed to make it harder for Black voters' preferred candidates to win.[760] The law's outsized impact on runoff elections is no coincidence, as it comes after a high-profile runoff election where Georgians—especially Georgians of color—turned out in historic numbers.[761] The

---

[755] *See, e.g.,* Jane C. Timm, *'Outrageous': Biden Condemns New Georgia Law as a 'Blatant Attack' on Voting Rights*, NBC NEWS (Mar. 26, 2021), https://www.nbcnews.com/politics/elections/democrats-excoriate-new-voting-restrictions-georgia-make-it-illegal-give-n1262181.

[756] *See* Kate Kelly & Sapna Maheshwari, *Paid Time Off, Free Fries: How Corporate America Is Getting Out the Vote*, N.Y. Times (Oct. 23, 2020), https://www.nytimes.com/2020/10/23/business/corporate-america-voting-time-off.html; Anne Glusker, *Chefs Are Helping Hungry Voters Waiting in Line at the Polls*, SMITHSONIAN MAG. (Oct. 30, 2020), https://www.smithsonianmag.com/smithsonian-institution/chefs-are-helping-hungry-voters-waiting-line-polls-180976179/ (describing how renowned chef José Andrés started Chefs For The Polls to bring food to those waiting at polling sites).

[757] Ex. 123, Declaration of Stephen [last name redacted] ¶ 17.

[758] Declaration of Robert [last name redacted] ¶ 7 (attached as Exhibit 327); *see also* Ex. 118, Declaration of Jonathan [last name redacted] ¶ 7 (waited three hours to vote while standing in the hot sun but "[l]uckily there were some volunteers who were distributing snacks and water to the voters in line, as none of us had expected to be there as long as we were"); Declaration of Eboney [last name redacted] ¶ 5, 6 (attached as Exhibit 328) (waited nine hours to vote but others in line were "very congenial" and local vendors handed out pizza).

[759] *See* O.C.G.A. § 21-2-414 (attached as Exhibit 329); Grace Panetta, *Georgia's New Controversial Voting Law Bans Volunteers from Delivering Free Water and Snacks to Voters in Line*, BUS. INSIDER (Mar. 26, 2021), https://www.businessinsider.com/ga-voting-law-bans-volunteers-from-delivering-food-water-to-voters-2021-3.

[760] Jerusalem Demsas, *Why Georgia has Runoff Elections*, VOX (Jan. 5, 2021), https://www.vox.com/21551855/georgia-ossoff-perdue-loeffler-warnock-runoff-election-2020-results.

[761] Nathaniel Rakich *et al., How Democrats Won the Georgia Runoffs*, FIVETHIRTYEIGHT (Jan. 7, 2021), https://fivethirtyeight.com/features/how-democrats-won-the-georgia-runoffs/.

SECTION IV:  S.B. 202: SUPPRESSION REVISITED

General Assembly responded by slashing the runoff period from nine weeks to four, giving voters less time to mail their absentee ballots or vote early in person.[762] The new law only requires that early voting be offered Monday through Friday the week before the election.[763] And that week could collide with the Thanksgiving holiday, further limiting the availability of early voting.[764] Of course, for many voters, weekends afford their only opportunity to vote.[765]

D.   S.B. 202 Also Empowers the Highly Partisan State Legislature to Oversee and Influence the Outcome of Elections.

While the criminal penalties for handing voters water have captured headlines, another insidious voter suppression tactic permeates S.B. 202. In a blatant power grab, the Georgia General Assembly gave itself more power to oversee and influence the outcomes of its own elections and potentially silence the voices of its opposition, including millions of Black, brown and AAPI voters. As Rick Hansen, Professor of Law and Political Science at University of California Irvine, stated: "[o]ne of the worst aspects of the bill is the part making election administration even more partisan."[766] If the purpose of the legislation were really to address the "significant lack of confidence in Georgia election systems,"[767] this power grab is precisely the wrong way to do it.

In the months following the 2020 General Election and the January 2021 runoff, Secretary of State Raffensperger defended the election results he knew to be legitimate. Now, S.B. 202 punishes the office he legitimately and appropriately used to speak out, and may prevent future officials from doing

---

[762] Ex. 13, S.B. 202 § 42; *compare* O.C.G.A. § 21-2-501(a)(1) (attached as Exhibit 330); Stephen Fowler, *Georgia Governor Signs Election Overhaul, Including Changes To Absentee Voting*, NPR POLITICS (Mar. 25, 2021), https://www.npr.org/2021/03/25/981357583/georgia-legislature-approves-election-overhaul-including-changes-to-absentee-vot.

[763] Ex. 13, S.B. 202 § 28; *compare* Ex. 321, O.C.G.A. § 21-2-385(d)(1)(B); Stephen Fowler, *Georgia Governor Signs Election Overhaul, Including Changes To Absentee Voting*, NPR POLITICS (Mar. 25, 2021), https://www.npr.org/2021/03/25/981357583/georgia-legislature-approves-election-overhaul-including-changes-to-absentee-vot.

[764] Ex. 319, Complaint, *Ga. State Conf. of NAACP*, No. 21-cv-01259 (N.D. Ga. Mar. 28, 2021), ¶69, ECF No. 1.

[765] *See, e.g.*, Declaration of Donald [last name redacted], ¶ 5, 6 (attached as Exhibit 331) (describing how, as a long haul truck driver, Sunday is his only day off and without Sunday voting he would have to take off work and lose income); Declaration of DanElle [last name redacted], ¶ 4, 7 (attached as Exhibit 332) (describing the need for weekend voting because, as a wheelchair user, she relies on others who work during the week to get take to the polls).

[766] Zack Beauchamp, *Georgia's Restrictive New Voting Law, Explained*, VOX (Mar. 26, 2021), https://www.vox.com/22352112/georgia-voting-sb-202-explained.

[767] Ex. 13, S.B. 202 § 2.

**SECTION IV:   S.B. 202: SUPPRESSION REVISITED**

the same.[768] The law undemocratically strips the office of the Secretary of State of some of its powers regarding election administration and certification. For instance, it removes the Secretary of State as the chair and a voting member of the State Election Board.[769] Instead, the State legislature will now appoint the chair.[770] Georgia election official Gabriel Sterling expressly told CNN he viewed the General Assembly's decision to reduce the Secretary of State's power in elections as punishment for standing up against the claims of widespread fraud.[771]

S.B. 202 transfers control over the State of Election Board to the State legislature, which now appoints of a majority of its five members—one member appointed by the House, one member appointed by the Senate, and the chair elected by the entire General Assembly.[772] This control over the State Election Board is significant because, under S.B. 202, it can suspend county election officials it believes are performing poorly.[773] The State Election Board can then pick the replacements,[774] who will have broad authority over election administration and results.[775]

The potential consequences of the General Assembly's new power cannot be overstated. Though S.B. 202 claims that "[e]nsuring there is a mechanism to address location election problems will promote voter confidence and meet the goal of uniformity,[776] the law opens the possibility that hand-picked partisan players will be appointed to interfere in elections in counties with significant populations of

---

[768] Ex. 13, S.B. 202 § 5; *compare* Ex. 314, O.C.G.A. § 21-2-30(a).

[769] *Id.*

[770] *Id.*

[771] *Georgia Election Official: Both Parties Treat Voters Like Children,* CNN at 6:50-7:12, YOUTUBE (March 27, 2021), https://www.youtube.com/watch?v=BzoAVL89SPc; *see also* Medias Touch Podcast, *Unedited: Gabriel Sterling Accepts Challenge to Debate Georgia Voter Bill with MediasTouch* at 32:04-32;20, 48:08-48:27, YOUTUBE (Apr. 2, 2021), https://www.youtube.com/watch?v=cHvzaEAEQdU.

[772] Ex. 13, S.B. 202 § 5; *compare* Ex. 314, O.C.G.A. § 21-2-30(a).

[773] Ex. 13, S.B. 202 § 6; *compare* Ex. 315, O.C.G.A. § 21-2-33.1(f).

[774] *Id.*

[775] *See* Domingo Morel, *As Georgia's New Law Shows, When Black People Gain Local Power, States Strip That Power Away,* WASH. POST (Apr. 1, 2021), https://www.washingtonpost.com/politics/2021/04/01/georgias-new-law-shows-when-black-people-gain-local-power-states-strip-that-power-away/.

[776] Ex. 13, S.B. 202 § 2.

**SECTION IV:   S.B. 202: SUPPRESSION REVISITED**

people of color. The State lawmakers already have their eyes set on Fulton County, which has a large number of Black voters and has played a significant role in recent election results.[777]

It was once unthinkable that partisan players would refuse to certify election results for no verifiable reason, but that is not the case today. As the *Atlanta Journal-Constitution* recognized, "[s]tate takeovers of local election offices could change the outcome of future elections, especially if they're as hotly contested as last year's presidential race."[778] Agents of the General Assembly may now accept and reject mail ballots, decide on challenges to voters' eligibility, close polling places, alter early voting hours, hire their own poll workers, and even certify election results.[779] The ability to disqualify voters is all the more concerning given the recent spate of demonstrably false allegations of voter fraud and that S.B. 202 now allows unlimited challenges to someone's voter registration.[780] Given the staying power of these lies, it is more than possible they will grow louder in future elections.

E.   <u>The Hurried Passage of S.B. 202 Reflects a Broader Strategy Among State Legislatures that Will Only Worsen if Left Unchecked by Federal Legislation.</u>

S.B. 202 could have been much worse. If not for intense public scrutiny, Georgia lawmakers might have burdened the rights of their constituents to an even larger extent. Provisions in other bills put forth this year would have eliminated automatic voter registration,[781] no-excuse absentee voting,[782] Sunday voting (which is disproportionately utilized by Black voters through events such as "Souls to the

---

[777] *Id.*; Deidra Dukes, *Local Leader Says Fulton County Unfairly Targeted by Georgia Election Law*, FOX 5 ATLANTA (Mar. 29, 2021), https://www.fox5atlanta.com/news/local-leader-says-fulton-county-unfairly-targeted-by-georgia-elections-law.

[778] Mark Niesse, *Georgia Bill Could Shift Power over Elections to GOP Appointees*, ATLANTA J.-CONST. (Mar. 24, 2021), https://www.ajc.com/politics/georgia-bill-would-shift-power-over-elections-to-gop-appointees/VPNVO2W4TBBTFKGA7Z2GZIEQEE/.

[779] *See id.*

[780] Ex. 13, S.B. 202 § 15; *compare* Ex. 34, O.C.G.A. § 21-2-229(a).

[781] Stephen Fowler, *Georgia Senate Republicans Pass Bill to End No-Excuse Absentee Voting*, NPR (Mar. 8, 2021), https://www.npr.org/2021/03/08/974985725/georgia-senate-republicans-pass-bill-to-end-no-excuse-absentee-voting.

[782] *Id.*

Polls"),[783] and all drop boxes.[784] But just because these provisions did not make it into S.B. 202 does not mean Georgia voters are safe from similar attacks in the future.

The sponsors of S.B. 202 contend that they aim to restore confidence in Georgia's elections. The theme of disingenuous, unsubstantiated concern permeates the law. But as has been proven time and again, Georgia's 2020 election was safe and secure. And because a record number of Georgians voted,[785] the election results evinced a truer democratic reflection of voters' will.

Yet state lawmakers are determined to subvert the democratic will of the people. For example, the Republican Chair of the Gwinnett Board of Registrations and Elections called for the State legislature to enact new laws to restrict voting, explaining that "they don't have to change all of them, but they've got to change the major parts of them so that we at least have a shot at winning."[786] She referred to 2020 as a "terrible elections cycle," despite record turnout and no documented problems with voter fraud in the face of heavy scrutiny.[787] It is remarkable that an elected official in a state where people have tirelessly fought for the right to vote would bemoan such an outcome.

Georgia lawmakers' most recent efforts to suppress the vote and seize electoral power demonstrate how critical the fight for voting rights remains. Georgia voters deserve public servants concerned with protecting the constitutional rights of their constituents—not their own power. The Georgia legislature purports to offer legislative solutions to a nonexistent problem with the true intention of effectively disenfranchising voters. S.B. 202 also restructures the State government to ensure that the administration of elections—including potentially the certification of the outcome—is even more skewed in favor of those already in power. This legislation breeds cynicism, not confidence.

---

[783] Nick Corasaniti & Jim Rutenberg, *In Georgia, Republicans Take Aim at Role of Black Churches in Elections*, N.Y. TIMES (Mar. 6, 2021), https://www.nytimes.com/2021/03/06/us/politics/churches-black-voters-georgia.html.

[784] Ben Nadler, *Georgia Senate GOP Push for End to No-Excuse Absentee Voting*, ASSOCIATED PRESS (Dec. 8, 2020), https://apnews.com/article/election-2020-joe-biden-donald-trump-legislature-georgia-db63d0d40fddd0724faffdffc8b72c0c; Christopher Alston, *Gwinnett Election Board Chair Refuses to Resign After Intense Criticism*, WABE (Jan. 21, 2021), https://www.wabe.org/gwinnett-election-board-chair-refuses-to-resign-after-intense-criticism/.

[785] Allison McCartney, *Turnout Hits Historic Highs in Contentious Georgia Senate Races*, BLOOMBERG (Jan. 5, 2021), https://www.bloomberg.com/graphics/2021-georgia-senate-runoff/.

[786] Curt Yeomans, *Gwinnett Elections Board's New Chairwoman Wants Limits on No-Excuse Absentee Voting, Voter Roll Review*, GWINNETT DAILY POST (Jan. 16, 2021), https://www.gwinnettdailypost.com/local/gwinnett-elections-boards-new-chairwoman-wants-limits-on-no-excuse-absentee-voting-voter-roll-review/article_7df1c274-5715-11eb-a31d-dfa23b30ec62.html.

[787] *Id.*



While voting rights activists and concerned Georgia voters fought to eliminate some of the most extreme provisions of S.B. 202, the instinct to preserve power at the expense of voters of color remains a threat. Volunteers, donors, and organizations should not have to pour millions of dollars into combating voter suppression legislation. It is up to the federal government to step in to protect the fundamental democratic principle that every citizen's vote matters and deserves to be counted.



