# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

FAIR FIGHT ACTION, INC, *et al.*,

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

Civil Action No.
1:18-cv-05391-SCJ

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ - 1 -

PROCEDURAL HISTORY ................................................................ - 6 -

LEGAL STANDARDS...................................................................... - 12 -

   I)  Standing ................................................................................ - 12 -

     A.  Injury-in-Fact ................................................................ - 14 -

     B.  Traceability and Redressability................................... - 18 -

   II) Count I: Fundamental Right to Vote ............................... - 26 -

   III) Count II: Fifteenth Amendment Prohibition on Racial Discrimination .. - 30 -

   IV) Count III: Equal Protection Under the Fourteenth Amendment ............. - 34 -

     A.  Equal Protection Against Discrimination................................. - 34 -

     B.  Equal Protection Against Arbitrary and Disparate Treatment Based on Geographic Location ............................................................ - 35 -

   V)  Count V: Section 2 of the Voting Rights Act ............................... - 36 -

   VI) Remedies ....................................................................... - 38 -

     A.  Standard Governing Entitlement to Relief ............................... - 38 -

     B.  Entitlement to Injunctive Relief ............................................ - 39 -

     C.  Legal Standards Pertinent to Defendants' Arguments Against the Imposition of Remedies .................................................. - 43 -

STANDING ...................................................................................... - 55 -

   I)  AME Sixth Episcopal District ("Sixth District") Has Suffered an Injury-in-Fact Caused by Defendants. ...................................................... - 55 -

     A.  The Sixth District's Organizational Purpose........................... - 55 -

     B.  The Sixth District Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation during the 2018 Election Cycle. .................................................................... - 57 -

C.   The Sixth District Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation in the 2020 Election Cycle, and the Sixth District Continues to Do So Today. ............................. - 59 -

D.   The Sixth District's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from the Sixth District's Other Activities................................................................................................................. - 62 -

II)   Ebenezer Baptist Church ("Ebenezer") Has Suffered an Injury-in-Fact Caused by Defendants............................................................................................. - 64 -

A.   Ebenezer's Organizational Purpose .......................................................... - 64 -

B.   Ebenezer Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation during the 2018 Election Cycle...................................................................................................................... - 67 -

C.   Ebenezer Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation in the 2020 Election Cycle, and Ebenezer Continues to Do So Today......................................................... - 74 -

D.   Ebenezer Has Diverted Resources from Ebenezer's Core Activities to Counter Voter Suppression Practices at Issue in this Litigation.................. - 76 -

III) Care in Action Has Suffered an Injury-in-Fact Caused by Defendants. . - 79 -

A.   Care in Action's Organizational Purpose................................................. - 79 -

B.   Care in Action Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation during the 2018 Election Cycle...................................................................................................................... - 80 -

C.   Care in Action Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in This Litigation in the 2020 Election Cycle, and Care in Action Continues to Be Forced to Do So Today. ....................... - 82 -

D.   Care in Action's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from Its Other Activities............... - 86 -

IV) Fair Fight Action Has Suffered an Injury-in-Fact Caused by Defendants. - 89 -

A.   Fair Fight Action's Organizational Purpose ............................................ - 89 -

B.   Fighting Voter Suppression Is Not Fair Fight Action's Core Mission.  - 90 -

C.   Fair Fight Action Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation After the 2018 Election, Including in the 2020 Election Cycle, and Continues to Be Forced to Do So Today. ...................................................................................................... - 93 -

D.   Fair Fight Action's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from Fair Fight Action's Other Activities...................................................................................................... - 106 -

V)   Baconton Missionary Baptist Church Has Suffered an Injury-in-Fact Caused by Defendants......................................................................................... - 108 -

A.   Baconton's Organizational Purpose ......................................................... - 108 -

B.   Baconton Diverted Resources to Counter the Unlawful Voter Suppression Practices at Issue in This Litigation During the 2018 Election Cycle. ....... - 110 -

C.   Baconton Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in This Litigation in the 2020 Election Cycle, and Baconton Continues to Do So Today. .................................................... - 115 -

D.   Baconton's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from Baconton's Other Activities. .... - 115 -

VI)  Virginia-Highland Church Has Suffered an Injury-in-Fact Caused by Defendants. .......................................................................................................... - 117 -

A.   Virginia-Highland's Organizational Purpose......................................... - 117 -

B.   Virginia-Highland Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation during the 2018 Election Cycle. ................................................................................................ - 118 -

C.   Virginia-Highland Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation in the 2020 Election Cycle, and Virginia-Highland Continues to Do So Today .......................... - 120 -

D.   Virginia-Highland's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from Virginia-Highland's Other Activities ................................................................................................ - 122 -

THE ROLE OF DEFENDANTS ............................................................................ - 124 -

I)   The Secretary of State Is the Chief Election Official with Control Over the Counties. ................................................................................. - 124 -

II)   The State Election Board Is Also Responsible for Elections in Georgia. - 127 -

III)  The Secretary of State and State Election Board Share Responsibility for Investigating Complaints Concerning Election Administration. ................. - 131 -

EXACT MATCH ................................................................................. - 141 -

I)   History of Exact Match ............................................................... - 145 -

   A.   From Its Inception, Exact Match's Impact on Voters of Color and Naturalized Citizens Raised Concerns. ......................................... - 145 -

   B.   The Exact Match Process Is an Unwritten, Opaque Policy. ................. - 149 -

II)   Exact Match MIDR and Citizenship Are Traceable to and Redressable by Defendants. .................................................................................. - 151 -

III)  Defendants' Exact Match Policies Are Not Required by HAVA. .......... - 152 -

   A.   Georgia's Exact Match MIDR Policy Is Not Required by HAVA. ....... - 152 -

   B.   Exact Match Citizenship Is Not Required by HAVA. .......................... - 155 -

IV)  Exact Match MIDR Violates the Fundamental Right to Vote. ............... - 156 -

   A.   Exact Match MIDR Burdens Voters. ............................................... - 157 -

   B.   Exact Match MIDR Serves No State Interest. ................................... - 170 -

V)   Georgia's Exact Match Citizenship Process Violates the Fundamental Right to Vote. ...................................................................................... - 177 -

   A.   Exact Match Citizenship Burdens Voters. ...................................... - 177 -

   B.   Exact Match Citizenship Is Not Justified by a State Interest. ............. - 193 -

VI)  Exact Match MIDR and Citizenship Violate Section 2 of the Voting Rights Act. .............................................................................................. - 202 -

   A.   Under Section 2 of the Voting Rights Act, the Court Analyzes the Brnovich and Senate Factors to Determine if Political Processes are "Equally Open" Under the Totality of the Circumstances. .......................... - 202 -

   B.   Brnovich Factors Show That Political Processes in Georgia Are Not "Equally Open" Under the Totality of the Circumstances. ......................... - 205 -

C.   The Senate Factors Show That Political Processes in Georgia Are Not "Equally Open" Under the Totality of the Circumstances. ........................ - 214 -

VII) ..Exact Match MIDR and Citizenship Violate the Fifteenth Amendment and Equal Protection Clause. ................................................................................... - 240 -

A.   Exact Match MIDR Violates the Fifteenth Amendment and Equal Protection Clause. ............................................................................ - 240 -

B.   Exact Match Citizenship Violates the Fifteenth Amendment and Equal Protection Clause. ............................................................................ - 248 -

AFFIRMATIVE MISMANAGEMENT OF THE VOTER REGISTRATION DATABASE ........................................................................................... - 252 -

I)    Violations of Law Caused by the Statewide Registration Database Are Traceable to and Redressable by Defendants. ................................................. - 257 -

A.   Federal and State Law Assign The Secretary of State—and Not the Counties—Legal Responsibility Over the Statewide Voter Registration Database. ....................................................................................... - 258 -

B.   Federal and State Law Assign The Secretary of State—and Not the Counties—Legal Responsibility for List Maintenance Operations. .......... - 263 -

C.   The Secretary of State Has the Power to Redress the Injuries Shown Below. .......................................................................................... - 280 -

D.   The State Election Board Is Also Responsible for Burdens on Voters Caused by the Voter Registration System. .................................................. - 282 -

II)   Statewide Voter Registration System Processes Violate the Fundamental Right to Vote. ....................................................................................... - 284 -

A.   The Voter Registration System Processes Burden Voters. ................... - 285 -

B.   No State Interest Justifies These Burdens. ............................................ - 340 -

ABSENTEE BALLOTS ........................................................................... - 348 -

I)    Inadequate Training on Absentee Ballot Cancellation Is Traceable to and Redressable by Defendants. ................................................................. - 350 -

A.   The Secretary of State Is Responsible for Training the State's Counties on the Cancellation of Absentee Ballots. ............................................................ - 351 -

B.   The State Elections Board Is Also Responsible for Burdens on Voters Caused by Absentee Ballot Cancellation Processes. .................................... - 356 -

II)  Defendants' Inadequate Training on Absentee Ballot Cancellation Procedures Violates the Fundamental Right to Vote. ..................................... - 358 -

A.   Training is Especially Important in the Context of Absentee Ballot Cancellation Procedures. .................................................................. - 359 -

B.   Defendants Have Failed to Train Local Officials Adequately on Absentee Ballot Cancellation. ...................................................................... - 363 -

C.   Georgia Voters Have Been Burdened by the Defendants' Failure to Train County Officials on the Absentee Ballot Cancellation Process. ................. - 373 -

D.   The Secretary Does Not Adjust Training to Address Recurring Problems on Absentee Ballot Cancellation. .................................................... - 379 -

E.   There Is No State Interest Justifying These Burdens. ........................... - 387 -

III) Georgia's Absentee Ballot Cancellation Practices Violate the Equal Protection Clause Through Failure to Provide Adequate Statewide Standards. . - 389 -

REMEDIES .................................................................................................... - 392 -

I)   Remedies for Exact Match MIDR .............................................................. - 398 -

II)  Remedies for Exact Match Citizenship ..................................................... - 401 -

III) Remedies for Mismanagement of the Voter Registration Database ...... - 403 -

IV) Remedies for Absentee Ballot Cancellation .............................................. - 410 -

V)  Cross-Cutting Remedies .......................................................................... - 414 -

CONCLUSION .............................................................................................. - 415 -

CERTIFICATION .......................................................................................... 433

CERTIFICATE OF SERVICE ....................................................................... 433

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Abbott v. Perez,
138 585 U.S. __, S. Ct. 2305 (2018) ...................................................................... 32, 33

Alpha Phi Alpha v. Raffensperger,
No. 21-cv-5337, 2022 WL 633312 (N.D. Ga. Feb. 28, 2022) ........................ 202, 204

Anderson v. Celebrezze,
460 U.S. 780 (1983) ................................................................................................ passim

Anderson v. Raffensperger,
497 F. Supp. 3d 1300 (N.D. Ga. 2020) ...................................................................... 24

Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.,
522 F.3d 1200 (11th Cir. 2008) ............................................................................. 39, 40

Arcia v. Fla. Sec'y of State,
772 F.3d 1335 (11th Cir. 2014) ............................................................................. 15, 17

Arizona Republican Party v. Democratic National Committee,
141 S. Ct. 221 (2020) ...................................................................................................... 9

Baker v. Carr,
369 U.S. 186, 217 (1962) ....................................................................................... 44, 45

Branch v. Smith,
538 U.S. 254 (2003) ......................................................................................................... 2

Brnovich v. Democratic Nat'l Comm.,
141 S. Ct. 2321 (2021) ............................................................................................. passim

Buckman v. Halsey,
2021 WL 4127067 (11th Cir. Sept. 10, 2021) ............................................... 21, 22, 23

Burdick v. Takushi,
504 U.S. 428 (1992) .................................................................................................. passim

Burton v. City of Belle Glade,
  178 F.3d 1175 (11th Cir. 1999) ................................................................... 30, 31, 241

Bush v. Gore,
  531 U.S. 98 (2000) ................................................................................................. 35, 44

Charles H. Wesley Educ. Found., Inc. v. Cox,
  408 F.3d 1349 (11th Cir. 2005) .............................................................................. 18, 40

City of Guyton v. Barrow,
  828 S.E.2d 366, 305 Ga. 799 (Ga. 2019) .............................................................. 24, 25

Clapper v. Amnesty Int'l USA,
  568 U.S. 398 (2013) ..................................................................................................... 12

Coal. for Good Governance v. Raffensperger,
  2020 WL 2509092 (N.D. Ga. May 14, 2020) .................................................. 50, 51, 52

Columbus Bd. of Educ. v. Penick,
  443 U.S. 449 (1979) ............................................................................................. 31, 241

Common Cause v. Kemp,
  347 F. Supp. 3d 1270 (N.D. Ga. 2018) .............................................................. 2, 3, 47

Common Cause/Georgia v. Billups,
  406 F. Supp. 2d 1326 (N.D. Ga. 2005) ................................................................. 40, 41

Common Cause/Georgia v. Billups,
  554 F.3d 1340 (11th Cir. 2009) ............................................................................. 17, 28

Cordoba v. DIRECTV, LLC,
  942 F.3d 1259 (11th Cir. 2019) .................................................................................. 19

Crawford v. Marion Cty. Election Bd.,
  553 U.S. 181 (2008) ............................................................................................... 28, 29

Crumly v. Cobb Cty. Bd. of Elections & Voter Registration,
  892 F. Supp. 2d 1333 (N.D. Ga. 2012) ...................................................................... 41

Culverhouse v. Paulson & Co.,
  813 F.3d 991 (11th Cir. 2016) .................................................................................... 18

Curling v. Kemp,
   334 F. Supp. 3d 1303 (N.D. Ga. 2018) ...................................................... 36

Curling v. Raffensperger,
   397 F. Supp. 3d 1334 (N.D. Ga. 2019) ...................................................... 54

Curling v. Raffensperger,
   403 F. Supp. 3d 1311 (N.D. Ga. 2019) ........................................................ 3

Curry v. Baker,
   802 F.2d 1302 (11th Cir. 1986) ...................................................... 50, 51, 52

Dem. Party of Ga. v. Crittenden,
   347 F. Supp. 3d 1324 (N.D. Ga. 2018) ........................................ 3, 41, 42, 47

Dem. Exec. Comm. of Fla. v. Lee,
   915 F.3d 1312 (11th Cir. 2019) ................................................... 20, 27, 28

Dem. Nat'l Comm. v. Wis. State Legislature,
   141 S. Ct. 28 (2020) ....................................................................... 27

Dillard v. Crenshaw County,
   640 F. Supp. 1347 (M.D. Ala. 1986) ......................................................... 41

Doe v. Moore,
   410 F.3d 1337 (11th Cir. 2005) ............................................................... 34

Dunkin' Donuts of Am., Inc. v. Minerva, Inc.,
   956 F.2d 1566 (11th Cir. 1992) ............................................................... 38

Fish v. Kobach,
   840 F.3d 710 (10th Cir. 2016) ................................................................ 40

Fla. State Conference of N.A.A.C.P. v. Browning,
   522 F.3d 1153 (11th Cir. 2008) ........................................................passim

Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs,
   868 F.3d 1248 (11th Cir. 2017) (en banc), abrogated on other
   grounds by Uzuegbunam v. Preczewski, 141 S. Ct. 792 (2021)............... 198, 199

Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of
     Registration & Elections,
     36 F.4th 1100 (11th Cir. 2022) .................................................. 14, 15, 18, 19

Ga. Coal. for the People's Agenda v. Kemp,
     347 F. Supp. 3d 1251 (N.D. Ga. 2018) .............................................. 2, 3, 47

Ga. Latino All. for Human Rights v. Governor of Ga.,
     691 F.3d 1250 (11th Cir. 2012) ................................................................. 15

Ga. Latino Alliance for Human Rights v. Deal,
     793 F. Supp. 2d 1317 (N.D. Ga. 2011), aff'd in part, rev'd in part,
     691 F.3d 1250 (11th Cir. 2012) ............................................................... 221

Ga. Muslim Voter Project v. Kemp,
     918 F.3d 1262 (11th Cir. 2019) ................................................................. 49

Ga. Republican Party, Inc. v. Sec'y of State for Ga.,
     No. 20-14741, 2020 WL 7488181 (11th Cir. Dec. 21, 2020) .................... 24

Ga. Shift v. Gwinnett Cty.,
     2020 WL 864938 (N.D. Ga. Feb. 12, 2020) ............................................. 52

Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs,
     775 F.3d 1336 (11th Cir. 2015) ................................................................. 26

Gamza v. Aguirre,
     619 F.2d 449 (5th Cir. 1980) ....................................................... 50, 51, 52

Gibson v. Casto,
     523 S.E.2d 564, 271 Ga. 667 (1999) ...................................................... 267

Greater Birmingham Ministries v. Sec'y of State for State of Ala.,
     992 F.3d 1299 (11th Cir. 2021) ......................................................... passim

Haves v. City of Miami,
     52 F.3d 918 (11th Cir. 1995) .................................................................... 34

Hunter v. Hamilton Cty. Bd. of Elections,
     635 F.3d 219 (6th Cir. 2011) .................................................................... 42

I.L. v. Alabama,
   739 F.3d 1273 (11th Cir. 2014) ...................................................... 31, 33, 34

Jacobson v. Fla. Sec'y of State,
   974 F.3d 1236 (11th Cir. 2020) ...........................................................passim

Jones v. Governor of Fla.,
   975 F.3d 1016 (11th Cir. 2020) .............................................................. 1, 2

Langston By and Through Langston v. ACT,
   890 F.2d 380 (11th Cir. 1989) ..................................................................... 13

Larios v. Cox,
   305 F. Supp. 2d 1335 (N.D. Ga. 2004) .................................................... 41

League of Women Voters of Fla., Inc. v. Fla. Sec'y of State,
   32 F.4th 1363 (11th Cir. 2022)................................................32, 33, 53, 54

League of Women Voters of Fla. v. Browning,
   863 F. Supp. 2d 1155 (N.D. Fla. 2012) .................................................... 40

League of Women Voters of Ohio v. Brunner,
   548 F.3d 463 (6th Cir. 2008) .................................................................... 389

Lewis v. Gov. of Ala.,
   944 F.3d 1287 (11th Cir. 2019) (en banc) ........................................... 22, 23

Luckey v. Harris,
   860 F.2d 1012 (11th Cir. 1988) ................................................................. 21

Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992) .................................................................................... 13

Martin v. Crittenden,
   347 F. Supp. 3d 1302 (N.D. Ga. 2018) ............................................. 2, 3, 47

Martin v. Kemp,
   341 F. Supp. 3d 1326 (N.D. Ga. 2018) ............................................. 2, 3, 47

Meredith v. Fair,
   305 F.2d 343 (5th Cir. 1962) ................................................................... 394

Morales v. Handel,
     No. 08-cv-3172, 2008 WL 9401054 (N.D. Ga. Oct. 27, 2008) .............................. 145

Ne. Ohio Coal. for the Homeless v. Husted,
     696 F.3d 580 (6th Cir. 2012) ................................................................ 35, 36

Ne. Ohio Coal. for the Homeless v. Husted,
     837 F.3d 612 (6th Cir. 2016) ...................................................................... 389

New Georgia Project v. Raffensperger,
     976 F.3d 1278 (11th Cir. 2020) ............................................................. 52, 53

Nipper v. Smith,
     39 F.3d 1494 (11th Cir. 1994) (en banc) .................................................... 39

NLRB v. SW Gen., Inc.,
     137 S. Ct. 929 (2017) ................................................................................. 267

Norman v. Reed,
     502 U.S. 279 (1992) ............................................................................ 28, 340

Obama for Am. v. Husted,
     697 F.3d 423 (6th Cir. 2012) ............................................................... 40, 42

People First of Ala. v. Merrill,
     491 F. Supp. 3d 1076 (N.D. Ala. 2020) ..................................................... 26

In re Polygraphex Systems, Inc.,
     275 B.R. 408 (M.D. Fla. 2002) ................................................................. 312

Powell v. McCormack,
     395 U.S. 486 (1969) .................................................................................. 198

Purcell v. Gonzalez,
     549 U.S. 1 (2006) ................................................................................. 42, 54

Republican Nat'l Comm. v. Dem. Nat'l Comm.,
     140 S. Ct. 1205 (2020) ......................................................................... 53, 54

Reynolds v. Sims,
     377 U.S. 533 (1964) ...................................................................................... 1

Schneider v. Rusk,
    377 U.S. 163 (1964) ............................................................. 34, 35

Schwier v. Cox,
    412 F. Supp. 2d 1266 (N.D. Ga. 2005) .......................... 145, 206

Scott v. Roberts,
    612 F.3d 1279 (11th Cir. 2010) .......................................... 42

Shahar v. Bowers,
    120 F.3d 211 (11th Cir. 1997) ......................................... 239

Shelby Cty., Ala. v. Holder,
    570 U.S. 529 (2013) ................................................... 202, 220

Tellabs, Inc. v. Makor Issues & Rights Ltd.,
    551 U.S. 308 (2007) ......................................................... 14

Thornburg v. Gingles,
    478 U.S. 30 (1986) ............................................. 37, 38, 204

Town of Chester, N.Y. v. Laroe Ests., Inc.,
    137 S. Ct. 1645 (2017) ...................................................... 14

United States v. Alabama,
    857 F. Supp. 2d 1236 (M.D. Ala. 2012) .............................. 42

United States v. Atkins,
    323 F.2d 733 (5th Cir. 1963) .............................................. 2

United States v. Buttner,
    432 F. App'x 696 (9th Cir. 2011) ..................................... 291

United States v. Couch,
    906 F.3d 1223 (11th Cir. 2018) ....................................... 267

United States v. Dickert,
    635 F. App'x 844 (11th Cir. 2016) ................................... 312

United States v. Georgia,
    892 F. Supp. 2d 1367 (N.D. Ga. 2012) ......................... 49, 50

United States v. Rivera,
    780 F. 3d 1084 (11th Cir. 2015) ............................................................ 189

Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,
    429 U.S. 252 (1977) ............................................................................... 30

Wesberry v. Sanders,
    376 U.S. 1 (1964) ..................................................................................... 1

Williams v. Salerno,
    792 F.2d 323 (2d Cir. 1986) ................................................................... 40

Wright v. Sumter Cty. Bd. of Elections & Registration,
    301 F. Supp. 3d 1297 (M.D. Ga. 2018) ................................................ 226

Yick Wo v. Hopkins,
    118 U.S. 356 (1886) ............................................................................... 26

Zatler v. Wainright,
    802 F.3d 397 (11th Cir. 1986) ............................................................... 21

**Statutes**

42 U.S.C. § 1983 ........................................................................................ 8

52 U.S.C. § 10301 ............................................................................... passim

52 U.S.C. § 20507 .................................................................................. 277

52 U.S.C. § 21083 ............................................................................... passim

Fla. Stat. Ann. § 98.0751 ........................................................................ 292

2019 Ga. Laws 24 ................................................................................... 359

O.C.G.A. § 21-2-31 ............................................................................. passim

O.C.G.A. § 21-2-33.1 .......................................................................... passim

O.C.G.A. § 21-2-33.2 .............................................................................. 357

O.C.G.A. § 21-2-50 ............................................................................. passim

O.C.G.A. § 21-2-50.2 ................................................................... 124, 152, 259

O.C.G.A. § 21-2-99 .................................................................................. 352

O.C.G.A. § 21-2-100 ........................................................................ 126, 352

O.C.G.A. § 21-2-101 ........................................................ 125, 351, 357, 363

O.C.G.A. § 21-2-216 ........................................................... 152, 285, 286

O.C.G.A. § 21-2-217 ................................................................................ 205

O.C.G.A. § 21-2-220.1 ........................................................ 157, 159, 213

O.C.G.A. § 21-2-221 ................................................................................ 205

O.C.G.A. § 21-2-223 ................................................................................ 314

O.C.G.A. § 21-2-226 ..................................................................... 264, 304

O.C.G.A. § 21-2-228 ..................................................................... 265, 266

O.C.G.A. § 21-2-231 ...................................................................... _passim_

O.C.G.A. § 21-2-388 ...................................................................... _passim_

O.C.G.A. § 21-2-417 ................................................................................ 173

O.C.G.A. § 21-2-561 ................................................................................ 196

Tex. Elec. Code § 11.002 .................................................................... 292

**Other Authorities**

Black's Law Dictionary (7th ed. 1999) ................................................ 260

F.R.E. 106 ................................................................................... 227, 244

F.R.E. 201 ................................................................................................ 239

F.R.E. 401 ...................................................................................... _passim_

F.R.E. 403 ................................................................................................ 195

F.R.E. 602 ................................................................................................ 378

F.R.E. 801 ........................................................................................ 300, 360

F.R.E. 802 ................................................................................................ 377

F.R.E. 803 .................................................................................. 291, 299, 312

F.R.E. 901 ................................................................................................ 291

F.R.E. 1002 ................................................................................................ 65

10 Fed. Prac. & Proc. Civ. § 2664 (4th ed.) ........................................ 38, 39

Fed. R. Civ. P. 32 ............................................................................. 162, 192

Fed. R. Civ. P. 54 ................................................................................... 392

Fed. R. Civ. P. 52 ........................................................................... 6, 11, 12

U.S. Constitution ............................................................................... passim

Webster's New Collegiate Dictionary (1977) ...................................... 260

James D. Wascher, Recognizing the 50th Anniversary of the Voting
      Rights Act, Fed. Law., May 2015 .............................................. 203

Richard H. Pildes, Introduction, in The Future of the Voting Rights
      Act (David L. Epstein, et al., eds., 2006) ................................. 203

Terrye Conroy, The Voting Rights Act of 1965: A Selected Annotated
      Bibliography, 98 Law Libr. J ..................................................... 203

U.S. Department of Justice, Office of Justice Programs, Prisoners in
      2020—Statistical Tables 46 tbl.2,
      https://bjs.ojp.gov/content/pub/pdf/p20st.pdf ......................... 291

**Bills**

SB 202 ......................................................................................................... 3

HB 316 ............................................................................................... passim

## **INTRODUCTION**

1.     This case is about Georgians' right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." <u>Wesberry v. Sanders</u>, 376 U.S. 1, 17 (1964); <u>see also</u> <u>Reynolds v. Sims</u>, 377 U.S. 533, 561–62 (1964) ("[T]he right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.").

2.     This case is also about the Georgia Secretary of State and State Elections Board's persistent failure to fix problems in the manner in which elections in Georgia are conducted, problems that result in disenfranchisement and abridgment of the right to vote, particularly for Black and brown Georgians and new Americans. It goes without saying that states enjoy considerable discretion in regulating their elections, including enacting laws governing "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. But that discretion is not unfettered. <u>See generally</u> <u>Jones v. Governor of Fla.</u>, 975

F.3d 1016, 1029 (11th Cir. 2020). Indeed, one of the most fundamental roles of the federal courts is, and has been for decades, to ensure that states are conducting elections in compliance with the U.S. Constitution and the Voting Rights Act. See, e.g., Branch v. Smith, 538 U.S. 254, 268 (2003) ("The Voting Rights Act of 1965 . . . assign[ed] to the federal courts jurisdiction to involve themselves in elections."); United States v. Atkins, 323 F.2d 733, 743 (5th Cir. 1963) ("The right to vote is one of the most important and powerful privileges which our democratic form of government has to offer. Although state governments may regulate this right, they are subject to close judicial scrutiny when doing so and are limited by the fifteenth amendment in addition to the fourteenth."); Martin v. Kemp, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) (directing the Secretary to issue instructions to the counties prohibiting them from rejecting absentee ballots for signature mismatches and directing notice be given); Ga. Coal. for the People's Agenda v. Kemp, 347 F. Supp. 3d 1251 (N.D. Ga. 2018) (directing the Secretary to act immediately to require counties to allow people flagged for citizenship to vote at the polls); Common Cause v. Kemp, 347 F. Supp. 3d 1270 (N.D. Ga. 2018) (directing the Secretary to establish and publicize a website and free-access hotline so provisional ballot voters could check the

status of their ballots); <u>Martin v. Crittenden</u>, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) (enjoining Gwinnett County from rejecting absentee ballots with missing or incorrect years of birth); <u>Dem. Party of Ga. v. Crittenden</u>, 347 F. Supp. 3d 1324 (N.D. Ga. 2018) (extending the <u>Martin v. Crittenden</u> injunction statewide).

3.      Even leaving aside for the moment Georgia's long history of unlawful impediments to voting, Georgia's more recent history illustrates the need for federal court action. During the 2018 General Election alone, four United States District Judges (this one included) issued five preliminary injunctions or temporary restraining orders to require the State of Georgia to comply with federal law in conducting elections. <u>See</u> <u>Martin,</u> 341 F. Supp. 3d 1326; <u>Ga. Coalition</u>, 347 F. Supp. 3d 1251; <u>Common Cause</u>, 347 F. Supp. 3d 1270; <u>Martin</u>, 347 F. Supp. 3d 1302; <u>Dem. Party of Ga.</u>, 347 F. Supp. 3d 1324. And litigation challenging the State in the voting arena has continued. <u>See, e.g.</u>; <u>Curling v. Raffensperger</u>, 403 F. Supp. 3d 1311 (N.D. Ga. 2019); <u>see also</u> <u>In re Georgia Senate Bill 202</u>, No. 21-mi-55555, pending in the United States District Court for the Northern District of Georgia.

4.      In this case, Plaintiffs contend that Defendants, the Georgia Secretary of
State, the State Elections Board, and the State Election Board members are
denying and abridging Georgian's right to vote through: (1) the Secretary
of State's "Exact Match" policy and its application; (2) extensive
mismanagement of the statewide voter registration list; and (3) non-
uniform and improper practices regarding in-person cancellation of
absentee ballots. Plaintiffs allege these three policies and practices violate
federal law.

5.      More specifically, Plaintiffs allege the Exact Match policy and its
application: (a) violate the fundamental right to vote as guaranteed by the
First and Fourteenth Amendments; (b) racially discriminate against
Georgians of color in violation of the Fifteenth Amendment and the Equal
Protection Clause of the Fourteenth Amendment; (c) discriminate against
Georgians based on where they live and based on naturalized citizenship
status in violation of the Equal Protection Clause of the Fourteenth
Amendment; and (d) deny or abridge the right to vote in violation of the
Voting Rights Act. Plaintiffs also allege Defendants' extensive
mismanagement of the statewide voter registration list violates Georgians'
fundamental right to vote in violation of the First and Fourteenth

Amendments. Lastly, Plaintiffs allege that the non-uniform and improper practices regarding in-person cancellation of absentee ballots (a) violate Georgians' fundamental right to vote in violation of the First and Fourteenth Amendments; and (b) discriminate against Georgians based on where they live, in violation of the Equal Protection Clause of the Fourteenth Amendment.

6.      As detailed in this opinion, the extensive record in this case documents three policies that significantly burden voters in Georgia – and, in particular, voters of color and new American citizens – without any meaningful justification. In the case of Exact Match, Defendants' policies reflect and result from a discriminatory purpose and unfortunately demonstrate that the long sad history of racial discrimination in voting, which both parties agree has existed in the past, continues very much to this day. Federal law requires this Court to enjoin further violations caused by Defendants' policies and thus orders specific, narrow remedies to address those violations.

## PROCEDURAL HISTORY

7.      This matter came before the Court for a bench trial. The Court heard

        twenty-one days of testimony from fifty-six witnesses: including forty-four

        fact witnesses and five expert witnesses presented by Plaintiffs, as well as

        six fact witnesses and no expert witnesses presented by Defendants. The

        Court also received extensive arguments from the Parties throughout the

        trial. Now, as Federal Rule of Civil Procedure 52 requires, the Court makes

        findings of fact and conclusions of law as set forth below.

8.      On November 27, 2018, Fair Fight Action and Care in Action filed a

        complaint in this Court for declaratory and injunctive relief. See Compl.,

        Doc. No. [1]. The complaint has since been amended twice, first as a matter

        of right on February 19, 2019, and again with permission of the Court on

        December 3, 2020. See Am. Compl, Doc. No. [41]; Second Am. Compl.,

        Doc. No. [582]. Four faith-based organizations— Sixth Episcopal District of

        the A.M.E. Church, Ebenezer Baptist Church, Baconton Missionary Baptist

        Church, and Virginia-Highland Church—joined as plaintiffs.

9.      The operative Second Amended Complaint sues Secretary of State Brad

        Raffensperger in his official capacity as Secretary of State and as Chair of

the State Election Board. It also sues the State Election Board itself and the additional members of the State Election Board in their official capacities. The Second Amended Complaint alleges violations of federal law related to: the fundamental right to vote secured by the First and Fourteenth Amendments to the United States Constitution (Count I); the ban on racial discrimination in voting secured by the Fifteenth Amendment (Count II); violation of equal protection secured by the Fourteenth Amendment (Count III); violation of procedural due process secured by the Fourteenth Amendment (Count IV); and violation of Section 2 of the Voting Rights Act of 1965 (Count V).

10. As relevant to the current proceedings, the Second Amended Complaint seeks relief with respect to:

- Certain processes involving verification of voter registration information against information provided by the Department of Driver Services (DDS) or the Social Security Administration, which Plaintiffs describe as a set of "Exact Match" policies;

- 7 -

- Mismanagement of the State's voter registration database, which Plaintiffs allege results in systemic inaccuracies in voter registration information that burdens voters; and

- Failure to establish and to train local officials on uniform processes with respect to voters who seek to cancel their absentee ballots in order to vote in person at a polling place.

11. The Court has issued a number of substantive orders in this case. First, on May 30, 2019, the Court issued a decision on a motion to dismiss brought by Defendants. The Court granted the motion to the extent it sought to dismiss the claims against the State Election Board premised on 42 U.S.C. § 1983 and on the Help America Vote Act (which Plaintiffs subsequently voluntarily dismissed with respect to all Defendants). See Doc. No. [68] at 84. The Court denied the motion to the extent it sought to dismiss the remaining counts against all Defendants or to dismiss the Voting Rights Act claim against the State Election Board. Id. at 83–84. The court found all elements of standing were satisfied.

12. Second, on February 16, 2021, the Court issued a decision on Defendants' motion for summary judgment with respect to jurisdictional issues. The

Court dismissed on standing grounds the Second Amended Complaint's claims about changes in precincts and polling places, and dismissed on mootness grounds the Second Amended Complaint's claims as they pertain to security of the voter registration database, dates of birth on absentee ballots, and failure to notify voters of absentee ballot rejections. See Doc. No. [612] at 71–72.

13.    Third, the Court issued a decision on Defendants' motion for summary judgment on the merits on March 31, 2021. The Court dismissed claims relating in general to provisional ballots, absentee ballot rejections and untimely mailing of absentee ballots, and the "voter purge" process. See Doc. No. [617] at 24. The Court also dismissed Fifteenth Amendment claims and equal protection claims based on racial discrimination other than those pertaining to Exact Match, equal protection claims relating to disparities based on geography or residence other than those pertaining to Exact Match and in-person absentee ballot cancellation, and a procedural due process claim relating to list maintenance. Id. at 94–95. The Court stayed its consideration of Plaintiffs' Voting Rights Act claim pending the U.S. Supreme Court's pending decision in Arizona Republican Party v. Democratic National Committee, 141 S. Ct. 221 (2020). Doc. No. [617] at 95.

14.   Finally, on November 15, 2021, the Court issued a decision on Defendants'
      renewed motion for summary judgment on Plaintiffs' Voting Rights Act
      claim following the Supreme Court's July 1, 2021, decision, in <u>Brnovich v.
      Democratic National Committee</u>, which was consolidated with <u>Arizona
      Republican Party</u>. <u>See</u> 141 S. Ct. 2321 (2021). The Court denied Defendants'
      motion to dismiss Plaintiffs' Voting Rights Act claim. <u>See</u> Doc. No. [636] at
      47.

15.   After a delay in the start of trial due to the Omicron variant of COVID-19,
      trial began on April 11, 2022. After 21 trial-days, 22 days including closing
      arguments, trial concluded on June 23, 2022.

16.   The trial opened with Plaintiffs' presentation of fifty witnesses, including
      six expert witnesses, seven current and former employees of the Secretary
      of State's office, and two members of the State Election Board. Among the
      witnesses who testified at trial were Georgia voters whom this Court
      recognizes with gratitude. It is no small undertaking to sit for a deposition,
      to travel to a federal courthouse, or to swear an oath and testify in public
      before a federal court. This Court finds the participation of these witnesses
      merits recognition, and further finds that these voters provided credible

testimony useful to this Court's consideration of the issues presented at trial. This Court also accepts as an undisputed fact that not every voter who experiences a problem with the elections system speaks publicly about that problem. Tr. 1916:4-10 (Harvey). And the obstacles to participating in a federal trial, logistical and personal, guarantee that this Court has heard from only a small sample of the voters affected by the practices at issue in this case. Tr. 1061:25-1063:9 (Conrad) (describing the obstacles that prevent voters from sharing their voting experience). This Court, therefore, finds that the voters who testified at trial are representative of many other members of their communities and this State who faced similar experiences.

17.   At the close of Plaintiffs' case, on May 11, 2022, the Court heard Plaintiffs' remedies presentation, laying out the remedies sought and the basis for granting such relief. See (Trial Tr.), Tr. 3181:20-3232:12 (remedies).

18.   On May 12, 2022, the court heard Defendants' argument for granting their oral motion for a Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c) motion. The Court also heard Plaintiffs' arguments for denying the 52(c) motion. On May 16, 2022, the Court ruled on

Defendants' 52(c) motion, "exercis[ing] its discretion to decline to render

any judgment until the close of all of the evidence." See Doc. No. [839] at 2.

19.   On June 13, 2022, Defendants began their case-in-chief. Defendants

presented six fact witnesses and no expert testimony. On June 21, 2022,

Plaintiffs presented their rebuttal case, followed by both parties' closing

arguments on June 23, 2022.

## LEGAL STANDARDS

20.   This section sets forth the legal standards governing Plaintiffs' claims. It

begins by addressing the legal standards governing Defendants' challenge

to Plaintiffs' standing. It then addresses the substantive legal standards

governing Plaintiffs' claims: Count 1, Fundamental Right to Vote; Count 2,

Fifteenth Amendment Prohibition on Racial Discrimination; Count 3,

Equal Protection Under the Fourteenth Amendment; and Count 5, Section

2 of the Voting Rights Act. It concludes by addressing the legal standards

governing Plaintiffs' entitlement to relief.

### I)   Standing

21.   "The party invoking federal jurisdiction bears the burden of establishing

standing." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 411 (2013).

22.  The well-established standard for standing requires a plaintiff to show

three elements. First, the plaintiff must show an "injury in fact,"

constituting "an invasion of a legally protected interest which is (a)

concrete and particularized, and (b) actual or imminent, not conjectural or

hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)

(formatting altered). Second, the plaintiff must show that the injury is

"fairly traceable to the challenged action of the defendant, and not the

result of the independent action of some third party not before the court."

Id. Third, the plaintiff must show that it is "likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision." Id.

23.  Plaintiffs bear the burden of establishing injury-in-fact, traceability, and

redressability by a preponderance of the evidence. See Lujan, 504 U.S. at

561 ("[E]ach element must be supported … with the manner and degree of

evidence required at the successive stages of the litigation."); Langston By

and Through Langston v. ACT, 890 F.2d 380, 383–84 (11th Cir. 1989)

(noting that the plaintiff in a § 1983 suit bears the burden of "prov[ing] his

case by a preponderance of the evidence" at trial). Thus, to establish

standing, Plaintiffs need only "demonstrate that it is more likely than not

that" they have suffered an injury-in-fact; that the injury is traceable to

Defendants, and that a favorable decision likely will redress the injury. Tellabs, Inc. v. Makor Issues & Rights Ltd., 551 U.S. 308, 328–29 (2007) (emphasis omitted).

24.   So long as this Court finds that one Plaintiff has standing with respect to each challenged practice, it need not proceed to evaluate standing for the remaining Plaintiffs. See Town of Chester, N.Y. v. Laroe Ests., Inc., 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."), Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections, 36 F.4th 1100, 2022 WL 2061703, at *7 (11th Cir. June 8, 2022) ("We need not parse each Plaintiff's standing, however, because one—GALEO—has standing, under a diversion of resources theory, to assert all of the claims in the second amended complaint.").

### A. Injury-in-Fact

25.   An organization experiences an injury-in-fact when it "divert[s] resources to counteract [a defendant's] illegal acts," thus impairing its own "ability to engage in its projects." Fla. State Conference of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008).

26.   "[A] litigant can establish organizational standing to challenge election

laws by showing it has or anticipates having to divert time, personnel, or

other resources from its usual projects to assist voters whose ability to vote

is affected by state action." Doc. No. [612] at 10 (citing Arcia v. Fla. Sec'y of

State, 772 F.3d 1335, 1341 (11th Cir. 2014); Browning, 522 F.3d at 1165–66));

see also Ga. Ass'n of Latino Elected Officials, 2022 WL 2061703, at *7

(reversing district court decision and holding that assigning personnel to

help Spanish-speaking voters understand English-only materials, if true,

would constitute sufficient diversion of resources to qualify as injury-in-

fact).

27.   An organizational plaintiff must show that the diversion causes a

"perceptible impairment" of organizational activities and "identify the

specific activities from which it diverted or is diverting resources." Doc.

No. [612] at 10 (citing Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1249–50

(11th Cir. 2020)); Ga. Latino All. for Human Rights v. Governor of Ga., 691

F.3d 1250, 1260 (11th Cir. 2012) (holding that an immigration

organization's cancellation of citizenship classes to respond to increased

questions about a new law qualified as diversion of resources).

28.     Plaintiffs "do not need to quantify their diversion of resources to show that

such diversions occurred," as long as they "make . . . a minimal showing of

a concrete injury." Doc. No [612] at 12.

29.     Moreover, "when an organization diverts its resources to achieve its

typical goal in a different or amplified manner, the organization may still

gain standing." Doc. No. [612] at 10 (citing <u>Browning</u>, 522 F.3d at 1166).

30.     "As the law currently stands, Plaintiffs simply need to show that

Defendants' actions caused Plaintiffs to divert resources, even if that

manifests as a diversion from one activity geared toward achieving the

organization's mission to a different activity geared towards that mission."

Doc. No [612] at 13.

31.     As relevant here, Eleventh Circuit case law establishes that "[i]n election

law cases, an organization can establish standing by showing that it will

need to divert resources from general voting initiatives or other missions

of the organization to address the impact of election laws or policies." Doc.

No. [68] at 14; <u>see also</u> Doc. No. [612] at 13 n.9 ("[F]or organizations with

broad missions such as 'voting rights,' the analysis may often turn on

whether the organization had to divert resources in a way that forced it to

alter *how* it achieved its mission, not *whether* it was pursuing its usual or a new mission.").

32. Indeed, the Eleventh Circuit has repeatedly found standing under a diversion-of-resources theory in such circumstances. See Common Cause/Georgia v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009) ("The record reflects that the NAACP is actively involved in voting activities and would divert resources from its regular activities to educate and assist voters in complying with [the challenged statute]."); Arcia, 772 F.3d at 1341 (finding standing where the organizational plaintiffs had engaged in a "redirection of resources to counteract" the Secretary's program of removing voters from the rolls who were identified as non-citizens); Browning, 522 F.3d at 1164 (considering whether a challenged voter registration statute would "hinder [the plaintiffs'] abilities to carry out their missions" of registering voters).

33. Accordingly, this Court has already found that "[t]he diversion of resources from general voting initiatives or other missions of the organization to programs designed to address the impact of the specific

conduct of the Defendants satisfies the injury-in-fact prong." Doc. No. [68] at 16.

### B. Traceability and Redressability

34.   To establish traceability for the purposes of standing, Plaintiffs need only establish "'a fairly traceable connection between the plaintiff's injury and the complained of conduct of the defendant.'" Ga. Ass'n of Latino Elected Officials, 2022 WL 2061703, at *9 (quoting Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1352 (11th Cir. 2005) (emphasis in original)). Where the injury alleged is diversion of resources, traceability is established by showing that the resources were diverted to "'counteract' the defendants' assertedly illegal practices." Browning, F.3d at 1166.

35.   In other words, "[i]n reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." Culverhouse v. Paulson & Co., 813 F.3d 991, 994 (11th Cir. 2016) (citation omitted). Moreover, where "a jurisdictional challenge implicates the merits of the underlying claim . . . the proper course of action for the district court . . . is to find that jurisdiction exists

- 18 -

and deal with the objection as a direct attack on the merits of the plaintiff's case." <u>Ga. Ass'n of Latino Elected Officials</u>, 2022 WL 2061703, at *6 (quotation marks and alterations omitted).

36.     The traceability requirement is not stringent. Traceability exists when state law assigns responsibility for an election administration process to the Secretary of State or State Election Board. <u>See</u> <u>infra</u> pp. 151–52, 257–84, 350-58. And that responsibility, and thus traceability, is not impacted by the Secretary's or the Board's discretionary decision to reassign the administration of parts of its statutory responsibilities to county-level actors. Moreover, "[e]ven a showing that a plaintiff's injury is indirectly caused by a defendant's actions satisfies the fairly traceable requirement." <u>Cordoba v. DIRECTV, LLC</u>, 942 F.3d 1259, 1271 (11th Cir. 2019) (quotation marks omitted); <u>see also</u> Doc. No. [68] at 13 (articulating this same rule in denying Defendants' motion to dismiss).

37.     Courts assessing § 1983 claims in voting rights cases do not conduct a separate causation analysis after traceability has been established. <u>See</u> <u>Greater Birmingham Ministries v. Sec'y of State for State of Ala.</u>, 992 F.3d 1299, 1318 (11th Cir. 2021) (stating that under § 1983, "plaintiffs must

demonstrate both that the defendants deprived them of a right secured under the Constitution or federal law and that the deprivation occurred under color of state law" and never suggesting that there is an additional causation inquiry); see generally, e.g., Jacobson, 974 F.3d 1236 (discussing the Anderson-Burdick standard with no suggestion that a § 1983 causation analysis separate from traceability applies); Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312 (11th Cir. 2019) (analyzing the plaintiffs' § 1983 claims without applying any causation standard beyond traceability). That is, once a court has established that an injury is traceable to a defendant for purposes of establishing standing in a voting rights case, it does not, and need not, then go further to determine whether an intervening act has broken the causal chain.

38.  This makes good sense. The applicable legal standards for Plaintiffs' § 1983 claims effectively incorporate a causation requirement. Most principally, the Anderson-Burdick test requires courts to analyze "the burden *imposed by* [the state's] rule." Anderson, 460 U.S. at 789 (emphasis added). In addition, courts reaching the merits of § 1983 claims in the voting-rights context—including this Court—have already determined that the plaintiffs have sued the proper government actors for the rights deprivations they

- 20 -

allege. See Doc. No. [68] at 63, 73 (holding at the motion-to-dismiss stage that Plaintiffs had sued the proper parties for their claims and counties need not be joined as defendants).

39.    Furthermore, it is black letter law that "personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity. All that is required is that the official be responsible for the challenged action." Luckey v. Harris, 860 F.2d 1012, 1015 (11th Cir. 1988). In contrast, "when individuals are being sued in *individual capacities* for damages for personal injuries, the causation inquiry must be more refined and focused than that undertaken where only declaratory and injunctive relief are sought." Zatler v. Wainright, 802 F.3d 397, 401 (11th Cir. 1986) (formatting edited).

40.    In arguing for an additional causation requirement in their closing presentation, Defendants rely on Buckman v. Halsey, an unreported case addressing a § 1983 claim by an inmate against a prison guard, *in his individual capacity*, for allegedly violating the Eighth Amendment under a "failure-to-protect" theory of causation. 2021 WL 4127067 (11th Cir. Sept. 10, 2021). There, the court held that the inmate's injury was not caused by

the prison guard because the plaintiff himself "started the fight" in which

he was injured. <u>Id.</u> at *3. The inmate's decision to start the fight was the

"independent intervening cause" of his injuries, meaning that those

injuries were not a "reasonably foreseeable consequence" of anything the

*prison guard* did. <u>Id.</u>

41. <u>Buckman</u> does not alter the causation analysis of Plaintiffs' official-

capacity claims. Most principally, <u>Buckman</u> does not even purport to

apply to voting rights cases, whereas Eleventh Circuit cases analyzing

voting rights claims do not engage in a separate § 1983 causation analysis

for the reasons stated above. <u>See</u> <u>supra</u> ¶¶ 37–38. And in any event, the

harms to voters in this case were certainly foreseen consequences of

Defendants' challenged practices, <u>see</u> <u>infra</u> pp. 292–97. Thus, even if a

separate causation standard does apply (which it does not), the counties'

actions do not constitute an "independent intervening cause" under

<u>Buckman</u>. <u>See</u> <u>id.</u>

42. An injury is redressable when "a decision in a plaintiff's favor would

significantly increase the likelihood that she would obtain relief." <u>Lewis v.</u>

<u>Gov. of Ala.</u>, 944 F.3d 1287, 1301 (11th Cir. 2019) <u>(en banc)</u> (internal

quotation marks and alterations omitted). That is true so long as the

court's judgment may remedy the plaintiff's injury, "whether directly or

indirectly." Id. (quotation marks omitted).

43.     In this Circuit, an important inquiry for both traceability and redressability

is whether state law assigns ultimate responsibility for the challenged

practice to defendants or, instead, to independent officials not within

defendants' control. For example, in the Eleventh Circuit's decision in

Jacobson v. Florida Secretary of State, "Florida law tasks the Supervisors,

independently of the Secretary, with printing the names of candidates on

ballots in the order prescribed by the ballot statute." 974 F.3d 1236, 1253

(11th Cir. 2020). The plaintiffs in that case could not meet the traceability or

redressability requirements "[b]ecause the [Secretary" didn't do (or fail to

do) anything that contributed" to the harm, and, likewise, did not itself

possess the statutory authority under Florida law to cease enforcing the

challenged law.

44.     The cases following Jacobson, including this Court's decision on summary

judgment, have accordingly looked to the scope of defendants'

responsibility under state and federal law when determining traceability

and redressability. In its summary judgment ruling, the Court thus held

that traceability and redressability were satisfied as to each issue

remaining in this case. Doc. No. [612] at 34–44, 49–55; see also Ga.

Republican Party, Inc. v. Sec'y of State for Ga., No. 20-14741, 2020 WL

7488181, at *1 (11th Cir. Dec. 21, 2020) (unpublished) (noting that Georgia

law assigned responsibility to conduct the absentee ballot signature-

verification process to local county supervisors); Anderson v.

Raffensperger, 497 F. Supp. 3d 1300, 1328–29 (N.D. Ga. 2020) (looking to

state law to determine traceability, holding traceability not satisfied

because no statute gave the state defendants any role in the decision at

issue; state law established that "counties must address" it).

45.     In their closing argument, Defendants invoked City of Guyton v. Barrow,

828 S.E.2d 366, 305 Ga. 799 (Ga. 2019), in addressing the scope of the State

Election Board's statutory authority. See Tr. 4422. There, the Georgia

Supreme Court ruled that courts must "exhaust[] all tools of construction"

to interpret the meaning of a statute or regulation without looking to the

agency's interpretation. 828 S.E.2d at 370, 305 Ga. at 803. Only in the "few"

instances where the statute or regulation is "truly ambiguous," after all

such interpretative tools have been exhausted, can courts defer to agency

interpretations. Id. (explaining that where "the meaning of the applicable [law] is not obvious on its face, this does not mean [it] is ambiguous"). City of Guyton thus confirms that this Court should not defer to Defendants' readings of the statutes that apply to them; it is up to the Court to "exhaust[] all tools of construction" to interpret the statute. Id. In any event, as explained below, all of the Georgia statutes relevant to the traceability and redressability of Plaintiffs' claims herein are unambiguous on their face and thus City of Guyton supports Plaintiffs in this case. See infra pp. 257–84.

46.     Indeed, the Court has already recognized that it "must examine the Secretary of State's and the State Election Board's statutory obligations to determine whether the challenged practices are traceable to and redressable by Defendants," and that this examination of state law for standing purposes raises no Eleventh Amendment problem, because liability will be determined pursuant to federal law. See Doc. No. [617] at 43–44. As this Court explained, in § 1983 cases, "courts routinely examine state statutes to determine whether a defendant is responsible for the allegedly unconstitutional practices." Id. at 44.

47.   Indeed, as discussed below, Georgia law gives Defendants authority over, and ultimate responsibility for, the challenged practices. See infra pp. 257–84.

## II)   Count I: Fundamental Right to Vote

48.   The right to vote is "one of the most fundamental rights" of citizens." Doc. No. [617] at 14 (quoting Ga. State Conf. of NAACP v. Fayette Cty. Bd. of Comm'rs, 775 F.3d 1336, 1343 (11th Cir. 2015)); see Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886) (describing the "political franchise of voting" as "a fundamental political right, [ ] preservative of all rights"); People First of Ala. v. Merrill, 491 F. Supp. 3d 1076, 1091 ("Voting is an inviolable right, occupying a sacred place in the lives of those who fought to secure the right and in our democracy, because it is preservative of all rights.") (quotation marks omitted).

49.   In assessing whether a practice violates the fundamental right to vote protected by the First and Fourteenth Amendments, the Court "first consider[s] the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Anderson v. Celebrezze, 460 U.S. 780, 789 (1983); accord

Burdick v. Takushi, 504 U.S. 428, 434 (1992). It then "identif[ies] and
evaluate[s] the precise interests put forward by the State as justifications
for the burden imposed by its rule." Anderson, 460 U.S. at 789.

50. The Anderson-Burdick standard applies not just where plaintiffs claim that
they are burdened by a particular policy or affirmative action by a
defendant, but also where the plaintiffs argue that the defendant has failed
to train or failed to supervise election-related conduct. See Doc. No. [617]
at 20–22. In other words, "where, as here, the plaintiff's claims are
constitutional challenges alleging a generalized burden on the right to
vote, Anderson-Burdick squarely applies." Id. at 22 (citing Democratic
Nat'l Comm. v. Wis. State Legislature, 141 S. Ct. 28, 35 (2020) (Kavanaugh,
J., concurring)); Lee, 915 F.3d at 1319 ("[W]e are considering the
constitutionality of a generalized burden on the fundamental right to vote,
for which we apply the Anderson-Burdick balancing test instead of a
traditional equal-protection inquiry.").

51. In conducting this analysis, the court must "not only determine the
legitimacy and strength of each of those interests; it must also consider the
extent to which those interests make it necessary to burden the plaintiff's

rights." <u>Anderson</u>, 460 U.S. at 789. "Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." <u>Id.</u>; <u>see also</u> <u>Burdick</u>, 504 U.S. at 434.

52.   If a state imposes a "severe" burden on the right to vote, the state's action "must be 'narrowly drawn to advance a state interest of compelling importance.'" <u>Id.</u> at 434 (quoting <u>Norman v. Reed</u>, 502 U.S. 279, 289 (1992)). Burdens "are severe if they go beyond the merely inconvenient." Doc. No. [617] at 17 (quoting <u>Crawford v. Marion Cty. Election Bd.</u>, 553 U.S. 181, 205 (2008) (Scalia, J., concurring)).

53.   Moreover, "[e]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." <u>Lee</u>, 915 F.3d at 1318–19 (citing <u>Common Cause/Ga.</u>, 554 F.3d at 1352); <u>see also</u> <u>Crawford v. Marion Cty. Election Bd.</u>, 553 U.S. 181, 191 (2008) ("However slight that burden may appear, . . . it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation'") (plurality op.).

54.   The <u>Anderson-Burdick</u> analysis focuses on the "character and magnitude" of burden on voters' First and Fourteenth Amendment rights. As this

Court has already concluded, there is no requirement that in addition to

showing a burden on voting rights Plaintiffs must also show that the

burden is "widespread and systemic." Doc. No. [617] at 25 (quoting

Anderson and Burdick).

55.     While combatting voter fraud can be a legitimate state interest, "a state

cannot simply cite fraud as a state interest for every voting rule without

showing that the rule prevents fraud or otherwise legitimately furthers

that state interest." Doc. No. [636] at 40.[1] Under Anderson-Burdick, the

burden is not balanced against the legitimacy or strength of the state's

interests in the abstract; the burden is balanced against "the extent to

which those interests *make it necessary to burden the plaintiff's rights*" by

imposing the challenged practices. Anderson, 460 U.S. at 789 (emphasis

added).

---

[1] Nor did the decisions in Greater Birmingham Ministries and Crawford find otherwise.
See generally Crawford, 553 U.S. 181; Greater Birmingham Ministries, 992 F.3d 1299.
Contra Tr. 3329 (Defendants' closing argument that the "state interest" standard has
been resolved "as a matter of law"); Tr. 3359 (same, with reference to Crawford and
Greater Birmingham Ministries).

### III)    Count II: Fifteenth Amendment Prohibition on Racial Discrimination

56.    Under the Fifteenth Amendment, "[t]he right of citizens of the United
       States to vote shall not be denied or abridged by the United States or by
       any State on account of race, color, or previous condition of servitude."
       U.S. Const. amend. XV. A claim under the Fifteenth Amendment requires
       a plaintiff to show both discriminatory purpose and discriminatory effect.
       See Burton v. City of Belle Glade, 178 F.3d 1175, 1188–89 (11th Cir. 1999).

57.    With regard to the discriminatory purpose prong, where a law or policy
       "create[s] an express racial classification, no inquiry into discriminatory
       purpose is necessary." Id. at 1189. A facially neutral law may have been
       enacted with a discriminatory purpose if racial discrimination was "a
       motivating factor"—not necessarily the "sole[]" or even a "primary"
       motive—for Defendants' actions. Vill. of Arlington Heights v. Metro.
       Hous. Dev. Corp., 429 U.S. 252, 265–66 (1977). A court must "evaluate all
       available direct and circumstantial evidence of intent in determining
       whether a discriminatory purpose was a motivating factor in a particular
       decision." Doc. No. [617] at 61 (quoting Burton, 178 F.3d at 1189).

- 30 -

58.  The relevant factors courts consider when determining discriminatory purpose include: (1) the impact of the challenged practice; (2) the historical background; (3) the specific sequence of events preceding it; (4) procedural and substantive departures from the normal sequence in adopting it; (5) the contemporary statements and actions of those responsible (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives. See Greater Birmingham Ministries, 992 F.3d at 1321–22.

59.  Thus, discriminatory intent may be shown through evidence that the disparate impact was foreseeable, the defendant had knowledge of that impact, and less discriminatory alternatives were available. See id. at 1342; see also Burton, 178 F.3d at 1189 ("Indeed, all 'actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.'") (quoting Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 464 (1979)).

60.    The Eleventh Circuit has held that a "clear pattern" of disparate impact

may be sufficient to show discriminatory purpose. I.L. v. Alabama, 739

F.3d 1273, 1278 (11th Cir. 2014) (quotation marks omitted).[2]

61.    In League of Women Voters, the Eleventh Circuit observed that "[t]he

Supreme Court has instructed that when a court assesses whether a duly

enacted statute is tainted by discriminatory intent, 'the good faith of the

state legislature must be presumed.'" League of Women Voters of Fla., Inc.

v. Fla. Sec'y of State, 32 F.4th 1363, 1373 (11th Cir. 2022) (quoting Abbott v.

Perez, 138 S. Ct. 2305, 2324 (2018)). League of Women Voters, consistent

with Abbott, applied the presumption of good faith in the limited context

of determining the intent of legislators when passing "a duly enacted

statute" in the context of a 14th and 15th Amendment claim. Id.

---

[2] Greater Birmingham Ministries is not to the contrary.  There, the court reasoned that legislators' statements "not made about the law at issue . . . do not evince discriminatory intent behind it."  992 F.3d at 1323.  This comment does not stand for the proposition that where an *uncodified policy* is being challenged, plaintiffs must present evidence of policymakers' comments linked to that specific policy. Greater Birmingham Ministries itself would foreclose that approach.  See 992 F.3d at 1321–22 (setting forth the applicable multifactor analysis).  Moreover, unlike challenges to uncodified policies, challenges to legislation have a record behind the enactment for courts to examine. There is no legislative record—or even administrative record—regarding uncodified policies like Exact Match for courts to examine.

62. Thus, as an initial matter, the "presumption of legislative good faith" applies only to claims with a discriminatory intent element, *i.e.*, the Fourteenth (Count III) and Fifteenth (Count II) Amendment claims here. It has no relevance at all to the Anderson-Burdick (Count I) or Voting Rights Act (Count V) claims. See Abbott, 138 S. Ct. at 2324; League of Women Voters, 32 F.4th at 1373.

63. Moreover, even when the "presumption of legislative good faith" applies in this Circuit, it is restricted to the intent of the *legislature*. Abbott, 138 S. Ct. at 2324 (addressing "the good faith of *the state legislature*") (formatting altered). Defendants have identified no precedent for applying the presumption beyond the context of "a duly enacted statute." Id.; League of Women Voters, 32 F.4th at 1373. Plaintiffs in this case do not challenge any "duly enacted statute." League of Women Voters, 32 F.4th at 1373.

64. Finally, the "presumption of legislative good faith" is a rebuttable presumption. It can be "overcome" when plaintiffs adduce evidence showing "invidious intent." Abbott, 138 S. Ct. at 2325.

65. Because Plaintiffs do not challenge any statutes, the Court finds the presumption of legislative good faith irrelevant to the claims asserted here.

Even were the presumption applicable, the Court finds that Plaintiffs have

provided evidence of discriminatory intent sufficient to overcome any

rebuttable presumption of good faith. See infra pp. 240–52.

66.   Once discriminatory purpose and effect are established, the burden shifts

to the defendant to demonstrate that the same action would have been

taken "in the absence of any discriminatory motive." I.L. v. Alabama, 739

F.3d 1273, 1278 (11th Cir. 2014).

### IV)   Count III: Equal Protection Under the Fourteenth Amendment

#### A. Equal Protection Against Discrimination

67.   Under the Fourteenth Amendment, "[n]o State shall . . . deny to any

person within its jurisdiction the equal protection of the laws." U.S. Const.

amend. XIV. Here, Plaintiffs allege that Defendants' Exact Match policy

unlawfully discriminates on the basis of race and national origin. The

Supreme Court has held that "classifications regarding 'race, alienage,

national origin, gender, or illegitimacy'" constitute suspect classifications

subject to heightened scrutiny under the Equal Protection Clause. Doe v.

Moore, 410 F.3d 1337, 1346 (11th Cir. 2005) (quoting Haves v. City of

Miami, 52 F.3d 918, 921 (11th Cir. 1995)).

68.     With respect to naturalization status, the Supreme Court has held that "the

rights of citizenship of the native born and of the naturalized person are of

the same dignity and are coextensive. The only difference drawn by the

Constitution is that only the "natural born' citizen is eligible to be

President." Schneider v. Rusk, 377 U.S. 163, 165 (1964) (holding that

legislation that denationalized naturalized citizens, but not native-born

citizens, who lived abroad for three years, was so discriminatory as to

violate due process).

69.     Plaintiffs' equal protection claim concerning discrimination resulting from

the Exact Match process "is subsumed in the same analysis that the Court

applie[s] to the Fifteenth Amendment claim pertaining to Count II." Doc.

No. [617] at 79; see also Greater Birmingham Ministries, 992 F.3d at 1321

(addressing identical standards for "an equal protection analysis under the

Fourteenth Amendment and a denial or abridgement analysis under the

Fifteenth Amendment").

### B.  Equal Protection Against Arbitrary and Disparate Treatment Based on Geographic Location

70.    The Equal Protection Clause is violated where electoral standards produce

"arbitrary and disparate treatment . . . valu[ing] one person's vote over

- 35 -

that of another" depending on whether the person lives. <u>Bush v. Gore</u>, 531

U.S. 98, 104–05 (2000); <u>see</u> <u>Ne. Ohio Coal. for the Homeless v. Husted</u>, 696

F.3d 580, 598 (6th Cir. 2012) (holding that a consent decree that treated

similarly situated provisional ballots differently based on the form of

identification used "likely violates the equal protection principle

recognized in <u>Bush v. Gore</u>"); <u>Curling v. Kemp,</u> 334 F. Supp. 3d 1303, 1325

(N.D. Ga. 2018) (preliminarily finding likelihood that Plaintiffs would

prevail on Fourteenth Amendment claims because "votes cast by

[Georgia's voting machines] may be altered, diluted, or effectively not

counted on the same terms as someone using another voting method"). As

the Court recognized at summary judgment, "[t]he central question" in

determining whether a geographic equal protection claim exists is

"whether the state lacks 'adequate statewide standards'." Doc. No. [617] at

82 (citing <u>Husted</u>, 837 F.3d at 635–36).

### V)     Count V: Section 2 of the Voting Rights Act

71.    Section 2(a) of the Voting Rights Act of 1965 provides, in relevant part, that

"[n]o voting qualification or prerequisite to voting or standard, practice, or

procedure shall be imposed or applied by any State or political subdivision

in a manner which results in a denial or abridgement of the right of any

citizen of the United States to vote on account of race or color." 52 U.S.C.
§ 10301(a). Section 2(b) provides that a violation of Section 2(a) is
established "if, based on the totality of circumstances, it is shown that the
political processes leading to nomination or election in the State or political
subdivision are not equally open to participation by members of a class of
citizens protected by subsection (a) in that its members have less
opportunity than other members of the electorate to participate in the
political process and to elect representatives of their choice." Id. § 10301(b).
As the Supreme Court recently held in Brnovich, "[t]he key requirement is
that the political processes leading to nomination and election (here, the
process of voting), must be 'equally open' to minority and non-minority
groups alike." Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2337
(2021).

72.    For the reasons the Court explained in deciding Defendants' renewed
motion for summary judgment on Plaintiffs' Section 2 claim, in assessing
the totality of the circumstances, it is appropriate to consider both the
"guideposts" set out in Brnovich and the factors set out in the Supreme
Court's prior opinion in Thornburg v. Gingles, 478 U.S. 30 (1986). See Doc.
No. [636] at 23–25. Thus, in analyzing Count V, the Court considers below

the factors set forth in <u>Brnovich</u>: "(1) the size of the burden imposed; (2) the deviation from standard practice in 1982; (3) the size of the disparity of the burden; (4) other available means of voting; and (5) the strength of the state interest." <u>Id.</u> at 25. It also considers the "relevant factors from <u>Gingles</u>": "(1) the history of official discrimination in Georgia; (2) whether there is racially polarized voting in Georgia; (3) voting practices and procedures in Georgia; (4) discrimination outside the voting context in Georgia; (5) racial appeals in campaigns in Georgia; and (6) minority candidate success in Georgia." <u>Id.</u> at 25–26.

## VI)   Remedies

### A. Standard Governing Entitlement to Relief

73.   Upon a showing by Plaintiffs of a violation of law at the conclusion of all the evidence, "it is the court's duty to grant whatever relief is appropriate in the case on the basis of the facts proved." <u>See</u> <u>Dunkin' Donuts of Am., Inc. v. Minerva, Inc.</u>, 956 F.2d 1566, 1575 (11th Cir. 1992).

74.   Defendants have argued that Plaintiffs are required to introduce evidence, as an element of their claims, that a *particular* remedy is required to ameliorate the violations they have proven. <u>See</u> Tr. 4486. The Court finds

Defendants argument unsupported by the law. Even if Plaintiffs had not

introduced such evidence, that would not be a basis to deny relief because

none of the claims in this case requires Plaintiffs to prove their entitlement

to any specific remedy. See supra pp. 26–38 (showing that no element of

any claim concerns proof of remedies); 10 Fed. Prac. & Proc. Civ. § 2664

(4th ed.) ("[T]he demand for relief does not constitute part of the pleader's

claim for relief."). In any event, Plaintiffs in fact have introduced evidence

of particular appropriate remedies. See infra pp. 392–412.[3]

### B.  Entitlement to Injunctive Relief

75.    Plaintiffs here have asked the Court to enter permanent injunctive relief.

"[A] plaintiff seeking a permanent injunction must demonstrate (1) it has

suffered an irreparable injury; (2) remedies available at law, such as

---

[3] Defendants have supported their misreading of the law by citing a case, Nipper v. Smith, 39 F.3d 1494 (11th Cir. 1994) (en banc), which speaks to the elements of a *vote dilution* claim under § 2 of the Voting Rights Act.  Tr. 4486:22–25 (Defendants' Closing Argument) ("Nipper makes plain that at least for the second Section 2 claim, the plaintiffs have to show a remedy that works. And that's the piece that they have not done").  One of the elements of a vote dilution claim requires plaintiffs to show that a particular remedy is appropriate.  See Nipper 39 F.3d at 1530–31 (11th Cir. 1994) (en banc) (explaining that "the issue of remedy is part of the plaintiff's prima facie case in section 2 *vote dilution* cases" because vote dilution claims include a "Gingles precondition" element requiring a showing of remedies) (emphasis added))."  This "Gingles precondition" element is not part of Plaintiffs' *vote denial* claim under § 2. See supra ¶¶ 71–72.

monetary damages, are inadequate to compensate for that injury; (3)

considering the balance of hardships between the plaintiff and defendant,

a remedy in equity is warranted; and (4) the public interest would not be

disserved by a permanent injunction." Angel Flight of Ga., Inc. v. Angel

Flight Am., Inc., 522 F.3d 1200, 1208 (11th Cir. 2008).

76.     A voting rights violation "almost always inflicts irreparable harm." League

of Women Voters of Fla. v. Browning, 863 F. Supp. 2d 1155, 1167 (N.D. Fla.

2012); see, e.g., Charles H. Wesley Educ. Foundation, Inc. v. Cox, 408 F.3d

1349, 1355 (11th Cir. 2005) (plaintiffs' "franchise-related rights" were

"threatened with significant, irreparable harm" by Georgia's refusal to

process voter registration applications); Fish v. Kobach, 840 F.3d 710, 752–

53 (10th Cir. 2016) ("weigh[ing] heavily," as part of an irreparable harm

analysis, the "constitutionally protected fundamental" nature of the right

to vote, and finding irreparable harm in the denial of that right caused by

cancellation and suspension of registration applications); Obama for Am.

v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the

fundamental right to vote ... constitutes irreparable injury."); Williams v.

Salerno, 792 F.2d 323, 326 (2d Cir. 1986) (finding that voter registrants

"would certainly suffer irreparable harm if their right to vote were

impinged upon"); <u>Common Cause/Georgia v. Billups</u>, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005) ("[T]he right to vote is a fundamental right and is preservative of all other rights. Denying an individual the right to vote works a serious, irreparable injury upon that individual.").

77.    There is no adequate remedy at law to redress ongoing violations of individual rights secured by the Constitution and Voting Rights Act. <u>See, e.g.</u>, <u>Crumly v. Cobb Cty. Bd. of Elections & Voter Registration</u>, 892 F. Supp. 2d 1333, 1344 (N.D. Ga. 2012) (Jones, J.) (holding voter had "no adequate remedy at law and no other way to guarantee his rights" other than through injunctive relief sought, and issuing injunction accordingly); <u>Larios v. Cox</u>, 305 F. Supp. 2d 1335, 1343 (N.D. Ga. 2004) ("Given the fundamental nature of the right to vote, monetary remedies would obviously be inadequate in this case; it is simply not possible to pay someone for having been denied a right of this importance." (quoting <u>Dillard v. Crenshaw County</u>, 640 F. Supp. 1347, 1363 (M.D. Ala. 1986)).

78.    The hardships for voters subject to constitutional and statutory voting rights deprivations outweigh any hardship involved in satisfying the State's federal-law obligations. <u>See, e.g.</u>, <u>Democratic Party of Georgia, Inc.</u>

v. Crittenden, 347 F. Supp. 3d 1324, 1346 (N.D. Ga. 2018) (Jones, J.) (finding that "the disenfranchisement of certain voters who cast absentee or provisional ballots" absent an injunction outweighed any hardship that state defendants would face due to an injunction); United States v. Alabama, 857 F. Supp. 2d 1236, 1242 (M.D. Ala. 2012) ("the potential harm caused to UOCAVA voters far outweighs the burden placed upon the State, which has a legally mandated obligation to vindicate the fundamental right of its military and overseas constituents to vote in federal elections").

79. The public interest weighs strongly against enforcement of an unlawful policy. See Scott, 612 F.3d at 1297 ("[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law."). The public "has a 'strong interest in exercising the fundamental political right to vote,'" which "'is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful.'" Obama for Am., 697 F.3d at 436–37 (quoting Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) and Hunter v. Hamilton Cty. Bd. of Elections, 635 F.3d 219, 244 (6th Cir. 2011) (internal quotation marks omitted)).

### C. Legal Standards Pertinent to Defendants' Arguments Against the Imposition of Remedies

80.  Defendants have raised a number of arguments throughout trial and in their closing as to why this Court lacks authority to, or otherwise should not, order relief even if Plaintiffs succeed in proving Defendants' liability for the claims in this case. The Court is unpersuaded by Defendants' arguments, and addresses those arguments in turn here.

81.  Political Question Doctrine: Defendants have argued that Plaintiffs' claims should be dismissed, or that this Court can make no remedial order, in light of the political question doctrine. This Court has rejected this argument before and does so again for the same reasons. See Doc. No. [612] at 67 (holding at summary judgment that Plaintiffs' claims do not present political questions because "federal courts are equipped and empowered to address claims that individuals' voting rights are being burdened").

82.  Defendants' argument is at odds with decades of precedent in which courts have adjudicated First, Fourteenth, and Fifteenth Amendment cases as well as Voting Rights Act cases in which individual voting rights are at issue. See, e.g., Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321 (2021);

<u>Bush v. Gore</u>, 531 U.S. 98 (2000), <u>Anderson v. Celebrezze</u>, 460 U.S. 780 (1983); <u>Greater Birmingham Ministries v. Secretary of State for Ala.</u>, 992 F.3d 1299 (11th Cir. 2021). In *none* of those cases did the court ever suggest that the claims before it presented nonjusticiable political questions. <u>See</u> <u>id.</u> The reason for this unbroken line of precedent is straightforward.

83.     In <u>Baker v. Carr</u>, the Supreme Court held "courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority." 369 U.S. 186, 217 (1962). "[T]here should be no dismissal for non-justiciability on the ground of a political question's presence" "[u]nless one of [the following] formulations is inextricable from the case": "[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the

potentiality of embarrassment from multifarious pronouncements by various departments on one question." Id.

84.    The application of the Baker factors is simple: Individual voting rights issues have not been committed to a "political department." Baker, 369 U.S. at 217. The Elections Clause "commits the regulation of the 'Times, Places and Manner of holding Elections' to state legislatures." Jacobson, 974 F.3d at 1265 (quoting U.S. Const. art. I, § 4, cl. 1). It does not deprive federal courts of the right to adjudicate federal-law claims concerning individual voting rights. Id. at 1261–62; see Doc. No. [612] at 70 (holding at summary judgment that "the Elections Clause does not bar [the Court's] consideration of Plaintiffs' claims"). Moreover, judicially manageable standards exist for adjudicating Fundamental-Right-to-Vote claims under the First and Fourteenth Amendments, Equal Protection claims under the Fourteenth Amendment, Racial Discrimination claims under the Fifteenth Amendment, and § 2 claims under the Voting Rights Act. See supra pp. 26–38.

85.    Jacobson is not to the contrary. As the Eleventh Circuit made clear, election cases may present nonjusticiable political questions when they are "not

based on the right to vote *at all*." 974 F.3d at 1261 (emphasis in original); see also id. ("[C]ourts cannot rely on legal standards to adjudicate this kind of complaint because it does not allege *any* burden on individual voting rights." (emphasis in original)). Thus, in Jacobson, the Eleventh Circuit held that "a complaint that the order in which candidates appear on a ballot confers an impermissible partisan advantage to one party presents a nonjusticiable political question." Id. at 1263–64.  But Jacobson itself distinguished as *not* political questions cases concerning burdens on the right to vote. Id. at 1262. When challenged policies "burden[] voting rights even slightly," courts can—and indeed "must"—adjudicate the claim. Id.

86. "Summary Judgment Order" and Statutory Authority: Defendants have repeatedly invoked this Court's summary judgment order to argue that the Court may not impose a remedy that exceeds Defendant's statutory obligations. Defendants misunderstand this Court's order and the law.

87. The sentence Defendants have focused upon in the order states: "The Court agrees with Defendants that the law does not impose constitutional

liability for governments because they do not *exceed* their statutory obligations." Doc. No. [617] at 22.

88.     Defendants' argument that this Court's remedial authority is somehow constrained by the bounds of what state law already requires cannot be squared with the law. In voting rights cases, federal courts, including this Court, have repeatedly ordered remedies that were not required by—or even consistent with—state statutes. See, e.g., Martin v. Kemp, 341 F. Supp. 3d 1326 (N.D. Ga. 2018) (directing the Secretary to issue instructions to the counties prohibiting them from rejecting absentee ballots for signature mismatches and directing notice be given); Ga. Coal. for the People's Agenda v. Kemp, 347 F. Supp. 3d 1251 (N.D. Ga. 2018) (directing the Secretary to act immediately to make counties let people flagged for citizenship vote at the polls); Common Cause v. Kemp, 347 F. Supp. 3d 1270 (N.D. Ga. 2018) (directing the Secretary to establish and publicize a website and free-access hotline so provisional ballot voters could check the status of their ballots); Martin v. Crittenden, 347 F. Supp. 3d 1302 (N.D. Ga. 2018) (enjoining Gwinnett County from rejecting absentee ballots with missing or incorrect years of birth); Dem. Party of Ga. v. Crittenden, 347 F. Supp. 3d 1324 (N.D. Ga. 2018) (Jones, J.) (extending the Martin injunction

- 47 -

statewide). To hold otherwise would effectively limit the scope of federal law claims and remedies to that of state law, a result that finds no support in the case law and for good reason. Although Plaintiffs' claims in this case do not seek to invalidate any state statute, federal courts have routinely and properly enforced compliance with the U.S. Constitution and federal laws even when such enforcement conflicts with state law, where necessary, to protect those individual and fundamental rights.

89.    Indeed, the very next sentence in the Order states, "However, as the Court noted in its jurisdictional summary judgment order, State law requires that the Secretary 'conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections.'" Doc. No. [617] at 22 (quoting O.C.G.A. § 21-2-50(a)(11)). This Court was not addressing limitations on appropriate remedies. It was making *Plaintiffs*' traceability point: where state law gives these Defendants responsibility for the practice at issue, the law *does* "impose constitutional liability." <u>Id.</u> Thus, the Court could reach the issue of "whether, under <u>Anderson-Burdick</u>, Defendants' inadequate training of superintendents and registrars caused an unconstitutional burden on Georgians' right to vote." <u>Id.</u> at 23.

90.  Judicial "micromanagement" of state elections: Defendants have argued a number of times that this Court is prohibited from granting Plaintiffs relief because any such order would constitute an allegedly impermissible "judicial micromanagement" of Defendants' administration of elections in Georgia. This argument finds no basis in the law.

91.  Where plaintiffs establish jurisdiction and a violation of federal law according to the legal standards described above, a Court *must* order relief. There is no case that says that relief is unwarranted when bringing state actors into compliance with federal law would constitute "micromanagement"—a term that Defendants have never defined.

92.  Courts (including this Court) have entered and affirmed injunctive relief requiring Georgia's Secretary of State to take very specific actions. See, e.g., Ga. Muslim Voter Project v. Kemp, 918 F.3d 1262, 1262–63 (11th Cir. 2019) (denying a motion to stay a preliminary injunction to remedy a likely constitutional violation that "ordered the Secretary of State of Georgia to instruct county elections officials to provide prerejection notice and an opportunity to be heard in the event of a perceived signature mismatch"); United States v. Georgia, 892 F. Supp. 2d 1367, 1378–80 (N.D. Ga. 2012)

- 49 -

(Jones, J.) (finding a likely federal statutory violation and issuing an injunction requiring the Secretary of State to, among other things, post certain information on its website, provide certain voters with the option of returning their ballot by email, fax, or express delivery service at no cost to the voter, and "provide guidance and training to county election officials … regarding all relief being imposed under this Order, to enable them to take any action necessary for its implementation").

93.    The cases Defendants have cited to this Court are not to the contrary. See Defs.' Brief in Support of Continuing Relevance Objections, Doc. No. [794] at 4–11; Defs.' Response in Opposition to Plaintiffs' Evidentiary Brief on Relevance, Doc. No. [800] at 16–18. In all those cases, courts were asked to alter the result or administration of *one specific election* that had already occurred or was about to occur. See Curry v. Baker, 802 F.2d 1302 (11th Cir. 1986) ("the methods and the evidence" used to determine who won a 1986 gubernatorial primary); Gamza v. Aguirre, 619 F.2d 449 (5th Cir. 1980) (vote counting in a 1978 school board election); Coal. for Good Governance v. Raffensperger, 2020 WL 2509092 (N.D. Ga. May 14, 2020) (COVID safety measures for the 2020 general election). Plaintiffs' claims

are not tied to, and Plaintiffs do not ask this Court to intervene in, any

particular election. See infra pp. 392–412.[4]

94.  Even in the cases Defendants cite, moreover, the Court did not deny relief

because of a concern regarding "micromanagement." See Curry, 802 F.2d

at 1314–17 (dismissed because the plaintiffs failed to establish a

constitutional violation); Gamza, 619 F.2d at 454 (dismissed because the

trial record did not support the plaintiff's cause of action); Coalition for

---

[4] These factors distinguish the instant case from Alpha Phi Alpha Fraternity Inc. v.
Raffensperger, a redistricting case in which this Court declined to enjoin the 2022
election calendar because "due to the mechanics of State election requirements, there is
insufficient time to effectuate remedial relief for purposes of the 2022 election cycle." --
F. Supp. 3d --, 2022 WL 633312, at *74 (N.D. Ga. Feb. 28, 2022).  In Alpha Phi Alpha, "the
evidence at the preliminary injunction hearing showed that moving the date for
qualifying without moving the date of the primary election risks the accuracy of the
primary because of the required timelines for building ballot combinations, proofing
draft ballots, and preparing ballots for printing by the deadline for overseas and
military voters. Likewise, moving the primary election date would upend months of
planning by local election officials." Id. at *75. No such risks exist in this case, where the
requested relief is not tied to any particular election and Defendants have adduced no
evidence that the requested relief pose implementation problems. Additionally,
unlike Alpha Phi Alpha at the preliminary injunction stage, this Court has the benefit of
a complete record and now issues a decision on the merits.  See id. at *76 ("Having
determined that a preliminary injunction should not issue, the Court cautions that this
is an interim, non-final ruling that should not be viewed as an indication of how the
Court will ultimately rule on the merits at trial.").

Good Governance, 2020 WL 2509092 at *2–4 (dismissed because the

plaintiffs' claims presented a nonjusticiable political question).

95.   In fact, all of these cited cases support *Plaintiffs'* arguments in this

litigation, as those decisions expressly convey that their reasons for

dismissal would not apply in a case like this one. See Curry, 802 F.2d at

1314 ("Although *federal courts closely scrutinize state laws whose very design*

*infringes on the rights of voters*, federal courts will not intervene to examine

the validity of individual ballots or supervise the administrative details of

a local election." (emphasis added)); Gamza, 619 F.2d at 454 n.6 ("Our

holding today is confined to cases where inadvertent errors occur in the

administration of *otherwise fair voting procedures*." (emphasis added)); Coal.

for Good Governance, 2020 WL 2509092, at *3 n.2 ("Specifically, *this is not a*

*case in which the state applied its own policy*, adopted a rule, or enacted a

statute *that burdened the right to vote*." (emphasis added)).

96.   In any event, Plaintiffs do not ask this Court to "sit as a guarantor of a

flawless election," Ga. Shift v. Gwinnett Cty., 2020 WL 864938, at *6 (N.D.

Ga. Feb. 12, 2020), or "second-guess[] and interfer[e] with a State's

reasonable, nondiscriminatory election rules," New Georgia Project v.

Raffensperger, 976 F.3d 1278, 1284 (11th Cir. 2020). Plaintiffs ask that this Court enjoin illegal election administration policies and practices that violate voters' individual rights. That is not "micromanagement"—it is a core federal judicial function.

97.    Finally, as discussed further below, Plaintiffs' proposed remedies do not seek or have the effect of disrupting any management functions or roles in Georgia's elections. Rather, those remedies are narrowly and carefully targeted to be readily implemented by Defendants without burdens or disruptions to counties or Defendants' election administration. Indeed, those remedies are designed to render election administration easier and more accurate for all involved, including voters and elections personnel. For this reason as well, Defendants' claim of "micromanagement" fails.

98.    *Purcell*: In considering remedies, this Court is mindful of the Purcell principle. Purcell "teaches that federal district courts ordinarily should not enjoin state election laws in the period close to an election." League of Women Voters, 32 F.4th at 1371; see also Republican Nat'l Comm. v. Dem. Nat'l Comm., 140 S. Ct. 1205, 1207 (2020) ("[L]ower federal courts should ordinarily not alter the election rules on the eve of an election."). The

Purcell principle reflects the fact that "orders affecting elections … can themselves result in voter confusion." League of Women Voters, 32 F.4th at 1371 (quoting Purcell, 549 U.S. at 4–5).

99.   But here, Plaintiffs do not ask this Court to "enjoin state election laws," id., or "alter the election rules on the eve of an election," Republican Nat'l Comm., 140 S. Ct. at 1207. Plaintiffs ask this Court to enjoin policies that are not tied to any particular election, much less require implementation on the "eve" of one. See id.; infra pp. 392–412.

100.   Moreover, even if this Court concluded that Purcell applied, injunctive relief should not be denied. The Court would simply delay the relief until after the next election cycle. See League of Women Voters, 32 F.4th at 1371–72, 1375–76 (concluding that where the Purcell principle is successfully invoked, the district court's injunction should be stayed); Curling v. Raffensperger, 397 F. Supp. 3d 1334, 1406–10 (N.D. Ga. 2019) (identifying practical difficulties with implementing injunction for then-pending election, but enjoining the challenged practices with respect to all subsequent elections).

## STANDING

101.   Plaintiffs offered the testimony of eight witnesses in support of the organizational standing of the six Plaintiffs: Liza Conrad and Cianti Stewart-Reid (Fair Fight Action); Senator Raphael Warnock and Reverend Dr. John H. Vaughn (Ebenezer Baptist Church); Reverend Matt Laney (Virginia-Highland Church); Pastor Hermon Scott (Baconton Missionary Baptist Church); Jessica Livoti (Care in Action); and Bishop Reginald Jackson (Sixth Episcopal District of the A.M.E. Church). The Court finds each of these witnesses credible and specifically credits their testimony summarized below.

### I)   AME Sixth Episcopal District ("Sixth District") Has Suffered an Injury-in-Fact Caused by Defendants.

#### A. The Sixth District's Organizational Purpose

102.   The Sixth District, one of twenty districts of the African Methodist Episcopal ("AME") church across the world, covers the state of Georgia. The Sixth District has more than 500 AME churches and more in 96,000 members across the state. Tr. 2974:7–11; 2980:19–20 (Bishop Jackson).

103.   Bishop Reginald Jackson is the Bishop of the Sixth District. He assumed this role in 2016. Tr. 2973:2–10 (Bishop Jackson).

104.   The official motto of the AME Church, "God, Our Father, Christ, Our Redeemer, humankind, our neighbor, and the Holy Spirit, our keeper," places a strong emphasis on social service. Tr. 2981:22–2982:5 (Bishop Jackson).

105.   The Sixth District's mission is to "promote God's kingdom on earth." Tr. 2981:15–21 (Bishop Jackson).

106.   The AME church has a long history of involvement in civil rights, and that the tradition remains strong in the church today. Tr. 2979:18–2980:8 (Bishop Jackson).

107.   The Sixth District also has a deep history of focusing on the importance of education, which "next to social justice, is probably the legacy of the A.M.E. Church." Tr. 2979:6–7 (Bishop Jackson).

108.   Since beginning his tenure in the Sixth District, Bishop Jackson has emphasized voting rights—viewing it as his responsibility to make sure "every eligible person in the Sixth District who is 18 and above is registered to vote, and not only to register but actually votes." Tr. 2982:11–18 (Bishop Jackson).

109. There is no merit to Defendants' argument that Bishop Jackson's personal endorsement of Stacey Abrams, found in DX. 245, negates the Sixth District's standing. Bishop Jackson credibly testified that this was his personal endorsement and that "each person must make their own choice." Tr. 3036:7–10 (Bishop Jackson). The Sixth District is strictly non-partisan and does not support, endorse, or raise funds for specific candidates. Tr. 2983:17–19 (Bishop Jackson).

110. Indeed, Bishop Jackson confirmed that his congregation's work around voting issues is "not an issue of [] partisanship," but a matter of responding to the singling out of Black Georgians and the belief that "the right to vote is the greatest right we have in this democracy." Tr. 3000:2–24 (Bishop Jackson).

### B. The Sixth District Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation during the 2018 Election Cycle.

111. In 2018, the Sixth District diverted resources to address Exact Match MIDR, voter roll inaccuracies, and absentee ballot cancellation procedures. Tr. 2999:4–12 (Bishop Jackson).

112.    During the 2018 election cycle one of Bishop Jackson's lead voting
        volunteers, Mr. James Uzcategui-Gaymon, himself experienced Exact
        Match problems at the polls due to his hyphenated last name. Tr. 2989:4–
        20 (Bishop Jackson).

113.    As a result of the issues related to the challenged practices that he was
        witnessing, Bishop Jackson began preaching from the pulpit in 2018 about
        the Sixth District's voter initiatives. Tr. 2998:23–2999:3 (Bishop Jackson).

114.    Bishop Jackson also engaged in a sustained email campaign that reminded
        AME pastors to "get the word out" to their congregations regarding early
        voting an effort to address the Exact Match MIDR and voter roll
        inaccuracies concerns. See PX. 741 (Oct. 25, 2018, email urging early voting
        during the 2018 election).

115.    Sixth District staff and members who devoted time in 2018 to oppose the
        challenged practices in this litigation included Reverend Augusta Hall; Mr.
        Uzcategui-Gaymon, who Bishop Jackson said made voting work a full-
        time job and provided daily updates on his work; members of an
        organization called Sons of Allen that has volunteers across the district;

and the women's ministries throughout the district. Tr. 2995:2–14, 2996:6–16 (Bishop Jackson).

116.    Additionally, more than 5,000 other AME church volunteers across the state worked on voting-related efforts during the 2018 election cycle. Tr. 2997:4–9 (Bishop Jackson).

### C. The Sixth District Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation in the 2020 Election Cycle, and the Sixth District Continues to Do So Today.

117.    During the 2020 election cycle, the Sixth District continued to divert resources to address issues concerning Exact Match MIDR, mismanagement of the voter rolls and absentee ballot cancellation procedures. See Tr. 2984:7–15 (Bishop Jackson).

### (1) Voter Registration, Mobilization, and Empowerment plans

118.    The Sixth District redoubled its focus on verifying voters' registration status ahead of the 2020 elections, based on the "tough lessons" learned from 2018. Tr. 2986:9–15 (Bishop Jackson).

119.    In 2020, the Sixth District announced a new statewide Voter Registration, Mobilization, and Empowerment plan, which urged AME member

churches to implement outreach programs and get out the vote strategies within their local congregations. PX. 1908 (document announcing that Bishop Jackson was establishing this statewide voting plan).

120.  Bishop Jackson implemented this new plan as a direct response to "Georgia's exact match law" and people finding themselves removed from the voter rolls. PX. 1908; see also Tr. 3008:17–21; 3009:5–11 (Bishop Jackson) (explaining that "random purging" did not refer to "The Purge" because the terms used in the letter did not have a legal meaning).

121.  As part of this plan, Bishop Jackson and the Sixth District's trained voter education staff visited each of the seventeen district conferences. PX. 1908. During these visits, the groups discussed how to check voter registration status online, how to properly handle mail in applications, and how to check the status of voters' absentee ballots, among other topics. Id.; Tr. 3009:23–3010:3 (Bishop Jackson).

### (2)   Operation Voter Turnout

122.  The Sixth District also launched Operation Voter Turnout ("OVT"), which sought to expand the registration verification efforts started in 2018 to specifically address issues that arose due to Exact Match and difficulties

surrounding voting via absentee ballots. Tr. 3011:5–3012:6 (Bishop

Jackson). While turnout operations are ordinarily focused on issues such as

voter education and mobilization, in Georgia it was necessary to put "great

emphasis on registration" as well, given errors with the voter rolls and

issues related to absentee voting, and thus as Bishop Jackson explained, it

was "not just the routine registration effort." Tr. 3031:5–13 (Bishop

Jackson).

123.   As part of the OVT program, Mr. Uzcategui-Gaymon conducted weekly

"How to check your voting status" trainings in the lead up to the 2020

elections. PX. 1909 (OVT Outreach Calendar showing trainings on Oct. 6,

13, 20, and 27). Bishop Jackson testified that the Sixth District felt those

trainings were "necessary" following issues that arose in the 2018 election.

Tr. 3013:4–9 (Bishop Jackson).

124.   The workshops included specific training on how to cancel absentee

ballots and vote in person, training related to individuals whose voter

registrations are inaccurate, and training related to individuals facing

problems with Exact Match. Tr. 3024:20–3025:18 (Bishop Jackson); PX.

1992.

125.   Through OVT, the Sixth District also emphasized early voting and voting by mail, in part as a response to problems with these methods of voting in 2018. Tr. 3015:21–25 (Bishop Jackson). To that end, the Sixth District organized a statewide transportation plan to facilitate early voting in the January 2021 runoff election. PX. 1919. (OVT transportation plan for U.S. Senate runoff election).

### (3)   Volunteer Time

126.   The Sixth District's voter protection efforts in 2020 involved more than 10,000 volunteers and "significant" financial and other resources. Tr. 3018:22–3019:15 (Bishop Jackson).

127.   As in 2018, Mr. Uzcategui-Gaymon effectively worked full-time during the 2020 election cycle leading the Sixth District's voting-related efforts. See PX. 1909 (listing Mr. Uzcategui-Gaymon's extensive outreach duties).

### D. The Sixth District's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from the Sixth District's Other Activities.

128.   If the Court grants the Plaintiffs the relief sought, the resources that have been diverted to address the practices at issue could be used for other purposes. For example, Bishop Jackson testified that if the challenged

practices ceased, he could "go back to what [his] initial vision and hope was" for the Sixth District, including hiring a full-time Christian education director, a full-time social action director, developing scholarships for students studying theology. Tr. 3021:11–23(Bishop Jackson). From the pulpit, Bishop Jackson would devote time to other pressing issues for the church, such as increasing outreach to younger community members. Tr. 2999:4–12 (Bishop Jackson).

129. Similarly, Sixth District staff and volunteers across Georgia would have more time to focus on other non-voting ministries and pressing needs, such as work on the church's Rites of Passage programs that focus on helping young men in the community. Tr. 2995:19–2996:3 (Bishop Jackson).

130. Mr. Uzcategui-Gaymon, for example, is integrally involved in many other social justice initiatives at the Sixth District beyond voting. If he had more time available, he could redirect it toward the Sixth District's COVID-related efforts, or its efforts related to the census. Tr. 2996:17–1997:1 (Bishop Jackson).

131. While the challenged practices remain, the Sixth District anticipates continuing to dedicate resources to assisting voters overcome the burdens

imposed by the Defendants. <u>See</u> PX. 1992 (draft personal voter plan for 2022 election).

* * *

132.    The Court finds that the Sixth District has demonstrated by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its organizational resources from the core mission of the church to counteract the Exact Match MIDR policy, the mismanagement of the voter rolls, and the lack of adequate training in connection with absentee ballot cancellation procedures.

**II)    Ebenezer Baptist Church ("Ebenezer") Has Suffered an Injury-in-Fact Caused by Defendants.**

**A. Ebenezer's Organizational Purpose**

133.    For decades, Plaintiff Ebenezer Baptist Church has played a pivotal role in connection with voting rights. In 1935, then-Ebenezer pastor Martin Luther King, Sr., led a voting rights campaign in the City of Atlanta 30 years before the voting rights law was passed. PX. 2053 at 35:10–17 (Warnock Dep.).

134.    Ebenezer has continued this tradition ever since. <u>See</u> PX. 2053 at 41:17–18

(Warnock Dep.)[5] (the tradition of supporting voting rights is "bigger than

Ebenezer. It's a tradition of the black church.").

135.    Ebenezer's current Senior Pastor, United States Senator Reverend Raphael

Warnock, testified that encouraging civic participation and voting is

central to Ebenezer's organizational mission. PX. 2053 at 72:8–10 (Warnock

Dep.) ("We take voting seriously" because "citizenship is part of our

Christian responsibility.").

---

[5] <u>See</u> Defendants' objections and Plaintiffs' responses at Doc. No. [767-1] at 8–9.
Defendants' blanket objections to this deposition testimony are not well-founded. *First*,
this testimony is relevant because the witness is outlining Ebenezer Baptist Church's
mission and how voting rights and combatting voter suppression fit within that
mission. *Second*, to the extent Defendants raise a foundation objection, Reverend
Warnock, as the Senior Pastor of the church, established his familiarity with all aspects
of the church's mission and operations. *Third*, the testimony contains statements of
facts, not opinions. But to the extent the testimony discusses about how voting rights fit
within a theological framework, Reverend Warnock holds a Ph.D. in systematic
theology and is amply qualified to discuss that topic. <u>See</u> PX. 2053 at 13:12–15 (Warnock
Dep.). *Fourth*, Defendants' "argumentative" objection misses the mark because such
objections are meant to control the questioner, not the witness, and defense counsel
conducted this deposition. *Finally*, Defendants' "scope" objection fails because the cited
authority, Federal Rule of Evidence 1002, relates to original documents, not the conduct
of an examination. Moreover, Reverend Warnock was simply responding directly to the
question asked.

136.   The church's view on the importance of voting is tied to the church's understanding of theology. According to Reverend Warnock, Ebenezer views "democracy [as] the political expression of this idea that all human beings are created in the image of God" and as "the best protection we have in society against the excesses of the powerful trampling the concerns of the weak." PX. 2053 at 39:6–10 (Warnock Dep.).[6]

137.   In short, for Ebenezer, voting rights are "a moral issue and a spiritual issue," PX. 2053 at 39:1–4 (Warnock Dep.),[7] and protecting those rights is a "key part of Ebenezer's mission," id. 41:3–6;[8] see also id. 93:14–17 ("Mobilizing people to vote, registering people to vote, and challenging unjust policies that create unnecessary barriers to voting . . . are all a part of the mission of [Ebenezer]."); id. 93:2–4 ("[C]ivic participation is part of what it means to be a Christian in the world").

---

[6] See Defendants' objections and Plaintiffs' responses at Doc. No. [767-1] at 5–6; see also supra note 5.

[7] See Defendants' objections and Plaintiffs' responses at Doc. No. [767-1] at 5–6; see also supra note 5.

[8] See Defendants' objections and Plaintiffs' responses at Doc. No. [767-1] at 6–7; see also supra note 5.

138.    Since the early 2000s, under Reverend Warnock's leadership, Ebenezer's

voting efforts have focused primarily on "voter education, registration,

[and] mobilization." PX. 2053 at 35:17–36:9 (Warnock Dep.). Those efforts

have emphasized the importance of voting; encouraged individuals to

register to vote; reminded people of upcoming elections; and opened

Ebenezer's doors to candidates for office, regardless of their political party.

PX. 2053 (Warnock Dep.) at 44:10–23; id. 71:15–23.

### B.  Ebenezer Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation during the 2018 Election Cycle.

139.    Prior to the 2018 election cycle, Ebenezer devoted its voting efforts to

general get-out-the-vote activities, consistent with the church's focus on

voter registration, education, and mobilization. See PX. 2053 at 49:1–3

(Warnock Dep.); see also id. 46:6–13 (Ebenezer's "souls to the polls" efforts

in prior years was "about getting those people to the polls, but it was as

much about raising awareness about the fact that there's an election

happening").

140.    Reverend Warnock testified Ebenezer's voting efforts changed in 2018,

however, when Ebenezer expanded its voting efforts to counteract the

harmful effects of Defendants' challenged voting practices, specifically the Exact Match MIDR policy and the Secretary of State's voter roll mismanagement. PX. 2053 at 47:7–49:5 (Warnock Dep.) (discussing Ebenezer's concern about "cross-matching"); see also id. 104:15–18.

141. According to Reverend Warnock, the church would not "allow anything to thwart [its] mission." PX. 2053 at 108:7–11 (Warnock Dep.). In Reverend Warnock's words, that has meant, "we had to step up and be more vigilant and make sure that our mission was carried out, which was to make sure that people can vote. But it made that work much harder is what I would say." Id. 108:12–16.

142. Counteracting the problems caused by the Exact Match MIDR policy and voter roll mismanagement issues became a central focus of Ebenezer's voting-related work in the lead-up to the 2018 election. See PX. 2053 at 48:5–25 (Warnock Dep.), id. 48:17–21 ("Q. And the work to counteract voter suppression has happened in elections before the 2018 election; correct? A. Not with this kind of focus that we've had to put forward in 2018.").

143.   Reverend Warnock testified that, as a result of the Exact Match MIDR

policy and voter roll inaccuracies, the church in 2018 added one more

step—voter registration verification—to the church's previous emphasis

on voter registration, education, and mobilization. PX. 2053 at 49:1–5

(Warnock Dep.).

144.   Starting in 2018, Ebenezer emphasized to its members that they should

verify the accuracy of their voter registration information and status prior

to election day. Church staff and volunteers explained to members,

including those who had voted for decades, that "even though [they have]

never missed an election," they could have been erroneously dropped

from the voter rolls and would be unable to vote as a result unless they

checked their registration status and corrected any errors in time for the

2018 election. PX. 2053 at 49:15–18 (Warnock Dep.).

145.   To avoid these problems, Ebenezer "spent . . . resources and time"

focusing on verification, including "time and energy, staff time, resources,

and Sunday morning worship time getting people to understand how to"

verify their registrations. PX. 2053 at 185:8–24 (Warnock Dep.).

146.    These resources included both volunteer time and staff time. Reverend

        Warnock explained that Ebenezer has limited paid staff who oversee and

        supervise Ebenezer's volunteer-led ministries and other church efforts.

        PX. 2053 at 107:11–14 (Warnock Dep.). Because the church's paid staff is so

        small, volunteer efforts "literally involve[] the entire ministerial staff and

        the entire administrative staff." Id. 108:1–6.

147.    In addition to the above-described activities, Ebenezer launched the

        following specific initiatives to counteract the wrongdoing asserted in this

        case.

### (1)    Voter Registration Verification Hotline

148.    In 2018, Ebenezer set up a hotline to assist with voter verification issues.

        PX. 2053 at 51:7–12 (Warnock Dep.). This was the first time that Ebenezer

        offered a voting hotline at the church "to help people who were having

        problems." Id. 52:24–53:12; see also id. 71:9–72:1.[9]

---

[9] See Defendants' objections and Plaintiffs' responses at Doc. No. [767–1] at 16–17.
Defendants' objections, which target the testimony at 71:12–14, are not well-founded.
This testimony is relevant because Reverend Warnock is outlining Ebenezer Baptist
Church's voter registration verification efforts in 2018, which goes directly to the
challenged practices. As for Defendants' other blanket objections, they fail for the
reasons discussed earlier. See supra note 5.

149.   Ebenezer allocated volunteer time to making sure callers were registered to vote and to assisting callers with any voting questions they had. PX. 2053 at 51:7–12 (Warnock Dep.).

150.   In addition to providing volunteer time, the church provided physical space for the hotline, space the church had not previously used in connection with prior election efforts. PX. 2053 at 111:10–21 (Warnock Dep.) ("Well, church space would have been used differently when we set up the hotline to assist people who were having issues.").

**(2)   Phone Banks**

151.   Ebenezer's Social Justice Ministry organized and provided volunteers for a two-day phone bank in the fall of 2018 to encourage voters to check their registration status. PX. 2053 at 70:25–71:8 (Warnock Dep. Designation).

152.   Prior to 2018, Ebenezer had not hosted phone banks to encourage voters to verify their registration status. PX. 2053 at 71:9–72:1 (Warnock Dep.).[10]

---

[10] See Defendants' objections and Plaintiffs' responses at Doc. No. [767-1] at 16–17, pertaining to testimony at 71:12–14; see also supra note 9.

### (3)   Voter Education Efforts

153.    In 2018, Reverend Warnock invited staff from the New Georgia Project to the church to introduce a voting application for mobile phones that would allow people to verify that they were registered. PX. 2053 at 59:13–18 (Warnock Dep.).

154.    Reverend Warnock used time during worship services to introduce the application, and the church held a rally after the service to roll out the application. PX. 2053 at 59:19–24 (Warnock Dep.).

### (4)   Encouraging Vote by Mail and Early Voting

155.    In the lead-up to the 2018 election, Ebenezer for the first time began encouraging voters to vote early or by absentee ballot. PX. 2053 at 183:12–17 (Warnock Dep.); see also id. 103:3–8, 103:10.

156.    Reverend Warnock testified that, prior to 2018, Ebenezer had not prioritized voting by mail because it was "cumbersome." PX. 2053 at 49:21–50:8 (Warnock Dep.).

157.    Ebenezer's 2018 "vote by mail" campaign was driven by its concerns about encouraging voters, especially seniors and students, to verify their registration status. See PX. 2053 at 49:12–25, 50:2–4 (Warnock Dep.) ("We

put a lot more emphasis on verification . . . trying to encourage people to

verify their registration . . . which is why we did our 'vote by mail'

campaign . . . [b]ecause it is the one method where . . . you can track your

vote. You've got a paper trail."); id. 110:9–24[11] ("[A]ll of the [voter

suppression] practices were a part of our concern . . . . [W]e were

concerned enough to try to add [vote by mail] as one more tool in our

toolbox to respond to the voter suppression tactics.").

158.   The church diverted volunteer resources and accompanying staff time to

assist with supervising, developing, and implementing the "vote by mail"

program. PX. 2053 at 106:22–107:25 (Warnock Dep.).

159.   Reverend Warnock and other staff members also spent staff time

participating in a video explaining the vote by mail process, which they

then sought to distribute to pastors and faith leaders statewide. PX. 2053 at

183:21–25 (Warnock Dep.); id. 184:14–16.

---

[11] See Defendants' objections and Plaintiffs' responses at Doc. No. [767-1] at 23–24; see also supra note 9.

160.   Ebenezer also expended financial resources specifically to support the vote by mail effort. PX. 2053 at 185:8–14 (Warnock Dep.).

### C. Ebenezer Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation in the 2020 Election Cycle, and Ebenezer Continues to Do So Today.

161.   Because the voting issues Ebenezer began addressing in 2018—specifically Exact Match MIDR, voter roll inaccuracies, and absentee ballot cancellation procedures—are ongoing, Ebenezer continued and expanded its efforts, including registration verification and the "vote by mail" program, in the 2020 election cycle. PX. 2053 at 59:3–8 (Warnock Dep.); see also Tr. 2944:9–2946:8 (Reverend Vaughn); Tr. 2948:6–19 (Reverend Vaughn).

162.   Ebenezer continued to encourage voters to check their registration status. PX. 1943 at Pltfs-EBC-001679 (Blessed Ballot flyer directing voters to "Check Your Status"); see also Tr. 2950:8–16 (Reverend Vaughn).

163.   Ebenezer also continued to encourage voters to vote by mail and vote early. PX. 1944 at Pltfs-EBC-001676–77 (email from the Social Justice Ministry Steering Team advertising Blessed Ballot weekend); see also Tr. 2951:6–12, 2952:25–2953:5 (Reverend Vaughn).

### (1)     Blessed Ballot Weekend

164.   In addition to the specific activities that Ebenezer undertook in the 2018

election cycle, during the 2020 election cycle Ebenezer hosted a new series

of "Blessed Ballot" events in October 2020. PX. 1944 (email from the Social

Justice Ministry Steering Team advertising Blessed Ballot weekend). These

programs included ministry meetings, prayer sessions, panel discussions

led by voting rights groups including the Georgia NAACP and Fair Fight

Action, and worship services designed to drive voter turnout and equip

voters with the tools and knowledge to establish a voting plan and vote

early. See PX. 1911 ("Black-led Voter Power Panel" flyer); Tr. 2953:6–23

(Reverend Vaughn).

165.   The church devoted church space and volunteer time to these efforts. PX.

1910 (Ebenezer's Blessed Ballot Volunteer Sign-Up spreadsheet); PX. 1913

(Blessed Ballot volunteer assignments spreadsheet); see also Tr. 2948:20–

2949:5 (Reverend Vaughn).

166.   Ebenezer's executive staff and ministry leaders also devoted substantial

time to plan, coordinate, and advertise the Blessed Ballot weekend. See PX.

1944 (email from the Social Justice Ministry Steering Team advertising

Blessed Ballot weekend); PX. 1951 (outline of Ebenezer's "Blessed Ballot: Proposed Comms Plan"); <u>see also</u> Tr. 2948:20–2949:5 (Reverend Vaughn).

### D. Ebenezer Has Diverted Resources from Ebenezer's Core Activities to Counter Voter Suppression Practices at Issue in this Litigation.

167. Devoting the resources discussed above to addressing Defendants' Exact Match MIDR policy, absentee ballot cancellation, and mismanagement of the voter rolls prevented Ebenezer from accomplishing other priorities on its very full agenda. PX. 2053 at 106:22–107:25 (Warnock Dep.).

168. As Reverend Warnock explained, the same volunteers who participate in Ebenezer's voting work also volunteer in other areas of church life. PX. 2053 at 107:15–25 (Warnock Dep.) ("So volunteer time was diverted. And the volunteers who do this kind of work in voting, they volunteer in other areas of church life as well.").

169. Thus, diverting volunteer time to voter registration verification efforts affected other church programs that rely on the same volunteers, including Ebenezer's "soup kitchen, the Crisis Closet, Cutting Through Crisis, [] work with [church] children," or one of the church's other "dozens of programs." PX. 2053 at 107:15–25 (Warnock Dep.).

170.   Reverend Warnock credibly testified that he would "like to spend more

time engaged in other kinds of outreach, engaged in providing people the

. . . kind of quality of life that the vote helps to secure. . . . But if we need to

be engaged in [fighting voter suppression by addressing the challenged

practices], absolutely, we will." PX. 2053 at 190:8–16 (Warnock Dep.).[12]

171.   Reverend Vaughn testified that if Plaintiffs' claims are successful, the

church would spend fewer resources addressing the challenged practices.

Tr. 2955:15–24; Tr. 2958:24–2959:1 (Reverend Vaughn).

* * *

172.   The Court finds that Ebenezer has demonstrated by a preponderance of

the evidence that it has suffered a concrete injury-in-fact by diverting its

organizational resources to counteract the Exact Match MIDR policy, the

mismanagement of the voter rolls, and the lack of adequate training in

connection with absentee ballot cancellation procedures.

---

[12] See Defendants' objections and Plaintiffs' responses at Doc. No. [767-1] at 33–34.
Defendants' objections are not well-founded. This testimony is relevant because
Reverend Warnock is discussing how Ebenezer Baptist Church would reallocate its
limited resources if the challenged practices were ended, which goes directly to
standing. As for Defendants' other blanket objections, they fail for the reasons discussed
earlier. See also supra notes 5 and 9.

173.   In so finding, the Court rejects Defendants' argument that Ebenezer's efforts in 2018 and thereafter to have voters check their registration status and vote by mail is no different from Ebenezer's voting activities prior to the 2018 election. <u>See</u> PX. 2053 at 48:17–25 (Warnock Dep.); Tr. 2964:3–2965:13; 2967:18–24 (Reverend Vaughn). Reverend Warnock credibly testified that, prior to the 2018 election cycle, Ebenezer did not engage in voter registration verification and instead focused on typical get-out-the-vote campaigns. PX. 2053 at 49:1–5 (Warnock Dep.). But since 2018, Ebenezer has "had to add one more step" by focusing on verification, including urging even consistent voters to check their registration status. <u>See</u> <u>id.</u> 49:3–5, 108:23–109:3.[13]

174.   Further, the Court finds it irrelevant to Ebenezer's standing that Reverend Warnock was formerly the board chairman of the New Georgia Project. Tr. 3852:8–11 (Groh-Wargo).

---

[13]  <u>See</u> Defendants' objections and Plaintiffs' responses at Doc. No. [767-1] at 21–22. This testimony is relevant because Reverend Warnock is discussing Ebenezer's voter registration verification efforts, which goes directly to the challenged practices. As for Defendants' other blanket objections, they fail for the reasons discussed earlier. <u>See also</u> <u>supra</u> note 5 and 12.

### III)   Care in Action Has Suffered an Injury-in-Fact Caused by Defendants.

### A. Care in Action's Organizational Purpose

175.   Care in Action is a nonprofit organization that operates nationwide but has a substantial focus on Georgia. Tr. 83:20–23 (Livoti).

176.   Care in Action's mission is to fight for fairness and dignity for domestic workers, including by helping them exercise their rights, of which their right to vote is one of the most important. Tr. 83:7–12 (Livoti).

177.   Care in Action believes that exercising the right to vote is central to its mission because it is one of the best ways to secure fairness and dignity for domestic workers. Tr. 89:15–90:8 (Livoti).

178.   Care in Action's voting-related programs have typically focused on encouraging domestic workers, primarily women of color, to turn out and vote in each election. Tr. 91:2–16.

179.   Jessica Livoti, Care in Action's former executive director and currently a member of its board of directors, testified that when people in Care in Action's target population do not vote, it is often because they need individualized outreach. Tr. 80:1–4; 91:17–24 (Livoti).

180.   Prior to 2018, Care in Action did not view voter protection as part of its

voting work. Tr. 92:21–93:4 (Livoti). Rather, Care in Action's voter-related

work focused on voter turnout. Tr. 93:5–23 (Livoti).

### B. Care in Action Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation during the 2018 Election Cycle.

181.   Going into the 2018 election in Georgia, Care in Action planned for its

voting work to end on Election Day. Tr. 94:6–10 (Livoti).

182.   But Care in Action was forced to continue working past Election Day

because voters who Care in Action had encouraged to go to the polls

"were not actually able to cast their vote" on Election Day at the polls and

so, Livoti said, "our job wasn't done." Tr. 94:19–20 (Livoti).

183.   To finish its job, Care in Action stayed in Georgia after the election to make

sure voters who had voted provisionally cured their issues in a timely

manner and their ballots counted. Care in Action's post-election work in

this regard involved direct and continued voter engagement. Tr. 95:1–21

(Livoti).

### (1)    Staff and Volunteer Time

184.    To encourage voters to cure their provisional ballots, Care in Action

engaged in door-to-door communications, phone banks, text message

campaigns, and social media efforts. Tr. 95:9–21 (Livoti).

185.    Care in Action dedicated additional staff time and resources to these

efforts, which meant that those staff members were unable to work on

immigration matters, including specifically leading the movement to end

family separation and family detention at the border. Tr. 96:6–97:24

(Livoti). Care in Action also recruited volunteers for phone banks and text

banks and bought digital advertisements to reach potentially impacted

voters. Tr. 96:4–12 (Livoti); PX. 902.

### (2)    Travel, Housing, and Meal Expenses

186.    Care in Action paid for the housing, travel and meal expenses of staff

members who stayed in Georgia to work on these post-election activities.

See PX. 915 (receipt documenting an additional $447.15 incurred for

Airbnb reservations); PX. 916, 922, 940 (receipts documenting expenses to

change flights for two Care in Action staff members as a result of post-

election activities); PX. 1006 (invoice for Care in Action's post-election

expenditures, including meals and transportation for staff).

### (3)   Digital Ad Buys

187.   Care in Action spent $107,500 on post-election digital ads to reach

potentially affected voters who had cast provisional ballots. Tr. 96:4–12

(Livoti); PX. 902.

### (4)   Additional Training

188.   Care in Action also provided post-election trainings to voters and

canvassers about how they could cure their provisional ballots so that

those ballots would be counted. Tr. 98:2–12 (Livoti).

### C.   Care in Action Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in This Litigation in the 2020 Election Cycle, and Care in Action Continues to Be Forced to Do So Today.

189.   The experience with the 2018 election caused Care in Action to expand the

scope of its voting-related work and to start reaching out to voters earlier

in the election cycle. Tr. 108:6–9 (Livoti).

190.   Care in Action realized from the high number of provisional ballots in

2018 that it needed to discuss the voting process with prospective voters to

educate them about how the challenged practices could prevent them from casting a valid ballot. Tr. 108:9–16; 146:17–21 (Livoti).

191.   Engaging in voter protection work much earlier in the process has caused Care in Action to incur additional costs to train staff and canvassers and to devote more time to its voting activities. Tr. 117:4–6 (Livoti) ("To do that we have to start a lot earlier. That costs money; that costs canvassers; that costs time. It makes us kind of change the calendar of the organization.").

### (1)   Voter Education and Registration Verification

192.   After the 2018 election, Care in Action took steps to ensure canvassers were appropriately trained to make sure voters understood that they may face challenges at the polls and what those challenges may be. Tr. 115:15–116:13 (Livoti). The effort required Care in Action to "invent whole new programs" to support training staff, canvassers, and volunteers to navigate the "complicated and laborious" conversations with voters. Tr. 108:9–16 (Livoti).

193.   Care in Action has trained its canvassers to be able to educate voters about the Exact Match MIDR policy because Care in Action serves a population that commonly has multiple names, hyphenated names, or names that

elections officials may have difficulty spelling. Tr. 149:14; 150:1–4; 158:4–6 (Livoti).

194.   Care in Action discusses Exact Match MIDR issues with voters because the MIDR flag can create issues when they try to vote, even after HB 316. Tr. 161:21–162:1 (Livoti).

195.   Care in Action has also trained its canvassers to be able to educate voters about the Exact Match Citizenship policy because Care in Action serves a population with a high number of immigrants and naturalized citizens. Tr. 115:4–10; 131:10–18; 158:4–6; 179:1–11; 180:22–25 (Livoti).

196.   Care in Action encourages naturalized citizens to bring their naturalization papers with them to the polls even though that advice conflicts with Care in Action's philosophy that naturalized citizens should be accorded the same dignity as birthright citizens. Tr. 113:19–114:17 (Livoti).

197.   Care in Action has trained its canvassers to be able to educate voters about the challenges they may face due to voter roll inaccuracies, including being registered at the wrong address (due to being a transient population) and

being registered under the wrong name. Tr. 89:11–12; 109:10–12; 119:9–12; 130:5–15; 151:4–7; 158:4–6; 175:6–16; 181:1–4 (Livoti).

198.   In 2020, through its canvassers, Care in Action spoke to over 100,000 voters in Georgia, but Care in Action could have reached more voters if all it had to do was traditional get-out-the-vote work, where conversations with voters are not so complex and time consuming. Tr. 115:18–23; 117:12–22 (Livoti).

199.   Care in Action has also fielded questions from voters and educated them on the issues that could arise with absentee ballots and the process for voting in-person if they did not receive the absentee ballot they requested. Tr. 119:8–9; 141:17–24; 160:20–25 (Livoti).

200.   Care in Action also created a digital hotline for voter complaints. Tr. 118:22–24 (Livoti). Among other issues, voters regularly used the hotline to report inaccuracies in their voter registration data. Tr. 151:1–7 (Livoti).

### (2)   New Job Requirements

201.   Based on Care in Action's 2018 experience in Georgia, Care in Action changed its job requirements to ensure it has more employees with experience in voter protection efforts. Tr. 108:4–6 (Livoti).

### (3)   Increased Budget

202.   Since the 2018 election, Care in Action has begun holding over $250,000 in reserve in anticipation of additional post-election costs. Tr. 118:7–10 (Livoti).

203.   Livoti testified that an earmark of this size poses a considerable strain on the organization's budget, but is necessary to enable Care in Action to follow up with voters after the election. Tr. 118:11–16 (Livoti).

## D. Care in Action's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from Its Other Activities.

204.   As a result of its expanded voting work, Care in Action has diverted resources from its other program priorities. Tr. 123:6–124:3 (Livoti).

205.   Care in Action's unexpected voting work in 2018 prevented Care in Action from timely completing its strategic planning for 2019, which was scheduled to occur during the time the staff was engaged in their post–election efforts in Georgia. Tr. 98:19–21 (Livoti).

206.   As a result of its participation in helping voters make their provisional ballots count in the 2018 election, Care in Action had to forgo sending staff to Mexico to work on immigration issues. Tr. 97:18–20 (Livoti).

207.   More broadly, Care in Action's voter protection efforts have taken Care in

        Action's resources away from its core work of organizing of domestic

        workers, engaging in state and federal legislative advocacy for domestic

        workers, and providing on-the-job training for domestic workers. Tr.

        123:6–124:3 (Livoti).

208.   These diversions are ongoing. As Livoti testified, Care in Action will

        continue its efforts to counteract voting issues in Georgia, but it would not

        need to do so if the practices in dispute were remedied. Tr. 124:4–11

        (Livoti).

* * *

209.   The Court finds that Care in Action has demonstrated by a preponderance

        of the evidence that it has suffered a concrete injury-in-fact by diverting its

        organizational resources to counteract the Exact Match MIDR and

        citizenship policies, the mismanagement of the voter rolls, and the lack of

        adequate training in connection with absentee ballot cancellation

        procedures.

210.   In so finding, the Court rejects Defendants' argument that Care in Action

        was not injured by its diversion of resources because its efforts in 2018 to

help voters cure their provisional ballots were to help Stacey Abrams get elected in 2018, an election that would have advanced Care in Action's mission. See Tr. 142:16–19; 156:25–157:11 (Livoti).

211. The testimony and exhibits proffered by Care in Action belie Defendants' argument. When describing Care in Action's efforts in the provisional ballot chase after the 2018 election, Livoti credibly testified that regardless of the organization's political endorsements, its intent was not to advance one candidate over another; instead, it was focused on the voters and making sure they understood how to cure their provisional ballots. Tr. 156:25–157:11 (Livoti). Finally, even in elections in which Ms. Abrams was not a candidate, Care in Action engaged in activities to counteract the problems that domestic workers face from Exact Match identity and citizenship policies, from voter roll mismanagement, and from incorrect handling of absentee ballot cancellations. See Section III(C), supra.

212. Further, the Court finds it irrelevant to Care in Action's standing that Congresswoman Nikema Williams was formerly involved in Care in Action's leadership. See Tr. 132:3–21 (Livoti).

**IV)   Fair Fight Action Has Suffered an Injury-in-Fact Caused by Defendants.**

### A. Fair Fight Action's Organizational Purpose

213.   Fair Fight Action is a non-profit organization that operates nationwide, with its primary activities focused on Georgia. Tr. 1383:22–1384:1 (Stewart-Reid).

214.   Fair Fight Action was originally formed in 2014 with the name Voter Access Institute ("VAI"). Tr. 1395:12–17 (Stewart-Reid).

215.   VAI changed its name to Fair Fight Action in 2018. Tr. 1395:21–23 (Stewart-Reid). Although the organization's name changed, its mission remained the same: voter education, Get Out the Vote efforts, and progressive issue research. Tr. 1395:18–20, 1396:5–7 (Stewart-Reid); Tr. 3852:20–3853:5, Tr. 3857:20–3858:3 (Groh-Wargo); see also Tr. 3877:14–18 (defense counsel acknowledging "[w]e established that the Voter Access Institute was Fair Fight. It just simply changed its name.").

216.   Fair Fight Action is particularly focused on supporting marginalized communities, voters of color, young voters, and low-income voters. Tr. 1396:8–13 (Stewart-Reid).

217.   Fair Fight Action also has a research department that focuses on progressive issues, such as Medicaid expansion and reproductive rights. Tr. 1414:11–15 (Stewart-Reid).

218.   The Court finds credible the testimony of Ms. Groh-Wargo, who testified that while Fair Fight Action's core mission was voter engagement activities, not combating voter suppression, but that the only way Fair Fight Action could protect that core mission was to counteract the voter suppression Fair Fight Action saw in the 2018 election. Tr. 3858:4–3859:5 (Groh-Wargo).

### B. Fighting Voter Suppression Is Not Fair Fight Action's Core Mission.

219.   Defendants argue that the core mission of Fair Fight Action and Voter Access Institute is to fight voter suppression, but the evidence is to the contrary.

220.   Because of what it observed in the 2018 election, Fair Fight Action began to expend resources to mitigate voter suppression as a means to protect its core mission, which is voter education, Get Out the Vote efforts, and progressive issue research. Tr. 3858:4–3859:5 (Groh-Wargo).

221.   In other words, Fair Fight Action took on the "extra work" of fighting

voter suppression as a step to achieving its core mission. Tr. 3859:3–5,

3895:20–3896:1, 3930:25–3931:4 (Groh-Wargo). But the core mission of the

organization did not change. Tr. 3930:25–3931:1 (Groh-Wargo).

222.   Similarly, Fair Fight Action's current executive director, Cianti Stewart-

Reid, credibly testified that Fair Fight Action has had to divert resources

away from its core mission to address voter suppression. Tr. 1395:25–

1396:4, 1459:3–11 (Stewart-Reid); see also Tr. 1397:20–25, 1458:7–15

(Stewart-Reid) (discussing how educating voters requires Fair Fight Action

to spend more time with each voter and devote more resources than is

necessary for basic topics covered in standard voter education activities).

223.   While Defendants contend that, as far back as 2014, Voter Access Institute

was using voter suppression as a way to motivate people to vote, this

argument neither addresses what Voter Access Institute's core purpose

was nor is borne out by the evidence. Defendants base their argument on a

single 2014 Voter Access Institute planning document, which there is no

evidence was ever put into practice. See DX. 116. Ms. Groh-Wargo, who

the Court finds credible, testified that that Voter Access Institute never

used voter suppression as a way to motivate people to vote. Tr. 3895:5–
3896:15 (Groh-Wargo).

224.   Defendants also argue that Stacey Abrams' statements to the press,

including her gubernatorial "acknowledgment" speech on November 18,

2018 and statements made in a September 6, 2019 Teen Vogue article

establish that the core mission of Fair Fight Action is to combat voter

suppression. See DX. 285[14] and DX. 286. Such an argument belies the

content of the documents.

225.   In her acknowledgment speech, Ms. Abrams, the gubernatorial candidate

announced the launch of Fair Fight Georgia to "pursue accountability in

Georgia's election and integrity in the process of maintaining our voting

rolls." DX. 285. She never indicated that the core mission of the

organization was to fight voter suppression. Instead, she identified

activities the organization planned to engage in. Similarly, in the Teen

---

[14]  DX. 285 is not in the record. In response to Plaintiffs' hearsay and relevance
objections, and after a colloquy with the Court, defense counsel agreed to "work on a
redacted 285." Tr. 3882:1–2; see also Tr. 3875:13–3878:21; 3880:23–3881:23. But defense
counsel never produced or offered the redacted version. Accordingly, although
Plaintiffs address DX. 285 above to avoid waiver, Plaintiffs maintain that DX. 285 is not
in evidence, and Defendants' argument relative to this exhibit should be disregarded.

Vogue article, when asked to talk about "what Fair Fight does," Ms.

Abrams purportedly stated that "we work with people around the country

because we focus on litigation, legislation, and advocacy." DX. 286.

226.   The Court finds that even if Ms. Abrams statements in DX. 285 and DX.

286 are attributable to Fair Fight Action, neither statement establishes that

the core mission of Fair Fight Action was to fight voter suppression.

### C. Fair Fight Action Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation After the 2018 Election, Including in the 2020 Election Cycle, and Continues to Be Forced to Do So Today.

227.   Following the problems during the 2018 election, Fair Fight Action

anticipated that it would need to divert additional resources to counteract

voter suppression in future Georgia elections. Tr. 1395:25–1396:4 (Stewart-

Reid); see also Tr. 3858:4–17 (Groh-Wargo). This prediction has proven

true.

228.   Fair Fight Action's work to counteract Defendants' unlawful actions has

required Fair Fight Action to divert resources from its other programs,

such as get-out-the-vote campaigns, the provision of general election

information to voters, and support of other progressive causes. For

instance, Ms. Stewart-Reid testified that volunteers cannot make as many calls encouraging individuals to get out and vote, because they have to spend time with voters focused on the challenged practices, and at the same time the practices prevent volunteers from having "deeper, longer, more meaningful conversations with voters." Tr. 1424:16–22 (Stewart-Reid); see also Tr. 1459:3–14 (Stewart-Reid) (absent the challenged practices, volunteers "could turn out more people, they could get more people engaged, which is our goal. We'd be able to have more conversations with folks and educate them on why it's important to participate, as opposed to educating them on these specific practices and how they have to combat them.").

229.    To combat the challenged practices, Fair Fight Action created new initiatives, including Fair Fight U, the Democracy Warriors, an Organizing department, a poll observer program, voter roll verification efforts, and a story collection project. Tr. 1399:14–18 (Stewart-Reid); Tr. 1066:6–8 (Conrad).

230.    Liza Conrad, the head of the Voter Protection Department, testified that Fair Fight Action has undertaken efforts to address voter registration

problems caused by Exact Match Citizenship, including individuals forced to verify their citizenship after being erroneously flagged as non-citizens, and voter roll irregularities. Tr. 1084:2–20 (Conrad).

231.   Stewart-Reid further testified that Fair Fight Action has devoted resources to educating voters about the absentee ballot cancellation process, which is not part of standard voter education, to counteract the State's failure to adequately train election officials about this practice. Tr. 1398:7–19 (Stewart-Reid).

232.   Fair Fight Action devoted substantial staff, volunteer, and financial resources to these efforts, including launching the specific initiatives discussed below, which are each tied to the practices Plaintiffs challenge. See Tr. 3870:21–3871:5 (Groh-Wargo).

(1)   **Fair Fight U**

233.   Stewart-Reid testified that Fair Fight Action created the "Fair Fight U" program shortly after the 2018 election as a direct response to the voter registration issues and absentee ballot cancellation problems that Fair Fight Action observed during the election. Tr. 1399:25–1400:18 (Stewart-Reid); see also Tr. 3870:11–17 (Groh-Wargo).

234.   Fair Fight U is a college-based program present on six college campus in Georgia that trains and educates students about exact match, voter roll inaccuracies, and absentee ballot cancellation. Tr. 1399:21–24 (Stewart-Reid).

235.   Stewart-Reid testified that Fair Fight Action wanted to work with college students because they are more likely to vote by absentee ballot and, therefore, more likely to experience absentee ballot cancellation issues. Tr. 1400:14–18 (Stewart-Reid).

236.   Fair Fight Action has dedicated staff time and financial resources to the Fair Fight U program. Staff members work extensively to train campus volunteers and help get Fair Fight U chapters up and running at the six schools that currently have them. Fair Fight Action also devotes financial resources to holding program activities on campuses. Tr. 1401:3–9, 1402:10–11 (Stewart-Reid).

237.   Fair Fight U also creates programs to mitigate identity exact match issues by educating college students about Georgia's exact match requirements and ensuring that their voter registration information is correct. Tr. 1400:9–18 (Stewart-Reid).

238.  Fair Fight U includes programs to mitigate voter roll inaccuracies by encouraging college students to check their voter registration information for accuracy. Tr. 1400:21–23 (Stewart-Reid).

239.  Fair Fight U includes programs to ensure college students are informed about how to cancel their absentee ballots. Tr. 1401:19–1402:2 (Stewart-Reid).

### (2)  Democracy Warriors

240.  Fair Fight Action also created the "Democracy Warriors" program shortly after the 2018 election to improve Fair Fight Action's capacity to address the voter registration issues and absentee ballot cancellation problems that Fair Fight Action observed during the election. Tr. 1402:14–1403:11 (Stewart-Reid); see also Tr. 3869:2–3870:10 (Groh-Wargo).

241.  The Democracy Warriors program is a robust volunteer program. Tr. 1402:16–18 (Stewart-Reid).

242.  Democracy Warriors volunteers hold "extended conversations" with voters to address the challenged practices, including reminding voters the need to check the accuracy of their voter registration information and the procedures they should follow if they requested an absentee ballot and

later seek to vote in person. Tr. 1403:1–11; 1403:15; 1403:18–19; 1403:23–1404:1 (Stewart-Reid); see also Tr. 1424:23–1425:1 (Stewart-Reid).

243.   Because these voting issues are more complicated than those involved in typical voter engagement work, the Democracy Warriors program and the conversations they have with would-be voters are necessarily more complicated and time consuming. Tr. 1405:4–8 (Stewart-Reid).

244.   These volunteers also serve as poll observers and conduct phone bank and text messaging campaigns to raise awareness about voting issues. Tr. 1403:15–19 (Stewart-Reid).

245.   In the summer of 2019, Fair Fight Action held Democracy Warrior Summits in Atlanta and Macon to train volunteers. Fair Fight Action spent $33,711 on the Atlanta Summit and $9,256 on the Macon Summit. PX. 1858 (Budget for Atlanta Summit); PX. 1859 (Budget for Macon Summit).

246.   Fair Fight Action held three additional Democracy Warrior Summits, which took place online after the onset of the pandemic. Tr. 1407:4–8 (Stewart-Reid).

247.   The virtual summits required Fair Fight Action to devote funds to running the programs, and Fair Fight Action staff are responsible for organizing the events and preparing training materials for them. Tr. 1407:12–18; 1407:23–1408:3 (Stewart-Reid).

248.   Stewart-Reid testified that if the volunteers did not have to focus on voter suppression tactics, they "could do deeper voter engagement and education." Tr. 1404:25–1405:3 (Stewart-Reid); see also Tr. 1425:7–8 (Stewart-Reid).

### (3)   Organizing Department

249.   Due to those increased activities to address voter suppression, Fair Fight Action created an Organizing department to manage Fair Fight Action's volunteers and its relationships with community partners. Tr. 1408:12–22 (Stewart-Reid); see also Tr. 3868:21–3869:3 (Groh-Wargo).

250.   These individuals also contact voters directly, asking them to be poll observers and ensuring they are trained on various voter suppression tactics, including the challenged practices. Tr. 1408:25–1409:12 (Steward-Reid).

251.   The Organizing Department also conducts outreach with community

partners to keep them apprised of voter suppression tactics, how to

become engaged, and how to communicate with their own communities.

Tr. 1408:15–22 (Stewart-Reid).

### (4)   Voter Protection Department

252.   Fair Fight Action's Voter Protection Department collects stories from

voters, helps voters ensure that their voter registration information is

accurate, and trains poll observers to support voters at the polls. Tr.

1059:12–14, 1066:6–8 (Conrad).

253.   The Department's work aims to educate voters about registration issues to

ensure that they remain on the voter rolls and eligible to vote. Tr. 1048:14–

19; 1065:24–1066:2 (Conrad).

254.   Fair Fight Action began its story collection program in response to the

problems that arose during the 2018 election. The purpose of the story

collection program was to learn about and understand the challenges

voters faced so that Fair Fight Action could develop tools to address those

problems effectively. Tr. 1054:3–7 (Conrad); see also Tr. 3906:3–10 (Groh-

Wargo). These stories inform Fair Fight Action's understanding of

Georgia's voting laws in general and the problems with Exact Match, voter roll inaccuracies, and absentee ballots in particular. Tr. 1083:6–11 (Conrad).

255.    Ms. Conrad credibly testified that collecting stories requires "tremendous resources." Tr. 1063:25–1064:2 (Conrad); see also Tr. 3907:16–25 (Groh-Wargo). Fair Fight Action has dedicated multiple staff members to this project full time. These staff members recruit and manage volunteers to conduct large phone banking and text banking events to reach out to voters. Tr. 1065:16–20; Tr. 1072:22–1073:6; 1073:21–1074:3 (Conrad); see also Tr. 3915:12–19 (Groh-Wargo).

256.    Collecting voter stories requires resources in proportion to the number of voters who experience problems; thus, if the challenged practices were eliminated, there would be fewer voters with problems and Fair Fight Action would redirect resources to its core activities: voter education, voter turnout, and advocacy around progressive issues. Tr. 1086:1–9; 1065:16–20 (Conrad).

257.    The Voter Protection Department also conducts an extensive poll observer program, which has been a "significant investment" for Fair Fight Action. Tr. 1078:13–20; 1082:14–15 (Conrad).

258. Ms. Conrad credibly testified that Fair Fight Action designed the poll observer program to account for and respond to the complexity of problems Georgia voters face due to the challenged practices. See Tr. 1076:24–1077:2; 1084:11–13 (Conrad). For example, Fair Fight Action stationed poll observers at polls to assist voters who encountered poll workers who "had not received the training and guidance to know how to allow [voters] to cancel their [absentee] ballot and vote in person." Tr. 1080:12–23 (Conrad). Poll observers helped "to connect the voter with [] resources so they can successfully overcome the hurdles presented by the [challenged] practices." Tr. 1084:16–20 (Conrad).

259. Fair Fight Action devoted staff time and financial resources to recruiting volunteers for this program and to assist volunteers with voter outreach and communications. Tr. 1077:25–1078:11; 1079:11 (Conrad); PX. 1949 (invoice for nearly $9,000 for buttons and yard signs dated Oct. 8, 2020).

260. More than 400 Fair Fight Action volunteer poll workers participated in the 2020 election cycle. See Tr. 1078:21–23 (Conrad). Fair Fight Action had to hire additional staff to recruit and train these volunteers. See Tr. 1077:7–8; 1079:1–6 (Conrad).

261.   If the Court grants Fair Fight Action the relief it seeks, it would enable the organization to reduce the scale of the poll observer program. Tr. 1082:6–13; 1083:7–11 (Conrad).

262.   Fair Fight Action's Voter Protection Department also conducts extensive verification efforts to ensure that voters have the correct information in the State's voter rolls. Ms. Conrad credibly testified that these efforts are necessary because Fair Fight Action "cannot take for granted that the way in which the State conducts list maintenance is accurate, such that voters who should be on the list to either be removed or to become inactive are there correctly, or that voters are going to receive notification of their placement on this list because we have received reports many, many times from voters that have indicated to us that they were on the list incorrectly, or that they never received notification of their status on the list to be removed or moved to inactive." Tr. 1066:19–1067:2 (Conrad); see also Tr. 1067:3–1068:13 (Conrad).

263.   Fair Fight Action's voter registration list accuracy campaigns encourage voters to "check and update their registration" information. Tr. 1068:14–23; 1069:24–1070:8 (Conrad).

264.   Fair Fight Action devotes financial resources for advertisements and mailers to inform voters about these campaigns. Tr. 1069:7–12 (Conrad); PX. 1920[15] (invoice for nearly $50,000 for ad buy dated Jan. 20, 2020).

265.   Fair Fight Action also spent nearly $40,000 on text banking and space rental in 2019 and an additional $2,500 on phone and text banking in 2021. Tr. 1073:23–1074:3; 1074:4–9; see also Tr. 1073:7–15 (Conrad).

266.   If Fair Fight Action were "able to rely on the accuracy of the [voter registration] list, both in that the folks who should be removed are actually the folks on the list and not someone else with a similar name; and second, that the folks who are on the list, [their] information is accurate such that they get notified, then" the Fair Fight Action would "dramatically scale back these activities" and no longer need to "invest time and energy in the proactive notification and outreach to voters." Tr. 1105:19–1106:7 (Conrad)

### (5)   Other Staffing

267.   Addressing voter list inaccuracies requires "the resources of [Fair Fight Action's] entire organization and each department." Tr. 1069:2–3 (Conrad).

---

[15] This invoice was admitted to show expenditures related to inaccurate registration lists, not anything related to the voter purge. Tr. 1071:14–19

268.    For example, the Communications Department has spent time creating graphics, press statements, and drafting social media content outlining the voter suppression tactics at issue to educate the media and the public at large. Tr. 1411:21–1412:16 (Stewart-Reid).

269.    The Communications Department also spent $2,000 creating a website called Peach Vote, which provided information about checking registration status. Tr. 1411:17–18; 1413:11–1414:5 (Stewart-Reid). The website also provided information about the absentee ballot cancellation process during the 2020 election. Tr. 1404:11–17 (Stewart-Reid).

270.    Fair Fight Action's Communications Department devotes resources to addressing identity exact match issues by creating public facing reminders, including on social media and launching the website peachvote.com, urging voters to check their registration status. Tr. 1412:21–1413:22 (Stewart-Reid).

271.    Fair Fight Action's Research Department has had to devote resources to media monitoring, particularly around the time of elections, to track and respond to the challenged practices. Tr. 1414:11–18 (Stewart-Reid).

### D. Fair Fight Action's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from Fair Fight Action's Other Activities.

272. Fair Fight Action's expanded focus on voter suppression has impacted virtually every other department, resulting in diversion of staff and financial resources across the entire organization. Tr. 1409:16–18; 1414:12–18 (Stewart-Reid); see also Tr. 3861:19–24 (Groh-Wargo).

273. Fair Fight Action's research team has diverted resources to "media monitoring" to alert the organization "to issues with absentee ballots or Exact Match or the list inaccuracies" "instead of doing research around progressive issues, around reproductive health and other issues that might come up." Tr. 1425:2–6 (Stewart-Reid); see also Tr. 3952:17–19 (Groh-Wargo).

274. If Fair Fight Action were not required to devote resources to mitigating voter registration issues and absentee ballot cancellation issues, Fair Fight Action would direct its budget and staff time to focus on promoting its core work of turning out voters, increase voter education efforts, and connecting with and empowering voters to facilitate an engaged electorate

and competitive elections in Georgia. Tr. 1426:6–15 (Stewart-Reid); Tr. 1086:15–19; 1087:11–15 (Conrad).

275. For example, Fair Fight Action could redirect more resources to its Civics for the Culture programming, which seeks to engage and educate young voters of color. Tr. 1087:11–15 (Conrad). These efforts are core to Fair Fight Action's core mission to "educate and empower voters." Tr. 1120:7–9 (Conrad).

276. If Fair Fight Action was not dedicating resources to combatting the challenged practices, it could dedicate more time to the educational component of voter protection to "creatively educate and empower voters and make the issues that are confronting them in the election relevant and exciting to them." Tr. 1086:10–19 (Conrad).

277. The need to address the challenged practices also prevents Fair Fight Action from expanding its partnerships in other states because "resource constraints" force Fair Fight Action to be "focused on Georgia." Tr. 1085:10–22 (Conrad); see also Tr. 1416:3–9 (Stewart-Reid); Tr. 1120:1–9; Tr. 1087:5–8 (Conrad).

* * *

278.   The Court finds that Fair Fight Action has demonstrated by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its organizational resources from its typical voter turnout and voter education activities to counteract the Exact Match MIDR and citizenship policies, the mismanagement of the voter rolls, and the lack of adequate training in connection with absentee ballot cancellation procedures. The Court credits the testimony of Ms. Groh-Wargo, Ms. Stewart-Reid, and Ms. Conrad.

### V)   Baconton Missionary Baptist Church Has Suffered an Injury-in-Fact Caused by Defendants.

#### A. Baconton's Organizational Purpose

279.   Baconton Missionary Baptist Church ("Baconton") is located in Walthourville, Georgia, which is in Liberty County. Baconton is affiliated with the general Missionary Baptist Convention. Tr. 2531:13–17 (Pastor Scott).

280.   Baconton was founded in 1869 by newly freed slaves. Tr. 2532:23–2533:10 (Pastor Scott). Since then, Baconton has maintained a deep commitment to civil rights and social justice issues. Tr. 2541:18–2542:14 (Pastor Scott).

281.  Today, the church has approximately 400 members. Tr. 2545:24 (Pastor Scott).

282.  Voting issues are a core part of Baconton's organizational mission and have been for several decades. Tr. 2550:13–24 (Pastor Scott). As Baconton's Senior Pastor, Reverend Doctor Hermon Scott, explained, the church built a community around core values espoused in Matthew 25, and encourages congregants to vote in accordance with these values. Tr. 2547:7–548:15 (Pastor Scott). Pastor Scott said this means encouraging voting for individuals who align with the organization's beliefs surrounding healthcare, homelessness, and incarceration. Tr. 2547:7–2547:25 (Pastor Scott).

283.  During Pastor Scott's tenure, Baconton has been actively involved in efforts to promote voter registration, voter education, and voter participation. Tr. 2549:1–6 (Pastor Scott).

284.  Baconton is strictly non-partisan and does not endorse political candidates. Tr. 2547:21–23, 2551:21–2552:1 (Pastor Scott). While Defendants noted the fact that Pastor Scott supported Stacey Abrams when she ran for governor in 2018, he did so in his personal capacity. Tr. 2551:24–2552:6.

285.  Pastor Scott credibly testified that his personal support of Ms. Abrams was
      not the reason he helped Baconton congregants ensure they were
      registered and registered accurately to vote in the 2018 election cycle. Tr.
      2552:7–15 (Pastor Scott).While Pastor Scott explained he was excited that
      his "granddaughter [would] have something to look forward to" and that
      his grandchildren could "look forward to [the day] they too might [] one
      day be governor" (Tr. 2632:19–21 (Pastor Scott)), Pastor Scott would have
      discussed these voter registration issues even if Stacey Abrams was not on
      the ballot in the 2018 general election, Tr. 2572:19–2573:1; 2573:18–2574:2
      (Pastor Scott).

286.  As Pastor Scott testified, "it would not matter whether or not leader
      Abrams decided to run or if Mickey Mouse ran. We still want it to be
      easier for people to vote." Tr. 2627:24–2628:1 (Pastor Scott).

   **B.  Baconton Diverted Resources to Counter the Unlawful Voter
        Suppression Practices at Issue in This Litigation During the
        2018 Election Cycle.**

287.  Prior to 2018, Reverend Scott's message regarding voting focused simply
      on encouraging Baconton's members to go to the polls and cast a ballot. Tr.
      2553:18–2554:4 (Pastor Scott). Reverend Scott and Baconton's members

"[took] for granted" that once voters were registered, they were on the rolls and would be able to vote. Tr. 2560:13–22 (Pastor Scott).

288. But Baconton "began to change" its focus during the lead up to the 2018 election after hearing from media outlets about the need for voters to check their registration status and verify their eligibility to vote. Tr. 2553:18–2554:4; Tr. 2555:14–21; Tr. 2557:7–17 (Pastor Scott).

289. Specifically, Pastor Scott was "concerned about having the ID card and the voter registration match up." While he is not sure he "had the name 'Exact Match' in [his] head," his concern was that he "didn't want folk going down to the polls and getting turned around because something didn't match." Tr. 2555:14–2556:5 (Pastor Scott); see also Tr. 2554:5–2555:6 (Pastor Scott).

290. Starting in 2018 and continuing through the present, Pastor Scott has been telling his congregants "before you go to participate, make sure that you've checked and make sure you can participate. One of the most disappointing things of all that as a citizen, as a citizen, you go to cast your vote and be told that you cannot vote." Tr. 2566:9–12 (Pastor Scott).

### (1) Time Spent During Church Services and Weekly Bible Study

291.   During the lead up to the 2018 general election, Pastor Scott diverted his time during weekly Sunday services from religious topics to discussing checking your voter registration status due to the voter roll inaccuracies and concerns regarding Exact Match MIDR. Tr. 2558:1–2559:7 (Pastor Scott). He also devoted time during the reading of announcements to discussing activities to combat voter suppression. Tr. 2559:12–2560:6 (Pastor Scott).

292.   Starting in 2018, and unlike in prior years, Pastor Scott spent time during church services and weekly bible study discussing the need to verify voter registration information. Tr. 2560:12–2561:2, 2574:7–12 (Pastor Scott).

### (2) Prayer Meetings

293.   Baconton also diverted church resources when it hosted two countywide prayer meetings at its church in 2018. Tr. 2562:14–15 (Pastor Scott); see also PX. 634 at 4 (Sept. 2, 2018, worship bulletin announcing prayer meeting at Baconton on Sept. 4, 2018). The purpose of these meetings was to provide a forum "to pray for our great state of Georgia" and "talk about the importance of voter registration, education and participation." Id.

294.   At these prayer meetings, Pastor Scott spent time discussing how
       important it was for people to check their voter registration status. Tr.
       2562:3–5 (Pastor Scott). Pastor Scott had not discussed voter registration
       verification at prayer meetings in prior years. Tr. 2565:20–2566:12 (Pastor
       Scott).

295.   When Baconton hosted these prayer meetings in 2018, Baconton diverted
       its resources by providing space in the church for the meetings, printing
       materials for the meetings, and supplying volunteers from the church
       community, including preaching staff who would participate as part of
       their voluntary ministry for the church. Tr. 2563:17–2564:17 (Pastor Scott).

296.   Defendants will attempt to point to the Baconton 2018 prayer meetings as
       partisan political gatherings, because Representative Al Williams, a
       Democrat and Fair Fight Action board member, was present. Defendants'
       argument falls flat. Pastor Scott credibly testified that during the prayer
       meetings, participants "prayed for the great state of Georgia" and prayed
       for "everybody" including Stacey Abrams and Brian Kemp. Tr. 2559:20–
       2661:20 (Pastor Scott). The fact that Representative Al Williams

participated in the 2018 prayer meetings and mentioned Stacey Abrams

has no impact on Baconton's diversion of resources and its standing.

### (3)    Voter Registration Verification Events

297.    Baconton also diverted volunteer time to hold events to help church

members verify their voter registration status throughout the fall of 2018.

Tr. 2575:22–2576:4 (Pastor Scott). Prior to 2018, Baconton had not asked

people to verify their registration status and instead had simply asked

whether they were registered to vote. Tr. 2576:18–25 (Pastor Scott).

298.    After church one Sunday in 2018, Baconton made its tablet computers

available so people who did not have smartphones could check their voter

registration status. The effort, led by Baconton's Assistant Pastor, Deron

Harper, also made Baconton staff available to assist congregants check

their registration information through the online system. Tr. 2558:7–12,

2577:9–15 (Pastor Scott).

299.    Baconton undertook these verification activities as a direct result of their

concerns regarding Exact Match MIDR and the mismanagement of the

voter rolls. Tr. 2578:13–17 (Pastor Scott).

### C. Baconton Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in This Litigation in the 2020 Election Cycle, and Baconton Continues to Do So Today.

300.   Concerns about COVID-19 limited the church's in-person activities with respect to the 2020 elections, but Pastor Scott continued to urge members to check their voter registration status during sermons, Bible study classes, and other times the church gathered. Tr. 2579:6–17 (Pastor Scott).

301.   Pastor Scott testified that without action by the Court, Baconton will continue its voting advocacy initiatives during the 2022 election cycle, with a particular focus on educating voters about checking their registration status. Tr. 2579:18–2580:3; 2654:14–25 (Pastor Scott).

### D. Baconton's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from Baconton's Other Activities.

302.   Pastor Scott testified that if volunteers and Baconton staff were not involved in registration verification activities, they would have been involved in other activities to "build [a] community of love and relationships," in accordance with Baconton's mission. Tr. 2578:3–12 (Pastor Scott). Among other things, these activities would have been "feeding the hungry, taking care of the vagrant and visiting" those in

prison, in accordance with Baconton's guiding teaching in Matthew 25. Tr. 2573:2–17; 2587:2–5 (Pastor Scott).

303.   Baconton would reduce the time spent on voter registration verification to only speaking about those issues during the times of the State's voter roll purge activities, rather than on a weekly basis. Tr. 2656:2–24 (Pastor Scott).

\* \* \*

304.   The Court finds that Baconton has demonstrated by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its organizational resources from the core mission of the church to counteract the challenged practices in this case, including the Exact Match MIDR policy and the mismanagement of the voter rolls, by educating and assisting voters with respect to voter registration issues and registration verification.

305.   If the Court grants relief to the Plaintiffs, Baconton would be able to refocus its diverted resources on its core activities, including "feeding the hungry, taking care of the vagrant and visiting" those in prison, in accordance with Baconton's guiding teaching in Matthew 25. See Tr. 2573:2–17 (Pastor Scott).

VI)   **Virginia-Highland Church Has Suffered an Injury-in-Fact Caused by Defendants.**

### A. Virginia-Highland's Organizational Purpose

306.   Virginia-Highland Church ("Virginia-Highland") is located in Atlanta, Georgia, in Fulton County. Virginia-Highland was formerly part of the Southern Baptist Convention but is now part of the United Church of Christ ("UCC"). Tr. 527:11–528:23 (Reverend Laney).

307.   Virginia-Highland has roughly 300 members in its congregation. Tr. 529:6–10 (Reverend Laney).

308.   Virginia-Highland's organizational mission is to "do justice, love mercy and to walk humbly with God." Tr. 529:23–530:1 (Reverend Laney). To do justice means the church is focused on representing "people who are marginalized or voiceless, particularly . . . the LBGTQ community." Tr. 530:4–9. The church also is interested in anti-racism work and providing ministry for those with disabilities. Tr. 530:9–11 (Reverend Laney).

309.   Virginia-Highland has several distinct ministries, including a Voting Rights Ministry, an LGBTQIA Ministry (called Uprising), and ministries that focus on people experiencing homelessness, people with disabilities, and young people. Tr. 542:19–543:3, 582:14 (Reverend Laney).

### B. Virginia-Highland Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation during the 2018 Election Cycle.

310. In 2018, Virginia-Highland had to divert resources to counteract Defendants' Exact Match policy and voter roll irregularities. Tr. 535:15–536:1 (Reverend Laney).

### (1)   Volunteer Efforts to Educate and Register Voters

311. Virginia-Highland's Voting Rights Ministry began in 2008. For years, the Voting Rights Ministry focused narrowly on registering new voters. Tr. 532:8–25 (Reverend Laney).

312. In 2016, it took roughly 15 minutes to train volunteers to register voters at the church's annual "Summerfest" event, and a voter could be registered to vote in five minutes or less. Tr. 534:4–7; 534:14–15 (Reverend Laney).

313. Starting in the summer of 2018, however, Virginia-Highland became aware of the many obstacles in Georgia's system, including the Exact Match policy, problems with the accuracy of the State's voter rolls, and absentee ballot cancellation issues. Tr. 535:9–536:1 (Reverend Laney). As a result, Virginia-Highland's Voting Ministry expanded its focus to include

verifying the registration status of existing voters. Tr. 535:15–536:1 (Reverend Laney).

314.   Expanding the focus of the Voting Ministry added to the information Jane Crain, the head of Virginia-Highland's Voting Ministry, needed to train new volunteers about, which in turn increased the amount of time it took to train volunteers. Tr. 536:23–537:1 (Reverend Laney). In 2018, the training took an hour or more, as opposed to 15 minutes, because it included new materials, such as Exact Match and how to check registration status online. Id.

315.   Expanding the focus of the Voting Ministry also meant that Virginia-Highland volunteers working at the annual Summerfest event had to spend more time with each person asking questions related to Exact Match and voter roll irregularities, including, "[a]re you registered to vote according to the name exactly as it appears on your driver's license?" and "[w]hen was the last time you checked if your status was active?" Tr. 535:13–536:8; 542:14 (Reverend Laney).

316.   Because Virginia-Highland's volunteers explained issues regarding the three challenged practices to would-be voters, in 2018 it took an average of

fifteen minutes to register a single voter, where in years past it only took

from three to five minutes. Tr. 537:2–11 (Reverend Laney).

### C. Virginia-Highland Diverted Resources to Counter Georgia's Unlawful Voter Suppression Practices at Issue in this Litigation in the 2020 Election Cycle, and Virginia-Highland Continues to Do So Today

317.   Virginia-Highland has continued to divert resources to counteract

Defendants' Exact Match policy, voter roll irregularities, and absentee

ballot cancellation procedures since the 2018 election. See Tr. 535:3–536:8,

537:4–11, 538:9–12 (Reverend Laney). This includes resources to address

Exact Match issues related to MIDR status and related to citizenship status.

Tr. 569:11–20, 539:21–24, 567:20–568:1, 571:16–572:13 (Reverend Laney).

318.   The number of church volunteers devoted to the Voting Right Ministry

and the annual SummerFest event has nearly tripled since 2016, making it

the largest ministry in the church. Tr. 533:22–23, 539:5–13 (Reverend

Laney).

319.   Virginia-Highland has devoted additional staff time to the Voting Rights

Ministry as well. Tr. 536:13–14; 538:15–16 (Reverend Laney). While the

ministerial staff spent on average one hour per month on voting issues in 2018, they spent more than 10 hours per month in 2021. Id.

320.    Although SummerFest was cancelled the last two years due to the pandemic, Virginia-Highland's Voting Ministry has held voter registration drives in public parks. Tr. 539:14–22 (Reverend Laney).

321.    Virginia-Highland also conducts voter registration drives at the federal building to help register new citizens after naturalization ceremonies. Tr. 539:21–24 (Reverend Laney).

322.    Virginia-Highland focuses specifically on educating newly naturalized citizens about the challenges they may face due to the citizenship exact match policy, particularly as it relates to discrepancies with the Department of Driver Services ("DDS"). Tr. 540:14–18 (Reverend Laney). Virginia-Highland also makes copies of naturalized citizens' papers and encourages these new Americans to bring a copy of their naturalization papers to the polls in case, like many others, they are flagged or not allowed to vote because of inaccurate information at DDS. Tr. 540:18–21 (Reverend Laney).

323.   If not for the Exact Match Citizenship policy, Virginia-Highland would not devote the same level of focus or volunteer training to its naturalization events. Tr. 541:5–7 (Reverend Laney).

### D. Virginia-Highland's Work to Counter Voter Suppression Practices at Issue in this Litigation Has Diverted Resources from Virginia-Highland's Other Activities

324.   Virginia-Highland's other ministries have suffered as a result of church resources being diverted to the Voting Rights Ministry. Church volunteers have told Reverend Laney, for example, that they would like to be more involved in the LGBTQIA ministry, but they do not have time for it given the demands of the Voting Rights Ministry. Tr. 543:6–544:15 (Reverend Laney).

325.   One of Virginia-Highland's volunteers resigned from a leadership position in the church's Uprising ministry and later from a ministry involved in making cloth masks during the pandemic because she needed that time to devote to the voting rights work. Tr. 581:24–582:11 (Reverend Laney).

326.   Without relief from the Court to address the challenged practices, Virginia-Highland anticipates continuing to divert resources in 2022 and in future elections due to the challenged practices. Tr. 577:2–9 (Reverend Laney).

327.   If this lawsuit is successful and the Court grants Plaintiffs' requested relief, the church would return to "the ministry of just registering people to vote" and would have "more people to deploy in other ministry of the church." Tr. 547:20–548:3 (Reverend Laney).

* * *

328.   The Court finds that Virginia-Highland has demonstrated by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its organizational resources from other core church programs to counteract the Exact Match MIDR and citizenship policies, the mismanagement of the voter rolls, and the lack of adequate training in connection with absentee ballot cancellation procedures.

329.   In so finding, the Court rejects Defendants' argument that Virginia-Highland does not have standing because Reverend Laney posted the following, "[i]t's going to be an historic political season in Georgia as the first [B]lack female candidate for [G]overnor in the United States goes up against one of two guys, who each tried to outdo the other in criminalizing immigrants!" The post concluded by stating, "[v]ote for the candidate who best exemplifies the values and vision of Jesus." DX. 731. Reverend Laney credibly testified that while he came close to making an endorsement, he

"did not cross that line." Tr. 591:8–11 (Reverend Laney). Virginia-Highland will lobby for or against particular issues, but it does not endorse specific candidates. Tr. 585:13–586:7, 592:15–17 (Reverend Laney).

## THE ROLE OF DEFENDANTS

I)    **The Secretary of State Is the Chief Election Official with Control Over the Counties.**

330.   The Secretary of State is Georgia's Chief Election Official, including with respect to ensuring the requirements of the Help America Vote Act of 2002 ("HAVA") are met. O.C.G.A. §§ 21-2-50(b) (referring to the Secretary of State as the "chief election official"), 21-2-50.2(a) (the Secretary of State, as chief election officer, is "responsible for coordinating the obligations of the state under [HAVA]"); 52 U.S.C. § 21083(a)(1)(A) ("[E]ach State, acting through the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level[.]").

331.   Under Georgia law, the Secretary shall "maintain the official list of registered voters for this state and the list of inactive voters required by this chapter." O.C.G.A. § 21-2-50(a)(14). The Secretary also has a mandate

to provide uniformity to the counties. Tr. 1831:9–18 (Harvey). The Secretary acknowledges that "[t]hrough uniform voting practices ... the Secretary of State's office works to keep elections secure, accessible, and fair for all Georgians." PX. 1152; Tr. 1834:5–15 (Harvey).

332.   Georgia law also requires that the "Secretary of State shall exercise all the powers granted to the Secretary of State . . . [t]o conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections[.]" O.C.G.A § 21-2-50(a)(11).

333.   County and municipal election superintendents and chief registrars are required to "become certified by completing a certification program approved by the Secretary of State" within six months after they are appointed. O.C.G.A. § 21-2-101(a). The "certification programs shall be offered by the Secretary of State," and include "classroom, online, and practical instruction as authorized and approved by the Secretary of State." Id.

334.   In addition to the certification requirement, county election superintendents and registrars are required to "attend a minimum of 12

hours' training annually"—training which is "selected by the Secretary of State." O.C.G.A. § 21-2-100(a).

335. The Secretary has additional control over the counties, including the ability—indeed, the obligation—to issue Official Election Bulletins, or "OEBs." The OEBs are formal communications from the Secretary. See Tr. 1533:3–6 (Germany); Tr. 3481:15–25, 3483:7–3484:2 (Harvey). The Secretary can issue an OEB on any topic, and these OEBs can convey that all county registrars must confirm in writing that they have read and understood the OEB and that they will follow any procedures stated in the OEB. Tr. 2147:19–21, 2148:2–13 (Harvey). Mr. Germany, however, said tracking responses from all 159 counties about their compliance with an OEB is "a very difficult thing." Tr. 1543:20–1544:3 (Germany). These OEBs typically provide information to election officials and county registrars—as Mr. Harvey put it, "people at a high level." Tr. 1972:6–9 (Harvey).

336. And when the Secretary has received a court order directing counties to do something, the Secretary issues an OEB. Tr. 1527:18–1528:6 (Germany); Tr. 3483:7–3484:2 (Harvey).

337.   Ryan Germany, General Counsel for the Secretary of State, testified:
"When we are instructed by court order to basically instruct the counties to
do something, this is how we do it. We send an Official Election Bulletin."
Tr. 1542:12–14 (Germany). And the bulletin—following the court order—
may direct counties to report their compliance to the Secretary of State. Tr.
1542:18–25, 1543:20–1544:3 (Germany).

## II)   The State Election Board Is Also Responsible for Elections in Georgia.

338.   Statutes enumerate the duties and powers of the State Election Board. See
O.C.G.A. §§ 21-2-31, 21-2-33.1.

339.   Among the Board's statutorily enumerated duties are the duties to (a)
promulgate rules and regulations to obtain uniformity in county practices
(O.C.G.A. § 21-2-31(1)), and (b) formulate, adopt, and promulgate rules
and regulations conducive to the fair, legal, and orderly conduct of
elections (O.C.G.A. § 21-2-31(2)).

340.   Significantly, the Board is obligated to investigate, or authorize the
Secretary of State to investigate, the administration of election laws.
O.C.G.A. § 21-2-31(5).

341.   The Board additionally owes a statutory duty to make recommendations to the General Assembly relative to the administration of elections (O.C.G.A. § 21-2-31(6)), and, subject to the General Assembly's specific appropriation of funds, to formulate and conduct voter education programs with a particular emphasis on the proper types of identification required for voting (O.C.G.A. § 21-2-31(9)).

342.   In addition to the specifically enumerated duties set forth in O.C.G.A. § 21-2-31(1)-(9), the Board also owes a far more expansive duty to "take such other action, consistent with law, as the board may determine to be conducive to the fair, legal, and orderly conduct of primaries and elections." O.C.G.A. § 21-2-31(10).

343.   To fulfill its statutory duties, the Board is granted significant enforcement authority, beginning with its power to issue orders. First, "[t]he State Election Board is vested with the power to issue orders . . . directing compliance with [Chapter 2 of the Elections code]," which governs "Elections and Primaries Generally" and sets forth procedures governing election administration. Second, "[t]he State Election Board is vested with the power to issue orders . . . prohibiting the actual or threatened

commission of any conduct constituting a violation" of election law.

O.C.G.A. § 21-2-33.1(a).

344.    Without question, the orders the Board is empowered to issue are

substantive. The Board is vested with the power to order a violator to: (1)

cease and desist from committed further violations; (2) pay a civil penalty

not to exceed $5,000.00 for each violation; (3) be reprimanded for having

committed a violation; (4) pay restitution to any government entity that

has suffered a loss as a result of a violation; (5) to attend training; and (6) to

pay investigative costs incurred by the Board. O.C.G.A. § 21-2-33.1(a).

345.    A violator's non-compliance with an order of the State Election Board may

be prosecuted by the Attorney General in the superior court; however,

judicial proceedings are not required for the Board to issue an order as

contemplated by O.C.G.A. § 21-2-33.1(a). The Board's findings on

violations enjoy near-absolute deference. Even in an action for non-

compliance with a Board order, the superior court is statutorily prohibited

from making an independent inquiry as to whether violations have

occurred and "shall enforce the orders of the State Election Board" so long

as proper notice was given and a hearing was held pursuant to the Georgia

Administrative Procedures Act. O.C.G.A. § 21-2-33.1(d).

346.    In addition to its power to issue orders for commanding compliance and

prohibiting actual or threatened election law violations, the State Election

Board is empowered to suspend up to four county or municipal

superintendents and appoint temporary superintendents, subject to

compliance with statutory procedures. O.C.G.A. § 21-2-33.1(f), (g).

347.    The State Election Board also possesses the power and resources of the

Secretary of State as a matter of statute, as O.C.G.A. § 21-2-33.1(h) requires

that "[t]he Secretary of State shall, upon request of the State Election

Board, provide any and all necessary support and assistance that the State

Election Board, in its sole discretion, determines is necessary . . . to carry

out or conduct any of its duties." O.C.G.A. § 21-2-33.1(h).

348.    For example, the Board can instruct the Secretary of State to issue an

Official Election Bulletin to provide instructions to the counties. Tr.

4017:18–21 (Sullivan); Tr. 4093:14–17 (Mashburn); see also PX. 122 (sample

letter of instruction); Tr. 1852:1–19 (Harvey).

349.   Thus, the State Election Board has both the power and the duty to take action to ensure uniformity amongst the counties and achieve fair, legal, and orderly elections. See O.C.G.A. §§ 21-2-31; 21-2-33.1.

### III)   The Secretary of State and State Election Board Share Responsibility for Investigating Complaints Concerning Election Administration.

350.   Both the Secretary of State and the State Election Board receive complaints concerning election administration. See Tr. 1742:16–1743:13 (Harvey); Tr. 4032:7–18 (Sullivan).

351.   It is undisputed that complaints play an integral role in assessing the efficacy of any election system on an ongoing basis.

352.   Plaintiffs' expert Kevin Kennedy, who has over thirty years of experience as Wisconsin's Chief Elections Officer under HAVA, testified that "complaints are like the canary in the coal mine; they tell you if there is a problem." Tr. 2872:10–11 (Kennedy). Mr. Kennedy went on to explain that "the complaint gives you an idea there is a problem, and by tracking those complaints, analyzing those complaints, you are able to determine the nature of the problem and can focus attention on resolving that problem." Tr. 2872:15–18.

353.    Chris Harvey, former Director of the Secretary of State's Elections

Division, agreed that complaints can "alert the Secretary of State that

election rules are not being followed," and that complaints "are sometimes

an indicator of something going wrong." Tr. 1913:5–8, 17 (Harvey). Mr.

Harvey further agreed that complaints are important to putting the

Secretary on notice of recurring problems that the Secretary ought to

investigate, that complaints were where the Secretary received most

information of the problems, that complaints could provide valuable

information for how to improve elections, and that ignoring complaints

was a risk the Secretary undertook at its own peril. Tr. 1914:22–1915:12

(Harvey). Indeed, Mr. Harvey even acknowledged that the Secretary

places such a premium on complaints that it solicits them from voters and

sends the complaints to high-ranking Elections Division employees

(namely Mr. Harvey and Mr. Rayburn, during their tenures with the

Secretary's office) to resolve. Tr. 1909:5–10 (Harvey), 1915:18–1916:3

(Harvey).

354.    As a matter of law, the State Election Board is required to investigate

complaints alleging violations of election law or to assign responsibility for

investigating such complaints to the Secretary of State. O.C.G.A. § 21-2-

31(5). The State Election Board has chosen to delegate its investigatory duty to the Secretary of State. Tr. 1769:4–7 (Le); Tr. 1769:18–22 (Le); Tr. 4020:7–23 (Sullivan).

355.  The Secretary of State conducts investigations into alleged election law violations through its Investigations Division. After conducting an investigation, the Secretary of State's Office presents the results and a recommendation to the State Election Board during a Board meeting. Tr. 4020:11–14 (Sullivan).

356.  The investigatory cases presented by the Secretary of State's Office are the only way the State Election Board learns about complaints made to the Secretary of State, and Board members rely on cases brought by the Secretary of State's office to identify problems in election administration and assess uniformity across the state. Tr. 1769:18–22 (Le); Tr. 1772:9–12 (Le); Tr. 1774:16–18 (Le); 1802:22–1803:14 (Le).

357.  Despite acknowledging the importance of complaints to understanding problems within the state elections system, State Election Board Members lack a basic understanding of critical information such as how the

Secretary of State chooses which complaints to investigate. Tr. 1770:3–7 (Le); Tr. 4025:8–11 (Sullivan).

358. The Board is also unaware of how many complaints the Secretary of State chooses to investigate, or the nature and substance of complaints to the Secretary of State not brought before the Board on investigation. Tr. 1772:13–24 (Le); Tr. 1773:3–15 (Le); see also Tr. 4004:6–21 (Sullivan); Tr. 4022:7–12 (Sullivan); Tr. 4025:8–11 (Sullivan); Tr. 4031:13–20 (Sullivan); Tr. 4032:2–6 (Sullivan). And when Board members receive complaints directly, they merely forward the complaints to the Secretary of State's office with no follow-up. Tr. 4032:7–18 (Sullivan).

359. The evidence presented at trial showed that the Board members lack complete information about election complaints and problems in election administration in Georgia and that this hinders the Board's ability to do its job. Tr. 4027:20–4028:21 (Sullivan).

360. One former member of the Board believes that all substantive complaints received by the Secretary of State result in an investigation brought before the Board, Tr. 4025:5–7 (Sullivan) ("I did expect every substantive complaint that was brought to the attention of the Secretary of State's

office to be investigated."). On the other hand, a current member of the

Board believes only one percent of complaints made to the Secretary of

State's office are brought before the Board, Tr. 4123:6–11 (Mashburn).

Though Defendants presented no reliable evidence of what percentage of

complaints the Secretary of State investigates and presents to the Board,

Mr. Harvey confirmed not all complaints result in an investigation brought

to the State Election Board. Tr. 1845:12–1846:6 (Harvey).

361.   One former member of the State Election Board agreed that an organized

log of information about the complaints received by the Secretary of State

"would be helpful" in performing her duties as a member of the Board. Tr.

1775:16–24 (Le). Another former member agreed that if the Board does not

hear all the complaints received by the Secretary of State, that could hinder

the Board's performance of its duties. Tr. 4027:20–4028:21 (Sullivan). Only

one member of the State Election Board testified that it would not be useful

to have a log tracking the cases brought before the State Election Board,

instead trusting he would notice when a problem reaches a level of

significance. Tr. 4124:5–16 (Mashburn). Of note, however, is that this same

member initially failed to recall a case the Board heard within the last

seven months that he personally described as a "nightmare scenario"

because a voter was disenfranchised, and an election had to be repeated. <u>Compare</u> Tr. 4110:11–17 (Mashburn), <u>with</u> Tr. 4126:16–24 (Mashburn).

362.   Though a log tracking the nature and substance of election-related complaints would no doubt be useful to the Board members tasked with ensuring uniformity in county practices and fairness and legality in elections, the Board members have not requested such a log from the Secretary of State, the Secretary has not offered such a log, nor have the Board members logged complaints they receive personally. Tr. 1807:2–9 (Le); Tr. 4123:12–20 (Mashburn), Tr. 4124:5–10 (Mashburn).

363.   With respect to the investigations the Secretary of State presents to the Board at Board meetings, the Board considers them on a case-by-case basis. Rather than addressing recurring problems, the Board has chosen to focus narrowly on individual cases that come before it and Board members ask no questions or draw any conclusions about trends or systemic problems. Tr. 1781:9–14 (Le); Tr. 1785:7–13 (Le); Tr. 1800:23–25 (Le) ("[W]e deal with the facts as presented and not try to speculate as to what other counties need or [do] not need as a solution to a problem that they may or may not have."); Tr. 1802:5–6 (Le) ("I don't look at a case as it applies to the rest of

the 158 counties."); Tr. 1802:6–10 (Le); Tr. 1804:12–13 (Le) ("I tried to work in the narrow context of the facts that they are presented."); Tr. 4093:7–10 (Mashburn).

364.   The evidence at trial established that, despite this Board's responsibility to take action to ensure uniformity in counties' election practices, the Board chooses to operate reactively rather than proactively. See Tr. 4083:18–19 (Mashburn) ("[T]he way we operate is more reactive than proactive."); Tr. 4092:8–11 (Mashburn) ("We're proactively saying don't let it happen again, but we're reacting to it that it happened."); Tr. 1781:13–17 (Le) ("We don't proactively just send [letters of instruction] to people who don't or parties who are not a respondent to the case."). With respect to the Board's relationship with the Secretary of State, Board member Mashburn testified that the State Election Board tells the Secretary to do something proactively only "maybe one out of a hundred" times, and "ninety-nine is [sic] always reactive." Tr. 4084:2–3 (Mashburn).

365.   As a result, the Board "very, very rarely" issues rules or provides guidance to help ensure that counties administer elections uniformly. Tr. 4083:24–

4084:2 (Mashburn); Tr. 1784:10–17 (Le); Tr. 4005:4–10 (Sullivan); Tr. 4017:6–9 (Sullivan).

366.   The Secretary of State, though legally required to "provide any and all necessary support and assistance that the State Election Board, in its sole discretion, determines is necessary . . . to carry out or conduct any of its duties," O.C.G.A. § 21-2-33.1(h), does not fill the void left by the State Election Board's inaction.

367.   Despite the demonstrated importance of voter complaints, as Mr. Harvey acknowledged and as expert testimony reinforced, the Secretary of State also takes no steps to meaningfully log, analyze, investigate, or systematically respond to all the complaints the Secretary of State's office receives. As Mr. Harvey put it, there was no "formal system" to log or track the complaints, and instead the Secretary relied on email inboxes to "search[] and identif[y]" complaints if needed. Tr. 1921:16–23 (Harvey). "[T]here is not a separate program that categorizes" complaints. Tr. 1921:22–23 (Harvey). Nor is there a system that "tracks the disposition of" the complaints, such as whether anyone has followed up, what the root of the problem was, or what issue the voter raised. Tr. 1922:5–9 (Harvey).

There is no way, then, for the Secretary to sort and quantify complaints in order to assess whether further training or action was needed. And while Mr. Harvey asserted that he had "a pretty good sense of what the issues were," he was forced to acknowledge that his informal knowledge is "different" from "somebody being able to sit down and look at hard data." Tr. 1922:16–25 (Harvey).

368.   Mr. Harvey baldly asserted that all or nearly all the complaints the Secretary received were responded to, including through phone calls that would not be recorded in the Secretary's email system. Tr. 1912:9–22 (Harvey); Tr. 1925:15–17 (Harvey). But because the Secretary does not log its complaints, there is no evidence to support that assertion. The record evidence, in fact, proves the contrary. For example, Plaintiffs introduced evidence of apparently unanswered complaints from voters who could not be found on the rolls when they went to vote or could not find themselves in the Secretary of State's My Voter Page website. See, e.g., PX. 559, 602, 630, 653, 661, 671, 674, 1409.[16]

---

[16]   Each of these cited exhibits were admitted not for their truth, but rather to show notice. See Tr. 2260: 9–13, 2248:24–2249:2, 2295:9–13, 2296:22–2297:2. In addition, PX. 1409 was admitted for any weight that may be due. Tr. 2296:22–2297:2. In their closing

369.   Moreover, even when Secretary of State employees *do* respond to

complaints, the evidence shows that those responses are ad hoc and make

no attempt to get to the bottom of any larger issues. By way of example, in

closing Defendants themselves cited one such complaint and response, PX.

1182. Defendants emphasized that Mr. Rayburn responded to this voter's

complaint promptly—and indeed, it appears he did. But to what end? Mr.

Rayburn's response was simply to tell Fulton County to resolve the

problem. PX. 1182. There is no evidence that Mr. Rayburn made any effort

to determine *why* the complainant Mr. Munoz de Cote Esquino's name

was wrong, nor whether it was emblematic of a larger problem or a direct

result of a Secretary of State policy. Defendants cannot establish reliably a

pattern or practice of responsiveness to voter complaints with one-off

examples, particularly given the evidence to the contrary. See, e.g., PX. 691

---

arguments, Defendants sought to minimize the import of the evidence of voter
complaints by reminding the Court that roughly 40% of the complaints came in for
notice only, rather than for their truth. This argument overlooks that the reason these
complaints came in for notice, as opposed to for the truthfulness of the assertions
therein, was because there was no Secretary of State response. Indeed, when the
Secretary responded to complaints in some way, this Court admitted the complaints for
their truth as admissions on the part of the Secretary's office. See, e.g., Tr. 1676:2–3
(admitting Mr. Chris Warren's complaint as an adoptive admission because of Mr.
Germany's response). Thus, the complaints admitted for notice are, in fact, evidence of a
lack of response on the part of the Secretary of State.

(Rayburn merely informs the voter his name is spelled wrong), PX. 1150

(Rayburn recommends contacting the county, rather than solving it

himself).

370.   Though Plaintiffs do not argue that the Defendants' failure to engage with

voter complaints in any meaningful way, standing alone, is

unconstitutional, the evidence reflects this failure exacerbates the burdens

of each challenged practice—Exact Match, the affirmative mismanagement

of the voter registration database, and the inadequate training regarding

absentee ballot cancellation.

## EXACT MATCH

371.   Plaintiffs challenge two policies under the umbrella of "Exact Match." Both

policies relate to how the Secretary of State handles voter registration

applications. In short, both policies match certain information from voter

registration applications against either the Georgia Department of Driver

Services ("DDS") or Social Security Administration ("SSA") databases. The

policies differ on the particular information being matched.

372.   The first policy Plaintiffs challenge relates to the matching of certain

identification information provided on voter registration applications. If

this information on the voter registration application does not exactly match, character by character, to the information in the DDS or SSA databases, the voter registration applicant is given "Missing ID Required" ("MIDR") status. Plaintiffs refer to this policy as Exact Match MIDR.

373.    The second policy Plaintiffs challenge relates to the matching of the voter registration applicant's citizenship information. Under this policy, voter registration applicants who provide a Georgia drivers' license number or state identification card number on their voter registration applications will have their citizenship status matched against the DDS database. Plaintiffs refer to this policy as Exact Match Citizenship.

374.    Defendants refer to these policies by different names. Seeking to imply that their policies are required by HAVA, they refer to Exact Match MIDR as "HAVA Match," and Exact Match Citizenship as "Citizenship Verification." Because the Court finds that this implication is misleading, as explained below in Part III, the Court will use the terms "Exact Match MIDR" and either "Exact Match Citizenship" or "current citizenship verification."

375.    Plaintiffs have brought claims that Exact Match MIDR violates the

Fundamental Right to Vote under the First and Fourteenth Amendments

(Claim I), the Voting Rights Act (Claim V), the Fifteenth Amendment's

prohibition on discrimination by race (Claim II), and the Fourteenth

Amendment's guarantee of equal protection as to race and geographic

location (Claim III). They bring the same challenges to Exact Match

Citizenship, plus a claim under the Fourteenth Amendment's guarantee of

equal protection for naturalized citizens (versus native-born citizens).

376.    In support of these claims, Plaintiffs marshaled the testimony of at least six

witnesses who were affected by an Exact Match policy[17] or who bore

witness to Georgia's long and tortured history of discrimination. Plaintiffs

also presented the testimony of four expert witnesses – Dr. Ken Mayer,[18]

---

[17] Witnesses who testified how this issue burdened voters include the following: Dr.
Benjamin Ansa (PX. 2096 (Ansa Dep.)); Cam Ashling (Tr. 294–326); Kia Carter (Tr. 2482–
2516); Dr. Carlos del Rio (Tr. 467–485); Rosa Hamalainen (PX. 2048 (Hamalainen Dep.));
Dr. Ali Kefeli (PX. 2049 (Kefeli Dep.)).

[18]  The Court is unpersuaded by Defendants attacks on Dr. Mayer's testimony.
Defendants' Slides at 122. Dr. Mayer is an expert in election administration who gave
robust and credible testimony based on his review of Georgia voter files, the Secretary's
training materials, the voter registration manual, depositions given by senior members
of the Secretary's office, and applicable statutes. Tr. 348:17–349:5 (Mayer).

Dr. Peyton McCrary,[19] Dr. Adrienne Jones, and Dr. Lorraine Minnite. Defendants offered only the testimony of current or former Secretary of State employees and State Election Board members. Defendants offered no expert testimony to rebut the conclusions of Plaintiffs' witnesses.

377.   The organization of this section is as follows. Section I sets forth the history of both Exact Match policies. Section II establishes that Exact Match MIDR and Citizenship are traceable and redressable by the Defendants, and Section III analyzes and rejects Defendants' arguments that these policies are required by law. Sections IV and V summarize the evidence that Exact Match MIDR and Exact Match Citizenship violate the fundamental right to vote, respectively. Section VI summarizes the evidence that Exact Match MIDR and Exact Match Citizenship violate the Voting Rights Act and Section VII does the same as to the Fifteenth Amendment and the Fourteenth Amendment's guarantee of equal protection.

---

[19] Defendants' criticisms of Dr. McCrary's work in this case (Defendants' Slides at 138) are not well-founded. Dr. McCrary is a longtime expert in voting rights cases who gave robust and credible testimony based on the standard methodology of historians and political scientists, including review of newspapers, government documents, legislative history, expert reports, and other litigation documents. Tr. 201:19–203:4 (McCrary). The Court finds Dr. McCrary's testimony reliable.

I)      **History of Exact Match**

      **A. From Its Inception, Exact Match's Impact on Voters of Color and Naturalized Citizens Raised Concerns.**

378.   Exact Match – both MIDR and citizenship – has a long and tortured history in Georgia dating back, at least, to <u>Schwier v. Cox</u>, 412 F. Supp. 2d 1266 (N.D. Ga. 2005), when the Court held the Secretary of State's use of an applicant's full Social Security number violated both the Privacy Act and the Voting Rights Act. When the State first adopted the policy, the Secretary of State did not believe the policy required preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. A three-judge panel,[20] however, held to the contrary in <u>Morales v. Handel</u>, No. 08-cv-3172, 2008 WL 9401054, at *8 (N.D. Ga. Oct. 27, 2008).

379.   The United States Department of Justice ("DOJ"), reviewing the State's preclearance application, declined to approve either Exact Match policy and issued a letter explaining why. <u>See</u> PX. 66. In the letter, DOJ laid out its reasons for rejecting the application:

---

[20]  Former District Court Judge William S. Duffey, Jr. sat as a member of the three-judge panel. Judge Duffey was recently appointed to serve as Chair of the State Election Board. *See* Tr. 4074:11–15 (Mashburn).

380.   The State's process "[did] not produce accurate and reliable information" such that "thousands of citizens who [were] in fact eligible to voter under Georgia law were flagged." PX. 66 at 3.

381.   The impact of the errors in the State's process fell "disproportionately on minority voters." PX. 66 at 4.

382.   Applicants who were "Hispanic, Asian, or African American [were] more likely than white applicants, to statistically significant degrees, to be flagged for additional scrutiny." PX. 66 at 4.

383.   DOJ found the process for verifying voter registration information to be "seriously flawed" in a manner that "subject[ed] a disproportionate number of African American, Asian, and/or Hispanic voters to additional and, more importantly erroneous burdens on the right to register to vote." PX. 66 at 4.

384.   DOJ concluded "[t]hese burdens are real, are substantial, and are retrogressive for minority voters." PX. 66 at 4.

385.   Ultimately, DOJ and the State reached an agreement and DOJ granted

preclearance after the State agreed to have the counties perform checks on

their data on a daily basis. PX. 76 at 8; Tr. 1595:14–1596:2 (Germany).

386.   When Georgia sought and obtained preclearance of the Exact Match

procedures in 2010, Georgia committed to closely monitor the results on a

daily basis. PX. 76 at 8; Tr. 1595:14–1596:2 (Germany); Tr. 249:4–17

(McCrary) (describing the changes to the procedures from prior rejected

proposal as including "daily monitoring" and "quick notification to any

individuals who were ruled to be ineligible to vote").

387.   This kind of monitoring is possible: in principle, when an application fails

verification, counties could go back and check their data entry to correct

information. Tr. 1958:9–19 (Harvey).

388.   The Secretary of State has not engaged in or required this kind of

monitoring to detect incorrect match failures. Tr. 353:20–24 (Mayer)

(testifying that oversight of the match process was "casual. It was ad hoc.

They were not carefully monitoring how the match process was actually

occurring.").

389.   While Chris Harvey, the director of the Secretary of State's Elections

Division from July 2015 to July 2021, testified that the Secretary of State

tells counties it is a "best practice" for them to double check their data

entry when match failures occur, the Secretary of State does not require the

counties to do so. Tr. 1959:23–1960:24 (Harvey); see also Tr. 250:2–254:17

(McCrary) (describing how expert reports of Gary Bartlett and Michael

McDonald filed in Georgia State Conference of the NAACP v. Kemp, No.

16-cv-00219 (N.D. Ga. filed Sept. 14, 2016) had found that the state's

assurances of close, daily monitoring proved inaccurate); PX. 1289

(McCrary Report) at ¶ 84.

390.   The Exact Match policies were subject to legal challenge in 2018, and it

became more publicly known that over 75,000 voter registration

applications remained in what was called "pending" status, a status that

meant those would-be voters were not registered to vote and would not be

registered to vote until they provided whatever information was necessary

to rectify the issues that put them in pending status in the first place. See

PX. 1887.

391.   In 2018, the Secretary of State conducted an analysis of the pending

records and determined about 47,000 of the pending applicants were in

pending status because they had failed to "match." PX. 1887. Of those

pending applicants, the Secretary of State's own analysis showed that

"70% . . . self-identify as African-American." PX. 1887.

392.   Despite knowing that 70 percent of those in pending status for Exact

Match MIDR reasons, Chris Harvey testified that he is unaware of any

action that the Secretary of State took in response to this information. Tr.

1994:12–15 (Harvey). Nor did any other Secretary of State witness who

testified identify any action that the Secretary of State took in response to

this analysis. Instead, the Secretary defended the discriminatory impact of

Exact Match by attributing the difference to the New Georgia Project's use

of paper registration forms and its policy of specifically targeting voters of

color. PX. 1887; PX. 97; see infra ¶¶ 584–590.

### B.  The Exact Match Process Is an Unwritten, Opaque Policy.

393.   As the Defendants acknowledge, the Exact Match process has never been a

written policy. Tr. 1940:22–24 (Harvey). To the extent the policy is

memorialized in writing, it is reflected piecemeal in various documents,

including training materials. Tr. 1940:22–1942:13 (Harvey); PX. 1289 (Expert Report of Peyton McCrary) at ¶ 78 ("The voter verification system was never adopted by the Secretary of State as a rule or policy, nor was it otherwise disclosed to the public."); Tr. 349:17–19 (Mayer) (testifying that there was "no indication that the policies and methods are actually written down and documented and clearly articulated.").

394. The Exact Match policy is opaque, uncertain, and frequently changing. The Secretary of State's office has admitted that Exact Match "evolved over time." Tr. 1936:1–14 (Harvey). For example, DDS recently switched from matching the whole first name to matching only the first letter of the first name "because [the Secretary of State] requested that." Tr. 1202:13–19 (McClendon); see also Tr. 1936:9–11 (Harvey) ("I think at one point they were matching the entire first name or a certain number of letters of the first name. But I know that is – that has changed over time."). Compare PX. 1752 with PX. 1753.

395. When Plaintiffs brought this lawsuit, Exact Match MIDR prevented voter registration applicants from being registered voters until they had taken certain steps to address the match failures generated by the Exact Match

MIDR process. If the applicant did not provide the information, they would "fall off the list" and would not be registered to vote. Tr. 3603:8–11 (Harvey).

396.  In April 2019, after Plaintiffs brought this lawsuit, Georgia passed HB 316, which changed the consequences of being flagged as "MIDR." Under HB 316, people flagged as MIDR were registered to vote, but were still labeled "MIDR" until they provided identification before or at the time they voted. Tr. 3604:3–4 (Harvey). HB 316 made no changes to the consequences of the Exact Match Citizenship policy. Tr. 2035:2–7 (Harvey).

**II)**  **Exact Match MIDR and Citizenship Are Traceable to and Redressable by Defendants.**

397.  There is no contention by Defendants here that some other party not before this Court is legally responsible for the Exact Match policies.[21]

---

[21] In closing, Defendants stated for the first time "Your Honor, if the plaintiffs wanted to prevent the HAVA match process from being done, they should have sued counties. Counties are the ones making the decision. The state policy is to provide them with certain information, and if the state does not provide them with that information, or if it provides them with a more limited set of information, you heard that they are going to look up or they do currently look up things on their own anyway." Tr. 4479:8–15. This was, however, inconsistent with Defendants' previous arguments at trial and in briefing and, indeed, inconsistent with their statement shortly thereafter when discussing list

398.   State law explicitly assigns responsibility for the voter verification and matching process to the Secretary. See O.C.G.A. § 21-2-50(a)(14); O.C.G.A. § 21-2-50.2(a); O.C.G.A. § 21-2-216(g)(7)); Order at 35, Feb. 16, 2021, Doc. No. [612].

399.   Under Georgia law, the Secretary of State "shall establish procedures to match an applicant's voter registration information to the information contained in the database maintained by [DDS] for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship." O.C.G.A. § 21-2-216(g)(7).

### III)   Defendants' Exact Match Policies Are Not Required by HAVA.

400.   Defendants argue that HAVA mandates their Exact Match policies. The Court disagrees.

### A. Georgia's Exact Match MIDR Policy Is Not Required by HAVA.

401.   Defendants maintain that HAVA requires Exact Match MIDR as a way of checking the identify of voter registration applicants. The law provides,

---

accuracy in counties that "In terms of the HAVA match, that is more of a state issue." Tr. 4480:21–24.

however, that "Georgia's verification requirements in Exact Match are much narrower than what HAVA itself requires. HAVA does not require comparison of a registration applicant's first name, last name, date of birth, or citizenship information. 52 U.S.C. § 21083(a)(5). Nor does it require identifying information to match exactly. Id. Finally, HAVA does not specify the consequences for a failure to match. Id. Order at 32, Nov. 15, 2021, Doc No. [636].

402.   HAVA requires only that states compare voter registration applicants' drivers' license numbers or the last four digits of their social security numbers against that information in the applicants' DDS or SSA files. 52 U.S.C. § 21083(a)(5); see also Tr. 358:4–6 (Mayer).

403.   HAVA does not require that any identifying information match exactly. 52 U.S.C. § 21083(a)(5); see also Tr. 214:7–10 (McCrary); Tr. 357:20–25 (Mayer); Tr. 358:7–8 (Mayer) ("Th[e] method is left up to the state."); Tr. 508:15–510:3 (Mayer).

404.   Indeed, Dr. Mayer's unrebutted testimony was that states have other options to implement HAVA verification for identity that do not require an exact match. The most common is typically referred to as contextual or

probabilistic matching, which accounts for the possibility of differences in a small number of characters between the databases without it being a different person. Tr. 358:16–359:7 (Mayer); PX. 1278 (Mayer Report) at 10.

405.   HAVA also does not specify what the consequences must be when information cannot be verified. Thus, HAVA does not require states to label voters like Georgia does. 52 U.S.C. § 21083(a)(5); see also Tr. 358:9–15 (Mayer); Tr. 508:15–510:3 (Mayer).

406.   Defendants argue that HAVA requires first time voters who have the same characteristics of Georgia voters in MIDR status to be able to provide, when voting, alternative identification (e.g., a utility bill or bank statement) to the photo identification Georgia law requires other voters to provide. While HAVA does require states to accept this alternative identification (referred to as "HAVA ID") for these first-time voters, see 52 U.S.C. § 21083(b)(2), HAVA does not require states to flag those voters with a label, much less a label stating "MIDR" or "Missing ID required." As discussed further below, Plaintiffs do not challenge Defendants' acceptance of the alternative "HAVA ID"; Plaintiffs challenge the Exact Match MIDR process by which voter registration applicants are placed in

MIDR status, how the Secretary of State informs voter registration applicants of their MIDR status, and the Secretary of State's use of "MIDR" or "Missing ID required" to describe the status of these voter registration applicants.

### B.  Exact Match Citizenship Is Not Required by HAVA.

407.  Defendants contend that they are required to confirm that registrants are U.S. citizens. Plaintiffs have confirmed repeatedly that they are not arguing that non-citizens should be allowed to vote or that citizenship should not be verified. Tr. 29:7–8 (opening); Tr. 4330:7–10 (closing). Plaintiffs' challenge is to Defendants' method of verifying citizenship, which Plaintiffs assert is flawed and burdensome to the voting rights of *citizens*.

408.  DOJ itself has stated that "HAVA takes no position concerning verification of citizenship, neither requiring nor prohibiting state action to verify the citizenship of voter registration applicants." PX. 66 at 2 (citations omitted); see also Tr. 365:1–4 (Mayer).

409.  Further, the Court credits Dr. Mayer's unrebutted testimony that at least three states (California, Massachusetts, and Wisconsin) rely exclusively on

a registrant's attestation of citizenship, without verifying citizenship status. Tr. 363:24–364:4 (Mayer).

**IV)    Exact Match MIDR Violates the Fundamental Right to Vote.**

410.    In assessing whether Exact Match MIDR violates the fundamental right to vote, this Court must (as described above) weigh the burden on voters against the state interest in the challenged practice. See supra ¶¶ 48–55.

411.    Defendants argue that Plaintiffs have not met their burden to show that any burden from the MIDR process is more than *de minimis*. As to state interest, Defendants argue that MIDR is required to comply with HAVA's identification requirements for first time voters and, further, that it is helpful in preventing registration of fictitious persons.

412.    Plaintiffs counter that the MIDR process is burdensome in two ways – (1) that the letter sent to inform registrants about the MIDR flag is confusing and discourages voting; and (2) that the MIDR label is misleading and predictably confuses poll workers into applying additional and inappropriate scrutiny to MIDR voters' identification.

413.    As described below, the Court concludes that the Secretary of State itself has acknowledged that the burdens Plaintiffs have identified are very real.

The Court further concludes the state interests that have been proffered here are not consistent with either the historical record or the statements of state officials, including testimony given at this trial. Accordingly, this Court concludes that Exact Match MIDR violates the fundamental right to vote.

### A. Exact Match MIDR Burdens Voters.

### (1)   Operation of MIDR Exact Match

414.   The Court begins with an explanation of the mechanics of Exact Match MIDR, as reflected in the evidence at trial.

415.   In Georgia, when individuals register to vote, they are required to provide a valid Georgia Driver's License or Georgia ID Number. PX. 6; O.C.G.A. § 21-2-220.1(a). If they do not have a Driver's License or Georgia ID Number, they must provide the last four digits of their Social Security Number. Id. If they do not have a Georgia Driver's License, Georgia I.D., or Social Security Number, they must affirm as to that fact. Id.

416.   Every night, the Secretary of State transmits all new voter registration applications to DDS (except for those received from DDS itself) for verification. PX. 76 at 6; Tr. 1592:17–1593:12 (Germany); PX. 1751 at 2. The

stated objective of this interface between the Secretary and DDS is to verify voter information. PX. 1751 at 1.

417.   When people provide a Georgia Driver's License or Georgia I.D. number on their voter registration applications, the applicants' information is matched against their information in DDS files. Id. at 2; Tr. 1195:16–21 (McClendon); Tr. 1944:8–14 (Harvey).

418.   When an applicant does not provide a Georgia Driver's License or Georgia I.D. number but does provide the last four digits of their social security number, DDS forwards the applicant's information to the SSA. PX. 62 at 3–4; PX. 1753 at 1; Tr. 1195:2–8 (McClendon); Tr. 1610:1–20 (Germany); Tr. 1944:16–1945:3 (Harvey).

419.   For voter registration applicants who provided Georgia driver's license or state identification numbers, the following information on their voter registration applications is matched against their information in the DDS database: driver's license number, first twenty characters of the last name, first initial of the first name, and date of birth. PX. 1753 at 1; Tr. 1197:24–1198:23 (McClendon); Tr. 1936:1–24 (Harvey).

420.    For voter registration applicants who did not provide their Georgia

driver's license or state identification numbers but did provide the last

four digits of their Social Security numbers, the following information on

their voter registration applications is matched against their information in

the SSA database: the last four digits of their Social Security number, first

twenty characters of the last name, first initial of the first name, and date of

birth. Id.

421.    Voter registration applicants who do not provide their Georgia driver's

license number, state identification card number, or last four digits of their

Social Security number do not have their information matched against any

database. That, however, does not prevent these applicants from being

registered to vote. Tr. 1943:6–25 (Harvey); Tr. 1946:2–1947:22 (Harvey).

422.    Since HB 316 was passed, registrants who fail the verification process are

added to the active voter rolls and flagged as "Missing ID Required"

(MIDR). O.C.G.A. § 21-2-220.1 (providing that in cases of an inexact match,

"the applicant shall nevertheless be registered to vote but shall be required

to produce proof of his or her identity . . . at or before the time that such

applicant requests a ballot for the first time").

- 159 -

423.   When registrants are placed into MIDR status, county officials send them a

form letter drafted by the Secretary of State and generated through eNet,

the Secretary of State's voter registration database. PX. 1900; see infra

¶¶ 669–673 (discussing eNet in more detail).

### (2)   Exact Match MIDR Produces False Non-Matches.

424.   By requiring that records submitted for verification exactly match across

multiple fields across databases, Georgia's Exact Match MIDR Policy is

guaranteed to produce false match failures. PX. 1278 (Mayer Report) at 10–

14, 30; see also PX. 1289 (McCrary Report) ¶ 72.

### (a)   The Most Minor Difference Between How Information Appears in Databases Can Wrongly Place a Registrant in MIDR Status.

425.   Exact Match can lead registrants to be placed in MIDR status incorrectly

due to typographical errors, changes in the way people spell their names,

and minor changes in characters between the two databases. Tr. 408:17–

409:6 (Mayer); PX. 1278 (Mayer Report) at 6.

426.   A transposed letter or number (Tr. 1956:14–1957:2 (Harvey)), the presence

of a hyphen (Tr. 1957:3–6 (Harvey)), or the presence of an apostrophe (Tr.

1957:7–12 (Harvey)) can cause a match failure. See also PX. 1182 (Secretary

of State employee Kevin Rayburn acknowledging that the cause of an applicant's problems was a missing letter at the end of the applicant's last name). Therefore, if an "applicant's last name is hyphenated on the voter registration application but not on the applicant's driver's license," he or she could fail verification. Tr. 1957:3–6 (Harvey).

427. For paper applications, the Exact Match MIDR process can occur only after county election personnel type the information into eNet. Tr. 1950:7–22 (Harvey). The Secretary of State's office has admitted that failures to verify "could be caused by erratic handwriting on a voter registration application or by a clerk committing a typing error when entering information." PX. 1119; Tr. 1957:15–1958:8 (Harvey).

428. The record is replete with examples of minor differences in names causing challenges for voters.

429. Voter Ra'Shad Johnson completed a paper application in 2016 and the county entered his registration with the first name "Reshed," which resulted in a non-match with DDS. PX. 699; PX. 2054 at 192:17–193:13

(Rayburn Dep.).[22] Kevin Rayburn, a deputy director of and lawyer in the Elections Division of the Secretary of State's office,  explained that it was "likely the county just misinterpreted" Mr. Johnson's "a's as e's." PX. 699.

430.   Voter David P. McKenzie registered to vote but his voter registration record incorrectly had a space between "Mc" and "Kenzie." PX. 691; PX. 2054 at 188:22–189:19, 190:11–192:11 (Rayburn Dep.).

431.   When Jessica E. Dasilva Souza wrote that she "had trouble at the polling booth . . . when [she] went to vote," Kevin Rayburn informed her that her last name was in the system as "D Souza," and recommended that she contact the county about "straightening out the last name issue." PX. 1150; see also Tr. 2237:10–2240:25 (Harvey).

432.   The same types of problems occur with other minor differences in identifying information. For example, applicant Casey Brooks failed SSA verification because his year of birth was incorrectly listed in eNet as 1997

---

[22] Defendants object to this portion of the deposition for "Speculation/Lack of Foundation, F.R.E. 602." Kevin Rayburn Deposition Designations and Objections at 17, April 5, 2022, Doc. No. [767-3] at 16. However, Defendants have waived as to F.R.E. 602, Fed. R. Civ. P. 32(d)(3)(B). Also, the witness's own understanding of training and voter list inaccuracies, including lack thereof, is relevant given witness's position in the Secretary's Office.

instead of 1970, even though his other information matched. PX. 654; see also Tr. 2256:20–2257:23 (Harvey).

433.    The Secretary of State has failed to take simple steps to eliminate certain of these problems. For example, the Secretary of State has not taken steps to standardize name fields – which is one of the things that should be done to help ensure accurate results. Tr. 409:7–19 (Mayer); see also Tr. 473:5–13 (del Rio) (Dr. Carlos del Rio testifying that his driver's license listed his name as "Delrio" because DDS does not allow spaces in last names).

434.    Additionally, Georgia's voter registration data contains obvious errors that could lead to false match failures. For example, in the December 30, 2019, voter file, 28 records had birthdates occurring after the registration date and 1,857 records had a birthdate of 1901 or earlier. PX. 1278 at 25 (Mayer Report).

    **(b)    The SSA Match Process Has an Error Rate the Secretary Acknowledges is "Pretty Ridiculous."**

435.    The volume of errors for voters verified through the SSA is particularly egregious. An Inspector General report found that SSA could provide a match for only 69% of applicants nationwide, and a "no match" response

for 31% of applicants. PX. 1289 at ¶¶ 71, 72 (McCrary Report) (citing

"Quick Response Evaluation: Accuracy of the Help America Vote

Verification Program Responses," A-03-09-29115, June 2009, at 2); Tr.

221:7–222:15 (McCrary).

436. Data from the Social Security Administration show that, since January

2011, over half (53.4%) of records sent by the state of Georgia failed to

match into the SSA database using name, date of birth, and last four digits

of the applicant's social security number. PX. 1278 (Mayer Report) at 14

(citing https://www.ssa.gov/open/havv/#representation (last visited

Feb. 13, 2020)).

437. The General Counsel of the Secretary of State's Office, Ryan Germany,

testified that the error rate for verification through SSA was "pretty

ridiculous" and "should not be the error rate." Tr. 1614:4–12 (Germany).

>              **(3)** **The MIDR Process Burdens Voters by Subjecting**
>                    **Them To Predictable and Wholly Unnecessary**
>                    **Additional Scrutiny at the Polls.**

438. Defendants assert that Plaintiffs have not proved that the MIDR status

causes problems at the polls, characterizing Plaintiffs' evidence as

consisting solely of Dr. del Rio's testimony. Defendants' Closing Slides at 119. The Court disagrees with this assessment.

439.   Plaintiffs presented unrebutted expert testimony from Dr. Mayer that an MIDR flag at the polls could "easily trigger a poll worker into thinking that they have to subject or should subject or must subject this registrant to a higher level of scrutiny than they do other voters." Tr. 403:4–24 (Mayer).

440.   The Court finds the opinion of Dr. Mayer, who testified that his expert opinion on this subject is rooted in the literature on electoral administration, reliable. Dr. Mayer credibly testified that that having clearly articulated policies and procedures matters because, if people do not know what the policy is, they will not know when there is a problem. Tr. 354:5–355:13 (Mayer). And the MIDR matching policy is not clearly articulated. Tr. 349:17–19 (Mayer); See supra ¶¶ 393.

441.   The Secretary of State itself has repeatedly acknowledged the risk that an Exact Match standard will be applied to voters' identification when presented at the polls.

442.   Chris Harvey outright acknowledged the risk. Tr. 1970:25–1971:5 (Harvey).

443. The Secretary's files show that risk was not theoretical. A voter whose last name was spelled wrongly spelled "Shon" in eNet but "Shan" on his driver's license was forced to vote provisionally because he was not able to cure his verification failure with his driver's license. PX. 837; Tr. 1980:11–1983:17 (Harvey). He was further incorrectly told that he had to present a social security card to the Dekalb County elections office for his vote to be counted. Id.

444. Further, the Secretary took no other steps to mitigate the risk it recognized – including changing the name of MIDR to avoid the clear implication that the person so flagged was required to present *additional* ID.

445. Precisely because the Secretary of State recognized the risk that poll workers will apply an "Exact Match" standard to the identification of those in MIDR status, the Secretary sent an Official Election Bulletin to county superintendents and registrars stating: "The identification shown [at the polls] is not required to exactly match the information in ExpressPoll. Instead, you must simply confirm that the voter is the same person as the applicant." PX. 730 at 2; Tr. 1975:3–19 (Harvey).

446. While the Secretary sent the OEB, the OEB did not ask county superintendents or registrars to confirm that they trained poll workers on the issue or that they even understood the OEB themselves, even though the Secretary has required such certification in other contexts. Tr. 1976:10–1979:4 (Harvey).

447. Indeed, Dr. del Rio's experienced this type of Exact Matching at the polls. Because DDS does not allow spaces in last names, Dr. Carlos del Rio's driver's license listed his name as "Delrio." Tr. 473:5–13 (del Rio). Dr. del Rio registered using his correct last name (del Rio), but when he arrived at the polls, his identification was scrutinized by a poll worker, and he was initially not able to vote. Tr, 473:21–25 (del Rio); Tr. 475:6–19 (del Rio). Only after Dr. del Rio presented additional evidence of his registration was he able to vote. Tr. 475:16–19 (del Rio).

448. For these reasons, the Court concludes that, even after HB 316, the risk that poll workers will subject those in MIDR status to additional, misplaced scrutiny is significant, and has been recognized as such by the Secretary of State.

### (4) The MIDR Process Burdens Voters by Sending Them a Letter that Is Misleading and Discourages Voting.

449.    While Defendants now contend that MIDR status is a *benefit* for voters (because they can present a wider variety of forms of identification the first time they vote), <u>see</u> <u>infra</u> ¶¶ 465–468, that is not the impression left by the form letter drafted by the Secretary of State and sent by the counties, <u>see</u> PX. 1900.

450.    The letter does not tell registrants that they are registered to vote. Instead, it implies that they are *not* registered (as they would not have been pre-HB 316). <u>Id.</u> It describes them as having "recently applied to register to vote" and then describes the steps the applicant must take to be able to vote. <u>Id.</u>; Tr. 401:12–403:3 (Mayer). This would lead a reasonable reader of the letter to conclude that the applicant is *not* registered to vote. <u>Id.</u> Indeed, as the Court previously observed, receiving this kind of letter could even cause an applicant to "panic." Tr. 1968:5–9 (The Court).

451.    Moreover, the letter is confusing. It contains undefined terms and confuses different categories of acceptable ID. PX. 1900; Tr. 401:12–403:3 (Mayer). The Court finds that it is "extremely cumbersome in its wording and difficult to understand, particularly with persons with lower educational

background." Tr. 253:23–254:17 (McCrary) (describing findings that Georgia's pending letters were "extremely cumbersome"); <u>see</u> <u>also</u> <u>T</u>r. 518:5–519:21 (Mayer) (concluding that, per the Flesch Kincaid readability analysis, this letter is at a collegiate reading level and is "difficult to read").

452.   Defendants admit the letter does not tell recipients that they are registered to vote. Tr. 4150:19–4151:1 (Germany).

453.   At closing argument, Defendants asserted that those in MIDR status receive a "precinct card," and so voters in MIDR status should know they are registered to vote. Tr. 4453:15–4454:11 (closing). But that precinct card is not mentioned in the MIDR letter. PX. 1900. Nor did Defendants present any evidence as to when, in relation to the letter, a voter in MIDR status would receive a precinct card; thus, based on the record, the Court finds that the mere fact that a precinct card is sent does not necessarily mitigate any voter confusion.

454.   Based on this evidence, the Court finds that the MIDR status burdens voters by, among other things, confusing voters about their registration status and implying they will face additional challenges at the polls, discouraging some from navigating the process at all.

### B. Exact Match MIDR Serves No State Interest.

455.   Defendants argued that the state has various interests in Exact Match MIDR but did not substantiate those interests with evidence.

456.   Chris Harvey acknowledged that, once HB 316 went into effect, people who fail the Exact Match MIDR process are, from a legal standpoint, just as eligible to vote as any other voter and can vote in precisely the same way as any other voter, including those not in MIDR status. Tr. 1990:5–17 (Harvey). As Defendants recognize in their trial brief, "[a]fter HB 316, voters in MIDR status may vote after showing proper identification, just like any other voter." Defendants' Trial Brief at 24, Dec. 15, 2021, Doc. No. [658-7].

457.   Given these realities, the Exact Match MIDR process is not protecting the State against anything having to do with the voter's eligibility to vote. Nor is Exact Match MIDR protecting the State against a risk that is not already protected against by the voter identification required for all voters.

458.   MIDR status is thus "just pure dead weight . . . . It doesn't serve to provide additional verification of voter identity or to verify the information in the

voter registration files. All it does is create an additional step." Tr. 405:23–406:11 (Mayer).

459. Underscoring the point, at trial, Chris Harvey, the former director of the Secretary's Elections Division, was unable to identify any state interest served by the MIDR flag. Tr. 1988:21–1993:12 (Harvey). When the Court asked, "Why do you need MIDR if all you got to do is show up and show what everybody else has to show," Mr. Harvey responded: "That's a good question" and "I don't have an answer for you, sir." Tr. 1993:5–12 (Harvey).

460. Defendants did not argue, much less substantiate with evidence, a state interest that can be squared with the above facts.

461. In their Rule 52(c) argument and closing argument, Defendants argued that Exact Match MIDR was required by HAVA as part of confirming voters' identity. See Tr. 3346:4–10 (52(c) argument), Tr. 4452:3 (closing); Tr. 4455:12–13 (closing). As explained above, however, this Court has already determined that HAVA does not require Exact Match MIDR. See supra ¶¶ 401–406.

462.  In their closing argument, Defendants argued that the State has an interest in preventing registrations under aliases, in showing that the voter is an actual person, and in helping weed out false registrations. Defendants' Closing Slide 124.

463.  All three rationales are taken from three pages of Chris Harvey's testimony, including a colloquy with this Court. See Tr. 3604–3606 (Harvey). Mr. Harvey offered as an example of a fictitious registration of "Jesus, on Heaven Street." Tr. 3606:4–24 (Harvey).

464.  But Mr. Harvey recognized no individual would have been allowed to vote under unless the person produced identification that shows that they "are an actual person." Tr. 3676:9–14 (Harvey). The MIDR flag serves no additional check on the integrity of the voting process.

465.  Late in the case, the Secretary of State identified a new state interest not found in Defendants' briefing on summary judgment, their trial brief, their opening statement, or the testimony of any of their witnesses on cross-examination in Plaintiffs' case. Specifically, the Secretary's general counsel, Ryan Germany, testified that the purpose of the MIDR flag is to effectuate the *laxer* HAVA ID requirement under HAVA and state law for certain

first-time voters, which is the only difference between a voter who is in

MIDR status and one who is not. Tr. 4165:7–11, 4146:13–17 (Germany).

466. Mr. Germany testified that, pursuant to HAVA and state law, those in

MIDR status can provide a photo ID like other Georgia voters *or* "a current

utility bill, bank statement, government check, or other government

document that shows the name and address." Tr. 4141:23–4142:7

(Germany) (testifying about O.C.G.A. § 21-2-417(c)).

467. Defendants highlighted this purported state interest in their closing.

Defendants' Closing Slides at 36; Tr. 4453:5–12 (closing).

468. Mr. Germany's testimony was the only evidence offered by Defendants in

support of this state interest.

469. The Court finds Mr. Germany's testimony insufficient to support

Defendants' claim of a state interest in Exact Match MIDR for several

reasons.

470. To begin, Exact Match was put into place in 2010, years before HB 316 was

enacted. Until HB 316 went into effect, Exact Match prevented the kinds of

applicants who now have MIDR status from becoming registered voters.

Thus, Exact Match was not put in place to ensure that those people whose identification information did not exactly match the information in DDS or SSA databases—the very people who today are flagged as MIDR—would have an easier time when they went to vote because they could use HAVA ID instead of having to use the photo identification otherwise required by Georgia to be able to vote. Accordingly, the state interest Defendants are now claiming for the Exact Match MIDR process is inconsistent with the purpose and effect of the policy as originally adopted.

471. Second, as noted above, senior personnel at the Secretary of State's office are unaware of Defendants' recently proffered state interest in MIDR, as evidenced by Chris Harvey's testimony when he told the Court that he did not know of any state interest served by MIDR. See supra ¶ 456.

472. Third, while HAVA does specify the permissible identification for first-time voters who register by mail, it does not specify how these first-time voters must be identified to poll workers. 52 U.S.C. § 21083(b). The law certainly does not specify that these voters – who alone among Georgia voters need not present photo ID – must be labeled as "Missing ID Required."

473.  As a matter of common sense, the label "Missing ID Required" implies to a poll worker that an additional step is required, rather than indicating that those so labeled can provide *additional* forms of identification. See supra ¶¶ 439–446 (discussing role of poll worker discretion). In short, "Missing ID Required" is a starkly inaccurate and ineffective label to effect this purported goal of ensuring that MIDR-flagged voters are treated more generously with respect to the identification required when they vote.

474.  Fourth, the letter the Secretary of State drafted for counties to send to people in MIDR status does not even say that these people are registered to vote. Tr. 4169:22–4170:6 (Germany). And the Secretary of State's own website page describing acceptable identification for in-person voting fails to convey that HAVA ID is acceptable for people in MIDR status. Rather, the website states that "Georgia law requires photo identification when voting, either in person or absentee." PX. 2139; Tr. 4155:5–15 (Germany); Tr. 4157:23–12 (Germany). A publicly available poll worker training video on the Secretary's website confusingly states in one place that HAVA ID is acceptable for people in MIDR status but immediately thereafter repeatedly says that *all* Georgia voters must present photo ID to vote a

regular ballot. PX. 2138B (video)[23]; PX. 2138C (transcript); Tr. 4164:3–6 (Germany).

475.    The Secretary's own repeated lack of attention to ensuring that the information it is providing to people in MIDR status, whether through the letter sent directly to them or through the Secretary's other publicly available information, belies Defendants' argument that Exact Match MIDR is justified by a state interest in ensuring that people in MIDR status are afforded the right to vote using HAVA ID.

476.    Further undercutting Defendants' argument is the fact that voters who are eligible to use HAVA ID the first time they vote are labeled as "Missing ID Required." That label contains no suggestion that the voter who bears it is entitled to provide a wider range of identification than other voters can provide. To the contrary, the plain language of the label suggests that the voter has failed to provide a necessary form of identification and must do something extra when going to vote. If the state interest were to protect the voters' right to provide HAVA ID instead of the photo identification

[23] PX. 2138(b) was admitted subject to Defendants' limitation on its use about training. *See* Tr. 4165:23–4166:6.

Georgia law requires from other voters, there would be no reason to use a label called "Missing ID required."

477.    Accordingly, the Court is not persuaded that the state has a legitimate interest in Exact Match MIDR because it protects the right of voters in that status to provide HAVA ID at the polls.

* * *

478.    The Court concludes that the trial record does not contain evidence of state interests that outweigh the burdens the Exact Match MIDR policy imposes on voters in MIDR status.

## V)    Georgia's Exact Match Citizenship Process Violates the Fundamental Right to Vote.

### A. Exact Match Citizenship Burdens Voters.

#### (1)    The Exact Match Citizenship Process

479.    Defendants' Citizenship Verification relates only to voter registration applicants who provide their driver's license or ID numbers on their applications.[24] Tr. 2033:7–21 (Harvey). If DDS responds that an applicant is not a citizen according to its records, the applicant's registration

---

[24] The SSA does not match for citizenship. Tr. 2033:2–15 (Harvey).

application is placed in "pending" status. Pending status for citizenship means the applicant is not registered to vote and will not be able to vote until and unless the applicant provides county election officials with documentary proof of citizenship. Tr. 2033:22–2034:18 (Harvey); see also Tr. 364:8–25 (Mayer).

480.   The citizenship information in DDS' database that is used to verify citizenship is obtained from the applications individuals complete when they obtain a driver's license. DDS, however, does not update that citizenship information "unless [it is] alerted" to a change. Tr. 1211:9 (McClendon). Thus, the information in the database represents only a "snapshot" from when the individual initially applied for a driver's license. Tr. 1210:21–1211:16 (McClendon); see also Tr. 1200:12–19 (McClendon); Tr. 366:21–367:13 (Mayer); Tr. 261:7–25 (McCrary).

481.   The fact is that DDS takes no steps to determine whether citizenship information in its database is outdated or someone has subsequently become a citizen because, in its view, "[t]hat would require us to continuously monitor our customers, and that's not something we do," and also because state law does not require individuals to update that

information after becoming naturalized. Tr. 1210:1–8 (McClendon); Tr. 1211:22–24 (McClendon); see also Tr. 367:23–368:3 (Mayer).

482. As a result, DDS's citizenship information is outdated. Tr. 2038:10–2039:3 (Harvey); Tr. 366:21–367:13 (Mayer); PX. 1820 (OEB recognizing that "DDS may not be updated with the latest citizenship status"). DDS makes no representation that the citizenship information in its database "is accurate beyond the date on which the customer last contacted DDS." Tr. 1211:17–21 (McClendon).

483. Non-citizens can obtain limited term driver's licenses upon providing proof that they are in the United States legally. Tr. 2036:24–2037:2 (Harvey). People who obtain drivers' licenses as noncitizens are neither required nor advised — not even through the DDS or Secretary of State websites — to update their citizenship information in DDS's records after becoming naturalized citizens. Tr. 1202:20–1205:16, 1209:12–25 (McClendon); Tr. 2037:7–17 (Harvey); Tr. 367:14–22 (Mayer); Tr. 368:10–15 (Mayer).

484. Even though U.S.-born citizens must provide proof of citizenship to get a REAL ID driver's license in Georgia, a driver's license (unlike voting) is

not a constitutional right. Additionally, when someone goes to obtain a REAL ID, they are informed in advance about the documents required to do so. The fact is that no such warning exists for recently naturalized citizens who register to vote.

485. The Secretary of State prepares Georgia's voter registration applications but nothing in those applications—or in other Secretary of State materials—warns naturalized citizens that, when they apply to register to vote, the Secretary of State will be matching their citizenship status against the DDS database and that they should either update their information with DDS or submit such documentary proof of citizenship with their registration applications. PX. 6; Tr. 2046:2–2047:2 (Harvey); Tr. 2050:25–2051:8 (Harvey); Tr. 1204:18–1205:16 (McClendon).

486. Updating information with DDS requires going to DDS offices in person. Tr. 2038:4–9 (Harvey). The Secretary of State knows it would "probably not" be a person's first thought upon naturalization "to run down and update their driver's license." Tr. 2037:23–2038:3 (Harvey).

487. For example, Dr. Ali Kefeli testified that he did not immediately update his driver's license upon his naturalization because the original naturalization

document had been submitted as part of his passport application and his driver's license was valid through 2024. PX. 2049 at 53:5–54:3 (Kefeli Dep.).

488. In 2019, the Secretary of State modified its protocols so that a failure to match DDS citizenship records could be overridden if an applicant submitted documentary proof of citizenship with their voter registration application. That override, however, pertains only to paper applications, which comprise only a small percentage of voter registration applications. Online voter registration is much more popular but documentary proof of citizenship cannot be submitted with online applications. Tr. 2043:2–2045:3 (Harvey); Tr. 2048:5–2050:24 (Harvey); PX. 1820; Tr. 3671:21–3672:5 (Harvey).

489. As discussed in greater detail below, counties are required to send applicants who are placed in pending status because of a citizenship match failure a notice by mail telling them that they are in pending status for failing citizenship verification and must bring to the county or polls proof of their citizenship. Tr. 2034:19–2035:7 (Harvey).

490. The evidence shows that applicants do not always receive the required letters. For example, Liyan Fu, an elderly Chinese voter incorrectly flagged

as a noncitizen, never received notification of her pending status. PX. 892 at State-Defendants-00093910–11; Tr. 2065:2–16 (Harvey).

### (2)   Empirical Evidence Shows that the Exact Match Citizenship Process Produces a High Error Rate.

491.   This type of citizenship verification process based on DDS information is known to produce a high error rate. Tr. 372:7–373:25 (Mayer). In Florida in 2012, for example, state officials claimed, based on driver's license records, that 182,000 noncitizens were registered to vote. But ultimately only 85 confirmed noncitizens were removed from the rolls, meaning the process had a 99.9% error rate, precisely because naturalized citizens are not required to (and frequently do not) update their information in their driver's license files. PX. 1999 at 5 (Mayer Supplemental Report); Tr. 372:7–373:10 (Mayer). In 2019, Texas abandoned a similar effort to remove noncitizens from the rolls because the initial analysis "wildly overstated" the number of non-citizens. Tr. 373:14–25 (Mayer).

492.   Indeed, in its 2009 letter objecting to Exact Match, DOJ noted that, since its inception, Citizenship Verification had flagged 7,007 individuals as potential noncitizens, "more than half [of whom] were in fact citizens." PX. 66 at 4; Tr. 225:20–226:5 (McCrary). According to Dr. Mayer's credible and

unrebutted testimony, the error rate of the Secretary of State's citizenship verification process was at least 43.1% based on the number of people who were able to move from the pending-for-citizenship list to active registration. PX. 2026; Tr. 371:14–372:6 (Mayer).

493.   The Secretary of State's General Counsel, Ryan Germany, acknowledged an even higher error rate than Dr. Mayer calculated. Tr. 1690:13–21 (Germany). Mr. Germany's error rate came from a 2022 audit undertaken by the Secretary of State using Systematic Alien Verification for Entitlements ("SAVE"), a web-based program operated by the Department of Homeland Security to help other governmental entities determine the immigration status of applicants for public benefits or licenses." PX. 2021 at 4; PX. 2014. That audit showed that the Secretary of State's Citizenship Verification process had incorrectly flagged more than 2,750 citizens as non-citizens. Tr. 1689:23–1690:23 (Germany). Ryan Germany testified that approximately 5,000 people were in pending status for citizenship, 624 of whom could not be run through SAVE. Of the 4,376 (5,000 minus 624) who were run through SAVE, Mr. Germany testified that 63%, or approximately 2,757, were citizens.

494.    And the 1,323 people Dr. Mayer identified as citizens and the

approximately 2,750 people the Secretary of State audit identified as

citizens who were wrongly flagged are different people. Dr. Mayer's

number represents those wrongly flagged who were able to overcome that

burden on their own before November 2021, whereas the Secretary of State

audit number represents those who were wrongly flagged and were

moved into active status only because of SAVE in spring 2022. PX. 2026;

Tr. 371:14–372:6 (Mayer); Tr. 1690:13–21 (Germany). Therefore, the 43%

Mayer error rate and 63% Germany error rate both underestimate the true

percentage of New Americans incorrectly identified as non-citizens by the

Secretary of State's Citizenship Verification process—Dr. Mayer's error

rate cannot capture those New Americans wrongly left on the pending list

despite being citizens, and Mr. Germany's error rate fails to reflect those

who were wrongly flagged but resolved the issue on their own before the

audit.

**(3)** **Moving Out of Pending Status Is a Significant Burden.**

**(a)** **The Citizenship Pending Letter Is Confusing and a Deterrent to Voting.**

495.  The Court finds that the Secretary's form letter that is sent to applicants placed in pending status by Citizenship Verification is extremely confusing. PX. 1231; PX. 1779. As Dr. Mayer testified, "it's not entirely clear on what voters need to do to change their status. It embeds that information in extraneous information that is not relevant to the steps that they need to take." Tr. 384:12–15 (Mayer).

496.  Using the Flesch Kincaid analysis, Dr. Mayer concluded that the letter was written at a collegiate reading level and was difficult to understand. Tr. 518:11–519:21 (Mayer); see also Tr. 253:23–254:17 (McCrary) (describing findings that Georgia's pending letters were "extremely cumbersome" and "difficult to understand, particularly with persons with lower educational background[s]"). The Court finds this methodology reliable.

497.  The letter is also sent only in English, with the exception of Gwinnett County, where it is also sent in Spanish. Tr. 2052:12–19 (Harvey); Tr. 385:10–25 (Mayer). This creates additional comprehension obstacles for

applicants who receive the letter, many of whom are recent immigrants

whose primary language is not English (or Spanish in Gwinnett County).

498.   Several steps must be taken before an applicant is moved out of pending

status and into active status. As Dr. Mayer explained, an applicant "would

have to receive this letter; they would have to understand the letter, like

reading it and comprehending the steps that they would need to take,"

and then they would have to "provide that documentary proof either by

showing it, appearing in the clerk's office, … making a copy and sending it

to a clerk's office, or appearing at a polling place and showing the

documentation before they are permitted to vote." Tr. 375:18–25 (Mayer).

499.   An additional impediment for naturalized citizens who fail Citizenship

Verification is that people who have recently gone through the

naturalization process after having been immigrants for a long time are

particularly sensitive to being "asked for their papers." Tr. 113:1–6 (Livoti).

This can be a deterrent that prevents new citizens from voting. Tr. 113:19–

114:17 (Livoti) ("[W]hen you go to . . . that first step in the process and the

first thing somebody does is ask you for your papers . . . that is not going

to increase your confidence in the process. It's not going to familiarize you with the process, and it absolutely could be deterrent.").

> **(b)** **The Secretary of State Has Acknowledged that Collecting the Documentation to Prove Citizenship Takes Time and Can Prevent Voting.**

500.   The Secretary recognizes that gathering proof of citizenship can take some time and appreciated that it would not always be easy for applicants in pending status. Tr. 2054:23–2055:2, 3700:2–19 (Harvey). In an Official Election Bulletin, the Secretary encouraged counties to process voter registration applications in a timely way so that if a voter "encounter[s] a problem with their application (such as failing to verify or … need[ing] to verify citizenship, or supply missing information)" they would not "lose months of time possibly needed to formulate a response and/or gather and submit documents that would allow their voter registration application to be approved in a timely manner." PX. 2092 at State-Defendants-00007596. In certain cases, therefore, this requirement can mean that a voter is unable to vote.

        (c)      **The Data Bears Out That Many of Those Erroneously Flagged as Non-Citizens Are Unable to Vote.**

501.   The Secretary analyzed a list of people in pending status at the time of the November 2020 and January 2021 elections to determine how many actually voted. The Secretary did this analysis to determine how well poll personnel were following the requirements for allowing people in pending status to vote as long as they provided documentary proof of citizenship at the polls. Tr. 2076:11–23 (Harvey). Of the approximately 4,200 people in pending status when the November 2020 election began, a total of 64 voted in the November 2020 election, the January 2021 election, or both. This means only 1.5% of people in pending status cast a vote in those elections. Tr. 2074:11–2078:14 (Harvey).

        (d)      **The Testimony of Naturalized Citizens Who Tried to Register Underscores the Burden of the Secretary of State's Approach.**

502.   The Court finds relevant and credible the evidence concerning the following voters whose registrations were placed in pending status by the current Secretary of State Citizenship Verification process despite being citizens at the time of their registration.

- 188 -

503.   Benjamin Ansa was born in Nigeria, moved to the United States in 1998,
       and became a United States citizen in 2013. PX. 2096 at 7:2–3; 8:12–14;
       12:25–13:4 (Ansa Dep.). Dr. Ansa attempted to register online before the
       2016 election. PX. 2096 at 17:18–18:8 (Ansa Dep.). He was surprised to
       receive a letter telling him that he needed to submit additional documents
       and wondered why the voter registration website itself did not list what
       was required. PX. 2096 at 19:5–19:19; 20:17–20:22 (Ansa Dep.). [25] Dr. Ansa
       did not have the "luxury of time" and did not vote in the 2016 election. PX.
       2096 at 21:21–22:7 (Ansa Dep.).

504.   Rosa Hamalainen attempted to register to vote so she could cast her ballot
       as a new United States citizen in the 2016 presidential election. PX. 2048 at
       10:18–10:23 (Hamalainen Dep.). She instead received the citizenship letter
       indicating that she had to provide additional proof of her citizenship. PX.
       2048 at 13:2–10, 13:18–14:11 (Hamalainen Dep.); PX. 2016 (Hamalainen
       letter). Ms. Hamalainen, who was in California attending college at the
       time and therefore wanted to vote by mail, did not have enough time to

---

[25] Defendants objected to 20:3–11 of Dr. Ansa's deposition under FRE 801. See
Defendants' objections and Plaintiffs' responses at Doc. No. [811-1], at 3. To the extent
that portion is incorporated in this sentence, it is not hearsay—it is an instruction.
United States v. Rivera, 780 F. 3d 1084, 1092 (11th Cir. 2015).

provide that proof and therefore did not vote in the 2016 election. PX. 2048 at 12:5–9, 17:22–25, 18:7–9 (Hamalainen Dep.).

505.   Kia Carter was incorrectly flagged as a noncitizen and, as a result, was not permitted to vote in the 2018 general election. PX. 2046; Tr. 2502:4–6, 2508:17–20 (Carter). This was the case even though Ms. Carter offered to go home to get her birth certificate but was informed by the poll worker that she would not have time to retrieve it and get back to the poll to vote. Tr. 2499:3–14 (Carter).[26] Ms. Carter was not offered a provisional ballot and therefore did not cast a ballot in the 2018 election. PX. 2046 at 2 (Carter eNet); Tr. 2501:24–2502:6 (Carter).

506.   Tuba Ozgunes regularly presented proof of her citizenship in multiple elections but continued to be identified as a non–citizen in the voter registration database. This resulted in her being challenged as a voter and needing to provide proof of her citizenship multiple times. Ultimately, she

---

[26]  The poll worker's instruction to Ms. Carter that she would not have time to retrieve her birth certificate and vote was admitted into evidence only for course of conduct. Tr. 2500:3–6.

was denied the right to vote in one election when she was refused even a provisional ballot. PX. 89 at 1–2, 5;[27] Tr. 2057:9–2059:14 (Harvey).

507. Dr. Ali Kefeli became a naturalized citizen in December 2019, in large part because he wanted to vote. PX. 2049 at 26:9–27:21; 40:22–41:2 (Kefeli Dep.). The same day he was naturalized, Dr. Kefeli worked with volunteers to submit a voter registration application along with a copy of his naturalization certificate. PX. 1905; PX. 2049 at 27:16–24, 31:17–19 (Kefeli Dep.). A little over a month after his naturalization, Dr. Kefeli received a letter informing him that his registration "remain[ed] in pending status" because his DDS record indicated he was not a citizen, and he was required to provide proof of citizenship before he could vote. PX. 1779 at 1–3; PX. 2049 at 33:14–34:14; 45:4–10; 45:19–46:9, 46:11 (Kefeli Dep.).[28] Dr. Kefeli provided a copy of his naturalization certificate yet again to resolve his registration issue. PX. 1780; PX. 2049 (Kefeli Dep.) 48:17–49:2. Two

---

[27] Although PX. 89 was initially taken under advisement, it was eventually admitted in its entirety. Tr. 2271:11.

[28] Defendants' objection to the question posed to Dr. Kefeli and his answer at Tr. 46:6–46:11 on the basis of speculation and relevance is not well taken. See Defendants' objections and Plaintiffs' responses at Doc. No. [767-5], at 6. His testimony relates to the effect of the Exact Match policy; testimony about his own surprise is not speculative. The testimony is based on Dr. Kefeli's personal knowledge.

members of Dr. Kefeli's immediate family had similar experiences where

they were also put into pending status and required to submit proof of

citizenship despite having already done so. PX. 1780 at 2; PX. 2049 (Kefeli

Dep.) 52:8–13, 56:7–10.[29]

508.   Ngoc Anh Tri Tran, who is now deceased, was an 80-year-old immigrant

from Vietnam who did not speak English. Tr. 295:13–296:5 (Ashling). Ms.

Tran's MVP Page showed a flag. Tr. 302:14–21 (Ashling). Cam Thi Ashling,

an activist in the Asian immigrant community (Tr. 296:10–23 (Ashling)),

helped Ms. Tran present her naturalization paperwork at the Board of

Elections. Tr. 309:24–310:7 (Ashling). After several hours, and only due to

Ms. Ashling's help, Ms. Tran was finally able to cast her vote. Tr. 312:19–21

(Ashling).

---

[29]  Defendants objected to this portion of the deposition as speculation, FRE 602, and hearsay under FRE 801. See Defendants' objections and Plaintiffs' responses at Doc. No. [767-5], at 9. Defendants' objection was waived as to F.R.E. 602, Fed. R. Civ. P. 32(d)(3)(B). The testimony is based on Dr. Kefeli's personal experience and explains why he was concerned about his right to vote. Testimony that Dr. Kefeli was concerned because he knew others similarly affected is not hearsay, but a description of his personal experience. Dr. Kefeli also established foundation by describing that the statement related to the other members of his immediate family. See PX. 2049 at 52:8–52:13 (Kefeli Dep.).

509.   Ms. Fu was required to vote a provisional ballot because she had not

received the letter informing her of her pending status and therefore did

not know to bring proof of her citizenship to the polls. PX. 892. Her vote

was counted after many emails among the Secretary of State employees

and involvement of the State Attorney General's office. PX. 892; Tr.

2066:22–2068:7 (Harvey).

### B.  Exact Match Citizenship Is Not Justified by a State Interest.

#### (1)   Non-citizens Registering and Voting is Extremely Rare.

510.   As Plaintiffs do not dispute, Defendants have a legitimate interest in

preventing non-citizens from registering to vote, but the Court finds that

interest insufficient to justify the burdens imposed upon U.S. citizens by

the Verification Process.

511.   As a threshold matter, Dr. Minnite's unrebutted testimony was that "the

empirical evidence makes clear that fraud committed by voters either in

registering to vote or at the polls on Election Day is exceedingly rare . . .

both nationally and in Georgia." Tr. 2345:25–2346:6 (Minnite). Specifically,

instances of noncitizens registering to vote are exceedingly rare. Tr. 374:4–

17 (Mayer); Tr. 2356:15–2359:5 (Minnite). Defendants did not offer any testimony to rebut Dr. Minnite's empirical analysis.

512. Dr. Minnite's testimony was consistent with Chris Harvey's. Mr. Harvey, who before becoming the director of the Secretary of State Elections Division was the chief investigator for the Secretary of State's Office, was not aware of any noncitizens "having been convicted or even indicted for voting illegally in a Georgia election." Tr. 2040:23–2041:1 (Harvey). Mr. Harvey agreed that noncitizens voting was "not a significant problem that [he is] aware of." Tr. 2041:10–16 (Harvey). He thought that, prior to 2020, there were between five and ten cases where Secretary of State investigators found that noncitizens had registered to vote. Tr. 2041:23–2043:1 (Harvey).

513. Mr. Harvey stated that these few cases of non-citizens voting primarily took place in the early 2000s, and many of these non-citizens did not intend to register to vote. Tr. 2042:3–13 (Harvey). In some cases, the persons who had been erroneously registered contacted the counties themselves to clarify, and, in others, the persons who had registered had mistakenly thought they were eligible. Tr. 2042:10–2043:1 (Harvey). There

were also cases of people stating on the application that they were not a citizen, but the county registering them anyway. Tr. 2042:14–18 (Harvey).

514.   Dr. Minnite's testimony was also consistent with that of Gabriel Sterling, Chief Operating Officer of the Secretary of State, who was also unaware of a single instance of a non-citizen attempting to vote. PX. 2130 (Sterling Dep.) 209:18–25.[30]

515.   While the Secretary of State's citizenship audit (discussed above, see supra ¶¶ 493–494) failed to verify 1,634 people, the Secretary of State has acknowledged that many of those applicants are likely U.S. citizens who were flagged in the audit only due to the limitations of how SAVE was used at the time of the Secretary's audit. SAVE itself requires that the Secretary of State provide those who fail to be verified with notice and an opportunity to provide proof of citizenship before making a final

---

[30] Defendants object to the deposition testimony as "Ambiguous, F.R.E. 403, 611. Lack of foundation/speculation, F.R.E. 602." See Defendants' objections and Plaintiffs' responses, Doc. No. [827-1] at 13. This objection is not well-founded as testimony includes no speculation; to the contrary, it reveals Mr. Sterling's personal knowledge regarding investigations and instances of alleged fraud within the Secretary of State's office, which is relevant to Defendants' asserted state interests behind their Exact Match citizenship policy.

determination. PX. 2021 at 7; PX. 2022 at 5. In fact, some of those 1,634

registrants have proved that they are citizens. Tr. 1714:7–14 (Germany).

516.   The rarity of such voter fraud is unsurprising given the strong sanctions

against such fraud in existing law and procedures. Everyone who applies

to vote to Georgia must attest, under penalty of law, that they are a United

States citizen. PX. 6 (Georgia Voter Registration form) ("WARNING: Any

person who registers to vote knowing that such person does not possess

the qualifications required by law, who registers under any name other

than such person's own name, or who knowingly gives false information

in registering shall be guilty of a felony. O.C.G.A. § 21-2-561"); PX. 1313

(Federal Voter Registration Form) ("I may be fined, imprisoned, or (if not a

U.S. citizen) deported from or refused entry to the United States."); Tr.

2031:5–2032:20 (Harvey).

517.   The punishment for falsely attesting to U.S. citizenship is up to ten years in

prison and a fine of $100,000. Tr. 362:3–7 (Mayer).

518.   Indeed, the Secretary's purported interest in Citizenship Verification is

overstated, as approximately 210,000 voters in Georgia do not have a

Georgia driver's license or a state ID number, and therefore were not

subjected to the Citizenship Verification process. Tr. 2035:8–2036:8
(Harvey); <u>see</u> <u>also</u> Tr. 2032:21–2023:15 (Harvey) (explaining that those who
do not provide a driver's license or identification number do not go
through Citizenship Verification).

519.   The Secretary himself acknowledges that an available, feasible, and more
accurate way to verify citizenship is the SAVE verification process. The
parties appear to agree that SAVE would greatly improve the accuracy of
the citizenship verification process, while still serving the state's interest in
keeping noncitizens off the voter rolls. After using SAVE in its citizenship
audit, the Secretary of State confirmed that several thousand applicants,
including voter witnesses Rosa Hamalainen and Dr. Benjamin Ansa, were
U.S. citizens. After years being in pending status incorrectly, Ms.
Hamalainen and Dr. Ansa were moved into active status. PX. 2017; PX.
2018; Tr. 1689:23–1690:23 (Germany).

520.   SAVE thus identifies potential non-citizens while substantially reducing
the number of citizens who would be unnecessarily and incorrectly
burdened by the current Citizenship Verification, which relies on stale

DDS records. <u>See</u> <u>supra</u> ¶¶ 493 (discussing the more than 2,750 citizens

found in the citizenship audit).

### (2)    Defendants' Argument That They Are Already Using SAVE Is Not Corroborated by the Trial Record.

521.   Defendants make a quasi-mootness argument, without calling it that, by

asserting that "[i]f we [the Secretary of State] are using SAVE, the injury is

not there." Tr. 4459:20–21 (closing).

522.   But a case is only moot "when the issues presented are no longer 'live' or

the parties lack a legally cognizable interest in the outcome." <u>Powell v.</u>

<u>McCormack</u>, 395 U.S. 486, 496–97 (1969) (citation omitted).

*523.*   When assessing whether the government's cessation of a challenged

practice renders the case moot, courts consider (1) whether the

government's change in conduct resulted from substantial deliberation or

is merely an attempt to manipulate the court's jurisdiction; (2) whether the

government's decision to terminate the challenged conduct was

unambiguous; and (3) whether the government has consistently

maintained its commitment to the new policy or legislative scheme.

<u>Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs</u>, 868 F.3d 1248, 1257

(11th Cir. 2017) (en banc), abrogated on other grounds by Uzuegbunam v. Preczewski, 141 S. Ct. 792 (2021); see also Doc. No. [612] at 57. Ultimately, however, "the entirety of the relevant circumstances should be considered and a mootness finding should follow when the totality of those circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged legislation." Doc. No. [612] at 57 (quoting Flanigan's Enters., 868 F.3d at 1257).

524.  As to the first factor, the Secretary's purported embrace of SAVE was transparently timed to undermine Plaintiffs' claims by undermining this Court's jurisdiction. The Secretary issued a press release relating to its use of SAVE in its citizenship audit on April 11, 2022—the first day of trial in this case. PX. 2083; see also PX. 2014. Moreover, in the Secretary's March 28, 2022, press release announcing his Office's citizenship audit, the Secretary touted the current Citizenship Verification as "working" despite awareness, based on the audit itself, that the current process had at least a 63% error rate – i.e., that at least 63% of the registrants flagged by the current process as non-citizens were in fact U.S. citizens. PX. 2014; Tr. 1690:13–21 (Germany).

525.  As to the second factor, though the Secretary of State used SAVE for the March 2022 audit, there is no guarantee that the Secretary will ever do so on an ongoing basis and the Secretary's commitment is far from "unambiguous." PX. 2014. Indeed, Ryan Germany testified that using SAVE is a "goal" and the Secretary of State is "working on [it] with DDS." See Tr. 1694:6–21 (Germany). He could not say that a plan was "in place" and was uncertain about the timeline for implementation. See Tr. 1708:22–1710:5, 1711:4–11 (Germany). That is particularly notable given that the Memorandum of Understanding to authorize the Secretary to use SAVE was signed in August 2020, yet the Secretary's witnesses acknowledged that SAVE had not been used until the end of 2021, when the Secretary's audit occurred. PX. 2022; Tr. 2094:7–17 (Harvey).

526.  Defendants offered no evidence at trial that they were even in the process of implementing any protocol for the ongoing use of SAVE protocol, much less actually using SAVE for anything other than a one-off litigation-based audit. Even though Defendants called as witnesses in their case Ryan Germany and Gabriel Sterling—the two Secretary of State employees with knowledge about SAVE—Defendants asked them no questions about

SAVE, including what steps, if any, had been taken to move Mr.

Germany's "hope" into a reality.

527.   As to the third factor, the Court finds the Secretary's commitment to SAVE

tenuous at best. Without a court order, the Secretary could easily change

course and decline to implement SAVE on an ongoing basis. The burdens

of the current Citizenship Verification remain, and there is no evidence to

suggest that SAVE has been or will be implemented to reduce those

burdens at any time in the near future.

* * *

528.   The Court concludes that the Exact Match Citizenship policy burdens U.S.

citizen Georgia voter applicants by preventing them from exercising their

right to vote or by forcing them to clear additional hurdles at the polls in

order to vote, based on demonstrably inaccurate and overinclusive records

of non-citizenship. Given the substantially less burdensome methods

available to ensure that non-citizens do not improperly vote—methods the

Secretary of State has deemed superior, desirable, and feasible for the

Secretary of State to use—the state interest in using the current Verification

Process does not justify these burdens. See Anderson, 460 U.S. at 789

(finding the court must "not only determine the legitimacy and strength of each of [the state's] interests; it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights.").

### VI) Exact Match MIDR and Citizenship Violate Section 2 of the Voting Rights Act.

#### A. Under Section 2 of the Voting Rights Act, the Court Analyzes the <u>Brnovich</u> and Senate Factors to Determine if Political Processes are "Equally Open" Under the Totality of the Circumstances.

529.   As this Court recently wrote, "'[t]he Fifteenth Amendment was ratified in 1870, in the wake of the Civil War. It provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude," and it gives Congress the "power to enforce this article by appropriate legislation."' <u>Shelby Cty., Ala. v. Holder</u>, 570 U.S. 529, 536 (2013). Even after the adoption of this amendment, however, many discriminatory systems – including violence – were used to deprive Blacks (among others) of their right to vote." <u>Alpha Phi Alpha v. Raffensperger</u>, No. 21-cv-5337, 2022 WL 633312, at *4 (N.D. Ga. Feb. 28, 2022) (Jones, J.).

530.    Again borrowing from the Alpha Phi Alpha opinion, "[o]ne particularly

extreme use of such violence took place on Sunday, March 7, 1965

("Bloody Sunday"). On that day, civil rights proponents began marching

from Selma, Alabama to Montgomery, Alabama for, among other things,

the right to vote. After crossing the Edmund Pettus Bridge, the marchers

were attacked by state troopers and civilians, an event that was televised

across America. The Bloody Sunday attack caused public outrage. See

James D. Wascher, Recognizing the 50th Anniversary of the Voting Rights

Act, Fed. Law., May 2015, at 41 (hereinafter, "Wascher") (citing Richard H.

Pildes, Introduction, in The Future of the Voting Rights Act xi, (David L.

Epstein, et al., eds., 2006)). Shortly thereafter, Congress passed the Voting

Rights Act of 1965 ("VRA"). It was signed into law on August 6 of that

year. Pub. L. No. 89-110, 79 Stat. 437 (1965) (codified as amended at 52

U.S.C. §§ 10301–10702). The Voting Rights Act was adopted specifically

"[t]o enforce the fifteenth amendment to the Constitution of the United

States." Id. Many commentators have "rightly called [it] the most effective

civil rights legislation ever adopted." Wascher at 38; see also Terrye

Conroy, The Voting Rights Act of 1965: A Selected Annotated

Bibliography, 98 Law Libr. J. 663, 663 (2006) (stating that the VRA "is

widely considered one of the most important and successful civil rights laws ever enacted").” <u>Alpha Phi Alpha</u>, 2022 WL 633312, at *4.

531.    The central inquiry in assessing whether political processes are “equally open” to all groups is whether, “under the totality of the circumstances,” a policy or practice abridges the right to vote on account of race. <u>Brnovich</u>, 141 S. Ct. at 2336. Under <u>Brnovich</u>, “any circumstance that has a logical bearing on whether voting is ‘equally open’ and affords equal ‘opportunity’ may be considered.” <u>Id</u>. at 2338.

532.    It is appropriate for courts to consider both the <u>Brnovich</u> “guideposts” and relevant factors from the Supreme Court’s decision in <u>Thornburg v. Gingles</u>. <u>See</u> <u>supra</u> ¶¶ 71–72. The Supreme Court in <u>Brnovich</u> stressed that the key historical questions under the totality-of-the-circumstances inquiry are whether “minority group members suffered discrimination in the past (factor one)” and whether “effects of that discrimination persist (factor five).” 141 S. Ct. at 2340.

### B. **Brnovich** Factors Show That Political Processes in Georgia Are Not "Equally Open" Under the Totality of the Circumstances.

### (1) **Brnovich** Factor 1: Size of the Burden Imposed by the Rule

533.   As discussed above in the context of the fundamental right to vote, both Exact Match MIDR and Exact Match Citizenship impose unnecessary burdens on U.S.-citizen Georgians who are eligible to vote. See supra ¶¶ 414–454 (MIDR), ¶¶ 479–509 (citizenship).

### (2) **Brnovich** Factor 2: Degree to which the Rule Departs from Standard Practice in 1982

534.   In 1982, Georgia only required voter registration applicants to provide an election registrar with "proper identification and information" that the registrar would use to complete a simple registration card with the voter's identifying information. The voter would then take an oath swearing to or affirming their citizenship and eligibility to vote. The county registrars did not verify the information provided by the applicant by comparing it to information maintained in separate databases. O.C.G.A. §§ 21-2-217, 21-2-221 (1982).

535.   Georgia did not maintain state-wide voter registration data until 1995, following a Section 5 objection to the State's inadequate response to the

National Voter Registration Act of 1993. PX. 1289 (McCrary Report) ¶ 25;

Tr. 212:15–213:1 (McCrary).

536.   Georgia finally began to comply with HAVA's voter verification

provisions in March 2007, when then Secretary of State Karen Handel

entered into an information-sharing agreement with Georgia's DDS, which

in turn entered into a memorandum of understanding with the SSA. PX.

1289 (McCrary Report) ¶¶ 69, 71; Tr. 216:1–8 (McCrary); Tr. 216:19–217:5

(McCrary); PX. 1751; PX. 62.

537.   Georgia previously asserted it was exempt from HAVA's voter verification

requirement because it required applicants to provide their full social

security numbers rather than just the last four digits of their social security

numbers. A federal court, however, rejected the basis for that theory in

Schwier v. Cox, 412 F. Supp. 2d 1266 (N.D. Ga. 2005). PX. 1289 (McCrary

Report) ¶ 68; Tr. 216:9–18 (McCrary).

(3)    <u>Brnovich</u> Factor 3: Size of the Disparities of the Rule's Impact on Different Racial Groups

    (a)    Exact Match MIDR Disproportionately Burdens Voters of Color.

        (i)  As an Empirical Matter, Voters of Color Are Disproportionately Put into MIDR Status.

538.    The Court credits the methodology used by Dr. Mayer in analyzing the state voter files. As an empirical matter, "voters of color are overwhelmingly and disproportionately in MIDR status compared to their overall composition of the voter file." Tr. 413:7–9 (Mayer).

539.    According to Dr. Mayer's analysis, the racial breakdown of those with an MIDR flag as of January 2020 was: 11.4% White non-Hispanic; 69.4% African American; 5.7% Hispanic; 3.3% Asian or Pacific Islander; 3.4% Other, 2 or more; 7% unknown. PX. 2030; Tr. 413:3–21 (Mayer).

540.    While "African-Americans were only about 30 percent of the overall voter file, they were almost 70 percent of voters who were in MIDR status." Tr. 413:10–21 (Mayer) (discussing PX. 2030).

541.    The Court finds Dr. Mayer's methodology to be sound and credits his conclusion that "an African-American voter [in Georgia] is more than 10

times more likely to be in MIDR status than a white non-Hispanic voter."
Tr. 414:2–9 (Mayer).

542.   The Secretary of State has not disputed and cannot dispute Dr. Mayer's
analysis because its own analysis is consistent with Dr. Mayer's results.
Specifically, in 2018 the Secretary of State's lawyers undertook a review
and concluded that approximately 70 percent of applicants in pending for
failed verification at DDS or SSA were Black. Tr. 1993:14–1994:18 (Harvey);
PX. 1887.

> **(ii) The Disproportionate Burden Is in Part the Foreseeable Result of the Secretary of State's Failure to Ensure the Database Can Accommodate Naming Conventions of Different Cultures.**

543.   Voters of color encounter problems with the Exact Match MIDR process
due to challenges associated with entering certain names—for example,
those with multiple spaces, apostrophes—into the various databases. See
Tr. 115:7–10 (Livoti) ("It's common in many of the cultures that we engage
with to use multiple, like, last names, they have three or four last names
and people don't understand how to do that. They may want to hyphenate
them and that creates a problem.").

544.  For example, because DDS does not allow spaces in last names, Dr. del
      Rio's driver's license listed his name as "Delrio." Tr. 473:8–13 (Del Rio).

545.  Cam Thi Ashling, testified how she personally, in addition to Ngoc Anh
      Thi Tran and others in the Asian immigrant community, experience
      difficulties with their names—which often have multiple first and last
      names—being misspelled or "jammed up together." Tr. 298:5–299:5
      (Ashling). Ms. Ashling ultimately legally changed her name to "have a
      better experience going through college with a name that was easier for the
      system to process." Tr. 298:23–25 (Ashling).

### (iii)   Once in MIDR Status, Voters of Color Are More Likely to be Burdened.

546.  The MIDR flag adds another required poll worker action before someone
      can vote, and the literature shows that this type of discretion leads poll
      workers to "apply different levels of scrutiny to white voters than they do
      minority voters. The voters of color are frequently and more likely to be
      subjected to a higher level of scrutiny and asked to do things that the law
      doesn't actually require them to do." Tr. 403:4–404:23 (Mayer).

547.    According to census estimates from 2013–2017, disparities in levels of

educational and economic achievement continue to impact voters of color

to a disproportionate extent. These disparities are likely to have an impact

on registrants of color's "ability to remedy 'exact match' failures in the

State's flawed voter verification program." Tr. 254:18–257:1 (McCrary).

> **(b)     Exact Match Citizenship Disproportionately
> Burdens Voters of Color.**

548.    The Court credits the methodology used by Dr. Mayer in analyzing the

state voter files. Non-Hispanic white registrants are far less likely to be

flagged as noncitizens, as compared to their overall representation in the

voter file, whereas voters of color are far more likely to be flagged as

noncitizens than their overall representation in the voter file reflects. Non-

Hispanic whites make up 46% of recent registrants, but only 13% of those

in pending. Hispanic registrants, however, are 4 to 5 times more likely to

be flagged as noncitizens relative to their share of the recent registrant

population, and Asian registrants are 7 to 8 times as likely to be flagged.

PX. 2027; Tr. 388:12–390:23 (Mayer).

549.    The people who are flagged as noncitizens and then unable to move from

pending to active status are also disproportionately voters of color. Indeed,

"white registrants who have been flagged as noncitizens were more likely than members of any other demographic group to have taken the steps to document their citizenship and be in active status" while "members of minority groups were significantly less likely than white registrants who had been flagged as noncitizens to be able to take those steps and have their registration put into active status." Tr. 392:6–20 (Mayer); PX. 2028.

550.  55.3 percent of white registrants who were flagged as noncitizens in January 2020 have been able to take the steps to document their citizenship and be in active status as of November 2021. Tr. 393:2–5 (Mayer); PX. 2028. At the same time, "[o]nly 36.5, or just over a third of African-American registrants who had been flagged as noncitizens, had been able to take the steps to move their citizenship into active status by November 2021." Tr. 393:22–25 (Mayer). And "Hispanics were far more likely than white registrants to be flagged, and only 40 percent of them had been able to take the steps to move their registration into active status." Tr. 394:3–9 (Mayer).

551.  "[A] white non-Hispanic registrant was least likely to be flagged as a noncitizen and most likely to have been able to overcome . . . that or to

take the steps to move their registration into active status." Tr. 393:9–15 (Mayer).

552.   Only 10.2% of those who remained in pending status for non-citizenship were white non-Hispanic, despite being 52.4% of the voter file, because white non-Hispanic voters were disproportionately underrepresented in both the initial flagging and in those who remained in pending status. PX. 2029; Tr. 395:22–396:6 (Mayer).

553.   The Court finds that voters of color are disproportionately impacted by Exact Match Citizenship because "[t]he verification process overwhelmingly and disproportionately flags voters of color who are more likely to be flagged and more likely to have remained in pending status." Tr. 398:7–10 (Mayer).

### (4)   <u>Brnovich</u> Factor 4: Opportunities Provided by the State's Entire System of Voting

554.   It remains true that "[t]here are no alternative means of registering to vote that avoid Exact Match. All registration applications are subject to the policy. Thus, while Defendants are right that 'Georgia provides multiple opportunities to vote besides in-person voting on Election Day' (Doc. No.

[623], [18]), that fact is of little significance when considering an issue that first manifests not at the polls but during the registration process." Order at 38, Nov. 15, 2021, Doc. No. [636].

555.   Exact Match MIDR applies to any voter registration application that provides a driver's license number, state identification number, or last four digits of a social security number. Exact Match Citizenship applies to anyone who provides a driver's license or state identification number. Tr. 2032:21–2033:21 (Harvey); Tr. 356:1–14 (Mayer); Tr. 359:8–360:18 (Mayer).

556.   Georgia law and Georgia's voter registration form require that the applicant provide a Georgia driver's license number or state identification number if they have one. O.C.G.A. § 21-2-220.1; PX. 6. They also require that those that do not have a Georgia driver's license or Georgia identification card must provide the last four digits of their social security number. Id.

557.   The only way to avoid Exact Match completely is to register without providing a driver's license number, state identification number, or last four digits of a social security number. Tr. 1943:6–25 (Harvey); Tr. 1946:2–1947:22 (Harvey); Tr. 2032:21–2033:15 (Harvey); Tr. 2035:8–2036:8

(Harvey). But 97% of Georgians have a driver's license or state identification number, which they are therefore legally required to provide on their voter registration application, and thus cannot avoid either component of Exact Match. Tr. 2035:8–12 (Harvey).

### (5) <u>Brnovich</u> Factor 5: Strength of the State's Interests Served by the Rules

558.  As discussed above in the context of the fundamental right to vote, both Exact Match MIDR and Exact Match Citizenship serve little to no state interest, since they are error-prone and poorly suited for the proffered state interest, especially given the availability of better and less burdensome alternatives. <u>See</u> <u>supra</u> ¶¶455–478 (MIDR), ¶¶ 510–520 (citizenship).

## C. The Senate Factors Show That Political Processes in Georgia Are Not "Equally Open" Under the Totality of the Circumstances.

### (1) Senate Factor 1: Extent of Any History of Official Discrimination Touching the Rights of Voters of Color to Register and Vote

559.  The State of Georgia has a long history of suppressing the right of people of color to vote. Although the State adjusted these discriminatory efforts when compelled to do so by federal intervention during Reconstruction

and by enforcement of the Voting Rights Act, it has consistently resisted the federal government's attempts to ensure fair voting based on race. PX. 1162 (Jones Report) at 2; see also Tr. 971:24–973:5 (Jones).

560.   Georgia's "long sad history of racist policies in a number of areas including voting" up to the 1990s is so well known that it is the proper subject of judicial notice. Order at 41, Nov. 15, 2021, Doc. No. [636].

561.   Georgia's first constitution, in 1777, limited the franchise to white males aged twenty years or older. Georgia's constitution excluded African Americans from voting from then until Reconstruction and again after the State was free of federal oversight related to Reconstruction. PX. 1162 (Jones Report) at 2–4; see also Tr. 953:3–960:9 (Jones).

562.   Few voter registration requirements were in place before Reconstruction, but after the emancipation and enfranchisement of African Americans, a reactionary countermovement arose in the South. By the turn of the twentieth century, African Americans had been virtually purged from the electorate of the Southern states, at first by the use of violent intimidation and trickery, and later by the introduction or reintroduction of a series of

superficially color-blind requirements intended to circumvent the

Fourteenth and Fifteenth Amendments. PX. 1038 at 4–5 (Minnite Report).

563.  Beginning with a statute enacted in 1908, Georgia restricted the

registration of voters to (1) persons who had served in any war on behalf

of the United States or the Confederate states or descendants of such

persons; (2) a person of "good character" who understood the duties and

obligations of citizenship; (3) someone who was able to read and write

correctly any paragraph of the federal or state constitution selected by the

local registrar; or (4) a person who owned 40 acres of land or $500.00 worth

of taxable property. Even if Black citizens could pass this registration test,

they still could not vote in the State's whites-only primary, which was the

only election that mattered in one-party Georgia. Tr. 203:7–204:23

(McCrary); PX. 1289 (McCrary) ¶ 18.

564.  Voter registration requirements were especially important because of the

degree to which they ceded discretion to local registrars and election

officials. Thus, an 1873 Georgia law permitted local registrars to close their

books to new registrants except during the planting and harvesting

months – *i.e.,* the time of the year when African American farm workers

most likely would not be able to make the trip. PX. 1038 at 4 (Minnite Report).

565.    From the end of Reconstruction to the middle of the twentieth century, no state was more systematic and thorough in its efforts to deny or limit voting and office holding by African Americans than Georgia. The State adopted virtually every one of the traditional expedients to obstruct the exercise of the franchise by Black citizens, including literacy and understanding tests, the poll tax, felony disenfranchisement laws, onerous residency requirements, cumbersome registration procedures, voter challenges and purges, the abolition of elective offices, the use of discriminatory redistricting and apportionment schemes, the expulsion of elected Black officials from office, and the adoption of white-only primary elections, and a county unit voting system. And where these technically legal measures failed, the State resorted to fraud and violence in order to suppress the Black vote. PX. 1162 at 4 (Jones Report); see also Tr. 960:10–965:4 (Jones).

566.    After the federal courts struck down the State's white primary in 1945, the decades-old registration requirements were the major obstacle in the path

of voting by people of color. To create a more difficult hurdle, the State adopted a re-registration law in 1949, requiring all voters to register again under a new literacy test. Under this test individuals would have to answer correctly at least 10 of 30 factual questions. In 1958, the legislature increased the required number of correct answers required from 10 to 20. Among the questions were how the writ of habeas corpus can be suspended and what procedures are required to amend the U.S. Constitution. The tests were usually administered by registrars with only a high school education and little legal training. Even if administered fairly, the questions were often difficult for even well-educated persons to answer. Tr. 204:4–7 (McCrary); Tr. 205:9–25 (McCrary); Tr. 207:3–19 (McCrary); PX. 1289 at ¶ 19 (McCrary Report).

567.   Passed in 1965, the Voting Rights Act abolished the literacy test for voter registration employed by Georgia and other, primarily Southern states. Georgia was covered under the formula in Section 4 of the Act because its total voter registration – white as well as African American – was under 50% of the total voting age population. PX. 1289 ¶ 22 (McCrary Report).

568.    Georgia has continually resisted the Voting Rights Act. Georgia legislators opposed passage of the Act and its preclearance requirement; Georgia brought a legal challenge to Act and supported others after its passage; and Georgia took the lead in contesting the reauthorization of the Act in 2006. PX. 1162 at 5–6, 9–10 (Jones Report); see also Tr. 970:13–19 (Jones).

569.    Georgia has attempted to thwart the Voting Right Act by continuing to erect barriers to African American voter registration after 1965. Between that year and 1968, the State adopted hundreds of new voting laws designed to curtail Black enfranchisement yet submitted just one of them for preclearance. PX. 1162 (Jones Report) at 5–6; see also Tr. 970:17–971:3 (Jones).

570.    For instance, in 1966 Georgia enacted a law providing that no person might assist more than one illiterate voter. The Department of Justice objected to this change in 1968. Georgia adopted a similar change again in 1981, reducing the number of illiterate or disabled voters a person could assist from ten to five. The Department objected to this change as well, noting that more Black voters than white voters depended on such assistance. Tr. 210:8–21 (McCrary); PX. 1289 ¶ 23 (McCrary Report).

571.   In total, the Department of Justice objected to 177 proposed changes to

election law by Georgia and its counties and municipalities between 1965

and the Supreme Court's decision in Shelby County v. Holder, 570 U.S. 529

(2013). Tr. 210:22–211:6 (McCrary); PX. 1289 at ¶ 26 (McCrary Report).

572.   Georgia has also enacted anti-immigrant policies in response to the State's

increasing Hispanic and immigrant populations in the late twentieth and

early twenty-first centuries. In particular, the State adopted two statutes in

response to purported concerns about illegal immigrants obtaining welfare

benefits and registering to vote: (1) HB 529, enacted in 2006, which

required verification of citizenship for applications for employment and

public benefits and created a channel for local and state law enforcement

to assist in enforcing federal immigration laws; and (2) HB 87, enacted in

2011, which was essentially an effort to provide more effective

enforcement of the key provisions of HB 529, and part of which was

permanently enjoined by federal courts on preemption grounds. These

concerns were implausible unless state officials were routinely failing to

enforce state and federal law, but then-Republican Governor Sonny

Perdue railed against them when signing SB 529 into law, using

inflammatory language that rose to the level of demaguery. Tr. 243:8–

244:5, 244:11–145:17 (McCrary); PX. 1289 at ¶¶ 53–55, 60, 63–65 (McCrary

Report); see also Ga. Latino Alliance for Human Rights v. Deal, 793 F.

Supp. 2d 1317 (N.D. Ga. 2011), aff'd in part, rev'd in part, 691 F.3d 1250

(11th Cir. 2012).

573.   Georgia's Exact Match program for verifying voter registrations also

reflects this history of official discrimination touching the rights of people

of color to register and vote. Exact Match was initially blocked by a

preclearance objection by the Department of Justice, in 2009, based on the

Department's careful analysis showing persuasively that the State's exact

match methodology did not produce accurate and reliable results and that

thousands of citizens who were in fact eligible to vote were flagged as

ineligible, often as the result of simple data entry errors, and that the

problem was compounded when inquiring into an applicant's citizenship

status. The Department found that out of 7,007 individuals who had been

flagged as non-citizens, more than half were in fact citizens. The

Department further noted that the impact of these errors fell

"disproportionately on minority voters," including Hispanic, Asian, and

African American applicants. Tr. 223:21–227:3 (McCrary); PX. 1289

(McCrary Report) ¶¶ 75–76; see also PX. 66.

574. Georgia sought preclearance of Exact Match again in 2010, after claiming to have taken steps to reform the program, from a three-judge court in the District of Columbia. The Department agreed to preclear the process in settlement of Georgia's lawsuit, based largely on Georgia's representations that the revised procedure called for careful monitoring of the voter verification process on a daily basis, with prompt notice to any applicant whom the system could not verify as a citizen and resident of Georgia under the exact match requirement. With preclearance in hand, however, Georgia's voter verification program remained largely unchanged until 2016; and its persistent high error rates and disparate impact through that time indicate the hollowness of the State's assurances in seeking preclearance in 2010 that it would carefully monitor its voter verification program. PX. 1289 at ¶¶ 77–78, 84 (McCrary Report); see also Tr. 249:2–253:22, Tr. 260:11–261:3 (McCrary).

575. A number of federal lawsuits have been brought challenging the citizenship verification program. In the first of these lawsuits, Georgia State Conference of the NAACP v. Kemp, No. 16-cv-219 (N.D. Ga., filed Sept. 14, 2016), plaintiffs alleged that the Secretary of State's voter verification program had a racially discriminatory effect, resulting in much

higher cancellation and citizenship non-match rates for applicants of color than white applicants. The State settled the lawsuit in 2017, agreeing to various changes to the procedure. PX. 1289 (McCrary Report) ¶¶ 95–97.

576. Shortly after the settlement, however, the General Assembly passed HB 268, which left the prior Exact Match protocol in place and undermined equitable implementation of the settlement. Tr. 258:2–15 (McCrary); PX. 1289 (McCrary Report) ¶ 98.

577. Because HB 268 left in place the procedures requiring an exact match between information in the voter registration database and the DDS or SSA database that had been shown to have a racially discriminatory impact, the Department of Justice likely would have objected to Georgia's implementation of HB 268 in the voter verification context if preclearance were still in effect in 2017. PX. 1289 at ¶¶ 98–99 (McCrary Report); see also Tr. 258:16–259:17 (McCrary).

578. In the second of these lawsuits, Ga. Coal. for People's Agenda, Inc. v. Kemp, No. 18-cv-4727 (N.D. Ga. filed Oct. 11, 2018), plaintiffs alleged that, under HB 268, Georgia's voter verification procedure continued to produce a high rate of erroneous non-matches with racially disparate

results. The district court granted the plaintiffs' motion for preliminary injunction, finding that (1) the burden on applicants who had been flagged and placed in pending status due to citizenship was "severe" and (2) the burden was greater than necessary to serve the State's interest of ensuring that only U.S. citizens can vote. The Court's injunction compelled the State to allow county officials to permit individuals flagged and placed in pending status due to citizenship to vote a regular ballot by furnishing proof of citizenship to poll managers or deputy registrars. PX. 1289 (McCrary Report) ¶¶ 102–10; see also Tr. 259:18–23, 262:13–263:10 (McCrary).

579.   Based on the historical arc to which he testified, Dr. McCrary concluded that the current pattern of voter registration in Georgia has its analogue in the system of voter registration in the Jim Crow era before 1965. Specifically, the difficulty African Americans faced in dealing with the complexities of the literacy test used by Georgia between 1945 and 1965 – coupled with the continuing racial disparities in income and education – closely resembles the difficulties voters of color face in dealing with Georgia's voter verification system since 2008. Tr. 264:4–16 (McCrary); PX. 1289 (McCrary Report) ¶¶ 10, 123.

580.   More recently, in December 2010, Dr. Nancy Dennard and nine other

African Americans, and eventually two more, were arrested and charged

with a collective 119 trumped-up felony charges relating to absentee

ballots following the election of the first-ever majority-Black school board.

These prosecutions were prompted by the Secretary of State, which

initiated an investigation and then asked the Georgia Bureau of

Investigations to become involved. Tr. 683:7–684:12, 676:1–728:7, 745:8–

755:3 (Dennard).

581.   Dr. Dennard testified that the prosecutors pressured her to accept an

agreement to plead guilty to a felony because a felony on her record would

result in her being removed from the school board. Dr. Dennard rejected

every plea. In the end, just one of her co-defendants was tried—three

times—only to be acquitted on all charges. Shortly thereafter, four years

after her arrest, the prosecutors asked the Court to dismiss all charges

against Dr. Dennard and her co-defendants, and the Court did so. Yet, the

Secretary of State and State Election Board kept their investigation against

Dr. Dennard and her co-defendants alive for another two years and

dismissed the case only after then-Attorney General Sam Olens issued an

opinion interpreting the operative statute as not prohibiting the conduct

Dr. Dennard had been accused of engaging in—merely possessing

another's sealed absentee ballot to help have it delivered. Tr. 649:7–728:7,

745:8–755:3 (Dennard); see also PX. 2000, 2038[31], 2047; DX. 736.

582. In 2014, HB 836 changed the school board district maps in Sumpter County

to dilute the strength of Black voters—a change that federal courts found

to violate Section 2 of the Voting Rights Act. See Wright v. Sumter Cty. Bd.

of Elections & Registration, 301 F. Supp. 3d 1297 (M.D. Ga. 2018), aff'd, 979

F.3d 1282 (11th Cir. 2020).

583. In July 2014, when then-Secretary Kemp was running to keep his job as

Secretary of State, he expressed concern at a Gwinnett County Republican

Party meeting that "Democrats are . . . you know, registering all these

minority voters that are out there[.]" Then-Secretary Kemp understood in

2014 when he made this comment and when he ran for governor in 2018

that Black Georgians overwhelmingly vote Democratic. DX. 740 at 7:16–19;

PX. 2051 at 72:08–72:20,[32] 74:13–74:22, 85:19–86:17 (Kemp Deposition). Mr.

---

[31] This newspaper article was admitted not for its truth, but for the non-hearsay
purpose of establishing the fact of publication and the effect on the reader. Tr. 685:15–
686:4.

[32] Defendants object to this portion of the deposition: "Campaign speech is not relevant,
F.R.E. 401; only a portion of the entire speech is cited, and the citation reflects an

Kemp's remarks bear out that Defendants were keenly aware that newly registered voters of color were a political threat to Republican candidates across the State.

584. One of the groups who Mr. Kemp referenced as "registering all of these minority voters" was the New Georgia Project. PX. 2051 (Kemp Deposition) at 99:19–100:3. New Georgia Project is an organization focused on registering people of color to vote. In 2014, Stacey Abrams was the chief executive officer of New Georgia Project. PX. 97 at 6. In the summer of 2014, New Georgia Project had spearheaded voter registration drives all over Georgia and had collected and submitted to election officials 85,000 voter registration applications. PX. 97 at 13.

585. In September 2014—just two months after then-Secretary Kemp expressed concern about the large number of "minorities" registering to vote and two

---

incomplete portion of a statement from the speech, FRE 106." <u>See</u> Defendants' objections and Plaintiffs' responses, Doc. No. [755-7] at 12. However, as the Secretary of State and Chair of the State Election Board, Governor Kemp was chiefly responsible for the administration of Georgia's elections during the relevant time period. Therefore, statements he made throughout that same time period in his capacity as a candidate for office are certainly relevant to the constitutionality of his actions. As to the rule of completeness, the speech has been introduced as DX. 740.

months before the November 2014 election—the State Election Board, then chaired by Secretary Kemp, called a special State Election Board meeting to publicize preliminary results of an investigation into the New Georgia Project related to alleged voter registration forgeries. Tr. 2015:1–2017:4, 2017:13–17, 3683:9–11 (Harvey); PX. 97 at 3–4. That same month, Mr. Kemp pronounced that a preliminary inquiry into the New Georgia Project's activities revealed "significant illegal activities, including . . . forged voter registration applications." PX. 2051 at 100:18–101:12 (Kemp Deposition). In his deposition, Mr. Kemp admitted that the statements he made were unproven. PX. 2051 (Kemp Deposition) at 103:23–104:3 (Q. "So at the time this statement was made in 157, Exhibit 157, there had not been an adjudication that anyone had in fact engaged in illegal activities, right? A. Well, there had – I believe that's correct, that had not been adjudicated.")

586.  Calling a special State Election Board meeting to discuss publicly the preliminary results of an investigation was highly unusual. Tr. 2021:3–8. Furthermore, the only action the State Election Board was asked to take at this meeting was to approve the issuance of a revised document subpoena to the New Georgia Project, an action requested even though the State Election Board had not been asked to approve the original subpoena,

which had been issued only the previous week. Tr. 3683:12–3684:24

(Harvey).

587.    At this point in the investigation, the Secretary of State had no evidence

suggesting that New Georgia Project or its principals had any intent to

engage in voter fraud, although the only violations involved in the

investigations were of statutes that required intent. PX. 97 at 19–20.

Further, New Georgia Project was cooperating in the investigation and had

been following the Secretary of State's advice about how to run the voter

registration drives in a manner that would be easier for county election

officials to handle. Id. at 6–7, 21–22.

588.    As State Election Board Member David Worley stated at the meeting, the

meeting served no purpose "other than having the opportunity to slap on

the New Georgia Project." PX. 97 at 26; Tr. 2027:5–8 (Harvey). According to

Mr. Worley, the meeting served merely to "brand an organization and to

call into question its worth right before the election in a way that may have

the effect of discouraging people to register to vote." PX. 97 at 26.

589.    New Georgia Project was later dropped as a respondent in the matter

because the Secretary's investigators could not find any connection

between New Georgia Project and the canvassers the investigators thought had committed forgeries. Tr. 2029:6–23 (Harvey). Yet, three years later, in 2017, State Election Board documents still listed New Georgia Project as the respondent. Tr. 2029:24–2030:11 (Harvey); PX. 431 at 2.

590.   Mr. Kemp's use of his position as Secretary of State and State Election Board chair to lodge admittedly false accusations of criminal activity against the New Georgia Project is significant evidence of Georgia's recent history official discrimination touching the rights of voters of color to register and vote – specifically, where the offices of the Secretary of State and the State Election Board were used to discourage and limit the registration of voters of color.

### (2)   Senate Factors 2 and 8: Extent to Which Voting in the State is Racially Polarized and Political Responsiveness

591.   Voting in Georgia is—and has long been—polarized along racial lines. From Reconstruction through the passage of the Voting Rights Act in 1965, white Georgians overwhelmingly supported the Democratic Party, which defended racial discrimination in registration and voting and official racial

segregation in all aspects of public life. PX. 1289 (McCrary Report) ¶¶ 11, 124; see also Tr. 230:4–14 (McCrary).

592.   Beginning in the 1960s and accelerating in recent decades, a continuing pattern of racially polarized voting has been coupled with a major realignment in Georgia's party system characterized by a shift of white voters from the Democratic Party to the Republican Party — which is now the party to which most white voters belong. The Republican Party has dominated state government since 2002 — and vice versa for voters of color, most of whom now belong to the Democratic Party. PX. 1289 (McCrary Report) ¶¶ 11, 37–42, 124; see also Tr. 229:6–232:15 (McCrary).

593.   As a result, aside from the fact that the Republican Party replaced the Democratic Party as the dominant party in Georgia, today's political context resembles the politics of Georgia before the adoption of the Voting Rights Act in 1965. PX. 1289 (McCrary Report) ¶¶ 11, 124; Tr. 264:17–265:1 (McCrary).

594.   Much as in the pre-1965 era, the greatest electoral threat to the dominant party in Georgia politics — now the Republican Party — is the State's growing number of citizens of color, who tend to strongly support

Democratic candidates. The threat of increasing voting strength of people of color provides a powerful incentive for Republican officials at the state and local levels to place hurdles in the path of citizens of color seeking to register and vote. PX. 1289 (McCrary Report) ¶¶ 11, 49, 124.

595. Indeed, Dr. McCrary opined that this powerful incentive is "the most plausible explanation from the standpoint of a social science analysis" for Georgia's adoption of an Exact Match procedure known to be both technically flawed and racially discriminatory. Tr. 228:9–229:10 (McCrary); Tr. 231:1–232:5 (McCrary); see also PX. 1289 ¶ 11.

(3)    **Senate Factor 3: Extent to which State Has Used Procedures that May Enhance the Opportunity for Discrimination Against Voters of Color**

596. The law provides that the third Gingles factor is effectively the same as the Brnovich third guidepost. The Court therefore decides to evaluate this Gingles factor using the standards set forth in Brnovich. See Doc. No. [636] at 42–43. See supra ¶¶ 538–553.

**(4)    Senate Factor 5: Extent to Which People of Color Bear the Effects of Discrimination in Such Areas as Education, Employment, and Health**

597.    African Americans long received an education inferior to that of white students because African American students attended segregated schools that were funded at a far lower rate than white schools. For instance, in 1940, the average per–pupil expenditure for white schools in the State was $46.70, compared with only $14.61 for Black schools. PX. 1289 (McCrary Report) ¶ 20; Tr. 207:20–208:17 (McCrary).

598.    Data from the 1970 Census showed that 32% of African Americans aged 25 and over had completed less than five years of school, compared to just 8% of similarly aged whites. PX. 1289 (McCrary Report) ¶ 23.

599.    Disparities in education persist in more recent Census data. According to the American Community Survey's five-year estimates for 2013–2017, the percentage of Georgians aged 25 having less than a high school degree was 39.6% for Hispanics and 16.6% for African Americans compared to just 10.1% for whites. PX. 1289 (McCrary Report) ¶ 93; Tr. 255:13–25 (McCrary).

600.    The same American Community Survey estimates also indicate economic and employment-related disparities across different demographic groups.

For instance, the percentage of all Georgians below the poverty level was 26.7% for Hispanics and 24.4% for African Americans, compared to just 11.1% for whites. Likewise, whereas only 5.6% of whites were unemployed, the percentage was 11.5% for African Americans. PX. 1289 (McCrary Report) ¶ 94; Tr. 255:25–256:20 (McCrary).

601.   There is a large body of political science literature demonstrating that lower education achievement levels have a deterrent effect on political participation rates in the United States, including with respect to the process of registering to vote and casting ballots. PX. 1289 (McCrary Report) ¶ 93; Tr. 254:8–255:13 (McCrary); see also PX. 1162 (Jones Report) at 24 ("Education has historically been used as a pillar of the voter suppression system.").

602.   Black Georgians also have worse health outcomes than white Georgians. For instance, almost twice as many Black Georgians die from diabetes as white Georgians. PX. 1306; see also PX. 2126 (showing death rate from diabetes for United States is higher for Black Americans than white Americans).

603.  Black people in the United States also die at higher rates from heart disease and cancer than white Americans. PX. 2127; PX. 2128.

604.  The infant mortality rate for Black mothers in the United States is more than twice that of white mothers. PX. 2125.

605.  More recently, Black Georgians have been disproportionately impacted by COVID-19: A survey of eight hospitals conducted in April by the Center for Disease Control and Prevention found that out of 305 individuals hospitalized for COVID-19, 83% were Black. PX. 1290.

### (5)  Senate Factor 6: Whether Political Campaigns Have Been Characterized by Overt or Subtle Racial Appeals

606.  The record is replete with evidence of recent racial appeals in campaigns including both overtly racist appeals and so-called "dog whistles."

607.  In May 2017, the husband of Republican congressional candidate Karen Handel shared a meme on Twitter stating that votes for his wife would help "free the black slaves from the Democratic plantation." PX. 1661.

608.  During the 2018 Republican gubernatorial primary, candidate (and then-State Senator) Michael Williams conducted a "deportation bus" tour with a school bus emblazoned with the words "Fill this bus with illegals." The

back of the bus read: "Danger! Murderers, rapists, kidnappers, child molesters, and other criminals on board." PX. 1653.

609.   During the 2018 gubernatorial election, a hate group telephoned voters pretending to be Oprah Winfrey, dubbing Stacey Abrams Winfrey's "fellow Negress" and a "poor man's Aunt Jemima." PX. 830; PX. 831.

610.   In September 2016, a Douglas County commissioner was recorded making disparaging statements to voters about Black candidates in local races, stating that a government run by African American leadership would "bankrupt you." He also warned voters that a Black sheriff candidate would put unqualified African Americans in high-ranking positions if elected. PX. 1651.

611.   In June 2020, then-Republican candidate for Georgia's 14th U.S. congressional district Marjorie Taylor Greene received national criticism for racist, Islamophobic, and anti-Semitic views expressed in a series of Facebook videos. Greene suggested that Muslims do not belong in government; that Black people "are held slaves to the Democratic Party"; that George Soros is a Nazi; and that African Americans should feel

"proud" to see a Confederate monument because it symbolizes progress made since the Civil War. PX. 1207.

612.   In April 2020, former U.S. congressman Paul Broun, Jr., running to reclaim his former seat, posted a campaign ad in which he offered to give away an assault rifle, stating that such guns were needed to protect against the "looting hordes from Atlanta." PX. 1655.

613.   In June 2020, Facebook removed campaign posts and advertisements from the Trump campaign featuring an upside-down red triangle symbol once used by Nazis to identify political opponents. PX. 1659.

614.   In October 2020, President Trump shared on his Twitter feed a video associating the Democratic party with a twice-deported Mexican immigrant who was given the death penalty for killing two California police officers in 2014, and urging his audience to "Vote Republican now!" PX. 1666.

615.   In 2017, a robocall targeted at white audiences pretended to be a supporter of Keisha Lance Bottoms, a Black candidate for Atlanta mayor, stating that

Lance Bottoms could "keep Atlanta Black" and "stop the white takeover." PX. 1652.

616.   In 2018, Georgia governor candidate Brian Kemp's campaign issued a campaign video that showed violent imagery—Kemp blowing up items, Kemp cocking a gun, and Kemp using a chainsaw—before he revs his truck and stated "I got a big truck—just in case I need to round up criminal illegals and take 'em home myself. Yup I just said that." PX. 1669.

617.   In April 2022, Kandiss Taylor—candidate for Georgia governor—posted a graphic reflecting her endorsement by the Georgia Proud Boys, commenting that she was "proud to be the first candidate to receive an endorsement from the Georgia Chapter. Thank you for serving as I plan to serve." PX. 2165.

618.   In May 2022, when running in the Republican primary for Georgia governor, former Senator David Perdue accused Stacey Abrams of "demeaning her own race." PX. 2172.

619.   In June 2022, candidate for the U.S. House of Representatives in Georgia's Third Congressional District Rhonda Simpson posted a photo on Facebook

that falsely imagines Stacey Abrams saying "I ain't even stole the election yet and people be congratulatin' me like crazy" and President Obama responding, "It's because they think you're pregnant." PX. 2164.

### (6)   Senate Factor 7: Extent to Which People of Color Have Been Elected to Public Office in the State

620.   Only three Black candidates have ever been elected to non-judicial statewide offices in Georgia: (1) former Labor Commissioner Mike Thurmond, in 2002 and 2006; (2) former Attorney General Thurbert Baker, in 1998, 2002, and 2006; and (3) U.S. Senator Raphael Warnock, in 2020. See Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997) (the Court can take judicial notice of these "matters of 'political history,'" which are "'not subject to reasonable dispute'" (quoting Fed. R. Evid. 201(b)).

* * *

621.   Given the above, the Court therefore concludes that, under the totality of the circumstances, Plaintiffs have met their burden to show that the Exact Match policies render Georgia's political processes unequally open to members of groups of color. See Brnovich, 141 S. Ct. at 2337.

**VII)** **Exact Match MIDR and Citizenship Violate the Fifteenth Amendment and Equal Protection Clause.**

    **A. Exact Match MIDR Violates the Fifteenth Amendment and Equal Protection Clause.**

        **(1)** **Exact Match MIDR Disproportionately Burdens Voters of Color.**

622. As discussed above in the context of the third <u>Brnovich</u> factor, Exact Match MIDR disproportionately burdens voters of color. <u>See</u> <u>supra</u> ¶¶ 538–547.

        **(2)** **Georgia's Exact Match MIDR Process Has a Disparate Impact Across the State.**

623. The percentage of voters in MIDR varies widely by county, meaning that Exact Match affects voters unequally across the state. Tr. 415:10–15 (Mayer).

624. According to Dr. Mayer's analysis, there is a relationship between percentage of a county that is non-Hispanic white and the percentage of registrants in MIDR. Counties that are more white tend to have a lower percentage of registrants in MIDR. Tr. 415:25–416:8 (Mayer); PX. 2031.

625. Dr. Mayer noted, though, that there was substantial variation between counties that could not be explained by race, and suggested "different

administrative practices in different counties, even with the same overall demographics." Tr. 416:9–19 (Mayer); PX. 2031.

### (3)   Exact Match MIDR Was Implemented with a Discriminatory Purpose.

626.   As described above, discriminatory intent may be shown through evidence that the disparate impact was foreseeable, the defendant had knowledge of that impact, and less discriminatory alternatives were available. See Greater Birmingham Ministries v. Sec'y of State for State of Ala., 992 F.3d 1299, 1342 (11th Cir. 2021); see also Burton v. City of Belle Glade, 178 F.3d 1175, 1188, 1189 (11th Cir. 1999) ("Indeed, all 'actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.'") (quoting Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 464 (1979)). The law provides that a Court must "evaluate all available direct and circumstantial evidence of intent in determining whether a discriminatory purpose was a motivating factor in a particular decision." Burton, 178 F.3d at 1189; see also Order at 61, Mar. 31, 2021, Doc. No. [617].

627.   The Secretary of State has long been on notice of the disproportionate impact of Exact Match on voters of color. In the Department of Justice's

2009 letter objecting to Exact Match, it noted that the impact of these errors fell disproportionately on voter registration applicants of color. PX. 66; PX. 1289 (McCrary Report) ¶¶ 75–76; Tr. 225:2–5 (McCrary).

628.    Specifically, DOJ alerted the Secretary of State that the Exact Match MIDR process flagged 60 percent more African-American voters who registered during this period than white voters. PX. 66 at 4; Tr. 1617:8–1618:7 (Germany). It also provided Defendants notice that "Hispanic and Asian individuals are more than twice as likely to appear on the list as are white applicants," a difference that is statistically significant. Id. at 4. Indeed, DOJ warned that "This flawed system frequently subjects a disproportionate number of African-American, Asian, and/or Hispanic voters to additional and, more importantly, erroneous burdens on the right to register to vote," adding that "[t]hese burdens are real, are substantial, and are retrogressive for minority voters." PX. 66 at 4.

629.    Nine years after DOJ's explicit warning about the discriminatory effects of Exact Match came the Secretary of State's own internal review that showed that 70 percent of applicants in pending for failed verification at DDS or SSA were Black. Tr. 1993:14–1994:18 (Harvey); PX. 1887.

630.    After having learned about the discriminatory effect from their own

analysis, Defendants did exactly what they had done after DOJ's warning

in 2009 – nothing. Following the 2018 analysis, Defendants took no steps to

reassess their use of Exact Match and its compliance with the Voting

Rights Act and took no steps to ameliorate Exact Match's impact on people

of color.

631.    Instead, Defendants tried to defend the discrepancy and blame the

applicants themselves by pointing to Black applicants' greater use of paper

applications, a legally required option for voter registration applicants,

and specifically blamed groups like the New Georgia Project that utilized

paper applications in outreach. See supra ¶¶ 584–590; PX. 1887 (noting the

New Georgia Project specifically focuses on "minority voters and only uses

paper registration forms").

632.    As discussed above in Section (C)(1) on Senate Factor 1, shortly before the

special State Election Board meeting regarding the New Georgia Project,

when then-Secretary Kemp was running to keep his job as Secretary of

State, he stated at a Gwinnett County Republican Party meeting that

"Democrats are . . . you know, registering all these minority voters that are

out there[.]" DX. 740 at 7:16–19; PX. 2051 (Kemp Deposition) at 72:08–

72:20,[33] 74:13–74:22, 86:9–17, 87:13–88:4, 89:13–89:16, 89:20–21.

633. The Court finds it more than coincidental that Secretary Kemp had

expressed concern in July 2014 about the number of "minorities"

registering to vote and then two months later took the unusual step of

convening a special State Election Board meeting to publicize negative

information about an organization that had been successful in obtaining

voter registration applications from people of color. Mr. Kemp's use of his

position as Secretary of State and State Election Board chair to convene a

press conference where he lodged admittedly false accusations of criminal

activity against the New Georgia Project, is significant circumstantial

evidence of Defendants' discriminatory purpose – specifically, the use of

---

[33] Defendants object to this portion of the deposition "Campaign speech is not relevant, F.R.E. 401; only a portion of the entire speech is cited, and the citation reflects an incomplete portion of a statement from the speech, FRE 106." See Defendants' objections and Plaintiffs' responses, Doc. No. [755-7] at 12. However, as the Secretary of State and Chair of the State Election Board, Governor Kemp was chiefly responsible for the administration of Georgia's elections during the relevant time period. Therefore, statements he made throughout that same time period in his capacity as a candidate for office are certainly relevant to the constitutionality of his actions." As to the rule of completeness, the speech has been introduced as DX. 740.

the office of the Secretary of State and the State Election Board to

discourage and limit registration by voters of color.

634. Also discussed above in Section (C)(1) on Senate Factor 1, the same year

the Secretary of State received approval to implement the Exact Match

policy, the Secretary initiated baseless voter fraud accusations against

twelve Black Brooks County residents, including Dr. Nancy Dennard,

following the election of the first-ever majority-Black school board. Tr.

683:7–684:12, 676:1–728:7, 745:8–755:3 (Dennard). The Secretary of State

and State Election Board kept their investigation against Dr. Dennard and

her co-defendants for two years after the Court dismissed the charges. Tr.

3695:25–3697:18 (Harvey); see supra ¶¶ 580–581.

635. Additional evidence of intent comes from the Secretary's disregard of the

Voting Rights Act. As stated above, even after conducting its own analysis

of information showing that 70 percent of the voter registration applicants

in pending status in 2018 were African-American, the Secretary of State not

only took no action to ameliorate the situation but also tried to defend the

Exact Match policy by claiming the problem was caused by African-

Americans used paper applications more than white people do. The

Secretary of State's utter lack of concern that this analysis was showing a disparate impact of the Exact Match policy on African-Americans is underscored by the Secretary's consistent treatment of the Voting Rights Act as unimportant.

636.   For example, when the Secretary's Election Division was called upon to prepare a transition memo for Secretary-elect Raffensperger that explained what the Elections Division does, the memo contained a list of "Important Federal Laws." The Voting Rights Act was not included in the list. PX. 994; Tr. 1997:2–1999:2 (Harvey). And, in the Secretary of State's job descriptions for the Election Division's training coordinator and its county liaisons, essential job duties included keeping abreast of federal voting legislation. Although those job descriptions identified four federal voting statutes, the Voting Rights Act was not among them. PX. 2002 at 18, 22; Tr. 1997:2–1999:2 (Harvey).

637.   The Voting Rights Act is of such little importance to the Secretary of State that Chris Harvey, the director of the Elections Division, mistook, when preparing for a 30(b)(6) deposition of the Secretary of State, a notice of deposition topic referring to the Voting Rights Act (VRA) as a topic

referring to the National Voter Registration Act (NVRA) instead. Furthermore, he was prepared for this deposition by Secretary of State counsel, including the general counsel of the Secretary of State, who apparently also did not appreciate the difference between the VRA and the NVRA. Tr. 2003:13–2005:23 (Harvey).

638.   Defendants argue that they presented affirmative evidence of their attempts to help voters in trying circumstances such as the onset of the COVID-19 pandemic. See, e.g., Tr. 4419:5–10 (closing). Any such evidence about these general efforts, however, is irrelevant to the discriminatory intent of the Exact Match MIDR policy. To the extent Gabriel Sterling's statements about recent efforts of the Secretary's office are relevant, so are Mr. Sterling's Twitter statements that reflects his political partisanship. Tr. 4210:25–4211:2 4211:8–11, 4229:6–4230:25, 4239:6–15, 4240:12–13.

* * *

639.   The Court concludes that given the Secretary of State's decision to press forward with Exact Match MIDR despite the minimal state interest and his Office's awareness of the substantial and predictable racial disparities it creates, coupled with other indicia that Exact Match was implemented

with a discriminatory purpose, Exact Match MIDR impermissibly violates the Fifteenth Amendment's and Equal Protection Clause's prohibitions on racial discrimination.

### B.  Exact Match Citizenship Violates the Fifteenth Amendment and Equal Protection Clause.

#### (1)    Exact Match Citizenship Disproportionately Burdens Voters of Color and Naturalized Citizens.

640.    As discussed above in the context of the third <u>Brnovich</u> factor, Exact Match Citizenship disproportionately burdens voters of color. <u>See</u> <u>supra</u> ¶¶ 538–553.

641.    In addition to voters of color, because of the nature of the process, the citizenship verification also almost exclusively applies to naturalized citizens who were noncitizens when they received their driver's license or state I.D. and who later naturalized. Tr. 398:11–17 (Mayer); Tr. 261:4–25 (McCrary) (describing that Hispanic and Asian registrants were disproportionately pending as non-citizens because they are disproportionately naturalized citizens impacted by the DDS verification process).

### (2)   Georgia's Exact Match Citizenship Process Has a Disparate Impact Across the State.

642.   The percentage of voters in pending status varies widely by county, meaning that Exact Match affects voters unequally across the state. Tr. 417:17–418:13 (Mayer).

643.   According to Dr. Mayer's analysis, there is a relationship between percentage of a county that is non-Hispanic white and the percentage of registrants in pending status. Counties that are more white tend to have a lower percentage of registrants in pending status. Tr. 417:25–418:5 (Mayer); PX. 2032.

644.   Dr. Mayer noted, though, that there was substantial variation between counties that could not be explained by race. Some counties with similar demographics had large differences in the pending rate, "often differences that exceed a factor of ten," which is "suggestive of and consistent with inconsistent administrative practices" in different counties. Tr. 418:6–13 (Mayer); PX. 2032.

### (3) Exact Match Citizenship Was Implemented with a Discriminatory Purpose.

645. The evidence that Exact Match MIDR was implemented with a discriminatory purpose also applies to Exact Match Citizenship, since DOJ raised the same concerns about the racial impact of Exact Match Citizenship, and Defendants did nothing. See supra ¶¶ 626–639.

646. As described above, the evidence related to Defendants' treatment of the New Georgia Project, Dr. Nancy Dennard, and the Voting Rights Act provides further evidence of their discriminatory purpose. See supra ¶¶ 626–639.

647. The evidence also shows that Exact Match Citizenship was implemented with the intent to discriminate against naturalized, versus native-born, citizens.

648. The Secretary of State is aware that its DDS citizenship verification process affects recently naturalized citizens rather than native-born citizens. Tr. 2036:9–2040:14 (Harvey).

649. Georgia was put on notice of the problems with its voter verification procedure as early as 2009, when the Department of Justice objected to

Georgia's adoption of an "exact match" methodology for voter verification in implementing HAVA. PX. 66 at 4.

650. The Department of Justice's report warned that, of the individuals who were flagged as potential non-citizens in a single report, "more than half were in fact citizens." PX. 66 at 4. Citing this statistic and others, the Department of Justice concluded that Georgia's "proposed procedures for verifying voter registration information are seriously flawed." Id. at 4. Yet Defendants went ahead with the program.

651. Even after Defendants learned that the current citizenship verification process has at least a 63% error rate, Defendants have not implemented meaningful changes to the Exact Match Citizenship policy, to mitigate its burdens on naturalized citizens. Instead, Defendants have publicly celebrated the policy as an effort to block non-citizens from voting, ignoring that their own investigation also shows that it routinely blocks *citizens* from voting. PX. 2014; PX. 2083. The Court finds that this rhetoric suggests that all individuals not born in the United States – including, by extension, naturalized citizens wrongly flagged by this process – are somehow less worthy than other Americans.

* * *

652.   The Court therefore concludes that given the extremely high error rate of the Exact Match Citizenship process, the availability of substantially less burdensome alternatives, and evidence of discriminatory purpose, the Exact Match Citizenship process violates the Fifteenth Amendment's and Equal Protection Clause's prohibitions of discrimination on the basis of race, naturalization status, and geographic location.

## AFFIRMATIVE MISMANAGEMENT OF THE VOTER REGISTRATION DATABASE

653.   Plaintiffs next contend that the Secretary of State and State Election Board are in violation of the First and Fourteenth Amendments to the Constitution due to their affirmative mismanagement of the voter registration database, which is the database that houses the registration records of eligible voters in the State of Georgia.

654.   Beginning with the traceability and redressability requirements of their claim, Plaintiffs contend the Secretary of State is responsible for managing the list of the state's eligible voters as a matter of law and, as a matter of fact, the Secretary of State exercises that responsibility as demonstrated by

the list maintenance processes it has chosen. In support of their claim, Plaintiffs cite the statutory framework and obligations concerning maintenance of the voter rolls under state and federal law and rebut Defendants' interpretation of irrelevant state statutes.

655. More specifically, Plaintiffs point to three list maintenance processes that fall within the Secretary of State's responsibility for managing the voter registration database: (1) the cancellation of records on the basis that the voter is convicted of a disqualifying felony; (2) the cancellation of records on the basis that the voter is deceased; and (3) the merger of voter registration records based on the belief that two records are duplicative and represent only one eligible voter. The details of these processes, which are performed on a weekly or monthly basis, are set forth in para. 716–94 below. Plaintiffs allege, and this Court finds, that the manner in which Defendants carry out their responsibilities in these three areas violate the U.S. Constitution

656. To establish Defendants' violation of the fundamental right to vote protected by the First and Fourteenth Amendments, Plaintiffs marshaled the testimony of at least thirteen voter witnesses who were burdened by

Defendants' affirmative mismanagement of the voter rolls,[34] three of the Secretary of State's own employees (Mr. Hallman, Ms. Frechette, and Mr. Harvey), and various State Election Board members. Alongside that testimony, Plaintiffs introduced evidence of voter complaints, State Election Board cases, and internal Secretary of State communications revealing the magnitude of these burdens.

657. Collectively, the evidence shows that these challenged processes are infected by errors that affect tens of thousands of voters. Specifically, loose matching criteria and a complete lack of safeguards mean that voters' records are teed up for cancellation based on obviously false matches, and the Secretary does nothing to stop it. This makes sense, because the Secretary's own employees admitted that having ineligible voters on the rolls is the "bigger concern," from their standpoint, than ensuring that all eligible voters can cast a ballot. PX. 2130 (Sterling Dep. Designations)

---

[34] Witnesses who testified how this issue burdened voters include the following: Kia Carter (Tr. 2482–2516); Dasia Holt (PX. 2082 (Holt Dep.)); Kelly Dermody (PX. 2101 (Dermody Dep.)); Nicole Freemon (Tr. 1493–1515); Julian Grill (PX. 2056 (Grill Dep.)); Alkhealasharteula Harrison (Tr. 2666–2690); Emily Huskey (Tr. 1141–1168); Antoinette Johnson (PX. 2105 (Johnson Dep)); Brenda Lee (PX. 2095 (Lee Dep.)); Anthony McKissic (Tr. 2724–2749); Meridith Rose (Tr. 2765–2819); Andre Smith (Tr. 2429–2481); Jayme Wills (PX. 2052 (Wills Dep.)).

175:23–24. [35] That attitude permeates all of these list maintenance processes, to the detriment of the voter.

658.   Defendants responded with an interpretation of State law that shifted blame for the burdens on voters caused by list maintenance to county elections personnel. Defendants did not offer any expert testimony, nor did they offer any testimony from county officials to support their argument that responsibility for managing the voter registration database lies with Georgia's 159 counties, and not with Defendants.

659.   Whether Defendants delegate certain list maintenance functions to the county or not, the law assigns ultimate responsibility for maintaining an accurate voter registration database to the Secretary of State, as set forth below. And a voter registration database that excludes eligible voters from the active voter list in error is not accurate. More pointedly,

---

[35] Defendants object to the deposition testimony at 175:10–176:6 for "Lack of foundation/speculation." Doc. No. [827-1] at 8. This objection is not well-founded. *First*, the portion of the testimony quoted above includes no speculation; to the contrary, it reveals Mr. Sterling's personal knowledge regarding prioritization within the Secretary of State's office as the second-in-command. *Second*, to the extent this testimony touches on Georgia's existing eNet system or its upcoming GaRVIS system, Mr. Sterling has sufficient personal knowledge and foundation given his role as the ultimate decisionmaker for new GaRVIS system features (which necessarily involves familiarity with the current workings of eNet).

mismanagement of a voter registration database in a manner that wrongly disenfranchises eligible voters or requires voters to take additional steps to re-prove their eligibility unduly burdens voters in violation of the First and Fourteenth Amendment. The Secretary of State's delegation of list maintenance functions to county personnel does not absolve Defendants of responsibility for burdens caused by list maintenance because (1) as discussed below, the Secretary has the statutory responsibility under both Georgia and Federal law to maintain a uniform voter list and to remove ineligible voters and not remove eligible voters; (2) the policies and criteria that identify which voter registrations are identified for cancellation or modification are the Secretary's and the Secretary implements those policies in the Secretary's voter registration database, and (3) the State Election Board is statutorily responsible for uniformity in county practices and the fairness and legality of elections.

660. The evidence of traceability and redressability is addressed first below, followed by evidence of the unconstitutional burdens on voters resulting from Defendants' mismanagement of the voter registration database.

I)   **Violations of Law Caused by the Statewide Registration Database Are Traceable to and Redressable by Defendants.**

661.   T law recognizes that the Secretary of State's office has legal responsibility for maintaining accurate voter rolls. Doc. No. [612] at 42–43. The law and facts that underlie the Court's previous ruling are unchanged.

662.   While acknowledging that the Secretary of State has *some* role to play in the maintenance of accurate voter lists (as it must, given the plain language of both state and federal law), Defendants argued at trial that the Secretary of State's role is limited to simply hosting the platform—eNet—and providing technical support like "bandwidth." Tr. 858:22–24 (Defense counsel). As a result, under Defendants' theory of the law, the mismanagement of the voter rolls leading to the cancellation of eligible voters is attributable to and redressable by Georgia's 159 counties, not the Secretary. See Tr. 67:13–15, 73:24–25 ("Is the remedy to list accuracy, to ask counties to do better?"); Tr. 4420:6 ("[C]ounties are the ones administering the elections.").

663.   The Court finds that as a matter of law, Defendants are wrong about their responsibility for list maintenance. The specific practices Plaintiffs challenge—namely the improper cancellation or alteration of voters'

registration records as deceased, as duplicates, persons convicted of a disqualifying felony—all fall squarely within the Secretary of State's statutory authority and are committed to the Secretary's responsibility under the applicable statutes. As a result, even though the Secretary has delegated the final execution of these tasks to the counties (which Plaintiffs do not dispute), these errors are directly traceable to the Secretary of State, and the harms can be redressed by the Secretary of State, *not* the counties.

### A. Federal and State Law Assign The Secretary of State—and Not the Counties—Legal Responsibility Over the Statewide Voter Registration Database.

664.  The Help America Vote Act of 2002 ("HAVA") was passed to "assist in the administration of Federal elections," as well as "to establish minimum election administration standards for States." Pub. L. No. 107-252, 116 Stat. 1666. In other words, the Help America Vote Act was designed to do just that—*help* Americans vote, including by "shift[ing] a lot of the focus of administering elections from the local level, either county or municipal level, the responsibility of that to a state-driven leadership role in the administration of elections." Tr. 2854:20–25 (Kennedy).

665.   The Secretary of State is Georgia's Chief Election Officer (a required designation under HAVA) and is "responsible for coordinating the obligations of the state under" HAVA. O.C.G.A. § 21-2-50.2(a). As Chris Harvey recognized, being designated the HAVA Chief Election Officer means the Secretary of State is responsible for ensuring compliance with HAVA requirements. Tr. 3485:6–11 (Harvey) (Secretary was "to make sure that the HAVA requirements were met").

666.   HAVA requires "each State, acting through the chief State election official, [to] implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

667.   HAVA also requires that the statewide "election system shall include provisions to ensure that voter registration records in the State are accurate and are updated regularly, including the following: … (B) Safeguards to

ensure that eligible voters are not removed in error from the official list of eligible voters." 52 U.S.C. § 21083(a)(4).

668.   In addition to making the Secretary of State the HAVA Chief Election Official, the Georgia Election Code requires the Secretary of State to "maintain the official list of registered voters." O.C.G.A. § 21-2-50(a)(14).

669.   In implicit acknowledgment of its HAVA responsibilities, the Georgia Secretary of State administers a statewide voter registration system known as eNet, or alternatively as GVRS (Georgia Voter Registration System). Tr. 759:13–18 (Hallman); PX. 1878 at 1. The Secretary of State developed eNet in partnership with a vendor, PCC. Tr. 759:19–21 (Hallman); Tr. 821:25– 822: 5 (Hallman).

670.   Defendants argue that when Georgia law requires them to "maintain" the official list, that means only to "keep [the database] in an existing state," or "[t]o care for (property) for purposes of operation productivity or appearance; to engage in general repair and upkeep." Defs.' Closing Slides at 18 (citing Webster's New Collegiate Dictionary (1977) and Black's Law Dictionary (7th ed. 1999)). As a preliminary matter, the Court finds that those definitions help Plaintiffs—not Defendants. Keeping the database

information in its existing state, such as by not incorrectly cancelling or modifying voters' records based on faulty processes conducted by the Secretary, is precisely the kind of thing Plaintiffs are asking Defendants to do. Nothing about the plain meaning of the word "maintain" supports the narrow, technical reading Defendants would assign it, limiting "maintenance" to things like bandwidth and server capacity.

671.   Moreover, HAVA, too, uses the word "maintain," instructing States to "define[], maintain[], and administer[]" the statewide voter registration list—but plainly HAVA's concept of "maintaining" includes carrying out the various functions set forth in HAVA (*including* the list maintenance functions Plaintiffs challenge, see infra ¶¶ 674–703) and including necessary safeguards to ensure that eligible voters are protected. See generally 52 U.S.C. § 21083. Even the name HAVA assigns the duplicates, felons, and vitals processes—"list maintenance"—makes clear that the word "maintain" contemplates tasks more involved than merely providing technical bandwidth. Id. § 21083(a)(2) ("Computerized list maintenance").

672.   And for that reason, the statewide system the Secretary has set up is far more involved than merely a passive server. eNet is the system in which a

voter's registration is processed, in which that voter's information is
stored, in which that voter's information can be updated or changed, in
which a voter can be moved from one county to another, and in which a
voter's record can be cancelled. Tr. 760:7–15 (Hallman). The Secretary
provides an eNet guide that it gives the counties, which provides an
overview of eNet's many functions. See generally PX. 1878. County users
work in eNet to carry out these (and other) functions. Tr. 2201:25–2202:4
(Harvey) ("[E]very county is in eNet every day . . . [I[f a county election
office is working, 99 percent of the time somebody is going to be in eNet
doing something."). In other words, any action of consequence concerning
a voter's registration is handled within the eNet system developed and
administered by the Secretary of State. eNet, and its various processes, are
how the Secretary maintains the rolls.

673.   The accuracy of Georgia's voter rolls – as stored in and accessed by eNet –
is integral to voters' ability to exercise their right to vote. Tr. 2192:2–2192:4
(Harvey) ("Q. And eNet, in your words, is where all the magic takes place,

correct? A. I believe I said that."); PX. 994 at 22–28 (December 2018

transition memo describing eNet and its functions).[36]

### B. Federal and State Law Assign The Secretary of State—and Not the Counties—Legal Responsibility for List Maintenance Operations.

674.   The Court finds that the challenged practices are traceable to Defendants

by law.

675.    Defendants advance various arguments for why the counties—not the

Secretary of State—are responsible for list maintenance. (The mechanics of

these specific procedures are discussed in Part II, <u>infra</u>.) First, Defendants

invoke a moving target of state statutes purportedly assigning list

maintenance responsibilities to the county. Second, Defendants cast the

counties as responsible, solely because Defendants chose to delegate to the

counties the function of cancelling voter registration records in eNet, albeit

based on the Secretary's criteria and using the list generated by the

---

[36] The transition memorandum for the Elections Department, which appears at pages 22–28 of PX. 994, was admitted without objection.  PX. 994 also includes additional transition memoranda related to other departments, which were not made part of the record. Tr. 1861:18–1862:14.

Secretary. But neither Georgia law nor Defendants' choice to delegate responsibility shields Defendants from responsibility for list maintenance.

676. Defendants argue that Georgia law assigns the responsibility for removing voters from the rolls to the counties, citing a combination of inapplicable statutes. But the only *relevant* statutes—O.C.G.A. § 21-2-231 and 52 U.S.C. § 21083—unmistakably assign these tasks to the Secretary. The statutes upon which Defendants' theory of county responsibility turn are addressed in turn below.

677. To begin, Defendants argue that counties are generally responsible for *any and all* errors in voter registration information because of O.C.G.A. § 21-2-226, which states: "(a) It shall be the duty of the county board of registrars to determine the eligibility of each person applying to register to vote in such county." Based on that statutory grant of authority, Defendants argue that *anything* having to do with the accuracy of the voter rolls is not their responsibility—including removing registered voters from the rolls on an ongoing basis. See Tr. 3800:20–3801:15 (Harvey) (discussing the import of section 226). The plain text of the statute belies that reading.

678.   Section 226 addresses *only* the process of "applying to register to vote." <u>Id.</u>
It says nothing about changes made to a voter's registration after they are
registered to vote—precisely the list-maintenance procedures Plaintiffs
challenge. <u>See</u> Tr. 3835:1–4 (Harvey) (agreeing that "the process of
removing someone from the registration list is not the same process as
when someone is applying to register to vote"). Section 226 therefore does
not dictate who has authority over *removing* voters from the rolls, or
*altering* the registration of a voter long since registered.

679.   Next, Defendants assert that O.C.G.A. § 21-2-228 requires the counties to
conduct list maintenance. Tr. 4433:6–24. This statute, entitled
"[e]xamination of electors' qualifications," addresses a thorough challenge
process. O.C.G.A. § 21-2-228. Under section 228(a), "[t]he board of
registrars of each county or municipality shall have the right and shall be
charged with the duty of examining from time to time the qualifications of
each elector of the county or municipality whose name is entered upon the
list of electors and shall not be limited or estopped by any action
previously taken." The remaining subsections detail an intricate challenge
process, including three days' notice, the production of books and papers,

subpoenaed witnesses, service by a sheriff or peace officer, a hearing, and a right of appeal. See generally id. § 228(b)–(f).

680.   Section 228 plainly describes a wholly different process from the three processes Plaintiffs challenge (duplicates, vitals, and felons), which are by and large unaccompanied by this rigorous process to protect eligible voters from being wrongfully removed from the rolls. In other words, section 228, like section 226, says nothing about county responsibility for routine list-maintenance removals, as distinguished from *ad hoc* challenges to eligibility.

681.   Defendants have cited no statute assigning responsibility for list maintenance to the counties to the exclusion of the Secretary of State. Plaintiffs, by contrast, cite O.C.G.A. § 21-2-231, which specifically addresses and governs two list maintenance processes challenged (the felons and vitals cancellation processes) and assigns responsibility to the Secretary. The particulars of section 231 are discussed below.

682.   There is no tension between sections 226 and 228 on the one hand, and section 231 on the other hand. To the contrary, as Defendants themselves argue, the statutes can and should be "harmonize[d] and construed

together." <u>Gibson v. Casto</u>, 523 S.E.2d 564, 565, 271 Ga. 667, 669 (Ga. 1999).

Together, they paint a coherent whole: Under section 226, counties make

the initial eligibility determinations when people apply to get on the rolls.

From the point those people become registered, the *Secretary* implements

and conducts several routinized list-maintenance procedures under section

231, which are the usual ways that voters are removed from the rolls.

Those procedures necessarily have some county involvement, but by law

they are fundamentally the Secretary's to undertake. And under section

228, counties have the residual authority to initiate challenges on an *ad hoc*

basis from time to time, to remove those voters not caught through the

regular list-maintenance functions. This reading is the most harmonious

combination of the statutes—as opposed to Defendants' reading, which

essentially makes the list-maintenance processes described in section 231

irrelevant or superfluous (given their broad reading of sections 226 and

228).

683.   If there were any discordance, however, sections 226 and 228 would

necessarily give way to section 231 because of the "commonplace of

statutory construction that the specific governs the general." <u>United States

v. Couch</u>, 906 F.3d 1223, 1228 (11th Cir. 2018) (quoting <u>NLRB v. SW Gen.,</u>

Inc., 137 S. Ct. 929, 941 (2017)). The statutes Defendants muster in support of their position—sections 226 and 228—are general provisions allocating general authority over the initial registration process and the general challenge process. Because section 231 explicitly governs two of the processes at issue here, that section necessarily trumps the more general provisions invoked by Defendants.

684. Next, Defendants argued for the first time in their closing for the that Plaintiffs' reading of the relevant Georgia statutes would open up the Secretary of State to "a challenge" for being too invasive of the counties' processes. Tr. 4426:1–4 (closing). This speculation about potential future litigation, however, is based solely on a citation to Chris Harvey's unsupported and illogical testimony that the data in the statewide voter registration system (which the Secretary is charged by HAVA to define, maintain, and administer) is somehow *only* the counties' data. Defendants' speculation is not based on any actual statutes prohibiting the Secretary from exercising meaningful oversight. Id. Defendants' vague reference to a future legal challenge thus fails for the same reasons as the arguments above: The statutes make clear that it is *not* in fact just "the counties' data."

It is the *Secretary's* data, and it is the *Secretary's* tasks regarding updating that data, that are being challenged in this suit.

685.   Finally, Defendants cannot circumvent their list maintenance responsibility by delegating certain functions to the counties, as though the counties are a sort of intervening cause that disrupts the direct line between the burdens experienced by voters when they are cancelled in error and the Secretary's list maintenance responsibility and selection of records for cancellation. In this vein, Defendants argue that even if the Secretary has some legal authority over the list-maintenance procedures, there can be no traceability to the Secretary of State because, as a *factual* matter, the Secretary has outsourced its statutory obligations to the counties. Tr. 4500:13–17 (closing) ("I think that's the testimony"—namely that counties make the final decision—"in terms of how it operates."). In other words, Defendants argue that because it is a county employee who at the end of the day presses the button to cancel the voter, there is nothing the Secretary can legally do to avoid the harms challenged in this case.

686.   As a preliminary matter, however, Defendants did not call a *single* county employee to support their legal argument that counties, and not the

Secretary, must conduct these procedures. They did not offer a single county official to testify that this was their understanding, that this was required by law, or even that the counties benefited from or enjoyed the current allocation of labor.

687. More to the point, this, like Defendants' other arguments, is incorrect. Under Jacobson, the relevant inquiry is whether the Secretary of State has the *legal responsibility* to carry out the challenged tasks, not whether it is, as a factual matter, undertaking that responsibility. 974 F.3d 1236, 1253 (11th Cir. 2020). That rule makes sense: Otherwise, the party legally obligated to carry out a key function could simply insulate itself from liability by outsourcing it to someone else. Crediting Defendants' argument would thus lead to a perverse result at the voters' expense.

688. To be clear, Plaintiffs do not dispute that under the Secretary's current regime, it is by and large county employees, rather than Secretary of State employees, who perform the final function in the process of cancelling a voter's registration record in eNet during the routine list-maintenance processes. (The lone exception is the vitals process, discussed infra pp. 301–03.) Nor do Plaintiffs challenge that division of labor, or even the

Secretary's decisions to delegate certain aspects of the challenged

processes. That delegation of the Secretary's authority, however, does not

absolve the Secretary of the legal power (and responsibility) to ensure that

the process of cancelling or modifying voters' registration records is done

accurately and in conformance with federal law by the counties.

> **(1)     The Secretary of State Has the Legal Responsibility for Identifying Persons Convicted of a Disqualifying Felony for Removal from the Rolls.**

689.  Contrary to Defendants' arguments, both Georgia law and federal law are

clear: The *Secretary* has statutory oversight over the process of identifying

and removing voters who are on the list of convicted felons.

690.  Georgia law requires government agencies to send the Secretary of State "a

complete list of all persons, including addresses, ages, and other

identifying information as prescribed by the Secretary of State, who were

convicted of a felony in this state since the preceding reporting period."

O.C.G.A. § 21-2-231(a). The Secretary, in turn, "[u]pon receipt of the lists"

of people with felony convictions described in subsection (a), as well as an

analogous list from the federal authorities, "shall transmit the names of

**such persons whose names appear** on the list of electors to the

appropriate county board of registrars who shall mail a notice to the last known address of **each such person**" initiating the felon clock. Id. § 21-2-231(c)(2) (emphases added).

691.  In other words, the process proceeds in two parts under Georgia law. First, the Secretary of State receives the lists of people with felony convictions from the various correctional authorities. The Secretary's job is to determine *which* of those people "appear on the list of electors"— to *itself* compare the list of people with felony convictions to the list of registered voters and determine who matches. Id. The Secretary must send the names of "such persons whose names appear"—*and only such persons*—to the counties. Then, at step two, the counties mail a notice to "each such person" identified by the Secretary. Id. The statutory scheme, therefore, makes it the Secretary's job to find the correct matches for cancellation, and the counties' job to mail the letter that begins the cancellation process.

692.  In closing, Defendants argued that Plaintiffs' reading of O.C.G.A. § 21-2-231(c)(2) must be rejected on constitutional avoidance grounds, because any reading of the statute that required the state to forward all information from the Department of Corrections, without any limit, would raise "real

implications in terms of due process." Tr. 4444:1–9 (closing). This argument, however, is fighting a straw man. Plaintiffs have *never* stated that section 231 requires the Secretary to send all the names to the counties without limit — nor have Plaintiffs ever asked for that as a remedy. Indeed, Plaintiffs have always maintained quite the opposite: that the Secretary needs to do *more* to identify which people on the list from the Department of Corrections are *actually* on the rolls before they send those names (and only those names) to the counties. See supra ¶ 691. Plaintiffs' actual arguments therefore implicate no constitutional questions, and constitutional avoidance cannot salvage Defendants' reading of the statute to absolve them of any oversight responsibility.

693.   And again, as a guiding principle, HAVA requires that the list maintenance "shall be conducted in a manner that ensures that … only voters who are not registered or who are not eligible to vote are removed from the computerized list." Id. § 21083(a)(2)(B)(ii). This requirement makes complete sense, of course, as maintaining an accurate voter registration list – the Secretary of State's responsibility – requires *both* removing ineligible voters *and* keeping eligible voters on the list. So the Secretary of State, as the entity charged with fulfilling HAVA's obligations,

legally must ensure that it has implemented "[s]afeguards to ensure that eligible voters are not removed in error from the official list of eligible voters." Id. § 21083(a)(4)(B).

694. It bears repeating that Plaintiffs do not dispute that the Secretary has chosen, as a matter of fact, to delegate discretionary decision-making about which people on the list of felons are or are not on the list of registered voters. Whether that decision complies with Georgia law is not at issue in this suit—Plaintiffs' challenge to the felon matching process is not that it violates state law, but that it is carried out in a way that burdens Georgia's voters unconstitutionally. The purpose of the state law is to show that Georgia law assigns *legal* responsibility to the Secretary, such that the injuries are legally traceable to them and any remedy this Court orders against the Secretary would be effective to redress the problem.

### (2) The Secretary of State Has the Legal Responsibility for Removing Deceased Voters from the Rolls.

695. The law regarding who bears responsibility for vitals cancellations is even clearer, as even Defendants and Defendants' witnesses recognized. Without question, that responsibility falls to the Secretary of State.

696.   Georgia law requires the counties to transmit lists of deceased residents to

the Secretary of State. O.C.G.A. § 21-2-231(d). The law then requires that

the Secretary "or his or her designated agent **shall** remove **all** such names

of deceased persons from the list of electors." Id. § 21-2-231(e) (emphases

added); see also Tr. 3773:20–3775:9 (Harvey) (acknowledging that the

statute does not provide counties with any role in removing deceased

persons from the rolls and that removal of deceased persons is a task

required to be performed by the Secretary of State). There is simply no

reading of the statute where this job is not the Secretary's legal

responsibility.

697.   Without offering any law or evidence contradicting that the Secretary

bears responsibility for removing deceased persons from the rolls,

Defendants point to subsection (e.1) of the same statute to argue that the

counties, too, may remove voters who have passed away. Tr. 3832:7–23

(Harvey). This provision states: "County registrars may obtain information

about persons who died from obituaries published by local newspapers,

death certificates, verifiable knowledge of the death, and information

provided in writing and signed by a family member or members of the

deceased person. County registrars shall determine if such deceased

person's name appears on the list of electors and, if so, shall remove such name from the list of electors." Again, however, Defendants' argument misses the point: Plaintiffs do not contend and need not prove that counties are prohibited from removing deceased voters from the rolls if authorized by O.C.G.A. § 21-2-231(e.1), nor are Plaintiffs even arguing that Defendants have violated the law by delegating the cancellation of deceased voters to the counties. Plaintiffs' point, unrebutted, is that when it comes to the weekly removals of deceased voters based on lists from the department of public health, the Secretary is the entity responsible as a matter of law.

698.   Next, Defendants argue that whatever section 231 says, subsection (f) makes clear that the counties are required to take the ultimate steps when it comes to all list-maintenance processes. Tr. 3783:20–3784:6 (Harvey).  For felons and vitals cancellations, Defendants argue, subsection (f) is an independent grant of authority to make the final cancellation determinations. In addition to continuing to misunderstand the relevance of these statutes to Plaintiffs' arguments, this is not a fair reading of the statute. All subsection (f) says is that county registrars must "initiate appropriate action … within 60 days after receipt of the information

described in this Code section." O.C.G.A. § 21-2-231(f). In other words,
subsection (f) gets one no further than any other section does—it just says
that whatever the counties have to do, per the other subsections, they must
do within 60 days. It otherwise adds no responsibility to the counties nor
eliminates any responsibilities of the Secretary of State.

699.   Again, HAVA is in agreement that the Secretary of State is responsible for
the cancellation of deceased voters from the voter registration database.
HAVA requires "each State" (acting through their Chief Election Officer)
to "conduct a general program that makes a reasonable effort to remove
the names of ineligible voters from the official lists of eligible voters by
reason of … the death of the registrant." 52 U.S.C. § 20507(a)(4). This
program, too, is subject to the restriction that the Secretary must conduct
its list maintenance "in a manner that ensures that … only voters who are
not registered or who are not eligible to vote are removed from the
computerized list." Id. § 21083(a)(2)(B)(ii). So like Georgia law, HAVA
makes removal of deceased voters a job for the Secretary, meaning that
even if the Secretary chooses to delegate some portion of the job to the
counties, the *Secretary* retains the obligation to ensure that the task is done
constitutionally.

700.    If there were any doubt that the Secretary (and not the counties) has the legal authority to remove voters, the Secretary's own conduct confirms that it has — and indeed exercises — that authority. When it comes to removing deceased voters from the rolls, the *Secretary* automatically cancels certain records it deems a "tight" match with the lists from the department of public health without any county involvement at all. PX. 800 at 12. The Secretary therefore knows that it is empowered by law to carry out these cancellations itself. See also Tr. 3597:4–16, 3717:4–17, 3773:20–3774:2 (Harvey).

>               **(3)     The Secretary of State Has the Legal Responsibility for Removing Duplicate Registrations from the Rolls.**

701.    Nothing in Georgia state law addresses the removal of duplicate registrations, as Defendants conceded. Tr. 4457:13–21 (closing). There can be no credible argument, therefore, that this function is assigned to counties as a matter of state law. And while state law is silent as to the assignment of responsibility for removing duplicate registrations, federal law is not.

702.    HAVA explicitly mentions duplicate cancellations. HAVA requires that the statewide database "be conducted in a manner that ensures that …

duplicate names are eliminated from the computerized list." 52 U.S.C.

§ 21083(a)(2)(B)(iii). In addition to requiring that the Chief Election Officer

ensure that duplicate names are eliminated, HAVA also requires that the

Chief Election Officer conduct its list maintenance "in a manner that

ensures that … only voters who are not registered or who are not eligible

to vote are removed from the computerized list." Id. § 21083(a)(2)(B)(ii).

Under federal law, the Secretary is responsible for these processes.

703. To the extent that Defendants argue that the duplicate search that is

conducted when the counties receive new voter registration applications

falls within the authority given to the counties under section 226, this

again is incorrect. As discussed above, see supra ¶¶ 677–678, section 226

speaks only of "determin[ing] eligibility" for those "applying to register to

vote." That process, which involves processing the registration, placing the

voter in a precinct, ensuring that all the correct information is provided,

and matching against DDS or the SSA, has nothing to do with duplicates.

The Secretary has *chosen*, however, pursuant to its obligation to search for

duplicates, to layer onto that process a separate search for duplicates

amongst existing registrations. That separate duplicate search,

orchestrated by the Secretary of State, is *not* the counties' obligation under law—it is the Secretary's.

### C. The Secretary of State Has the Power to Redress the Injuries Shown Below.

704.   The Court finds the Secretary has both the statutory authority and the actual tools to remedy the problems Plaintiffs challenge. The remedies Plaintiffs have proposed, see infra pp. 392–412, are easily accomplished in eNet or through Secretary of State training, Official Election Bulletins, or other policy documents.

705.   For example, The Secretary of State may implement programming changes to eNet, which its vendor carries out, and does so from time to time to improve eNet functionalities or to comply with changes to election laws. Tr. 759:22–760:2, 760:23–761:1 (Hallman); 2201:24–2202:2 (Harvey).

706.   The Secretary of State's office determines the substantive specifications for eNet. Tr. 761:2–4 (Hallman). These substantive specifications include, for example, the criteria used to tee up potential matches for counties to act upon, which the Secretary has the authority and ability to change. PX. 365

(Hallman explaining that he removed a specific criterion because it was generating too many false positives).[37]

707.   When a county user logs into eNet, they will see a "dashboard," which shows them the outstanding tasks they need to complete—for example, processing voter registration applications or conducting list maintenance removals. Tr. 764:25–765:5 (Hallman); PX. 1878 at 37 (example dashboard). From the dashboard, the eNet user can navigate to the specific voter registration applications or voter records at issue. Tr. 765:5–12 (Hallman). Choices that the Secretary of State makes, such as selecting the criteria to generate potential matches, directly determine which records the counties will see on their dashboards for cancellation or modification. E.g., PX. 50 at 18 (explaining changes to the dashboard as a result of HB 316).

708.   eNet retains a log of every action taken in the database, which includes identifying information for the specific user who took the action. Tr. 2211:19–2212:23 (Harvey). eNet can also generate audit detail reports, which provide a snapshot of all the actions taken in a specific period of

---

[37] The cited portions of PX. 365 were admitted as party admissions. Tr. 1358–59. The emails that were excluded are not cited.

time, which could be used to monitor employees' activity. Tr. 2212:9–17 (Harvey).

### D. The State Election Board Is Also Responsible for Burdens on Voters Caused by the Voter Registration System.

709.  The Court must also reject Defendants' argument that the counties are responsible for maintaining the voter registration database, because of the inescapable legal reality that the State Election Board is responsible for uniformity in county practices. O.C.G.A. § 21-2-31(1). The Board additionally owes a duty to take any other action necessary, consistent with the law, to achieve fair, legal, and orderly elections. O.C.G.A. § 21-2-31(10). And the Secretary of State must provide the Board with any and all support the Board determines is necessary to fulfill its duty to achieve uniform, fair, legal, and orderly elections. O.C.G.A. § 21-2-33.1(h). Following Defendants' arguments to their logical end, then, the best they have advanced is a basis to hold the State Election Board responsible for the unfair and unconstitutional burdens imposed on voters by the mismanagement of the vote registration database, whether that mismanagement is at the county or state level.

710.   In fact, the evidence is undisputed that the State Election Board has failed to take any action as it relates to maintenance of the voter registration database, including but not limited to investigating the effects of the list maintenance processes Plaintiffs challenge. Instead, the Board is reliant on incomplete information from the Secretary of State, generally refrains from proactive measures as a rule, and ultimately believes responsibility for list maintenance falls elsewhere – with the Secretary of State.

711.   The Board relies on the cases brought before it by the Secretary of State to assess uniformity among the counties. Tr. 1769:12–17 (Le). The Board does not know, however, whether the Secretary of State brings every complaint it receives to the Board for consideration. Tr. 1772:22–1773:5 (Le). While one former member of the Board believed that all complaints received by the Secretary of State result in an investigation brought before the Board (Tr. 4022:4–6 (Sullivan)), a current member believed only 1% of complaints to the Secretary of State's office are brought before the Board (Tr. 4123:6–11 (Mashburn)).

712.   The Secretary of State confirmed not all complaints result in an investigation brought to the State Election Board. Tr. 1845:12–1846:6

(Harvey). The Board is therefore relying on incomplete information to assess whether county practices are uniform, and the Board has very different understandings of what the Secretary is presenting for their consideration. Tr. 4025:5–7 (Sullivan) ("I did expect every substantive complaint that was brought to the attention of the Secretary of State's office to be investigated.").

* * *

713.   The Court therefore concludes that any violations of law caused by the felon cancellation, vitals, or duplicate processes challenged by Plaintiffs are traceable to and redressable by the Secretary of State and the individual members of the State Election Board.

## II)   Statewide Voter Registration System Processes Violate the Fundamental Right to Vote.

714.   Under Anderson-Burdick, state practices violate the Constitution if their burdens outweigh the state interests offered in their defense. For practices that impose "severe" burdens, the state interest "must be 'narrowly drawn to advance a state interest of compelling importance.'" Burdick, 504 U.S. at 434. And "[e]ven when a law imposes only a slight burden on the right to

vote, relevant and legitimate interests of sufficient weight still must justify that burden." Lee, 915 F.3d at 1318–19.

715.   Here, Plaintiffs' evidence shows that Defendants' approach to the list-maintenance practices challenged—the felons, vitals, and duplicate processes—undoubtedly burden voters, and cannot be justified by the flimsy state interests offered. First, Plaintiffs lay out the heavy burdens these practices impose on voters, which are a product of the Secretary's loose matching criteria and lack of any meaningful safeguards. Second, Plaintiffs address the absence of evidence for any meaningful—let alone compelling—state interest in administering the practices as the Secretary currently does. Together, this evidence shows that Defendants' current mismanagement of the voter registration database violates the First and Fourteenth Amendments.

### A. The Voter Registration System Processes Burden Voters.

#### (1)   The Secretary of State Uses eNet to Cancel Registered and Eligible Voters for Purported Felony Convictions.

##### (a)   The Felon Process: Background

716.   In Georgia, persons with disqualifying felony convictions are ineligible to vote. See O.C.G.A. § 21-2-216(b). To try to prevent any registered voters

with such felony convictions from voting, the Secretary works with the

Department of Corrections (DOC) and the Department of Community

Supervision (DCS) to obtain monthly lists of all individuals incarcerated,

on probation, or on parole due to a disqualifying felony conviction. PX. 800

at 19. The Secretary has programmed eNet to conduct a monthly

comparison between those monthly lists and the list of registered voters in

eNet. Id. The file from DOC is run at the end of the month, and the file

from DCS is run in the middle of the month. Id. at 20.

717.   The Secretary of State maintains authority to decide which criteria are

employed to identify individuals to be removed from the rolls for a felony

conviction. Tr. 3720:17–20 (Harvey). Likewise, the Secretary maintains

absolute discretion over whether or not to alter or continue using a given

criteria. Tr. 3733:12–22, 3767:4–10 (Harvey).

718.   Georgia counties, on the other hand, play no role in setting the criteria

employed to identify individuals to be removed from the rolls for a felony

conviction. Instead, the counties must operate within the criteria the

Secretary of State chooses to employ. Tr. 3768:1–11 (Harvey). The statute

governing this process (O.C.G.A. § 21-2-231(c), discussed supra ¶ 690, does

not provide the counties with a role in determining potential matches. 3780:21–3781:12 (Harvey). In fact, the only role in the process assigned to the counties by statute is mailing notices to electors identified as a person convicted of a felony. Tr. 3783:3–8 (Harvey); see also O.C.G.A. § 21-2-231(c)(2).

719.   As for the criteria chosen by the Secretary of State to identify voters convicted of a disqualifying felony, there are six, though the first two are nearly identical. The Secretary's criteria are: (1) Last name, first name, last four digits of social security number, and date of birth for voters in active, inactive, pending, or reject status; (2) last name, first name, last four digits of social security number, and date of birth for voters in cancelled status; (3) last name, last four digits of social security number, and date of birth; (4) first name, last four digits of social security number, and date of birth; (5) last name, first name, and date of birth; and (6) last name, date of birth, race, and gender. PX. 800 at 21. Secretary of State training from 2019 consolidated the first two criteria into one. PX. 1903 at 14.

720.   Notably, the felon process is the only one of the Secretary's various matching criteria that relies on race and gender as relevant identifiers. Tr. 864:2–8 (Hallman).

721.   Voter registration records that match with felon records based on any of the Secretary's criteria are displayed on the counties' dashboards for review. PX. 800 at 22. Voters are grouped into various buckets depending on which of the Secretary's criteria triggered a suspected match, and a voter will appear in only one bucket — the one for the tightest criteria with which they match. Tr. 871:8–17 (Hallman). By way of example, a voter with the same last name, first name, last four digits of the social security number, and date of birth would appear only in the first bucket; they would not then appear again in the subsequent buckets. Id.

722.   The implication, then, is that voters appearing in, for example, the third bucket (last name, last four digits of social security number, and date of birth) necessarily have different first names, otherwise they would appear in the previous buckets due to matching on tighter criteria. Likewise, voters that appear in the fourth bucket (first name, last four digits of social security number, and date of birth) have different last names, and so on.

723.  eNet users working their way through these buckets of voter records for cancellation have the option to compare the two records, at which point eNet shows them a compare screen, with the voter information on one side and the felon information on the other side. PX. 800 at 25. The users have three options: mark the voter as a felon match, designate the two records as not a match, or "challenge" the voter. PX. 1903 at 12; PX. 800 at 25.

724.  If a voter is marked as a felon match, the voter should be mailed a letter notifying them that they have been identified as a felon and is then placed on a "40-day felon clock." PX. 1903 at 12; PX. 2088 (felon letter). This means that the voter has forty days to request a hearing and prove that they are not a felon. PX. 1903 at 13. If at the end of the forty days, the voter has not requested a hearing and shown eligibility, eNet automatically cancels the voter's record. PX. 1903 at 13. At that point, no additional letter is generated in eNet. Id.

725.  A voter who is "challenged" for any reason has "the responsibility to clear up the issue" before they can vote. Tr. 1328:1–5 (Frechette); see also Tr. 3739:10–12 (Harvey). As both Secretary of State and State Election Board representatives Chris Harvey and Rebecca Sullivan acknowledged, it is not

- 289 -

easy to prove "you're not a felon" as you are "trying to prove a negative." Tr. 3739:20–22 (Harvey); see also Tr. 4063:17–19 (Sullivan). And yet, the process puts the onus on voters to prove they have not committed a felony and are eligible to vote. This is reiterated by the Secretary's training materials for counties on the challenge process. See PX. 1903 at 13; Tr. 3842:19–23 (Harvey).

### (b) Georgia Repeatedly Leads the Nation in Felon Removals.

726.   In 2018, the Election Administration and Voting Survey ("EAVS"), published by the Election Assistance Commission, identified Georgia as the state with the most felon removals (68,249). PX. 1904. Georgia removed 20,000 more felons than the state in second place. Id.

727.   In 2020, Georgia again took the lead, removing 54,730 purported felons (followed by California, with 19,069 removals in second place). PX. 1981 at 167. Of course, California's population is much greater than Georgia's, as reflected by the fact that it has roughly three time as many registered voters as Georgia. Id. at 27. In fact, that same year, not only was Georgia's raw number of people removed for felony convictions anomalous; Georgia was also one of just two states that attributed over 10% of all voter

cancellations to felony removals. Id. at 167. The national average was 1.6%.

Id. at 168.

728.   The Secretary contends that the large number of removals is a result of

Georgia having automatic voter registration ("AVR"). See PX. 1904.

However, 23 other states use AVR and no other state comes even close to

Georgia's number of removals for felony convictions. See PX. 1981 at 124.

Instead, Georgia still leads even the AVR states by a significant margin (id.

at 167), belying any argument that the problem can be blamed on AVR.

729.   The Secretary also contends that Georgia's large number of removals is a

product of Georgia's generally higher incarceration rates. Again, this is a

red herring. Georgia ranks fourth in the nation in terms of population in

state prisons. See U.S. Department of Justice, Office of Justice Programs,

Prisoners in 2020—Statistical Tables 46 tbl.2, https://bjs.ojp.gov/content/

pub/pdf/p20st.pdf.[38] Texas, California, and Florida all outrank Georgia in

terms of prison populations; yet all lag far behind Georgia in terms of felon

---

[38] The contents of this report, prepared by the U.S. Department of Justice, are facts of
which this Court may take judicial notice, as they are not subject to reasonable dispute
and come from a self-authenticating source. See FRE 901(5) ("official publications" are
self-authenticating); United States v. Buttner, 432 F. App'x 696 (9th Cir. 2011) (California
DOJ report on firearms satisfied FRE 803(8)).

cancellations. <u>Compare</u> <u>Prisoners in 2020</u> at 46, <u>with</u> PX. 1981 at 167. Nor

can the discrepancy be explained by differences in felon eligibility to vote,

as both Texas and Florida prohibit people with felony convictions from

voting until their sentence (including probation) is fully discharged. <u>See</u>

Tex. Elec. Code § 11.002; Fla. Stat. Ann. § 98.0751.

### (c)   The Felon Process Generates Many Inaccurate Matches.

730.   The criteria used for felon matching generate thousands of matches. <u>See,</u>

<u>e.g.,</u> PX. 800 at 22 (over 5500 matches on one county's dashboard at one

snapshot in time); Tr. 872:4 (Hallman) (noting image in PX. 800 was a real

dashboard). In particular, the last criterion (last name, date of birth, race,

and gender) generates by far the most matches. <u>See</u> PX. 800 at 22 (4475

matches in last category alone); Tr. 872:9–11 (Hallman) ("[Y]ou can see on

the very bottom bucket that there is a lot of matches in that bucket

compared to the other buckets."). In just one run of the felon match

process in August 2019, the Secretary's criteria identified an implausible

50,000-plus records as potential matches to the list of persons convicted of

a disqualifying felony. PX. 1151. Of those 50,000, roughly 25,000 fell into

the last criterion (last name, date of birth, race, and gender). <u>Id.</u>

731.   The Secretary of State's employees, however, view matches based on this last criterion as "pretty loose." PX. 1151. Indeed, they have so little confidence in the accuracy of these matches that Mr. Hallman said he "would remove [those matches] from any calculations of expected matches." Id. In other words, it was his position that essentially none of those 25,000 matches would actually be felons. Mr. Rayburn, in that same email exchange, agreed and did not count those 25,000 voters in his estimates. Id.

732.   Mr. Hallman stated again at trial that "[a] lot of those are probably not matches … not true matches." Tr. 872:21–22 (Hallman). Ms. Frechette agreed. Tr. 1360:2–3 (Frechette) ("It brought up a lot of matches that—a lot of comparisons that would not be matches."); see also Tr. 3746:15–16 (Harvey) ("we're wasting a lot of time doing these matches that are low probability matches").

733.   Despite the Secretary's awareness that this last criterion in particular produces many false matches and thereby risks disenfranchising thousands of voters, the Secretary persists in its reliance on this last criterion to identify voter records for cancellation.

734.   Exacerbating the problem, none of the Secretary's written materials or trainings for county officials warn that voters identified for cancellation because of a match based on the last criterion are, in reality, unlikely to be voters with felony convictions and should therefore be reviewed with extra caution. See PX. 800, 1903, 1878. When asked by the Court, Chris Harvey was unsure whether this critical information is ever communicated to county officials. Tr. 3765:16–19 (Harvey).

735.   Both John Hallman and Melanie Frechette acknowledged that the volume of records suggested for cancellation burdened counties and generated complaints. Again referring to the last criterion chosen and used by the Secretary of State, Mr. Hallman conceded that counties asked the Secretary to "take that one out" because "there are too many ones that don't match." Tr. 872:12–13 (Hallman). Counties that prioritized working through all of the records on their dashboard were "bothered" because they "would have to go through that bucket [of records selected based on the last criterion] and click not a match on every single one that was, you know, was not a true match." Tr. 873:10–20 (Hallman).

736.   Ms. Frechette recalled "complaints about the numbers of records on the
dashboard and the time-consuming part of it." Tr. 1359:21–22 (Frechette).
And she acknowledged that "there were dashboard things that weren't
matches, but you still had to go through them, or they would sit on your
dashboard." Tr. 1360:6–8 (Frechette). Specifically with regard to the last
name, date of birth, race, and gender criterion, Ms. Frechette recalled
concerns "that it was time-consuming to go through," and the records
were not, in fact, matches. Tr. 1361:4–12; see also 3746:13–16 (Harvey)
(describing the drain on resources of large counties forced to go through a
large number of loose matches that rarely, if ever, result in a match).

737.   But the Secretary of State knew it was overburdening counties even
without hearing the counties' complaints. Mr. Hallman agreed that "if
there [were] 4,475 potential matches to review," that would be a lot of
work for a given county. Tr. 873:21–23 (Hallman). Indeed, to conduct any
kind of meaningful review with that volume "may be undoable" for some
counties, which Mr. Hallman suggested might lead them to "ignore that
bucket" altogether. Tr. 873:24–874:3 (Hallman). Yet, the Secretary persisted
in giving counties thousands of records to review for cancellation. See, e.g.,
PX. 800 at 22 (over 5500 matches on one county's dashboard at one

snapshot in time); Tr. 872:4 (Hallman) (noting image in PX. 800 was a real dashboard).

738.   Mr. Harvey initially suggested that the Secretary retained the extraordinarily loose felon criterion because "some counties like it," and "they tend to be the smaller counties." Tr. 3746:8–16 (Harvey). Of course, this justification makes clear that the Secretary of State has chosen to prioritize the preferences of smaller, less burdened counties (with fewer voters), over the needs of the more populous counties (with, by definition, more potentially affected voters. Tr. 3746:8–16 (Harvey) (noting that Fulton and Gwinnett and Cobb all found the criterion unhelpful). Mr. Harvey then walked back his explanation, clarifying that which counties liked to receive these loose matches was "more of a—sort of a personality thing than anything else," and that all counties would prefer to have fewer matches and a lighter workload. Tr. 3770:4–23 (Harvey).

739.   Thus, by design, the Secretary's chosen criteria and process overwhelmed at least some counties with too many records to process that were predictably included for review and cancellation in error. It is no surprise, then, that counties attempting to navigate the thousands of records sent by

the Secretary of State for cancellation are also overinclusive when it comes to cancelling records on the belief that the voter was convicted of a disqualifying felony.

### (d)    Voters Are Incorrectly Cancelled As Persons with Felony Convictions.

740.   The evidence in fact bears out that Georgia voters find themselves incorrectly cancelled as persons convicted of disqualifying felonies, often without receiving any advance notice. For example, Andre Smith, a Fulton County resident and professional musician, learned for the first time in June 2020 that he had been cancelled. Tr. 2431:12–13; 2432:11–22, 2435:3–7; 2436:7–12; 2437:24–2438:2 (Smith); PX. 2071. He had received no pre-cancellation notice. Id. After making several attempts to contact Fulton County, Mr. Smith (with Fair Fight's help) was able to get reinstated as an active voter. PX. 2089; Tr. 2442:12–2443:1 (Smith). Immediately after being reinstated, however, Mr. Smith's record was cancelled on felony grounds again. DX. 724, DX. 761. Mr. Smith again contested that designation, and Fulton County eventually explained that Mr. Smith had been cancelled based on an incorrect match with an Andre Smith with a different middle

initial (and obviously with different unique government identifiers). PX. 2089.

741.   The Secretary of State's repeated mis-designation of Mr. Smith affected his ability to vote normally. Specifically, when he arrived at the polls on Election Day in June 2018, he learned that his registration could not be verified. Tr. 2448:1–2 (Smith). He was eventually allowed to vote by provisional ballot. Tr. 2249:7–8 (Smith). Problems with Mr. Smith's registration have persisted. When Mr. Smith checked his status on MVP immediately prior to testifying in this case, his MVP page indicated that he was once again cancelled based on a fictitious felony conviction. PX. 2097.

742.   Chris Warren received a letter informing him that he had been identified as having a felony conviction and instructing him to attend a hearing within 6 days. PX. 912. He called the number on the letter, for a Mr. Stanley Girtman, and informed Mr. Girtman that he was not a felon, though as he put it, "[i]t's hard to provide documentation proving that something did not occur." Id. Mr. Girtman agreed he was not the same person in the felon record—that person lived 100 miles away in Walker County, and had different driver's license and social security numbers. PX.

912; PX. 2019. Mr. Girtman told Mr. Warren he did not need to do anything further and would be able to vote. PX. 912. But when Mr. Warren went to his polling place, he learned that he had indeed been cancelled. Id. It was only after reaching out to the ACLU that he got to the bottom of it and his provisional ballot was counted. PX. 2019; PX. 900.

743.   The same thing has happened to many other voters, in mistakes that have been going on for years. See, e.g., PX. 89 at 1–2 (Dale Thomas and Jean Duncan, mistakenly cancelled as persons convicted of a felony in 2013, though their case was not heard by the State Election Board until 2019); PX. 2159 at 83–85 (transcript of State Election Board Case No. 2013-052 regarding these same voters);[39] PX. 1715 (Douglas Miller, cancelled as a match with a Robert Miller).[40]

---

[39] Plaintiffs moved for the admission of PX. 2159. It is Plaintiffs' understanding that the Court did not make a formal ruling, and so took the exhibit under advisement. Tr. 4050:12–4054:21. The document is admissible as a credible government record under FRE 803(8), and it was directly relevant to the witness's position as a member of the State Elections Board.

[40] PX. 1715 was taken under advisement by the Court.  Tr. 3104:16–3105:2.  Defendants raised a Rule 401 objection to this document, see id., and not a hearsay objection.  This document is plainly relevant as an example of a voter whose "record was cancelled in error" based on data from the Department of Community Service and the Department of Community Supervision.  PX. 1715 at 1.  This is direct evidence of a voter with a different first and middle name from a person with a felony conviction (not to mention

744.    Moreover, eNet flags the same voters over and over again even if a user

has previously processed the records as a non-match. For example,

Elizabeth Bauer, who was convicted of a misdemeanor in another state,

repeatedly appeared on Gordon County's dashboard to process, even after

Ms. Bauer provided documentation that her crime was not a felony, and

even after Gordon County had designated her as not a match before. PX.

658;[41] see also DX. 724 (Andre Smith repeatedly cancelled). That means

that even if the first time a voter is teed up, the county correctly designates

that voter as not a felon, that voter may month after month risk

cancellation.

745.    Voters cancelled as felons are burdened when they try to vote. Some, like

Dale Thomas, are disenfranchised altogether. PX. 89. Others, like Andre

---

a different address and social security number) being cancelled in error based on the
Secretary's loose matching criteria.

[41] PX. 658 was taken under advisement by the Court.  Plaintiffs submit that Mr.
Hallman's responses to the county employee constitute adoptive admissions under FRE
801(d), because he manifested his agreement with the county employee's description of
events.  (Here, although Mr. Hallman expressed surprise that this is how the system
would operate, he did not question the veracity of the county employee's description,
and instead remarked that he would see why it was working that way for that voter.)
This is sufficient to constitute an adoption.  In the alternative, the document should
admissible to show that the Secretary was on *notice* that the counties had identified this
as a potential problem. (case law for admissibility for notice)

Smith and Chris Warren, need to make heroic efforts, in particular

enlisting the help of third-party organizations (Fair Fight Action, for Mr.

Smith, and the ACLU, for Mr. Warren) and repeatedly contacting elected

officials to rectify the error and ensure that their votes counted. A voter

who is repeatedly mislabeled, like Mr. Smith, must assume the burden of

eternal vigilance to ensure that he or she is not mislabeled again in the

future.

> ### (2)   The Secretary of State Uses eNet to Cancel Living and Eligible Voters as Deceased.

746.   The Secretary receives a list of deceased voters every week from the

Georgia Department of Public Health. PX. 800 at 11. And every week, eNet

compares that list against the list of registered voters. Id. This process is

called the "vitals" process. Id.; Tr. 3715:17–19 (Harvey).

747.   For the vitals process, the Secretary has subscribed to two different kinds

of matches: "tight matches" and "loose matches." PX. 800 at 11. Tight

matches are matches on the following criteria: (1) last name, social security

number, and date of birth (either cancelled or not cancelled); and (2) social

security number and date of birth, with a status other than cancelled (i.e.

active, pending, inactive). PX. 800 at 12. eNet, the Secretary's database, has been programmed to automatically cancel tight matches. Id.

748.  Loose matches are matches on the following criteria: (1) last name and date of birth; and (2) last name and social security number. PX. 800 at 13. The Secretary places loose matches on the counties' eNet dashboards for review. Id. eNet generates a compare screen of the loose match records for review, with the voter record on one side and the vitals record on the other side. PX. 1878 at 28. From there, the user can cancel the voter, designate the two records as not a match, or challenge the voter. PX. 800 at 14.

749.  When a record is cancelled on suspicion that the voter is deceased, there is no pre-cancellation notice. PX. 1878 at 29.

750.  The Secretary of State selects the criteria—the categories of information about Georgia voters—used to match the records of deceased people. Tr. 3716:15–19 (Harvey). Likewise, the Secretary decides which criteria are "tight matches" that are automatically cancelled and which criteria are "loose matches" that are then transmitted to the county dashboards for determination. PX. 800 at 11–13; Tr. 3717:4–3719:18 (Harvey).

751.   The vitals process, like the other processes, identifies many potential

matches for review. See, e.g., PX. 800 at 15 (identifying over 1400 vitals

matches on one dashboard in one week). And the vitals process, like the

other processes, results in wrongful cancellations, such as the cancellation

of Deborah Hall. PX. 490. Ms. Deborah Morris Hall registered to vote—

while very much alive—but was cancelled as deceased based on a record

for a Debra Z. Hall. Id. The two women had different middle names,

different birthdates, and different social security numbers. Indeed, even

their first names were spelled differently. Id. Nonetheless, Ms. Deborah

Morris Hall was cancelled, and her case was investigated by State Election

Board as a potential case of voter fraud *by Ms. Hall herself*. Id. The

investigation revealed that the board of registrars "erroneously removed

the eligible elector from the list of qualified voters without verifying the

information." Id. at 3.

> **(3)    The Secretary of State Conducts a Pre-Registration
> Duplicate Search in eNet that Results in Inaccurate
> Modification of Existing Records.**

752.   The Secretary of State has designed and implements processes for

identifying and, ultimately, cancelling voter registration records as

suspected duplicate records both prior to a voter becoming registered and

on a routine basis as part of the Secretary's maintenance of the voter registration database.

### (a)   The Pre-Registration Search and Record Modification: Background

753.   Before registering any new voter, the Secretary of State has created a separate duplicate search process that compares the voter registration application against the entire universe of registered voters in Georgia. PX. 1878 at 37–38, 54–55. The search is purportedly "intended to validate, identify, and eliminate the occurrence of duplicate voter registrations." PX. 1878 at 55.

754.   Defendants might suggest that O.C.G.A. § 21-2-226, which authorizes counties to process registrations and determine eligibility in the first instance, encompasses this practice. This argument is a non-starter for two reasons. First, of course, processing new registrations is a wholly separate function from searching for duplicates—the Secretary has simply chosen to layer the latter process on top of the former. One could easily imagine a system whereby the counties processed all new registration applications without regard to potential duplicates, and then used *only* the monthly duplicate search function (discussed <u>infra</u> pp. 321–25) to tidy up any

duplicates on the back end. Plaintiffs do not propose such a system, but the point stands that it is a *choice* — and one made by the Secretary — to conjoin application processing with duplicate searching.

755. While voters can register in several ways, the two most common are through the Department of Driver Services ("DDS") and Online Voter Registration ("OLVR"). Tr. 761:9–19 (Hallman); PX. 1981 at 145–49.

756. For voters who register through either of these methods, that search of the entire universe of registered voters takes place automatically. Tr. 762:11–763:1 (Hallman). So, when the eNet user clicks on either the DDS or OLVR registration application to process a new voter registration application, eNet will automatically run the search across the universe of registered voters using three discrete criteria the Secretary has chosen. Tr. 765:6–18 (Hallman). Those criteria are: (1) Driver's license number; (2) Last name, first name, date of birth, and social security number; and (3) last name, first name, and date of birth. PX. 50 at 39. The three criteria are independent of one another, meaning that a new application will be deemed a "match" with an existing record if it matches any one of those criteria. Tr. 766:9–16 (Hallman).

757.  The criteria are exclusive of one another, meaning that one voter cannot appear as a match under two different criteria. Tr. 871:8–13 (Hallman). In other words, if a new registration matches an existing registration based on the Secretary's third set of criteria ("last name, first name, and date of birth"), the new registration necessarily does not have the same driver's license number or social security number as the existing registration record (otherwise it would be caught in the second set of criteria, if they had the same social security number, or the first set, if they had the same driver's license number). That new registration matching based on the Secretary's third set of criteria, but not driver's license or social security number, will nonetheless be identified as a suspected duplicate registration.

758.  The database-wide search is conducted in order, meaning that eNet will look first for any voter registration with the same driver's license number; if the new registration matches on the first criterion, the automatic search does not proceed to confirm a match based on any other criteria. The automated search would identify those two records as potential duplicates. Tr. 766:3–8 (Hallman). This is true even if no other values across the two records matched. Tr. 767:15–24 (Hallman). Conversely, if the new registration does not match any existing registration with the

same driver's license number, the system will next search for a voter
registration with the same last name, first name, date of birth, and social
security number, and so on. Tr. 765:13–18 (Hallman); PX. 50 at 40.

759.  If eNet identifies two records that it considers to be potential duplicates
using the Secretary's criteria, eNet displays the voter registration
application and the existing registration side by side, in what is called the
"compare" screen. Tr. 765:15–18 (Hallman); PX. 1878 at 38. From the
compare screen, eNet gives the registrar two options: either designate the
two records as not a match and process the new registration (by selecting
"new voter"), or designate the two records as a match and selecting
"change voter." PX. 1878 at 38; Tr. 774:16–775:4 (Hallman).

760.  If the user selects "change voter," the existing voter registration is updated
with the information from the new application, such as (for example) by
changing the voter's address. Tr. 774:16–24 (Hallman). If the user is
incorrect and changes the existing registration on the basis of a new
application from a unique registrant, then an existing voter's record will be
altered based on someone else's information, meaning that the resulting
record has incorrect information. Tr. 775:18–776:6 (Hallman). Following

through on the example of a user changing a registration address, the voter

with the existing registration will now be registered at a different (and

inaccurate) address, sometimes even in a different county. Tr. 794:17–25

(Hallman).

761.   The choice to implement this pre-registration duplicate search, and the

chosen criteria for identifying potential duplicate records, belong to the

Secretary of State, not the counties. The Secretary of State cannot disclaim

the outcome of the process it has designed.

762.   In addition to this automated search for DDS and OLVR applications,

which is a function of the Secretary's eNet system's design, the Secretary of

State requires the counties to conduct a manual search in eNet before

processing any paper applications. PX. 1878 at 54.

763.   At the instruction of the Secretary of State, the manual search is conducted

using either Voter Search Criteria or Voter Identifiers. PX. 1878 at 54. The

Secretary instructs counties to use these criteria both in its training

materials and by programming eNet to accept only those criteria as

potential search options. Id. A search using Voter Search Criteria uses last

name, first name, and date of birth. Id. at 55. The user may also enter the

social security number, although that is optional. Id. A search using Voter Identifiers uses either the applicant's voter registration number (if provided) or the applicant's driver's license number, but not both. Id.

764. If eNet finds a potentially matching record using the manual search, either based on Voter Search Criteria or Voter Identifiers, the user has the option to either "change voter" or create a "new voter." PX. 1878 at 55. Like with the automated search, if the user selects "change voter," the existing record will be modified with the information from the application. Tr. 794:10–21 (Hallman). And also like the automated search, if the user changes an existing voter record based on an application from a unique registrant, the result is that the existing registered voter will find herself moved to an unfamiliar address. Tr. 794:17–25 (Hallman).

765. There is no advance notice given to a voter before their record is modified. Tr. 837:25–838:5 (Hallman).

(b)     The Pre-Registration Search Uses Loose Matching Criteria.

766. Both for the Secretary's automatic search in the pre-registration process and for the manual search conduct for paper applications, the Secretary

has chosen overly broad criteria the leads to errors when it comes to

identifying duplicate registration records.

767. The first example of overbreadth arises in the context of the automatic

search conducted pre-registration. By way of background, if when voters

were registering to vote they did not provide a date of birth, the voters'

eNet records will contain a default value of 01/01/1900. Tr. 767:7–14.

When eNet's automated search occurs in the pre-registration process, it

treats the default date of birth (01/01/1900) in eNet as a match with any

other date of birth. PX. 50 at 40. This means that eNet treats an application

with any birthdate as a match with the default birthdate of 01/01/1900. Tr.

768:15–18 (Hallman).

768. Next, the manual matching search is similarly designed to capture what

the Secretary describes as "loose matches." PX. 1878 at 55. These loose

matches include two records that match on first initial and last name

(meaning that a James Smith and a John Smith with the same date of birth

would match), as well as records with missing information (such as the

default date of birth of 01/01/1900, or a missing first name). Id. A "loose

match" is less likely to be a "true match"—in other words, an accurate

match—as the Secretary well knows. Tr. 795:20–23 (Hallman). This means that conceivably, a James Smith with a default date of birth in eNet (i.e., 01/01/1900) could match with a John Smith with any date of birth. Tr. 791:6–793:9 (Hallman).

769.    Both the manual and the automated pre-registration duplicate searches rely on driver's license number alone as a matching criterion. PX. 1878 at 55; PX. 50 at 39. This means that a one-digit typographical error entering a voter's driver's license number can cause a voter registration to appear duplicative of an existing registration—as the Secretary is well aware. PX. 621. The Secretary is also aware of numerous instances in which two voters in the database are identified as having the same driver's license number. See, e.g., PX. 275; PX. 870; see also Tr. 1502:17–1503:6 (Freemon).

770.    Indeed, John Hallman, the Election Systems Manager for the Secretary of State remarked that "[i]n other cases" of inaccurate matches, "there were typos in the DOB, SSN, or DL number that caused the two voters to appear[] as a match. For example, the DL was entered incorrectly, and this caused the voter to match with another voter with the same (correct for them) DL." PX. 621 at 3.

771.   Instead of responding to the likelihood of typographical errors by tightening its loose criteria or implementing safeguards, the Secretary of State shirks responsibility for predictable mistakes in the system it has built and instead continues to rely on driver's license number alone to identify duplicate records. PX. 50 at 39; PX. 1878 at 55.

### (c)   The Pre-Registration Search Generates Inaccurate Modification of Records, Which Burdens Voters.

772.   The pre-registration duplicate search not only has the *potential* to incorrectly identify unique registrations as duplicates, in fact, it has that predictable result.

773.   For example, retired DeKalb County resident Brenda Lee's registration was transferred from her home address in Avondale Estates to an unfamiliar address in Decatur. PX. 2058 (eNet record); PX. 1347 (MVP page); PX. 2095 at 6:24–7:8 (Lee Dep.). [42] She had not moved, nor had she

---

[42] Defendants object to Plaintiffs' Exhibits 1347, 2059, and 2060, although this Court admitted them subject to further ruling. Tr. 2752:13–17. (Plaintiffs' Exhibit 2058, Ms. Lee's eNet record, was admitted without objection. Tr. 2664:15–2665:25.) PX. 2059 and 2060 are admissible as self-authenticating public records, because they are printed from a recognizable government URL. In re Polygraphex Systems, Inc., 275 B.R. 408, 418 n.8 (M.D. Fla. 2002). These records are also public records and so qualify for an exception to the hearsay rule under FRE 803(8). United States v. Dickert, 635 F. App'x 844, 849–50

updated her address information with the Secretary of State. PX. 2095 at

7:2–6 (Lee Dep.). With help from her grandson, she learned that another

family named Lee lived at that address, which DeKalb County tax records

confirm. PX. 2059, 2060 (DeKalb County tax records); PX. 2095 at 17:5–7

(Lee Dep.). When one of the Lees at that Decatur address submitted a voter

registration application, the Secretary of State's pre-registration duplicate

search identified Brenda Lee as a match and transferred her to a new

address without her knowledge or consent—as a county employee put it, a

"human error." PX. 2095 at 20:25–21:7 (Lee Dep.).

774.   Similarly, Christine Jordan arrived at the polls in 2018 only to be turned

away for not being registered. PX. 1721. Months later, after a press inquiry,

the Secretary learned that Ms. Jordan (who had been voting since 1982,

and whose registration contained the placeholder 01/01/1900 birthdate)

had been transferred from Fulton to Houston County based on a

registration application for a voter with a "similar" name born in 1976. PX.

1260; PX. 1721.

---

(11th Cir. 2016) (federal tax form is self-authenticating public record and satisfies public
record hearsay exception).  Defendants also object to portions of the designated
testimony.  See Defendants' objections and Plaintiffs' responses at Doc. No. [811-3].

775. With respect to Christine Jordan, Defendants argue that the cause of her disenfranchisement was not their matching system, but rather Ms. Jordan's decision to use a paper registration. Tr. 4432:2–8 (closing). But the blame cannot fairly be placed on Ms. Jordan for her chosen method of registering to vote. First and foremost, the Secretary of State continues to issue and accept paper registrations and, therefore, cannot hide behind the tools it created. Indeed, the Secretary of State is *required by law* to offer paper registration forms—surely it must also take steps to ensure those paper registrations are not subject to erroneous cancellation. O.C.G.A. § 21-2-223(a). Second, Defendants ignore the technological realities of voter registration for voters like Ms. Jordan who have been registered since at least the early 1980s. PX. 1721. Third, despite Defendants' apparent belief that the use of a paper application can lead to disenfranchisement decades after a voter becomes registered, Defendants offer no evidence that they have done anything to identify the voters with placeholder dates of birth to remedy the problem their own system caused. See, e.g., PX. 1260 (noting, over a year after Ms. Jordan's disenfranchisement, that her date of birth was still incorrect). Far from addressing the problem of registration records with missing dates of birth, the Secretary compounds the

likelihood of error by assigning a default date of birth and treating the default date as a match with all other dates of birth.

776.   Joyce Miskiel, a magistrate judge in Brooks County, and David Goldsby of Fulton County, are yet two more victims of the Secretary of State's loose criteria for identifying duplicate registrations. When Judge Miskiel arrived at her polling place in 2016, she learned that she was registered in Fulton County, where she had never lived. PX. 1875. An official investigation uncovered that a registration application for a David Goldsby (a Black man in Fulton) had been used to update Joyce Miskiel's (a white woman in Brooks) registration information without her knowledge or consent, simply because of a one-digit difference in the two voters' registration numbers. Id. Meanwhile, Mr. Goldsby was unable to vote in Fulton because they had no registration under his name—they only had it under Ms. Miskiel's. Id.

777.   There are numerous other examples of voters improperly transferred from one county to another on the basis of an inaccurate match. See, e.g., PX.

2033 (Jonathan Ashworth); PX. 1246 (Rebecca Gary);[43] PX. 584 (Denice

Lynn Hamby); PX. 1881 (Michael Brown).

778.   The Secretary is aware of these examples, as shown by the email traffic

within the Secretary of State's office. Moreover, the Secretary is aware that

these problems arise far more frequently than these lone examples suggest.

Mr. Hallman acknowledged in an email as early as January 2017 that he

was "constantly receiv[ing] calls" from counties complaining that other

counties had taken their voters through an inaccurate duplicate merger of

records (PX. 1705), while Ms. Frechette stated in May 2018 that she was

"getting a lot of calls about this same issue" (PX. 1881).

779.   There are, of course, countless other voters who encounter problems but

never submit a formal complaint to the Secretary of State, and never have

their concerns escalated from the county or poll worker to the Secretary's

office. Tr. 1916:4–10. For many voters—like Christine Jordan and David

---

[43] PX. 1246 was taken under advisement by the Court.  Tr. 3104:16–3105:2. Defendants raised a Rule 401 objection to this document (Tr. 3105:1–3), and not a hearsay objection. This document is undoubtedly relevant, as it shows the case of a voter who was "transferred" when the counties "grabbed a different person with a similar name," based on "[t]he lack of DOB of file."  PX. 1246 at 1.  This is direct evidence of the existence of these errors arising out of the new registration duplicate search, as well as the Secretary of State's acknowledgement of those errors.

Goldsby—this problem manifests as the voter simply not appearing on the rolls in their county. PX. 1875; 1721. And untold numbers of voters who find themselves in that scenario—again, like Ms. Jordan and Mr. Goldsby themselves—simply accept their fate and leave the polling place without casting a ballot or kicking up a fuss. PX. 1875; PX. 1721.

780.   The risk of a unique voter registration application being wrongly identified and treated as a duplicate of an existing registration is compounded by the volume of new registrations each county must process. See, e.g., PX. 1878 at 37 (identifying 3300 DDS applications alone on one county dashboard at one moment in time). Every single new application is, under the Secretary's mandatory pre-registration duplicate search, an opportunity to incorrectly alter an existing record. The Secretary is not making it any easier, and is no doubt making it harder, on counties by bombarding them with extraneous records to process based on loose criteria likely to misidentify unique records as duplicates.

781.   Without question, the voters whose records are erroneously identified and treated as duplicates are burdened as a result. First, both the existing voter whose record is changed and the new applicant whose registration was

not properly processed can be disenfranchised. See, e.g., PX. 1721

(Christine Jordan); PX. 1875 (David Goldsby). Second, short of

disenfranchisement, voters who find their registrations changed in error

must take many steps to successfully vote, whether spending hours on

hold, driving to an incorrect polling place in rush-hour traffic, or insisting

that poll workers scan multiple forms of identification until they get it

right. See, e.g., PX. 2095 (Brenda Lee);[44] PX. 1875 (Joyce Miskiel); Tr.

1497:22–1503:22 (Freemon); Tr. 2734:1–2738:5 (McKissic).

782.   For example, Coweta County resident Anthony McKissic, a basketball

coach, pastor, and active community member, learned upon arriving at his

polling place that he was erroneously registered in Fulton County. Tr.

2734:2–7, 2733:6–13 (McKissic). Although his wife had already voted at the

Coweta polling place, (Tr. 2731:1–5 (McKissic)), the poll workers refused to

let Pastor McKissic vote, even provisionally (Tr. 2736:1–5 (McKissic)).

Undeterred—and moved by the recollection of "all the individuals that

just fought for [him] to have the right to vote," he travelled about ninety

minutes in rush-hour traffic to Roswell to cast a ballot. Tr. 2736:13–2737:3

---

[44] For Defendants' objections and Plaintiffs' responses, see Doc. No. [811-3], supra n.42.

(McKissic). There, he was forced to wait for more than an hour, and then was informed that because he candidly explained that he lived in Palmetto, rather than Roswell, he could not vote in the local elections. He was permitted to vote only in the statewide elections, not the local ones. Tr. 2737:4–2738:5 (McKissic).

783. Nicole Freemon, a math and physics tutor from Cherokee County attempted to vote in-person in the June 2020 primary election. Tr. 1495:1–2, 1498:6–8 (Freemon). When she tried to access her MVP page, she was unable to do so using her married name. Tr. 1498:9–22 (Freemon). When she called the county elections office, she learned that she was registered incorrectly as "Feemon." Tr. 1501:20–24 (Freemon). When she arrived to vote, however, she was unable to check-in under either name. Tr. 1502:11–1503:6 (Freemon). Eventually, she used her outdated driver's license with her maiden name to check-in and vote. Tr. 1503:7–15 (Freemon).

784. Defendants have consistently tried to minimize the burdens voters grapple with as a result of being incorrectly matched with another voter as a duplicate record. See, e.g., Tr. 1630:6–23, 1645:8–11 (Germany) (testifying, in response to questions about a voter who was unable to vote because his

voter registration was moved from Peach County to Bibb County, that the voter could simply have come back the next day after straightening out the problem or he could have voted a provisional ballot); Tr. 1511:13–15 (defense counsel noting that Ms. Freemon was ultimately able to vote); see also Tr. 2722:17–25 (defense counsel emphasizing that it took Ms. Bennett, an absentee ballot cancellation witness, only ten to fifteen minutes to leave the polling place, return with her absentee ballot, and be able to vote).

785. Defendants' diminishment of voters' challenges ignores the cost imposed on these voters. For example, only upon cross-examination did Mr. Germany acknowledge that, in stating that the voter could come back the next day, he presumed the voter had the ability to get off work another day and that he had child care and that he had transportation. Tr. 1630:6–23 (Germany). The lack of these resources presents an impediment for underprivileged Georgians, who are no less deserving of protection for their fundamental right to vote. Tr. 109:1–110:20 (Livoti).

(4)   **The Secretary Programs eNet to Conduct a Monthly Duplicate Search Which Results in Inaccurate Merges and Cancellation of Voters.**

(a)   **The Duplicate Batch Process: Background**

786.   Once a month, without any action on the part of the counties, the Secretary has programmed eNet to run a search through all the voter records in eNet to try to identify potential duplicate voter registrations. PX. 50 at 41. This search uses four criteria: (1) Last name, first name, date of birth, last 4 digits of social security number; (2) full social security number; (3) driver's license number; (4) first name, date of birth, last 4 digits of social security number. Id. Each of these sets of criteria is independent from the others, meaning that two records with the same social security number will be identified as potential duplicates based on the second criterion, even if no other values included in the other three criteria match. Tr. 810:21–811:09 (Hallman). Likewise, two voters with the same driver's license number will be identified as potential duplicates, even if no other information matches. Tr. 811:10–11 (Hallman).

787.   The potential duplicate records identified by the Secretary's matching criteria will be placed on the counties' dashboard in eNet, grouped into four sets by which criterion predicted the match. PX. 1878 at 32. The eNet

user can select a record to review, at which point eNet takes them to a

compare screen where they can see the identifying information for both

the original voter and the duplicate voter. Id. at 33–34. Users can then

"merge the two records, at which point the voting history of the duplicate

record will be merged with the Original Voter Record." Id. at 34. The

duplicate record will be cancelled. Tr. 811:17–20 (Hallman).

788.   If an eNet user decides incorrectly that the two records reflect the same

person, a registered voter's record will be cancelled by reason of duplicate.

Tr. 811:21–24 (Hallman). The Secretary neither provides nor requires notice

to the registered voter prior to cancellation. Tr. 837:25–838:5 (Hallman).

And if an unnotified, cancelled voter attempts to vote, the best case

scenario available to them is that they will be allowed to cast a provisional

ballot that will be counted only if they can resolve (within three days)

whatever problem led to their cancellation. Tr. 812:17–813:14 (Hallman).

**(b)   Voters Are Incorrectly Identified as Duplicates.**

789.   Predictably, the monthly duplicate batch process leads to erroneous

cancellations of voter registration records. For example, Oconee County

voter Cynthia Baugher went into her precinct holding a precinct card with

her registration number, yet the poll workers could not find her on the list of registered voters. PX. 621 at 5. No one at the polling place could find her, nor could the assistant director of elections, who got involved to try to resolve the problem. When Oconee asked John Hallman for help, he suggested that it might be "linked to a duplicate merge," as that is "the only thing that . . .would cause a record not to show up." <u>Id.</u> at 4. Over one week later, Mr. Hallman reported that Ms. Baugher had been merged with a Screven County voter. <u>Id.</u> at 3. That voter, however, had a different name, driver's license, social security number, and date of birth from Ms. Baugher—indeed, the only thing "even remotely close" was a one-digit difference in the voters' registration numbers. <u>Id.</u>

790.   In another instance, a Bryan County election administrator reached out to the Secretary's office about a Bryan County voters, Warren Hans Blew, whose registration had been merged with a Robert Cowles in Stephens County. PX. 426 at 2–3.

791.   In yet another case, a Fulton County registration officer contacted the Secretary's office for assistance un-merging two unique records—one for a Joe Hall in Fulton, the other for a Toria Brewer in Madison. PX. 663 at 2–

3;[45] 1304:1:8 (Frechette). The merged record jumbled the information of both voters, with Ms. Brewer's original registration number, but Mr. Hall's name. As a result, the merged record was not accurate for either voter. PX. 663 at 2.

792. Although eNet contains an "unmerge voter" function (PX. 1878 at 35), emails to the Secretary of State show that counties struggle to actually unmerge voters. See, e.g., PX. 426, 663.

793. The Secretary is aware of other instances of incorrect duplicate merges. See, e.g., PX. 1146 ("Looks like the county messed up a merger."). In fact, the process and criteria chosen by the Secretary essentially guarantee errors. Indeed, hundreds of voters are identified every month in the duplicate batch process. PX. 1878 at 32 (identifying 519 duplicate voters on one county's dashboard for one month).

794. Like with the pre-registration duplicate errors, voters who are cancelled as duplicates often may not be able to learn at the polling place what went wrong. Take Cynthia Baugher, whose problem took over a week and a half

---

[45]   PX. 663 was admitted as a party admission as to Ms. Frechette's emails.  Tr. 1303:7–9.

to resolve—and indeed was only resolved because the Oconee County employee took the time to resolve it. PX. 621. Voters who are not as persistent, or who are not lucky enough to live in a small county with registrars with time to spend, may simply assume they did not register and be disenfranchised; and the true number of those voters is again unknowable.

### (5) The Secretary of State Does Not Use Safeguards to Alleviate Any of These Burdens.

#### (a) eNet Contains No System Messages.

795. Despite the fact that the Secretary of State knows that the criteria it uses are in many cases too loose, and despite the fact that the Secretary knows it is identifying hundreds upon hundreds of records for county officials to consider for cancellation, the Secretary has not implemented in eNet any system messages that prevent or deter wrongful merges or cancellations. Tr. 837:14–18 (Hallman). So long as one of the criteria is satisfied, nothing in eNet would stop the user from cancelling or changing the record, even if all the other values differed. Tr. 1304:19–1305:8 (Frechette).

796. But the Secretary could use alerts or systems messages if it so chose. After all, the Secretary of State uses alerts and error messages in other places. For

example, if a voter attempts to register online through OLVR and enters a driver's license number that contains fewer than 8 digits, the Secretary's website provides an error message, as shown in Plaintiffs' remedies presentation. PX. 2173 at 53.[46] Similarly, if a voter attempts to register online and provides a valid driver's license number, but one that does not match their name, the Secretary's website provides a different error message. Id. Yet the Secretary chooses not to provide error messages in eNet.

797.   Such error messages could include, for example, an alert if a voter's gender and last name differ from the record being compared to, and that says "Are you sure you wish to proceed?" Or an alert that prohibits such a cancellation in eNet altogether. Or an alert that requires a second level of approval, whether from a peer or a supervisor.

---

[46] This exhibit shows screenshots of error messages on the Secretary of State's online voter registration portal and was admitted as a demonstrative. Tr. 4272:4–4273:3.

**(b)     The Secretary of State Does Not Require Minimum Matching Information Prior to Cancellation.**

798.   The Secretary of State has also chosen not to implement a policy prohibiting cancelling, merging, or otherwise altering a voter registration unless sufficient identifying information matches. Instead, the Secretary's policy is that "it's the responsibility of the county office to review the two records to determine if it is the same person or not." Tr. 1324:10–12 (Frechette). Indeed, Ms. Frechette testified: "Minimal standards just wasn't part of our vocabulary. It was review the records and make the decision for your county registrations." Tr. 1324:22–24 (Frechette). Ms. Frechette made clear that her superiors at the Secretary's Office had never told her to establish any minimum standards for counties to follow. Tr. 1353:20–22 (Frechette) ("[T]here was never guidance given to me that I was to establish best practices for the counties.").

**(c)     The Secretary of State Has Not Established Best Practices.**

799.   None of the Secretary of State's training materials contain any best practices about which values must match, or the proper procedures to follow when evaluating two different records. See, e.g., PX. 50; PX. 800; PX.

1878; PX. 1903. Instead, these trainings all focus on the technical aspects of the comparison process—which buttons to press to display which screen. E.g., PX. 1878 at 29. They do not contain any substantive best practices about how to decide whether two records are a match.

800.  The Secretary has the authority to set best practices for how to conduct these processes, and in fact does recommend best practices for certain ministerial aspects of these processes. For example, when it comes to the felon cancellation process, the Secretary's training says: "It is a best practice to retain information concerning the matching criteria and the reason for cancelling the record." PX. 800 at 27. Why does the Secretary choose to provide this best practice? In the words in this training: in case "the voter challenges why you cancelled their record, can you defend your actions?" Id. In other words, the Secretary instructs counties to try to insulate themselves from liability in the wholly foreseeable (and indeed, foreseen) event of an inaccurate cancellation—not to implement any best practices to avoid those cancellations in the first place. The Secretary's focus is shielding itself from criticism, not protecting voters.

801.   And when it comes to the vitals process, the Secretary's training says: "[I]t

is a best practice to conduct regular audits to ensure every record removed

by the Vitals procedure are processed." PX. 800 at 17. In other words, the

only time the Secretary recommends auditing is to ensure that the

maximum number of records are removed.

> **(d)     The Secretary Does Not Answer Questions About Ambiguous Matches, Even if Plainly Not The Same Voter.**

802.   When county officials encounter potential matches that they do not know

how to process, they reach out to the Secretary of State for help.

803.   For example, Tamika Geist of Columbus County asked John Hallman what

to do with a vitals match where the social security number matched, but

the first and last name did not. PX. 541 at State-Defendants-00270173–74.[47]

Ms. Giest went on to ask "what information is most critical for

verification? Should all of the info match …?" Id. at State-Defendants-

00270174. In response to these questions, however, Mr. Hallman simply

---

[47] Plaintiffs agreed that this exhibit could be admitted with the caveat that the
statements by Ms. Giest would not be offered for their truth subject to the right to
further brief the issue. Tr. 887:15–888:8. Because Plaintiffs do not seek to use statements
by Ms. Giest for the truth of their contents, further briefing on this issue is unnecessary.

responded "all of the ones on your dashboard are up to you." Id. at State-Defendants-00270173. He did not provide any specifics on what criteria were more or less helpful, or if any number needed to match. See also PX. 622 at State-Defendants-00224125 ("It is up to each county to work their best practice in how to handle these.").[48] To be clear, Mr. Hallman offered no warning or advice to Ms. Giest about whether to treat as duplicates two registration records with different first and last names.

804.    Mr. Hallman went one step further at trial, testifying that the Secretary of State's office intentionally and as a policy left counties in the dark about how to identify duplicate records. Even if Mr. Hallman was asked whether to treat as duplicates two records with different social security numbers, he insisted: "I'm never going to tell them the answer to that question." Tr. 898:2–6 (Hallman).

805.    Mr. Hallman further explained the reason behind that shocking policy, namely that providing such critical guidance to counties might put him or his colleagues "in a bad position" if their advice turned out to be incorrect

---

[48] Ms. Frechette's and Mr. Hallman's statements were admitted for their truth, but Mr. Reaves's and Ms. Miller's statements were not admitted for their truth. See Tr. 840:23–841:2.

in some way. Tr. 900:2–4 (Hallman). Of course, the properly registered

voter whose record is cancelled in error is sure to be placed in a bad

position—and likely disenfranchised—by the Secretary's chosen policy not

to assist counties in determining whether to cancel a voter teed up by the

Secretary's criteria.

806. The Secretary of State even stands by this policy of refusing to help the

counties when the Secretary's office thinks that the matches that have been

made are incorrect. For example, when Mr. Hallman reviewed the

cancellation of Douglas Miller as a felon, he agreed that Mr. Miller "may

be correct" that he was wrongly cancelled. PX. 1715.[49] But despite agreeing

that Douglas Miller, who had been cancelled, was not the Robert Miller

convicted of a felony, all Mr. Hallman asked was that the county follow up

with the voter "if" the county "decide[d] to reverse the felon status of the

voter." Id.

---

[49] Plaintiffs moved to admit PX. 1715 subject to a Rule 401 objection from Defendants.
Tr. 3104:12–3105:4. The objection is overruled. PX. 1715 is relevant to illustrating the
Secretary of State's policy of refusing help to counties even if employees of the
Secretary's office believe a match was incorrect.

807. Defendants tried in vain to cast doubt on this obvious conclusion during closing arguments, pointing to Melanie Frechette's email in PX. 410. But that email *reinforces*, rather than contradicts, Plaintiffs' point. In that email, a county employee asked Ms. Frechette whether she should merge two duplicates; Ms. Frechette responded, "I agree that it is a duplicate to merge." Id. (She also went on to express enthusiasm for cleaning up lists. Id.) The implication of that email is not, as Defendants suggest, that the Secretary gives advice freely (despite Mr. Hallman's unequivocal testimony to the contrary on the stand). Rather, it shows that although the Secretary of State's office will not intervene to prevent the erroneous cancellation of a voter, it apparently has no trouble encouraging cancellations. The Secretary will never tell a county *not* to cancel a voter, as the emails above show, but Office employees will happily encourage a county to go right ahead and cancel a voter.

808. The way the Secretary of State engages with counties navigating the process of merging and cancelling voter registration records is entirely consistent with the Office's general policy of prioritizing the removal of

voters above ensuring eligible voters stay on the rolls. PX. 2130 at 175:23–24 (Sterling Dep.).[50]

### (e)   The Secretary Refuses to Eliminate Criteria That Produce False Matches.

809.   When pressed for an explanation for persisting with loose criteria that leads to predictable errors, Ms. Frechette claimed that only changes to the laws would have merited changes to the eNet functionalities. Tr. 1329:9–11 (Frechette). In other words, there is no reason to expect the Secretary of State's office to act on its own to reduce the errors associated with registration cancellations and mergers, despite the Secretary's office repeatedly witnessing these errors and their effect on voters.

810.   After all, Mr. Hallman acknowledged that although there had been "discussions" about eliminating the last name, date of birth, race, and gender criterion for the felon matching, the Secretary had decided to retain

---

[50] See Defendants' objections and Plaintiffs' responses at Doc. No. [827-1] at 9. This objection is overruled. *First*, the referenced testimony includes no speculation; to the contrary, it reveals Mr. Sterling's personal knowledge regarding prioritization within the Secretary of State's office as the second-in-command. *Second*, to the extent this testimony touches on Georgia's existing eNet system or its upcoming GaRVIS system, Mr. Sterling has sufficient personal knowledge and foundation given his role as the ultimate decisionmaker for new GaRVIS system features (which necessarily involves familiarity with the current workings of eNet).

that criterion. PX. 1151. Similarly, although the Secretary knows of many instances in which two voters have the same driver's license number (<u>see</u> <u>supra</u> ¶ 769), both the duplicate batch process and the pre-registration duplicate search rely on driver's license number alone as sufficient to tee up two records for cancellation. PX. 50 at 39, 41.

811.   Though the Secretary is unwilling to change its problematic matching criteria, it does possess the power to do so and has done so in the past. For example, Mr. Hallman eliminated an even looser felon match criteria — date of birth and the last four digits of the social security number — because it had created too many "false positives." PX. 365.[51]

### (f)   The Secretary's Processes Promote Non-Uniformity.

812.   One of the Secretary of State's responsibilities is to ensure that there is uniformity in how the counties carry out their elections. Tr. 1830:16–1831:18 (Harvey). The State Election Board, too, has a statutory duty to achieve uniformity in county practices. See O.C.G.A. § 21-2-31(1). This requirement of uniformity means, according to Chris Harvey, that counties

---

[51] The final email on the first page of the document was admitted as a party admission. Tr. 1358:14–1359:4.

should be applying the same procedures with respect to the voter list—
while some counties may choose to provide more help to voters, no
counties should fall below a uniform baseline. Tr. 1835:2–17 (Harvey);
3672:13–3673:12 (Harvey).

813. Despite that, neither the Secretary nor the State Election Board make an
effort to promote uniformity. Tr. 869:19–21 (Hallman).

814. Indeed, as described below, the Secretary's voter roll policies, as seen in
email exchanges with counties and in the Secretary's trainings on the
subject, not only tolerate, but in fact actively condone and promote
disuniformity.

815. The certification materials regarding felon cancellations, for example,
instruct each county to set a standard operating procedure for that county
and follow it. PX. 1769 at 13. Further training regarding felony
cancellations also instructs counties to "[s]et a countywide policy and use
the same policy for each record." PX. 800 at 23. Each county's standard
operating procedure, however, may differ from any other's procedure. Tr.
870:16–19 (Hallman).

816.  Mr. Hallman's and Ms. Frechette's emails to the counties, too, guarantee disuniformity. When Mr. Hallman instructed the counties that all the records on their dashboards were "up to you," he also explained: "The best advice I can give you is to establish a policy and treat all records the same." PX. 541 at State-Defendants-00270173.[52] He told Ms. Geist not to cancel the voter if it made her "uncomfortable" (id.), but Mr. Hallman acknowledged that what makes one person uncomfortable may not make another person uncomfortable. Tr. 890:18–23; see also PX. 622 ("It is up to each county to work their best practice in how to handle these.");[53] Tr. 1352:14–20 (Frechette) ("Q: [T]hat means that you could have 159 different policies, right? One for each county, right, conceivably? A: Yes, conceivably, there could be.").

817.  For its part, the State Election Board is not even aware of the criteria the Secretary of State has established for removing registered voters from the list based on suspected felony convictions or vitals status. Tr. 4048:21–4049:5 (Sullivan); see also Tr. 4049:6–12 (Sullivan).

---

[52] Statements by Mr. Hallman were admitted for their truth, but statements by Ms. Giest were admitted not for their truth. See supra note 47.

[53] This statement by Ms. Frechette was admitted for its truth. See supra note 48.

818.  The Board has heard cases involving voters misidentified as having felony convictions (PX. 2159[54]), yet the Board has not evaluated the accuracy of the felon matching process or whether it is applied uniformly across the state. Tr. 4049:6–12, 4054:16–4056:22 (Sullivan). Nor are at least some members of the Board aware of any policy to prevent the repeated misidentification of voters as being convicted of a disqualifying felony. Tr. 4056:23–4057:1 (Sullivan).

819.  When confronted by a case involving a voter registration record transferred in error, with a voter named Ryan *Christopher* Johnson misidentified as a voter named Ryan *Eugene* Johnson, the Board did not even issue a letter of instruction to the county that made the transfer. Tr. 4038:13–21, 4042:5–10 (Sullivan); PX. 2158 at 23–24.

820.  The Board conceded that the types of errors seen in the cases before it are bound to happen. PX. 2158 at 24 ("[Y]ou are going to find that sort of thing"). And yet the Board has not investigated the burdens associated

---

[54] It is Plaintiffs' understanding that the Court took this document under advisement. See supra note 39.

with how the list of registered voters is maintained because it believes the Secretary of State is responsible for doing so. Tr. 4113:19–24 (Mashburn).

### (g) The Secretary Prioritizes Voter Removal and Its Own Reputation Over Voter Protection.

821. The Secretary takes an aggressive approach to removing voters from the list because having ineligible voters on the rolls is the "bigger concern," from the Secretary's standpoint, than ensuring that all eligible voters can cast a ballot. PX. 2130 at 175:23–25 (Sterling Dep.).[55]

822. Ms. Frechette, for example, expressed enthusiasm for "cleaning up lists" when she helped a county official determine whether to merge two records. Tr. 1321:9–12; PX. 410.

823. Although the Secretary imposes no safeguards on improper duplicate cancellations or changes to voters' records, the Secretary's office has built in not one but two different ways to try to find duplicates. In other words, it takes a belt and suspenders approach to removing duplicates, but no steps at all to protecting voters.

---

[55] See Defendants' objections and Plaintiffs' responses at Doc. No. [827-1] at 9. This objection is not well-founded for the reasons discussed supra note 50.

824.   The Secretary of State's trainings also repeatedly advise county users to "challenge" voters if they are unsure whether the voters are a match. PX. 800 at 14; PX. 1903 at State-Defendants-00068940. The Secretary provides this guidance despite knowing that it places the burden on voters to prove their eligibility before they can vote. Tr. 1328:4–5 (Frechette). And the Secretary does this despite knowing it places on voters the difficult—if not impossible—burden to "prove a negative." Tr. 3739:20–22 (Harvey); see also Tr. 4063:17–19 (Sullivan).

825.   When it comes to answering county employees' basic questions, the Secretary chooses not to because it may put them in "a bad position." Tr. 900:3–4 (Hallman). Instead, the Secretary prefers to let the counties make mistakes so that it "ultimately is going to be on them," and "not going to be on" the Secretary. Tr. 899:21–22 (Hallman). Similarly, instead of resolving obvious and easily fixable errors itself, the Secretary's office waits for the counties to do it, taking the position that "it's much better for the county to do that." Tr. 2243:12–14 (Harvey).

826.   Even the few best practices the Secretary provides have to do exclusively with insulating the Secretary's office from liability in the case of a

disgruntled voter. E.g., PX. 800 at 27 (focusing not on whether the county

made the right decision, but whether it can defend its decision).

827.   Entirely missing from the Secretary of State's consideration is the effect of

these policies on voters, including the known risk that voters could be (and

indeed have been) disenfranchised as a result.

### B.  No State Interest Justifies These Burdens.

828.   The evidence above shows the severe burdens imposed on Georgia's

voters as a result of the Secretary's mismanagement of the voter

registration database. Such severe burdens "must be 'narrowly drawn to

advance a state interest of compelling importance.'" Burdick, 504 U.S. at

434 (quoting Norman v. Reed, 502 U.S. 279, 289 (1992)). Indeed, even if this

Court found that the litany of burdens were only "slight," Defendants

would still need to justify those burdens by showing "relevant and

legitimate interests of sufficient weight." Lee, 915 F.3d at 1318–19.

Defendants hardly attempt to show any state interests in these

procedures—and the few they raise fell flat.

829.   First and foremost, Defendants have not offered a shred of evidence to

show why administering these processes in such an overbroad and

standardless manner serves any legitimate, let alone important, state

interest. Mr. Harvey did not testify as to why the Secretary uses these loose

criteria and impose no restrictions in eNet to prevent obvious mistakes.

Mr. Germany did not testify to that either. Nor did Mr. Sterling. Nor did

Defendants call back Mr. Hallman or Ms. Frechette to testify to the interest

in these processes during Defendants' case in chief. Defendants did not call

a county official to testify that they liked the current loose criteria, and if

so, why. In short, Defendants have merely pointed to their statutory

obligations to maintain the lists and have treated that as justification

enough for the process as currently administered.

830.    Although the state has a valid interest in eliminating voters who are not

eligible to vote, these policies as currently administered do not serve that

interest.

831.    By using loose criteria to identify duplicates, felons, and deceased voters,

the Secretary increases inaccuracy by cancelling eligible voters. This

creates confusion, undermines public confidence in the integrity of

elections, and undermines list accuracy. Perhaps the starkest example of

how the Secretary's processes are compromised by overly broad criteria

and insufficient safeguards is that of the possibility that, for any one given felon record, multiple voters from different counties could be cancelled based on a "pretty loose" match with that one name. Tr. 3726:5–22 (Harvey). Defendants can hardly claim that their system is working to ensure accuracy when, at the same time, it has established a system that would permit an unlimited number of voter records to be cancelled on the basis of a single felony record.

832.  Moreover, by using overly broad criteria, the Secretary, if anything, encourages counties *not* to review all of the potential matches teed up on their dashboards. As Mr. Hallman acknowledged, some counties give up on reviewing the felons altogether because there are too many and they know too few of them will be true matches. Tr. 874:2–3 (Hallman). The Secretary's office cannot truly believe that this criterion is helping to remove people with felony convictions from the voter rolls, if it knows that most matches are not true matches and that some counties ignore it altogether. And the Secretary's office cannot truly believe that counties are meaningfully conducting their own research into each and every potential match, when the Secretary is deliberately flooding the counties' dashboards with thousands of purported matches.

833.   The Secretary also undermines the accuracy of the results by refusing to answer counties' questions or impose basic safeguards prior to cancellation. If the Secretary's desire were to ensure accurate cancellations, the office would readily provide guidance on what identifiers to consider or whether to cancel an ambiguous match, and the team would encode eNet to warn counties before making basic mistakes.

834.   The only specific facet of this process that Defendants sought to defend (albeit only with argument of counsel rather than with witness testimony) was the use of race and gender as criteria in the felon matching process. Tr. 4439:23–4440:22. The obvious inference to be drawn from the Secretary's use of race and gender as criteria in the felon process (and only the felon process) is that the Secretary is using a dragnet to catch as many Black men as possible—regardless of what other information does not match. According to defense counsel (again, not any actual *witnesses* for the defense), this information is important to *narrow* the universe of potential matches, because the felon data from the federal government does not include social security numbers. Id. This argument lacks merit. First and foremost, it is legal argument unsupported by any facts in the record. Second, even on its own terms it makes no sense. If race and gender were

criteria the Secretary found meaningful and helpful in determining

matches, surely the Secretary would use it for all the list maintenance

processes, rather than just felony cancellation (where the overwhelming

majority of Georgia's incarcerated population is Black and male (see supra

¶¶ 729). And third, if the Secretary's office really wanted to winnow down

the number of matches, it would not retain this criterion that it called

"pretty loose" via email and on the stand. PX. 1151; Tr. 872:19–22

(Hallman) ("A lot of those are probably not matches, you know, not true

matches."); Tr. 1359:21–1360:8 (Frechette) ("It brought up a lot of matches

that—a lot of comparisons that would not be matches.").

835.   On the contrary, Dr. Adrienne Jones's testimony provides powerful

evidence of the *real* state interest in this loose criterion. Dr. Jones observed

that historically, states "would codify some criminal activity as felonious,"

because "this create[d] an opportunity to deny a person's right to vote."

Tr. 962:13–15 (Jones). As a result, "[t]here was an increase in the number of

felonies chosen or selected based upon what were presumed to be

common offenses by Black people." Tr. 962:16–18 (Jones).

836.   Indeed, even Mr. Harvey, who sought to justify this loose criterion because counties liked to have their dashboards at zero was forced to acknowledge that "if [a county] had fewer matches that they had to make on the felon front, that would accomplish their goals even more." Tr. 3770:24–3771:3 (Harvey).

837.   Defendants articulated no legitimate state interest justifying these burdensome policies.

* * *

838.   The Court therefore concludes that the voter registration system's pre-registration search for duplicate voter records burdens Georgia voters by resulting in their voter registration information being changed incorrectly based on purported "matches" thanks to an overbroad set of matching criteria. The Secretary causes inaccurate matches by using "loose matches" like placeholder dates of birth and first initials, despite being aware of multiple instances in which voters were harmed as a result of mistakes in this process. The voters burdened often find themselves at unknown addresses, and either have to travel long distances or are disenfranchised as a result.

839.    The Court similarly concludes that the voter registration system's monthly search for duplicate voters results in improper merges of voter registration information and cancellation of voters, once again because it causes county users to merge and cancel records based on the system's identification of duplicates based on overbroad criteria. Here, too, the Secretary uses loose matches despite *knowing* that one-digit typographical errors in driver's license numbers can lead to improper merges and cancellations. These voters, too, can find themselves unable to vote altogether, or registered at another voter's address.

840.    The voter registration database also allows for the improper cancellation of registered voters as purported felons ineligible to vote, based on the application of overbroad matching criteria. These loose criteria result in tens of thousands of voter registrations being cancelled, including many that the Secretary knows are inaccurate.

841.    Finally, the voter registration system results in voters improperly being cancelled on the grounds that they are deceased, once again due to the application of overbroad matching criteria.

842.   Each of these processes substantially burden Georgia voters who find their voter registrations cancelled or their voter registration information, such as their registration address, changed when they go to vote.

843.   No state interest justifies these burdens, as each of these processes *promote*, rather than guard against, inaccuracies in the database. Defendants presented no evidence to justify any of these loose criteria and lack of safeguards—likely because there can be no state interest in allowing such a high rate of error to permeate these processes. If Defendants were truly interested in administering orderly elections, keeping lists accurate, and promoting public confidence in elections, surely they would impose the reasonable safeguards Plaintiffs request. Instead, the voter registration database adjusted and maintained by the Secretary of State's office lacks obvious safeguards that would minimize these errors and the corresponding burdens on voters, and the Secretary has affirmatively refused to take steps to standardize these processes to reduce the number of incorrectly impacted voters. There is no state interest in overly broad criteria with a corresponding lack of safeguards; to the contrary, these database errors undermine public confidence in elections and the accuracy of the voter registration list.

## ABSENTEE BALLOTS

844.   Plaintiffs contend that Defendants are responsible for adequate training of county election officials, that Defendants' training in absentee ballot cancellation procedures is inadequate, and that this deficiency has caused voters to be severely burdened when trying to vote in person after having requested absentee ballots. Plaintiffs assert that Defendants' failure to train on absentee ballot cancellation procedures violates the fundamental right to vote and generates a lack of adequate statewide standards in violation of the Equal Protection Clause of the Fourteenth Amendment.

845.   Georgia law permits a person who has requested an absentee ballot to vote in person as long as the voter has not received the ballot, has the ballot in the voter's possession, has not returned the ballot, or has returned the ballot but the ballot has not yet been received by the county registrars. O.C.G.A. § 21-2-388. The procedures for cancelling absentee ballots vary depending on whether voters bring or do not bring their absentee ballots with them to the polling place. See id.

846.   Plaintiffs' claim here focuses mainly on absentee ballot procedures related to voters who want to cancel their absentee ballots so they can vote in

person but do not have their absentee ballots with them at the polling place. This situation can arise, for example, when a voter has requested an absentee ballot but has not received the absentee ballot in time to cast it and have it counted.

847. Plaintiffs assert that Defendants' inadequate training of county election superintendents and registrars means county election personnel do not know the correct procedures for cancelling absentee ballots, causing voters not to be able to vote at all or to be able to vote only after significant effort.

848. Plaintiffs provided substantial evidence in support of their claim, including the testimony of Chris Harvey, the former director of the Secretary's Election Division, acknowledging that a number of Secretary of State training materials set forth incorrect procedures for cancelling absentee ballots; the testimony of eight voter witnesses burdened by absentee ballot cancellation issues;[56] training materials the Secretary provided to county election officials and poll workers; the unrebutted

---

[56] Witnesses who testified how this issue burdened voters include the following: Aria Aaron (PX. 2057 (Aaron Dep.)); Deborah Allen (Tr. 623–648); Patricia Andros (Tr. 2690–2709); Dayle Bennett (Tr. 2709–2724); Saundra Brundage (Tr. 1236–1253); Emily Huskey (Tr. 1141–1168); Aaron Karp (Tr. 601–622); Margaret Whatley (PX. 2050 (Whatley Dep.)).

testimony from expert witness Kevin Kennedy about the inadequacy of

Defendants' training and the causal connection between inadequate

training and burdens placed on voters; numerous complaints received by

the Secretary of State and the State Elections Board regarding problems

voters experienced when trying to cancel their absentee ballots and vote in

person; and the testimony of State Elections Board members.

849.   For the reasons discussed below, the Court finds that Plaintiffs have

carried their burden of proof on their claims regarding inadequate training

as to absentee ballot cancellation procedures.

    **I)**    **Inadequate Training on Absentee Ballot Cancellation Is Traceable to and Redressable by Defendants.**

850.   The Court first addresses whether Plaintiffs' absentee ballot cancellation

claim satisfies the traceability and redressability prongs of standing. <u>See</u>

<u>supra</u> ¶¶ 34–47.

851.   As a threshold matter, Defendants previously "concede[d] that they are

statutorily responsible for training of superintendents and registrars.

Indeed, at the summary judgment hearing, Defendants' counsel agreed

that a failure-to-train claim regarding the training of superintendents and

registrars would not present a jurisdictional issue." Order at 52, Feb. 16, 2021, Doc. No. [612].

852.   Defendants are correct that their statutory responsibilities regarding the training of county election superintendents and registrars make Plaintiffs' absentee ballot cancellation claims traceable to and redressable by Defendants.

### A. The Secretary of State Is Responsible for Training the State's Counties on the Cancellation of Absentee Ballots.

853.   Georgia law provides that the "Secretary of State shall . . . conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections." O.C.G.A. § 21-2-50(a)(11).

854.   More specifically, state law requires the Secretary to train county election officials both early in those officials' tenure and on a continuing basis thereafter. Under O.C.G.A. § 21-2-101(a), "[a]ll county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations of such board

shall become certified by completing a certification program approved by the Secretary of State within six months following their appointment." This certification "may include instruction on, and may require the superintendent to demonstrate proficiency in, . . . state and federal law and procedures related to elections." Id.

855.   State law also provides that "[t]he election superintendent and at least one registrar of the county or, in counties with boards of election or combined boards of election and registration, at least one member of the board or a designee of the board shall attend a minimum of 12 hours' training annually as may be selected by the Secretary of State." O.C.G.A. § 21-2-100(a). The Secretary of State office either selects or approves the trainings used for this annual training requirement. See Tr. 1874:11-18 (Harvey).

856.   In tandem with these requirements imposed directly on the Secretary of State, state law requires county election superintendents to provide training to their election personnel, including poll workers. See O.C.G.A. § 21-2-99(a).

857.   Former Election Division Director Chris Harvey testified that this training structure is a "train the trainer" scenario. Tr. 1871:8-22 (Harvey). Secretary

of State employees train county election superintendents and registrars who in turn train their local personnel. Id. Under this structure, the Secretary's training of county officials lays the groundwork for the entire training system. As articulated by the Secretary of State's office, "to ensure the smooth operation of safe, accessible, and fair elections[,] [p]roper training of everyone involved in the elections process is fundamental." PX. 994 at 22 (Secretary of State 2018 Transition Memo);[57] Tr. 1863:21-25 (Harvey).

858.   The train-the-trainer approach is successful only if the initial training is accurate and adequate. As Mr. Harvey acknowledged, "if the county superintendents and registrars are not adequately trained or well trained in terms of absentee ballot procedures or absentee ballot cancellation procedures, they don't have the knowledge they need to turn around and train their personnel." Tr. 1873:19-25 (Harvey).

859.   One of the Secretary's responsibilities is to ensure uniformity in how counties carry out their legal duties. Tr. 1830:12-20 (Harvey) (agreeing that

---

[57] The transition memorandum for the Elections Department, which appears at pages 22–28 of PX. 994, was admitted without objection.  See supra note 36.

one of the roles of the Secretary of State is to ensure uniformity in following the law). Uniformity includes all counties following the absentee ballot cancellation procedures required by law. Tr. 1835:21-23 (Harvey).

860.   In addition to his responsibilities regarding uniformity, the Secretary is charged with ensuring that elections in Georgia are safe, accessible, and fair. PX. 994 at 22 (mission of the Elections Division).

861.   Mr. Harvey testified that training is "an important component" both for achieving uniformity and for having safe, accessible, and fair elections. Tr. 1865:7-10 (Harvey). With respect to absentee ballot cancellation training in particular, Mr. Harvey acknowledged that, given the record-breaking number of absentee ballot requests in 2020 and the fact that many people did not receive their absentee ballots in time to be able to vote them by mail, it was particularly important that training regarding absentee ballot cancellation processes was clear. Tr. 2121:24–2123:22 (Harvey).

862.   Plaintiffs also presented trial testimony from Kevin Kennedy, an expert on election administration and training. Mr. Kennedy was the chief election officer in Wisconsin for over 33 years. Tr. 2820:12-17 (Kennedy). In this capacity, he administered "all state and federal elections in Wisconsin,"

including "developing training materials and conduct[ing] training sessions for local election officials" and "implementing state and federal laws with respect to election administration." Tr. 2820:23–2821:7 (Kennedy). Mr. Kennedy has experience training individuals at the national, state, county, municipal, and poll worker levels. Tr. 2824:2-7 (Kennedy). He also has worked with several national organizations, including the National Association of State Election Directors, the Election Center, the United States Election Assistance Commission, the Center for Election Innovation and Research, the Pew Research Center, the Massachusetts Institute of Technology Election Data Sciences Lab, the Federal Election Commission state and local election officials advisory committee, and a National Academy of Sciences, Engineering, and Medicine working group for election security issues. Tr. 2825:19–2836:2 (Kennedy).

863.    The Court found Mr. Kennedy qualified as an expert to render the opinions he provided at trial. Tr. 2845:16-25, 2847:9-11 (Kennedy) (Court discussion of order).

864.   Mr. Kennedy testified to the significant effect training has on outcomes for voters. He testified that inadequate training regarding absentee ballot cancellation procedures will leave local election officials "floundering," and voters encountering "different treatment" depending on whether the local officials they are interacting with received adequate training. Tr. 2864:3–21 (Kennedy).

865.   As discussed below, and consistent with Mr. Kennedy's testimony, the evidence Plaintiffs presented regarding burdens on Georgia's voters illustrates the consequences of Defendants' inadequate training.

### B. The State Elections Board Is Also Responsible for Burdens on Voters Caused by Absentee Ballot Cancellation Processes.

866.   The State Elections Board members share responsibility for the ultimate adequacy of training on absentee ballot cancellation processes. Under state law, the State Elections Board is required to promulgate rules that ensure elections are run fairly and in a uniform fashion. Tr. 1838:17-24 (Harvey); 3672:12-3673:7 (Harvey); see also O.C.G.A. § 21-2-31.

867.   The Board is also required to distribute explanatory materials regarding the interpretation or application of election laws. O.C.G.A. § 21-2-31(4).

Even more broadly, the Board is required to take "all other action," consistent with the law, that it deems "conducive to the fair, legal, and orderly conduct of primaries and elections. O.C.G.A. § 21-2-31(10).

868. The Board is specifically authorized to promulgate rules and regulations that "may include provisions related to additional or remedial training or the limitation, suspension, revocation, or reinstatement of a superintendent's certification issued by the Secretary of State." O.C.G.A. § 21-2-101(f). Moreover, in 2021, the Georgia Election Code was amended to authorize the State Election Board to, on its own motion or on the request of other specified entities, pursue extraordinary relief to suspend a county or municipal superintendent if at least three members of the Board find, after notice and hearing, that the county official has completed at least three violations of the Election Code or State Election Board rules and regulations in the last two general election cycles and has not sufficiently remedied the violations, or the official has, for at least two elections within a two-year period, demonstrated nonfeasance, malfeasance, or gross negligence in the administration of the elections. O.C.G.A. § 21-2-33.2(c).

* * *

869. Given the statutory responsibilities of the Secretary of State and State Election Board, the Court concludes that Plaintiffs' inadequate training claim is traceable to and redressable by Defendants.

## II) Defendants' Inadequate Training on Absentee Ballot Cancellation Procedures Violates the Fundamental Right to Vote.

870. To meet their burden on their fundamental right to vote claim with respect to absentee ballot cancellation training, Plaintiffs must show that Defendants' failure to adequately train county election officials about absentee ballot cancellation procedures causes burdens on voters that are not outweighed by legitimate state interests that justify those burdens. See supra ¶¶ 48–55.

871. Plaintiffs have met their burden. The evidence adduced at trial shows the Secretary's training of county election superintendents and supervisors regarding absentee ballot cancellation procedures is not just inadequate, it is wrong; voters have been burdened by election personnel not knowing what the correct cancellation procedures are; and Defendants have no legitimate state interest in training being inadequate or incorrect, much less an interest that justifies these burdens.

## A. Training is Especially Important in the Context of Absentee Ballot Cancellation Procedures.

872.   The process for cancelling absentee ballots has changed during the pendency of this case. Prior to HB 316's passage in April, 2019, Georgia law required, in pertinent part, that voters who had requested absentee ballots but went to the polls to vote in person and did not have their absentee ballots with them needed to appear before the county registrar, deputy registrar or absentee ballot clerk to cancel their absentee ballots. O.C.G.A. § 21-2-388(2) (2007), amended by 2019 Ga. Laws 24 (HB 316).

873.   The Secretary knew that counties engaged in varying practices for cancelling absentee ballots under the pre-HB 316 regime. Tr. 2109:22–25 (Harvey). For example, some counties required voters to go to the main election office to have their absentee ballots cancelled and then return to the polling place to vote. Tr. 2110:16–18 (Harvey). Other counties deputized polling place personnel to serve as deputy registrars who could cancel voters' absentee ballots at the polling place. Tr. 2110:9–15 (Harvey). In still other counties, as shown below, voters were not allowed to vote at all if they did not have their absentee ballots with them.

874.    Saundra Brundage, who testified at trial, is a good example of this. Ms.

Brundage was disenfranchised in the 2018 general election. Ms. Brundage,

a retired DeKalb County resident with limited mobility, lives in a senior

living facility. See Tr. 1238:23-25 (Brundage). Because she never received

the absentee ballot she requested for the 2018 general election, on Election

Day she took a shuttle from her facility to the polling place. Tr. 1240:7-8,

1241:1-5 (Brundage). When Ms. Brundage checked-in, the poll worker

asked for her absentee ballot and Ms. Brundage responded that she never

received it. Tr. 1240:20-25 (Brundage). The poll worker then told her,

incorrectly, that she could not vote because she did not have her absentee

ballot. Tr. 1241:14-24 (Brundage).[58] The poll worker recommended that Ms.

Brundage speak to another person working at the polling place, but that

person was pacing around the polling place talking on the telephone. Tr.

---

[58]  The Court permitted Ms. Brundage to testify to the poll worker's statements but
ruled that the statements would not be admitted for the truth of the matter asserted. Tr.
1246:3–6, 1249:10–16. Plaintiffs do not offer the poll worker's statements for the truth of
the matter asserted. Plaintiffs offer the poll worker's statements as context for Ms.
Brundage's course of conduct, that is, to explain why Ms. Brundage left the polling
place without voting. As a secondary point, the poll worker's statement that Ms.
Brundage could not vote is not a true statement. It is an inaccurate statement. The poll
worker's statement therefore does not fall within the definition of hearsay. See Fed. R.
Evid. 801(c).

1239:16–1242:14 (Brundage). After waiting for about 15 minutes to speak with him, Ms. Brundage had to leave because the shuttle to her residential facility was departing and she could not walk home. Tr. 1250:7-15 (Brundage). Ms. Brundage was unable to vote in the 2018 general election. Tr. 1250:7-21 (Brundage).

875.   Emily Huskey, a Fulton County resident who is a dietician working with cancer patients by day and a law student at night, *see* Tr. 1142:25–1143:1, 1144:9–18 (Huskey), was also burdened in the absentee ballot cancellation process. Motivated by a desire to protect her immunocompromised patients, Ms. Huskey requested an absentee ballot for the 2018 general election, but it never arrived. Tr. 1146:4–24 (Huskey). Thus, Ms. Huskey made a plan to vote in-person. Tr. 1146:25–1147:3 (Huskey). When she arrived at her polling place, the poll worker at the check-in desk told Ms. Huskey, incorrectly, that Ms. Huskey could not vote because she had requested an absentee ballot. Tr. 1149:13-17 (Huskey).[59] In response, Ms.

---

[59]  As above, Ms. Huskey's recounting of what the poll worker told her is admitted not for the truthfulness of the statement, but to show the response and explain Ms. Huskey's conduct and her reason for needing to request an affidavit from the poll worker. *See* Tr. 1148:20–22 (ruling on objection and holding statement was not admitted for truthfulness, but to show the response of the witness).

Huskey requested an affidavit so that she could attest she had not voted absentee previously. Tr. 1151:6-21 (Huskey). The poll worker never offered her an affidavit in order exercise her right to vote. Id. Ms. Huskey was therefore able to vote only because she insisted on the affidavit. Id.

876.   When HB 316 was passed, it changed the absentee ballot cancellation procedure by providing, in essence, that voters who want to vote in person but do not have their absentee ballots with them need not go to the main election office to cancel their absentee ballot. Rather, someone at the polling place can call the registrar's office and obtain approval to cancel voters' absentee ballots. See O.C.G.A. § 21-2-388 (effective Apr. 2, 2019).

877.   Despite the passage of HB 316, voters continue to be burdened because the Secretary does not train county officials adequately about the post-HB 316 statutorily prescribed procedures for cancelling absentee ballots. Under the circumstances, the preexisting problem of nonuniform cancellation processes across the state should have led the Secretary to step up its training once the new procedure was enacted to ensure that voters did not continue to be unduly burdened or treated differently depending on where they try to cast their vote.

### B. Defendants Have Failed to Train Local Officials Adequately on Absentee Ballot Cancellation.

### (1) Critical Training Materials Either Include Incorrect Instructions or Omit Discussion of Absentee Ballot Cancellation Entirely.

878. As described above, the Secretary is statutorily required to handle the certification of county election superintendents and registrars, which must happen within six months of those officials taking their jobs. The Secretary is also responsible for the training materials to be used in that certification process. See supra ¶¶ 332–334.

879. The Secretary requires county superintendents and registrars to take a certification course within six months following their appointments. O.C.G.A. § 21-2-101(a); Tr. 1865:22-1866:2 (Harvey). This consists of several different self-directed, online courses that are followed by quizzes, with a hands-on training regarding voting machines. Tr. 1880:1–24 (Harvey). County superintendents and registrars must take that training and pass the quizzes in order to be certified. Id.

880. Other than a cybersecurity training course the Secretary requires certain county personnel to take annually, the certification training is the only

Secretary of State training that is mandatory for county superintendents and registrars to take. Tr. 1881:7–10 (Harvey).

881.   Mr. Harvey testified repeatedly about the particular importance of training county election officials whenever a relevant election law changes. See Tr. 1829:1–8 (Harvey) (acknowledging counties look to the Secretary for guidance when there are changes); Tr. 1889:11–12 (Harvey) (noting a special focus on changes in law or procedure).

882.   But in three different sets of Secretary of State certification course materials that were prepared after HB 316 was passed, the only instruction that is provided about how to cancel absentee ballots is two PowerPoint slides that quote the pre-HB 316 version of the absentee ballot cancellation statute. See PX. 1027 at State-Defendants-00101293-94 (GEOC #8: Absentee Ballot Procedures); PX. 1765 at 27-28 (same); DX. 328 at 25-26 (GROC #8: Absentee Ballot Procedures).

883.   Mr. Harvey acknowledged that these Secretary of State certification training materials are incorrect. Tr. 2103:22-2105:20 (Harvey) (confirming these trainings included the pre-HB 316 version of the statute); see also Tr.

3700:20–3701:17 (Harvey) (describing this as a "mistake"). Defendants

proffered no certification materials showing that they had been corrected.

884.   Defendants' response to the mandatory but incorrect certification materials

is to say those materials are not important because only new

superintendents and registrars, not experienced election officials, would

have seen the incorrect materials. See Tr. 2120:16–2121:12 (Harvey).

Despite their access to and knowledge about county election

superintendents and registrars, Defendants proffered no evidence to

substantiate that only an inconsequential number of county

superintendents and registrars were trained with the incorrect certification

materials during the more-than-three-year period since HB 316 was

passed. See Tr. 4466:8-23. Nor does Defendants' argument address the

voters living in counties whose superintendents or registrars were

incorrectly trained by the Secretary about absentee ballot cancellation

procedures.

### (2)   The Secretary's Other Post-HB 316 Training Materials Regarding Absentee Ballot Cancellation Procedures Are Inadequate.

885.   Evidence at trial also included two optional training presentations available to county superintendents and registrars in which post-HB 316 absentee ballot cancellation procedures were referenced. See PX. 1076; PX. 1189. Although these presentations, unlike the Secretary's certification materials, are not inaccurate about absentee ballot cancellation procedures, they provide little, if any, meaningful information.

886.   The first of these two presentations, PX. 1076, is a March 2019 presentation made when HB 316 was on the verge of becoming law. The purpose of the presentation was to address HB 316's provisions. But, with respect to absentee ballot cancellation procedures, the presentation provides no information whatsoever as to how HB 316 would change these procedures. See PX. 1076 at 26 (Presentation regarding Legislation and Litigation HB 316, by Kevin Rayburn); Tr. 2134:11-18 (Harvey) (confirming there was nothing in the presentation discussing how HB 316 would change the absentee ballot cancellation procedure).

887.   Mr. Harvey speculated at trial that perhaps the presenter of the training provided commentary that identified how the absentee ballot cancellation procedures would be different under HB 316 but, when pressed, Mr. Harvey admitted that he has no recollection of what the presenter said about these training slides. Tr. 2134:15–2135:5 (Harvey).

888.   In September 2019, the Secretary offered another training presentation that touched briefly upon absentee ballot cancellation procedures under HB 316. See PX. 1189 (presentation regarding Absentee by Mail Updates and Review, by Melanie Frechette). But this training treated the topic of absentee ballot cancellation in a cursory manner toward the end of the presentation. Id. at 23–25.

889.   The Secretary's second training gives absentee ballot cancellation procedures short shrift despite the Secretary's awareness that, just a few months earlier, an election in Webster County had been nullified because the county election superintendent there—an election official the Secretary was responsible for training—did not know the proper procedures for cancelling absentee ballots. In the Webster County situation, voter Mildred Russell tried to cancel her absentee ballot in order to vote three different

times, with no success. PX. 1589 (Voter Complaint—admitted for truth); PX. 1149, at 2-4 (Aug. 1, 2019 Report of Investigation). The Webster County Election Supervisor told the Secretary's investigators that she believed a voter who had been sent an absentee ballot needed to bring the absentee ballot to the county office. <u>See</u> PX. 1149, at 3. Because Ms. Russell was not permitted to vote, the election was nullified. PX. 1131 (consent order).

890.   Mr. Harvey admitted that not even this dramatic example of what can happen if a county superintendent does not know the correct procedures for cancelling an absentee ballot caused the Secretary to reassess the adequacy of his training about absentee ballot cancellations. Tr. 2151:1-10 (Harvey) ("Q. And this training doesn't give any extra emphasis to cancellation of absentee ballots despite what the Secretary of State knew had just happened in a county where an entire election was nullified because of one absentee ballot cancellation problem, correct? A. Correct."). PX. 1149, at 2-4 (Aug. 1, 2019 Report of Investigation). Nor did this case prompt the State Elections Board to provide instruction to other counties. Tr. 4131:5–10 (Mashburn).

891.   Mr. Harvey also did not recall the Secretary of State informing county

superintendents and registrars about the correct absentee ballot

cancellation procedures by simply emailing them an Official Election

Bulletin. Tr. 2147:10–2148:15 (Harvey). And Defendants did not proffer any

such Bulletin at trial. See Tr. 2124:2-20 (Harvey) (stating that he did not

recall sending an Official Election Bulletin addressing this issue); Tr.

4019:3-7 (Sullivan) (acknowledging the State Elections Board did not

instruct the Secretary of State to issue an Official Election Bulletin about

absentee ballot cancellation procedures).

892.   Mr. Harvey further acknowledged that had he sent an Official Election

Bulletin about the new absentee ballot cancellation procedure, he could

also have instructed the counties to confirm that they had read and

understood the Bulletin, and that they had trained or would train their

personnel, including poll workers, about the new procedures. But he did

not do so. Tr. 2148:2–15 (Harvey).

893.   The Secretary of State's lack of attention to training about absentee ballot

cancellation procedures is also shown by two "Poll Worker Manuals" the

Secretary made available for the 2020 elections and the January 5, 2021

runoff. The 2020 Poll Worker Manual recited the pre-HB 316 process for absentee ballot cancellation even though HB 316 had gone into effect in 2019, a year earlier. PX. 1270 at 98; Tr. 2115:22–2116:13 (Harvey) (agreeing that "in this troubleshoot section of the poll worker's manual for 2020 . . . it contains the wrong instructions"); Tr. 3552:25–3553:5 (Harvey) (confirming HB 316 went into effect in 2019).

894.  The Secretary's other poll worker manual for the 2020 election cycle eliminated all information about how to cancel absentee ballots. PX. 1282 (April 2020 Poll Worker Manual); Tr. 2117:11–2118:10 (Harvey) (confirming PX. 1282 provides no instruction to poll workers about how to cancel an absentee ballot at the polls).

895.  It was not until May, 2021, a full two years after HB 316 went into effect, that the Secretary updated its Poll Worker Manual to include the post-HB 316 absentee ballot cancellation instructions. PX. 1315 at 55–56; Tr. 2131:15-21 (Harvey) ("Q. So May of 2021, as far as you know, is the first time the Secretary of State had corrected the poll worker manual to reflect the correct instructions, correct? A. I believe so.").

896.   Defendants, however, did not inform counties that both of the 2020

versions of the manual were incorrect and did not tell counties to use the

May 2021 edition. Tr. 2132:4-12 (Harvey) ("Q. The Secretary of State didn't

notify the counties, did it, to let them know that they had made an error in

earlier poll worker manuals, but it now has been corrected? A. Not that

I'm aware of, or while I was there, I don't think").

### (3)   Defendants Have No Knowledge of How County Officials Are Applying Their Training on Absentee Ballot Cancellation.

897.   Compounding the above deficiencies in their training of local officials, and

despite relying on a train-the-trainer approach, Defendants do not know

how county superintendents are training their workers on absentee ballot

cancellation procedures. See Tr. 1897:22–1898:8 (Harvey) (confirming that

the Secretary of State's office does not know what training materials

county officials use to train their poll workers, including specifically with

respect to absentee ballot cancellation); Tr. 2131:16–2132:3 (Harvey)

(confirming that the Secretary of State's office does not know "one way or

the other" whether counties use the Poll Worker Manual to train their poll

workers); Tr. 4113:1-7 (Mashburn) (confirming the State Elections Board

has not taken any action to determine is absentee ballot cancellation

procedures are being conducted in a uniform way across the state); Tr.

4033:19-24 (Sullivan) (confirming no familiarity with the details of training

on cancellation absentee ballots).

898.   The Secretary does not require counties to show the Secretary's office their

training materials, nor does the Secretary generally approve or review any

county training materials. Tr. 1898:9–1898:17 (Harvey) (confirming that

county training materials for poll workers are not reviewed by the

Secretary's office).

899.   Indeed, the Secretary has no process to ensure counties conduct any kind

of absentee ballot cancellation training at all. See Tr. 1889:18–1890:9

(Harvey) (acknowledging that county officials need to certify that they

have trained poll workers, but do not need to specify what they trained

them on); Tr. 3671:9-20 (Harvey) (confirming that the certifications do not

cover the content of trainings).

900.   Taken together and individually, all of these failures have contributed to

burdens on voters as a result of improper absentee ballot cancellation

practices.

### C. Georgia Voters Have Been Burdened by the Defendants' Failure to Train County Officials on the Absentee Ballot Cancellation Process.

901.   This Court explained in its summary judgment order that disparate and unpredictable absentee ballot cancellation requirements cause more than an ordinary burden on voters' First and Fourteenth Amendment rights. See Order at 33, March 31, 2021, Doc. No. [617].

902.   Plaintiffs have presented evidence that these burdens continue. The trial evidence shows that Georgia voters attempting to cancel absentee ballot requests in person must frequently deal with more than the "ordinary" burden of going through the statutory process outlined in O.C.G.A. § 21-2-388. Moreover, the evidence shows that these problems are a predictable and avoidable result of the inadequate training discussed above.

903.   Kevin Kennedy and Chris Harvey both testified that a causal connection exists between inadequate training and burdens on voters' ability to vote. Chris Harvey testified that "if county election personnel aren't well trained, that would probably turn into a problem that the Secretary of State will get a complaint about." Tr. 3704:17–21 (Harvey). He also acknowledged that when he was the director of the Elections Division, he

identified training problems as connected to problems voters were experiencing. Tr. 3704:6–16 (Harvey); see also Tr. 3707:13-3708:2 (Harvey) (saying voter complaints allow election officials to identify potential problems, including with the adequacy of their training). And he testified that training is an important component for having safe, accessible and fair elections. Tr. 1865:7-10 (Harvey).

904. The Webster County case underscores the point. The county election superintendent, whom the Secretary is responsible for training, said she did not allow Ms. Russell to vote because she (the superintendent) was unaware of the correct procedures for cancelling absentee ballots. PX. 1149 at 3-4.

905. Ms. Russell in Webster County was not the only voter affected by election personnel who did not know the correct procedures for cancelling absentee ballots after HB 316 was passed.

906. For the June 2020 primary, Aaron Karp of DeKalb County intended to vote by absentee ballot. Tr. 603:17-19 (Karp). Mr. Karp received his absentee ballot but misplaced it, and so he decided to go to his precinct to vote in-person. Tr. 603:25–605:1 (Karp). Upon arriving at his precinct and

explaining his situation to the poll workers, the precinct's poll workers appeared confused. Tr. 606:19–607:3 (Karp).[60] After consulting with the polling manager, Mr. Karp was given an affidavit to sign, but was still improperly forced to vote by provisional ballot. Tr. 612:15–613:1, 614:13-17 (Karp).

907.   Deborah Allen, a Fulton County resident, twice requested an absentee ballot for the June 2020 primary. Tr. 626:18-627:25 (Allen). Her absentee ballot never arrived so she decided to vote in-person at her polling location. Tr. 626:18–628:23 (Allen). At the FanPlex location, Ms. Allen was told by the poll worker at the check-in table to sit in a waiting area because Ms. Allen did not have the absentee ballot she had never received. Tr. 634:3–635:3 (Allen). After a forty-minute wait and several interactions with poll workers, Ms. Allen was allowed to vote a provisional ballot only. Tr. 635:6–639:7 (Allen).

---

[60]  The Court held at trial that the poll workers' response was not offered for the truth of the matter but rather to show what the poll worker said. Tr. 605:19–24. The Court further allowed Mr. Karp to testify as to his observations of the poll workers' apparent confusion, but not based on anything that the poll workers said; he could also testify to subsequent observation of poll workers' actions in giving him a provisional ballot. Tr. 606:12–14, 614:3–5.

908.    Margaret Whatley of Muscogee County sought to cancel the absentee

ballot she received for the November 2020 general election. PX. 2050 at

21:8-12 (Whatley Dep.).[61] Ms. Whatley brought her absentee ballot with

her, which is not required, but still had to wait for more than an hour as

the poll workers proved unable to handle her absentee ballot cancellation

request. PX. 2050 at 23:11–24:4 (Whatley Dep.). Ms. Whatley spoke to the

head poll worker, but was still unable to cancel the absentee ballot she had

in-hand to vote in person. PX. 2050 at 24:8-16 (Whatley Dep.). Ultimately,

she left because she had to begin her workday, and she dropped off her

absentee ballot at a ballot dropbox. PX. 2050 at 24:10-16, 27:18–28:2

(Whatley Dep.).

909.    Dayle Bennett of Fulton County received an absentee ballot for the

September 2020 special election, although she never requested one for that

election. Tr. 2713:4-17 (Bennett). When she arrived at her voting precinct,

the poll worker told her she could either bring in her absentee ballot to be

---

[61] For Defendants' objections and Plaintiffs' responses to portions of Ms. Whatley's
deposition, see Doc. No. [760-13].

destroyed or vote provisionally. Tr. 2717:9-17 (Bennett).[62] Ms. Bennett was not allowed to cancel her ballot in person at the polling place, but instead had to go home and retrieve the ballot, and only then was she able to vote. Tr. 2720:8–13 (Bennett).

910.   Patricia Andros of Cobb County planned on voting in person in the June 2020 primary. Tr. 2694:12-17 (Andros). She never requested an absentee ballot, but received one regardless, three days before Election Day. Tr. 2694:18–2695:2 (Andros). Ms. Andros brought her absentee ballot to the polling place with her, but was incorrectly instructed to vote provisionally. Tr. 2695:22–24, 2696:5-24 (Andros).

911.   Aria Aaron of Clayton County was attending graduate school in Los Angeles at the time of the November 2020 general election and so she requested an absentee ballot. PX. 2057 at 24:14-19 (Aaron Dep.). When the ballot did not arrive, she undertook significant efforts to fly home to Georgia to vote. PX. 2057 at 27:3-7, 28:11-16 (Aaron Dep.). [63] At her polling

---

[62]  Defendants' counsel ultimately withdrew his objection to Ms. Bennett's statement that she was told by a poll worker that she could either bring her ballot with her or vote provisionally.  See Tr. 2719:18–20.

[63]  Defendants' objection to lines 27:3–7 from Ms. Aaron's deposition on the grounds of "Hearsay, F.R.E. 802," is not well taken. See Doc. No. [760-1] at 3. This testimony

place, a poll worker instructed her that because she had submitted an absentee ballot, Ms. Aaron might not be able to vote. Only after Ms. Aaron pushed back, knowing her right to cancel her absentee ballot and vote, did the poll worker get assistance from an individual whom Ms. Aaron believed was the location supervisor. PX. 2057 at 29:17–30:23 (Aaron Dep.).[64] Ms. Aaron was then able to sign an affidavit and vote. Id. Ms. Aaron and her sister had researched in advance how to respond to questions about cancelling her absentee ballot, and this enabled her to exercise her right to vote. PX. 2057 at 40:16–41:9 (Aaron Dep.).[65]

---

describes Ms. Aaron's actions in flying back to Georgia to vote with the help of a classmate.

[64] Defendants' objection to this passage from Ms. Aaron's deposition on the grounds of "Speculation/Lack of Foundation, F.R.E. 602" is not well taken. See Doc. No. [760-1] at 3. As Plaintiffs correctly argue, this testimony responded to a direct question from Defendants and describes Ms. Aaron's personal experience voting. Nor is it speculative; Ms. Aaron is simply recounting her experience initially pushing back when the poll worker told her she could not vote, only after which did the poll worker bring over the poll manager or supervisor.

[65] Defendants' objection to this passage from Ms. Aaron's deposition on the grounds of "Speculation/Lack of Foundation, F.R.E. 602" is similarly not well taken. See Doc. No. [760-1] at 5. Ms. Aaron testified that she and her sister had independently researched what to do in her situation, which is the reason she asked to be able to cancel her ballot. Plaintiffs are correct that this is not speculative or lacking in foundation because Ms. Aaron is describing her own experience; this experience is directly relevant to whether Ms. Aaron would have known to ask about cancelling her absentee ballot without such research.

912.   These voters' experiences show that voters continue to be burdened by

non-uniform and incorrect absentee ballot cancellation practices. Those

burdens range from being turned away from the polls to being required to

vote provisionally to being forced to wait for long time periods. There is no

threshold number of affected voters necessary to find that these burdens

exist. <u>See</u> <u>supra</u> ¶ 54 (no requirement that Plaintiffs show that the burden

is "widespread and systemic").

### D. The Secretary Does Not Adjust Training to Address Recurring Problems on Absentee Ballot Cancellation.

913.   The Secretary of State has no apparent inclination to adapt trainings to

address recurring problems. As discussed in this section, the Secretary

lacks critical metrics to assess the effectiveness of training on a statewide

basis, a problem that is born out in the context of absentee ballot

cancellation in particular. Moreover, the Secretary has responded in a

patently unreasonable fashion to repeated complaints on this precise issue.

914.   Metrics to assess the effectiveness of training are a necessary way to

determine whether the county officials the Secretary trains are

understanding the Secretary's training, which in turn is the only way to

ensure those county officials are able to train other people. Tr. 1895:23–1896:2 (Harvey).

915.   The Secretary acknowledges the importance of metrics. In the Secretary's job description for the training administrator for the Elections Division, the Secretary identifies as an essential duty of the training administration the "develop[ment] of metrics to measure the success of training." PX. 2002 at 18–19 (Job Description for Elections Training Administrator).

916.   Mr. Harvey testified, however, that the Secretary has not developed any such metrics. See Tr. 1892:5-7 ("Q. Now the Secretary of State hasn't developed any metrics to measure the success of its training, has it? A. I don't believe so no.").

917.   According to Mr. Kennedy, the Secretary's failure to have metrics in place to assess training means the Secretary cannot ensure that his training is sufficient. Tr. 2871:2–2872:6 (Kennedy).

918.   Mr. Kennedy opined that voter complaints are an important metric for gauging the adequacy of training: "if you see a pattern of complaints about the same types of issues, it's a very good sign that the training hasn't been

adequate." Tr. 2871:2-13 (Kennedy). Mr. Harvey agreed, testifying that voter complaints allow election officials to identify potential problems with their election administration, including with the adequacy of their training. Tr. 3707:13-3708:2 (Harvey).

919.    Both witnesses also independently described voter complaints as the "canary in the coal mine." Tr. 2872:7-14 (Kennedy), Tr. 3707:13-3708:2 (Harvey); see also Tr. 1913:5-8 (Harvey) (agreeing that complaints are a way for voters to alert the Secretary that election rules are not being followed); Tr. 1914:22–1915:1 (Harvey) (agreeing voter complaints put the Secretary of State on notice that there might be something wrong).

920.    The utility of voter complaints is dictated by how they are processed. Mr. Kennedy credibly described how tracking and analyzing voter complaints is a critical element of assessing the adequacy of training in that it allows elections administrators to identify gaps in training, or specific localities where additional training may be necessary. Tr. 2874:1–2875:2 (Kennedy). In particular, analyzing complaints at a statewide level, rather than at a local level, is necessary to further uniformity throughout the state. Tr. 2878:11-23 (Kennedy).

921. Tracking and analyzing voter complaints would also benefit the State Election Board. Tr. 1775:16-23 (Le) (agreeing every fact, such as an organized log of complaints, is helpful); Tr. 4027:20-4028:3 (Sullivan) (agreeing that not knowing the extent of voter complaints could hinder her performance of her duties as a Board member); Tr. 1773:9-11 (Le) (stating the State Elections Board does not log complaints it receives); Tr. 4123:18-20, 4124:5-10 (Mashburn).

922. The Defendants do not, however, have a system that would identify how many complaints were received on a specific issue during a given election. Tr. 1922:10-15 (Harvey); Tr. 1773:9-11 (Le); Tr. 4123:18-20, 4124:5-10 (Mashburn). And whether or not Mr. Harvey had a good sense of the issues reported in complaints and where they came from, even he conceded that is not the same as analyzing data to identify recurring problems. Tr. 1922:14-25 (Harvey).

923. The Board claimed it was unaware of any significant issue related to absentee ballot cancellation procedures. Tr. 4086:1-13, 4097:17–4098:4 (Mashburn). Board members also admitted, however, that the Board is

only aware of the complaints the Secretary of State chooses to bring to the Board as cases. Tr. 4121:24–4122:4 (Mashburn); Tr. 4022:7-12 (Sullivan).

924.   Board members' testimony also revealed that their reliance on the members' ability to recall cases to identify recurring problems is misplaced. Current member and Acting Chair Thomas Matthew Mashburn did not even recall the Webster County absentee ballot cancellation case the Board heard only six months ago, despite previously describing the case as a "nightmare scenario." Compare Tr. 4110:11-17 (Mashburn), with Tr. 4126:16-24 (Mashburn).

925.   Taken in sum, the evidence shows that despite being confronted by the "nightmare" scenario caused by improper absentee ballot cancellation procedures, the Board has not investigated whether county practices are uniform (Tr. 4113:1-7 (Mashburn)), has not promulgated rules concerning absentee ballot cancellations (Tr. 4019:3-7 (Sullivan)), has not requested the Secretary of State issue an Official Election Bulletin about the procedure (Tr. 4019:3-7 (Sullivan)), and has not taken any action to assess training provided to the counties on the procedure (Tr. 4033:19–4034:1 (Sullivan)).

926.   The Secretary also received other complaints from voters about absentee ballot cancellation problems, providing additional significant notice of the issue. For example, a Clarke County voter submitted a complaint in which he informed the Secretary that in June 2020 he was barred from voting in-person and told he had to fill out the absentee ballot paperwork and drop it off at a different location in order to exercise his right to vote. PX. 1929.[66] It is undisputed that whether the voter had his absentee ballot or not, he had a right to vote. Tr. 2174:17–2175:7 (Harvey) (acknowledging that if the voter arrived at the polls and his ballot had not already been returned, he "should have been able to vote in person.").

927.   Another Clarke County voter reported that she received the same erroneous instructions from poll workers in June 2020 and despite having her absentee ballot with her, was instructed to drive to another location to drop off the absentee ballot. PX. 1931.[67] It is undisputed that this voter was wrongly burdened by an inadequately trained poll worker. See Tr. 2174:4-

---

[66]  This voter complaint was admitted not for its truth, but as proof of notice of the issue that the complainant described. See Tr. 2167:9–2167:13.

[67]  This voter complaint was admitted not for its truth, but as proof of notice of the issue that the complainant described. See Tr. 2167:9–2167:13.

16 (Harvey) (agreeing that the voter should have been allowed to vote in person).

928.   A Coweta County voter, who had never requested an absentee ballot, reported that she was told at her precinct that she had received an absentee ballot in the mail and thus could not vote in person. PX. 1932.[68]

929.   In October 2020, a Fulton County voter wrote to the Secretary's office informing them that when she arrived at the polls, she was instructed that she would only be able to vote in person if she destroyed her absentee ballot in front of them. PX. 1950.[69] It is undisputed that voters need not destroy their ballot at the precinct in order to cancel their absentee ballots. See Tr. 2179:17–2179:20 (Harvey) (agreeing this was not a correct procedure under the law).

930.   Likewise, another Coweta County voter submitted a complaint in June 2020, explaining that the election worker informed her that she could only vote in-person if she brought her absentee ballot to the precinct and turned

---

[68]  This voter complaint was admitted not for its truth, but as proof of notice of the issue that the complainant described. Tr. 2176:20–2177:3.

[69]  Section four of this voter complaint was admitted not for its truth, but as proof of notice of the issue that the complainant described. Tr. 2180:14–25.

it in. PX. 1935.[70] It is undisputed that voters need not turn in their absentee ballots in order to vote in person. <u>See</u> Tr. 2177:21–2177:24 (Harvey) (agreeing this was another complaint regarding an absentee ballot cancellation not being handled correctly).

931.   As Chris Harvey acknowledged, these voter complaints placed the Secretary's office on notice of the types of election law violations occurring across the state. <u>See, e.g.</u>, Tr. 1913:5-8. These voter complaints provided the Secretary with sufficient notice that county officials were failing to follow the legally prescribed process for absentee ballot cancellation and thus that the Secretary's trainings were doing an inadequate job educating county officials on absentee ballot cancellation procedures.

932.   Despite the notice provided by these complaints, Defendants treated complaints as one-off occurrences and did not analyze the complaints or investigate the complaints to identify recurring problems—consistent with their general approach to complaints involving absentee ballot cancellation problems. Tr. 2881:11–16 (Kennedy); <u>see</u> <u>supra</u> ¶¶ 352–367. Nor did the

---

[70]  This voter complaint was admitted not for its truth, but as proof of notice of the issue that the complainant described related to statewide notice. Tr. 2178:7–10.

Secretary even issue an Official Election Bulletin on this issue. See supra ¶ 925. This conduct effectively guarantees that these problems will continue to persist without court intervention.

933.   Gabriel Sterling, the Chief Operating Officer for the Secretary of State, testified that the Secretary's office had instituted a tracking system, "BallotTrax," for optional use by voters, which would notify the voter of the status of their absentee ballot. Tr. 4183:17–4187:18 (Sterling). The BallotTrax system, however, is a red herring: Mr. Sterling conceded that if a voter were to request to cancel the absentee ballot at a polling place, this system would not affect one way or the other whether poll workers follow uniform and non-burdensome absentee ballot cancellation procedures. Tr. at 4206:10-14 (Sterling).

### E.  There Is No State Interest Justifying These Burdens.

934.   Defendants lack a state interest in failing to adequately train county officials on absentee ballot cancellation. To the contrary, Defendants have an interest in ensuring, and in fact a mandate to ensure, uniformity in county practices—including the practices for voters cancelling their absentee ballots. See Tr. 1830:16-20 (Harvey) (acknowledging one of the

Secretary's responsibilities is to ensure uniformity in what counties are doing); see also O.C.G.A. § 21-2-31(1).

935.   Training is "certainly a very large portion" of what is needed to obtain uniformity among counties with respect to absentee ballot practices. Tr. 1836:22-24 (Harvey). Defendants thus have an interest in ensuring county officials are properly trained, and that in turn poll workers are properly trained, on the absentee ballot cancellation process. See Tr. 1836:25–1837:15 (Harvey) (agreeing that the procedures should be the same across all counties). This interest is wholly consistent—and in fact furthers—the Secretary's responsibility to "train the trainer." See supra ¶ 857.

936.   Moreover, Defendants have not taken various steps available to them to ameliorate these issues. As discussed with respect to remedies, there are a number of straightforward and non-onerous steps within Defendants' power to take that would redress at least some burdens on voters with respect to absentee ballot cancellation. See infra pp. 407–11.

* * *

937.   For these reasons, the Court concludes that Defendants' failure to train county officials in non-burdensome absentee ballot cancellation practices

has caused a burden on voters that is not justified by any state interests. Plaintiffs have therefore met their burden of proof on their fundamental right to vote claim pertaining to absentee ballot cancellation.

### III) Georgia's Absentee Ballot Cancellation Practices Violate the Equal Protection Clause Through Failure to Provide Adequate Statewide Standards.

938.   Plaintiffs separately aver that Defendants are liable for arbitrary and disparate statewide absentee ballot cancellation practices that violate the Equal Protection Clause's protections against such treatment based on where a voter lives. See supra ¶ 70.

939.   As discussed above, the touchstone of this claim is "whether the state lacks 'adequate statewide standards.'" Order at 82, Mar. 31, 2021, Doc. No. [617] (citing Husted, 837 F.3d at 635-36). For example, the Sixth Circuit affirmed the denial of a motion to dismiss based in part on allegations that poll workers received inadequate training and "[i]n some counties," poll workers misdirected voters. See League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 478 (6th Cir. 2008). The court held that "[i]f true, these allegations could establish that Ohio's voting system deprives its citizens of the right to vote or severely burdens the exercise of that right

depending on where they live in violation of the Equal Protection Clause."
Id.

940.    The testimonial and documentary evidence presented at trial illustrate the

disparate approaches Georgia counties take in cancelling absentee ballots,

persisting both before and after the enactment of HB 316. As discussed in

depth above, voters have experienced a variety of outcomes when seeking

to vote in person after having requested an absentee ballot. See supra

¶¶ 901–912.

941.    Chris Harvey admitted that he was aware that different counties were

engaged in varying practices with respect to absentee ballot cancellation.

See Tr. 2109:22-25, Tr. 2110:6-21 (Harvey).

942.    Following HB 316, Defendants' wholesale failure to provide adequate

training on uniform, non-burdensome absentee ballot cancellation

processes means that a variety of practices still persist due to a failure to

train on the change in the law. This is reflected in the testimony of voters

from several different counties who experienced varying approaches to

absentee ballot cancellation. See supra ¶¶ 901–912.

943.    The voter complaints discussed <u>supra</u> ¶¶ 901–912 further illustrate the Secretary's awareness that HB 316 did not solve the problem of a lack of uniform standards and practices across Georgia.

944.    Despite this knowledge, the Secretary has not taken meaningful action to analyze what different counties are doing or to make sure all county officials are aware of a uniform, non-burdensome process for absentee ballot cancellation. <u>See</u> <u>supra</u> ¶¶ 913–933. The State Election Board has taken no such action, either. <u>See supra</u> ¶¶ 921–925; Tr. 4113:1-7 (Mashburn). This inaction effectively guarantees a lack of uniform statewide standards, meaning that voters are arbitrarily and disparately burdened based on their residences.

*  *  *

945.    The Court concludes that Defendants' failure to train county officials adequately has resulted in a lack of adequate statewide standards for absentee ballot cancellation, resulting in Georgia voters being variably burdened based on where they live and violating the Equal Protection Clause.

## REMEDIES

946.     As Plaintiffs have demonstrated by a preponderance of the evidence

that Defendants are liable on the various counts that remain in this case,

this Court must issue a remedial order. *See* Fed. R. Civ. P. 54(c) (entitling

prevailing party to any relief to which it is entitled). Plaintiffs have

proposed numerous remedies, but this Court ultimately has the power to

fashion an appropriate remedy, whether based on Plaintiffs' suggestions

or not. See Dunkin Donuts, 956 F.2d at 1575; Lee, 915 F.3d at 1328 (district

court "mold[ed] its decree to meet the exigencies of the particular case,"

rather than relying on remedies suggested by the parties); supra ¶¶ 73–79.

In doing so, the Court is mindful that the Secretary has not always been

diligent in following this Court's orders or in ensuring the General

Assembly is sufficiently aware of this Court's Orders. See Tr. 1535–61,

1566–68 (Germany).  The Court therefore intends its remedies to be clear,

unequivocal, capable of objective assessment, and enforceable through the

use of the Court's contempt powers.

947.     Plaintiffs have identified a number of concrete remedies within the

Court's power to order that would redress the harms at issue. Indeed,

Defendants have characterized many of these remedies as "good ideas,"

embracing them at least in principle. Tr. 3452:7-8, 3329:24-25, 3300:12-13, 3300:16-17, 3356:6 (52(c) arguments). The evidence does not support a reasonable expectation, however, that Defendants will implement Plaintiffs "good ideas" absent a Court order.

948.     As discussed above, see supra ¶¶ 73–79, Plaintiffs are not required in their case in chief to prove the viability of any particular remedy once this Court determines a violation of law has taken place. Nonetheless, the Court finds Plaintiffs' proposed remedies to be viable, appropriately narrow to address the harms created by the challenged practices, and feasible for Defendants to implement.

949.     Throughout trial, Defendants have in effect argued that even if Plaintiffs prove Defendants are acting in violation of federal law, the Court cannot order a remedy that exceeds Defendants' legal obligations under state law. E.g., Tr. 2328:7-13 (Harvey). This is not, and cannot, be right. Plaintiffs do not claim Defendants are violating state law; Plaintiffs claim Defendants are violating the United States Constitution and Section 2 of the Voting Rights Act.  And this Court has the power to impose relief for those violations, regardless of whether the relief is currently prescribed by

state law.  See, e.g., United States v. Georgia, 892 F. Supp. 2d 1367, 1378-80

(N.D. Ga. 2012) (Jones, J.) (preliminarily enjoining the Secretary of State to

post certain information on its website and to provide additional means of

casting a ballot at no expense to the voter). Indeed, if Defendants were

correct, it would mean that federal constitutional and statutory law is

limited by state law. That gets the Supremacy Clause exactly backwards.

Moreover, if a federal court were limited to only instructing a state actor to

follow state law, a court would be limited to making an impermissible

"obey the law" injunction, in violation of *Pennhurst State Sch. & Hosp. v.*

*Halderman*, 465 U.S. 89 (1984).

950.     For these well-established reasons, Courts have long ordered state

actors to bring their behavior into compliance with federal law

notwithstanding—and in some cases in spite of—otherwise applicable

state statutes. See, e.g., Martin v. Kemp, 341 F. Supp. 3d 1326 (N.D. Ga.

2018) (directing Secretary to issue instructions prohibiting counties from

rejecting absentee ballots for signature mismatches and providing notice);

Ga. Coal. for the People's Agenda v. Kemp, 347 F. Supp. 3d 1251 (N.D. Ga.

2018) (directing Secretary to require counties to permit people flagged for

citizenship to vote at the polls); Common Cause v. Kemp, 347 F. Supp. 3d

1270 (N.D. Ga. 2018) (directing Secretary to establish and publicize a website and hotline to assist provisional-ballot voters). Indeed, the federal courts have a long history of fashioning such remedies in the context of voting rights violations. <u>See, e.g.,</u> <u>Meredith v. Fair</u>, 305 F.2d 343, 344, 361 (5th Cir. 1962) (enjoining University of Mississippi to admit students regardless of race); <u>see</u> <u>supra</u> ¶¶ 86–89.

951.     Courts in this Circuit have issued such orders, moreover, even with the recognition that sometimes a state actor *must* take administrative steps with concomitant costs to come into compliance with federal law.  *See, e.g., Fla. Dem. Party v. Scott*, 215 F. Supp. 3d 1250, 1258 (N.D. Fla. 2016) (finding that it would be nonsensical to prioritize the state's self-imposed voter registration deadlines over the right to vote under circumstances where the aspiring voters, through no fault of their own, would be barred from registering to vote); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) (rejecting Secretary Kemp's hardship argument that it would be unduly burdensome to employ a new absentee ballot procedure so close to the election and that changes to the procedures imperil the integrity of the election process, finding instead that "assuring that all eligible voters are permitted to vote [does not] undermine[] [the] integrity of the election

- 395 -

process. To the contrary, it strengthens it."); *Ga. Coal. For the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) (recognizing administrative burden on Secretary of State to make changes to its process of verifying citizenship for voters, disseminating information and training poll managers was minimal compared to the potential loss of a right altogether and that it would be in the public's interest to ensure that there is a procedure in place to allow every eligible Georgia citizen to register and vote); *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1299 (N.D. Ga. 2018) (granting "narrowly tailored" relief and citing the authority above). The Court observes, however, that Defendants have introduced no evidence to suggest that implementing the remedies Plaintiffs propose would be costly or administratively problematic. Indeed, as the Court discusses below, the evidence demonstrates to the contrary that each of these remedies would be easy and feasible for Defendants to implement. Those remedies are also consistent with, and indeed in some instances more aligned with, existing state laws than Defendants current conduct.

952.    The Court has carefully considered Defendants' arguments that Plaintiffs are asking this Court to "micromanage" Georgia elections. But the Court has also reviewed the recent history of voting litigation in

Georgia. The remedies the Court is ordering are consistent with directions from other courts in this district and consistent with relief upheld in the Eleventh Circuit. In Common Cause Ga. v. Kemp, for example, the Court ordered the Secretary to establish and publicize a website for provisional ballot voters and to direct the 159 county superintendents to do the same. 347 F. Supp. 3d at 1299-1300. And in the Georgia Coalition case, the Court directed the Secretary to update the SOS website to provide "clear instructions" and contact information for voters with questions about their pending status due to citizenship. 347 F. Supp. 3d at 1270. Likewise, in Martin v. Kemp, the Court directed the Secretary to instruct the county officials to provide voters whose absentee ballots were subject to rejection for signature mismatches to provide notice and an opportunity to cure. 341 F. Supp. 3d at 1341. Thus while the remedies the Court directs may appear as minor as directing a posting on a website as in Common Cause, they are nonetheless an appropriate and incremental approach to alleviating the burden the Secretary's policies have imposed on voters and would-be voters in Georgia.

953.    The Court also notes that Defendants' argument Plaintiffs' proposed remedies conflict with federal law — namely Defendants' obligations under

HAVA—fails. *See, e.g.* 52 U.S.C. § 21083(a)(1)(A) and 52 U.S.C. §

21083(a)(4)(B).

954.     For the reasons discussed above, <u>supra</u> ¶¶ 98–100, nor do Plaintiffs'

proposed remedies—which are not tied to any specific election—implicate

the <u>Purcell</u> principle or any concern about judicial micromanagement of a

local election.

**I)      Remedies for Exact Match MIDR**

955.     The Court finds the most straightforward and viable way to redress

the harms of Defendants' Exact Match "MIDR" policy is to enjoin the

Secretary of State from flagging relevant voters as being in "MIDR"—that

is, "Missing ID Required"—status. <u>See</u> Tr. 1937:7-8 (Harvey).

956.     Plaintiffs presented persuasive, extensive, and unrebutted evidence

that the mere fact of a voter being placed in MIDR status—and thus

singled out from other voters as apparently needing to provide additional

identification—has the demonstrated effect of burdening voters, without

serving any corresponding state interest.  <u>See supra</u> ¶¶ 410–478

957.     The Court does not, however, enjoin the Secretary from flagging

voter registration records with a different label, such as "new voter" or

"HAVA ID Permitted" so long as the label conveys to poll workers and others that the voter is able to use either (a) any form of HAVA identification;  or (b) the forms of identification required by Georgia law.

958.      In addition, the Court enjoins the Secretary from providing the letter to voters in MIDR status for counties to send in its existing form. See, e.g., PX. 1900.  Instead, the Secretary shall ensure notice is provided  by letter to registered voters who are permitted to present HAVA identification setting forth the following: (a) that such voters are in fact, registered to vote, (b) a clear list of all forms of identification such voters may present; and (c) that such voters may present the permitted identification before Election Day or when they appear to vote in person, as opposed to requesting the permitted identification "before Election Day." *See, e.g.,* PX 1900 ("Please submit a copy of your identification before Election Day to our office, either by mail or in person.").

959.      The remedy of removing or changing the MIDR flag is efficacious because it is the application of the MIDR flag next to a voter's name on the poll list that creates the threshold burden on voters.

960.     The remedy of removing or changing the MIDR is feasible because, as discussed above, the Secretary is responsible for implementing the MIDR flag within the system and has the ability to remove that flag or change how it appears.  See supra ¶¶ 397–99.  The remedy of revising the letter of notice provided to registered voters entitled to present HAVA identification is, likewise, feasible because the Secretary of State controls the content of that letter,  possesses complete information about all types of HAVA identification permitted for such voters, and has demonstrated an ability to present clear, organized, and illustrated instructions to voters via its website in certain circumstances, including the description of permitted identification when submitting an absentee ballot by mail. See PX 2139.

961.     Accordingly, the Secretary of State shall cease labeling voters with the MIDR flag.  To the extent a flag is necessary to alert poll workers that the voter is able to use HAVA ID, the Secretary of State must use a flag that conveys that, when voting, the voter is permitted to use either (a) any form of HAVA identification; or (b) the forms of identification required by Georgia law. The Secretary of State shall ensure notice is provided by letter to registered voters who are permitted to present HAVA identification

- 400 -

setting forth the following: (a) that such voters are in fact, registered to vote, (b) a clear list of all forms of identification such voters may present, and (c) that such voters may present the permitted identification either before Election Day or when they appear to vote in person.

962.    Defendants shall additionally promulgate a rule, issue an OEB, and include in the Secretary's mandatory training for county registrars and superintendents instructions that make clear that MIDR status shall not trigger extra scrutiny in requesting, checking, or considering voters' identification at the polling place.

## II)    Remedies for Exact Match Citizenship

963.    There are several viable remedies to address the harms that Plaintiffs have shown with respect to the Exact Match citizenship-verification process.  This Court finds that the most effective remedy—indeed a remedy Defendants have claimed they wish to implement in any event, *see* Tr. 1694:13–21 (Germany)—would be to replace the current citizenship verification procedure with the three-step SAVE verification process outlined in the Secretary's August 2020 Memorandum of Agreement with the Department of Homeland Security and the SAVE

Program Guide. <u>See</u> PX. 2022 at 3–5; PX. 2021 at 10–13 (SAVE program guide); <u>see</u> <u>supra</u> ¶¶ 519–28.

964.     Using the SAVE verification process as outlined in the Secretary's existing Memorandum of Agreement is a feasible method to remedy the harms of the citizenship-verification process because the SAVE verification process more accurately verifies applicants' citizenship while avoiding the significant error rate of the current process.  <u>See</u> <u>supra</u> ¶¶ 519–28.

965.     Moreover, using the SAVE verification process is within the Secretary's power to implement, as demonstrated by the fact that the Secretary of State *is already* party to an Agreement permitting its use of SAVE and the Secretary's office used at least part of the SAVE verification process on a one-off basis to review voters' citizenship records in March 2022.  <u>See</u> <u>supra</u> ¶ 519.  On numerous occasions, Defendants have expressed their intention to fully implement SAVE.

966.     The Secretary of State argues that its goal of adopting some form of SAVE renders a court order unnecessary.  But Defendants have shown no evidence over the course of this trial that they are in fact taking any steps to achieve that "goal," <u>see</u> <u>supra</u> ¶¶ 521–28. Given that the Secretary has

failed to implement SAVE on an ongoing basis, this Court finds a court

order is needed to require the Secretary of State to actually implement this

remedy.

967.      This Court finds that using SAVE to the fullest extent is the most

narrowly tailored and effective remedy. Accordingly, the Secretary shall

use SAVE to the fullest extent possible, which means the Secretary shall

obtain the registrant's alien number and other immigration-related

information from DDS at the time of registration and shall submit a

verification request for all such registrants through SAVE. Moreover, for

any registrant who cannot be verified through the initial verification, the

Secretary shall use the subsequent levels of verification through SAVE,

including third-level verification. See PX. 2021 (SAVE program guide). In

other words, the Secretary shall use SAVE as outlined in the Memorandum

of Agreement.

### III)   Remedies for Mismanagement of the Voter Registration Database

968.      There are numerous viable remedies to address the harms Plaintiffs

have shown with respect to the Defendants' systematic mismanagement of

the statewide voter registration database.  Plaintiffs proposed these

remedies at the close of their case in chief (see PX. 2173), and Defendants did not introduce any evidence to rebut the efficacy, feasibility, or legality of any of these proposed remedies in their case. Indeed, Defendants did not address this issue at all.

969.    One remedy for erroneous cancellations or merges of registered voters is to require the Secretary of State to make changes to the statewide registration system to prevent counties from removing or changing a voter's record in the voter registration database unless certain minimum criteria are confirmed to match.

970.    This Court finds that this remedy is feasible. The voter registration system can be programmed to reject cancellations of purported matches unless the driver's license number or the last four digits of the social security number match, *and* at least six of the following seven identifiers match: Date of Birth; First Name; Middle Name; Last Name; Address; Race; Gender. (Indeed, this Court is mindful that Mr. Harvey agreed the Secretary of State can make these "as tight or as loose" as it chooses. Tr. 3734:3-6 (Harvey).) This Court finds that this change will prevent a

substantial number of errors that burden voters—including, but not limited to, disenfranchisement.

971.     This remedy is within the Secretary's power to implement, as Plaintiffs have shown that the Secretary adopted similar restrictions and system messages with respect to voter *registration* procedures for new registrants, but has not adopted them for procedures that would merge or cancel an existing voter's application. PX. 2173 at 53; see supra ¶¶ 795–97. And it would plainly help to eliminate wrongful cancellations or modifications because it would automatically restrict the user's ability to make such errors.

972.     Another feasible remedy is to require the Secretary to tighten the matching criteria for matches that the voter registration system identifies for counties in the first place as potential duplicates, felons, or deceased voters. Currently, the system uses matching criteria, selected by the Secretary of State, that the Secretary's employees have acknowledged generate false matches. Yet, the Secretary of State presents those matches to county officials as potential records to be cancelled or merged with other voters.  See supra ¶¶ 730–39.

973.     This Court finds that using tighter matching criteria would reduce

the number of false matches that burden voters. For example, the Secretary

can adjust the voter registration system to no longer identify potential

felony conviction matches that match only along the lines of "last name,

first name, date of birth" and "last name, date of birth, race, and gender."

See PX. 800 at 22.  Eliminating last name, first name, and date of birth as a

criterion will save voters like Andre Smith from wrongful cancellation,

while eliminating last name, date of birth, race, and gender will eliminate

the category of matches that the Secretary of State's own employees have

suggested eliminating as "pretty loose." PX. 1151.

974.     In addition, programming the voter registration system not to treat

"placeholder" dates of birth as matches with all other dates of birth would

have saved Ms. Jordan, for example, from disenfranchisement, (PX. 50 at

40; PX. 1721).

975.     The feasibility of these remedies is demonstrated by the fact that the

Secretary has taken similar steps in the past.  In 2017, the office

reprogrammed the voter registration database matching criteria so as not

to identify potential felon matches based only on a match between the last

four digits of a social security number and date of birth. See supra ¶ 811;

see also Tr. 3734:3-6 (Harvey) ("[Y]ou can make it as tight or as loose as

you want it."). The Secretary made that change in 2017 precisely *because*

the looser criteria were generating too many "false positives."  PX. 365.

The Secretary can similarly tighten the matching criteria as discussed in

the preceding paragraphs.

976.    On top of these remedies, the Secretary shall ensure that 30-day pre-

cancellation notice is provided to any voter whose record is cancelled as

deceased or as a duplicate, as it is required already to do for felony

cancellations.  This, too, is feasible, as such notice is currently provided for

voters cancelled based on felony convictions. See PX. 1903 at 12.

977.    Moreover, the Court finds that the Secretary of State has the power

to implement a statewide policy requiring counties to confirm that certain

minimum criteria match before removing or merging a voter record, and

setting forth what those criteria are. See supra ¶¶ 330–70. The State

Election Board, too, has the power to promulgate a rule or issue an OEB or

explanatory pamphlet specifying the appropriate procedures to follow

when handling felons, vitals, and duplicate matches. The record evidence

demonstrates that Defendants are capable of setting such policies, which they should include in the Secretary's voter registration system guide, in routine trainings, in rules, and in OEBs to the counties to make clear what the rules of the road are when dealing with cancellations or modifications to voters' registration records. E.g., PX. 1820, 1821 (OEBs); PX. 50 (training laying out changes to the eNet dashboard); PX. 1878 (eNet guide).

978.     The above changes will substantially redress the erroneous changes and cancellation records that Plaintiffs have shown are a function of the way the Secretary of State has chosen to program the voter registration system and that impose unconstitutional burdens on Georgia's voters. If the loose matches do not appear on the counties' dashboards for review, the staggering number of records teed up for counties to review will be reduced and the counties will not be put in the predictable position of erroneously cancelling an eligible voter as deceased, a duplicate, or convicted of a felon.  See PX. 365. And if the voter registration system does not permit cancellations if two records have multiple mismatching identifiers, that necessarily will prevent erroneous cancellations where voters have all different identifying information. The Secretary cannot and does not meaningfully argue otherwise.

979.     Accordingly, as set forth in the Court's separate remedial Order,

this Court will (1) order the Secretary of State to program the voter

registration system to prevent counties from cancelling registrations due to

matches unless the driver's license or last four of the social security

numbers **and** at least 6 of the relevant 7 identifiers discussed <u>supra</u> match;

(2) order the Secretary of State to program the voter registration system to

alert users to non-matching fields before modifying or cancelling a voter's

record; (3) order the Secretary of State to program the voter registration

system to prevent the entry of logically impossible birthdates or

registration dates; (4) order the Secretary of State to program the voter

registration system not to consider a placeholder date of birth as a match

with all other dates of birth; (5) order the Secretary of State to program the

voter registration system to eliminate the application of the following

criteria, and any other criteria that are substantially the same, to identify

voters with felony convictions for cancellation: "last name, date of birth,

race, and gender;" (6) order the Secretary of State to ensure 30-day pre-

cancellation notice is provided to any voter cancelled as a potential

decedent or duplicate; (7) order the State Election Board to promulgate a

rule or issue an Official Election Bulletin or informational pamphlet for the

appropriate procedures to follow when handling felons, vitals, and duplicate matches.

**IV)   Remedies for Absentee Ballot Cancellation**

980.    The Court finds that multiple viable remedies exist to redress Defendants' failure to train on absentee ballot cancellation.  Mandatory training of county officials must include correct information about the proper absentee ballot cancellation procedures under state law: specifically, that voters must be allowed to cancel their absentee ballots in person at a polling place, even when they do not have the ballot with them, by signing a form administered by the polling place manager. Correct mandatory training for county officials will allow county officials to train their own poll workers on the absentee ballot cancellation process. See O.C.G.A. § 21-2-50(a)(11) (addressing the Secretary's training obligations).

981.    Accounting for Defendants' contention that this remedy would not redress Plaintiffs' harms—because, as Chris Harvey suggested, most county officials do not keep up with additional versions of the certification

trainings after they are already certified (see Tr. 3534:4-23 (Harvey)),

additional remedies are warranted.

982.     This Court finds that it would also be effective and feasible to

require the Secretary to mandate that county superintendents confirm

specifically that they trained and will continue to train their poll workers

in absentee ballot cancellation procedures, which the Secretary does not

currently do.  See Tr. 1889:25-1890:2 (Harvey) (confirming the Secretary

does not currently require counties to certify that they trained poll workers

on absentee ballot cancellation procedures).  In fact, the Secretary of State

has already taken similar action in a different absentee-ballot context.  See

Tr. 1976:19–1977:6 (Harvey) (testifying that the Secretary monitors and

requires certification of counties' compliance with the deadline for

Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA)

ballots).

983.     This Court finds that it will also be effective and feasible for the

Secretary of State and State Election Board members to mandate signs to

be posted at polling places explaining that voters have the right to cancel

an absentee ballot at the polling place, even if they do not have the ballot

with them. See, e.g., Ga. Comp. R. & Regs. 183-1-12-.10(8), 183-1-12-.11(9)
(exercising the SEB's powers pursuant to O.C.G.A. § 21-2-31 to require
specific signage at polling places); id. 183-12-.18(2) (requiring polling
places to "have an information sheet developed by the Secretary of State
available for voters who have questions about the provisional ballot
process"); O.C.G.A. § 21-2-50(a)(12)–(13) ("The Secretary of State shall
exercise all the powers granted to the Secretary of State by this chapter and
shall perform all the duties imposed by this chapter, which shall include
the following … To prepare and publish … all notices and advertisements
in connection with the conduct of elections which may be required by law
[and] [t]o prepare and furnish information for citizens on voter registration
and voting").

984.     This Court also finds that it will be effective and feasible for the
Secretary of State or State Election Board members to send an Official
Election Bulletin setting forth appropriate procedures for cancellation of
absentee ballots at the polls, as witnesses acknowledged is within
Defendants' powers. Tr. 2147:19-2148:15; see also Tr. 4017:18-21 (Sullivan);
Tr. 4093:14-17 (Mashburn).

985.     Finally, the State Election Board is authorized to "issue orders … [t]o require violators to attend training as specified by the board."  O.C.G.A. § 21-2-33.1(a)(5). Under this statutory authority, the Board shall order county personnel—not just registrars and superintendents—to complete a uniform training session if they are found to have followed unlawful absentee ballot cancellation procedures.

986.     Accordingly, this Court will (1) order Defendants to issue an OEB conveying that voters must be allowed to cancel their absentee ballots in person at a polling place, even when they do not have the ballot with them, by signing a form administered by the polling place manager; (2) order the Secretary of State to include this information in its Poll Worker Manual; (3) order the Secretary of State to add to its mandatory Georgia Election Official Certification training and optional training materials the information that voters must be allowed to cancel their absentee ballots in person at a polling place, even when they do not have the ballot with them, by signing a form administered by the polling place manager—and to train county officials to convey this information to their poll workers; (4) order Defendants to mandate that signs be posted at polling places informing voters of their right to cancel an absentee ballot at their polling

place, even if they do not have the ballot with them; (5) order Defendants

to send an Official Election Bulletin setting forth appropriate procedures

for cancellation of absentee ballots at the polls; (6) order the State Election

Board members to require that county personnel must complete a uniform

training session if they are found to have followed unlawful absentee

ballot cancellation procedures.

## V)   **Cross-Cutting Remedies**

987.      As discussed above, Defendants rely on voter complaints to identify

burdens on voters to investigate and address, yet they lack any systematic

process for identifying such burdens. Supra ¶¶ 350–70.

988.      The Court finds that establishing a logging, tracking, and reporting

system for voter complaints is feasible and will be effective to identify and

reduce undue burdens on voters.  Defendants have not adduced any

evidence that would indicate otherwise.

989.      Accordingly, the Secretary shall track voter complaints by category

and report the number of complaints per category in a document released

monthly. That report should, at a minimum: (1) log, track, and respond to

complaints or comments a voter or organization submits about the

experience of registering to vote and voting; (2) identify issues that
generate frequent complaints or comments and analyze those for potential
action; and (3) be presented to the State Election Board to investigate and
identify trends, patterns, and resolutions of the submitted complaints.

## CONCLUSION

Having heard and considered the evidence presented at trial and the Parties'
proposed findings of fact and conclusions of law, and for the reasons set forth
above, the Court **DECLARES** as follows:

1. Defendants' process for identity verification, specifically its Exact Match
   requirement and its use of the label "Missing ID Required" ("MIDR"),
   violates the Constitution and the Voting Rights Act.

   a. MIDR violates the First and Fourteenth Amendments by placing an
      undue burden on the fundamental right to vote.

   b. MIDR violates the Fourteenth Amendment's prohibition on
      geographic discrimination, by subjecting voters in different counties
      to different rules and standards for registration.

   c. MIDR violates the Fourteenth Amendment's and the Fifteenth
      Amendment's prohibition on racial discrimination, because it was

adopted with the intent to deny voters of color the right to vote, and indeed it operates to deny voters of color the right to vote.

d. MIDR violates the Voting Rights Act's prohibition on procedures that abridge the right to vote on the basis of race, as Black and brown voters are disproportionately affected by this process.

2. Defendants' process for citizenship verification, which compares registrants' information against outdated and inaccurate data from the Department of Driver Services, violates the Constitution and the Voting Rights Act.

a. The citizenship verification process violates the First and Fourteenth Amendments by placing an undue burden on the fundamental right to vote.

b. The citizenship verification process violates the Fourteenth Amendment's prohibition on geographic discrimination, by subjecting voters in different counties to differing standards when they try to vote.

c. The citizenship verification process violates the Fourteenth Amendment's and the Fifteenth Amendment's prohibition on racial discrimination, because it was adopted with the intent to deny

voters of color the right to vote, and indeed it operates to deny

voters of color the right to vote. Moreover, the citizenship

verification process discriminates on the basis of national origin,

again in violation of the Fourteenth Amendment's Equal Protection

Clause.

d.  The citizenship verification process violates the Voting Rights Act's

prohibition on procedures that abridge the right to vote on the basis

of race.

3.  Defendants' processes for overseeing and managing the statewide voter

registration database, particularly those governing the identification and

removal of duplicate registrations, voters with felony convictions, and

deceased voters violate the Constitution. These procedures violate the First

and Fourteenth Amendment by placing an undue burden on the right of

Georgia citizens to vote, which is not justified by any compelling state

interest.

4.  Defendants' training regarding the procedures for cancelling absentee

ballots at the polling place is deficient and violates the Constitution.

a. Defendants' inadequate training violates the First and Fourteenth Amendments by placing an undue burden on the right to vote on voters who seek to cancel their absentee ballots and vote in person.

b. Defendants' inadequate training also violates the Fourteenth Amendment's prohibition on geographic discrimination, by subjecting voters in different counties to different rules for cancelling their ballots.

The Court hereby further **ORDERS** the following measures to remedy the violations set forth above:

**1. Citizenship Exact Match**

a. The Secretary shall be enjoined from using the current citizenship verification process for new registrants, and shall implement a protocol that contains the components set forth below, which shall apply to applicants for voter registration by any method in the State of Georgia, no later than ninety (90) days from the date of this Order.

b. For any registrant flagged as a noncitizen by the Department of Driver Services ("DDS"), the Secretary shall obtain the registrant's

alien number and any other immigration-related information available from DDS within one business day.

c. Upon receipt of a registrant's citizenship flag, and no later than one business day thereafter, the Secretary shall place the registrant in pending status and submit a verification request with the registrant's information to Systematic Alien Verification for Entitlements (SAVE).

d. If, upon initial verification, SAVE verifies that the registrant is a citizen, the Secretary shall immediately place the registrant into active status.

e. If a registrant is not verified as a citizen upon initial verification, the Secretary shall institute any and all additional verification available through SAVE, including third-level verification, as that term is described in the Department of Homeland Security's SAVE Program Guide and as is required by the Secretary's SAVE Memorandum of Agreement dated August 17, 2020. If SAVE verifies that a registrant is a citizen upon such additional verification, that registrant shall be immediately placed into active status.

- 419 -

f.  If SAVE does not verify the registrant as a citizen after conducting such additional verification, or such verification cannot be completed after all reasonable efforts to obtain additional information have been made, the Secretary shall repeat the verification process through SAVE set forth above within 10 business days to safeguard against the possibility that the registrant's naturalization record was still being processed when the first SAVE verification was conducted.

g.  If the registrant cannot be verified as a citizen after two successive efforts at verification through SAVE, the Secretary shall contact the registrant to obtain proof of citizenship, using use each contact method the registrant provided (mailing address, phone number, and/or email address).

h.  If the registrant cannot be verified as a citizen after two successive efforts at verification through SAVE, the Secretary shall not remove or cancel the registrant from the voter registration system or remove the registrant's record from pending status for a period of two presidential election cycles and shall maintain such record in pending status subject to verification of U.S. citizenship.

- 420 -

i. The Secretary shall disclose the status of the steps set forth above on the registrant's My Voter Page. At any point in the SAVE verification process, a registrant shall be provided the opportunity to submit proof of citizenship and immediately be placed into active status.

j. The Secretary shall update the voter registration application form (on-line and otherwise) to (1) allow submission of documentary proof of citizenship with the application, (2) to explain that such proof "may be needed if you were recently naturalized," and (3) to allow the registrant to indicate and attest that s/he is a naturalized citizen.

k. In six months from the date of this Order, and every six months thereafter for five years, the Secretary shall provide a report of its protocols, training, and SAVE results—including each time additional verification was required, and whether that additional verification was completed—to the Court and the Plaintiffs to ensure ongoing compliance with these terms.

## 2. MIDR Exact Match

a. The Secretary shall be enjoined from using the MIDR" flag in the voter registration system no later than ninety (90) days from the date of this Order. To the extent a flag is necessary to alert poll workers that the voter is able to use HAVA ID, the Secretary may use a flag that is reasonably related to that goal, such as "new voter" or "HAVA ID Permitted," so long as the label conveys to poll workers and others that the voter is able to use either (a) any form of HAVA identification;  or (b) the forms of identification required by Georgia law

b. The Secretary shall not use the letter sent to voters in MIDR status in its existing form.  Instead, the Secretary shall provide notice by letter to registered voters who are permitted to present HAVA identification setting forth the following: (a) that such voters are in fact, registered to vote, (b) a clear list of all forms of identification such voters may present; and (c) that such voters may present the permitted identification before Election Day or when they appear to vote in person, as opposed to requesting the permitted identification "before Election Day."  Such letter shall reflect the identification

options available to the recipient under applicable law and affirm

the recipient's status as a registered voter.

c. The Secretary and State Election Board shall promulgate a rule, issue

an OEB, and include in the Secretary's mandatory training for

county registrars and superintendents expressly clarifying that

flagged voters shall not receive extra scrutiny in poll workers'

requesting, checking, or considering voters' identification at the

polling place.

**3. Management of the Voter Registration Database**

a. The Secretary shall be enjoined from using the current record

removal processes addressed below in their current form, and shall

implement the measures set forth below, no later than ninety (90)

days from the date of this Order.

b. The Secretary shall have the voter registration system programmed

to prevent the merger, change, or cancellation of a voter registration

record based on a determination that such record is a duplicate

record, matches a list of qualifying felons, or matches a list of

deceased persons, unless the driver's license number or the last four

digits of the social security number match, and at least 6 of the

following 7 identifiers match: Date of Birth; First Name; Middle
Name; Last Name; Address; Race; Gender.

c. The Secretary shall program the voter registration system to alert
users to non-matching fields before modifying or cancelling a voter's
record.

d. The Secretary shall have the voter registration system programmed
to prevent the entry of logically impossible birthdates or registration
dates.

e. The Secretary shall have the voter registration system programmed
to prevent the identification of a match on the basis, in whole or in
part, of a default Date of Birth (e.g., "01/01/1900").

f. The Secretary shall have the voter registration system programmed
to eliminate the application of the following criteria, or substantially
the same criteria, to identify voters with felony convictions for
cancellation: "last name, date of birth, race, and gender."

g. The Secretary shall notify, or shall require notification, to any
registered voter at least thirty (30) days prior to the cancellation or
modification of the voter's record to allow such voter to object to

such cancellation or modification, except where such voter has made

the request for cancellation or modification.

h. The State Election Board shall promulgate a rule or issue an Official

Election Bulletin or informational pamphlet for the appropriate

procedures to follow when handling felony, vitals, and duplicate

matches.

**4. Absentee Ballot Cancellation**

a. No later than ninety (90) days from the date of this Order, the

Secretary and State Election Board shall issue an Official Election

Bulletin conveying that voters must be allowed to cancel their

absentee ballots in person at a polling place, even when they do not

have the ballot with them, by signing a form administered by the

polling place manager.

b. The Secretary shall include this information in its Poll Worker

Manual.

c. The Secretary shall add to its mandatory Georgia Election Official

Certification training materials and optional training materials the

information that voters must be allowed to cancel their absentee

ballots in person at a polling place, even when they do not have the

ballot with them, by signing a form administered by the polling

place manager.  The Secretary's training shall also instruct county

officials to convey this information to their poll workers.

d.  The Secretary shall mandate that signs be posted at polling places

informing voters of their right to cancel an absentee ballot at their

polling place, even if they do not have the ballot with them.

e.  The State Election Board shall require that county personnel must

complete a uniform training session if they are found to have

followed unlawful absentee ballot cancellation procedures.

## 5.  Compliance Reporting & Complaints

a.  The Secretary shall report its compliance with the terms of this

Order in six months, including a report on each term.

b.  The Secretary shall track voter complaints by category and report

the number of complaints per category in a document released

monthly. That report shall, at a minimum: (1) implement a system to

log, track, and respond to complaints or comments a voter or

organization may submit about the experience of registering to vote

and voting; (2) identify issues that generate frequent complaints or

comments and analyze those for potential action; and (3) be

presented to the State Election Board to investigate and identify trends, patterns, and resolutions of each complaint.

c.  The Secretary shall include in its mandatory certification curriculum any changes to voter registration verification procedures, voter registration database operations, and absentee ballot cancellation procedures that county officials may need to implement.

d.  The Secretary shall require county registrars and superintendents to confirm their receipt of OEBs and their understanding of the Secretary's training presentations.

## 6.  Continued Jurisdiction

a.  The Court shall retain jurisdiction to ensure compliance with this Order for a period of at least one year from the date of this Order.

Respectfully submitted this, the 1st day of July, 2022.

*/s/ Allegra J. Lawrence*

Allegra J. Lawrence (GA Bar No. 439797)

Leslie J. Bryan (GA Bar No. 091175)

Lovita T. Tandy (GA Bar No. 697242)

Celeste Coco-Ewing (Admitted *pro hac vice*)

Michelle L. McClafferty (GA Bar No. 161970)

Monica R. Owens (GA Bar No. 557502)

Rodney J. Ganske (GA Bar No. 283819)

Maia Cogen (GA Bar No. 832438)

Suzanne Smith Williams (GA Bar No. 526105)

Bria Stephens (GA Bar No. 925038)

**LAWRENCE & BUNDY LLC**

1180 West Peachtree Street, Suite 1650

Atlanta, GA 30309

Telephone: (404) 400-3350

Fax: (404) 609-2504

allegra.lawrence-hardy@lawrencebundy.com

leslie.bryan@lawrencebundy.com

lovita.tandy@lawrencebundy.com

celeste.coco-ewing@lawrencebundy.com

michelle.mcclafferty@lawrencebundy.com

monica.owens@lawrencebundy.com

rod.ganske@lawrencebundy.com

maia.cogen@lawrencebundy.com

suzanne.williams@lawrencebundy.com

bria.stephens@lawrencebundy.com

Thomas R. Bundy (Admitted *pro hac vice*)
**LAWRENCE & BUNDY LLC**
8115 Maple Lawn Boulevard
Suite 350
Fulton, MD 20789
Telephone: (240) 786-4998
Fax: (240) 786-4501
thomas.bundy@lawrencebundy.com

Dara Lindenbaum (GA Bar No. 980780)
**SANDLER REIFF LAMB ROSENSTEIN &**
**BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW
Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: (202) 479-1115
lindenbaum@sandlerreiff.com

Elizabeth Tanis (GA Bar No. 697415)
John Chandler (GA Bar No. 120600)
957 Springdale Road, NE
Atlanta, GA 30306
Telephone: (404) 771-2275
beth.tanis@gmail.com
jachandler@gmail.com

Kurt G. Kastorf (GA Bar No. 315315)
**KASTORF LAW, LLC**
1387 Iverson St, Suite 100
Atlanta, GA 30307
Telephone: (404) 900-0330
kurt@kastorflaw.com

Matthew G. Kaiser (Admitted *pro hac vice*)
Sarah R. Fink (Admitted *pro hac vice*)
**KAISERDILLON PLLC**
1099 Fourteenth Street, NW
Eighth Floor West
Washington, DC 20005
Telephone: (202) 640-2850
Fax: (202) 280-1034
mkaiser@kaiserdillon.com
sfink@kaiserdillon.com


Kali Bracey (Admitted *pro hac vice*)
Ishan Bhabha (Admitted *pro hac vice*)
Victoria Hall-Palerm (Admitted *pro hac vice*)
Kathryn L. Wynbrandt (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
Telephone: (202) 639-6000
Fax: (202) 639-6066
kbracey@jenner.com
ibhabha@jenner.com
vhall-palerm@jenner.com
kwynbrandt@jenner.com


Jeremy M. Creelan (Admitted *pro hac vice*)
Elizabeth A. Edmondson (Admitted *pro hac vice*)
Allison N. Douglis (Admitted *pro hac vice*)
**JENNER & BLOCK LLP**
919 Third Avenue
New York, NY 10022
Telephone: (212) 891-1600
Fax: (212) 891-1699
jcreelan@jenner.com
eedmondson@jenner.com
adouglis@jenner.com

Keri L. Holleb Hotaling (Admitted *pro hac vice*)

Kelsey Stimple (Admitted *pro hac vice*)

**JENNER & BLOCK LLP**

353 North Clark Street

Chicago, Illinois 60654

Telephone: (312) 222-9350

khotaling@jenner.com

kstimple@jenner.com

Von A. DuBose

**DUBOSE MILLER LLC**

75 14th Street N.E., Suite 2110

Atlanta, GA 30309

Telephone: (404) 720-8111

Fax: (404) 921-9557

dubose@dubosemiller.com

Jonathan Diaz (Admitted *pro hac vice*)

Paul M. Smith (Admitted *pro hac vice*)

**CAMPAIGN LEGAL CENTER**

1101 14th St. NW**,** Suite 400

Washington, DC 20005

Telephone: (202)736-2200

jdiaz@campaignlegal.org

psmith@campaignlegal.org

Andrew D. Herman (Admitted *pro hac vice*)

**MILLER & CHEVALIER CHARTERED**

900 Sixteenth Street, NW

Washington, DC 20006

Telephone: (202) 626-5800

Fax: (202) 626-5801

aherman@milchev.com

*Counsel for Fair Fight Action, Inc.; Care in Action,*

*Inc.; Ebenezer Baptist Church of Atlanta, Georgia,*

431

*Inc.; Baconton Missionary Baptist Church, Inc.;*
*Virginia-Highland Church, Inc.;*
*and The Sixth Episcopal District, Inc.*

## CERTIFICATION

I hereby certify that the foregoing has been prepared with a font size and point selection (Book Antigua, 13 pt.), which is approved by the Court pursuant to Local Rules 5.1(C) and 7.1(D).

This, the 1st day of July, 2022.

*/s/ Allegra J. Lawrence*
Allegra J. Lawrence

## CERTIFICATE OF SERVICE

I hereby certify that, on JULY 1, 2022, the foregoing **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** was filed with the Court using the ECF system, which will serve all counsel of record.

This, the 1st day of July, 2022.

*/s/ Allegra J. Lawrence*
Allegra J. Lawrence