## SECTION V:

**Congress Has the Robust Record Needed to Enact Renewed Voting Rights Legislation**

Source: MikeyLPT via iStock by Getty Images





## Congress Has the Robust Record Needed to Enact New Voting Rights Legislation.

In 2013, the Supreme Court gutted the VRA's preclearance formula because the coverage formula on which Congress had based the most recent amendment to the VRA was "based on decades-old data and eradicated practices."[788] The Court found the record before Congress when it passed the amendment to the VRA did not "approach[] the 'pervasive,' 'flagrant,' 'widespread,' and 'rampant' discrimination that clearly distinguished the covered jurisdictions from the rest of the Nation in 1965."[789] The Court ended by instructing that, "while any racial discrimination in voting is too much, Congress must ensure that the legislation it passes to remedy that problem speaks to current conditions."[790]

The Congressional response to *Shelby County*, that to date has led to the House passage of H.R. 4, is creating a robust record of pervasive, flagrant, widespread, and rampant voter suppression throughout the states. This record includes H.R. 116-317 (2019). As Congresswoman Fudge said when the House Report was released, "It is time for us to set the right example as a democracy and encourage people to vote, rather than continuing to erect barriers that seek to suppress the vote and the voices of our communities."[791]

Through this report and in Leader Abrams's testimony before Congress, Fair Fight Action and Georgia voters provide Congress a multitude of "pervasive," "flagrant," "widespread," and "rampant" acts of suppression by Georgia against its own citizens; acts designed to disenfranchise and burden its citizens' fundamental right to vote.[792] Fair Fight Action and the citizens of Georgia who have voluntarily shared their stories present this report not simply to illustrate to members of Congress how Georgia and subdivisions within Georgia have systematically disenfranchised their citizens, particularly their citizens of color. Fair Fight Action has placed this report within Congress's stewardship to support a record that justifies passage of the VRAA based on "current conditions" and to provide the evidence demonstrating that Georgia needs federal preclearance oversight to protect Georgia's voters' right to vote.[793]

---

[788] *Shelby County*, 570 U.S. at 551.

[789] *Id*. at 554 (quoting *Katzenbach*, 383 U.S. at 308).

[790] *Id.* at 557.

[791] *See* H. REP. NO. 116-317 (2019) at 12 (attached as Exhibit 333).

[792] *Shelby County*, 570 U.S. at 551.

[793] *See id*. at 557.



As recent attacks on Section 2 of the VRA before the Supreme Court demonstrate, people who believe they are losing power will try to retain that power by attacking the VRA and other measures meant to empower voters. Fair Fight Action and the voters that support the VRAA are not naïve: those who wish to destroy democracy also will attempt to attack and undermine the VRAA. Fair Fight Action implores Congress to be prepared for such attacks by compiling a record that supports the VRAA, and relying on that record to pass the law. As the Supreme Court expected in *Shelby County*, Congress must "start[] from scratch" to collect data and statistics that will support the "present coverage formula."[794] Fair Fight Action looks forward to working with congressional members to ensure the congressional record for the VRAA is comprehensive and will survive judicial review.

## CONCLUSION

Fair Fight Action hopes this report has been illustrative of how one state, Georgia, has continued to act in violation of the Constitution and the VRA, and how the voters in Georgia so desperately need Congress to act swiftly and pass the VRAA. The evidence in this report provides current data to support the congressional record in response to *Shelby County*. The United States portrays itself as a world leader in civil and human rights. Yet the evidence in this report demonstrates to Congress, citizens of this country, and the world, that governments within our country continue to systematically disenfranchise their own citizens based on race—that is not leadership behavior. This country can demonstrate global leadership by passing the VRAA, and show the world this country embodies the ideals of democracy and equality.

---

[794] *Id*. at 556.



## TABLE OF AUTHORITIES CITED IN REPORT (In Order of Appearance)

*The documents in this list that start with "*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| *Shelby County v. Holder*, 570 U.S. 529 (2013) | |
| *Thornburg v. Gingles*, 478 U.S. 30 (1986) | |
| *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) | |
| *Lane v. Wilson*, 307 U.S. 268 (1939) | |
| *Davis v. Guam*, 932 F.3d 822 (9th Cir. 2019) | |
| *Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) | |
| For the People Act, H.R. 1, 117th Cong. (as passed by House, Mar. 3, 2021) ("FPA") | |
| * Expert Report of Dr. Adrienne Jones, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Aug. 15, 2019), ECF No. 92 | 1 |
| Barbara Finlay, *The Roots of Voter Fraud in America*, HISTORYNET (Dec. 2016), https://www.historynet.com/the-roots-of-voter-fraud-in-america.htm | |
| *Compromise of 1877*, HISTORY.COM (Nov. 27, 2019), https://www.history.com/topics/us-presidents/compromise-of-1877 | |
| *United States Presidential Election of 1876*, ENCYCLOPEADIA BRITANNICA (Oct. 31, 2020), https://www.britannica.com/event/United-States-presidential-election-of-1876 | |
| * U.S. Comm'n on Civil Rights, *An Assessment of Minority Voting Rights Access in the United States* (2018) | 2 |
| Isabel Wilkerson, *Caste: The Origins of Our Discontents* (2020) | |
| *The Murder of Emmett Till*, PBS, https://www.pbs.org/wgbh/americanexperience/features/till-timeline/ | |
| Laughlin McDonald, A Voting Rights Odyssey: Black Enfranchisement in Georgia (2003) | |
| *Smith v. Allwright*, 321 U.S. 649 (1944) | |
| *King v. Chapman*, 62 F. Supp. 639 (M.D. Ga. 1945) | |
| Robert A. Holmes, *Georgia Legislative Black Caucus*, NEW GEORGIA ENCYCLOPEDIA (Feb. 11, 2005), https://www.georgiaencyclopedia.org/articles/government-politics/georgia-legislative-black-caucus | |
| * Expert Report of Dr. Peyton McCrary, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ, (N.D. Ga. Aug. 15, 2019), ECF No. 339 | 3 |
| * The National Archives, *John Lewis – March from Selma to Montgomery, 'Bloody Sunday', 1965*, in EYEWITNESS: AMERICAN ORIGINALS FROM THE NATIONAL ARCHIVES, https://www.archives.gov/exhibits/eyewitness/html.php?section=2 | 4 |
| Voting Rights Act of 1965, Pub. L. No. 89-110, 79 Stat. 445 | |
| *President Johnson's Special Message to Congress: The American Promise*, LBJ PRESIDENTIAL LIBRARY (Mar. 15, 1965), http://www.lbjlibrary.org/lyndon-baines-johnson/speeches-films/president-johnsons-special-message-to-the-congress-the-american-promise | |
| * *About Section 5 of the Voting Rights Act*, U.S. DEP'T JUST. (Sept. 11, 2020), https://www.justice.gov/crt/about-section-5-voting-rights-act | 5 |
| 52 U.S.C. §§ 10301 et seq. | |



## TABLE OF AUTHORITIES CITED IN REPORT (In Order of Appearance)

*The documents in this list that start with "*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| * Letter from Stephen J. Pollack, Assistant Att'y Gen., C.R. Div., to Arthur K. Bolton, Att'y Gen., State of Georgia (July 11, 1968), https://www.justice.gov/sites/default/files/crt/legacy/ 2014/05/30/GA-1010.pdf | 6 |
| *Busbee v. Smith*, 549 F. Supp. 494 (D.D.C. 1982), aff'd mem. 459 U.S. 1166 (1983) | |
| * Voting Determination Letters for Georgia, U.S. DEP'T JUST. (Aug. 7, 2015), https://www.justice.gov/crt/voting-determination-letters-georgia | 7 |
| * Letter from Loretta King, Acting Ass't Att'y Gen., Civ. Rights Div., to Thurbert E. Baker, Att'y Gen., State of Georgia (May 29, 2009), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_090529.pdf | 8 |
| Ewa Kochanska, *Georgia Files Lawsuit Against U.S. Justice Department*, ATLANTA EXAMINER (June 23, 2010) | |
| Shannon McCaffrey, *Georgia Attorney General Thurbert Baker Refuses to File Suit Over Voter Checks*, NORTHWEST GEORGIA NEWS (Apr. 22, 2010), https://www.northwestgeorgianews.com/rome/news/georgia-attorney-general-thurbert-baker-refuses-to-file-suit-over-voter-checks/article_58f3c7ba-727e-5432-af22-dd25152074dc.html | |
| *Georgia v. Holder*, 748 F. Supp. 2d 16 (D.D.C. 2010) | |
| Allie Gottlieb, *The Struggle for Voting Rights in Georgia*, THE REGULATORY REVIEW (Jan. 4, 2021), https://www.theregreview.org/2021/01/04/gottlieb-struggle-voting-rights-georgia/ | |
| Settlement Agreement, *Ga. State Conf. of NAACP v. Kemp*, No. 2:16-cv-00219-WCO (N.D. Ga. Feb. 8, 2017), http://www.projectvote.org/wp-content/uploads/Settlement-Agreement-NAACP-v.-Kemp-2.9.17-1.pdf | |
| * Stipulation of Dismissal, *Ga. State Conf. of NAACP v. Kemp*, No. 2:16-cv-00219-WCO (N.D. Ga. Mar. 28, 2017), ECF No. 60 | 9 |
| *Ga. Coal. for the People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 (N.D. Ga. 2018) | |
| Emilye Crosby, *The Selma Voting Rights Struggle: 15 Key Points from Bottom-Up History and Why It Matters Today*, https://www.teachingforchange.org/wp-content/uploads/2015/01/15-Points-The-Selma-Voting-Rights-Struggle.pdf | |
| Michael Wines, *Critics See Efforts by Counties and Towns to Purge Minority Voters from Rolls*, N.Y. TIMES (July 31, 2016), https://www.nytimes.com/2016/08/01/us/critics-see-efforts-to-purge-minorities-from-voter-rolls-in-new-elections-rules.html?smid=url-share | |
| * Compl. for Injunctive and Declaratory Relief , *Ga. State Conf. of NAACP v. Hancock Cnty. Bd. of Elections & Registration*, No. 5:15-cv-00414 (M.D. Ga. Nov. 3, 2015) | 10 |
| Mark Niesse, *Black Senior Citizens Ordered Off Georgia Bus Taking Them To Vote*, ATLANTA J.-CONST. (Oct. 17, 2018), https://www.ajc.com/news/state--regional-govt--politics/black-senior-citizens-ordered-off-georgia-bus-taking-them-vote/42lZxIGOF1uFo637TEc9jP/ | |
| Kira Lerner,*'This is Live Voter Suppression': Black Voters Matter Blocked from Taking Seniors to Vote*, THINKPROGRESS (Oct. 15, 2018), https://thinkprogress.org/georgia-black-voters-matter-bus-blocked-from-taking-seniors-to-vote-a3c3e6580c5b/ | |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Anjali Enjeti, *Voter Intimidation Is a Real Threat to the 2020 Race*, ZORA (Sept. 19, 2019), https://zora.medium.com/voter-intimidation-is-a-real-threat-to-the-2020-race-80ea56b4a108 | |
| Charles Bethea, *Are Police Targeting Get-Out-the-Vote Efforts in Georgia?*, NEW YORKER (Nov. 1, 2018), https://www.newyorker.com/news/dispatch/are-police-targeting-get-outthe-vote-efforts-in-georgia | |
| Letter from the Georgia State Conf. of the NAACP, Georgia Coal. for the Peoples' Agenda and the Lawyers' Comm. for Civ. Rights Under Law to Jeanetta Watson, Macon-Bibb Cnty. Bd. of Elections Supervisor, and Reginald B. McClendon, Ass't Cnty. Att'y (Apr. 13, 2016), https://lawyerscommittee.org/wp-content/uploads/2016/04/Objection-to-Sheriffs-Office-Polling-Location.4.13.16.pdf | |
| Stanley Dunlap, *Macon-Bibb Polling Location OK'd After Sheriff's Precinct Nixed*, TELEGRAPH (May 16, 2016), http://www.macon.com/news/local/article77920442.html | |
| Letter from the Georgia Coal. for the Peoples' Agenda, Georgia State Conf. of the NAACP, New Georgia Project and the Lawyers' Comm. for Civ. Rights Under Law to Alfred Dixon, Mayor Pro Tem of the City of Jonesboro, Shauna Dozier, Clayton Cnty. Dir. of Elections, and Members of the Jonesboro City Council and Clayton Cnty. Bd. of Elections and Registrations (Oct. 7, 2019), https://assets.documentcloud.org/documents/6463506/Objection-to-Change-of-Poll-Location-10-7-19.pdf | |
| Letter from Aklima Khondoker et al., ACLU of Georgia, to Shauna Dozier, Dir. of Elections, and Members of the Clayton Cnty. Bd. of Elections and Registration (Oct. 8, 2019), https://www.acluga.org/sites/default/files/field_documents/clayco_letter.pdf | |
| Michael Harriot, *White City Council in Majority Black City Quietly Moves Only Voting Location to Police Station*, THE ROOT (Oct. 8, 2019), https://www.theroot.com/white-city-council-in-majority-black-city-quietly-moves-1838888108 | |
| *City of Mobile v. Bolden*, 446 U.S. 55 (1980) | |
| Voting Rights Act 1982, Amendments, Pub. L. No. 97-205, 96 Stat. 131 | |
| S. Rep. No. 97-417 (1982) | |
| Jon Ward, *How a Criminal Investigation in Georgia Set an Ominous Tone for African-American Voters*, YAHOO NEWS (Aug. 6, 2019), https://news.yahoo.com/how-a-criminal-investigation-in-georgia-set-a-dark-tone-for-african-american-voters-090000532.html ("Yahoo Quitman") | |
| *A Georgia Voter Fraud Prosecution and Voter Suppression*, EQUAL JUST. INITIATIVE (Aug. 16, 2019), https://eji.org/news/georgia-voter-fraud-prosecution-ploy-suppress-Black-votes/ ("EJI Quitman") | |
| Ariel Hart, *Voting Case Mirrors National Struggle*, ATLANTA J.-CONST. (Dec. 13, 2014), https://www.ajc.com/news/state--regional-govt--politics/voting-case-mirrors-national-struggle/seFGcSydGzV2IxD6DcyiVK ("AJI Quitman") | |
| Spencer Woodman, *Top Georgia Officials Are Going After Black Leaders Who Organized Voters*, VICE (July 15, 2014), https://www.vice.com/en/article/av4nzb/the-quitman-10-2-and-voter-suppression-in-modern-georgia-715 ("Vice Quitman") | |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| *\* Field Hearing on Voting Rights and Election Administration in Georgia before Subcomm. on Elections of the Comm. on House Admin. of the House of Representatives*, 106th Cong. 12 (Feb. 19, 2019) (statement of Stacey Abrams, CEO and Founder, Fair Fight Action), https://www.govinfo.gov/content/pkg/CHRG-116hhrg37653/html/CHRG-116hhrg37653.htm | 11 |
| Adam Floyd, *'Quitman 11' Charges Dropped*, VALDOSTA DAILY TIMES (Jan. 8, 2015), https://www.valdostadailytimes.com/news/local_news/quitman-11-charges-dropped/article_951d07fe-97b0-11e4-b1c7-6f4e16c25190.html | |
| \* The Mere Possession of Another's Absentee Ballot Does Not Constitute Unlawful Possession of an Absentee Ballot Under Either O.C.G.A. § 21-2-385(a) or § 21-2-574, Op. Georgia Att'y Gen. 2016-2 (June 15, 2016), https://law.georgia.gov/opinions/2016-2 | 12 |
| \* 2021 Ga. Laws Act 9 ("S.B. 202") § 33 | 13 |
| Anastasia Tsioulcas, *Georgia Voters Face Hours-Long Lines At Polls On First Day Of Early Voting*, NPR (Oct. 12, 2020), https://www.npr.org/2020/10/12/923090987/georgia-voters-face-hours-long-lines-at-polls-on-first-day-of-early-voting | |
| Sam Levine, *More Than 10-Hour Wait and Long Lines as Early Voting Starts in Georgia*, THE GUARDIAN (Oct. 12, 2020), https://www.theguardian.com/us-news/2020/oct/13/more-than-10-hour-wait-and-long-lines-as-early-voting-starts-in-georgia | |
| Jane C. Timm, *In Supreme Court, GOP Attorney Defends Voting Restrictions by Saying They Help Republicans Win*, NBC NEWS (Mar. 2, 2021, 1:21 PM EST), https://www.nbcnews.com/politics/elections/supreme-court-gop-attorney-defends-voting-restrictions-saying-they-help-n1259305 | |
| *Arizona Republican Party v. Democratic Nat'l Comm.*, No. 19-1258 (Mar. 2, 2021) | |
| Martha Dalton, *Group Asks Cobb School Board to Address Racism Concerns, Equity in Schools*, WABE (Sept. 3, 2019) https://www.wabe.org/group-asks-cobb-school-board-to-address-racism-equity-in-schools/ | |
| Larry Felton Johnson, *Democratic School Board Nominees Release Resolution Condemning Racism*, COBB CNTY. COURIER (Sept. 29, 2020), https://cobbcountycourier.com/2020/09/democratic-school-board-nominees-condemning-racism/ | |
| Bill Rankin, *Exclusive: Buford Schools Superintendent Recorded in Racist Rant, Lawsuit Says*, ATLANTA J.-CONST (Aug. 21, 2018), https://www.ajc.com/news/local/lawsuit-buford-schools-superintendent-recorded-racist-rant/xywRl237UbhMvGUO4EBunN/ | |
| Isabel Hughes, *Lawsuit: Former Buford Superintendent Geye Hamby Led District by 'Fear and Intimidation'*, Gwinnett Daily Post (Jan. 6, 2019), https://www.gwinnettdailypost.com/local/lawsuit-former-buford-superintendent-geye-hamby-led-district-by-fear-and-intimidation/article_2c295c0b-e2e8-556f-b62f-fbdfa80a3a22.html | |
| \* Complaint, *Ingram v. Buford City School District*, 1:18-cv-03103-ELR (N.D. Ga. June 27, 2018), ECF No. 1 | 14 |



## TABLE OF AUTHORITIES CITED IN REPORT *(In Order of Appearance)*

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Ernie Suggs, *Douglas Leader's Racial Comments Spark Calls that He Resign*, ATLANTA J.-CONST. (Nov. 8, 2016), https://www.ajc.com/news/local/douglas-leader-racial-comments-spark-calls-that-resign/AVjoe8BDCXLsut6OBPjIHI/ | |
| VRAA § 3 | |
| \* H.R. 4 Report - Section II Appendix, VRAA "Voting Rights Violations" in Georgia | 15 |
| \* Letter from Thomas Perez, Ass't Att'y Gen., to Dennis R. Dunn, Deputy Att'y Gen., State of Georgia (Dec. 21, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_121221_0.pdf | 16 |
| *Howard v. August-Richmond County*, 1:14-cv-00097, 2014 WL 12810317, (S.D. Ga. May 13, 2014) | |
| *Morales v. Handel*, No. 1:08-cv-03172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008) | |
| \* Letter from Thomas E. Perez, Ass't Att'y Gen., to Andrew S. Johnson, Esq. & B. Jay Swindell, Esq. (Aug. 27, 2012), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_120827.pdf | 17 |
| \* Letter from Thomas E. Perez , Ass't Att'y Gen., to Michael S. Green, Esq., Patrick O Dollar, Esq. & Cory O. Kirby, Esq. (Apr. 13, 2012), https://www.justice.gov/sites/default/ files/crt/legacy/2014/05/30/l_120413.pdf | 18 |
| \* Letter from Thomas Perez, Ass't Att'y Gen. to Walter G. Elliot, Esq. (Nov. 30, 2009), https://www.justice.gov/sites/default/files/ crt/legacy/2014/05/30/l_091130.pdf | 19 |
| \* Letter from Ralph F. Boyd, Jr., Ass't Att'y Gen., to Wayne Jernigan, Esq., Phillip L. Hartley, Esq. & Cory O. Kirby, Esq. (Oct. 15, 2002), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2690.pdf | 20 |
| \* Letter from J. Michael Wiggins, Acting Ass't Att'y Gen., to Robert T. Prior, Esq. (Aug. 9, 2002), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/l_020809.pdf | 21 |
| \* Letter from J. Michael Wiggins, Acting Ass't Att'y Gen., to Al Grieshaber, Jr., Esq. (Sept. 23, 2002), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2680.pdf | 22 |
| \* Letter from Bill Lann Lee, Acting Ass't Att'y Gen., Civ. Rights Div., to James M. Skipper, Jr., Esq. (Jan. 11, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2630.pdf | 23 |
| \* Letter from Lann Lee, Acting Ass't Att'y Gen., Civ. Rights Div., to Melvin P. Kopecky, Esq. (Mar. 17, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2640.pdf | 24 |
| \* Letter from Ralph F. Boyd, Jr., Ass't Att'y Gen., Civ. Rights Div., to Tommy Colemen, Esq. (Oct. 1, 2000), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2650.pdf | 25 |
| \* Letter from Wan J. Kim, Ass't Att'y Gen., to Tommy Coleman, Esq. (Sept. 12, 2006), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2700.pdf | 26 |
| *Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297 (M.D. Ga. 2018), aff'd 979 F.3d 1282 (11th Cir. 2020) | |
| \* Permanent Injunction Order, *Wright v. Sumter Cnty. Bd. of Elections & Registration*, No. 1:14-cv-00042-WLS (M.D. Ga. Mar. 30, 2018), ECF No. 204 | 27 |
| *Cofield v. City of LaGrange*, 969 F. Supp. 749 (N.D. Ga. 1997) | |
| \* Complaint, *Kwon v. Crittenden*, No. 1:18-cv-05405-TCB (N.D. Ga. Nov. 27, 2018), ECF No. 1 | 28 |
| \* Consent Order, *Kwon v. Crittenden*, No. 1:18-05405-TCB (N.D. Ga. Nov. 29, 2018), ECF No. 7 | 29 |



## TABLE OF AUTHORITIES CITED IN REPORT *(In Order of Appearance)*

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| \* *Marion County, Georgia to Change its Method of Election in an Agreement with the Justice Department*, DEP'T OF JUST. (June 6, 2000), https://www.justice.gov/archive/opa/pr/2000/June/320cr.htm | 30 |
| \* Consent Order, *Ga. State Conf. of NAACP v. Fayette Bd. of Comm'rs*, No. 11-cv-00123-TCB (N.D. Ga. Jan. 28, 2016), ECF No. 289 | 31 |
| *Fayette Settlement Key Points*, LDF, https://naacpldf.org/document/fayette-settlement-key-points | |
| *Georgia State Conf. of NAACP v. Fayette Co. Bd. of Comm'rs*, 775 F.3d 1336 (11th Cir. 2015) | |
| \* Fourth Consent Motion to Stay Proceedings, *Ga. State Conf. of NAACP v. Emanuel Cnty. Bd. of Comm'rs*, No. 16-cv-00021-JRH-GRS (S.D. Ga. Dec. 8, 2016), ECF No. 37 | 32 |
| \* Order on Stipulation of Dismissal, *Ga. State Conf. of NAACP v. Emanuel Cnty. Bd. of Comm'rs*, No. 16-cv-00021-JRH-GRS (S.D. Ga. May 16, 2017), ECF No. 40 | 33 |
| \* O.C.G.A. § 21-2-229 | 34 |
| \* O.C.G.A. § 21-2-230 | 35 |
| *New Georgia Project v. Raffensperger*, No. 1:21-cv-01229-JPB, 2021 WL 1158043 (N.D. Ga. Mar. 25, 2021) | |
| \* Consent Decree, *United States v. Long County*, No. 06-cv-00040-AAA (S.D. Ga. Feb. 10, 2006), https://www.justice.gov/sites/default/files/crt/legacy/2010/12/15/long_cd.pdf | 36 |
| Neima Abdulahi, *Ga. County Under Microscope, Accused of Suppressing Black Votes*, 11 ALIVE (Aug. 5, 2016), https://www.11alive.com/article/news/politics/elections/ga-county-under-microscope-accused-of-suppressing-black-votes/85-288453664 | |
| \* *QuickFacts: Hancock County, Georgia*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fact/table/hancockcountygeorgia/PST040219 | 37 |
| Avery Braxton, *Lawsuit Now Mandates Monitoring of Hancock County Elections*, 13WMAZ (Oct. 31, 2018, 11:01 A.M.), https://www.13wmaz.com/article/news/local/lawsuit-now-mandates-monitoring-of-hancock-county-elections/93-609769958 | |
| \* Order on Joint Motion for Entry of Consent Order, *Georgia State Conf. of NAACP v. Hancock Cnty Bd. of Elections & Registration*, No. 5:15-cv-00414-CAR (N.D. Ga. Mar. 30, 2018), ECF No. 71 | 38 |
| *Editorial: Voting Rights in Hancock County Still Hard-Fought*, SAVANNAH NOW (Mar. 11, 2017), https://www.savannahnow.com/opinion/editorial/2017-03-11/editorial-voting-rights-hancock-county-still-hard-fought | |
| Suevon Lee, *A Reading Guide to True the Vote, the Controversial Voter Fraud Watchdog*, PROPUBLICA (Sept. 27, 2012), https://www.propublica.org/article/a-reading-guide-to-true-the-vote-the-controversial-voter-fraud-watchdog | |
| *True the Vote Partners with Georgians in Every County to Preemptively Challenge 364,541 Potentially Ineligible Voters*, TRUE THE VOTE (Dec. 18, 2020), https://truethevote.org/true-the-vote-partners-with-georgians-in-every-county-to-preemptively-challenge-364541-potentially-ineligible-voters/ | |
| \* First Amended Complaint for Declaratory and Injunctive Relief, *Fair Fight Inc. v. True the Vote, Inc.*, No. 2:20-cv-00302-SCJ (N.D. Ga. Mar. 22, 2021), ECF No. 73 | 39 |



## TABLE OF AUTHORITIES CITED IN REPORT (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| * Exhibit 2, *Fair Fight Inc. v. True the Vote, Inc.*, No. 2:20-cv-00302-SCJ (N.D. Ga. Dec. 29, 2020), ECF No. 11-3 | 40 |
| Bill Barrow, *GOP Activist's Voter Challenges Raise Questions in Georgia*, ASSOCIATED PRESS (Dec. 22, 2020), https://apnews.com/article/georgia-elections-political-organizations-voter-registration-atlanta-3a8989df44c323ce798e0a5d34eb9876 | |
| * Pls.' Mem. of Law in Supp. of Mot. for Temporary Restraining Order, *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, No. 1:20-cv-00266 (M.D. Ga. Dec. 27, 2020), ECF No. 5-1 | 41 |
| * Declaration of Nakeitha Essix, *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, No. 1:20-cv-00266 (M.D. Ga. Dec. 27, 2020), ECF No. 5-6 | 42 |
| * Declaration of Gamaliel Warren Turner, Sr., *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, No. 1:20-cv-00266 (M.D. Ga. Dec. 27, 2020), ECF No. 5-4 | 43 |
| * Declaration of Debra Lewis, *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, No. 1:20-cv-00266 (M.D. Ga. Dec. 29, 2020), ECF No. 21 | 44 |
| Amy Gardner & Keith Newell, *'Someone's Going to Get Killed': GOP Election Official in Georgia Blames President Trump for Fostering Violent Threats*, WASH. POST (Dec. 1, 2020), https://www.washingtonpost.com/politics/georgia-official-trump-election/2020/12/01/f1d5c962-3427-11eb-b59c-adb7153d10c2_story.html | |
| Sean Keenan, *An Atlanta Election Worker Is in Hiding After a Claim that He Tossed a Ballot. His Boss Says the Claim Is False*, N.Y. TIMES (Nov. 6, 2020), https://nyti.ms/3p7oNDe | |
| * Declaration of [Redacted], *Fair Fight Inc. v. True the Vote, Inc.*, No. 2:20-cv-302-SCJ (N.D. Ga. Jan. 1, 2021), ECF No. 26 | 45 |
| * Declaration of [Redacted] #2, *Fair Fight Inc. v. True the Vote, Inc.*, No. 2:20-cv-302-SCJ (N.D. Ga. Jan. 1, 2021), ECF No. 26 | 46 |
| *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) | |
| *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324 (N.D. Ga. 2018) | |
| * O.C.G.A. § 21-2-381 | 47 |
| * O.C.G.A. § 21-2-384 | 48 |
| * O.C.G.A. § 21-2-386 | 49 |
| * Declaration of Dinesh [last name redacted] | 50 |
| * Declaration of Thires [last name redacted] | 51 |
| * Declaration of Vicki [last name redacted] | 52 |
| Curt Devine & Drew Griffin, *Georgia County Tosses Out Hundreds of Minority Absentee Ballots*, CNN (Oct. 21, 2018), https://www.cnn.com/2018/10/20/politics/gwinnett-county-absentee-ballots | |
| Mark Niesse & Tyler Estep, *High Rate of Absentee Ballots Thrown Out in Gwinnett*, ATLANTA J.-CONST. (Oct. 16, 2018), https://www.ajc.com/news/state--regional-govt--politics/high-rate-absentee-ballots-thrown-out-gwinnett/azdOsCxX2X6mT8PTrgZlJI/ | |
| * Expert Rebuttal Report of Daniel A. Smith, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Mar. 4, 2020), ECF No. 259 | 53 |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| *Martin v. Kemp*, Nos. 18-cv-4776-LMM, 18-cv-4789-LMM, 2018 WL 10509482 (N.D. Ga. Oct. 25, 2018) | |
| *Ga. Muslim Voter Project v. Kemp*, Nos. 18-14502-GG, 18-14503-GG, 2018 WL 7822108 (11th Cir. Nov. 2, 2018) | |
| *Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019) | |
| \* Permanent Injunction Order, *Martin v.. Kemp*, No. 1:18-cv-04776-LMM (N.D. Ga. Nov. 2, 2018), ECF No. 41 | 54 |
| \* Official Election Bulletin, *Martin v. Kemp*, No. 1:18-cv-04776-LMM (N.D. Ga. Nov. 12, 2018), ECF No. 54 | 55 |
| \* Email from David Worley to Jansen Head, et al. (Nov. 13, 2018), State-Defendants-00018630 | 56 |
| *Martin v. Crittenden*, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) | |
| 52 U.S.C. § 10101 | |
| *Jones v. Jessup*, 279 Ga. 531 (2005) | |
| \* Email from David Worley to Jansen Head, et al. (Nov. 13, 2018), State-Defendants-00018634 | 57 |
| \* Email from Robyn Crittenden to David Worley, et al. (Nov. 14, 2018), State-Defendants-00988362 | 58 |
| \* Compromise Settlement Agreement and Release, *Democratic Party of Ga., Inc. v. Raffensperger*, No. 19-cv-5028 (N.D. Ga. Nov. 6, 2019), ECF No. 56-1 | 59 |
| \* O.C.G.A. § 183-1-14-.13 | 60 |
| \* Declaration of Edward [last name redacted] | 61 |
| \* Declaration of Aria [last name redacted] | 62 |
| \* Declaration of Amanda from DeKalb [last name redacted] | 63 |
| \* Declaration of Sharonda [last name redacted] | 64 |
| \* Declaration of Mykel [last name redacted] | 65 |
| \* Declaration of Heath [last name redacted] | 66 |
| \* Declaration of Alexandra [last name redacted] | 67 |
| \* Declaration of Madison [last name redacted] | 68 |
| \* Declaration of Stephanie [last name redacted] | 69 |
| \* Declaration of Maria [last name redacted] | 70 |
| \* Declaration of Tabatha [last name redacted] | 71 |
| \* Declaration of Mustapha [last name redacted] | 72 |
| \* Declaration of Sue [last name redacted] | 73 |
| \* Declaration of Kendall [last name redacted] | 74 |
| \* Declaration of Christie [last name redacted] | 75 |
| \* Declaration of Katrina [last name redacted] | 76 |
| \* Declaration of Jacqueline [last name redacted] | 77 |
| \* Declaration of LeeAnn [last name redacted] | 78 |
| \* Declaration of Pamela from Fulton [last name redacted] | 79 |



<div style="background:purple;color:white">

**TABLE OF AUTHORITIES CITED IN REPORT**  *(In Order of Appearance)*

</div>

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| * Declaration of Annie [last name redacted] | 80 |
| * Declaration of Patricia from Cobb [last name redacted] | 81 |
| * Declaration of Reuben [last name redacted] | 82 |
| * Declaration of Donna from Haralson [last name redacted] | 83 |
| * Declaration of Jane [last name redacted] | 84 |
| * Declaration of Phyllis [last name redacted] | 85 |
| * Declaration of Karen [last name redacted] | 86 |
| * Declaration of Margo [last name redacted] | 87 |
| * Declaration of Keosha [last name redacted] | 88 |
| Alan Blinder & Richard Fausset, *Stacey Abrams Ends Fight for Georgia Governor with Harsh Words for Her Rival*, N.Y. TIMES (Nov. 16, 2018), https://www.nytimes.com/2018/11/16/us/elections/georgia-governor-race-kemp-abrams.html?smid=url-share | |
| Georgia Election Results, N.Y. TIMES, https://www.nytimes.com/interactive/2020/11/03/us/elections/results-georgia.html | |
| Nate Cohn et al., *Detailed Turnout Data Shows How Georgia Turned Blue*, N.Y. TIMES: THE UPSHOT (Nov. 17, 2020), https://www.nytimes.com/interactive/2020/11/17/upshot/georgia-precinct-shift-suburbs.html | |
| Richard Fausset & Nick Corasaniti, *Georgia Recertifies Election Results, Affirming Biden's Victory*, N.Y. TIMES (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/us/politics/georgia-recertify-election-results.html | |
| Alana Wise, *Jon Ossoff Wins Georgia Runoff, Handing Democrats Senate Control*, NPR (Jan. 6, 2021), https://www.npr.org/2021/01/06/952417689/democrat-jon-ossoff-claims-victory-over-david-perdue-in-georgia-runoff | |
| Jonathan Brater et al., *Purges: A Growing Threat to the Right to Vote*, BRENNAN CTR. FOR JUST. (July 20, 2018), https://www.brennancenter.org/sites/default/files/2019-08/Report_Purges_Growing_Threat.pdf | |
| Khushbu Shah, *'Textbook Voter Suppression': Georgia's Bitter Election a Battle Years in the Making*, THE GUARDIAN (Nov. 10, 2018), https://www.theguardian.com/us-news/2018/nov/10/georgia-election-recount-stacey-abrams-brian-kemp | |
| Maya T. Prabhu & Mark Niesse, *22,000 Reinstated to Voting Rolls as Georgia Attorneys Defend Purge*, ATLANTA J.-CONST. (Dec. 20, 2019), https://www.ajc.com/news/state--regional-govt--politics/000-reinstated-voting-rolls-georgia-attorneys-defend-purge/c4fp7iGVwnVr4WEbR1uulJ/ | |
| NAACP Legal Def. and Educ. Fund, *Democracy Defended: Analysis of Barriers to Voting in the 2018 Midterm Elections* (Sept. 6, 2019), https://www.naacpldf.org/wp-content/uploads/Democracy_Defended__9_6_19_final.pdf | |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Michael King, *Georgia Officials Contact 8k People Who May Have Moved Out of State but Requested Ballots for Jan. 5 Election*, 11 ALIVE (Dec. 22, 2020), https://www.11alive.com/article/news/politics/elections/8000-contacted-who-may-have-moved-but-requested-runoff-ballots/85-a1af6cc8-7789-41db-ade5-8983c71865d1 | |
| \* Expert Report of Kenneth Mayer, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ, (N.D. Ga. Feb. 18, 2020), ECF No. 238 | 89 |
| Lawyers' Comm. for Civ. Rts. Under Law, *Voting Advocates Announce a Settlement of "Exact Match" Lawsuit in Georgia*, 866 OUR VOTE (Feb. 10, 2017), https://866ourvote.org/press-releases/voting-advocates-announce-a-settlement-of-exact-match-lawsuit-in-georgia/ | |
| \* 30(b)(6) Deposition of Chris Harvey, Ga. Sec'y of State Elections Dir., *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Aug. 16, 2019), ECF No. 507-1 | 90 |
| \* Congressional Research Service, *Voter Registration: Recent Developments and Issues for Congress* (June 10, 2020), https://fas.org/sgp/crs/misc/R46406.pdf | 91 |
| \* "Georgia HAVA Verification" Presentation, Ga. Sec'y of State, State-Defendants-00114398 | 92 |
| \* "Georgia HAVA Verification" Presentation, Ga. Sec'y of State, State-Defendants-00131676 | 93 |
| Stanley Augustin, *Voting Rights Advocates File New Federal Voting Rights Lawsuit Challenging Georgia's Restrictive Exact-Match Voter Registration Verification Scheme*, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Sept. 14, 2016), https://lawyerscommittee.org/voting-rights-advocates-file-new-federal-voting-rights-lawsuit-challenging-georgias-restrictive-exact-match-voter-registration-verification-scheme | |
| Kate Brumback, *Lawsuit: Georgia Voter Registration Process Violates the Law*, ASSOCIATED PRESS (Sept. 14, 2016), https://apnews.com/article/5dca86cf28114b23b94e4a3891da1d64 | |
| Press Release, *Voting Rights Advocates File New Federal Voting Rights Lawsuit Challenging Georgia's Restrictive Exact-Match Voter Registration Verification Scheme*, ASIAN AMERICANS ADVANCING JUSTICE, ATLANTA (Sept. 14, 2015), https://us2.campaign-archive.com/?u=c07af679cb8d889c8f33cb996&id=8612c7128e | |
| Stanley Augustin, *Voting Advocates Announce a Settlement of "Exact Match" Lawsuit in Georgia*, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Feb. 10, 2017), https://lawyerscommittee.org/voting-advocates-announce-settlement-exact-match-lawsuit-georgia | |
| \* O.C.G.A. § 21-2-220.1 | 94 |
| P.R. Lockhart, *Georgia Put 53,000 Voter Registrations on Hold, Fueling New Charges of Voter Suppression*, VOX (Oct. 12, 2018), https://www.vox.com/policy-and-politics/2018/10/11/17964104/georgia-voter-registration-suppression-purges-stacey-abrams-brian-kemp | |
| Brentin Mock, *How Dismantling the Voting Rights Act Helped Georgia Discriminate Again*, BLOOMBERG CITY LAB (Oct. 15, 2018), https://www.bloomberg.com/news/articles/2018-10-15/how-georgia-s-exact-match-program-was-made-possible | |
| P.R Lockhart, *Georgia, 2018's Most Prominent Voting Rights Battleground, Explained*, VOX (Nov. 6, 2018), https://www.vox.com/policy-and-politics/2018/10/26/18024468/georgia-voter-suppression-stacey-abrams-brian-kemp-voting-rights | |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Don Owens, *Civil Rights Groups Sue Georgia Secretary of State Brian Kemp to Cease Discriminatory 'No Match, No Vote' Registration Protocol*, LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW (Oct. 11, 2018), https://lawyerscommittee.org/civil-rights-groups-sue-georgia-secretary-of-state-brian-kemp-to-cease-discriminatory-no-match-no-vote-registration-protocol | |
| \* Complaint, *Ga. Coal. for Peoples' Agenda, Inc. v. Kemp*, No. 1:18-cv-04727-ELR (N.D. Ga. Oct. 11, 2018), ECF No. 1 | 95 |
| Andrew Prokop, *Did 40,000 Voter Registration Application Forms in Georgia Just Disappear?*, VOX (Oct. 31, 2014), https://www.vox.com/2014/10/31/7132171/georgia-missing-voter-registration-applications-lawsuit | |
| Hansi Lo Wang, *Concern Over New-Voter Registration In Georgia Ahead of Election*, NPR (Oct. 22, 2014), https://www.npr.org/sections/codeswitch/2014/10/22/357998924/concern-over-new-voter-registration-in-georgia-ahead-of-election | |
| Tim Reid & Grant Smith, *Missing Hyphens Will Make it Hard for Some People to Vote in U.S. Election*, REUTERS (Apr. 11, 2018), https://www.reuters.com/article/us-usa-election-laws-insight/missing-hyphens-will-make-it-hard-for-some-people-to-vote-in-u-s-election-idUSKBN1HI1PX | |
| \* Declaration of Cam Thi [last name redacted] | 96 |
| \* Declaration of Carlos del Rio | 97 |
| \* Declaration of Gary [last name redacted] | 98 |
| Ari Berman, *A Federal Court Just Ruled That Thousands of Eligible Voters in Georgia Must Be Allowed to Vote*, MOTHER JONES (Nov. 2, 2018), https://www.motherjones.com/politics/2018/11/a-federal-court-just-ruled-that-thousands-of-eligible-voters-in-georgia-must-be-allowed-to-vote-brian-kemp-stacey-abrams/ | |
| \* Declaration of Kia [last name redacted] | 99 |
| \* State Training Presentation re: Special Topics of the Month, Verification Changes due to H.B. 316, State-Defendants-0095888, at State-Defendants-0095898, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Aug. 5, 2020), ECF No. 507-2 | 100 |
| \* Email from G. Saleh to J. Simmons (Oct. 17, 2016), State-Defendants-00155223 | 101 |
| Leadership Conf. Ed. Fund, *Democracy Diverted: Polling Place Closures and the Right to Vote* (Sept. 2019), http://civilrightsdocs.info/pdf/reports/Democracy-Diverted.pdf ("Democracy Diverted") | |
| \* Voting Determination Letter from Stephen J. Pollak, Ass't Att'y Gen., to Jesse Bowles (Dec. 12, 1968), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-1030.pdf | 102 |
| \* Voting Determination Letter from J. Stanley Pottinger, Ass't Att'y Gen., to Judge George E. Crawford, Jones Cnty. (Aug. 12, 1974), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-1380.pdf | 103 |
| \* Voting Determination Letter from Drew S. Fays III, Ass't Att'y Gen., to Judge David M. Proctor, Camden Cnty. (Aug. 4, 1978), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-1710.pdf | 104 |
| \* Voting Determination Letter from John R. Dunne, Ass't Att'y Gen., to Judge Charlotte Bealle (Oct. 28, 1992), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2400.pdf | 105 |



*The documents in this list that start with "*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| * Voting Determination Letter from Deval L. Patrick, Ass't Att'y Gen., to William E. Woodrum, Jenkins Cnty. Att'y (Mar. 20, 1995), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/GA-2610.pdf | 106 |
| Mark Niesse & Maya T. Prabhu, *Voting Precincts Closed Across Georgia Since Election Oversight Lifted*, ATLANTA J.-CONST. (Sept. 4, 2018), https://www.ajc.com/news/state--regional-govt--politics/voting-precincts-closed-across-georgia-since-election-oversight-lifted/bBkHxptlim0Gp9pKu7dfrN/ | |
| * Expert Report of Michael C. Herron, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Feb. 18, 2020), ECF No. 241 | 107 |
| Terry Richards, *Lanier May Close 3 of 4 Voting Precincts*, VALDOSTA DAILY TIMES (June 28, 2016), https://www.valdostadailytimes.com/news/local_news/lanier-may-close-of-voting-precincts/article_6cf02c80-93ce-51df-86c6-3b4a692acc18.html | |
| Mark Niesse & Nick Thieme, *Precinct Closures Harm Voter Turnout in Georgia, AJC Analysis Finds*, ATLANTA J.-CONST. (Dec. 16, 2019), https://www.ajc.com/news/state--regional-govt--politics/precinct-closures-harm-voter-turnout-georgia-ajc-analysis-finds/11sVcLyQCHuQRC8qtZ6lYP | |
| * Declaration of Kenneth [last name redacted] | 108 |
| * Declaration of Tameche [last name redacted] | 109 |
| * Declaration of Carol from Clay [last name redacted] | 110 |
| * Declaration of Lottie [last name redacted] | 111 |
| * Declaration of Robbie [last name redacted] | 112 |
| Doug Richards, *Consultant Behind Plan to Close Randolph Co. Polling Places Did it Before, But Not on This Scale*, 11 ALIVE (Aug. 20, 2018), https://www.11alive.com/article/news/local/consultant-behind-plan-to-close-randolph-co-polling-places-did-it-before-but-not-on-this-scale/85-585898906 | |
| Matt Vasilogambros, *Polling Places Remain a Target Ahead of November Elections*, PEW RSCH. TRS.: STATELINE (Sept. 4, 2018), https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2018/09/04/polling-places-remain-a-target-ahead-of-november-elections | |
| Victor Blackwell et al., *Elections Board Takes Less than a Minute to Reject Proposal to Close 7 of 9 Polling Places in Majority-Black County*, CNN (Aug. 24, 2018), https://www.cnn.com/2018/08/24/us/randolph-county-polling-closures-vote/index.html | |
| Johnny Kauffman, *Georgia County Votes to Keep Polling Places Open After Intense Scrutiny*, NPR (Aug. 24, 2018), https://www.npr.org/2018/08/24/641556969/georgia-county-votes-to-keep-polling-places-open-after-intense-scruitney | |
| Anna Maria Barry-Jester, *Patterns of Death in the South Still Show the Outlines of Slavery*, FIVETHIRTYEIGHT (Apr. 20, 2017), https://fivethirtyeight.com/features/mortality-black-belt/ | |
| Mark Niesse, *Precinct Closures in Rural Georgia Approved by County Elections Board*, ATLANTA J.-CONST. (Aug. 19, 2019), https://www.ajc.com/news/state--regional-govt--politics/precinct-closures-rural-georgia-approved-by-county-elections-board/cDHVxWR6F6547qexIsYjNI/ | |
| * Email from Melanie Frechette, Ga. Sec'y of State's Office, to Ralph Jones, Fulton County (July 9, 2018), State-Defendants-00468982 | 113 |



*The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| * Email from Leigh Combs, Ga. Sec'y of State's Office, to Shauna Dozier, Clayton County (Sept. 11, 2019), State-Defendants-00095374 | 114 |
| * Helpdesk Request from Sherie Jeffries to Chris Harvey, Ga. Sec'y of State's Office Elections Dir. (Oct. 30, 2019), State-Defendants-00295594 | 115 |
| * Letter from Chris Harvey, Ga. Sec'y of State's Office Elections Dir., to Jordan Fuchs, Deputy Sec'y of State, (Jan. 22, 2019), State-Defendants-00200645 | 116 |
| * Declaration of Brandi [last name redacted] | 117 |
| * Declaration of Jonathan [last name redacted] | 118 |
| * Declaration of Shannon W. from Fulton [last name redacted] | 119 |
| * Declaration of Dayle [last name redacted] | 120 |
| * Declaration of Ryan [last name redacted] | 121 |
| * Declaration of Jason [last name redacted] | 122 |
| * Declaration of Stephen [last name redacted] | 123 |
| * Declaration of Suzanne [last name redacted] | 124 |
| * Declaration of Carol from DeKalb [last name redacted] | 125 |
| * Declaration of Caren [last name redacted] | 126 |
| * Declaration of Antoinette [last name redacted] | 127 |
| * Declaration of Shanterrie [last name redacted] | 128 |
| * Declaration of Joshua [last name redacted] | 129 |
| * Declaration of Erika [last name redacted] | 130 |
| * Declaration of April [last name redacted] | 131 |
| 52 U.S.C. § 20507 | |
| * O.C.G.A. § 21-2-235 | 132 |
| * *2021 State Elections & Voter Registration Calendar*, GA. SEC'Y OF STATE, https://sos.ga.gov/admin/uploads/2021_State_Calendar_(Short).pdf | 133 |
| * O.C.G.A. § 21-2-418 | 134 |
| * O.C.G.A. § 21-2-419 | 135 |
| * Declaration of Caroline [last name redacted] | 136 |
| * Supplemental Expert Report of Michael P. McDonald , *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Apr. 8, 2020), ECF No. 293 ("Supplemental McDonald Report") | 137 |
| * Expert Report of Michael P. McDonald, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Feb. 18, 2020), ECF No. 240 ("McDonald Report") | 138 |
| * O.C.G.A. § 21-2-233 | 139 |
| * O.C.G.A. § 21-2-234 | 140 |
| * Declaration of Melissa [last name redacted] | 141 |
| * Declaration of Joel [last name redacted] | 142 |
| * Declaration of Allison [last name redacted] | 143 |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| \* Declaration of Carolyn [last name redacted] | 144 |
| \* Declaration of William [last name redacted] | 145 |
| \* Transcript of Proceedings Before the Hon. Steve C. Jones, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ, (N.D. Ga. Dec. 19, 2019), ECF No. 615 | 146 |
| Paul M. Smith, *"Use It or Lose It": The Problem of Purges from the Registration Rolls of Voters Who Don't Vote Regularly*, ABA (Feb. 10, 2020), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/voting-rights/-use-it-or-lose-it---the-problem-of-purges-from-the-registration0 | |
| Angela Caputo et al., *They Didn't Vote . . . Now They Can't*, APM REPS. (Oct. 19, 2018), https://www.apmreports.org/story/2018/10/19/georgia-voter-purge | |
| \* Letter from Deval L. Patrick, Ass't Att'y Gen. to Dennis R. Dunn, Sr. Ass't Att'y Gen. (Oct. 24, 1994) | 147 |
| \* Declaration of Roxahne [last name redacted] | 148 |
| \* Declaration of Johnny [last name redacted] | 149 |
| \* Declaration of Gahalam [last name redacted] | 150 |
| \* Declaration of Khalidah [last name redacted] | 151 |
| \* Declaration of Andre [last name redacted] | 152 |
| \* Declaration of Rashidah [last name redacted] | 153 |
| Mark Niesse, *Changes Coming to Georgia Purges, Vote Counts and Voting Machines*, ATLANTA J. CONST. (Mar. 19, 2019), https://www.ajc.com/news/state--regional-govt--politics/measure-would-change-georgia-purges-vote-counts-and-voting-machines/lk1muv5jrC5SXI1wt29dzN/ | |
| Tony Pugh, *Georgia Secretary of State Fighting Accusations of Disenfranchising Minority Voters*, MCCLATCHY DC (Oct. 7, 2016), https://www.mcclatchydc.com/news/politics-government/article106692837.html | |
| Jonathan Brater et al., PURGES: A GROWING THREAT TO THE RIGHT TO VOTE, BRENNAN CTR. FOR JUST. (2018) | |
| Geoff Hing, *Georgia Purged About 107,000 People From Voter Rolls: Report*, WABE (Oct. 19 2018), https://www.wabe.org/georgia-purged-about-107000-people-from-voter-rolls-report/ | |
| Ben Nadler, *Voting Rights Become a Flashpoint in Georgia Governor's Race*, AP NEWS (Oct. 9, 2018), https://apnews.com/article/fb011f39af3b40518b572c8cce6e906c | |
| \* Email from Deb Cox, Lowndes Cnty. Official, to Chris Harvey, Sec'y of State Empl. (Nov. 14, 2018), State-Defendants-00055300 | 154 |
| Maya T. Prabhu & Mark Niesse, *22,000 Reinstated to Voting Rolls as Georgia Attorneys Defend Purge*, ATLANTA J.-CONST. (Dec. 20, 2019), https://www.ajc.com/news/state--regional-govt--politics/000-reinstated-voting-rolls-georgia-attorneys-defend-purge/c4fp7iGVwnVr4WEbR1uulJ | |
| \* Declaration of Kilton [last name redacted] | 155 |
| \* Declaration of Clifford [last name redacted] | 156 |
| \* Declaration of David [last name redacted] | 157 |



*The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| * Declaration of Chryshawn [last name redacted] | 158 |
| * *Historical Voter Registration Statistics, State of Georgia, 1998 to Present*, GA. SEC'Y OF STATE, https://sos.ga.gov/admin/uploads/Voter_Registration_Statistics_03032021.pdf | 159 |
| Stephen Fowler, *Why Do Nonwhite Georgia Voter Have to Wait in Line for Hours? Their Numbers Have Soared, and Their Polling Places Have Dwindled.*, PROPUBLICA (Oct. 17, 2020), https://www.propublica.org/article/why-do-nonwhite-georgia-voters-have-to-wait-in-line-for-hours-their-numbers-have-soared-and-their-polling-places-have-dwindled | |
| Barrett Holmes Pitner, Opinion, *Early Voting Lines Are So Long, People Are Fainting. That Harms Democracy*, THE GUARDIAN (Oct. 19, 2016), https://www.theguardian.com/commentisfree/2016/oct/19/early-voting-lines-georgia | |
| Tony Thomas et al., *Some Wait Several Hours as Early Voting Begins in Georgia*, WSBTV (Oct. 17, 2016), https://www.wsbtv.com/news/politics/early-voting-begins-across-state/458139151 | |
| * Declaration of Derrick [last name redacted] | 160 |
| * Declaration of Tunnizia [last name redacted] | 161 |
| * Declaration of Jeffery [last name redacted] | 162 |
| * Declaration of Hollie [last name redacted] | 163 |
| * Declaration of Kevin from Chatham [last name redacted] | 164 |
| * Declaration of Velma [last name redacted] | 165 |
| * Declaration of Patricia [last name redacted] | 166 |
| * Declaration of Shannon G. from Fulton [last name redacted] | 167 |
| * Declaration of Barbara from Chatham [last name redacted] | 168 |
| * Declaration of Angel [last name redacted] | 169 |
| * Declaration of Sharman [last name redacted] | 170 |
| * Declaration of Ann [last name redacted] | 171 |
| * Declaration of Arnaud [last name redacted] | 172 |
| * Declaration of Pamela from Chatham [last name redacted] | 173 |
| * Declaration of Noell [last name redacted] | 174 |
| * Poll Worker Manual, Ga. Sec'y of State (2018), State-Defendants-00146399 | 175 |
| * Poll Worker Manual, Ga. Sec'y of State (2016), State-Defendants-00095472 | 176 |
| * Declaration of Atlas [last name redacted] | 177 |
| * Declaration of Margaret [last name redacted] | 178 |
| * Declaration of Dawn [last name redacted] | 179 |
| * Declaration of Talisha [last name redacted] | 180 |
| * Declaration of Blakke [last name redacted] | 181 |
| * Declaration of Jessica [last name redacted] | 182 |
| * Declaration of Melanie [last name redacted] | 183 |
| * Declaration of Mollye [last name redacted] | 184 |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| THE 2018 VOTING EXPERIENCE: POLLING PLACE LINES, BIPARTISAN POL'Y CTR. (Nov. 2019), https://bipartisanpolicy.org/wp-content/uploads/2019/11/The-2018-Votin-Experience.pdf | |
| Stephen Fowler, *'It Was Very Chaotic': Long Lines, Voting Machine Issues Plague Georgia Primary*, NPR (June 9, 2020), https://www.npr.org/2020/06/09/873054620/long-lines-voting-machine-issues-plague-georgia-primary | |
| \* Expert Report of Dr. Jonathan Rodden, *Anderson v. Raffensperger*, No. 1:20-cv-03263-MLB (N.D. Ga. Sep. 1, 2020), ECF No. 93-61 | 185 |
| Mark Niesse & Nick Thieme, *Extreme Voting Lines Expose Where Georgia Primary Failed*, ATLANTA J.-CONST. (July 28, 2020), https://www.ajc.com/politics/extreme-voting-lines-expose-where-georgia-primary-failed/YQUMSTEBVFAY7CR7UQOQEHSVLI | |
| \* Declaration of Kimberley [last name redacted] | 186 |
| \* Declaration of Lazar [last name redacted] | 187 |
| \* Declaration of Joseph [last name redacted] | 188 |
| \* Declaration of Shari [last name redacted] | 189 |
| \* Declaration of Eilzabeth [last name redacted] | 190 |
| \* Declaration of Catherine [last name redacted] | 191 |
| \* Declaration of Katherine [last name redacted] | 192 |
| \* Declaration of Ian [last name redacted] | 193 |
| \* Declaration of Kimberly [last name redacted] | 194 |
| \* Declaration of Kyla [last name redacted] | 195 |
| \* Declaration of Christina from Fulton [last name redacted] | 196 |
| \* Declaration of Allison S. from Fulton [last name redacted] | 197 |
| \* Declaration of Thomas [last name redacted] | 198 |
| \* Declaration of Brianna [last name redacted] | 199 |
| \* Declaration of Grace [last name redacted] | 200 |
| \* Declaration of Alli [last name redacted] | 201 |
| \* Declaration of Darra [last name redacted] | 202 |
| \* Declaration of Lucille [last name redacted] | 203 |
| \* Declaration of Kiplyn [last name redacted] | 204 |
| \* Declaration of Matthew [last name redacted] | 205 |
| \* Declaration of Canute [last name redacted] | 206 |
| \* Declaration of Raye [last name redacted] | 207 |
| \* Declaration of Nolan [last name redacted] | 208 |
| \* Declaration of Meredith [last name redacted] | 209 |
| \* Declaration of Anthony [last name redacted] | 210 |
| \* Declaration of Donna from Chatham [last name redacted] | 211 |
| \* Declaration of Alvin [last name redacted] | 212 |



<div style="background:purple;color:white">**TABLE OF AUTHORITIES CITED IN REPORT** (In Order of Appearance)</div>

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| \* Declaration of Keli [last name redacted] | 213 |
| \* Declaration of Eddie [last name redacted] | 214 |
| \* Declaration of Donna from Clayton [last name redacted] | 215 |
| \* Declaration of Melanie from Cobb [last name redacted] | 216 |
| \* Declaration of Jenny [last name redacted] | 217 |
| \* Declaration of Regina [last name redacted] | 218 |
| \* Declaration of Zoee [last name redacted] | 219 |
| \* Declaration of Barbara from Fulton [last name redacted] | 220 |
| \* Declaration of RT [last name redacted] | 221 |
| \* Declaration of Dorothy [last name redacted] | 222 |
| \* Declaration of Bryan [last name redacted] | 223 |
| \* Declaration of Varana [last name redacted] | 224 |
| \* Declaration of JoAnne [last name redacted] | 225 |
| \* Declaration of Matt [last name redacted] | 226 |
| \* Declaration of Courtney from Cobb [last name redacted] | 227 |
| \* Declaration of Jamie [last name redacted] | 228 |
| \* Declaration of Anceta [last name redacted] | 229 |
| \* Email to Election Complaints from R. Hancock (Nov. 9, 2016), State-Defendants-00330810 | 230 |
| \* Email to Election Complaints from C. Hatcher (Nov. 8, 2016), State-Defendants-00332339 | 231 |
| \* Deposition of Chris Harvey, *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Dec. 5, 2019) | 232 |
| \* 30(b)(6) Deposition of Chris Harvey, Ga. Sec'y of State Elections Dir., *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-cv-05391-SCJ (N.D. Ga. Jan. 6, 2020) | 233 |
| \* Declaration of Amanda from Clayton [last name redacted] | 234 |
| \* Declaration of Scott [last name redacted] | 235 |
| \* Declaration of Shana [last name redacted] | 236 |
| \* Declaration of Tyre [last name redacted] | 237 |
| \* Declaration of Tobias [last name redacted] | 238 |
| \* Declaration of Jennifer from Cobb [last name redacted] | 239 |
| \* Declaration of Sara [last name redacted] | 240 |
| Candace Wheeler, *Closer Look: Fulton Elections Director Talks 2020 Voting; Atlanta City Councilmember Responds to Tensions Between US and Iran*, WABE (Jan. 9, 2020), https://www.wabe.org/episode/closer-look-fulton-elections-director-talks-2020-voting-city-councilmember-farokhi-responds-to-tensions-between-us-and-iran | |
| Al Hackle, *So Far Just 2 New Voting Machines*, STATESBORO HERALD (Jan. 3, 2020), https://www.statesboroherald.com/local/so-far-just-2-new-voting-machines | |



## TABLE OF AUTHORITIES CITED IN REPORT (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Mark Niesse & Alan Judd, *Election Fiasco Reveals Flaws with Georgia's New Voter System*, ATLANTA J.-CONST. (June 14, 2020), https://www.ajc.com/news/state--regional-govt--politics/election-fiasco-reveals-flaws-with-georgia-new-voting-system/FoZjtLGPYccOrHzXHiPbDL/ | |
| \* Declaration of Mariel [last name redacted] | 241 |
| \* Declaration of Wynne [last name redacted] | 242 |
| \* Declaration of Shea [last name redacted] | 243 |
| \* Declaration of Benjamin from Fulton [last name redacted] | 244 |
| \* Declaration of Gail [last name redacted] | 245 |
| \* Declaration of Courtney from Gwinnett [last name redacted] | 246 |
| \* Declaration of Christina from Chatham [last name redacted] | 247 |
| \* Declaration of Amy [last name redacted] | 248 |
| \* Declaration of Ramon [last name redacted] | 249 |
| \* Declaration of Andrea from Fulton [last name redacted] | 250 |
| \* Declaration of Amanda from Fulton [last name redacted] | 251 |
| \* Declaration of Walter [last name redacted] | 252 |
| *Provisional Ballots*, NAT'L CONF. OF STATE LEGISLATURES (Sept. 17, 2020), https://www.ncsl.org/research/elections-and-campaigns/provisional-ballots.aspx; *Provisional Ballots*, MIT ELECTION DATA SCI. LAB, https://electionlab.mit.edu/research/provisional-ballots | |
| 52 U.S.C. § 21082 | |
| *\* Election Management Guidelines: Chapter 16, Provisional Ballots,* U.S. ELECTION ASSISTANCE COMM'N 158, https://www.eac.gov/sites/default/files/document_library/files/Election-Management-Guidelines-Provisional-Ballots.pdf | 253 |
| *\* Quick Start Management Guide: Provisional Ballots*, U.S. ELECTION ASSITANCE COMM'N (Oct. 2008), https://www.eac.gov/sites/default/files/document_library/files/Quick_Start-Provisional_Ballots.pdf | 254 |
| \* Ga. Comp. R. & Regs. 183-1-12-.18 | 255 |
| \* Helpdesk Request from John Hallman (Jan. 22, 2018), State-Defendants-00224899 | 256 |
| \* Helpdesk Request from John Hallman (Feb. 19, 2018), State-Defendants-00225242 | 257 |
| \* Email from Rachelle Thurmond, Dawson Cnty. Official, to Melanie Frechette, Sec'y of State Empl. (June 11, 2018), State-Defendants-00468910 | 258 |
| \* Email from John Hallman, Sec'y of State Empl., to Brenda Hodges, Charlton Cnty. Official (Jan. 27, 2017), State-Defendants-00158872 | 259 |
| \* Email from DeKalb Cnty. Voter to Elections Complaint Alerts Account (Nov. 8, 2016), State-Defendants-00234997 | 260 |
| \* Email from Alpharetta Voter to SOS Contact Alerts Account (Apr. 18, 2017), State-Defendants-00193941 | 261 |
| \* Declaration of Andrea from DeKalb [last name redacted] | 262 |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| * Declaration of Delaney [last name redacted] | 263 |
| * Declaration of James [last name redacted] | 264 |
| * Declaration of Robin [last name redacted] | 265 |
| * Declaration of Ayesha [last name redacted] | 266 |
| * Declaration of Angela [last name redacted] | 267 |
| * Declaration of Suzanne from Chatham [last name redacted] | 268 |
| * Declaration of Candace [last name redacted] | 269 |
| * Declaration of Therese [last name redacted] | 270 |
| * Declaration of Jennifer from Hall [last name redacted] | 271 |
| * Declaration of Benjamin from Maryland [last name redacted] | 272 |
| * Declaration of Eunice [last name redacted] | 273 |
| * Declaration of Frank [last name redacted] | 274 |
| * Declaration of Colleen [last name redacted] | 275 |
| * Declaration of Kelly [last name redacted] | 276 |
| * Declaration of Martha [last name redacted] | 277 |
| * Declaration of Alexus [last name redacted] | 278 |
| * Declaration of Christina from Bryan [last name redacted] | 279 |
| * Declaration of Chris [last name redacted] | 280 |
| * Declaration of Allen [last name redacted] | 281 |
| * Declaration of Julia [last name redacted] | 282 |
| * Declaration of Dominic [last name redacted] | 283 |
| * Declaration of Kevin from Fulton [last name redacted] | 284 |
| * Letter from Chris Harvey, Elections Director, to electors identified on NCOA voting list (Dec. 15, 2020) | 285 |
| * Letter from Frances Watson, Chief Investigator, to electors identified on NCOA voting list (Jan. 15, 2021) | 286 |
| * Letter from Frances Watson, Chief Investigator, to electors identified on NCOA voting list (Feb. 15, 2021) | 287 |
| * Email from ORR Administration to Nick [last name redacted] (Mar. 31, 2021) | 288 |
| * *Secretary of State Brad Raffensperger Protects Runoffs From Out Of State Voters*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/secretary_of_state_brad_raffensperger_protects_runoffs_from_out_of_state_voters | 289 |
| * Letter from Brad Raffensperger, Ga. Sec'y of State, to Members of Congress (Jan. 6, 2021), https://sos.ga.gov/admin/uploads/Letter%20to%20Congress%20from%20Secretary%20Raffensperger%20(1-6-21).pdf | 290 |



*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Eric Mack, *Brad Raffensperger to Newsmax TV: Georgia Voter ID Law a Line of Fraud Defense*, NEWSMAX (Dec. 26, 2020), https://www.newsmax.com/newsmax-tv/georgia-brad-raffensperger-secretary-of-state-election-fraud/2020/12/26/id/1003192/ | |
| \* Email from Ellen [last name redacted] to Fair Fight Action (Dec. 31, 2020) | 291 |
| 52 U.S.C.A. § 10101 | |
| \* "Election Law for Non-Lawyers, MEOC Municipal Course # 2" Training Materials Presentation, Ga. Sec'y of State, State-Defendants-00107570 | 292 |
| \* O.C.G.A. § 21-2-31 | 293 |
| \* *State Election Board: Elections*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/state_election_board | 294 |
| \* Elections Division Transition Memo: SOS Description of Duties, Ga. Sec'y of State, State-Defendants-00149713 | 295 |
| *State Election Board*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/state_election_board | |
| \* *SEB Meeting Minutes*, GA. SEC'Y OF STATE (Apr. 3, 2018), https://sos.ga.gov/admin/files/SEB_Meeting_Minutes_April%203,%202018%20(SIGNED).pdf | 296 |
| \* *SEB Meeting Minutes*, GA. SEC'Y OF STATE (Sept. 11, 2018), http://sos.ga.gov/admin/files/SEB%20Meeting%20Minutes_September_11_2018.pdf | 297 |
| \* *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Apr. 3, 2018), https://sos.ga.gov/admin/uploads/04%2003%202018%20-%20SEB%20-%20ATLANTA,%20TRANSCRIPT.pdf | 298 |
| \* *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Sept. 11, 2018), https://sos.ga.gov/admin/uploads/stateelectionboard9.11.pdf | 299 |
| \* Letter of Instruction to Evie Roberts, Toombs Cnty. Official, Ga. State Bd. of Elections and Registration from Candice Broce, Ga. Sec'y of State. (July 10, 2015), State-Defendants-00842626 | 300 |
| \* *SEB Meeting Minutes*, GA. SEC'Y OF STATE (Aug. 21, 2019), http://sos.ga.gov/admin/files/August%2021,%202019%20(SIGNED).pdf | 301 |
| \* *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Feb. 10, 2021), http://sos.ga.gov/admin/uploads/State_Election_Board_Feb_10,_2021_-_Transcript.pdf | 302 |
| \* *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Feb. 17, 2021), https://sos.ga.gov/admin/uploads/Transcript_-_February_17,_2021.pdf | 303 |
| \* *SEB Meeting Transcript*, GA. SEC'Y OF STATE (Sept. 10, 2020), https://sos.ga.gov/admin/uploads/September_10,_2020_(SEB_Transcript).pdf | 304 |
| Spencer Woodman, *Register Minority Voters in Georgia, Go to Jail*, NEW REPUBLIC (May 5, 2015), https://newrepublic.com/article/121715/georgia-secretary-state-hammers-minority-voter-registration-efforts | |



*The documents in this list that start with "*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Kristina Torres, *Voter Registration Fraud Alleged at Democratic-Backed Group*, ATLANTA J.-CONST. (Sept. 10, 2014), https://www.ajc.com/news/state--regional-govt--politics/voter-registration-fraud-alleged-democratic-backed-group/1oDWNijMJZQAYO2D88ZHHN/ | |
| * Deposition of Brian Kemp, *Fair Fight Action, Inc.*, No. 1:18-cv-05391-SCJ (N.D. Ga. Jan. 8, 2020), Jan. 8, 2020, ECF No. 481-1 | 305 |
| * *SEB Meeting Transcript*, GA. SEC'Y OF STATE, 38-39 (Sept. 20, 2017), https://sos.ga.gov/admin/uploads/September_20,_2017_Transcript.pdf | 306 |
| Kristina Torres, *Georgia AG Gets 53 Forms in Probe of Voter Registration Group*, ATLANTA J.-CONST. (Sept. 20, 2017), https://www.ajc.com/news/state--regional-govt--politics/georgia-gets-forms-probe-voter-registration-group/MhhTWfqOh3cdkdoTVmwiYI/ | |
| Mark Niesse, *Voting Groups Call Georgia Investigations Empty Partisan Attacks*, ATLANTA J.-CONST. (Feb. 10, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECNBPKVDMG4A5MFQ/ | |
| Mark Niesse, *Voting Groups Dismiss Probes by State as Partisan Attacks*, ATLANTA J.-CONST. (Feb. 8, 2021), https://www.ajc.com/politics/voting-groups-call-georgia-investigations-empty-partisan-attacks/OTBTDDGGJJECN-BPKVDMG4A5MFQ/ | |
| David Wickert, *Georgia Investigates Voter Registration Groups*, ATLANTA J.-CONST. (Nov. 30, 2020), https://www.ajc.com/politics/election/georgia-investigates-voter-registration-groups/YHEWSZLOYNEWZPYSHWAPJQFNFQ/ | |
| * *Secretary Raffensperger Launches Investigation Into Groups Encouraging Fraudulent Registrations*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/secretary_raffensperger_launches_investigation_into_groups_encouraging_fraudulent_registrations | 307 |
| Joseph Choi, *Georgia Secretary of State Opens Investigation into Voter Registration Groups*, THE HILL (Nov. 30, 2020), https://thehill.com/homenews/state-watch/528012-georgia-secretary-of-state-opens-investigation-into-voter-registration | |
| Sam Levine, *'Intimidation Tactic': Georgia Officials Investigate Groups That Mobilized Black Voters*, THE GUARDIAN (Feb. 12, 2021), https://www.theguardian.com/us-news/2021/feb/12/georgia-voting-rights-stacey-abrams | |
| Meidas Touch Podcast, *Unedited: Gabriel Sterling Accepts Challenge to Debate Georgia Voter Bill with MeidasTouch*, YOUTUBE (Apr. 2, 2021), https://www.youtube.com/watch?v=cHvzaEAEQdU | |
| * *Stop Voter Fraud*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/stop_voter_fraud | 308 |
| Jim Walls, *Absentee Ballots Abused*, ATLANTA J.-CONST. (Aug. 11, 2012), https://www.ajc.com/news/local-govt--politics/absentee-ballots-abused/EwNLkw1aQoEcly2mxKpwYJ/ | |
| Claire Simms, *Georgia Launches 'Secure the Vote' Education Campaign*, FOX 5 ATLANTA (Dec. 6, 2019), https://www.fox5atlanta.com/news/georgia-launches-secure-the-vote-education-campaign; SECURE THE VOTE, https://securevotega.com | |
| SECURE THE VOTE, https://securevotega.com | |
| *Fact Check*, SECURE THE VOTE, https://securevotega.com/factcheck/ | |



*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| *\* Secretary Raffensperger Warning: 'Moving' to Georgia Temporarily in Order to Vote in Jan. 5 Runoff is Illegal and Will Be Prosecuted*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/secretary_raffensperger_warning_moving_to_georgia_temporarily_in_order_to_vote_in_jan_5_runoff_is_illegal_and_will_be_prosecuted | 309 |
| Mark Niesse, *Georgia Elections Chief Launches Effort Against Mail-in Voting Fraud*, ATLANTA J.-CONST. (Apr. 6, 2020), https://www.ajc.com/news/state--regional-govt--politics/georgia-elections-chief-launches-effort-against-mail-voting-fraud/uKcFoPbbLnFC0A4nXihaLI/ | |
| *\* Raffensperger Sends More Voting Cases to Prosecutors*, GA. SEC'Y OF STATE (Feb. 18, 2021), https://sos.ga.gov/index.php/elections/raffensperger_sends_more_voting_cases_to_prosecutors | 310 |
| \* Ga. Sec'y of State Investigations Division, Ga. Sec'y of State/Ga. Bureau of Investigation ABM Signature Audit Report (Dec. 29, 2020), https://sos.ga.gov/admin/uploads/Cobb%20County%20ABM%20Audit%20Report%2020201229.pdf | 311 |
| \* Email from Chris Channell, Task Force Member, Glynn Cnty., Ga. to American Oversight (Oct. 6, 2020) | 312 |
| \* Email from Ryan Germany, General Counsel, Ga. Sec'y of State, to Brad Rigby et al., Members of Absentee Ballot Fraud Task Force (Sept. 8, 2020) | 313 |
| Beau Evans, *Georgia Secretary of State Faces Backlash Over Double-Voting Claims*, AUGUSTA CHRONICLE (Sept. 9, 2020), https://www.augustachronicle.com/story/news/politics/elections/state/2020/09/09/georgia-secretary-of-state-faces-backlash-over-double-voting-claims/43139411/ | |
| Vann Newkirk II, *Voter Suppression is Warping Democracy*, THE ATLANTIC (Jul. 17, 2018), https://www.theatlantic.com/politics/archive/2018/07/poll-prri-voter-suppression/565355/ | |
| Alexandra Hart & Shelly Brisbin, *Analysis Finds People of Color Account for 72% of Election Fraud Cases Brought by the Texas Attorney General*, TEX. STANDARD (Mar. 25, 2021), https://www.texasstandard.org/stories/analysis-finds-people-of-color-account-for-72-of-election-fraud-cases-brought-by-the-texas-attorney-general/ | |
| Rebekah Barber, *Is Georgia's Secretary of State Unjustly Targeting Voting Rights Activists Again?*, FACING SOUTH (Oct. 4, 2017), https://www.facingsouth.org/2017/10/georgias-secretary-state-unjustly-targeting-voting-rights-activists-again | |
| Christopher Alston, *There Are a Lot of Voting Bills in the Georgia General Assembly. Here's What You Need to Know.*, WABE (Feb. 25, 2021), https://www.wabe.org/there-are-a-lot-of-voting-bills-in-the-georgia-general-assembly-heres-what-you-need-to-know/ | |
| Fredreka Schouten, *Here's Why Voting Rights Activists Say Georgia's New Election Law Targets Black Voters*, CNN (Mar. 26, 2021), https://www.cnn.com/2021/03/26/politics/georgia-voting-law-black-voters/index.html | |
| Zack Beauchamp, *Georgia's Restrictive New Voting Law, Explained*, VOX (Mar. 26, 2021), https://www.vox.com/22352112/georgia-voting-sb-202-explained | |
| \* O.C.G.A. § 21-2-30 | 314 |
| \* O.C.G.A. § 21-2-33.1 | 315 |



## TABLE OF AUTHORITIES CITED IN REPORT (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Fredreka Schouten, *Here's Why Voting Rights Activists Say Georgia's New Election Law Targets Black Voters*, CNN (Mar. 26, 2021), https://www.cnn.com/2021/03/26/politics/georgia-voting-law-black-voters/index.html | |
| Zack Beauchamp, *Georgia's Restrictive New Voting Law, Explained*, VOX (Mar. 26, 2021), https://www.vox.com/22352112/georgia-voting-sb-202-explained | |
| Domingo Morel, *As Georgia's New Law Shows, When Black People Gain Local Power, States Strip That Power Away*, WASH. POST (Apr. 1, 2021), https://www.washingtonpost.com/politics/2021/04/01/georgias-new-law-shows-when-black-people-gain-local-power-states-strip-that-power-away/ | |
| Derek Hawkins, *Ex-Officer Texted 'We Stormed the Capitol' During Jan. 6 Riot, Feds Say, and Tipsters Turned Him In*, WASH. POST (Apr. 3, 2021), https://www.washingtonpost.com/nation/2021/04/03/former-utah-police-capitol-riot/ | |
| Rebecca Shabad, *Georgia Legislator Arrested For Protesting Voting Law Says Signing Of Bill 'Far More Serious Crime'*, NBC NEWS (Apr. 1, 2021), https://www.nbcnews.com/politics/politics-news/georgia-legislator-arrested-protesting-voting-law-says-signing-bill-far-n1262748 | |
| Gabby Birenbaum, *State GOPs Have Already Introduced Dozens of Bills Restricting Voting Access in 2021*, VOX (Jan. 29, 2021), https://www.vox.com/22254482/republicans-voter-suppression-state-legislatures | |
| Nick Corasaniti, *Republican Lawmakers in at Least 8 States are Vying for More Power Over How Elections Are Run*, N.Y. TIMES (Mar. 25, 2021), https://www.nytimes.com/2021/03/25/us/republican-lawmakers-in-at-least-8-states-are-vying-for-more-power-over-how-elections-are-run.html | |
| *State Voting Laws*, BRENNAN CTR. FOR JUST., https://www.brennancenter.org/issues/ensure-every-american-can-vote/voting-reform/state-voting-laws | |
| Alex Samuels et al., *The States Where Efforts to Restrict Voting Are Escalating*, FIVETHIRTYEIGHT (Mar. 29, 2021), https://fivethirtyeight.com/features/the-states-where-efforts-to-restrict-voting-are-escalating/ | |
| Dahlia Lithwick, *Why Republicans Are Still Holding Onto the Big Lie*, SLATE (Feb. 26, 2021), https://slate.com/news-and-politics/2021/02/republicans-cpac-stolen-election-lie.html | |
| *The Myth of Voter Fraud*, BRENNAN CTR. FOR JUST., https://www.brennancenter.org/issues/ensure-every-american-can-vote/vote-suppression/myth-voter-fraud | |
| Andy Sullivan, & Joseph Ax, *Explainer: Despite Trump Claims, Voter Fraud is Extremely Rare. Here is How U.S. States Keep it That Way*, REUTERS (Sept. 9, 2020), https://www.reuters.com/article/us-usa-election-voter-fraud-facts-explai/explainer-despite-trump-claims-voter-fraud-is-extremely-rare-here-is-how-u-s-states-keep-it-that-way-idUSKBN2601HG | |
| Michael Tackket & Michael Wines, *Trump Disbands Commission on Voter Fraud*, N.Y. TIMES (Jan. 3, 2018), https://www.nytimes.com/2018/01/03/us/politics/trump-voterfraud-commission.html | |
| Justin Levitt, *The Truth About Voter Fraud*, BRENNAN CTR. FOR JUST. 3, 4, 6 (2007), https://www.brennancenter.org/sites/default/files/2019-08/Report_Truth-About-Voter-Fraud.pdf | |



*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Wendy Weiser & Harold Ekeh, *The False Narrative of Vote-by-Mail Fraud*, BRENNAN CTR. FOR JUST. (Apr. 10, 2020), https://www.brennancenter.org/our-work/analysis-opinion/false-narrative-vote-mail-fraud | |
| Tiffany Camhi, *How Oregon Became the First State to Vote by Mail in a Presidential Election*, OPB (June 19, 2020), https://www.opb.org/news/article/history-vote-by-mail-oregon-elections/ | |
| Natasha Khan & Corbin Carson, *Comprehensive Database of U.S. Voter Fraud Uncovers No Evidence that Photo ID Is Needed*, NEWS21 (Aug. 12, 2012), https://votingrights.news21.com/article/election-fraud/ | |
| *Election Fraud in America*, NEWS21 (Aug. 12, 2012), https://votingrights.news21.com/interactive/election-fraud-database/ | |
| Lorraine Minnite, THE MYTH OF VOTER FRAUD (2007) | |
| Aaron Morrison et al., *Trump Election Challenges Sound Alarm Among Voters of Color*, ABC NEWS (Nov. 23, 2020), https://abcnews.go.com/Politics/wireStory/trump-election-challenges-sound-alarm-voters-color-74345706 | |
| Jacob Shamsian and Sonam Sheth, *Trump and His Allies Filed More than 40 Lawsuits Challenging the 2020 Election Results. All of Them Failed.*, BUS. INSIDER (Feb. 22, 2021), https://www.businessinsider.com/trump-campaign-lawsuits-election-results-2020-11 | |
| Lawrence Hurley, *U.S. Supreme Court Dumps Last of Trump's Election Appeals*, REUTERS (Mar. 8, 2021), https://www.reuters.com/article/us-usa-court-election-idUSKBN2B01LE | |
| Kate Brumback, *Georgia Again Certifies Election Results Showing Biden Won*, ASSOCIATE PRESS (Dec. 7, 2020), https://apnews.com/article/election-2020-joe-biden-donald-trump-georgia-elections-4eeea3b24f10de886bcdeab6c26b680a | |
| Brad Raffensperger, *Opinion: Georgia's Election Results Are Sound*, WASH. POST (Nov. 21, 2020), https://www.washingtonpost.com/opinions/2020/11/21/brad-raffensperger-georgia-results-2020-election-trustworthy/ | |
| Greg Bluestein, *Duncan Pushes Back on False Voter Fraud Claims: "We're Better Than This"*, ATLANTA J.-CONST. (Dec. 1, 2020), https://www.ajc.com/politics/politicsblog/duncan-pushes-back-on-false-voter-fraud-claims-were-better-thanthis/GSNRMYELPBBADHZ5RQ7LDTVHCE/ | |
| Amy Gardner & Paulina Firozi, *Here's the Full Transcript and Audio of the Call Between Trump and Raffensperger*, WASH. POST (Jan. 5, 2021), https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgiavote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html | |
| Scott Pelley, *Georgia Secretary of State Describes Call Where Trump Pressured Him to Find Evidence of Voter Fraud*, CBS NEWS 60 MINUTES (Jan. 10, 2021), https://www.cbsnews.com/news/georgia-election-brad-raffensperger-60-minutes-2021-01-10/ | |
| *Georgia Election Results*, POLITICO (Jan. 6, 2021), https://www.politico.com/2020-election/results/georgia/ | |
| *\* Georgia Breaks All-Time Voting Record*, GA. SEC'Y OF STATE, https://sos.ga.gov/index.php/elections/georgia_breaks_all_time_voting_record | 316 |



*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Luis Noe-Bustamante & Abby Budiman, *Black, Latino and Asian Americans Have Been Key to Georgia's Registered Voter Growth Since 2016*, PEW RSCH. CTR. (Dec. 21, 2020), https://www.pewresearch.org/fact-tank/2020/12/21/black-latino-and-asian-americans-have-been-key-to-georgias-registered-voter-growth-since-2016/ | |
| Nathaniel Rakich et al., *How Democrats Won the Georgia Runoffs*, FIVETHIRTYEIGHT (Jan. 7, 2021), https://fivethirtyeight.com/features/how-democrats-won-the-georgia-runoffs/ | |
| Ross Williams, *Record Turnout Among Black Voters Could Help Georgia Reshape the Nation*, GPB (Jan. 11, 2021), https://www.gpb.org/news/2021/01/11/record-turnout-among-black-voters-could-help-georgia-reshape-the-nation | |
| Emil Moffatt, *Speaker Ralston Announces Election Integrity Committee That Will Focus on 'Moving Forward'*, WABE (Jan. 7, 2021), https://www.wabe.org/speaker-ralston-announces-election-integrity-special-committee-that-will-focus-on-moving-forward/ | |
| Stephen Fowler, *In Georgia County, Elections Bills Have Consequences*, NPR (Mar. 27, 2021), https://www.npr.org/2021/03/27/981354303/in-georgia-county-elections-bills-have-consequences | |
| Timothy Pratt, *The Lawyer Behind Georgia's New Anti-Voting Law*, THE NATION (Apr. 8, 2021), https://www.thenation.com/article/politics/georgia-voting-law-barry-fleming/ | |
| Jewel Wicker, *Here's What's Going on with Voting Legislation in Georgia and Why Opponents Say It's Clear "Voter Suppression"*, ATLANTA MAGAZINE (Mar. 11, 2021), https://www.atlantamagazine.com/news-culture-articles/heres-whats-going-on-with-voting-legislation-in-georgia-and-why-opponents-say-its-clear-voter-suppression/ | |
| Jeff Amy, *Georgia to Vaccinate Adults Over 55, Those with Conditions*, ASSOCIED PRESS (Mar. 10, 2021), https://apnews.com/article/public-health-emergency-management-georgia-coronavirus-pandemic-5584d52bbb5d116c40499c2a9b0e39cc | |
| Stephen Fowler, *A Dozen Voting Bills, Citizen's Arrest Overhaul Survive 2021 Crossover Day*, GPB (Mar. 9, 2021), https://www.gpb.org/news/2021/03/09/dozen-voting-bills-citizens-arrest-overhaul-survive-2021-crossover-day | |
| \* Georgia Senate Rules Calendar, https://www.legis.ga.gov/api/document/docs/default-source/senate-calendars/20212022/rules-calendar-2021-legislative-day-28.pdf?sfvrsn=cac7ebff_2 | 317 |
| \* Complaint, *Sixth District of African Methodist Episcopal Church v. Kemp*, No. 21-cv-01284 (N.D. Ga. Mar. 29, 2021), ECF No. 1 | 318 |
| Nathaniel Rakich, *All the Ways Georgia Could Make It Harder to Vote*, FIVETHIRTYEIGHT (Feb. 25, 2021), https://fivethirtyeight.com/features/all-the-ways-georgia-could-make-it-harder-to-vote/ | |
| *Special Committee On Election Integrity – Archives*, Georgia House of Representatives, https://www.house.ga.gov/Committees/en-US/ElectionIntegrityArchives.aspx | |
| *Special Committee on Election Integrity Monday, Feb. 22 Meeting*, GEORGIA HOUSE OF REPRESENTATIVES (Feb. 22, 2021), https://livestream.com/accounts/25225474/events/8729747/videos/217887713 | |
| \* Complaint, *Georgia State Conf. of NAACP v. Raffensperger, et al.*, No. 21-cv-01259 (N.D. Ga. Mar. 28, 2021), ECF No. 1 | 319 |



*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
| --- | --- |
| *Fiscal Analysis*, VOTING RIGHTS LAB (Feb. 24, 2021), https://votingrightslab.org/wp-content/uploads/2021/02/Fiscal-Impact-of-GA-SB-241.pdf | |
| *Legislative Day 38 - 2021 Legislative Session (3/25/21)*, GEORGIA STATE SENATE 6:12:40, 6:19:00 (Mar. 25, 2021), https://www.youtube.com/watch?v=QVzKEHqNxuY. | |
| \* Complaint, *VoteAmerica v. Raffensperger*, No. 21-cv-01390 (N.D. Ga. Apr. 7, 2021), ECF No. 1 | 320 |
| *Georgia Senate Bill 202*, LEGISCAN, https://legiscan.com/GA/bill/SB202/2021 | |
| Stephen Fowler, *Georgia Governor Signs Election Overhaul, Including Changes To Absentee Voting*, NPR POLITICS (Mar. 25, 2021), https://www.npr.org/2021/03/25/981357583/georgia-legislature-approves-election-overhaul-including-changes-to-absentee-vot | |
| Natasha Chen & Theresa Waldrop, *Black Voter Says a Painting at Georgia Governor's Voter Bill Signing Shows the Plantation Where Her Family Worked for Generations*, CNN (Mar. 28, 2021), https://www.cnn.com/2021/03/28/us/georgia-callaway-plantation-painting-trnd/index.html | |
| Rebecca Shabad, *Georgia Legislator Arrested For Protesting Voting Law Says Signing Of Bill 'Far More Serious Crime'*, NBC NEWS (Apr. 1, 2021), https://www.nbcnews.com/politics/politics-news/georgia-legislator-arrested-protesting-voting-law-says-signing-bill-far-n1262748 | |
| Opinion, *Our View: Marching Backward into History*, ATLANTA J.-CONST. (Mar. 26, 2021), https://www.ajc.com/opinion/our-view-marching-backward-intohistory/KERD4OAURNFRNOQUZPKZNTBXF4/ | |
| Jeff Cockrall, *Chicago Booth Scholar Pushes Companies to Take Substantive Step Toward Change*, UCHICAGO NEWS (Aug. 4, 2020), https://news.uchicago.edu/story/why-paid-time-voting-can-help-address-racial-inequities | |
| Sendhil Mullainathan, *For Racial Justice, Employees Need Paid Hours Off for Voting*, N.Y. TIMES (Jun. 12, 2020), https://www.nytimes.com/2020/06/12/business/for-racial-justice-employees-need-paid-hours-off-for-voting.html | |
| Mark Niesse, *Early Voting Brought Record Turnout in Georgia Ahead of Election Day*, ATLANTA J.-CONST. (Oct. 31, 2020), https://www.ajc.com/politics/early-voting-brought-record-turnout-in-georgia-ahead-of-election-day/76JRESFLMVEYBGX2J7AAGKABQ4/ | |
| Abigail Abrams, *Mail Voting Boosted Turnout for Voters with Disabilities. Will Lawmakers Let It Continue?*, TIME (Feb. 18, 2021), https://time.com/5940397/2020-mail-voting-accessibility/ | |
| Kim Eckart, *UW Political Science Expert on the Value of Mail-In Voting*, UNIV. OF WASH. NEWS (Sept. 4, 2020), https://www.washington.edu/news/2020/09/04/uw-political-science-expert-on-the-value-of-mail-in-voting/ | |
| *Georgia Early Voting Statistics*, U.S. ELECTIONS PROJECT, https://electproject.github.io/Early-Vote-2020G/GA.html | |
| \* O.C.G.A. § 21-2-385 | 321 |
| \* O.C.G.A. § 21-2-417 | 322 |
| *Special Committee on Election Integrity Friday, Feb. 19 Meeting*, GEORGIA HOUSE OF REPRESENTATIVES 26:40-26:52 (Feb. 19, 2021), https://livestream.com/accounts/25225474/events/8729747/videos/217751717 | |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*The documents in this list that start with "*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Mark Niesse, *Georgia Moves Toward ID Numbers to Verify Absentee Voters*, ATLANTA J.-CONST. (Mar. 15, 2021), https://www.ajc.com/politics/georgia-moves-toward-id-numbers-to-verify-absentee-voters/K3XW5WYNCJHKDJ7BWG3CLMIHIY/ | |
| *Voter Registration Statistics*, GA. SEC'Y OF STATE, sos.ga.gov/index.php/Elections/voter_registration_statistics | 323 |
| Sari Horwitz, *Getting a Photo ID So You Can Vote is Easy. Unless You're Poor, Black, Latino or Elderly.*, WASH. POST (May 23, 2016), https://www.washingtonpost.com/politics/courts_law/getting-a-photo-id-so-you-can-vote-is-easy-unless-youre-poor-black-latino-or-elderly/2016/05/23/8d5474ec-20f0-11e6-8690-f14ca9de2972_story.html | |
| Brentin Mock, *Like It or Not, Voter ID is Not Working*, BLOOMBERT CITYLAB (Mar. 3, 2016), https://www.bloomberg.com/news/articles/2016-03-03/voter-id-laws-simply-are-not-working-in-texas-alabama-and-georgia | |
| * O.C.G.A. § 21-2-382 | 324 |
| Nick Corasaniti & Reid J. Epstein, *What Georgia's Voting Law Really Does*, N.Y. TIMES (Apr. 2, 2021), https://www.nytimes.com/2021/04/02/us/politics/georgia-voting-law-annotated.html | |
| Kat Stafford et al., *'This is Proof': Biden's Win Reveals Power of Black Votes*, ASSOCIATED PRESS (Nov. 9, 2020), https://apnews.com/article/election-2020-joe-biden-race-and-ethnicity-virus-outbreak-georgia-7a843bbce00713cfde6c3fdbc2e31eb7 | |
| Astrid Galvan & Christina A. Cassidy, *Ballot Drop Boxes Seen as a Way to Bypass the Post Office*, ASSOCIATED PRESS (Aug. 18, 2020), https://apnews.com/article/41706cd2f7b03452d0bfb9efca3e76e3 | |
| Barry Fleming, *Guest Column: Republican Party Wins on Election Day, and Future is Bright*, THE AUGUSTA CHRONICLE (Nov. 15, 2020), https://www.augustachronicle.com/story/opinion/columns/guest/2020/11/15/guest-column-republican-party-wins-on-election-day-and-future-is-bright/43155971/ | |
| * O.C.G.A. § 21-2-266 | 325 |
| * *QuickFacts: Fulton County, Georgia*, U.S. CENSUS BUREAU, https://www.census.gov/quickfacts/fultoncountygeorgia | 326 |
| *Early Voting Starts Today & Fulton Mobile Voting Units Hit the Streets*, FULTON CNTY. (Oct. 12, 2020), http://fultoncountyga.gov/news/2020/10/12/early-voting-and-fulton-mobile-voting-units-hit-the-streets | |
| Stella Mackler, *Mobile Voting Units Offer Conveneience*, THE SOUTHERNER ONLINE (Nov. 4, 2020), https://thesoutherneronline.com/78479/news/new-fulton-county-mobile-voting-units/ | |
| Zachary Roth, *The Caged Ballot: Why the GOP is Poised to Create Large-Scale Voting Chaos This Year*, NEW REPUBLIC (Mar. 30, 2020), https://newrepublic.com/article/156861/republican-voter-suppression-tactics-trump-2020 | |
| Mark Niesse, *Eligibility of 364,000 Georgia Voters Challenged Before Senate Runoff*, ATLANTA J.-CONST. (Dec. 22, 2020), https://www.ajc.com/politics/eligibility-of-364000-georgia-voters-challenged-before-senate-runoff/3UIMDOVRFVERXOJ3IBHYWZBWYI/ | |



## TABLE OF AUTHORITIES CITED IN REPORT *(In Order of Appearance)*

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Russ Bynum, *Group Says It's Challenging Residency of 364K Georgia Voters*, NEWS JAX (Dec. 19, 2020), https://www.news4jax.com/news/georgia/2020/12/19/group-says-its-challenging-residency-of-364k-georgia-voters/ | |
| Provisional Ballots, GEORGIA VOTER GUIDE, https://faq.georgiavoter.guide/en/article/provisional-ballots | |
| Zachary Roth, *Report: Minorities More Likely to Cast Provisional Ballots*, MSNBC (Oct. 30, 2014), https://www.msnbc.com/msnbc/report-minorities-more-likely-cast-provisional-ballots-msna447721 | |
| Jane C. Timm, *'Outrageous': Biden Condemns New Georgia Law as a 'Blatant Attack' on Voting Rights*, NBC NEWS (Mar. 26, 2021), https://www.nbcnews.com/politics/elections/democrats-excoriate-new-voting-restrictions-georgia-make-it-illegal-give-n1262181 | |
| Kate Kelly & Sapna Maheshwari, *Paid Time Off, Free Fries: How Corporate America Is Getting Out the Vote*, N.Y. TIMES (Oct. 23, 2020), https://www.nytimes.com/2020/10/23/business/corporate-america-voting-time-off.html | |
| Anne Glusker, *Chefs Are Helping Hungry Voters Waiting in Line at the Polls*, SMITHSONIAN MAG. (Oct. 30, 2020), https://www.smithsonianmag.com/smithsonian-institution/chefs-are-helping-hungry-voters-waiting-line-polls-180976179/ | |
| \* Declaration of Robert [last name redacted] | 327 |
| \* Declaration of Eboney [last name redacted] | 328 |
| \* O.C.G.A. § 21-2-414 | 329 |
| Grace Panetta, *Georgia's New Controversial Voting Law Bans Volunteers from Delivering Free Water and Snacks to Voters in Line*, BUS. INSIDER (Mar. 26, 2021), https://www.businessinsider.com/ga-voting-law-bans-volunteers-from-delivering-food-water-to-voters-2021-3 | |
| Jerusalem Demsas, *Why Georgia has Runoff Elections*, VOX (Jan. 5, 2021), https://www.vox.com/21551855/georgia-ossoff-perdue-loeffler-warnock-runoff-election-2020-results | |
| \* O.C.G.A. § 21-2-501 | 330 |
| \* Declaration of Donald [last name redacted] | 331 |
| \* Declaration of DanElle [last name redacted] | 332 |
| Ben Nadler and Jeff Amy, *From Handing Out Water to Sunday Voting: What to Know About Georgia's New Republican Election Law*, ABC NEWS (Apr. 4, 2021), https://abc7news.com/new-georgia-voting-law-explained-governor-brian-kemp-sunday-water-voters/10483657/ | |
| CNN, *Georgia Election Official: Both Parties Treat Voters Like Children*, YOUTUBE 6:50-7:12 (Mar. 27, 2021), https://www.youtube.com/watch?v=BzoAVL89SPc | |
| Deidra Dukes, *Local Leader Says Fulton County Unfairly Targeted by Georgia Election Law*, FOX 5 ATLANTA (Mar. 29, 2021), https://www.fox5atlanta.com/news/local-leader-says-fulton-county-unfairly-targeted-by-georgia-elections-law | |
| Mark Niesse, *Georgia Bill Could Shift Power over Elections to GOP Appointees*, ATLANTA J.-CONST. (Mar. 24, 2021), https://www.ajc.com/politics/georgia-bill-would-shift-power-over-elections-to-gop-appointees/VPNVO2W4TBBTFKGA7Z2GZIEQEE/ | |



## TABLE OF AUTHORITIES CITED IN REPORT  (In Order of Appearance)

*\* The documents in this list that start with "\*" are documents that are included in the hard-copy Exhibit Notebooks and have been assigned exhibit numbers.*

| Description | Exhibit |
|---|---|
| Stephen Fowler, *Georgia Senate Republicans Pass Bill to End No-Excuse Absentee Voting*, NPR (Mar. 8, 2021), https://www.npr.org/2021/03/08/974985725/georgia-senate-republicans-pass-bill-to-end-no-excuse-absentee-voting | |
| Nick Corasaniti & Jim Rutenberg, *In Georgia, Republicans Take Aim at Role of Black Churches in Elections*, N.Y. TIMES (Mar. 6, 2021), https://www.nytimes.com/2021/03/06/us/politics/churches-black-voters-georgia.html | |
| Ben Nadler, *Georgia Senate GOP Push for End to No-Excuse Absentee Voting*, ASSOCIATED PRESS (Dec. 8, 2020), https://apnews.com/article/election-2020-joe-biden-donald-trump-legislature-georgia-db63d0d40fddd0724faffdffc8b72c0c | |
| Christopher Alston, *Gwinnett Election Board Chair Refuses ot Resign After Intense Criticism*, WABE (Jan. 21, 2021), https://www.wabe.org/gwinnett-election-board-chair-refuses-to-resign-after-intense-criticism/ | |
| Allison McCartney, *Turnout Hits Historic Highs in Contentious Georgia Senate Races*, BLOOMBERG (Jan. 5, 2021), https://www.bloomberg.com/graphics/2021-georgia-senate-runoff/ | |
| Curt Yeomans, *Gwinnett Elections Board's New Chairwoman Wants Limits on No-Excuse Absentee Voting, Voter Roll Review*, GWINNETT DAILY POST (Jan. 16, 2021), https://www.gwinnettdailypost.com/local/gwinnett-elections-boards-new-chairwoman-wants-limits-on-no-excuse-absentee-voting-voter-roll-review/article_7df1c274-5715-11eb-a31d-dfa23b30ec62.html | |
| *South Carolina v. Katzenbach*, 383 U.S. 301 (1966) | |
| \* H. REP. NO. 116-317 (2019) | 333 |



# TABLE OF EXHIBITS

| Section | Volume | Exhibit Range |
|---|---|---|
| 1. Historical Background is Important to Understanding the Need for Continued Protection of Access to the Right to Vote | Volume 1 | 1-14 |
| 2. If the Senate Adopts the House Formula, Georgia will Again be Subject to Preclearance | Volume 2A | 15-46 |
| 2. If the Senate Adopts the House Formula, Georgia will Again be Subject to Preclearance | Volume 2B | 47-88 |
| 3. Georgia's Recent Elections Demonstrate that Voting Rights Violations Persist | Volume 3A | 89-131 |
| 3. Georgia's Recent Elections Demonstrate that Voting Rights Violations Persist | Volume 3B | 132-184 |
| 3. Georgia's Recent Elections Demonstrate that Voting Rights Violations Persist | Volume 3C | 185-252 |
| 3. Georgia's Recent Elections Demonstrate that Voting Rights Violations Persist | Volume 3D | 253-301 |
| 3. Georgia's Recent Elections Demonstrate that Voting Rights Violations Persist | Volume 3E | 302-303 |
| 3. Georgia's Recent Elections Demonstrate that Voting Rights Violations Persist | Volume 3F | 304-313 |
| 4. Georgia's Recent Legislative Session Demonstrates that Attacks on Voting Rights Are Increasingly Aggressive and Persistent | Volume 4 | 314-332 |
| 5. Congress Has the Robust Record Needed to Enact Renewed Voting Rights Legislation | Volume 5 | 333 |