**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FAIR FIGHT ACTION, INC., *et al.*

    *Plaintiffs*,

    v.

BRAD RAFFENSPERGER, *et al.*,

    *Defendants*.

CIVIL ACTION

FILE NO. 1:18-CV-5391-SCJ

**DEFENDANTS' PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW[1]**

---

[1] These proposed findings of fact and conclusions of law are submitted in accordance with this Court's Order (Doc. No. [846]) and in lieu of a post-trial brief.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

LEGAL STANDARDS........................................................................1

   I.  Article III Standing ...............................................................4

      A.   Injury-in-fact .................................................................5

      B.   Traceability and Redressability...................................8

   II.  Mootness ..............................................................................10

   III.  First and Fourteenth Amendment Right to Vote............11

   IV.  Fourteenth Amendment Equal Protection and Fifteenth Amendment ......14

   V.  Section 2 of the Voting Rights Act ....................................18

   VI.  The Political Question Doctrine .......................................25

   VII. Remedies..............................................................................29

FINDINGS OF FACT ........................................................................34

   I.  The Secretary of State .......................................................34

      A.   Elections Operations...................................................39

          i.    Investigative Division and Voter Complaints.....................41

          ii.   The Secretary's interaction with county election officials.................45

i

II.  The State Election Board ........................................................................ 47

III. The Plaintiffs ............................................................................................. 56

    A.  Fair Fight ............................................................................................ 57

    B.  Care in Action ................................................................................... 66

    C.  Baconton Missionary Baptist Church .......................................... 71

    D.  Ebenezer Baptist Church................................................................ 81

    E.  Sixth District A.M.E. Church......................................................... 86

    F.  Virginia-Highland Church ............................................................. 93

IV. HAVA Match ............................................................................................. 97

    A.  HAVA Match Process and Purpose .............................................. 97

    B.  The Impact of HAVA Match ........................................................106

    C.  Plaintiffs' HAVA Match witnesses..............................................110

        i.  Dr. Carlos Del Rio........................................................................111

        ii.  Julian Grill ..................................................................................112

V.  Citizenship Verification ..........................................................................114

    A.  The Citizenship Verification Process and Purpose..................114

B.   The Impact of Citizenship Verification.......................................122

C.   Plaintiffs' Citizenship Verification Witnesses...........................127

   i.   Cam Ashling...........................................................................127

   ii.   Rosa Hamalainen....................................................................129

   iii.   Dr. Benjamin Ansa...............................................................132

   iv.   Dr. Ali Kefeli .......................................................................133

VI.  List Accuracy .............................................................................135

A.   The Division of Labor................................................................135

B.   The Felon Matching Process......................................................144

   i.   Plaintiffs' Felon Match Witness.............................................149

C.   The Duplicate Matching Process ...............................................152

   i.   Plaintiffs' Duplicate Match Witnesses..................................158

      a.   Brenda Lee ........................................................................158

      b.   Dasia Holt..........................................................................159

      c.   Kia Carter ..........................................................................162

      d.   Anthony McKissic..............................................................165

D.   Vital Records Matching Process ................................................. 167

E.   Miscellaneous List Accuracy Witnesses ................................. 169

   i.   Antoinette Johnson ................................................................. 170

   ii.   Nicole Freemon ...................................................................... 173

   iii.   Alkhealasharteula Harrison ................................................. 175

   iv.   Emily Huskey .......................................................................... 177

   v.   Meredith Rose ......................................................................... 179

   vi.   Jayme Wills ............................................................................. 182

   vii.   Kelly Dermody ....................................................................... 185

VII. Training on Absentee Ballot Cancellation Procedures ................................ 187

A.   Training Generally ..................................................................... 187

B.   Training Specific to Absentee Ballot Cancellation ................. 190

   i.   Impact of the COVID-19 Pandemic on Training ................. 192

   ii.   Errors in State Training Documents .................................... 196

C.   Plaintiffs' Absentee Ballot Witnesses ..................................... 197

   i.   Saundra Brundage ................................................................. 198

    ii.    Aaron Karp .......................................................................200

    iii.   Deborah Allen ...............................................................202

    iv.   Patricia Andros ..............................................................203

    v.    Dayle Bennett ................................................................204

    vi.   Margaret Whatley ........................................................206

    vii.   Aria Aaron .....................................................................207

    viii.  Webster County ............................................................210

VIII.   Other Evidence Considered. .......................................212

   A.   Plaintiffs' Expert Witnesses .........................................212

    i.    Dr. Adrienne Jones ......................................................212

    ii.    Dr. Peyton McCrary .....................................................224

    iii.   Dr. Lorraine Minnite ....................................................229

   B.   Dr. Dennard and Judge Vines ......................................236

   C.   The New Georgia Project Investigation......................242

   D.   Campaign Speeches of Governor Kemp......................247

   E.   Plaintiffs' additional documentary evidence.............249

F.   Georgia voting and voter registration statistics ...................................... 249

ANALYSIS AND CONCLUSIONS OF LAW ............................................................ 251

I.   Plaintiffs' Article III Standing ............................................................. 251

A.   Injury-in-fact ................................................................................. 251

i.   Fair Fight Action ..................................................................... 252

ii.   Care in Action ...................................................................... 255

iii.   Baconton Missionary Baptist Church .................................. 259

iv.   Ebenezer Baptist Church ....................................................... 263

v.   Sixth District AME Church ..................................................... 269

vi.   Virginia-Highland Church ...................................................... 273

B.   Traceability and Redressability ................................................... 277

II.   HAVA Match and Citizenship Verification ................................... 282

A.   Plaintiffs First and Fourteenth Amendment Claim Against HAVA
Match and Citizenship Verification Fails ...................................... 288

i.   The Burden Imposed ............................................................ 289

ii.   The State's Interest .............................................................. 292

B. Plaintiffs' Section 2 of the Voting Rights Act Claim Fails As To HAVA Match and Citizenship Verification ................................................................. 295

    i. Applying the Brnovich Guideposts ...................................................... 296

    ii. Applying the Gingles Factors to HAVA Match and Citizenship Verification. ..................................................................................... 305

    iii. Conclusions regarding HAVA Match and Citizenship Verification under Section 2 .................................................................................. 312

C. Plaintiffs' Fifteenth Amendment and Fourteenth Amendment Equal Protection Claim Fails As To HAVA Match and Citizenship Verification ................................................................................................ 314

III. Plaintiffs' List Accuracy Claim ....................................................................... 321

A. Plaintiffs' list accuracy claim improperly challenges the administrative details of Georgia's elections .................................................. 323

B. Plaintiffs failed to demonstrate causation on their list accuracy claim. .................................................................................................. 328

C. The burden imposed by list accuracy ...................................................... 331

D. The State's interest in its list accuracy process ........................................ 339

E.   The Political Question Doctrine counsels against this Court's

intervention into list accuracy ............................................................. 341

IV.  Training on Absentee Ballot Cancellation ...................................... 343

A.   Plaintiffs' First and Fourteenth Amendment Claim .............................. 343

B.   Fifteenth Amendment and Fourteenth Amendment Equal

Protection Claims ................................................................................. 347

V.   Plaintiffs' Proposed Remedies ....................................................... 348

A.   Plaintiffs' HAVA Match Remedies ......................................................... 350

B.   Plaintiffs' Citizenship Verification Remedies .......................................... 352

C.   Plaintiffs' List Accuracy Remedies ......................................................... 353

D.   Plaintiffs' Absentee Ballot Cancellation Training Remedies ................. 356

CONCLUSION ..........................................................................................358

## INTRODUCTION

At its initiation, this case involved numerous challenges to a broad scope of Georgia election-administration practices, but the issues that remain at trial are relatively narrow: (1) the State's HAVA Match policy, including a separate citizenship verification policy; (2) the State's maintenance of the statewide voter database; and (3) training on the cancellation of absentee ballots.  Doc. No. [617] at 94-96.

While the issues are limited, the volume of evidence before the Court is significant.  The Parties engaged in over two years of discovery, participated in over 200 depositions, and collectively called over 50 witnesses over a six-week trial.  Ultimately, after applying binding precedent of the Eleventh Circuit and the Supreme Court of the United States, this Court concludes that Plaintiffs' evidence falls short of demonstrating a violation of either the United States Constitution or Section 2 of the Voting Rights Act.

## LEGAL STANDARDS

1.      As this Court has previously explained, Plaintiffs' case is ultimately "about individual voting rights and whether Georgia's election laws and policies unduly burden individuals' right to vote."  Doc. [612] at 68.  The First and

Fourteenth Amendments—which provides a basis for Plaintiffs' challenge to each of the contested issues—focus on the burden on the right to vote and not the unique experiences of individual voters. Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 197 (2008) (voter-specific burdens "arising from life's vagaries" are not unconstitutional); New Georgia Project v. Raffensperger, 976 F.3d 1278, 1281 (11th Cir. 2020) (election day deadline did "not implicate the right to vote at all" despite possibility that some individuals voters might be adversely affected); see also Greater Birmingham Ministries v. Sec'y of State for State of Alabama, 992 F.3d 1299, 1330 (11th Cir. 2021) (agreeing, in the Section 2 context, with other circuit courts' refusals to "make the unjustified leap from the disparate inconveniences that voters face when voting to the denial or abridgement of the right to vote.") (quotation omitted). This distinction is important.

2.     While this lawsuit once involved broad challenges to virtually every aspect of the State's election practices, only three claims remain to be resolved in this case: (1) training of election superintendents on absentee ballot cancellations ("Absentee Ballot Training"); (2) voter list accuracy ("List Accuracy") and (3) HAVA Match and citizenship verification.  The first two claims are referred to collectively herein as the "Administrative Claims," while reference to all three

remaining claims against the State's election practices are referred to, collectively, as the "Challenged Practices."

3.      Plaintiffs' Administrative Claims (asserted in Count I of Plaintiffs' Second Amended Complaint) are both brought under the First and Fourteenth Amendments to the United States Constitution as alleged violations of the fundamental right to vote. Plaintiffs' Absentee Ballot Training claim is also challenged under the Equal Protection Clause of the Fourteenth Amendment (Count III).

4.      Plaintiffs' HAVA Match and Citizenship verification claims are similarly brought as fundamental right to vote claims under the First and Fourteenth Amendments (Count I), the Equal Protection Clause of the Fourteenth Amendment (Count III), the Fifteenth Amendment (Count II), and Section 2 of the Voting Rights Act (Count V).

5.      For efficiency and clarity's sake, Plaintiffs' claims are generally addressed herein by issue rather than count or cause of action due to both the factual and legal overlap among the causes of action. See Doc. No. [12] at 71 n.34. The applicable standard for each legal theory under which one of Plaintiffs' claims is brought is provided below.

3

## I.    Article III Standing

6.    As a threshold matter, this Court must determine whether, and which, Plaintiffs have standing to brings the claims asserted in this lawsuit.  See U.S. Const. art. III, § 2.  Standing must be established at each stage of a case, with the allegations in the complaint ultimately "supported adequately by the evidence adduced at trial." Gladstone Realtors v. Vill. of Bellwood, 441 U.S. 91, 116 n.31 (1979); see also Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992) (elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation").

7.    To establish standing to present a case or controversy, a litigant must prove: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." Jacobson v. Fla Sec'y, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992); U.S. v. Amodeo, 916 F.3d 967, 971 (11th Cir. 2019)).

4

A. Injury-in-fact

8.     Plaintiffs here are all corporate entities that lack a direct injury caused by the Challenged Practices.  Accordingly, principles of organizational standing apply, and those principles require each of the Plaintiffs to demonstrate that the Challenged Practices required diversion of either financial resources or its personnel's time and energy. Arcia v. Sec'y of Fla., 772 F.3d 1335, 1341 (11th Cir. 2014); Common Cause of Ga. v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009).

9.     Plaintiffs' diversions of resources must also be linked to the specific harms alleged. See, e.g., Fla. State Conf. of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008) ("organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract **those illegal acts**") (emphasis added).  The injury must cause a perceptible impairment of organizational activities or daily operations, Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919–21 (D.C. Cir. 2015), or diverted resources "beyond those normally expended." Cigar Ass'n of Am. v. U.S., 323 F.R.D. 54, 63 (D.C. Dist. 2017); accord Ga. Republican Party v. SEC, 888 F.3d 1198, 1203 (11th Cir. 2018) (no evidence that plaintiff was forced to divert resources, "let alone that such diversion impairs the Party."); Ga. Latino Alliance for Human Rights v. Deal, 691 F.3d

5

1250, 1260 (11th Cir. 2012) (challenged legislation "has strained [plaintiff's] limited resources and will continue to do so").  For this reason, the diversion of resources cannot be to new initiatives; rather, Plaintiffs must identify what activities they must "divert resources away *from* in order to spend additional resources" combatting the specific policy or law at issue. Jacobson, 974 F.3d at 1250 (emphasis in original).

10.     Each Plaintiff must demonstrate that each of the Challenged Practices caused a diversion of resources to demonstrate an injury sufficient to establish this Court's jurisdiction. See Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017).

11.     Litigation expenses cannot be used to impart standing on an organization. Nat'l Treasury Emps. Union v. U.S., 101 F.3d 1423, 1434 (D.C. Cir. 1996). Plaintiffs must also demonstrate a concrete injury, such as perceptible impairment of organizational activities or daily operations, Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 919–21 (D.C. Cir. 2015), or diverted resources "beyond those normally expended," Cigar Ass'n of Am. v. U.S., 323 F.R.D. 54, 63 (D.C. Dist. 2017); accord Ga. Republican Party v. SEC, 888 F.3d 1198, 1203 (11th Cir. 2018) (no evidence that plaintiff was forced to divert resources, "let alone that such diversion impairs the Party."); Ga. Latino Alliance for Human Rights v.

6

Deal, 691 F.3d 1250, 1260 (11th Cir. 2012) (challenged legislation "has strained [plaintiff's] limited resources and will continue to do so").

12.     The injury is measured as of the time that Plaintiffs filed their complaint.  A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co., 925 F.3d 1205, 1212 (11th Cir. 2019); Arcia, 772 F.3d at 1340; Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003).  A plaintiff without standing cannot acquire it later based on injuries occurring after the suit was filed. Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co., 68 F.3d 409, 414 (11th Cir. 1995).

13.     Further, each plaintiff must be more than a mere "concerned bystander" who is interested in a problem; instead, the plaintiff must show that the injury is distinct to itself. Gardner v. Mutz, 962 F.3d 1329, 1343 (11th Cir. 2020) (no injury when only generalized interest in preserving history); see also Arcia, 772 F.3d at 1342 ("[A]bstract social interest[s]" cannot establish a concrete injury in fact); Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996) ("abstract concern . . . does not impart standing.").  "'[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified [an] organization is in evaluating the problem, is not sufficient by

itself.'" <u>Gardner</u>, 962 F.3d at 1341 (11th Cir. 2020) (quoting <u>Sierra Club v. Morton</u>, 405 U.S. 727, 739 (1972)).

B. <u>Traceability and Redressability</u>

14.     As the Eleventh Circuit has explained, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" <u>Jacobson</u>, 974 F.3d at 1253 (quoting <u>Lujan</u>, 504 U.S. at 560).

15.     Further, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." <u>Lewis v. Governor of Ala.</u>, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (internal quotations omitted); <u>see also</u> <u>Jacobson</u>, 974 F. 3d at 1254 (precluding judgment against absent parties on redressability grounds).

16.     As applied here, those requirements mean that this Court may not bind any county election officials who are not part of the lawsuit; none would be "obliged . . . in any binding sense . . . to honor an incidental legal determination [this] suit produce[s]." <u>Lewis</u>, 944 F. 3d at 1302 (internal quotation marks omitted). Some counties might defer to Defendants' directions as ordered by this

Court, while others may continue to follow the law as it exists. Jacobson, 974 F. 3d at 1255; see also Friedman v. Snipes, 345 F. Supp. 2d 1356, 1381 (S.D. Fla. 2004).

17.     "[F]ederal courts have no authority to erase a duly enacted law from the statute books." Jacobson, 974 F. 3d at 1255. And even a "favorable declaratory judgment . . . cannot make [] an unconstitutional statute disappear." Steffel v. Thompson, 415 U.S. 452, 469 (1974).

18.     Thus, while this Court may "enjoin executive officials from taking steps to enforce a statute," Mitchell, supra at 936, it may "exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit," Jacobson, 974 F. 3d at 1255.[2] This is because "a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions. But under traditional equitable principles, no court may 'lawfully enjoin the world at large,'" Whole Woman's Health v. Jackson, No.

---

[2] Unlike Georgia law, the Florida law considered in Jacobson empowered its Secretary of State to redress the alleged harm required the Florida Secretary to "[o]btain and maintain uniformity in the interpretation and implementation of the election laws" and to "[p]rovide written direction and opinions to the supervisors of elections," Fla. Stat. § 97.012, and the Eleventh Circuit found even that insufficient to establish traceability or redressability.

21–463, 2021 U.S. LEXIS 6144, at *23 (Dec. 10, 2021), especially not "absent

nonparties," Jacobson, 974 F. 3d at 1254.

19.     The principles of traceability and redressability are intertwined.

"Redressability requires that the court be able to afford relief **through the**

**exercise of its power**, not through the persuasive or even awe-inspiring effect of

the opinion **explaining** the exercise of its power." Lewis v. Governor of Alabama,

944 F.3d 1287, 1305 (11th Cir. 2019) (quoting Franklin v. Massachusetts, 505 U.S.

788, 825, 112 S. Ct. 2767 (1992) (Scalia, J. concurring in part and concurring in the

judgment) (emphasis in original)).

## II.     Mootness

20.     Mootness is another threshold jurisdictional issue that may be raised

at any point during proceedings.  Cole v. Nat'l Collegiate Athletic Ass'n, 120 F.

Supp. 2d 1060, 1068 (N.D. Ga. 2000) ("The Constitution's case or controversy

requirement mandates that the case be viable at all stages of the litigation; it is

not sufficient that the controversy was live only at its inception.") (quotations

omitted).

21.     "A case is moot when events subsequent to the commencement of a

lawsuit create a situation in which the court can no longer give the plaintiff

10

meaningful relief." <u>Jews for Jesus, Inc. v. Hillsborough Cty. Aviation Auth.</u>, 162 F.3d 627, 629 (11th Cir. 1998).

22.     If a Court determines that an action is moot based on what the State has already done or is already doing, then that action will no longer be a "case" or "controversy" over which it has jurisdiction. <u>United States v. Sanchez-Gomez</u>, 138 S. Ct. 1532, 1537 (2018) ("A case that becomes moot at any point during the proceedings is "no longer a 'Case' or 'Controversy' for purposes of Article III," and is outside the jurisdiction of the federal courts.") (quoting <u>Already, LLC v. Nike, Inc.</u>, 568 U.S. 85, 91 (2013)).

## III.     First and Fourteenth Amendment Right to Vote

23.     The Court evaluates Plaintiffs' First and Fourteenth Amendment claims under the <u>Anderson</u>-<u>Burdick</u> analysis. "Under <u>Anderson</u> and <u>Burdick</u>, courts must weigh the "character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." <u>Timmons v. Twin Cities Area New Party</u>, 520 U.S. 351, 358 (1997) (internal quotation marks omitted).

24.     In conducting that analysis, this Court <u>first</u> must "'**consider the character and magnitude** of the asserted injury to the rights protected by the

11

First and Fourteenth Amendments that the plaintiff seeks to vindicate.'" Doc.
[617] at 16 (citing Anderson v. Celebrezze, 460 U.S. 780, 789 (1983) (emphasis
added)).

25.     "'Ordinary and widespread burdens, such as those requiring
nominal effort of everyone, are not severe.'" Doc. [617] at 17 (citing Crawford v.
Marion Cty. Election Bd., 553 U.S. 181, 205 (2008) (Scalia, J., concurring)); see also
Duncan v. Poythress, 657 F.2d 691, 699 (5th Cir. 1981) (the Constitution provides
no guarantee against innocent irregularities in the administration of elections).

26.     The Supreme Court and Eleventh Circuit have provided guideposts
for measuring an alleged burden on the right to vote given that all "election laws
'invariably impose some burden upon individual voters.'" New Georgia Project
v. Raffensperger, 976 F.3d 1278, 1280–81 (11th Cir. 2020) (quoting Burdick, 504
U.S. at 433).

27.     On the one hand, "'lesser burdens . . . trigger less exacting review.'"
Doc. No. [188] at 22 (quoting Timmons v. Twin Cities Area New Party, 520 U.S.
351, 358 (1997)).  Otherwise, states would find their hands tied "as they seek
'order, rather than chaos' in their elections.'"  New Georgia Project 976 F. 3d at
1280–81 (quoting Burdick, 504 U.S. at 433, 112 S.Ct. 2059).  In Timmons, the court
decided that a Minnesota law prohibiting fusion candidates did not impose a

severe burden.  520 U.S. at 363.  In New Georgia Project, the challenged policy,

Georgia's deadline to have absentee ballots returned to county election offices by

the times polls close (7pm on Election Day), was deemed a lesser burden.  976

F.3d at 1280.

28.     On the other hand, "[s]evere burdens under Anderson-Burdick are

burdens imposed as a direct result of a state's laws and policies, such as drastic

limits on voting hours or restrictions on ballot access, not 'burdens . . . arising

from life's vagaries.'" Curling, et al. v. Raffensperger, et al., No. 20-13730 (11th

Circuit, April 1, 2021) (denying motion to lift stay) (Brasher, J.) (quoting

Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 197 (2008)). Severe burdens

include onerous restrictions like requiring a political party to obtain petitions

signed by qualified electors totaling 15% of number of ballots cast in a prior

election to appear on the ballot for the next election, practically excluding them

from the election entirely. Williams v. Rhodes, 393 U.S. 23, 31 (1968) ("[T]he right

to vote is heavily burdened if that vote may be cast only for one of two parties at

a time when other parties are clamoring for a place on the ballot.")

29.     Second, after categorizing the level of the burden, this Court then

"'identif[ies] and evaluate[s] the **interests** put forward by the State as

13

justification for the burden imposed by its rule.'"[3] <u>Crawford</u>, 553 U.S. at 190 (emphasis added).

30.     "When the alleged burdens are not severe, a compelling state interest is not required." <u>New Georgia Project</u>, 976 F. 3d at 1281–82. "If a State's election law imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." Doc. [617] (citing <u>Burdick v. Takushi</u>, 504 U.S. 428, 434 (1992)).

## IV.     Fourteenth Amendment Equal Protection and Fifteenth Amendment

31.     The Fourteenth Amendment to the United States Constitution prevents States from denying any person "the equal protection of the laws." U.S. Const. amend. XIV. The Fifteenth Amendment provides that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United

---

[3] It is important to recognize that the <u>Anderson</u>-<u>Burdick</u> analysis requires consideration of the burden first: it is not enough for plaintiffs to come to federal court and attack the State's interest without first trying to quantify the burden to measure the interest against.  <u>See</u>, <u>e.g.</u>, <u>Cowen v. Georgia Sec'y of State</u>, 960 F.3d 1339, 1342 (11th Cir. 2020) ("**First**, the court must 'consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.' **Second**, '[i]t then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.'") (quoting <u>Anderson</u>, 460 U.S. at 789) (alteration in original) (emphasis added).

States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV.

32.    Courts in this circuit have applied the same standard and elements to claims arising under the Equal Protection Clause and the Fifteenth Amendment.  See Doc. No. [617] at 79–80; see also Greater Birmingham Ministries v. Sec'y of State for State of Alabama, 992 F.3d 1299, 1318 (11th Cir. 2021) (quoting Burton v. City of Belle Glade, 178 F.3d 1175, 1187–88 (11th Cir. 1999).

33.    First, Plaintiffs must show "discriminatory purpose and effect." Greater Birmingham Ministries v. Sec'y of State for State of Alabama, 992 F.3d 1299, 1321 (11th Cir. 2021) (citations, quotations and alterations in original omitted).  This frequently turns on a multi-factor approach set forth in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977).  The test considers (1) whether the impact "bears more heavily on one race than another;" (2) the "historical background of the decision;" (3) the "specific sequence of events leading" to the challenged statute, regulation, or policy; (4) any "departures from the normal procedural sequence;" (5) contemporary statements by the policymaker on the challenged issue; (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the

15

availability of less discriminatory alternatives. <u>Greater Birmingham Ministries</u>, 992 F.3d at 1321–22 (quoting <u>Arlington Heights</u>, 429 U.S. at 266).

34.   Discriminatory intent must also be shown by more than mere "awareness of the consequences" of a potentially disparate impact. <u>League of Women Voters of Fla., Inc. v. Fla. Sec'y of State</u>, 32 F.4th 1363, 1373 (11th Cir. 2022) (even absent presumption of good faith, awareness of consequences "is insufficient to establish discriminatory purpose."); <u>see also</u> <u>Personnel Adm'r of Mass. v. Feeney</u>, 442 U.S. 256, 279 (1979) ("'Discriminatory purpose' . . . implies that the decisionmaker, in this case a state legislature, selected or reaffirmed a particular course of action at least in part 'because of,' and not merely 'in spite of,' its adverse effects upon an identifiable group.").

35.   Only if Plaintiffs satisfy their burden of showing racial discrimination was a 'substantial' or 'motivating' factor behind enactment of a challenged law, and a racially disproportionate impact the result, would this Court then move to the second prong of the analysis.  There, the "burden shifts to the law's defenders to demonstrate that the law would have been enacted" regardless. <u>Hunter v. Underwood</u>, 471 U.S. 222, 228 (1985); <u>see also</u> <u>Greater Birmingham</u>, 992 F.3d at 1321 ("Once discriminatory intent and effect are established, the second prong provides that the burden shifts to the law's

defenders to demonstrate that the law would have been enacted without this racial discrimination factor." (quotation and alterations in original omitted).

36.     The Eleventh Circuit recently explained that each of the factors necessarily turn on the challenged practice at issue, which means this Court must consider the specific history behind the Georgia General Assembly's or Secretary's decisions to create or enforce the Challenged Practices as they currently exist.  See Greater Birmingham Ministries, 992 F.3d at 1323–24.

37.     Reliance on "old, outdated intentions of previous generations should not taint a state's legislative action forevermore on certain topics. To that end, Arlington Heights's 'historical background' factor should be focused on the specific sequence of events leading up to the challenged decision rather than providing an unlimited lookback to past discrimination." League of Women Voters of Fla., Inc. v. Fla. Sec'y of State, 32 F.4th 1363, 1373 (11th Cir. 2022) (quotations, citations, and alterations in original omitted).

38.     Underlying each of these factors is the "presumption of legislative good faith. The Supreme Court has instructed that when a court assesses whether a duly enacted statute is tainted by discriminatory intent, 'the good faith of the state legislature must be presumed.'" Id. (quoting Abbott v. Perez, 138 S. Ct. 2305, 2324 (2018)).

39.     Further, as to claims of geographically disparate treatment in voting, "[e]qual protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush v. Gore, 531 U.S. 98, 104–05, 121 S. Ct. 525, 530, 148 L. Ed. 2d 388 (2000). To this end, the inquiry is whether a voter in one area is "less likely to cast an effective vote than voters in [other areas]? It is this question, and not the question of whether uniform procedures have been followed across a state . . . that the Supreme Court consistently has emphasized in its voting jurisprudence." Wexler v. Anderson, 452 F.3d 1226, 1231 (11th Cir. 2006); see also Dunn v. Blumstein, 405 U.S. 330, 336 (1972) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction.").

## V.     Section 2 of the Voting Rights Act

40.     Section 2 of the Voting Rights Act prohibits jurisdictions from "impos[ing] or appl[ying]" any "voting qualification or prerequisite to voting or standard, practice, or procedure . . . which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a).

18

41.     "The essence of a Section 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Thornburg v. Gingles, 478 U.S. 30, 47 (1986).

42.     In Gingles, the Supreme Court identified a "non-exhaustive list of factors" to consider in a "totality of the circumstances" analysis. 478 U.S. 30. These factors include the "history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process," the extent to which voting in the state is "racially polarized," and "the extent to which members of the minority group have been elected to public office in the jurisdiction," among others. Gingles, 478 U.S. at 37

43.     In 2021, the Supreme Court decided Brnovich v. Democratic Nat'l Committee, 141 S.Ct. 2321 (2021).  Brnovich involved a vote-denial claim under Section 2 of the Voting Rights Act.  This Court's opinion established various "guideposts" for other courts to apply when considering Section 2 claims.  Id. at 2336.

44.     In <u>Brnovich</u>, this Court did not dispense with the <u>Gingles</u> factors, but it did caution that not all of those factors would be applicable in non-vote-dilution cases such as this one:

> [I]t is important to keep in mind that the <u>Gingles</u> or "Senate" factors grew out of and were designed for use in vote-dilution cases. Some of those factors are plainly inapplicable in a case involving a challenge to a facially neutral time, place, or manner voting rule. Factors three and four concern districting and election procedures like "majority vote requirements," "anti-single shot provisions," and a "candidate slating process." <u>See</u> <u>Gingles</u>, 478 U.S. at 37, 106 S.Ct. 2752 (internal quotation marks omitted). Factors two, six, and seven (which concern racially polarized voting, racially tinged campaign appeals, and the election of minority-group candidates), <u>ibid.</u>, have a bearing on whether a districting plan affects the opportunity of minority voters to elect their candidates of choice. But in cases involving neutral time, place, and manner rules, the only relevance of these and the remaining factors is to show that minority group members suffered discrimination in the past (factor one) and that effects of that discrimination persist (factor five). <u>Id.</u>, at 36–37, 106 S.Ct. 2752. We do not suggest that these factors should be disregarded. After all, § 2(b) requires consideration of "the totality of circumstances." But their relevance is much less direct.

<u>Brnovich v. Democratic Nat'l Comm.</u>, 141 S. Ct. 2321, 2340 (2021)

45.     <u>Brnovich</u> made clear that "equal openness [to voting] remains the touchstone" of a Section 2 claim. <u>Id.</u> at 2325.  But "Section 2 does not impose a 'freewheeling disparate-impact regime.'" <u>Veasey v. Abbott</u>, 13 F.4th 362, 378 (5th Cir. 2021) (Ho, J. concurring) (quoting <u>Brnovich</u>, 141 S. Ct. at 2341).

20

46.     Instead, "Section 2(b) directs us to consider the totality of circumstances that have a bearing on whether a State makes voting equally open to all and gives everyone an equal opportunity to vote—and not the totality of just one circumstance, namely, disparate impact." Id. (quotations omitted).

47.     Under Brnovich, the "key requirement [of a Section 2 vote denial claim] is that the political process leading to the nomination and election (here, the process of voting) must be equally open to minority and non-minority groups alike." Id. at 2337.  To that end, the Brnovich Court declined to "compile an exhaustive list," but it did identify "several important circumstances" that should be considered as the relevant guideposts. Id.

48.     First, courts must consider the "size of the burden imposed by a challenged voting rule."  Id. at 2338.  Plaintiffs alleging Section 2 claims cannot satisfy their burden by showing "[m]ere inconvenience," as "every voting rule imposes a burden of some sort."  Id.  The concepts of openness and opportunity relate to "the absence of obstacles and burdens that **block or seriously hinder voting**." Id. (emphasis added).

49.     Second, the "degree to which a [challenged] voting rule departs from what was standard practice when § 2 was amended in 1982 is a relevant consideration."  Brnovich, 141 S. Ct. at 2338.  The analysis must account for the

21

Supreme Court's expressed "doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." Id. at 2339.

50.     Third, the "size of any disparities in a rule's impact on members of different racial or ethnic groups is also an important factor to consider." Brnovich, 141 S. Ct. at 2339.  This consideration requires acknowledgement that "even neutral regulations, no matter how crafted, may result in some predicable disparities . . . but the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote."  Id.  For this reason, a "meaningful comparison is essential."  Id.

51.     In Brnovich, that meaningful comparison focused on racial disparities in "absolute terms."  141 S. Ct. at 2344–45.  It considered the district court's findings of fact that "a little over 1%" of minority voters cast ballots outside of their precinct, while the rate for non-minority voters was about 0.5%." Id.  Contrary to the dissent's analysis, the Brnovich majority did not highlight the difference between 0.5% (white voters) and 1% (voters of color).  Id.  Instead, the majority looked to the numbers in the aggregate and concluded that the policy

22

"work[s] for 98% or more of voters to whom it applies—minority and non-minority alike."[4] Id.

52.    "Unlike discrimination claims brought pursuant to the Fourteenth and Fifteenth Amendments, which require proof of both discriminatory intent and actual discriminatory effect, the language of Section 2(a) of the VRA requires only proof of discriminatory "results," not of discriminatory intent." Greater Birmingham Ministries, 992 F.3d at 1328–29.

53.    Importantly, however, the Brnovich majority specifically qualified the significance of a finding of disparate impact under Section 2: "The dissent . . . would rewrite the text of § 2 and make it turn almost entirely on just one circumstance—disparate impact.  This is a radical project." Id. at 2342.  Thus, disparate impact is a factor, but it is not dispositive.

54.    Fourth, the Brnovich Court instructed federal courts to "consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision." Id. at 2339 (emphasis added).  In

---

[4] The Court also opined on how the "use of statistics [can be] highly misleading." Brnovich, 141 S. Ct. at 2345.  For example, "if 99.9% of whites had photo IDs, and 99.7% of blacks did, it could be said that blacks are three times more likely as whites to lack qualifying ID (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical." Id. (quoting Frank v. Walker, 768 F.3d 744, 752, n. 3 (7th Cir.  2014)) (internal quotation marks omitted).

other words, "where a State provides multiple ways to vote," any burden

imposed by one of those available methods "cannot be evaluated without also

taking into account the other available means." Id. at 2339.

55.     Fifth, "the strength of a state's interests served by a challenged

voting rule" must also be considered. Id.  Here, the Brnovich majority reaffirmed

that the prevention of fraud is a "strong and entirely legitimate state interest."

Id. at 2340.  And, "it should go without saying that a State may take action to

prevent election fraud without waiting for it to occur and be detected within its

own borders." Id. at 2348.

56.     The Supreme Court also addressed what does not constitute proper

analysis under a Section 2 vote denial claim.  For example, the "disparate impact

model employed in Title VII and Fair Housing Act cases [is not] useful" when

considering Section 2. Id. at 2340.  Adopting such a standard would lead to

impermissible federal micromanaging of State elections. Id.

57.     The Supreme Court also rejected the "cat's paw" theory of liability

when looking to questions of intentional discrimination. Id. at 2349–50.  That

theory is typically used in employment contests where a plaintiff "seeks to hold

the plaintiff's employer liable for the 'animus of a supervisor who was not

charged with making the ultimate [adverse] employment decision.'"  Id. at 2350

(quoting Staub v. Proctor Hosp., 562 U.S. 411, 415 (2011)).

58.     Thus, in Section 2 cases, that one policymaker may have acted with

improper intent does not mean others did; indeed "it is insulting to suggest that

they are mere dupes or tools."  Id.

59.     In addition, and as in its analysis of Equal Protection and Fifteenth

Amendment claims, the Eleventh Circuit has cautioned against reliance on a

state's history regarding past voting practices that are unrelated to the claims at

issue when determining the intent of present-day actors.  See, e.g., Greater

Birmingham Ministries, 992 F.3d at 1332 ("While we credit Plaintiffs' argument

about Alabama's history of voting-related discrimination, we also reiterate our

caution against allowing the old, outdated intentions of previous generations to

taint Alabama's ability to enact voting legislation.").

60.     This Court has ruled that both the Gingles factors and Brnovich

guideposts are to be considered in evaluating Plaintiffs' claim.  Doc. No. [636] at

21.

## VI.   The Political Question Doctrine

61.     In addition to the legal standards governing Plaintiffs' standing and

their specific claims, this Court also finds it useful to set forth at the outset the

applicable limitations of its review of the State's adopted election procedures; namely, what matters constitute "political questions" that are left to the State's best determination and are outside the scope of judicial review. This political question doctrine provides another meaningful guidepost for this Court's analysis of each of Plaintiffs' claims.

62.    The United States Constitution authorizes states to set the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. And that power "is matched by state control over the election process for state offices." Clingman v. Beaver, 544 U.S. 581, 586, 125 S. Ct. 2029, 161 L.Ed.2d 920 (2005).

63.    These constitutional powers are "broad." See Duncan v. Poythress, 657 F.2d 691, 702 (5th Cir. 1981) ("[T]he constitution leaves to the states broad power to regulate the conduct of federal and state elections."). "[C]ourts have no business interfering with them absent a compelling need to do so [and w]hen courts do interfere, they must tread carefully and provide the minimum (and least disruptive) relief necessary to redress the harm."  Anderson v. Raffensperger, 497 F. Supp. 3d 1300, 1330 (N.D. Ga. 2020).

64.    The Eleventh Circuit reiterated this cautionary note against intruding on the State's authority to manage its own affairs in a recent voting

rights case, <u>New Georgia Project v. Raffensperger</u>. 976 F.3d 1278, 1283, (11th Cir. 2020) (the Supreme Court's "mantra" points "in one direction—allowing the States to run their own elections").

65. Upon staying a district court's decision to extend Georgia's absentee ballot return deadline, finding that the plaintiffs had not shown a substantial likelihood of success on the merits, this Court concluded: "Federal judges can have a lot of power—especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our sphere of decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." <u>Id.</u> at 1284.

66. As the Eleventh Circuit previously explained, "[a]lthough federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will **not** intervene to . . . supervise the **administrative details** of a local election." <u>Curry v. Baker</u>, 802 F.2d 1302, 1314 (11th Cir. 1986) (emphasis added).

67. "If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute . . . . Section 1983 did not create a delictual action for the torts of state

27

officials, and it did not authorize federal courts to be state election monitors."

Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980); see also Shipley v. Chicago

Bd. of Election Commissioners, 947 F.3d 1056, 1062 (7th Cir. 2020) ("[A]llegations

[of administrative misconduct] may state a claim for violation of the [state]

Election Code. But that is a state law claim for a violation of state law, not a

federal claim for a violation of constitutional rights.").

68.     In short, and as this Court has already held, "it is not the place of

federal courts to decide complex and subtle questions of election

administration."  Doc. [612] at 67.

69.     To this end, this Court does not, and will not, attempt to resolve

political questions.  A political question is one that involves "'[1] a textually

demonstrable constitutional commitment of the issue to a coordinate political

department" and/or "[2] a lack of judicially discoverable and manageable

standards for resolving it.'" McMahon v. Presidential Airways, Inc., 502 F.3d

1331, 1357 (11th Cir. 2007) (quoting Baker v. Carr, 369 U.S. 186 (1962)).

70.     "There are no legal standards discernible in the Constitution for

making such judgments."  Rucho v. Common Cause, 139 S. Ct. 2484, 2500 (2019).

These issues are, at their core, political questions. See Jacobson v. Fla. Sec'y of

State, 974 F.3d 1236, 1242 (11th Cir. 2020) ("[P]icking among the competing

visions of fairness poses basic questions that are political, not legal."); see also

Coalition for Good Governance, et al. v. Brad Raffensperger, et al., No. 1:20-CV-

1677-TCB, 2020 WL 2509092, at *3–4 (N.D. Ga. May 14, 2020), appeal dismissed

sub nom. Coal. for Good Governance v. Raffensperger, No. 20-12362-BB, 2020

WL 5753330 (11th Cir. Aug. 17, 2020) (dismissing claims as presenting

nonjusticiable political questions and declining to "micromanage the State's

election process" where "there are no discernable and manageable standards to

decide issues such as how early is too early to hold the election or how many

safety measures are enough.").

## VII.   Remedies

71.   This Court also finds it useful to address, at the outset of this Order,

the standard by which it will review Plaintiffs' proffered remedies in this case.

As with the political question doctrine, this standard will be interwoven into this

Court's review of all of Plaintiffs' claims.

72.   For all of their claims, Plaintiffs are limited to prospective injunctive

relief. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105–106 (1984).

73.   Rule 65 requires the terms of an order for injunctive relief to be

specific and describe with reasonable detail the act or acts restrained or required.

FRCP Rule 65(d).  And, "an injunction is to be narrowly tailored to remedy the

specific action which gives rise to it." <u>Valley v. Rapides Par. Sch. Bd.</u>, 646 F.2d 925, 942 (5th Cir.), on reh'g, 653 F.2d 941 (5th Cir. 1981); <u>see also</u> <u>Califano v. Yamasaki</u>, 442 U.S. 682, 702, 99 S. Ct. 2545, 2558, 61 L. Ed. 2d 176 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

74.     Moreover, injunctions that do little more than order a party to "obey the law" do not meet these requirements. <u>S.E.C. v. Goble</u>, 682 F.3d 934, 949 (11th Cir. 2012). Such "obey the law" injunctions are problematic for what they fail to do: they are too broad and non-specific to give the restrained party fair notice of conduct that risks contempt. <u>See</u> <u>Hughey v. JMS Dev. Corp.</u>, 78 F.3d 1523, 1531 (11th Cir. 1996); <u>see also</u> <u>Payne v. Travenol Lab'ys, Inc.</u>, 565 F.2d 895, 897 (5th Cir. 1978) ("This command of specificity is a reflection of the seriousness of the consequences which may flow from a violation of an injunctive order. The word 'discriminating' … is too general. […] Such 'obey the law' injunctions cannot be sustained.").

75.     As to Plaintiffs' Section 2 claim, the Eleventh Circuit has "repeatedly construed the first <u>Gingles</u> factor as requiring a plaintiff to demonstrate the existence of a proper remedy." <u>Burton v. City of Belle Glade</u>, 178 F.3d 1175, 1199 (11th Cir. 1999).

76.     **"The inquiries into remedy and liability . . . cannot be separated**: A district court must determine as part of the <u>Gingles</u> threshold inquiry whether it can fashion a permissible remedy in the particular context of the challenged system. . . . The absence of an available remedy is not only relevant at the remedial stage of the litigation but also precludes, under the totality of the circumstances inquiry, a finding of liability." <u>Nipper v. Smith</u>, 39 F.3d 1494, 1530–31 (11th Cir. 1994) (en banc).

77.     As to Plaintiffs' Administrative Claims, the Eleventh Circuit has repeatedly cautioned that "federal courts must be chary of hearing challenges to a state's duly enacted election procedures." <u>New Georgia Project</u>, 976 F.3d at 1285 (J. Lagoa, concurring); <u>see also</u> <u>Eu v. San Francisco Cty. Democratic Cent. Comm.</u>, 489 U.S. 214, 231 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process.").

78.     Accordingly, and as other courts in this district have noted, "[w]hen courts do interfere, they must tread carefully and provide the minimum (and least disruptive) relief necessary to redress the harm." <u>Anderson v. Raffensperger</u>, 497 F. Supp. 3d 1300, 1330 (N.D. Ga. 2020); <u>see also</u> <u>Georgia Shift v. Gwinnett Cty.</u>, No. 1:19-CV-01135-AT, 2020 WL 864938, at *5 (N.D. Ga. Feb. 12, 2020) ("A federal court should not be 'the arbiter of disputes' which arise in

elections; it is not the federal court's role to 'oversee the administrative details of a local election.'") (quoting <u>Curry v. Baker</u>, 802 F.2d at 1315).

79.    In addition, as to Plaintiffs' Equal Protection arguments, "[a]rguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although perhaps unfortunate, are to be expected, just as judges in sentencing-guidelines cases apply uniform standards with arguably different results." <u>Ne. Ohio Coal. for the Homeless v. Husted</u>, 837 F.3d 612, 636 (6th Cir. 2016).

80.    Finally, this Court has already agreed with Defendants that "[t]he law does not impose constitutional liability for governments because they do not *exceed* their statutory obligations.'" Doc. No. [617] at 22 (emphasis in original); <u>see also</u> <u>Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections</u>, 2020 WL 1031897, at *6–7.[5]

81.    Applying these principles, this Court finds that it was not only Plaintiffs' burden to show that constitutional violations exist and that they have been harmed thereby, but also to present remedies are the "minimum (and least

---

[5]  This is particularly relevant where, with respect to Plaintiffs' HAVA Match claim, Defendants' alleged liability is tied to their duties as prescribed by federal law. <u>Bellitto v. Snipes</u>, 935 F.3d 1192, 1202 (11th Cir. 2019) ("HAVA creates no private cause of action.").

disruptive) relief necessary to redress the harm." Anderson v. Raffensperger, 497 F. Supp. 3d 1300, 1330 (N.D. Ga. 2020); see also Georgia Shift v. Gwinnett Cty., No. 1:19-CV-01135-AT, 2020 WL 864938, at *6 (N.D. Ga. Feb. 12, 2020) (when election officials "fail to constitutionally carry out their duties to properly conduct and administer the . . . elections, an action can be brought to seek a tailored remedy of an actual injury by affected voters or advocacy groups[.]").

82.     As such, this Court reviews Plaintiffs' claims in light of the remedies Plaintiffs proposed at trial.  This Court also declines Plaintiffs invitation to attempt independently to develop alternative remedies or implement its own preferred policies for how Georgia's elections might be run.  Doing so simply is not the role of this Court.  See, e.g., Ohio Democratic Party v. Husted, 834 F.3d 620, 633 (6th Cir. 2016) ("[O]ur task (especially with respect to minimally burdensome laws) is neither to craft the 'best' approach, nor to impose our own idea of democracy upon the [ ] state legislature."); Rockford League of Women Voters v. U.S. Nuclear Regulatory Comm'n, 679 F.2d 1218, 1222 (7th Cir. 1982) ("Government agencies have limited resources to perform their appointed tasks. The courts cannot tell them how to allocate those resources so as to get the most value out of them. That calls for a managerial judgment.").

# FINDINGS OF FACT

Having considered the evidence at trial and the Parties' Rule 52(c) presentations and closing arguments, this Court makes the following findings of fact:

## I.  The Secretary of State

83.    During the years relevant to this lawsuit, Georgia had three Secretaries of State: Brian Kemp, who is currently Georgia's Governor; Secretary Brad Raffensperger, and Secretary Robin Crittenden, who served briefly between Secretary Kemp's resignation in November 2018, and Secretary Raffensperger's inauguration in January 2019. Tr. 3461:21–3462:2 (Harvey).

84.    The Secretary of State is a constitutional officer elected by Georgia voters every four years. Ga. Const. Art. 5, Sec. 3, Par. 1. In addition to other duties and obligations, the General Assembly designated the Secretary as the State's "chief election official" pursuant to the Help America Vote Act of 2002 ("HAVA").[6] O.C.G.A. § 21-2-50.2(a).

---

[6]  Mr. Harvey also testified that the Secretary's office never understood or interpreted the designation as the chief election official to mean that the Secretary was responsible for all aspects of Georgia elections. Tr. 3459:25-3460:6; 3484:25-3485:25.

85.     As relevant to this case, the Secretary maintains two divisions that impact elections: the Elections Division and the Investigations Division. Tr. 3462:3–5 (elections division); 3461:5–17 (investigations division); 3492:10–19 (same)).

86.     The Elections Division had about 16 employees throughout the relevant time of this lawsuit. Tr. 3462:3–5. It includes at least a training group, four to six county liaisons, counsel, and an Elections Division Director. Tr. 3509:10–12 (training group); 826:2–20 (liaisons); PX. 2054 (Rayburn Dep. Tr.), Tr. 11:8–18 (counsel).

87.     Most investigators are certified by the Georgia Peace Officer Standards and Training Council ("P.O.S.T."). Tr. 3461:5–17. Two to four would generally focus on elections, and they would handle multiple cases at a time. Tr. 3492:10–19.

88.     County liaisons are personnel in the Secretary of State's office who assist and support counties in the performance of their duties, in conjunction with other members of the Secretary's office, and act as the point-of-contact between counties and the Secretary's office to assist or troubleshoot problems when they arise. Tr. 1373:11–21; 3472:21–25 (Harvey); Tr. 826:2–20 (Hallman).

89.     Chris Harvey served as the deputy-inspector general/chief investigator for the Secretary of State's office from 2007 until July 2015 and then as the Elections Division Director from July 2015 until his departure from the Secretary's office in July 2021, and he  now serves as the Deputy Director at P.O.S.T. Tr. 3459:25–3460:6. During Harvey's time with the Secretary, about ten elections per year occurred. Tr. 3513:20–3514:5. While he served as Elections Division Director, Mr. Harvey was a member of the National Association of State Election Directors and attended training conference at least twice a year. Tr. 3462:23–3463:3.

90.     Gabriel Sterling is the current chief operating office for the Secretary of State's office. Tr. 4177:10–15. He has a political science degree from the University of Georgia and has worked in Georgia elections, in both volunteer and paid capacities, since 1986. Tr. 4177:16–18; 4175:2–6.

91.     Ryan Germany is the General Counsel for the Secretary of State's office. Tr. 1517:7–9. He has held that position since 2014. Tr. 1517:10–11.

92.     As General Counsel, Mr. Germany works with every division of the Secretary of State's office, including but not limited to the Elections Division, on legal issues. Tr. 1517:16–17.

36

93.     As General Counsel for the Secretary of State's office, Mr. Germany spent time on the promulgation of rules and regulations for the State Election Board. Tr. 1522:1–2.

94.     If the State elections board requests any rules or regulations to be adopted, Mr. Germany, or an attorney on his team at the Secretary of State's office, would be the primary drafter. Tr. 1741:14–17.

95.     Kevin Rayburn was the Deputy Elections Director and Deputy General Counsel at the Georgia Secretary of State's office at the times relevant to this lawsuit. PX. 2054 (Rayburn Dep. Tr.), Tr. 11:7–11:9. He began working at the Georgia Secretary of State's office in July of 2016. Prior to his work at the Georgia Secretary of State's office, Mr. Rayburn worked for the Tennessee Secretary of State as an attorney and policy analyst. PX. 2054, Tr. 10:11–10:22. Mr. Rayburn's job responsibility as Deputy Elections Director was to support the Director (Mr. Harvey) in managing the Elections Division. PX. 2054, Tr. 16:2–16:9.

96.     Melanie Frechette was employed with the Secretary of State's office from February 2017 through February 2020 as a county liaison and then as the training administrator. Tr. 1216:7–23. In her role at the Secretary's office, one of Ms. Frechette's responsibilities was to receive and respond to questions from

county election officials as well as to provide guidance on certain aspects of election administration. Tr. 1220:6–13.

97.     John Hallman was employed by the Secretary of State's office from 2013 to 2020. Tr. 758:15–20. Mr. Hallman was the Election Systems Manager of the statewide voter registration system known as eNet from July 2016 to February 2020. Tr. 759:3–12.

98.     During his tenure, Mr. Harvey never doubted that the United States Constitution and the federal Voting Rights Act applied to state elections, and he had no reason to doubt that Secretaries Kemp and Raffensperger shared those values. Tr. 3463:20–3464:18. Similarly, Mr. Harvey never suggested to county election officials that the Voting Rights Act did not apply to Georgia elections, and he had no reason to believe that county election officials were not aware that the United States Constitution and the Voting Rights Act applied to Georgia elections. Tr. 3464:2–8.

99.     Testimony established that the goal of the Secretary's office, including the Elections Division, is to consistently apply the laws applicable to Georgia elections. Tr. 3489:14–19 (Harvey); Tr. 1831:9–18 (Germany). Indeed, treating voters equally was a "motivating factor" in just about everything the Secretary's office did, and the Secretary's staff never wanted to provide even the

38

impression that they were targeting any individuals or groups." Tr. 3475:4–13 (Harvey). This was communicated to county election officials. Tr. 3478:3–7 (Harvey). To these ends, Mr. Harvey never turned down an invitation to speak to voting rights groups like the NAACP and ACLU, and he received recognition from the NAACP for his participation. Tr. 3476:8–3477:7.

100.   No member of the Secretary's office testified that the party affiliation of the Secretary of State or their own partisan beliefs influenced the execution of their public duties. Tr. 3490:23–3491:2 (Harvey); Tr. 4240:12–18 (Sterling). And, the political affiliation of those seeking the assistance of the Secretary's office did not change the way the office handled the issue. (Tr. 3491:7–19 (Harvey)).

A. Elections Operations

101.   The Secretary views Georgia's elections framework thusly: the General Assembly sets the statutory rules; pursuant to those statutes, the Secretary or the State elections board promulgate regulations; and the 159 Georgia counties administer Georgia elections. Tr. 3465:23–3466:24 (Harvey). SOS personnel generally serve in advisory, rather than supervisory, roles with county elections offices. Tr. 1315:1–3.

102.   Georgia county election administrators are organized in at least three different ways. The most common is a combined board of elections and

39

registrars; fewer counties have a probate judge serving as the election superintendent and a separate board of registrars; and fewer counties still have separate boards of registration and elections. Tr. 3466:25–3468:5.

103.    When he served as Secretary of State, Governor Kemp sought to work with the counties and rebuild relations that may have been previously strained; undisputed evidence indicated that the approach worked. Tr. 3480:11–20. No testimony indicated that Secretary Raffensperger has changed this policy. To these ends, the Secretary of State's office receives and responds to questions from county election officials and provides guidance on certain aspects of election administration.[7] Tr. 1220:6–13 (Frechette). But election superintendents do not necessarily follow, and are not necessarily required to follow, advice from the Secretary's office. Tr. 1315:4–7 (Frechette).

104.    Both the Secretary and State Election Board expect counties to administer elections in a generally uniform manner, and the weight of the evidence demonstrated that the Secretary would assist counties, when asked, to achieve this goal. While the Secretary intends for elections to be run in a general

---

[7] Plaintiffs point to statements from Secretary of State employee John Hallman to argue against the idea that the Secretary's office advises county election officials. Tr. 898:2-8 (Hallman). Having reviewed the record in its entirety, this Court finds that the weight of the evidence warrants a finding that the Secretary's office did, more often than not, work with and assist county election officials when requested. See, e.g., PX. 410.

uniform manner, that does not mean that the Secretary expects every county to administer elections in an identical manner. Tr. 3470:1–3471:19. Election administration becomes problematically non-uniform when it occurs contrary to law. Tr. 3471:20–24.

105.    For example, some counties have more advanced, in-person voting and make accommodations for that; others process (but do not tabulate) votes earlier than others due to greater population, and the number of polling places may differ by percentage of population in any given county. Tr. 3470:1–3471:19.

106.    Plaintiffs presented no evidence to suggest that county election officials do not take their positions seriously, are insincere, or are oblivious to Georgia's history of racism in elections; several individuals testified to the contrary, including Elections Division Director Harvey and State Election Board (sometimes referred to as "SEB") Member Rebecca Sullivan. Tr. 3473:3–18 (Harvey); Tr. 3981:3–24 (Sullivan).

   i.   *Investigative Division and Voter Complaints*

107.    Voter or other election-related complaints that came into the Secretary's office were frequently forwarded to the Investigative Division for investigation. Tr. 3983:1–5 (Sullivan); Tr. 1665:20–21 (Germany); Tr. 1823:18–23 (Harvey). In the vast majority of times, complaints involved a

41

"misunderstanding" or a voter's lack of knowledge about a particular voting requirement (e.g., showing photo identification to vote). Tr. 3475:17–3476:7 (Harvey).

108. When voters or others would register a complaint about Georgia elections with the Secretary, most communications would come to the Secretary's office via email. Tr. 3541:19–23. Other methods included by telephone, mailed letters, and personal visits. Tr. 3541:23–3543:3 (Harvey).

109. Emails that came regarding complaints would go into an email inbox that was managed by Chris Harvey and Kevin Rayburn, though other individuals in the Secretary's office had access to the email box. Tr. 3543:6–17 (Harvey).

110. Mr. Harvey and Mr. Rayburn developed a system under which one of them would typically review email complaints that came into the office. PX. 2054, Tr. 41:4–41:16. At that point, they frequently resolve it on their own, forward it to a county liaison in the Elections Division, or send it to investigations to be handled. Tr. 1912:13–1913:4 (Harvey). When referring issues for investigation, Mr. Rayburn would always check with Chris Harvey, as Mr. Harvey was previously the chief investigator. PX. 2054, Tr. 50:22–51:25.

111.    Matters would be forwarded to investigators for several reasons, including if the matter were "serious," including someone not being able to vote; apparently systemic; or involved a county with repeat and similar issues in the past. Tr. 3545:5–14 (Harvey). Mr. Harvey credibly testified that he erred on the side of sending matters to investigators, (Tr. 3547:12–16), and Plaintiffs provided no evidence to the contrary.

112.    Complaints and other matters would be sent to county liaisons if the voter were having a hard time reaching the county election office, if the county's administration of the procedure appeared incorrect, or if something needed more follow-up from the county office. Tr. 3545:17–3546:10 (Harvey). The county liaisons would directly report to Mr. Rayburn. PX. 2054, Tr. 29:22–30:4.

113.    Mr. Harvey and Mr. Rayburn would also mark a complaint as completed or resolved, which did not mean the issue was necessarily fully resolved, but it did indicate to at least Mr. Harvey and Mr. Rayburn that the initial triage had taken place. Tr. 3543:4–3544:8.

114.    This system, while informal, did have an ability to search emails, and Mr. Harvey testified credibly that he did not feel overwhelmed by the system he implemented. Tr. 3544:9–3545:1; Tr. 3547:2–11.

43

115.    A frequent example of a complaint introduced at trial would be a voter contacting the office saying they registered to vote but could not locate their information online (typically on the Secretary's My Voter Page or "MVP"). Mr. Rayburn would try to find them in the voter registration database, and Mr. Rayburn explained that he almost always found it be an issue that the voter had mistyped their name, last name, date of birth, or their county. Mr. Rayburn would contact the voter and help them understand why they were not able to find their record when he was able to do so while also confirming to the voter that they were, in fact, registered. PX. 2054, Tr. 44:8–45:9. The resolution frequently took only hours. See, e.g., PX. 1182.

116.    Mr. Rayburn testified that he would provide this service himself because (1) he strongly cares about elections, and (2) he is able to quickly find this information and have peace of mind that the voter was helped. PX. 2054, Tr. 45:12–46:2.

117.    Some matters that came to the Secretary's office as a complaint were either outside the scope of the Secretary's jurisdiction or were not election complaints as much as political ones. Tr. 3546:11–23. This happened relatively frequently in 2018, as "a lot of people"—both inside and outside Georgia—called

to express displeasure with then-Secretary Kemp serving as Secretary while running for Governor.[8] Id.

118.    Mr. Harvey testified that the Secretary's office responded to most cases in a timely basis, and this Court agrees based on the weight of the evidence. Tr. 3546:24–3547:1; see, e.g., PX. 892 (showing an issue arising at 11:11 a.m. and resolved by 3:53 p.m. that day, which was the day after the 2018 general election); PX. 1117 (Webster County issue coming before Mr. Harvey at 5:01 on June 20, 2019 and action being taken the next day); PX. 1182 (voter question about registration answered in three hours).

ii. *The Secretary's interaction with county election officials*

119.    This Court heard undisputed testimony that about 30% of the county election officials in the State are African-American. Tr. 3477:12–21 (Harvey).

120.    Counties were divided into regions based on divisions created by the Georgia Association of Voter Registration and Election Officials (GAVREO),

---

[8]  Plaintiffs' expert, Dr. Adrienne Jones, testified at trial that she similarly believed the 2018 gubernatorial election was "stolen" from Stacey Abrams due to the "conflict of interest for the Secretary of State to operate his own election." Tr. 975:3-10. Upon questioning from this Court noting that the Secretary of State is itself an elected position, however, Dr. Jones admitted that she "would have to think a little bit more about" the issue. Tr. 975:24-976:15.

and each division was assigned a liaison in the Secretary's office. Tr. 3524:1–20 (Harvey). The liaisons would speak frequently with county administrators, attend their regional meetings (which occurred ever month or two months), and provide other general assistance. Tr. 3472:22–25 (liaison contact); 3482:1–11 (attending meetings)).

121.    As Elections Division Director, Mr. Harvey spoke to county election administrators "all the time … multiple times a day, every day." Tr. 3472:9–13.

122.    The Secretary's office could also communicate to counties via an Official Election Bulletin, which are sent formally to all county election officials. Tr. 3481:14–25 (Harvey). Official Election Bulletins are not binding on the counties, and frequently they were used to point out something that was binding like a recent court decision impacting election administration. Tr. 3483:10–3484:2 (Harvey).

123.    During his tenure as Secretary of State, Governor Kemp oversaw the implementation of Firefly to communicate with the counties more easily. PX. 73, Tr. 69:4–9; 96:22–24. Firefly maintains election information, training materials, Official Election Bulletins, reports, and a chat room for election officials known as "The Buzz." Tr. 3482:14–3483:6. Firefly was available to all election officials in the State. Tr. 3482:17–18.

46

124.    The State would also provide speakers to the counties' election officials' annual meetings (e.g., GAVREO), where most of the county superintendents and registrars satisfied their training requirements. Tr. 3477:12:–13; 3535:6–14 (Harvey).

## II.    The State Election Board[9]

125.    The General Assembly created the SEB in Code Section 21-2-30(a). It consists of five members, including a representative of each of the two major political parties. O.C.G.A. § 21-2-30(c). Governor Brian Kemp served as chair of the State Election Board while he was Secretary of State. PX. 73, Tr. 10:7–14; 11:7–15. Secretary Raffensperger did until sometime in 2021. Tr. 4075:3–15 (Sullivan). Rebecca Sullivan and Matt Mashburn served as the acting chairs until very recently, when former United States District Court Judge for the Northern District of Georgia, William Duffey, was appointed as Chairman. Tr. 3976:21–24 (Sullivan); Tr. 4074:7–15; 4075:3–9 (Mashburn).

126.    As described more fully below, this Court heard testimony from three recent SEB members—Seth Harp, Rebecca Sullivan, and Anh Le—and one

---

[9]  The State Election Board as an entity remains a Defendant only for purposes of Plaintiffs' Section 2 HAVA Match claim. Doc. No. [617] at 3 nn.2 and 3. Other claims are brought against the SEB Members in their official capacities.

active member of the SEB, Matt Mashburn. All were attorneys. All had either

some significant state government experience before being appointed to the SEB

(Harp, Sullivan, Le, Lindsey), and/or had practiced election law well before their

appointment (Sullivan, Mashburn). Tr. 3989:9–3991:12 (Harp); Tr. 3975:12–

3976:12 (Sullivan); Tr. 4075:16–4077:18 (Mashburn); Tr. 1765:1–8; 16–17667:2 (Le);

Tr. 3977:1–10 (Lindsey).

127.    Members of the State Election Board do not receive formal training

upon appointment. See, e.g., Tr. 3977:25–3978:2 (Sullivan); PX. 73, Tr. 21:24–22:1

(Kemp). Nevertheless, Ms. Sullivan and Mr. Mashburn testified credibly that

they felt prepared for their service given their training and experience, and that

the lack of formal training did not hinder their service on the SEB. Tr. 3978:3–15

(Sullivan); 4078:7–19 (Mashburn). Mr. Mashburn further testified that he found

his fellow SEB members to be well-prepared, qualified, and that they take their

roles seriously. Tr. 4800:7–18. Ms. Sullivan also explained that the Board typically

works by consensus, and she could not recall a time that the SEB made a decision

on a one-vote majority. Tr. 3989:9–3991:12

128.    Commissioner Sullivan testified that she would take, on average, six

to eight hours preparing for meetings of the State Election Board, including

reviewing the investigation summaries, researching any unfamiliar cited law,

and reviewing drafts of proposed rules. Tr. 3979:5–25. Mr. Mashburn provided

similar testimony. Tr. 4078:20–23; 4079:8–10 (three hours of preparation for one

hour of a meeting). This preparation includes reviewing election complaints that

come before the Board. Tr. 4089:2–5.

129.    As Vice Chairman and acting Chair, Ms. Sullivan would also attend

pre-meetings and meet with SEB staff and investigators to prepare for the

meeting. Tr. 3980:4–15. During her time on the Board, Commissioner Sullivan

reviewed over 1,000 cases that came before it. Tr. 4065:16–19.

130.    The General Assembly imposed ten statutory duties on the State

Elections Board, which range from the promulgation of rules and regulations to

making recommendations to the General Assembly. O.C.G.A. § 21-2-31; see also

Tr. 4095:2–6 (Mashburn); PX. 73 (Kemp Dep. Tr.), Tr. 11:7–15.

131.    In State government parlance, the SEB does not have an

independent budget or line item in the annual State budget. Tr. 3984:24–3985:19

(Sullivan). Instead, State funds appropriated to the Secretary of State's office

covers any expenses for the State Election Board. Tr. 3985:20–22 (Sullivan).

Commissioner Sullivan testified that this budget process did not prevent her

from fulfilling her responsibilities on the State Election Board. Tr. 3986:15–17; see

also Tr. 4079:16–20 (Mashburn) (same).

132.    For most of 2014–2022, the SEB would meet less than monthly. Tr.
3998:7–16. At least one witness testified, however, that when Secretary
Raffensperger began his service, the board would meet more frequently to clear
up any remaining backlogs. Tr. 4121:18–23 (Mashburn).

133.    The State Election Board is generally staffed by the Secretary of
State's office, and the Attorney General's office provides legal advice and
support. Tr. 3984:4–9. The State Election Board does not conduct investigations;
investigations are performed by investigators at the Secretary of State's office
and brought before the SEB for review. Tr. 1769:4–17 (Le); Tr. 3982:2–5 (Sullivan).
SEB members testified, without contradiction, that the Secretary's staff was
competent, hard-working, and dedicated to their profession.[10] Tr. 3995:8–11
(Sullivan); Tr. 4079:22–25 (Mashburn).

134.    The State Election Board was not part of and did not follow,
however, the day-to-day operations of the Secretary of State's Elections Division.
Tr. 4004:6–9 (Sullivan). Not every complaint received by the Secretary of State's
office would require the SEB's involvement; many problems, particularly those
not involving a violation of Georgia's election laws, were resolved by the

---

[10] The Secretary of State's office does not pass all complaints or investigations onto the
SEB for action. Tr. 4121:24-4122:5 (Mashburn). The Secretary's staff works out most
complaints with the counties. Tr. 4180:10–4181:1 (Sterling).

Secretary of State's office independently. Tr. 4117:7–12; 4081:20–4082:1

(Mashburn); Tr. 4028:18–21; 4063:7–20 (Sullivan).[11]

135.    Generally, the SEB would work through the agenda prepared for it

by the Secretary's office at their meetings. Tr. 4017:6–9 (Sullivan). Commissioner

Sullivan further testified that, if the Secretary's office were not processing or

providing information to the SEB, members of the public would likely have

reached out as a check and balance. Tr. 4028:18–25.

136.    Indeed, Board members testified that they would receive complaints

directly from voters which they would forward to the Secretary of State's office.

Tr. 1773:16–18; 1774:1–2(Le); Tr. 4032:7–14 (Sullivan). The Board also provides

time during its meetings for public comment, during which people can raise

complaints or other issues to the Board. Tr. 4115:21–4116:5.[12] Commissioner

Sullivan testified that if a case was reported in the newspaper or presented by a

member of the public, it could be brought to the SEB's attention for action. Tr.

4021:4–25 (Sullivan).

---

[11]  Plaintiffs provided no quantitative or qualitative evidence on what was excluded, how much, and whether the excluded or non-investigated cases were within the jurisdiction of the Secretary's office or the SEB.

[12]  Mr. Mashburn testified that, despite Fair Fight Action frequently providing public comment before the Board, it had not brought concerns regarding the three Challenged Practices to the Board's attention. Tr. 4086:4-9. Mr. Mashburn also does not recall any of the other Plaintiffs ever bringing these issues to the Board's attention. Tr. 4086:10-18.

137.    Significant testimony was dedicated to the SEB's statutory duty to investigate and address violations of the Georgia Election Code. O.C.G.A. § 21-2-31(5). When exercising this authority and obligation, the SEB would hear and decide cases of alleged violations of statutory law or regulations by individuals or counties. Id.; see also Tr. 3607:12–20 (Harvey).

138.    The SEB members testified that they viewed the role of the Board to enforce the Election Code based upon the facts as presented and was not to look at prescribing solutions in cases not before the Board. Tr. 1802:8–10 (Le); PX. 2055, Tr. 38:08–38:19 (Harp); see also Tr. 4083:18–19 (Mashburn) (SEB typically acts in a reactive rather than proactive capacity). Ms. Le testified that cases presented to the Board were fact specific. Tr. 1780:16–18. The Board would consider all information presented during the hearings in its decision-making process. Tr. 1777:10–12.

139.    Witnesses from both the Secretary of State's office and SEB members testified that it was their impression that counties appearing before the SEB took the meetings, potential sanctions, and duties very seriously. Tr. 3980:22–3981:24 (Sullivan); Tr. 4084:11–13; 4084:23–4085:6; 4085:18–24 (Mashburn); Tr. 3616:2–4 (Harvey) (describing persons appearing before the SEB as "contrite").

140.    The Secretary of State's office views the SEB as the means of enforcing the Georgia Election Code against counties (and others) that violate the statutes and regulations governing elections. Tr. 3486:23–3487:18 (Harvey). This "stick" approach helped the SEB seek uniformity in Georgia elections by evaluating complaints before it, determining whether a county violated the law, and then implementing penalties or other enforcement actions against a county or individual when needed. PX. 73, Tr. 44:4–12, 19–25; 46:12–17; 54:5–12 (Kemp); see also Tr. 4080:19–22; 4084:8–10 (Mashburn) (the SEB hears cases of alleged county violations of State election law); Tr. 4093:7–8 (Mashburn) (The Board can issue a letter of instruction to a county respondent where it finds a violation of election law has occurred); PX. 2055 (Harp Dep. Tr.), Tr. 8:19–21; 23:03–23:15.

141.    Testimony indicated that there were a variety of possible decisions by the SEB when deciding how to resolve a matter before it, including: (1) dismissal without further action; (2) referral to the Attorney General's Office or a district attorney's office for further investigation and perhaps prosecutorial action; (3) a consent order; or (4) a letter of instruction, which was effectively a warning to refrain from further violations. Tr. 1777:13–25; 1780:21–1781:2.

142.    The State Election Board has at least the apparent authority to ask the Secretary to issue an Official Election Bulletin or "OEB." Tr. 4007:8–10, 4008:11–16 (Sullivan). It is a power that it exercises rarely. Tr. 4093:11–17.

143.    At SEB hearings, counties would sometimes indicate that they had, or would, adopt a new way of doing things to avoid the mistake that brought them before the Board. Tr. 1783:13–19 (Le). The Board did not generally take single practices developed by one county and suggest it to another county, however, because SEB cases are typically individualized and fact specific to that particular county. In fact, some SEB cases would focus on the action or inaction of a single individual within the county. Tr. 1784:10–1785:6.

144.    For example, Paulding County Case No. 2016-009 concerned the action of one poll worker who mistakenly entered a mail date while processing an overseas military voter's request with no evidence presented of a systemic problem. PX. 2086.[13]

145.    Occasionally cases appearing before the SEB would take significant time to be resolved. See, e.g., PX. 89 (Tuba Ozgunes). This could be for several reasons, including the complexity of the case and work required to investigate

---

[13] Admitted for the limited purpose of the effect on the listener. Tr. 1786:23-1788:5.

and present the matter to the SEB, requested continuances, and pending criminal prosecutions that would cause the SEB to defer action until the prosecution concluded. Tr. 3493:16–23; 3617:17–3618:17 (Harvey).

146.    Mr. Mashburn testified that the SEB always imposes its most severe penalties for instances where a voter is not allowed to vote. Tr. 4089:18–21. Mr. Mashburn was serving on the SEB when it heard a case from Webster County where a voter was denied the right to vote three times because she did not bring her absentee ballot with her to vote in person. Tr. 4126:20–24; 4129:8–20. Mr. Mashburn deemed this the "nightmare scenario" and made a motion to refer the matter to the Attorney General's Office. Tr. 4126:23–24; 4127:5–9.

147.    While Mr. Mashburn testified that wrongfully turning away a voter is the "worst thing that can happen," he also indicated that the issue in Webster County was an isolated incident. Tr. 4130:1–5. In his experience, Mr. Mashburn testified that he is not aware that absentee ballot cancellation is a big or widespread problem for voters. Tr. 4097:17–25; 4103:15–22; 4116:18–24.

148.    In fact, Members Le, Sullivan, and Mashburn each testified that they did not recall a significant number of cases about HAVA match, the accuracy of the voter list, or training on the cancellation of absentee ballots coming before the

SEB. Tr. 3983:18–25; 4048:3–4 (Sullivan); Tr. 1771:18–1772:4; 1806:20–23 (Le); Tr.

4086:1–3; 4086:23–4087:4 (Mashburn).

149.    Board members also offered uncontroverted testimony that they SEB

took allegations of voter disenfranchisement seriously; that the SEB did not make

any offers to increase the burden on Georgia voters (through implementation of

the HAVA match process or otherwise); and that they had not witnessed any acts

of intentional discrimination by any of the Defendants in this case. Tr. 3994:15–

3995:4 (Sullivan); Tr. 4087:7–9 (Mashburn). Commissioner Sullivan also testified

specifically that she was unaware of any efforts by then-Secretary Kemp or

Secretary Raffensperger to use the HAVA Match policy to disenfranchise voters

generally or voters of color specifically. Tr. 3994:21–3994:4.

## III.    The Plaintiffs

150.    This case involved six plaintiffs: two secular advocacy organizations

(Fair Fight Action, Inc. ("Fair Fight"), and Care in Action), and four churches:

Baconton Missionary Baptist Church ("Baconton"), Ebenezer Baptist Church

("Ebenezer"), The Sixth District of the African Methodist Episcopal Church

("Sixth District"), and the Virginia-Highland Church ("VHC").

A. Fair Fight

151.    Three different witnesses offered testimony as to the history,

operations, and purpose of Plaintiff Fair Fight Action: Lauren Groh-Wargo (Fair

Fight's former CEO); Cianti Stewart-Reid (its current CEO); and Liza Conrad (its

current Deputy Director).

152.    Lauren Groh-Wargo is currently the campaign manager for

Democratic Gubernatorial Nominee, Stacey Abrams; Ms. Groh-Wargo served in

the same role during Ms. Abrams's 2018 gubernatorial campaign. Tr. 3846:3–7,

10–12.[14] Ms. Groh-Wargo has worked with Ms. Abrams since 2012 when Ms.

Abrams was a Georgia State House Representative. Tr. 3851:15–20. Ms. Groh-

Wargo served as the chief executive officer or executive director of Fair Fight

Action from 2014 until November 2021, including under its original name, the

Voter Access Institute. Tr. 3847:8–11.

153.    Ms. Groh-Wargo was also a senior advisor with Fair Fight, Inc., a

political action committee created in late 2018 (the "PAC"). Tr. 3848:17–20; Tr.

3847:24–25, 3848:1; 3868:10–13. The PAC has made financial contributions to Fair

Fight Action and Democratic political candidates. Tr. 3890:11–13, 3848:2–16.

---

[14]  The AFG Group, the Abrams for Governor corporate entity, never shut down
between Ms. Abrams's two runs for Governor. Tr. 3846:10-20. It also made a one-
million-dollar donation to Fair Fight Action in 2018. Tr. 3890:14-17.

154.    Cianti Stewart-Reid is the current Executive Director of both Fair

Fight Action and the Fair Fight PAC to which Ms. Groh-Wargo served as a senior

advisor. Tr. 1383:20–21.

155.    Liza Conrad is the current Deputy Executive Director and Voter

Protection Director for Fair Fight Action. Tr. 1048:14–5.

156.    Before it was known as Fair Fight, Ms. Abrams and Ms. Groh-Wargo

worked together at the Voter Access Institute (sometimes called "VAI"). Tr.

3852:20–22; 3853:2–7.

157.    VAI was formed in 2014 to address voter registration and voter

turnout in Georgia, as well as "improve educational levels about voting of the

most underrepresented communities in the state, specifically the growing

African American, Latino, and Asian America communities." DX. 116; Tr.

3893:3–12. The VAI was engaged in voter engagement and "get out the vote"

efforts, such as canvassing, phone calls, and mail programs. Tr. 3852:20–22;

3853:2–7.

158.    Targeting or challenging alleged voter suppression was not,

however, part of VAI's mission or activities. Tr. 3855:16–18. VAI's stated goal

was to "take back our State" (from Republicans). See DX. 124; Tr. 3897:6–8 (Groh-

Wargo).

159.    From 2014 to 2016, the Voter Access Institute targeted approximately 500,000 low-propensity voters, individuals that infrequently vote, across 50 counties. Tr. 3856:5–25; Tr. 3857:1–2. During the process, the VAI did not communicate with county elections officials about its efforts going on in the counties or its concerns about voting or the voting process. Tr. 3855:7–15.

160.    The Voter Access Institute's strategic plan for the fall of 2014 states that they will be "working to educate new registrants from these communities as well as infrequent progressive voters on the importance and ease of voting" in Georgia. DX. 116; Tr. 3894:1–4.

161.    VAI sought to motivate these potential voters by utilizing its own poll-tested messages, including themes about voter suppression. DX. 116 at 1–2; Tr. 3895:5–8 (Groh-Wargo).

162.    Building off of Voter Access Institute's efforts in 2014, including its commissioned research, in 2015 the Voter Access Institute stated its intent to target voters who were uninformed, unprepared, cynical, not apathetic, and persuadable. DX. 124 at 2. According to VAI's documents, such voters may "lack basic knowledge on how to register and/or vote or have low information about the election schedule, **the roles of officials and how decisions are made**," and cynical to the process and elected officials. DX. 124 at 2. They also were

persuaded by the poll-tested arguments about voter suppression. Id.; Tr. 3900:20–24 (Groh-Wargo). In other words, the VAI sought to build a political coalition by reaching infrequent voters who were willing to believe voter suppression was real and the government was out to get them. DX. 124 at 2.

163.    After sitting out the 2018 elections, the VAI changed its name to Fair Fight Action after Ms. Abrams' defeat in the 2018 gubernatorial election and filed this lawsuit shortly thereafter. Tr. 3847:12–17 (Groh-Wargo); Tr. 1432:22–1433:13 (Stewart-Reid). It maintained its 501(c)(4) status. Tr. 3848:4–5 (Groh-Wargo).

164.    Ms. Abrams was the first Board Chair for Fair Fight Action, including at the time the lawsuit was filed. Tr. 3848:25–3849:3; 3849:1–3; 3867:10–12.

165.    Ms. Abrams announced the creation of Fair Fight Action on November 16, 2018 during the speech in which she acknowledged that Georgians elected Brian Kemp as Governor. Tr. 3859:10–25; DX. 285.[15] During the gubernatorial campaign, however, Ms. Abrams claimed that then-Secretary Kemp had engaged in voter suppression and that such had cost her the election. Tr. 4178:18–21; 4179:11–14; see also Tr. 1128:22–25 (Conrad).

---

[15] Admission limited to the last paragraph on page 5 and what goes on page 6. Tr. 3881:21-23.

166.     Consistent with Ms. Abrams's speech, once VAI became Fair Fight, it set out to mitigate what it alleged were tactics of "voter suppression," including through this litigation. Tr. 3858:9–17; 3860:5–6 (Groh-Wargo); Tr. 1440:15–18 (Stewart-Reid). By 2019, every staff member and consultant of Fair Fight who is involved in the organization spent a majority of their time working on this litigation. Tr. 3861:19–24 (Groh-Wargo). In addition, Fair Fight Action's Organization Department was mainly focused on mitigation of the organization's perceived voter suppression. Tr. 3869:14–19 (Groh-Wargo).

167.     New staff members were greeted with an "on-boarding" document that described the litigation as Fair Fight's "Primary Purpose;" identified only information about the lawsuit as what volunteers would "need to know" about Fair Fight; and provided volunteers with a timeline of the lawsuit. DX. 110 at 3–4, 12; Tr. 3871:14–15; 3872:6–8; 3873:9–17; 3873:18–20.

168.     Fair Fight undertook other efforts to combat what it sees as voter suppression and, moreover, collect "stories" for this lawsuit. For example, it created the Democracy Warrior Program, which includes training poll watchers. Tr. 3869:20–25; 3870:1 (Groh-Wargo); Tr. 1455:20–23 (Stewart-Reid); DX. 676. It also created Fair Fight U to provide education on fighting voter suppression and,

at least in part, to collect voters' stories for this lawsuit. Tr. 3870:11–17 (Groh-Wargo).

169.    Fair Fight collected voter stories in the 2018 election, the 2019 municipal elections, and the 2020 elections in several ways. Tr. 3906:3–10 (Groh Wargo); Tr. 1115:16–18 (Conrad). First, it employed, through its counsel, six to eight "story collector" contractors. Tr. 1098:21–1099:16 (Conrad). Fair Fight also collected stories through text messaging to its supporters (Tr. 3917:21–3918:19 3915:15–3916:5 (Groh-Wargo), DX. 190; DX. 680); emails (Tr. 1444:10–13 (Stewart-Reid); DX. 756); on its website[16] (Tr. 1448:13–1449:6 (Stewart-Reid)); social media posts (Tr. 3923:10–18 (Groh-Wargo)); submitting open records act requests (Tr. 3921:18–24 (Groh-Wargo)); searching the provisional ballot database (Tr. 3907:22–25 (Groh-Wargo)); attending SEB meetings (Tr. 3920:7–10 (Groh-Wargo)); attending political party events (Tr 395:23–3951:12 (Groh-Wargo)); attending church events (Tr. 3921:25–3923-3 (Groh-Wargo)); going on "thank you" tours with Ms. Abrams and her supporters (Tr. 3923:19–3924:3, 3928:2–9

---

[16] Since 2021, Fair Fight's website, peachvote.com, is operated by the Fair Fight PAC. Tr. 1452:20-23; 1453:9-20 (Stewart-Reid); DX. 754. In addition to collecting stories, it also refers voters to the Secretary of State's website on voter registration and directs voters to their county registrar were appropriate. Tr. 1450:9-1451:12 (Stewart-Reid).

(Groh-Wargo)); and even coordinating with the Oversight Committee of the United States House of Representatives (Tr. 3959:6–21 (Groh-Wargo)).

170.   Fair Fight also received information from the Voter Protection Hotline that is operated by the Democratic Party of Georgia, which received tens of thousands of phone calls. Tr. 3906:15–25; 3907:1; 3907:5–6 (Groh-Wargo).

171.   The Voter Protection Hotline provided Fair Fight with a chart containing information from the "Provisional Ballot Hotline form." The chart contains information about the voter's name, phone number, county, whether they needed help with their provisional ballot, and a narrative about the voter. Tr. 3908:14–18; Tr. 3909:21–25, Tr. 3910:1–3. The chart also has a category for "Good Media Story." Tr. 3910:17–19.

172.   Despite all this outreach, Fair Fight does not generally help voters correct their voting issues; it refers them to the Secretary of State's website to help them resolve problems. Tr. 1467:23–1468:3 (Stewart-Reid).

173.   These efforts led to Fair Fight's collection of about 3,315 declarations for use in this litigation and for other purpose. Tr. 1098:21–1099:16; 1121:14–18 (Conrad). There is no evidence that FFA ever provided any of the voter stories or declarations to the SOS or the SEB outside of litigation. Tr. 1099:9–13 (Conrad).

None of the voter stories or declarations FFA collected were, for example, provided to any County election officials. Tr. 1099:20–22

174.   Having reviewed the record, this Court finds that at least part of the Fair Fight's mission was doubtlessly political and a continuation of the VAI's political efforts to elect Democratic majorities in Georgia. In Fair Fight Action's fundraising presentation from 2019, it described the group's "Mission" as fighting for "FAIR ELECTIONS AND FOR A STRONG, BLUE GEORGIA." DX. 103.

175.   To achieve this goal of turning Georgia "Blue," or Democratic, Fair Fight told donors that it planned to run this litigation like a campaign, hold the GOP accountable, advance the "Abrams' Agenda," and build a "grassroots infrastructure [to] nurture and grow field, digital, political, [and] donor networks."[17] DX 103 at 12; Tr. 3888:6–3890:2. It also blamed Ms. Abrams's loss as due to an "OBSTACLE COURSE OF VOTER SUPPRESSION." DX. 103 at 7. It is further worth noting that Ms. Abrams's political campaign committee never shut down during Governor Kemp's four-year term. Tr. 3846:10–20.

---

[17]  Ms. Groh-Wargo stated that a "blue Georgia" means one that is run by Democrats who have been elected to office. Tr. 3890:3-6.

176.    Whatever its purpose, the VAI and Fair Fight certainly witnessed and perhaps contributed to increased voting among its targeted populations. In 2018, Fair Fight lauded that (1) "[v]oters under 30 doubled their vote share" compared to 2014; (2) African American voters than the total amount of Democratic votes in 2014; (3) 30.5 percent of all voters were African American in 2018 compared to 28.6 percent in 2016 and 29.6 percent in 2014; (4) 537,163 new voters, those not registered in 2016, cast a ballot; and (5) there was three times the voter turnout from Latinx and Asian American and Pacific Islanders compared to 2014. DX. 103 at 6; Tr. 3904:21–3905:15.

177.    Fair Fight opposed House Bill 316. Tr. 3971:11–15. Nevertheless, by 2020, Fair Fight's views about Georgia elections and voter suppression appeared to have changed. On December 6, after a majority of Georgians voted for (now) President Biden, and (now) Senators Warnock and Ossoff were headed into runoffs, and President Trump was claiming **his** election was stolen, Fair Fight tweeted that "[w]e should not allow free and fair elections in Georgia to be undermined by baseless and unproven claims of fraud." DX. 610. Then, after Senator Warnock's election, Ms. Groh-Wargo tweeted that "Georgia was a changed state." DX. 612.

178.    Ms. Stewart-Reid testified that Fair Fight will continue to contact voters, monitor social media for information on problems with voting, collect voter stories, operate Democracy Warriors and Fair Fight U, and generally spend its resources in similar ways as it has done even if this lawsuit is successful. Tr. 1460:9–1461:18; 1461:21–1462:12; 1476:17–22; 1480:3–11; 1492:7–11; see also Tr. 1064:5–6 (Conrad). Fair Fight Action's message in all of its activities concerning any type of list accuracy issue, for example, is for voters to check their registration. Tr. 1469:10–13 (Stewart-Reid).

B.    <u>Care in Action</u>

179.    Plaintiff Care in Action is 501(c)(4) non-profit organization that works to advance the rights of domestic voters. Tr. 134:20. This mission is primarily sought through mobilizing domestic workers to vote and support Care in Action's endorsed candidates Tr. 133:12–15, 139:20–25, 146:1–6.

180.    At trial, Care in Action was represented by Jessica Livoti, who was the executive director of Care in Action from August 2017 to until January 2021. Tr. 80:21–12. Ms. Livoti is also currently a Care in Action board member. Tr. 80:24–81:1.

181.    2018 was Care in Action's first year operating in Georgia. Tr. 92:24–25, 93:5–8. That year, Ms. Livoti stated that their "biggest and probably [] most

66

important goal was like introducing people to the organization," Tr. 93:8–10,

"[t]hen making sure they were talking about our agenda, the issues that matter to

us." Tr. 93:15–16, "[a]nd then lastly, we're just focused on turning out voters." Tr.

93:18–19. Part of organizing voters involves providing information on voter

registration and other voter registration efforts. Tr. 166:1–4.

182.    Another notable first for Care in Action in 2018 was their

endorsement of Stacey Abrams for governor. Tr. 145:21–23. The 2018 governor's

race was the first time that Care in Action had ever endorsed any candidate. Tr.

145:17–19. In fact, "in 2018 Care in Action one of the largest voter contact

programs in the state in effort to elect Stacey Abrams as governor." DX 729, Tr.

142:16–25. In 2018, Care in Action also endorsed 19 other candidates in down-

ballot races in Georgia. Tr. 145:21–23.

183.    In 2018, Care in Action's voter engagement was done through door-

to-door canvassing, phone meetings, text messages, social media, and

community events. Tr. 90:12–22. Care in Action would inform voters on the

processes related to registration, Tr. 142:5–7, such as how to track their ballot and

what to do if there was an issue so the voter could ultimately cast their ballot. Tr.

141:17–24. In addition, in the months leading up to the 2018 election Care in

Action was informing their target audience on the absentee ballot procedures in Georgia. Tr. 141:14–24.

184.    In at least October 2019, then-State Senator and now Congresswoman Nikema Williams served as Care in Action's Deputy Executive Director. Tr. 132:3–5.

185.    In the January 2021 runoff for United States Senate, Care in Action also endorsed Senator Raphael Warnock. Tr. 139:22–23.

186.    Post-2018 election, after experiencing their first election in Georgia, Care in Action decided to change their voter engagement strategy to better suit their Georgian constituency to cover the "life cycle of a voter." Tr. 107:5–14. Since then, they have also expanded their operations generally related to assisting voters due to natural organizational growth since 2018. Tr. 146:7–21.

187.    Care in Action's changes are not related to any specific policies of the Secretary of State, including the specific policies challenged. Regardless of the Secretary's policies, Care in Action will continue to mobilize voters and inform them of Georgia's voting procedures. Tr. 146:7–21.

188.    Rather, this Court finds that these changes, including following up on provisional ballots, are standard voter assistance efforts consistent with Care in Action's mission and spurred by assessing Care in Action's Georgia

constituency's needs, being new to Georgia, and experiencing growth that they have experienced over the past several years.

189.    Even the digital voter protection hotline, which started after the 2018 election, was already being implemented in Virginia, the only other state that Care in Action operates in relating to elections. Tr. 150:17–25. This is not an action in response to their experiences in Georgia, much less the challenged policies of the Secretary of State, since the hotline's use was already in pilot stages in the only other state that they operate in.

190.    Of the questions Care in Action received relating to HAVA match, such as "questions about names, challenges with registration," and "about what do you need to bring with you," Tr. 150:1–4. In all of the Georgia elections that Care in Action has operated in, none of the issues they assisted voters with were traced to the Georgia voter verification process for citizenship. Tr. 158:7–16.

191.    In addition, nothing in the record indicates that they had to respond to anything other than general questions about absentee ballots. Care in Action responded to absentee ballot questions as they related to the step of the process that Georgia was presently in (e.g., Care in Action would respond to questions about registration while in the time frame for voter registration, Care in Action would receive questions about absentee ballot delivery during the time frame

69

after a voter could request an absentee ballot, etc.). Tr. 150:5–16. Thus, this Court finds that Care in Action's efforts here are not tied specifically to the Absentee Ballot Cancellation Training claim.

192.    Further, Care in Action's "provisional ballot chase program" was only focused on provisional ballots generally and did not target any particular issue relating to provisional ballots (i.e., the program did not specifically seek to assist those who voted provisionally due to in-person absentee ballot cancellation issues). Tr. 153:12–23, 154:3–17. The "provisional ballot chase program" purely reminded voters to cure their provisional ballots, if necessary, and how to cure. Tr. 153:16–23. Given that the program focuses on provisional ballots generally, this Court does not find that Care in Action's program constitutes an injury related to any of the claims remaining in this case.

193.    Regarding voter list accuracy, Care in Action also only received and responded to general questions, such as questions about what to do when a voter's address does not match or questions about polling locations. Tr. 151:1–14. Nothing on the record indicates that they assisted any voters with issues decisions of the State that impacted voters' registration (or non-registration) in the voter database.

70

194.    Care in Action could not identify, on cross-examination, what aspects of Georgia's citizenship verification it was challenging, only that it is focused on making sure that voters are treated equally. Tr. 176:5–19. Specifically, they are concerned with wanting to make sure that assumptions are not being made as to voters' citizenship status based on their name or English proficiency, among other things, when registering to vote. Tr. 177:8–11, 178:5–10.

C. <u>Baconton Missionary Baptist Church</u>

195.    Plaintiff Baconton is a church located in Walthourville, Georgia in Liberty County. Tr. 2526:1–8. It is a member of the Zion Missionary Baptist Association and part of the General Missionary Baptist Convention of Georgia. Tr. 2531:13–17. At trial, Baconton was represented by Pastor Hermon Scott, who has served as the church's pastor since July of 1997. Tr. 2531:13–17.

196.    Baconton has about 400 members. 2545:23–2546:2. While its congregation is "99.95 %" African-American, such includes individuals across the age, economic, and education spectrum. Tr. 2542:15–25; 2544:21–2545:9.

197.    Baconton is a tax-exempt 501(c)(3) non-profit organization. Tr. 2595:1–3. Baconton understands that, as a 501(c)(3) organization, it is prohibited "from making or publishing any statement for or against a candidate for public office." Tr. 2595:4–8.

198.    According to Pastor Scott, the church's mission is to "build a biblically-based Holy Ghost-led community of loving relationships where we deal in love, model, and follow Jesus." Tr. 2547:5–6. Pastor Scott further testified that voting issues were a part of Baconton's primary mission and had been so for at least the last 25 years. Tr. 2596:11–16.

199.    Baconton does not allege that it had to divert financial resources because of any of the issues in this case; its alleged injury is based on the use of its facilities and the time and efforts expended by its personnel and staff. Tr. 2596:17–23.

200.    Baconton was not a party to this case at the time it was filed; Baconton only joined this case after it was requested to do so by Georgia House Representative Al Williams, a board member of Baconton's co-plaintiff, Fair Fight Action. Tr. 2596:24–2597:14. Baconton further acknowledged that it knew of the affiliation between Stacey Abrams and Fair Fight, and specifically that Ms. Abrams was involved in the formation of Fair Fight after the 2018 gubernatorial election. Tr. 2626:8–14.

201.    Baconton agreed to be a plaintiff in this case, in part, because it "was not going to cost the church anything." Tr. 2597:19–22. Baconton only reviewed

the amended complaint after it had already agreed to be a party to this case. Tr. 2600:23–2601:4.

202.   Pastor Scott admitted that he does not have direct knowledge of anyone affected by the issues in this case as it has never encountered anyone who was affected by the issues in this case. Tr. 2602:24–2603:5. Instead, Baconton's knowledge of people allegedly affected by the issues in this case all comes from stories that it heard in the media and its conversations with counsel. Tr. 2604:6–11. Baconton further admitted that it could not confirm whether any of the stories it heard were accurate. Tr. 2604:15–23.

203.   Baconton also made requests to its congregation to submit stories to be used as evidence in this case, but it was unable to obtain any. Tr. 2611:11–20. Baconton admitted that it never contacted the Secretary of State's office or the State Election Board about its concerns regarding voting issues because it never actually encountered anyone who was affected by such issues. Tr. 2611:21–2612:7.

204.   Nevertheless, Baconton joined this lawsuit because it was "concerned about the voter suppression and whatever form it would take." Tr. 2605:10–11. Baconton had been generally involved in voter "registration, education and participation" since at least 1997, without regard to the specific

issues raised in this case stemming from the 2018 gubernatorial election. Tr.

2552:7–15. Accordingly, the 2018 election imposed no injury on Baconton.

205.    In 2018, Bactonton's focus shifted to account for what it heard was

"a need to check your status and to make sure that you're eligible. And so then

leading up to 2018, we spent a whole lot of time making sure that we passed the

message along that you've got to have the right ID card and it's got to match

your voter identification. We spent a lot of time talking about that." Tr. 2553:23–

2554:4. Specifically, Baconton spoke to its congregants about the need to check

their voter status and, at least on one occasion, provided tablets at the church for

people to check their voter registration status. Tr. 2557:23–14; 2575:19–2577:8.

Pastor Scott also spoke about "voting in some form or another" during church

functions leading up to 2018 (Tr. 2559:1–7; 2560:7–12), but the focus on checking

voter registration status began in the lead up to the 2018 elections (Tr. 2560:13–

2561:6). Spending some time talking—particularly about the entity's mission—is

not an injury.

206.    Pastor Scott testified that Baconton held Tuesday prayer meetings in

the lead up to the 2018 gubernatorial election in which he encouraged

individuals to check their voter registration status. Tr. 2560:23–2562:8; 2565:20–

2566:12. According to Pastor Scott, the church used its building and resources to

74

host these prayer meetings (Tr. 2563:17–2564:17), but hosting them did not interfere with Baconton's normal operations (Tr. 2636:19–25). Baconton's participation in prayer meetings did not injure it.

207.    Baconton used its personnel and resources to assist individuals with checking their voter registrations, however, due in part to its concerns about voter list maintenance and the moving or closure of polling places; issues that are no longer a part of this case. Tr. 2606:4–23. Accordingly, Baconton's Pastor admitted they would continue to make these efforts regardless of the outcome on the remaining claims in this case. Tr. 2610:17–2611:4.

208.    Pastor Scott also testified that he believed "it would be difficult for [Baconton's congregants] to spend more than one hour" cancelling an absentee ballot or otherwise addressing one of the issues raised in this lawsuit, but he did not testify that such an event ever occurred or that Baconton diverted any resources to address the potential injury. Tr. 2571:15–2572:2. Baconton's view, even if true, did not itself injure Baconton.

209.    Pastor Scott only stated that "[i]n 2018, as I remember it, I really encouraged folk to go vote early or vote in person. I have -- I just don't like absentee ballot voting" without further explanation therefor or any reference to the Secretary of State's training of county superintendents on the issue. Tr.

75

2557:20–22. He testified later on that, due to COVID-19, "I had to encourage . . .

to seek and to apply for an absentee ballot" (Tr. 2579:4–5), and that "if you are

going to use the absentee ballot, please, sir, please, ma'am, make absolutely sure

you do it exactly right, exactly, take your time, follow the instructions and make

sure you dot every I and cross every T" (Tr. 2580:14–17). These efforts, even if

considered an injury, are not traceable to the Secretary or the SEB.

210.   Baconton offered no evidence to show how it was harmed by the

Secretary of State's training of county superintendents on absentee ballot

*cancellation* procedures. In fact, Baconton admitted that it does not know what the

Secretary of State even does to train county superintendents on this issue. Tr.

2618:25–2619:2.

211.   Similarly, Baconton admitted that it does not know what the

Secretary of State does to maintain the accuracy of the voter registration

database. Tr. 2619:25–2620:2.

212.   While Pastor Scott testified that he spoke about "exact match" at

church functions (Tr. 2586:4–2587:1), his testimony also revealed that he, and by

extension the Church as its 30(b)(6) representative, did not actually understand

what "exact match" or "HAVA match" entailed. Specifically, Baconton's

understanding of "exact match" or "HAVA match" was that "the person

checking the potential voter in, can look at the ID card, can look at the voter card, and if it does not -- for whatever reason does not match up, then that person could say, I'm sorry, you're at the wrong place or you're not registered to vote here, whatever, and they will have an issue with their casting their citizenship right to vote on that particular day." Tr. 2613:15–21.

213.   As discussed elsewhere in this order, this understanding is not correct; HAVA match has nothing to do with a poll worker checking a voter's ID card against what is listed in the voter registration database. See, e.g., Tr. 4141:7–25, Tr. 4142:1–11 (Germany); Tr. 3577:18–20 (Harvey); Tr. 399:21–24 (Mayer); PX. 1900 (Persons affected by the HAVA Match process will be flagged within the eNet system and placed in Active-MIDR status. They will then be mailed a letter notifying them of the kinds of identification needed to vote.).

214.   Baconton admitted that it does not know what activities, if any, it will engage in regarding voting issues during the 2022 election cycle. Tr. 2653:17–22. With regard to future endeavors, Pastor Scott stated "I have no plans at this point; I don't know if that's going to work out to we will have the kind of things we did then [in 2018], but I will certainly be encouraging folk to pray. […] Again, pardon my testimony, to serve the present age, that was 2018. This will be 2022, we may do things a little differently in 2022, but the mission and the praying will

77

still be the same; we'll still be praying. It may not be the same way." Tr. 2653:4–14.

215.   Highlighting the consistency with the church's historical mission, Pastor Scott described Baconton's activity in voting issues as part of its interest in pursuing the "social gospel" and what it views as its responsibilities to "do Matthew 25," referring to the biblical passage. Tr. 2541:18–2542:14; 2547:15–25.

216.   This includes, according to Pastor Scott, encouraging Baconton's congregation to "vote [their] interest" and to keep "in the forefront of their minds that our interest is our mission based on Matthew 25." Tr. 2547:15–2548:15.

217.   To this end, Pastor Scott testified that "I think it would be pastoral malpractice for me not to encourage our congregation to vote their interests and to be involved in the civic process, to elect somebody who thinks like we think." Tr. 2648:3–6. Pastor Scott also made clear that this individual was Stacey Abrams, testifying that the Church's support for her was "because she represents the interests that we talked about in Matthew 25. Those interests from Matthew 25 are embodied, if you will, in that candidate." Tr. 2641:7–10.

218.   Despite this prohibition, however, Pastor Scott openly admitted that his congregants "wanted to see Stacey Abrams elected" (Tr. 2640:19–21), and

78

repeatedly used church resources to publicly promote and support her 2018 gubernatorial campaign.

219.    For example, Baconton admitted its increased focus on voting issues, were "spurred by an interest in the election and support of Stacey Abrams." Tr. 2629:12–16. Specifically, Pastor Scott testified that the church was "motivated by the fact that here was a person who looked like us, running for the office of governor, that's going to create some excitement." Tr. 2630:12–14.

220.    Pastor Scott further testified that Stacey Abrams's campaign for governor was a "big impetus" for Baconton's increased focus on voting issues in 2018. Tr. 2632:1–11. Baconton tried to get Stacey Abrams to come to the church during the 2018 election and intends to do so again in 2022. Tr. 2633:2–6.

221.    On cross-examination, Pastor Scott admitted that he personally "would not be disappointed at all" if Stacey Abrams were to win the 2022 gubernatorial election and, "[a]s a matter of fact, the church would shout out a hallelujah if she won the election." Tr. 2628:5–9.

222.    Baconton's Tuesday night prayer meetings were also initiated and led by its Pastor and Democratic Georgia House Representative Al Williams. Tr. 2637:1–4; 15–17. Rep. Williams and the Georgia Democratic Party would assist in promoting the prayer meetings (Tr. 2638:22–25), and Baconton permitted Rep.

79

Williams to use these church functions to make political and partisan encouragement for specific candidates. Tr. 2639:23–2640:5.

223.    In addition to being partisan affairs, this Court also notes that only two prayer meetings were held at Baconton and used the Church's resources. Tr. 2642:9–14.

224.    The Church's public support for Ms. Abrams was further made clear in its October 14, 2018 Sunday service pamphlet, which Baconton admitted was created using church resources and distributed on church property at a church event. Tr. 2638:1–14. The pamphlet stated in its Announcement section: "On Tuesday, October 16, from 3:00 p.m. to 5:00 p.m., a rally will be held for Stacey Abrams at Stafford Park, Hinesville. Let's get fired up - come out and stand behind a great candidate for governor of the state of Georgia! Everyone is highly encouraged to get out and **VOTE! Early voting starts on October 15; national Election Day is November 16. Vote, vote, vote**." DX. 303 at 4; <u>see also</u> Tr. 2644:7–2645:3.

225.    Pastor Scott further testified, during cross-examination, that "the thing I want the Court to see and understand that we are excited about finally getting to a place in America where there are folk who look like us in positions of power. We're excited about that." Tr. 2650:6–10. Pastor Scott explained his view

80

that the there was nothing wrong with "a church, as I testified earlier, that is 99.9 percent African-American … getting excited about the possibility of electing Stacey Abrams governor." Tr. 2651:6–9.

226.    These efforts matter, because they suggest that Baconton's efforts were either its effort to fulfill its historical mission or seek the election of a particular candidate. Neither demonstrates, as a matter of fact, an injury caused by the Secretary or SEB.

D.   Ebenezer Baptist Church

227.    Plaintiff Ebenezer was represented by two witnesses and trial: Senator Reverend Raphael Warnock and Reverend John Vaughn.

228.    Sen. Warnock is a pastor at Ebenezer and has been so since 2005. PX. 2053 (Warnock Dep. Tr.), Tr. at 44:4–18. Rev. Vaughn is executive pastor at Ebenezer and has been with the church for two-and-a-half years. Tr. T. 2941:12–16; 2941:21–22.

229.    Rev. Vaughn describes his position with the church as akin to a COO. Tr. 2941:18–20. His duties include overseeing all of the church's internal operations including in the areas of worship, ministries, finance, development, and the church building. T. 2941:23–2942:2 Rev. Vaughn does not have any personal knowledge of anyone who was deprived of the right to vote due to any

of the challenged practices in this case. T. 2967:6–10. Nor does he have any

personal knowledge of anyone whose right to vote was burdened by any of the

challenged practices in this case. T. 2967:11–13. Like Baconton's Pastor Scott, Rev.

Vaughn misunderstood "exact match" to be when someone arrives at a polling

place and is not allowed to vote because of a wrong hyphen or transposed letters

in their name. T. 2944:19–21.

230.    Voting rights and voting issues generally are key parts of Ebenezer's

mission and has been a part of the church's mission since 1935. PX. 2053, Tr. 16:2;

35:7–14; 41:3–12; 44:4–23; 55:6–8; 65:17–22; see generally Tr. 2967:14–20. Rev.

Vaughn testified that the church has encouraged voting plans, which includes

asking people to determine their registration status on the Secretary's website,

and early voting since prior to 2018. Tr. 2964:16–23.

231.    This includes registering voters, which the Church has done since at

least when Sen. Warnock became pastor in 2005. PX. 2053, Tr. 44:4–18.

232.    In addition to registering voters, Ebenezer also seeks to assist voters

with voting. For example, the church's "Souls to the Polls" campaign to drive

voters to the polls was used prior to 2018 and at least a couple of other times

since 2005. PX. 2053, Tr. 36:6–9. The church's "Souls to the Polls" also raises

awareness of the fact that an election is happening and raising awareness has

been part of the church's mission since at least 2006. PX. 2053, Tr. 16:2, 44:10–23, 46:6–13.

233.    Ebenezer also urges its congregants to vote by mail, which it began doing in at least 2014. PX. 2053, Tr. 51:20–21, 52:5–52:8, 114:7–9; 138:10–19.

234.    In 2018, the church's prior registration and mobilization efforts related to voter education, registration, creation of voter plans, and verification continued with an added emphasis on verification. PX. 2053, Tr. 49:1–5. Tr. 2945:17–2946:4; 2946:5–8. The church's verification efforts have focused primarily on combatting "voter purges" such as the 300,000 voters who were purportedly scheduled to be dropped from Georgia's voter rolls. PX. 2053, Tr. 61:13–17, 151:21–23. The church's efforts to educate voters, make sure people are registered, verify registration status, and encourage people to have a voting plan, some of which were addressed in a sermon or in announcements, continue. T. 2957:18–2958:16. Rev. Vaughn testified that the church will continue to educate voters on how to participate in the voting process regardless of the outcome of the lawsuit. T. 2964:9–12, 2967:21–24. Rev. Vaughn testified that the challenged practices motivated the church's voting programs—registration, education, verify, and create a voting plan—in the 2020 and 2021 elections. T. 2945:13–16. He did not tie specific efforts to specific challenged practices, however.

83

235.   Rev. Vaughn did not personally receive any reports from church members about difficulties trying to vote in 2020. Tr. 2946:9–12. Nevertheless, in 2020–2021, Rev. Vaughn testified that the church made efforts in voter registration, education, verifying, creation of a voter plan, and encouraged people to vote early. Tr. 2948:4–19.

236.   However, the only ostensible difference between these efforts and what Ebenezer had previously done appears to have been the addition of the "voter plan," which this Court finds to be indistinct from voter education. Tr. 2964:12–25. And Rev. Vaughn indicated that Ebenezer intends to continue its voter education efforts regardless of the outcome of this case. Tr. 2964:9–15. As such, this Court finds, as a factual matter, that Ebenezer was not injured by undertaking these efforts.

237.   For example, in September 2020, the church emailed individuals in its database encouraging them to check the status of their registration to make sure they are still registered. Tr. 2949:16–2950:16; PX. 1943. It also emailed them a document with key voting deadlines and dates. Tr. 2952:7–13; PX. 1944. Rev. Vaughn testified the purpose of the email was to educate members about the voting process and reinforce the importance of a voting plan. Tr. 2953:1–5. Rev. Vaughn testified that the consistent themes for these efforts were to get people

84

registered, education on the voting process, encouraging creation of a voting plan, verifying registration, and getting people to vote early. Tr. 2953:18–23. The communication plan for these 2020 efforts included the creation of posts for social media, the church website, and the church Facebook page, but none of the social media posts related to the challenged practices in this lawsuit. Tr. 2956:6–16, 2957:1–11; PX. 1951. They focused on early voting and having a voting plan. Tr. 2966:23–2967:4. This leads this Court to find that the remaining Challenged Practices are not causing Ebenezer to do anything different than it has historically done in accordance with its mission of voter registration, voter education, and voter participation. This Court has no reason to believe that Ebenezer will not continue these and similar efforts regardless of the outcome of this case.

238.    The church also coordinated early voting caravans. Tr. 2950:24–2951:5; PX. 1913. Rev. Vaughn testified that this was part of the church's strategy to get people to vote early, have a voting plan, and have time to verify that their votes were counted. Tr. 2951:6–12.

239.    Financially, Ebenezer dedicated more funds to voter registration in 2018, at least in part, because the church had additional funds to spend. PX. 2053, Tr. 56:13-18. There are no documents that show a line item for voter-related

85

activities specific for the 2018 election under the social justice ministry budget. PX. 2053, Tr. 34:17-20, 55:1-6. And the 2018 voter hotline had been used in 2006, when the church set up a call-in system for Katrina voters. PX. 2053, Tr. 52:24-53:9.

240.    In sum, Ebenezer has continued its historical mission of registering voters, encouraging voters to vote early and by mail, and assisting voters with the casting of an actual ballot. None of these goals or practices have changed because of the Challenged Policies.

241.    Regardless of the outcome of this litigation, Ebenezer will continue to fight what it deems voter suppression, including the Secretary's list maintenance efforts that were dismissed at summary judgment. PX. 2053, Tr. 60:17-61:1; 108:8-11; 189:16–22.

E.   Sixth District A.M.E. Church

242.    Bishop Reginald Jackson testified on behalf of Plaintiff Sixth District African Methodist Episcopal Church ("Sixth District"). (Tr. 2970:6-8).

243.    The Sixth District is an organizational arm of the African Methodist Episcopal ("A.M.E.") Church that covers over 500 hundred churches, all in the State of Georgia. Tr. 2974:10-2975:12. The Sixth District is, itself, broken down

into six conferences to cover all of the State of Georgia. Tr. 2975:23-2976:5. There

are 96,000 individuals on the roll of the Sixth District churches. Tr. 2980:19-20.

244.    The mission of the A.M.E. church is to "promote God's kingdom on

earth," which it does through social justice activities. Tr. 2981:20-2982:2. Bishop

Jackson described "education, next to social justice, [as] the legacy of the A.M.E.

Church." Tr. 2979:6-7. In the 2018 and 2020 elections, nothing prevented the Sixth

District from informing voters about issues that it felt was important. Tr. 3034:3-

8.

245.    The A.M.E. Church was very active in the Civil Rights Movement

(Tr. 2979:15-16), and voting has historically been important to the Sixth District.

Tr. 2982:8-10; 3031:14-16. Indeed, the Bishop testified that it is his responsibility

to "make sure that every eligible voter in the Sixth District … not only register to

vote but actually votes. … I tell people it is a sin not to vote." Tr. 2982:13-18; see

also Tr. 2999:1-3. According to Bishop Jackson, it is also a sin not to help register

individuals to vote and take them to the polls if needed. Tr. 3027:12-15.

246.    Such efforts will remain part of the Sixth District's mission

regardless of the outcome of this lawsuit. Tr. 3027:17-21. As Bishop Jackson

testified, "whatever [the Church] has to do to help [voters] maintain their right to

vote, we're going to do." Tr. 3028:8-11. Accordingly, this Court finds these actions do not constitute injuries to the church.

247. Bishop Jackson was appointed as Bishop of the Sixth District in 2016. Tr. 3026:15-17. Upon his arrival, "the first thing" he said was that voting and encouraging "Black turnout" through registration and voting efforts would be a top priority. Tr. 2983:12-16; 3026:24-3027:5. As part of these efforts, some A.M.E. churches in the Sixth District, and other "Black churches across the state," engaged in "Souls to the Polls," which is where the church helped organize taking voters to polling locations after Sunday church services to take advantage of Georgia's early and Sunday voting. Tr. 3040:23-3041:8. The Sixth District also participated in a "get-out-the-vote service" before the past several elections, and it plans to do so in the future. Tr. 3041:21-3042:6.

248. Staring in 2018, the Sixth District engaged in what it referred to as "Operation Voter Turnout." Tr. 3030:2-18. The initiative was created for (and not in response to) the 2018 election. Tr. 3030:15-18. The plan succeeded in its goal of having 75% of the Sixth District's congregants vote early. Tr. 2986:3-5. Operation Voter Turnout was "not specifically duplicated in 2020." Tr. 2985:20-22. The efforts encompassed voter registration, voter education, mobilization, and organization. Tr. 3011:10-15. As part of the effort, the Bishop wanted to be sure

that congregants—through their pastors in the Sixth District churches—knew "when the election is, who the candidates are, and the importance of voting." Tr. 2992:18-2993:3. These efforts, while undoubtedly noble, are a continuation of the church's voter turnout and voter education efforts it had undertaken prior to the 2018 election; they are not injuries.

249.    Bishop Jackson testified that he had no complaints and heard of no complaints from congregants about their voter experience in the 2018 primary election where Ms. Abrams defeated her primary opponent. Tr. 3036:14-3037:2. Similarly, Bishop Jackson questions the credibility of the 2018 general election but not the 2020 elections. Tr. 3055:3-18.

250.    Bishop Jackson testified that the Sixth District "received a lot of complaints" about the general election in 2018. Tr. 2987:16-25. He could not, however, identify specific complaints about the three remaining issues in this lawsuit. Tr. 2987:16-25.

251.    Sometime after the lawsuit was filed, Bishop Jackson spoke to Lauren Groh-Wargo of Fair Fight Action about joining the litigation. Tr. 3062:12-15. But even before it joined the lawsuit, Bishop Jackson encouraged congregants who had trouble voting to contact the church's attorney, who would, in turn, pass their name on to Fair Fight. DX. 242; Tr. 3065:13-18.

252.    Citing lessons learned from the 2018 general election, the Sixth District "mandate[d]" that members utilize the Secretary's "My Voter Page" to check voter registration before voting. Tr 2986:11-15.

253.    Bishop Jackson's testimony on the use of church resources to address the three issues remaining in this case was inconsistent. At trial, he testified that the Sixth District dedicated resources and "time and energy" to oppose the practices. Tr. 2994:2-2995:12. Testimony was also provided on the cost of bringing individuals to the polls, but these efforts were also not linked to any of the Challenged Policies. Tr. 3015:15-15; PX. 1919.

254.    Further, Bishop Jackson could not testify to the approximate funds expended for the 2020 election. Tr. 3019:10-14. At least one individual was identified as spending time on voting issues that could have been spent on census efforts or COVID vaccination. Tr. 2996:20-2997:1. That decision was made, however, because the "voting issue ... was of paramount importance." Tr. 2997:1. Similarly, Bishop Jackson testified that if the challenged practices were to disappear, the church would "go back to [his] initial vision," but that includes voter registration and voter turnout. Tr. 3021:12-17.

255.    The Bishop also could not distinguish what resources were diverted from the Church's broader voting efforts to address the specific issues of list

accuracy, training on absentee ballot cancellations or HAVA Match. Tr. 2999:23-19 (citing list maintenance, lines).

256.    The Sixth District did engage in workshops to educate pastors on voting issue, including at least ostensibly the HAVA Match policy. PX. 1908; Tr. 3009:23-24. But, as with other Plaintiffs in this case, the testimony offered by Bishop Jackson demonstrated that his concerns with the HAVA Match policy are not based on the automated process or the Active-MIDR status. Tr. 3008:2-3. Instead, the Bishop believed the process was "subjective," which does not appear to be the case. Id. As such, these workshops, based on a misunderstanding of the law, do not constitute injuries.

257.    While this Court has no doubt as to the Sixth District's commitment to voting rights in general, there seems little evidence that the Sixth District's efforts were targeted toward the three remaining practices at issue in the lawsuit. For example, one document that was central to the Sixth District's efforts in the 2020 election—a voter plan—made no mention of any of the Challenged Policies. PX. 1992; DX. 764; Tr. 3024:9-3025:18; 3033:9-12. Even Bishop Jackson's declaration—filed in this case in opposition to the Defendants' motion for summary judgment—did not address any of the Challenged Policies and

focused, instead, on lines at polling locations and obtaining absentee ballots. DX. 765.

258.   Having strong turnout from Georgia's A.M.E. churches was particularly important to Bishop Jackson. In addition to being part of the church's historical mission, the Bishop testified that a low turnout "would mean that the A.M.E Church did not have influence. It would have meant that the Bishop really did not have influence, because the people didn't respond to the Bishop's call." Tr. 2998:6-12.

259.   Testimony also demonstrated Bishop Jackson's personal endorsement of Ms. Abrams in the 2018 gubernatorial primary. DX. 245; Tr. 3036:7-10. The Bishop's endorsement was communicated to congregants using church resources, specifically a "Constant Contact" email list. Tr. 3035:4-6.

260.   During the 2018 general election, Bishop Jackson also—along with other ministers—endorsed Ms. Abrams and stated that they would "be working to mobilize our congregations and communities to go to the polls and vote for Stacey Abrams." DX. 248. Despite the Bishop's recognition that the church does not endorse candidates, the issue of Ms. Abrams's election was important enough to Bishop Jackson to warrant the public endorsement and pledge of church resources toward that endeavor. Tr. 3054:1-7.

261.    As with other Plaintiffs, the Sixth District's political interest in the 2018 election is important when considering their generalized concerns about voting issues. Neither demonstrates an injury caused by the Secretary or SEB.

F.  <u>Virginia-Highland Church</u>

262.    Plaintiff Virginia-Highland Church ("VHC") is a church located in Atlanta, Fulton County Georgia. Since 2002, it has been aligned with the United Church of Christ. Tr. 528:22-23.

263.    At trial, VHC was represented by Pastor Matt Laney, who has served as the church's pastor since January of 2018. Tr. 524:16-24, 525:18-20.

264.    VHC is a 501(c)(3) tax-exempt organization. Tr. 563:18-20, 592:13-14.

265.    Today, VHC has about 160 members and a total congregation of between 260 and 300 people. Tr. 529:8-10. Twenty percent of the VHC congregation is people of color, and forty percent of the VHC congregation is LGBTQIA. Tr. 529:16-18. In terms of socioeconomic status, the VHC congregation is "mostly college-educated professional people." Tr. 529:19-21.

266.    VHC has not diverted financial resources as a result of what it has alleged to be unconstitutional or unlawful acts of the Defendants at issue in this case. Tr. 577:16-19. Nor is VHC paying anything for its legal representation in

this lawsuit. Tr. 554:23-25. VHC is not seeking monetary relief in this lawsuit. Tr. 555:1-4.

267.    VHC's voting mission began in 2008 with a single volunteer, Jane Crain. Tr. 532:8-19, 564:10-12. This mission includes assisting voters with registration, and the primary way it does so is with paper, written voter-registration forms. Tr. 591:24-592:5.

268.    Although Ms. Crain ceased her volunteer efforts in support of another VHC mission to focus on its voting mission, Pastor Laney could not identify anyone else who stopped volunteering with another VHC mission to focus on the voting mission. Tr. 581:24-583:4. VHC will continue its educational efforts on voting policies it deems to be obstacles, including policies once but no longer at issue in this case, regardless of the outcome of this case. Tr. 576:14-577:1, 577:10-15, 578:23-580:6, 580:23-581:16. Continuing its voting mission, including speaking about voting issues and assisting voters with registration, both of which the church also did before 2018, does not constitute an injury.

269.    VHC's mission, inspired by the prophet Micah, is "to do justice, to love mercy and to walk humbly with God." Tr. 529:23-530:1. Driving political change is also part of VHC's mission. Tr. 585:8-12. VHC takes positions and makes endorsements on political issues, but it professes to draw a strict line

94

when it comes to the endorsement of political candidates, meaning that it does not support or condemn any particular candidate for office. Tr. 585:17-5:86:4. Pastor Laney specifically denied that VHC has taken positions on candidates and both supported and condemned particular candidates for office. Tr. 586:5-11.

270.   That said, and while not mentioning candidates by name, in 2018, Pastor Laney used church resources to condemn two Republican candidates for Governor (Brian Kemp and Casey Cagle) while speaking favorably about Ms. Abrams' campaign. Tr. 586:17-591:11, DX. 731. Again, this is an important consideration because actions undertaken out of a political interest are not injuries caused by the specific Challenged Policies in this case.

271.   VHC never communicated any voting-related concerns to the Secretary's office or the State Election Board before becoming a party to this lawsuit in early 2019, nor did it do so at any other time. Tr. 549:14-22, 577:20-578:3. VHC never communicated any concerns about voting to any county or city election officials. Tr. 578:4-9.

272.   Although VHC joined the lawsuit as a party in January or February of 2019, it did not undertake efforts to determine and document whether anyone affiliated with VHC experienced voting difficulties prior to August 11, 2019. Tr. 549:13-16, 560:14-23.

273.    In connection with the HAVA match process, VHC did not assist anyone flagged for a voter-registration mismatch in gathering or presenting the identification documents necessary to complete the voter-registration process. Tr. 571:4-15. VHC, in fact, has no knowledge of anyone who was unable to vote because of what VHC refers to as Georgia's "exact match" process. Tr. 575:12-16. Georgia's HAVA match policy did not prevent VHC from educating voters. Tr. 574:12-17.

274.    VHC has no knowledge of any act of the Secretary to maintain the accuracy of Georgia's voter database, nor is it aware of anyone unable to vote as a result of the Secretary's maintenance of the voter database. Tr. 575:9-11, 575:22-576:1. VHC did not assist anyone who actually had a problem as a result of an inaccuracy in Georgia's voter database. Tr. 573:4-23. The State's efforts to maintain the voter database also did not prevent VHC from educating voters about issues it deemed important. Tr. 574:25-575:8.

275.    VHC has also no knowledge of anyone unable to vote as a result of the Secretary's training of county election superintendents on absentee-ballot cancellations. Tr. 575:17-21. VHC did not assist anyone who experienced a problem resulting from the Secretary's training of county election superintendents on absentee-ballot cancellation. Tr. 573:24-574:11. The

Secretary's training of county election superintendents on absentee-ballot

cancellation did not impair VHC's ability to communicate its message. Tr. 574:18-

24.

## IV.   HAVA Match

A.   <u>HAVA Match Process and Purpose</u>

276.   The Department of Drivers Services ("DDS") currently has a

Memorandum of Understanding ("MOU") with the Secretary of State's office

("SOS") regarding the transmission of "voter registration data between the

parties for verification pursuant to the provisions of HAVA. PX. 1751; <u>see also</u> Tr.

1189:1-7, 11-12, 16-23; 1190:21-22 (McClendon); Tr. 497:12-17 (Mayer). The HAVA

Match process considers information in both the DDS database and the federal

Social Security database. Tr. 3576:24-3577:8 (Harvey).

277.   The purpose of the MOU is to "enable[] the Secretary of State and

DDS to transmit voter registration data between the parties for verification

pursuant to the provisions of HAVA." Tr. 1189:18-20; <u>see also</u> PX. 1751. The

process for verification generally proceeds as follows:

278.   <u>First</u>, the SOS sends a new registering voter's information to DDS for

verification. Tr. 1191:22-24. Pursuant to the MOU, the SOS transmits voter

97

registration information to DDS for verification on a daily basis. Tr. 1190:23-1191:7; see also PX. 1751.

279.   Second, DDS takes the new registering voter's information and determines whether the record can be checked against DDS information or if it needs to go to the Social Security Administration. If the record has a driver's license or state ID number, it will be checked against DDS records. If a record does not have a driver's license number, it will be sent to the Social Security Administration for validation, with whom DDS has an agreement to verify information as required by HAVA. Tr. 1194:20-1196:18 (McClendon).

280.   If a record has certain uncurable defects, such as an invalid date of birth or non-numeric characters in the last four digits of the applicant's social security number, DDS will stop the verification process, flag, and return the application to the SOS. Tr. 1196:19-1197:15 (McClendon); PX. 1753.

281.   Third, for records that it can process for verification, DDS checks the following criteria in the record against the information it has on file to determine if it is a match:

    a.   Driver's license number, first twenty characters of the last name, first initial, and date of birth (if no social security number is provided); or

b. Driver's license number, first twenty characters of the last name, first initial, date of birth, and last four digits of the social security number (if provided); or

c. First twenty characters of the last name, first initial, and date of birth (if no social security number is provided and license number is not found); or

d. First twenty characters of the last name, first initial, date of birth, and last four digits of the social security number (if last four digits of social security number are provided and license number is not found).

PX. 1753 at 1; see also Tr. 1197:16-1199:18 (McClendon).[18]

282.   A prior version of the verification process involved comparing the first 20 characters of the first name. PX. 1752; see also Tr. 1201:9-25. The change was made sometime after 2017. Tr. 1202:1-4.

---

[18] Plaintiffs' expert, Dr. Mayer, opined that states have leeway in determining how to implement HAVA's match requirement. Tr. 433:16-18. He also testified HAVA does not specify the method that states use to verify registration information, what information is matched, or what action must be taken if the information is not verified, although this appears to be contrary to the language in the act. Compare Tr. 497:12-17 with 52 U.S.C. § 21083(b).

283.   For records verified by the SSA, DDS automatically returns to DDS the exact information provided to them. PX. 1753 at 2; see also Tr. 1200:20-8 (McClendon). These responses can include any of the following: invalid input data; multiple matches – all deceased; multiple matches – all alive; multiple matches – at least one alive and one deceased; single match – alive; single match – deceased; no match found; or system error. PX. 1753 at 2.

284.   Fourth, and finally, after it has performed the verification process, DDS transmits the voter information back to the SOS with a determination of whether the information was verified or not and, if not, the reasons therefor. Tr. 1191:11-21; 1199:19-1200:7 (McClendon); Tr. 3574:4-19 (Harvey); see also PX. 1751; DX. 42 (O.C.G.A. § 21-2-220.1(b) (revised version of HAVA Match policy enacted by HB 316). DDS takes no further action regarding a voter's registration information after it returns the verification to the SOS. Tr. 1192:7-9.

285.   Practically speaking, the above-described process only applies to voters who did not register through DDS to begin with. If a voter registers through DDS, including via automatic voter registration, their information will automatically match what is on file with DDS before the registration is sent to counties to be processed. Tr. 1950:12-1951:14 (Harvey). Most of Georgia voters, however, are registered to vote through DDS when they obtain a driver's license

and choose not to opt-out of voter registration. Tr. 4225:20-24. This automatic registration policy is not required by any federal law and was implemented during Governor Kemp's tenure as Secretary of State. Tr. 3562:11-22; 3565:2-9 (Harvey); Tr. 4225:20-4226:4 (Sterling).

286.    The HAVA Match process is distinct from the felon and duplicates match process described herein. Tr. 3574:4-16 (Harvey). Unlike felon and duplicates match, the matching process between the SOS and DDS is entirely automated; there is no role for the counties in the HAVA Match process and there is no discretion in trying to decide if someone has information at DDS or not. Tr. 3574:4-19 (Harvey); Tr. 1192:2-3 (McClendon).

287.    The Secretary of State's General Counsel since 2014, Ryan Germany, explained the Secretary's understanding that HAVA requires that all individuals registering to vote must provide his or her driver's license number, if they have one, or the last four digits of their Social Security Number. Tr. 1517:7-11; Tr. 4139:23-25, 4140:1-10; see also 52 U.S.C. §21083(a)(5)(B)(i). As Mr. Germany explained, this is also a requirement under Georgia law. Tr. 4143:19-25, 4144:1-2; see also O.C.G.A. § 21-2-220.1(a). Mr. Germany also testified that Georgia law regarding identification requirements for first time voters who register by mail

mirrors the requirements of HAVA for this type of registrant. Tr. 4141:7-25, 4142:1-11.

288.   If the information processed by DDS does not come back as a match, e.g., Johnathan William Smith registers to vote as Billy Smith, a name that he goes by, the eNet system will flag the person in what is called Active-MIDR (missing identification requirement) status. Id.; see also Tr. 3577:18-20 (defining MIDR) (Harvey). The matching is fully automated and binary: a voter is either flagged or not based on whether the information returns and is verified. Id.; see also PX. 2054 (Rayburn Dep. Tr.), Tr. 156:2-156:24. Put differently, and unlike the other Challenged Practices, the HAVA-match policy involves no discretion—either on the part of the Secretary or county election officials.

289.   Persons flagged as Active-MIDR status are deemed to be a registered voter in Georgia. Tr. 3581:4-8 (Harvey). Regardless of the flag, these voters are able to vote in person so long as they present a form of acceptable identification. Tr. 3574:20-22 (Harvey); Tr. 399:12-20; 505:16-21 (Mayer). They can vote absentee by mail only providing some form of required identification; the absentee ballot will otherwise be treated as a provisional and can be cured with the three-day period by, again, providing the required identification. Tr. 3575:2-4; 9-14.

290.    When persons in Active-MIDR status vote for the first time, they are able to use more types of information—including a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector—than the photo identification requirement of registered voters who are not in the MIDR status. Compare O.C.G.A. § 21-2-417(c) with O.C.G.A. § 21-2-417(a); see also Tr. 1614:20-22; Tr. 4137:23-24, 4141:11-17 (Germany). These forms of identification are referred to as HAVA ID, which is broader than the photo ID requirement for voters who have previously voted. Tr. 4137:3-10; 4141:21-25; 4142:1-7 (Germany).

291.    Plaintiffs' expert, Dr. Mayer, concurred with this understanding, stating that "[a] registrant who's been flagged as MIDR is required to clear that flag before they are given a ballot, and they could clear that flag by showing a form of I.D. that is otherwise required by Georgia's voter I.D. law, but it's also possible for certain registrants, particularly first-time registrants, to clear that flag with a different set of identification documents." Tr. 399:14-20.

292.    One purpose of MIDR is to prevent the same person from registering various aliases and proving that the registering voter is an actual person. Tr. 3604:11-19; 3606:14-24 (Harvey). A similar purpose of the HAVA

Match policy is that it helps weed out false registrations. Tr. 3605:20-3606:8 (Harvey).

293.   Importantly, a person flagged as MIDR also signals to the poll worker that this voter is permitted to use HAVA ID to vote. Tr. 4141:7-25, 4142:1-11; 4145:8-18; Tr. 4146:7-12 (Germany). Mr. Germany provided uncontested testimony that this notice is necessary for compliance with HAVA; without it, poll workers would be unable to identify which voters were allowed to alternatively provide a HAVA ID, as opposed to one of the photo IDs usually required by Georgia law, to vote. Tr. 4146:4-12 (Germany). In other words, another purpose of the Active-MIDR status is to ensure that those first-time voters eligible under federal law to provide HAVA ID can do so.

294.   If the voter does not have any of those forms of identification either, they are permitted to cast a provisional ballot. O.C.G.A. § 21-2-417(c); Tr. 3578:5-10; 3604:20-3605:18 (Harvey); Tr. 4145:19-25 (Germany).

295.   Other than being eligible to provide the aforementioned additional forms of identification—HAVA ID—when voting for the first time, there are no practical differences between a registered voter in Active-MIDR status and one that is not. Tr. 4146:13-17 (Germany)

296.    Persons on Active-MIDR status may also vote by absentee ballot once they have provided one of the broader forms of identification to a county election office; if the voter has yet to provide the identification, the absentee ballot will be treated as a provisional and can be cured with the three-day period by, again, providing the required identification. Tr. 3575:2-4; 9-14 (Harvey); Tr. 4145:19-25 (Germany).

297.    Persons who are flagged in Active-MIDR status receive a letter from their county election office notifying them of the kinds of identification they will need to vote. Tr. 399:21-24 (Mayer); see also PX. 1900.

298.    The letter sent to voters in Active-MIDR status informs them that they need to provide one of two forms of identification; a photo ID that complies with Georgia's photo ID law (such as a driver's license) or one of the alternative identification forms permitted under HAVA. PX. 1900; see also Tr. 401:22-402:5 (Mayer).

299.    The Secretary of State's office Deputy Elections Director and Deputy General Counsel explained that this would also apply to voters in MIDR status requesting an absentee ballot. They would be sent a provisional absentee ballot with instructions to show ID before it will count. PX. 2054, Tr. 197:10-197:16.

300. The placement of an individual in Active-MIDR represents a change pursuant to HB 316. Tr. 3576:24-3577:17 (Harvey); see also O.C.G.A. §§ 21-2-220.1(b), 21-2-216(g)(7); Tr. 3576:18-24 (Harvey) (reviewing DX. 42 (O.C.G.A. § 21-2-220.1)); Tr. 3580:8-23 (Harvey) (reviewing DX. 46 (O.C.G.A. § 21-2-216)).

301. Prior to the enactment of HB 316, someone who failed the HAVA Match process would be identified as "pending registration" and not on the active list of voters. Tr. 3576:24-3577:17; 3603:14-15 (Harvey); PX. 2054, Tr. 196:16-196:22. Consequently, the voter would not receive a precinct card (Tr. 3577:13-17 (Harvey)), and their time to take some action to remain on the active voter list was shorter than persons who were deemed active voters. See, e.g., O.C.G.A. § 21-2-235. Persons on the pending status may take longer to vote because the poll worker may need to assess the situation with a poll manager. Tr. 3577:21-3578:4 (Harvey).

B. The Impact of HAVA Match

302. Prior to the passage of HB 316, the Secretary's office conducted a demographic study and concluded that 70% of those in pending status were African-American. Tr. 3601:14-3602:2 (Harvey). After the passage of HB 316, which changed voters affected by HAVA Match from pending status to Active-MIDR, the only persons identified in that study which would still be in pending

106

status are those for citizenship verification. Id. Plaintiffs did not show that the

State had actual knowledge of any post-HB 316 study or of any alleged disparate

impact on voters of color caused by Active-MIDR status.

303.    In addition to this dated analysis, Dr. Mayer opined as to the impact

of HAVA Match. Specifically, Dr. Mayer was tendered as an expert on the topics

of election administration, including the analysis of voter registration files, voter

verifications processes and the impact of those processes on voters. Tr. 338:4-14.

304.    This Court qualified Dr. Mayer as an expert in the areas on of

election administration, including the analysis of voter registration files, voter

verifications processes and the impact of those processes on voters, as far as they

relate to statistical analyses. Tr. 342:18–343:2.

305.    According to Dr. Mayer, there were 60,377 registrants in MIDR

status as of January 2020; about 0.88% of the 6,798,488 registered voters as of

December 2019. PX. 1278 at 16; 18.

306.    Of those, 69.4% were African American; 11.4% were white non-

Hispanic; 5.7% were Hispanic; 3.3% were Asian or Pacific Islander; 3.4% were

other or two or more demographic categories; and 7% were unknown. Id. at 18.

307.   This translates to 2.03% of registered African American voters in Georgia; .19% white non-Hispanic; 1.50% Hispanic; 1.19% Asian or Pacific Islander; and 1.71% other or two or more demographic categories. Id. at 19.

308.   In other words, Dr. Mayer concluded that HAVA Match does not affect over 99.1% of voters in Georgia, including roughly 98% of African American registrants; 98.5% of Hispanic registrants; and 98.8% of Asian or Pacific Island registrants. Id.

309.   For his analysis, Dr. Mayer testified that he looked at HB 316, other statutes governing the verification process, a series of voter registration files from 2018-2021, training materials, and depositions of Ryan Germany, Kevin Rayburn, Chris Harvey, and Gabriel Sterling to familiarize himself with Georgia's voter verification process. Tr. 348:12-348:5.

310.   Dr. Mayer opined that the Secretary of State's office did not articulate how the match process works, but he admitted that he never attended a training conducted by the Georgia Secretary of State's office. Tr. 425:10-17.

311.   Dr. Mayer understood that the verification process is run by DDS, but he did not speak with anyone in that office when formulating his opinion in this case. Tr. 427:15-21.

312.    When a voter's information does not match the DDS or SSA records and the voter is placed in MIDR status, Dr. Mayer could not say whether the non-match was the result of a typographical error or data entry error by the county. Tr. 431:21-432:18. Dr. Mayer recognized, however, that it is the local election officials that enter registration data into the registration system, and not the Secretary of State's office. Tr. 504:13-19.

313.    Dr. Mayer agreed that an increase in voters registering by mail could increase the number of voters in MIDR status. Tr. 489:5-9.

314.    Dr. Mayer could not say definitively that being in Active-MIDR status would have any effect on a voter's experience at the polls. Instead, he opined that "the inference of the academic literature" suggested that a nonwhite voter might be more likely to be questioned about it than a white voter. Tr. 404:17-20. Dr. Mayer conceded, though, that he did not analyze whether this theory applied in Georgia or to what degree, nor did he identify a single Georgian who had an experience like the one in the generalized academic literature. See tr. 403:14-405:13.

315.    For that matter, Dr. Mayer also did not speak with any Georgians (or any other actual voters) about the HAVA notice letter or apply any quantitative metrics to determine if it was "clear" (Tr. 444:7-17); he only offered that he

considered it confusing and that he "think[s] it would be preferrable that the letter be in a form that is easily readable and understandable by voters." Tr. 443:17-19. This Court thus finds, as a matter of fact, that there is no evidence to indicate that receipt of the letter constitutes a burden on voters.

316.   Dr. Mayer did not opine on whether Georgia's voter registration practices and systems, including HAVA Match, were adopted with a discriminatory intent. Tr. 423:9-12. Mr. Harvey credibly testified that he had no reason to believe that either Secretaries Raffensperger or Kemp, or any members of their staff intended to discriminate against minority voters through the HAVA-Match process. Tr. 3464:19-3465:1.

C.   Plaintiffs' HAVA Match witnesses

317.   Plaintiffs put forth no witnesses affected by the HAVA Match policy. While Plaintiffs identified two witnesses that were purportedly impacted (Dr. Carlos Del Rio and Mr. Julian Grill, both discussed below), the evidence adduced at trial confirmed that such was not the case. In fact, Plaintiffs failed to establish that the issues experienced by Dr. Del Rio and Mr. Grill were related to *any* remaining issue in this lawsuit.

i.   *Dr. Carlos Del Rio*

318.    Dr. Del Rio testified that he registered to vote in 2007 or 2008 and did so without issue. Tr. 480:17-18. His eNet record does not indicate that he was ever placed in either "pending" or "MIDR" status at any point for any reason. PX 2011.

319.    Dr. Del Rio testified that he had no problems voting prior to 2018 and described the process as "smooth as silk." Tr. 480:19-21. When he went to vote in the 2018 general election, Dr. Del Rio testified that a poll worker told him that "there was a problem with my match, my ID and my registration." Tr. 475:9.

320.    Dr. Del Rio responded to this statement by pulling up his "My Voter Page" on the Secretary of State's website and confirming that he was, in fact, registered to vote. Tr. 475:9-12. Indeed, Dr. Del Rio admitted that every bit of information listed for him on the Secretary of State's My Voter Page was "totally correct." Tr. 485:5-10.

321.    After his exchange with the poll worker, Dr. Del Rio testified that the poll worker spoke with other individuals at the polling location and he was then able to cast a ballot. Tr. 476:16-477:9; 480:22-23. According to Dr. Del Rio, it took eight to ten minutes for the issue to be resolved. Tr. 484:2-25.

322.    While there is no evidence in the record to explain why the poll worker might have made the statement to Dr. Del Rio in the first place, beyond a simple mistake by the poll worker, this Court finds that none of available evidence suggests it had anything to do with the HAVA Match process. Indeed, Dr. Del Rio's testimony indicates that he resolved the issue by presenting the poll worker his own voter registration record on file with the Secretary of State's office, which confirms that he was at all times registered to vote and not in pending or MIDR status. Tr. 475:6-19; PX. 2011. As such, Dr. Del Rio's testimony and the evidence submitted by Plaintiffs fails to establish that he was affected by the HAVA Match process in any way.

ii.  *Julian Grill*

323.    Mr. Grill is a mechanical engineer and manages an ultrasound testing and development company. PX. 2056 (Grill Dep. Tr.), Tr. 8:9-14. He has lived in Chatham County, GA since 2015. PX. 2056, Tr. 10:15-20. Like Dr. Del Rio, Julian Grill was not affected by HAVA Match.

324.    Mr. Grill cannot receive US mail at his residential address in Chatham County. PX. 2056, Tr. 21:1. Any mail sent to Mr. Grill at his residential address, as opposed to his PO Box, is usually returned. PX. 2056, Tr. 21:15-20.

325.   After receiving a letter that Chatham County was updating his registration status, Mr. Grill checked his My Voter Page and found that he was in inactive status (not MIDR) and believed he would have to fill out a provisional ballot to vote. PX. 2056, Tr. 22:16-19, 22:2-4, 38:4-7. Mr. Grill did not notice that the notification he received from Chatham County stated that his inactive status would not affect his ability to vote. PX. 2056, Tr. 84:16–85:5. Regardless, this Court notes that a voter being placed in "inactive" status is a product of the State's list maintenance program, not HAVA Match, and list maintenance is no longer an issue in this case.

326.   Mr. Grill first called Fair Fight Action who were unable to assist him. He was directed to call the Chatham County elections office. PX. 2056, Tr. 13:19, 22:20-23:2. Similarly, when Mr. Grill spoke with an unidentified individual at the Secretary of State's office, he was referred to the Chatham County elections board because the county office would have the necessary information to address his issue. PX. 2056, Tr. 54:25-55:6.

327.   After Mr. Grill spoke with the Chatham County office, the Chatham County clerk then mailed a letter confirming they updated his voter-registration record back to active status. PX 2056 at 72:13-15; 77:16-77:20. On July 28, 2020, Mr. Grill accessed his My Voter Page and confirmed the change to active status.

PX. 2056, Tr. 77:21-23. Mr. Grill was able to vote successfully in Nov. 2020. PX. 2056, Tr. 25:3-7.

328.    Mr. Grill was also aware that the Secretary of State sent absentee ballot applications to all registered voters in 2020. PX. 2056, Tr. 23:3-9. Mr. Grill was not aware, however, whether the Secretary first sent the applications to residence addresses and not mailing addresses. PX. 2056, Tr. 23:10-14. Mr. Grill had apparently received an absentee ballot application that was addressed to his PO Box. PX. 2056, Tr. 24:1-3.

## V.    Citizenship Verification

### A. The Citizenship Verification Process and Purpose

329.    In Georgia, only United States citizens are eligible to vote. O.C.G.A. § 21-2-216(a)(2); see also Tr. 3581:1-3 (Harvey). The Election Code requires the Secretary of State to "establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by DDS for verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship." O.C.G.A. § 21-2-216(g)(7); see also Ga. Comp. R. & Regs. 590-8-1-.02.

114

330.    All voters must demonstrate citizenship at the time of registration, and the State elections board has promulgated a rule establishing the types of acceptable proof for voter registration purposes. Tr. 3585:12-21 (Harvey) (considering DX. 777 (Ga. Comp. R. & Regs. 183-1-6-.06)).

331.    In Georgia, when a voter registers using a driver's license or an I.D. card number, they go through a citizenship verification process. Tr. 359:8-14 (Mayer). The data used for the verification process is that which is on file with DDS. Tr. 359:19-23.

332.    Persons who provide some evidence of non-citizenship will be identified by DDS as such. Tr. 3582:12-16 (Harvey). If during the citizenship verification process, a match does not occur with the voter's DDS file, they are flagged as needing to provide evidence of citizenship and are placed in pending status. Tr. 364:5-25 (Mayer).

333.    Dr. Mayer could not provide a specific explanation for what causes individuals to be flagged by the matching process. Tr. 503:7-16. Dr. Mayer admitted, however, that a person can submit evidence of citizenship to election officials who can note that citizenship documentation has been provided, which would override a DDS flag and put the individual into active status. Tr. 386:13-19.

334.    To this end, voters in pending status are then sent a letter by a local election official by U.S. mail. Tr. 364:20-25 (Mayer). The letter indicates that a registrant placed in pending status may provide confirmation of their citizenship at the polls or while requesting an absentee ballot and be able to vote. Specifically, the letter states that the registrant may vote by providing, in addition to the valid photo ID required under Georgia law, a Birth certificate issued by a U.S. State or the U.S. Department of State; a U.S. Passport; a Certificate of Citizenship; a Naturalization Certificate; a U.S. Citizen I.D. card; or any of the fifteen other forms of verification allowed under Georgia law. PX. 1231 at STATE-DEFENDANTS-00742580.

335.    Non-citizens may obtain a Georgia driver's license. Tr. 3581:18-25 (Harvey). The license is known as a "limited term" license as opposed to those that show the driver is a United States citizen. Id.; Tr. 1203:1-6; 10-17; 1204:2-4 (McClendon). A non-citizen must renew their limited term license or state ID card in person and cannot do this on-line. Tr. 1203:23-1204:1 (McClendon). The expiration of limited-term driver's license or state identification card is tied to the lawful duration of the non-citizen's stay in the United States. Tr. 1203:14-17 (McClendon).

116

336.    DDS does not know when someone becomes a citizen unless the customer informs DDS of the change in citizenship status. Tr. 1205:2-5; 1206:2-4 (McClendon). If the customer does not inform DDS of a change in citizenship status, the individual will remain in the DDS database as a non-citizen. Tr. 1205:2-5; 1203:23-24 (McClendon).

337.    Both active and inactive voters are on the voter rolls. Tr. 1683:5-11 (Germany). Individuals who are pending for citizenship can vote if they show up to their polling place and provide proof of citizenship. Id. These individuals will be on the voter list at the polling location as someone who had registered but is just pending their citizenship verification. Id. If a voter is unable to verify their citizenship, they can vote provisionally and verify their citizenship afterward. Tr. 1724:22-25; 1725 1-2 (Germany).

338.    A Secretary of State regulation, Ga. Comp. R. & Regs. 590-8-1-.02, provides that if the DDS cannot determine citizenship, the county election office must make sure that the driver's license identification number or identification card was entered properly before making a decision on that individual's eligibility as a voter. Tr. 3584:1-18 (Harvey).

339.    The same regulation refers to the SAVE system, which the Secretary began to utilize after the 2020 election.

117

340.    "SAVE" stands for Systememmatic Alien Verification for Entitlements. Tr. 1708:14-17 (Germany). Apart from its potential utility in the elections and voter registration context, states are required to use SAVE to check the citizenship status of individuals applying for public benefits. Tr. 282:23-25 (McCrary). SAVE is a different system than E-Verify. Tr. 282:18-22 (McCrary).

341.    In 2021, the Secretary of State's office used SAVE to audit the voter rolls and records from DDS. Tr. 1680:15-16; 1680:20-22. The range of dates for the registrations that the Secretary of State's office identified during the audit was from 1997 until February 24, 2022. Tr. 1728:1-2 (Germany).

342.    During that audit, the Secretary of State's office looked at the entire voter roll. Tr. 1682:3-5. The Secretary of State's office worked with DDS to compare data and see what the Secretary of State's office could do to add driver's license numbers where it did not have them. Tr. 1681:1-4. The Secretary of State's office also had a special process through DDS to get the alien ID numbers of voters. Tr. 1709:6-9.

343.    Upon receiving from DDS the alien registration numbers for voters for whom they hadn't been able to verify citizenship, the Secretary of State's office ran those registration numbers through the SAVE process. Tr. 1681:21-24.

344.    As a result of this audit, 63 percent of people who had been listed as pending for citizenship verification came back with their citizenship confirmed and were put into active status. Tr. 1690:13-14 (Germany).

345.    Voters who were not verified as citizens based solely or in part on SAVE where sent a letter by the Secretary of State's office stating that the Secretary of State's office was unable to verify you and stated how the voter can show their citizenship. Tr. 1724:7-20 (Germany).

346.    SAVE is a federal system; the Secretary of State's office just has a login to the system. Tr. 1720:15-17 (Germany). Only one person at the Secretary of State's office, Paul Kokones, has undergone SAVE training, obtained a SAVE user ID, and has accessed the system. Tr. 1714:22-25; 1715:1-3; 1708:14-17 (Germany). It was Mr. Kokones, along with Sarah Beck, an attorney in the Secretary's office, who conducted the audit. Tr. 1683:23-25; 1687:10-15 (Germany).

347.    The citizen audit spreadsheet contains information that the Secretary of State's office pulled from SAVE as to whether somebody does or does not verify as a citizen. Tr. 1721:22-25 (Germany). Only people in the elections division of the Secretary of State's office have access to the citizenship audit excel spreadsheet produced by SAVE. Tr. 1719:10-14 (Germany).

348.    The Secretary of State's office is currently in discussions about implementing more frequent uses of SAVE to verify voters' citizenships going forward. Tr. 1710:2-5 (Germany). It is a goal of the Secretary of State's office to be able to run voter applicants' alien registration numbers through the SAVE system in real time. Tr. 1694:6-21 (Germany).

349.    Again, the county election office has the authority to determine whether a person flagged for non-citizenship is, in fact, a citizen. Tr. 3584-1-18 (Harvey). In other words, as with all other voters, the county election offices processes newly naturalized citizens voter applications. Tr. 3586:15-3587:20 (Harvey). The Secretary only provides the counties with the data to do so. Tr. 3587:11-20 (Harvey).

350.    In 2016, eNet used to have "blackout periods after elections where there were runoffs." Tr. 3584:23-25 (Harvey). The purpose behind the policy was to prevent the transfer of voters between the general election and the runoff. Tr. 3584:23-3585:7 (Harvey). This also led to backlogs of applications, including those of newly naturalized citizens. Tr. 3584:3-7 (Harvey).

351.    To address this problem, the Secretary's office clarified — through an Official Election Bulletin — that counties should continue to process voter

registration applications even during runoff election periods. PX. 2092; Tr. 3588:8-15 (Harvey).

352.    This Court heard evidence about the plight of Ms. Tuba Ozgunes. See PX. 89. In 2014, she brought a complaint to the State elections board about how Fulton County had continuously and wrongly determined that she was ineligible to vote as a non-citizen. Id.

353.    Ms. Le testified, however, that representatives from Fulton County at the SEB's August 2019 meeting testified that they had solved Ms. Ozgunes' issue of having to present proof of citizenship each time she voted by implementing a procedure to have citizenship information returned to the registration office and entered into the voter's record. Tr. 1818:5-10 (Le).

354.    In January 2019, the Secretary sent an Official Election Bulletin informing the county registrars of a change to the eNet system that allowed county election officials to override DDS's conclusion that a particular voter was not a citizen. Tr. 3590:6-3591:1 (Harvey); PX. 89. In other words, once a voter established citizenship to the county election office (including on the spot), the county was empowered to override potentially stale data from DDS. Id. This change addresses the situation that Ms. Ozgunes found herself in during the 2014 elections. Tr. 3590:6-3591:5.

355.    Mr. Harvey credibly testified that he had no reason to believe that either Secretaries Raffensperger or Kemp, or any members of their staff, intended to burden voters' rights to vote through the use of the citizenship verification process. Tr. 3465:4-7.

B.   The Impact of Citizenship Verification

356.    In addition to his HAVA Match analysis, Plaintiffs asked Dr. Mayer to analyze for this case the process of citizenship verification. Tr. 348:7-11.

357.    In Dr. Mayer's initial report, he identified 3,073 registrants flagged as pending for citizenship verification as of January 2020. PX. 1278 at 21. Of those, 31.6% (972) were African American; 13.0% (400) were white non-Hispanic; 20.9% (642) were Hispanic; 23.2% (714) were Asian or Pacific Islander; 5.2% (159) were other or two or more demographic categories; and 6.1% (168) were unknown. Id. at 18.

358.    For comparison's sake, Dr. Mayer also provided statistics as to the number of voting age naturalized citizens living in Georgia from the 2014-2018 5-year American Community Survey prepared by the U.S. Government. As of the date of that report, there were 457,179 voting age naturalized citizens living in Georgia with the following demographic characteristics:105,324 were African American; 77,488 were white non-Hispanic; 95,735 were Hispanic; 141,580 were

Asian or Pacific Islander; and 37,052 were other or two or more demographic categories. Id. at 22. Of the voting-age foreign-born population in Georgia, 20.9 percent are Hispanic, which is identical to the percentage of the people in pending status for citizenship verification who are non-white Hispanic. Tr. 450:24-451:8.

359.    In other words, of the voting-age foreign-born population in Georgia, 16.9 percent are white non-Hispanic, as compared to 13 percent of the voters in pending status for citizenship verification that are white non-Hispanic. Tr. 451:9-16 (Mayer). African-Americans are 23 percent of naturalized citizens in Georgia and 31 percent of citizens in pending status for citizenship. Tr. 452:1-5 (Mayer). Dr. Mayer testified that it is not surprising that the demographics of the naturalized citizen population in Georgia is similar to the demographics of individuals in pending status for citizenship verification. Tr. 451:19-22.

360.    Regardless, the African-American registrants flagged as pending for citizenship verification represent about 0.9% of the African-American voting age naturalized citizens living in Georgia at approximately the same time; along with about 0.5% of white non-Hispanic voting age naturalized citizens; 0.7% 0.5% of Hispanic voting age naturalized citizens; 0.5% of Asian or Pacific Islander voting

age naturalized citizens; and 0.4% or other or two or more demographic categories voting age naturalized citizens. Id.

361.    In his supplemental report, Dr. Mayer compared people in pending status in a voter file dated January 28, 2020 with a voter registration file from November 2021. Tr. 365:17-366:5; PX. 1999 at 6. Dr. Mayer testified that of the 3,073 voters who were in pending status for citizenship verification in the January 28, 2020 voter file, 43.1% were no longer in pending status in the November 2021 voter file. Tr. 366:4-12; PX. 1999 at 6. In other words, 1,323 people in pending status moved to active status, and 1,750 people remained in pending status. Tr. 370:18-24; PX. 1999 at 6.

362.    In Dr. Mayer's view, this indicates that the verification process misidentifies citizens as non-citizens with an "error rate" of 43.1 percent. Tr. 365:12-14. The reason for this purported error rate, however, as discussed above, is that DDS records are based on what people reported when they last got their driver's license or I.D. card, so naturalized citizens who do not update their status with DDS still show as a noncitizen in DDS's database. Tr. 366:24-367:13 (Mayer).

363.    Voters are placed in pending status for a variety of reasons, not solely for citizenship verification. Voters can be placed in pending status for

missing information not provided by the voter. Tr. 501:3-21 (Mayer). Further,

even Dr. Mayer admitted that persons who are in pending status for citizenship

could, in fact, be non-citizens. Tr. 504:3-12. Dr. Mayer admitted that he did not

know whether the 1,750 registrants who remained in pending status for

citizenship verification as of November 2021 were, in fact, citizens. Tr. 438:4-7.

364.    Dr. Mayer also could not testify as to why any of the 1,750 people in

pending status had not provided evidence of citizenship to move to active status.

Tr. 438:4-10; 449:7-8. Dr. Mayer agreed that it is possible that a person in pending

status for citizenship verification is actually a non-citizen. Tr. 504:9-12.

365.    Dr. Mayer did not review whether any of the individuals in pending

status attempted to vote provisionally in any elections. Tr. 438:11-14. Dr. Mayer

also did not conduct any analysis to see if any individuals in pending status

were, in fact, citizens who were prevented from voting for not verifying their

citizenship. Tr. 439:7- 440:10. However, Dr. Mayer agreed that there exists the

possibility that non-citizens would be placed on the voter rolls if all of the

individuals in pending status were moved to registered status. Tr. 439:25-440:4.

366.    Dr. Mayer did not speak with any voters who received a letter

regarding their status as pending for citizenship verification. Tr. 444:13-17. Dr.

Mayer also could not testify as to whether any voters who moved to active status or remained in pending status were confused by these letters. Tr. 448:20-449:8.

367.   Dr. Mayer testified that there are states which use only a voter's attestation of being a citizen, and do not go through a citizenship verification. However, Dr. Mayer was only able to identify three such states which accept a voter's attestation of eligibility to vote without going through a citizenship verification. Tr. 435:20-436:1. Dr. Mayer agreed that self-attestation would still require an individual to be removed from the voter rolls if they were found to not be a citizen. Tr. 436:12-437:4.

368.   In 2012, Dr. Mayer was retained by the United States Department of Justice to evaluate voter registration and list maintenance in Florida with respect to claims that non-citizens had registered and voted in Florida. Tr. 332:11-18. Dr. Mayer's work with the Justice Department in 2012 included information that had been generated through the SAVE system to evaluate whether registrants were citizens or not citizens. Tr. 333:2-4. Dr. Mayer did not, however, conduct any SAVE verifications during his work with the Department of Justice. Tr. 522:6-10.

369.   Dr. Mayer did not offer an opinion in his written reports on SAVE. Tr. 340:5; 521:14-16. From Dr. Mayer's experience working with the Department of Justice in Florida, the SAVE process winnowed down the number of people

flagged as non-citizens. Tr. 374:24-375:4; 441:18-20. Dr. Mayer believes that SAVE would likely bring down the number of voters in pending status for citizenship. Tr. 441:21-24; 510:9-15.

C. Plaintiffs' Citizenship Verification Witnesses

370.   Plaintiffs offered testimony regarding four individuals who had been flagged as non-citizens. Only two of these witnesses, Dr. Benjamin Ansa and Ms. Rosa Hamalainen, did not cast ballots, both in 2016 before HB 316 and the Secretary's implementation of SAVE took place.

i.  *Cam Ashling*

371.   Cam Ashling testified that she assisted another woman, Ms. Ngoc Anh Thi Tran, in casting a ballot in the 2018 general election. Tr. 295:10-14; 300:18-22. According to Ms. Ashling, she offered to take Ms. Tran to vote but decided to check her voter registration status first. Tr. 300:24:-301:4. Ms. Ashling testified that, upon doing so, she observed that Ms. Tran's MVP page did not have her listed in "active" status. Id.

372.   Ms. Ashling further testified that, because of what she observed on Ms. Tran's MVP page, she called the Gwinnett County elections to inquire about the issue. Tr. 302:14-17. Based on what Ms. Ashling was told, she decided to

provide Ms. Tran with a ride to the Gwinnett County elections office and told her to bring her naturalization paperwork to resolve the issue. Tr. 300:24; 302:15-20.

373.    It is undisputed that that Ms. Tran did, in fact, cast a ballot successfully in the 2018 general election. 315:20-22; see also PX. 2039 at 2. Indeed, Ms. Ashling testified that resolving the issue at the Gwinnett Elections office took no more than 30 minutes—not including travel time and the time she spent getting lunch with Ms. Tran—and only required Ms. Tran to present her naturalization paperwork to the elections office. Tr. 316:9-13.

374.    While this Court does not consider the statements of the unnamed Gwinnett County election officials who assisted Ms. Ashling and Ms. Tran for the truth of the matter asserted, as both are hearsay, this Court finds that Ms. Tran's eNet report does indicate that Ms. Tran was previously listed, as of November 1, 2018, as being in "pending" status for "citizenship verification." PX. 2039 at 2. This Court finds this record sufficient to establish that Ms. Tran was, in fact, in pending status at the time of the general election in November 2018.

375.    However, this Court finds Ms. Ashling's testimony does not show that Ms. Tran was *improperly* in pending status for purposes of citizenship verification at that time. Ms. Ashling could not testify, for example, how or when Ms. Tran first registered to vote. Tr. 314:14-18.

128

376.    Accordingly, Ms. Ashling could not testify that Ms. Tran was, in fact, eligible to vote at the time she submitted her registration. Ms. Ashling could not testify as to when Ms. Tran first became a U.S. citizen and whether such occurred before Ms. Tran attempted to register to vote. Tr. 315:3-12.

377.    Ms. Ashling further could not testify whether Ms. Tran possessed a driver's license or whether she previously received notice that she had been placed in pending status and the reasons therefor. Tr. 314:19-22; 315:15-19.

378.    Because of the limitations of Ms. Ashling's testimony regarding Ms. Tran's registration history, this Court is unable to conclude that Ms. Tran's placement in "pending" would have been in error at the time Ms. Tran tried to register to vote. Thus, it is not clear that Ms. Tran's story actually relates to Plaintiffs' citizenship claim at all.

379.    If Ms. Tran's experience occurred under Georgia law today, she would be able to bring her naturalization paperwork directly to her polling place, which further diminishes any burden.  PX. 1820; Tr. 2044:5-2045:7.

ii. *Rosa Hamalainen*

380.    Rosa Hamalainen did not contact Fair Fight Action to tell her story. In January, 2022, Fair Fight Action reached out to Ms. Hamalainen about her

voting experience in 2016 and requested she give testimony in this case. PX. 2048 (Hamalainen Dep. Tr.), Tr. at 20:10-20:22.

381.    Ms. Hamalainen obtained a driver's license in Georgia as a non-citizen when she turned 16. PX. 2048, Tr. 7:18-8:2. When she did so, Ms. Hamalainen provided documentary proof that she was not a citizen to DDS. PX. 2048, Tr. 24:14-17. Ms. Hamalainen never renewed her non-citizen driver's license in Georgia. PX. 2048, Tr. 23:15-17.

382.    Ms. Hamalainen was naturalized in February, 2015 and received her passport along with a naturalization certificate that same year. PX 2048 at 24:20-24:25, 28:4-14. Ms. Hamalainen never, however, renewed her non-citizen driver's license in Georgia before attempting to vote. PX. 2048, Tr. 23:15-17.

383.    Ms. Hamalainen registered to vote on-line in Georgia during the fall of 2016 for the Presidential election while she was in school in California. PX. 2048, Tr. 10:21-23, 25:5-8. Ms. Hamalainen does not remember providing proof of citizenship when she registered to vote. PX. 2048, Tr. 11:15-19.

384.    Ms. Hamalainen received a letter from the Gwinnett County Board of Registrations and Elections, sent October 1, 2016 in advance of the upcoming election, that more information was needed regarding her citizenship status. PX. 2048, Tr. 13:18-14:2, 14:22-24, 24:20-25, 27:17-19.

385.    There was no evidence presented to suggest that Ms. Hamalainen did not understand the letter; she testified that the letter indicated, correctly, that the State did not have information on file for her as a citizen. PX. 2048, Tr. 13:2-10. In fact, she called a number on the letter, as indicated, although she admitted she could not remember which government office she called. PX. 2048, Tr. 28:2-5,29:21-25.

386.    Ms. Hamalainen testified that she had a passport and a naturalization certificate and was told that she could confirm her citizenship by sending either by mail or fax. PX. 2048, Tr. 17:4-14. Ms. Hamalainen had access to a printer, fax machine, overnight delivery, and copier but elected not to provide any documentation of her citizenship status. PX. 2048, Tr. 17:23-25; 28:2-5,29:21-25. She did not vote in the 2016 election. PX. 2048, Tr. 18:7-9.

387.    Ms. Hamalainen did not claim that she was singled out or that her receipt of the letter or her assignment to pending status was due to her race. PX. 2048, Tr. 32:22-33.

388.    Ms. Hamalainen later registered to vote in California and voted in 2018 and 2020 in California. PX. 2048, Tr. 26:3-5, 13-21. Ms. Hamalainen is still registered to vote in California. PX. 2048, Tr. 27:10-11. However, Ms.

Hamalainen's pending application in Georgia was nevertheless confirmed

through the State's SAVE verification process in 2022. PX. 2017 at 1.

iii. *Dr. Benjamin Ansa*

389.    Dr. Benjamin Ansa lived in Atlanta, Georgia from 2010 through

2017. PX. 2096 (Ansa Dep. Tr.), Tr. 12:13-15, 22-24. In 2010, Dr. Ansa received a

green card and then three years later, in 2013, he became a United States citizen.

PX. 2096, Tr. 14:11-15.

390.    At the time Dr. Ansa became a naturalized citizen, he already had a

Georgia driver's license as a non-citizen. PX. 2096, Tr. 29:17-19. After becoming

naturalized, Dr. Ansa did not update his non-citizen license with Driver Services.

PX. 2096, Tr. 29:20-22.

391.    Dr. Ansa registered to vote in Georgia in the weeks before the 2016

election through online registration; he then received a letter before the election

stating he would need to provide documentation of citizenship to vote. PX. 2096,

Tr. 17:24-18:8; 19:8-15; 20-3-7; 30:7-22.

392.    There is no evidence to suggest that Dr. Ansa did not understand

the letter. Indeed, he testified that it "told [him] to send in more documents, like

[a] copy of my naturalization certificate." PX. 2096, Tr. 20:6-7. Dr. Ansa

nonetheless elected not to send in his documents because he felt it was too close

to the election so he "didn't bother to do it." PX. 2096, Tr. 20:7-16. Dr. Ansa

admitted, however, that had access to a printer and a copier if he had wanted to

send in his documents. PX. 2096, Tr. 32:8-32:21.

393.    In short, Dr. Ansa did not take any steps to follow up on the letter or

contact anyone about his voter registration, despite understanding exactly what

was required in the letter. PX. 2096, Tr. 21:21-22:2; 31:9-12, 32:4-7.

394.    Like Ms. Hamalainen, Dr. Ansa's experience occurred prior to HB

316 or the State's implementation of SAVE verification. Also like Ms.

Hamalainen, Dr. Ansa's pending status was later cured, without his

involvement, pursuant to the SAVE process. PX. 2018 at 1

395.    Dr. Ansa registered to vote in South Carolina and is currently

registered in South Carolina. PX. 2096, Tr. 22:8-10. Dr. Ansa does not believe that

his proof of citizenship was requested by Georgia because of his race. PX. 2096,

Tr. 35:28-22.

iv. *Dr. Ali Kefeli*

396.    Like Dr. Ansa, Dr. Kefeli obtained a limited term Georgia driver's

license while he was a green card holder in 2014 or 2015. PX. 2049 (Kefeli Dep.

Tr.), Tr. 25:2-7, 13-16. When he applied for that license, he provided

documentation to Georgia Driver Services of his status as a non-citizen green card holder to obtain the limited term license. PX. 2049, Tr. 25:8-12.

397.   Dr. Kefeli became a naturalized citizen in December 2019. PX. 2049, Tr. 27:18-21. After his naturalization ceremony, he gave his application and naturalization certificate to a volunteer who made copies and returned the original certificate to Dr. Kefeli. PX. 2049, Tr. 28:18-21, 31:15-20.

398.   Dr. Kefeli did not put his registration documents in the envelope, did not see the volunteer do so, and did not personally inspect the envelope to make sure it contained the copy of his naturalization certificate. PX. 2049, Tr. 31:23-32:1.

399.   Dr. Kefeli later received a letter from Fulton County that he needed to provide proof of citizenship. PX. 2049, Tr. 33:15-19. In response, Dr. Kefeli emailed Fulton County elections with a copy of his certificate of naturalization. PX. 2049, Tr. 33:20-34:3. Dr. Kefeli testified, however, that the letter also informed him that he could have verified his citizenship at the polls. PX. 2049, Tr. 33:20-24. As such, this Court finds no indication that Dr. Kefeli did not understand the contents of the letter he received.

400.   After turning in his documents, Dr. Kefeli received confirmation from Fulton County that his certificate was received and they had updated his

citizenship status; he confirmed this on his online My Voter Page. PX. 2049, Tr. 34:5-14.

401.    After verifying his citizenship as directed by the letter he received, Dr. Kefeli successfully voted in June 2020 primary. PX. 2049, Tr. 36:9-15. Dr. Kefeli also successfully voted in the November 2020 election and the January 2021 runoff and the November municipal election. PX. 2049, Tr. 36:16-37:4. In short, it does not appear that Dr. Kefeli's voting experiences were ever affected by the change in his naturalization status apart from providing the requested documents. PX. 2049, Tr. 26:13-15.

## VI.    List Accuracy

### A.    The Division of Labor

402.    Code Section 21-2-50(a)(14) charges the Secretary with "maintain[ing] the official list of registered voters for this state and the list of inactive voters." During the relevant time period, Secretaries Kemp, Crittenden, and Raffensperger viewed the word "maintain" as meaning "hosting and preserving a place for all registered voters to have their information stored" as it is inputted by each county. Tr. 3555:3-8 (Harvey). This Court finds this understanding to be correct, and distinct from imposing an additional obligation as to the data itself.

403.    The State's voter registration list is housed in a system known as "eNet." Tr. 759:13-21 (Hallman). John Hallman served as the systems administrator for eNet from July 2016 to February 2020. Tr. 759:3-12.

404.    In addition to generally maintaining eNet, the Chief Operating Officer for the Secretary of State's office, Mr. Sterling testified that the Secretary of State's office is now a member of, and uses, the Electronic Registration Information Center ("ERIC") to help improve the accuracy of Georgia's voter rolls. Tr. 4181:22-23 (Sterling).

405.    ERIC is a coalition of over 30 states now that share data on their voter registration files. It also gives those states access to things they don't have individually that's consistent; national change of address updates, the Social Security death records. Tr. 4181:11-21 (Sterling). The Secretary of State's office uses ERIC to facilitate the cleanliness of the voter list. Tr. 4258:13-15 (Sterling). For example, the Secretary of State's office continuously uses the Social Security death records provided by ERIC to check records. Tr. 4182:6-9. The office also did a mailing to voters whose records matched with those of out-of-state registrations, based on the highest possible match criteria, to confirm whether they had moved. Roughly 72,000 recipients of these letters responded and confirmed they had moved. Tr. 4182:9-18 (Sterling).

136

406.    The Secretary of State's office was not a member of ERIC in 2018. Tr. 4181:24-4182:2 (Sterling). The Secretary of State's office did, however, utilize ERIC in the 2020 general elections. Tr. 4182:3-5 (Sterling).

407.    The Secretary does not have a policy of facilitating an inaccurate voter list. Tr. 3555:19-21 (Harvey). And, the Secretary's staff agree that having accurate data is important. Tr. 4259:5-10 (Sterling).

408.    Most of the work done to ensure the accuracy of Georgia's voter rolls, however, is done at the county level. In Georgia, counties administer elections and the counties' operations are run by their respective county elections superintendents. Tr. 1744:23-24; 1754:18. The Secretary of State's office cannot unilaterally fire or replace county superintendents. Tr. 1753:24-25 (Germany).

409.    Counties have their own legal counsel; the Secretary of State does not provide legal counsel to county elections officials. Tr. 4136:19-24 (Germany). When county officials do ask for legal advice from the Secretary's office, the Secretary's office would refer them to their county attorneys. Tr. 896:4-12 (Hallman).

410.    Counties have the dual duties to (1) determine the eligibility of persons to register to vote, O.C.G.A. § 21-2-226(a); and (2) attempt to ensure that those on the voter list are eligible voters, O.C.G.A. § 21-2-228(a). The burden of

137

any challenge to a voter's ineligibility is on the person challenging the voter's status. Tr. 3738:13-3739:12 (Harvey); see also O.C.G.A. § 21-2-229(c) (addressing challenges by individuals).

411. In Georgia, voters can register with a paper application, online through the Secretary's website, and through DDS when the voter obtains a driver's license and chooses not to opt-out. Tr. 3557:9-14 (Harvey); see also 21-2-220(a). The most frequently utilized are registration through DDS and online voter registration. Tr. 4225:1-17 (Sterling); Tr. 3557:25-3558:2 (Harvey); Tr. 761:12-16 (Hallman).

412. In Georgia, counties enter data into the statewide voter database including when a voter moved within the state. Tr. 1629:12-15 (Germany); Tr. 3555:9-18 (Harvey) (addressing voter moves). The Secretary's office would not change data even upon a voter's request or if it knew the information was inaccurate; instead, the Secretary's office would contact the county directly or inform the voter how to contact the county. Tr. 3556:6-24 (Harvey).

413. When a voter moves to a different county, the voter's original county registrar will transfer that voter's records and registration to the voter's new county registrar. An administrative error by the county elections worker can

result in the voter's information being transferred incorrectly. Tr. 1629:6-22 (Germany).

414.    Although the Secretary of State employs quality control mechanisms to prevent this from happening, such as duplicate reports from ERIC and system notifications if there is a potential incorrect transfer, it is impossible to catch "every error that's made in 159 counties." Tr. 1634:13-22; 1635:10-16; 1638:19-25 (Germany).

415.    Regardless, Mr. Germany testified that the Secretary's office very rarely receives email complaints about transferred voters with incorrect addresses in their voter registrations. Tr. 1628:13-18. Where such does occur, Mr. Germany testified that county election officials are trained to provide these voters with provisional ballots. 1661:5-12.

416.    Given their rarity and unique nature, Mr. Germany testified that it would be difficult to determine a specific policy that would consistently address these instances of human error. Tr. 1638:19-25, 1639:1-19

417.    In 2016, Georgia's automatic voter registration began to be implemented whereby a Georgian who obtains a driver's license and does not affirmatively "opt-out" of registration is automatically registered to vote. Tr. 3557:15-24 (Harvey). Even when a voter moves within the state, if they update

their driver's license and do not opt-out, they renew registration address would be logged by DDS and sent to the county. Tr. 3555:9-18 (Harvey).

418.    During Governor Kemp's tenure as Secretary, the office also introduced online voter registration; the "My Voter Page," which allows voters to check their registration data before voting; a phone app that allows persons to check their registration data, and as indicated, automatic voter registration with the driver's license. PX. 73, Tr. 88:23-89:12; 96:19-21 (Kemp); Tr. 3558:6-21 (Harvey). He also created the Text to Vote ability to register to vote. PX. 73, Tr. 68:-22-25.

419.    Secretary Raffensperger built on this record of making it easier for eligible voters to register and cast their ballots by introducing online absentee ballot applications in 2020. Tr. 3558:22-23 (Harvey). Secretary Raffensperger also implemented a new web-enabled notification service for tracking one's absentee ballot called BallotTrax, which will provide a voter with push notifications on their vote updating the on the processing and whereabouts of their ballot. Tr. 4183:7-4185:5.

420.    These efforts appear to make Georgia a comparatively easy state to register to vote. Tr. 3562:7-9 (Harvey). Indeed, most of Georgia's policies on voter registration are done by choice and not as a requirement of the law, including

automatic voter registration, online voter registration, My Voter Page, weekend voting, and early in-person voting Tr. 3562:11-3565:1 (Harvey).

421.    As previously discussed, as it relates to voters who register when they obtain or renew their driver's license, the Secretary and DDS share information through a Memorandum of Understanding. PX. 1751.

422.    Pursuant to the agreement, when an individual applies for a driver's license, DDS collects the information and sends the information to ENet. Tr. 3565:10-25 (Harvey). The information will then be in the county's eNet box with updated information. Tr. 3565:20-23 (Harvey). The same is true when a voter renews their driver's license or moves and updates the driver's license. Tr. 3565:10-25 (Harvey).

423.    With online voter registration, the voter inputs their driver's license or state ID number into the Secretary's website, which is then run against the DDS database and sent to the county so that the county can process the voter registration the next day. Tr. 3566:2-10 (Harvey).

424.    Online voter registration may occur through the Secretary's website, but the county registrar still processes the data in eNet directly. Tr. 3599:4-15 (Harvey). When a voter registers to voter online, he or she will have entered the

data himself or herself, and while it is up to the county to check the data, but the county official is not entering data. Id.

425.    If the Secretary receives paper applications, the office sends the application to the county registrar's office and the county officials enter the data from the paper application. Tr. 3566:11-22; 3599:22-3600:1 (Harvey). If a person registered to vote with a paper application but the relevant county registrar had not processed the application by the time a ballot is requested, he or she may vote a provisional ballot. Tr. 3600:10-15 (Harvey).

426.    This Court does not doubt that mistakes can and do happen with voter registration and other aspects of the statewide voter list. Neither Defendants' nor Plaintiffs' witnesses familiar with elections operations seemed to dispute this fact. Tr. 4178:7-14 (Sterling); Tr. 4198:7-14 (Sterling); Tr. 2897:2-4 (Kennedy).

427.    This Court finds, however, that most of the errors on voter registration occurred with paper registrations, when voters had a change of circumstance like name or address and did not update it into the State's system, or other forms of human error. Tr. 3556:6-3667:8; 3558:3-5 (Harvey).

428.    Mr. Harvey also credibly testified that, occasionally, situations would arise where unintentional conduct led to someone not being able to vote.

Tr. 3508:1-3509:6. This included situations where, at voter registration drives, a volunteer accidently left voter registrations in their car and prevented would be first-time voters from exercising the franchise. Id. But, Mr. Harvey did not recall a comparatively high number of complaints in the 2020 election about data entry or list accuracy issues. Tr. 3542:1-4. Neither did Gabriel Sterling or any other witness. Tr. 4225 18 - 4226:10 (Sterling).

429.    Mr. Harvey also credibly testified that he had no reason to believe that either Secretary Raffensperger or Secretary Kemp intended to discriminate against voters through the maintenance of the state voter database. Tr. 3465:2-3.

430.    When a county user logs into eNet, they are presented with a dashboard listing "buckets" of information on the number of DDS applications and online voter registrations to process along with items such as duplicate matches, felon records, and death records. Tr. 772:6-773:1; 764:25-765:5 (Hallman). The county user then selects a "bucket" and is presented with a list of individual matches to process. Tr. 765:5-12 (Hallman).

431.    Counties are encouraged to document their cancellation decisions. Tr. 892:12-16 (Hallman). The matching system was built to accommodate flexibility by giving the counties the information they need to make decisions,

but ultimately the decision of whether or not a "potential" match is a "true" match is made by the counties. Tr. 899:10-12, 23-900:4 (Hallman).

B. <u>The Felon Matching Process</u>

432.    In Georgia, persons convicted of felonies who have not completed their sentence are not eligible to vote. O.C.G.A. § 21-2-216(b). An individual who has been convicted or pled to a felony but is on parole or probation will not be deemed as having completed their sentence. Tr. 3795:25- 3796:3 (Harvey). The felony status does not, however, impair their ability to obtain a driver's license. Tr. 3796:6-9 (Harvey). Consequently, many persons who are ineligible to vote because of felony status—purposefully or inadvertently—register to vote when they obtain their driver's license and fail to opt-out of the registration system. Tr. 3796:10-13 (Harvey).

433.    As part of their obligations of "examining from time to time the qualifications of each elector of the county or municipality whose name is entered upon the list of electors," county election officials must remove known felons from the voter rolls. O.C.G.A. § 21-2-228(a); <u>see also</u> O.C.G.A. § 21-2-231(c).

434.    To facilitate this, the Secretary of State's office receives information from the Department of Corrections and the Department of Community

Supervision on a regular basis. Tr. 3567:5-13 (Harvey). The Secretary will then run the information through eNet for potential matches to provide to the counties. Tr. 862:15-18; 3567:13-17 (Harvey); Tr. 1329:12-20 (Frechette).

435.   Potential matches between the felon lists and existing voter registration records are displayed on the county dashboard for review by the county. Tr. 1329:21-1330:1 (Frechette). Matches are highlighted if certain criteria are the same, and the Secretary's office establishes the criteria that will highlight a potential match of someone on the voter database with someone who is also on the list of felons supplied by the state and federal governments. Tr. 3720:5-9 (Harvey).

436.   eNet provides counties with tight felon matches listed first, then cascading down to the looser matches which become looser as you go down the list to make sure that as many potential matches and non-matches can be caught as possible. Tr. 871:8-18; 872:12-18 (Hallman). According to the Secretary's training documents, the comparison criteria used by the Secretary to highlight a possible potential match for the counties to process are as follows, from tightest to loosest:

      a.  Last Name, First Name, Last 4 SSN, Date of Birth – Active, Inactive, Pending, Reject,

  b.  Last Name, First Name, Last 4 SSN, Date of Birth – Cancelled

145

c.   Last Name, Last 4 SSN, Date of Birth

d.   First Name, Last 4 SSN, Date of Birth

e.   Last Name, First Name, Date of Birth

f.   Last Name, Date of Birth, Race, Gender

PX. 800 at STATE-DEFENDANTS-00115960; Tr. 1337:6-23; 1337:24-1338:2

(Frechette); see also PX. 800 at STATE-DEFENDANTS-00115961.

437.   Each county is responsible for setting their own countywide policy
to apply to each potential match to determine whether it is a true match, and
some will do extra research on their own to determine if the person that is a
potential match is an actual ineligible felon. Tr. 3570:5-10 (Harvey); Tr. 1351:16-
1352:11.

438.   Different counties have different resources and staff available;
accordingly, Mr. Hallman testified that it is difficult to choose a single procedure
that fits the needs of all counties. Tr. 869:19-22. As such, the counties are expected
to establish a uniform procedure for processing felon matches that is fair,
utilizing the resources and staff available in that county and to treat each record

in the same manner with no preference for one over the other. Tr. 870:3-15; PX. 541.[19]

439.    Some larger counties, such as Fulton County, told the Secretary of State's office they found review of looser matches difficult due to the large number of potential matches in that bucket. Many of the smaller counties, however, find the looser matches to be a useful tool. Tr. 871:7-873:20; 873:24-874:16 (Hallman); Tr. 1359:19-23; 1360:14-25; 1361:9-12 (Frechette); PX. 1151.

440.    Previously, in 2017, the Secretary of State eliminated a potential match filter consisting of only the last four digits of the social security number and date of birth because it was "showing too many false positives and all the good matches will be caught by other filters." PX. 365;[20] Tr. 1359:12-18 (Frechette).

441.    Ms. Frechette testified that she was not aware of any issue with eNet producing "a lot" of "false matches" for felons. Tr. 1355:14-19. When the structure of the Department of Corrections was changed and split into two agencies, namely the Department of Community Services and the Department of

---

[19]  Admission limited to Mr. Hallman's statements, excluding those of Ms. Geist. Tr. 887:22-888:8.
[20]  Admission limited to John Hallman's emails on May 23, 2017 and June 15, 2017. Tr. 1358:17-1359:4.

Community Supervision, however, the numbers of individual felon records listed for the counties to process was higher than usual. Tr. 876:7-20 (Hallman); PX. 1151.

442.   Ultimately, county election offices review these potential matches sent over by the Secretary of State and make the final determinations as to whether the person on the voter list is ineligible to vote by reason of a felony conviction; the Secretary makes none of those decisions and cannot prevent a county registrar's decision. Tr. 3568:2-19; 3569:14-25; 3572:21-3573:6 (Harvey).

443.   In other words, regardless of the criteria used for identifying potential matches, the counties are the ones who ultimately make the choice as to what information is, in fact, a true match. Tr. 873:3-5 (Hallman). Plaintiffs put forth no evidence from county officials to show that the criteria used by the Secretary of State to identify potential matches definitively led to errors occurring in counties' determinations, either due to the volume of the batches or otherwise.

444.   Before a county cancels a voter for felony status, they are required by law to mail them a letter 30 days in advance. O.C.G.A. § 21-2-231(c)(2). If a person objects to the designation, they are entitled to a hearing. Id. Mr. Harvey testified that the county (or other challenger) would have the burden of proof at

the hearing (Tr. 3738:13-3739:12 (Harvey)), but at least one training document seemed to suggest the burden was on the voter. PX. 1903. This would appear to be contrary to law (see O.C.G.A. § 21-2-229(c) (imposing burden of challenging a voter's eligibility on the individual making the challenge)), but, regardless, there was no evidence put forth of any voter in fact having to make this showing. Accordingly, this Court will credit Mr. Harvey's testimony in this regard.

445.    Mr. Harvey described checks and balances for this process. The first is the letter and opportunity for hearing afforded the voter. Tr. 3571:10-16 (Harvey). The Secretary also pushes counties to process potential felon matches so that the decision can be made in a timely fashion. Tr. 3571:17-3572:1 (Harvey). In addition, the Secretary encourages counties to investigate the issue thoroughly Tr. 3572:16-20. Mr. Harvey testified credibly that Counties tend to "want to be very sure before they cancel someone as a felon." Tr. 3569:12-13) (Harvey).

i.  *Plaintiffs' Felon Match Witness*

446.    Plaintiffs presented a single witness apparently affected by the felon match policy, Andre Smith. Andre Smith is a resident of Fulton County, Georgia and registered voter. Tr. 2431:11–15; PX. 2071; DX. 390. Prior to the June 2020 Primary Election, Mr. Smith had not experienced any difficulty in voting. Tr.

2434:09–16. On May 31, 2020, Mr. Smith was unable to locate his voter registration information online. Tr. 2434:21–2435:07; PX. 1323.

447.    In July of 2020, Mr. Smith received a letter from the Fulton County Board of Registration and Elections that he had been identified as a felon and that he would be removed from the voters' list after thirty days from the date of the letter if he did not request a hearing pursuant to state law. PX. 2088; Tr. 2441:02–2442:07. Mr. Smith had not received any prior notices. Tr. 2442:08–11.

448.    Mr. Smith contacted representatives of Fair Fight who, in turn, contacted Mr. Ralph Jones, the Fulton County Voter Registration Director to resolve the issue. Tr. 2442:15–23. Mr. Smith testified that he was aware that Mr. Jones corrected his voter registration issue, and Mr. Smith's eNet record reflects this information as well, showing that Mr. Smith's status was corrected by a Fulton County user on June 5, 2020 — the same day as a Fair Fight representative's email confirming his registration had been updated by Mr. Jones. Tr. 2460:15–24; Tr. 2462:04–23; DX. 388 at p. 10; DX. 724.

449.    Mr. Smith went to vote on June 9, 2020, for the primary election, but the poll worker was unable to verify his registration. Tr. 2448:01–2448:02. Mr. Smith cast a provisional ballot, which was counted. Tr. 2450:16–21.

450.    After the June 2020 primary, Ms. Pamela Coman, Registration Manager with the Fulton County Department of Registration and Elections wrote to Mr. Smith on August 25, 2020, apologizing and explaining that her office had cancelled his voter registration in error. PX. 2089. The letter explained that the county had mis-identified him with another voter who had the same "first name, last name and date of birth" as Mr. Smith. Id. The letter indicated that the issue had been corrected and included Mr. Smith's precinct card. Id.

451.    Mr. Smith voted in the November 2020 general election, the 2021 Senate runoff election, and the 2021 Atlanta mayoral election without issue. Tr. 2456:15–2457:09.

452.    The evening before Mr. Smith's testimony, on April 27, 2022, at 9:04 PM, Mr. Smith captured a screenshot of his My Voter Page, which indicated his record had again been cancelled as a felon. PX. 2097; Tr. 2452:02–2453:22. Mr. Smith testified that he called Fulton County regarding this issue after he had had discovered it, and a representative told him that it would be corrected within 24 to 48 hours. Tr. 2480:15–19. Mr. Smith's eNet record as of April 27, 2022, indicates that Mr. Smith is an active voter, following another user correction by Fulton County. DX. 761; Tr. 2472:16–20.

C.  <u>The Duplicate Matching Process</u>

453.   Generally speaking, a potential duplicate match occurs when eNet identifies people that may be the same person, e.g., Jonathan William Smith living in Fulton County and DeKalb County. Tr. 3575:22-13 (Harvey). Duplicate matches can be identified either when a new registration is processed and/or during counties' review of batches of potential matches provided by the Secretary of State's office. Tr. 1300:8-21 (Frechette).

454.   In either instance, the Secretary of State's office distinguishes between "tight" and "loose" potential matches and provides both for county registrars to process. Tr. 793:18-794:9 (Hallman). A "tight" potential match is one involving a "unique identifier [like social security number of driver's license number] and a lot of other information matching first name, last name, date of birth." Tr. 793:18-20. A "loose" potential match may include matches on one or two criteria, for example, first initial and last name. Tr. 791:6-10; 793:12-794:6; <u>see also</u> PX. 1878 at 55.

455.   Loose matches are often used to find records where an existing voter record is incomplete or needs to be corrected. Tr. 793:22-794:4-6. If loose match criteria were not used, it would run the risk of permitting the system to contain multiple registrations with multiple errors. Tr. 793:18-794:4 (Hallman). Because it

is a unique identifier, two records had the same drivers' license number but different first or last names or a different date of birth, it would still be treated as a potential match for comparison by the county user. Tr. 767:25-768:5 (Hallman).

456.   When a new voter's registration information is initially entered into eNet by a county user, the system automatically searches existing voter records to identify whether there are any existing records for that voter and to avoid the creation of duplicate records. Tr. 762:15-763:1; 787:4-13 (Hallman); Tr. 1221:5-12 (Frechette).

457.   If there is a match between certain criteria in the new application and existing record, the records are sent to the county's dashboard for review and determination of whether the records are a true match for the same person. Tr. 1222:23-1223:5 (Frechette). These criteria include, for example, first name, last name, and date of birth. Tr. 1290:10-21 (Frechette).

458.   If the county official determines that the records are a true match for the same person, the information from the new application replaces the information in the existing record so there is only one surviving record. Tr. 1223:6-12 (Frechette). The purpose of this process is to, where necessary, update an existing voter record rather than create a new, duplicate record for the voter. Tr. 1222:1-5 (Frechette).

153

459.    Ms. Frechette testified that in reviewing potential matches between a new registration and an existing voting record, county officials also conduct independent research to determine whether a true match existed. Tr. 1257:7-14. Ms. Frechette testified that the Secretary of State's office does not provide a minimum number of identifiers that must match between a new application and an existing record before a county official should decide that the two records are a true match for the same voter. Tr. 1264:3-7. Ms. Frechette would, however, help county officials find resources and information at their disposal to resolve their questions about potential matches. Tr. 1259:18-22; 1260:8-12.

460.    Ms. Frechette testified that it was not typical for a county official, in reviewing potential matches, to automatically assume there was a true match for the same voter based solely on a matching driver's license number. Tr. 1257:7-14. Regardless, like the felon match process, the Secretary does not make the final determination of whether the potential duplicates are, in fact, the same person. That process is completed only by the county election offices. Tr. 3576:14-19 (Harvey); Tr. 1315:23-1316:2 (Frechette).

461.    The eNet system also runs various batch processes on a daily, weekly and monthly schedule to identify potential duplicates and the results

appear on the dashboard for county registrars to process. Tr. 772:6-773:1

(Hallman); Tr. 1295:25-1296:13; 1300:2-4 (Frechette).

462.   eNet is programmed to apply four criteria to check for potential

duplicate records:(1) first name, date of birth, and last four digits of social

security number; or (2) full social security number; or (3) driver's license number;

or (4) first name, date of birth, and last four digits of social security number. PX.

1903 at STATE-DEFENDANTS-00068944; see also Tr. 1300:5-7 (Frechette).

463.   The process for handling these potential match batches is

structurally similar to that used during new registration; the eNet system

displays on a county worker's dashboard the existing voter registration

information and the new data side-by-side for the county registrar to determine

whether it is the same person. Tr. 765:13-18, 21-24 (Hallman); see also PX. 1903 at

STATE-DEFENDANTS-00068944.

464.   When there are duplicate records, the system does not automatically

override an existing record; eNet requires a county user to look at the screen and

make that determination manually. Tr. 765:19-766:1 (Hallman); Tr. 1305:9-16

(Frechette). Again, it is ultimately the counties' responsibility to implement

practices on how to process such potential duplicate records for review. Tr.

1296:14-15; 1297:14-15 (Frechette); Tr. 765:19-766:1; 772:1-773:1; 773:11–14; 774:7-

15 (Hallman). Accordingly, the Secretary of State's office does not dictate which particular criteria in records should match before a county official decides the records are a match for the same voter during the duplicate merge process. Tr. 1320:3-1321:8 (Frechette).

465.    As a precautionary measure, if a county cancels a voter from another county in the duplicate merge process, the other county will be notified of the cancellation on their dashboard because that county is required to send the voter a letter. Tr. 825:21-826:4.

466.    The system is designed to strike a balance between using business logic to prevent mistakes and allowing flexibility for registrars to correct errors and do what they need to do. Tr. 805:4-806:3 (Hallman). This balance is why the system includes loose matches and does not try to stop county users every time they try to fix a problem. Tr. 805:22-24 (Hallman).

467.    Mr. Hallman testified that adding additional criteria to the potential matching process would put more demand on the system and potentially slow down the process of voter registration applications, which is a problem the State's vendor has warned against. Tr. 848:11-849:2.

468.    If a county user mistakenly merges a potential duplicate match that is not a match, the resulting voter registration file will contain errors. Tr. 794:14-

21 (Hallman); Tr. 1223:13-24 (Frechette). It is not common, however, for county users to incorrectly merge duplicate voter records. Tr. 798:2-5, 12-14; 818:18-25. Where such did occur, Mr. Hallman testified that it would likely be treated as an individual training issue for that particular county user. Tr. 803:16-22. Plaintiffs put forth no evidence from county officials to show that the criteria used by the Secretary of State to identify potential matches definitively led to errors occurring in counties' determinations, either due to the volume of the batches or otherwise.

469.    Training guides are necessarily limited in scope and did not include every aspect of election procedure though the county users were reminded during training sessions to double check their screens and make sure they were not making mistakes. Tr. 805:22-807:4. Mr. Hallman testified that duplicate merging was definitely discussed during training sessions. Tr. 805:10-806:3.[21]

470.    Ultimately, if a county user mistakenly cancelled a registered voter and that person went to his or her polling place to vote, they would still be given a provisional ballot and allowed to vote. Tr. 812:17–813:6 (Hallman).

---

[21]  This Court has already ruled that Plaintiffs' List Accuracy claims do not cover any alleged insufficient or inadequate training. Doc. No. [816] at 6.

    i.  *Plaintiffs' Duplicate Match Witnesses*

      a.  BRENDA LEE

471.    Brenda Lee is a registered voter in DeKalb County. Tr. 7:20-21. Ms. Lee testified that she has previously voted in Georgia, including in the June 2020 primary without any issue. Tr. 9:6-9; 9:13-15.

472.    Ms. Lee testified that she requested an absentee ballot for the November 2020 general election. Tr. 9:25-10:3. According to Ms. Lee, she checked her My Voter Page when she had not received her absentee ballot. Tr. 10:9-10:14.

473.    Ms. Lee testified that her My Voter Page showed that an absentee ballot was issued to her but that her address was not correct. Tr. 10:22-25; PX. 1347. According to Ms. Lee, her My Voter Page showed her address as being on "Deep Shoals Circle," but Ms. Lee has never lived on a street of that name. Tr. 13:11-14:16; PX. 1347. Ms. Lee's record indicated that her current, correct address on Oakham Place is listed as a previous address. Tr. 15:6-16:13; PX. 2058.

474.    The Dekalb County tax commissioner website contains records that show another person with the last name Lee living at the Deep Shoals Circle address. Tr. 17:25-18:16; 18:24-19:2; 19:6-19:10; PX. 2059; PX. 2060.

475.    Ms. Lee contacted DeKalb County about the issue and testified that she spoke with a supervisor who told her the issue was "human error." T. 21:5-7.

Ms. Lee stated that the Dekalb County elections supervisor was able to correct the address on Ms. Lee's My Voter Page and issue her another absentee ballot. T. 21:23-22:4. Ms. Lee testified that she received the absentee ballot and successfully voted. T. 22:5-9.

476.    Based on this evidence, this Court concludes that the "human error" referenced by the DeKalb County supervisor was indeed an improper, but inadvertent, duplicate merge by a county election worker. There is no indication, however, that such was caused by the potential matching criteria set by the Secretary of State's office. Regardless, the issue was resolved without affecting Ms. Lee's ability to cast a ballot.

### b.  DASIA HOLT

477.    Dasia Holt testified that she registered to vote when she first got her driver's license in Sumter County but now resides in Webster County. PX. 2103 (Holt Dep. Tr.), Tr. 9:20-21; 20:23-21:2.

478.    Ms. Holt testified that on Election Day in 2018 she went to vote at the Webster County EMS building. PX. 2103, Tr. 19:11-15. According to Ms. Holt, she went to this polling location because her grandmother, who had lived at the same address as Ms. Holt at the time, told her to go vote. PX. 2103, Tr. 20:2-4; 20:11-13. Ms. Holt's eNet record, however, indicates that her polling place is the

Webster County Commissioner Office. PX. 2082. Ms. Holt did not look up her voting location online prior to going to the Webster County EMS building. Plaintiffs' PX. 2103, Tr. 20:14-16.

479.   Ms. Holt testified that, upon her arrival at the Webster County EMS building, two poll workers scanned her ID and said that her address was showing as Columbus, Georgia in Muscogee County. PX. 2103, Tr. 18:22-24; 21:11-14; 25:6-13. Ms. Holt testified that the poll workers said she could not vote at the Webster County EMS building and that she would have to go to Muscogee County to vote. PX. 2103, Tr. 25:6-9. Ms. Holt testified, however, that she did not drive to Columbus to vote. PX. 2103, Tr. 21:20-22.

480.   This Court notes that Ms. Holt did not follow up with anyone after her voting experience to try to have her address corrected. PX. 2103, Tr. 21:23-22:1.

481.   The poll worker statements regarding Ms. Holt's address are inadmissible hearsay. This Court disagrees with Plaintiffs that the statements are present sense impressions under FRE 803(1). There is no affirmative indication from Ms. Holt's testimony that the statements were made while or immediately after the poll worker perceived an event or condition, nor have Plaintiffs argued

160

what said event or condition was with respect to Ms. Holt's experience specifically.

482.    This Court likewise finds that the statements to Ms. Holt that she could not vote at the Webster County EMS building and needed to go to Muscogee County are also hearsay. The statements are not present sense impressions under FRE 803(1) because they are not statements that explain or describe an event or condition. Nor is there any indication that the statements were made while or immediately after the poll worker perceived some event or condition. This Court will not assume the factual circumstances of these statements when such facts are not included in Ms. Holt's testimony. Accordingly, this Court will not consider the statements for their truthfulness.

483.    Even if this Court were to take the poll worker statements as true, however, this Court cannot conclude definitively that from Ms. Holt's testimony that she was subject to an improper duplicate merge by a county worker or, if she was, that such was in any way the result of the "loose" match criteria set by the Secretary's office. This Court also notes that the issue appears to have been resolved; Ms. Holt's eNet record indicates she has successfully voted in at least five elections since the 2018 general election. PX. 2082 at 2.

c.  KIA CARTER

484.    Kia Cater is a resident of Lawrenceville, Georgia in Gwinnett County. Tr. 2482:25-2483:2. Kia Carter was a resident of Henry County at the time of the November 2018 general election. Tr. 2510:19-21.

485.    The 2018 gubernatorial election was the first time Ms. Carter had attempted to vote since 2012. Tr. 2509:20-23; 2510:9-14. When attempting to vote, Ms. Carter first went to the Henry County voter registration office after looking it up on Google. Tr. 2486:13-14. Ms. Carter arrived at the Henry County registration office after work at around 6:00 or 6:30 PM. Tr. 2490:17-18; 2511:10-16.

486.    From there, she was instructed to go "down the street" to vote but does not recall the name of her polling place. Tr. 2486:13-14; 2490:14-16. Upon arriving at the polling place at around 6:45 PM, Ms. Carter filled out a voter information card provided to her by poll workers and provided her I.D. card to be scanned. Tr. 2492:20-2493:8; 2512:23-245.

487.    Upon scanning Ms. Carter's I.D., the poll worker stated that she "ha[d] never seen this before" and called another poll worker over to her computer. Tr. 2493:8-10; 2498:23-25.

162

488.    The second poll worker then asked Ms. Carter if she was a U.S.

Citizen and Ms. Carter responded that she was. Tr. 2499:1-6. The poll workers

then instructed Ms. Carter to return to the Henry County voter registration

office, which she did. Tr. 2500:9-17.

489.    Ms. Carter gave the Henry County voter registration office her

driver's license and an employee there from her name down on a sticky note. Tr.

2500:18-22.

490.    Ms. Carter did not request, and was not offered, a provisional ballot;

she was not able to vote in the November 2018 gubernatorial election. Tr.

2501:24-2502:6; 2513:5-7.

491.    Ms. Carter's voting experience involved only interactions with

Henry County personnel; at no point did Ms. Carter speak with or contact the

Secretary of State's office. Tr. 2513:16-2514:8.

492.    Afterward, Ms. Carter reached out to DDS who told her there was

"nothing wrong with [her] registration. [She] was registered to vote. Nothing on

that end of it, so [she's] not sure what was the problem at the voter – at the

registration office." Tr. 2503:13-16. Ms. Carter also later confirmed on her My

Voter Page that she was registered to vote and that the issue had been fixed. Tr.

2514:18-2515:8.

493.     According to Ms. Carter's eNet record, she was listed as "pending status for citizenship verification and incomplete date of birth" as of June 6, 2016. PX. 2046 at 2. Between June 6, 2016 and December 16, 2016, Ms. Carter's eNet record reflects over a dozen status change updates, including what appears to be failed "DDS Verification" and an improper duplicate merge of her record with another from Cobb County. Id.

494.     The record also reflects an entry of "SYSTEM REVISION LEGAL MIDR" as of April 11, 2018. Id. Finally, on November 6, 2018, the eNet record reflects a "user correction" at 7:04 PM. Id. Ms. Carter testified that she was unaware of these status changes. Tr. 2507:15-2508:13.

495.     Based upon this evidence, it appears to this Court that Ms. Carter's eNet record was affected by multiple issues, some of which are outside the scope of this case, but an improper duplicate merge was likely one of them. As with Plaintiffs' other duplicate merge witnesses, however, there is nothing in Ms. Carter's testimony or eNet record to suggest that her issues were caused by, or even related to, the "loose" match criteria set by the Secretary's office.

496.     This Court also notes that, whatever her issues were, they appear to be fixed; she was able to vote successfully in the November 2020 presidential

election and the January 2021 runoff election. Tr. 2485:11-15; 2508:14-16; 2510:9-11; 2515:16-2; PX. 2046 at 2

d.  ANTHONY MCKISSIC

497.    Pastor Anthony McKissic and his wife moved from Fayette County to Coweta County sometime in 2015. Tr. 2741:12-14, 2743:16-2744:2.

498.    At an unknown time after Pastor McKissic and his wife moved from Fayette County to Coweta County, they attempted to update their voter-registration addresses by completing the same change-of-address forms Pastor McKissic's wife procured from an unknown source and mailing them at the same time to an unknown address. Tr. 2741:12-2742:11, 2744:3-7. Pastor McKissic and his wife lived together in the same home in Fayette County, and they moved together to the same home in Coweta County. Tr. 2743:16-2744:2.

499.    November 6, 2018 was the first election day Pastor McKissic and his wife attempted to vote in Coweta County. Tr. 2742:12-21. Pastor McKissic attempted to vote in person at the Madras Middle School polling location in Coweta County. Tr. 2742:12-21. Pastor McKissic attempted to vote at this location for two reasons:(1) he saw that polling location identified as his polling location on an unidentified website other than the Secretary's My Voter Page as the

correct polling location for his Coweta County residential address, and (2) his wife voted there in person earlier that day. Tr. 2742:12-2743:15.

500.    Pastor McKissic's wife "didn't have any issues" with her "quick" and successful voting experience at the Madras Middle School polling location in Coweta County on November 6, 2018. Tr. 2744:8-17. Pastor McKissic, however, was not permitted to vote at the Madras Middle School polling location in Coweta County on that day; instead, he was directed to a Roswell, Fulton County polling location. Tr. 2744:18-2745:14.

501.    Per the instructions of the Madras Middle School poll workers, Pastor McKissic went to a Roswell, Fulton County polling location and successfully cast a provisional ballot, which allowed him to vote in statewide races and was counted. Tr. 2746:14-24, PX. 2079.

502.    Pastor McKissic never reported anything about his November 6, 2018 voting experience to any county or state election officials, including anyone in the Secretary's office or with the State Election Board. Tr. 2747:1-10.

503.    Based on Pastor McKissic's testimony, this Court cannot conclude definitively that from he was subject to an improper duplicate merge by a county worker or, if he was, that such was in any way the result of the "loose" match criteria set by the Secretary's office. From Pastor McKissic's testimony, an equally

166

likely possibility is that a county official simply input Pastor McKissic's

information in wrong when processing his change-of-address form. Regardless,

this Court also notes that the issue appears to have been resolved; Pastor

McKissic has been able to vote at his assigned polling place in Coweta County in

elections since the November 6, 2018 election. Tr. 2747:24-2748:2, PX. 2079.

    D.  <u>Vital Records Matching Process</u>

    504.    Unlike the duplicate and felon matching processes, the Secretary

does remove from the voter database voters that appear on lists submitted by the

Georgia Department of Public Health who are deceased. O.C.G.A. §§ 21-2-231(d)

and (e); Tr. 3597:2-8 (Harvey). eNet identifies deceased voters by comparing the

voter registration rolls with vital records from the Georgia Department of Health

on a weekly basis. Tr. 884:14-24 (Hallman).

    505.    To prevent incorrect deletions of voter records, the Secretary utilizes

what is called a "tight match," which compares a (possibly deceased) voter's and

recently-deceased's last name, date of birth, and Social Security number. Tr.

3597:9-13 (Harvey); Tr. 1321:22-1322:5 (Frechette); <u>see also</u> PX. 800 at STATE-

DEFENDANTS-00115951.

    506.    If those factors match, the registrant is automatically cancelled in the

eNet. Tr. 3597:9-13 (Harvey); Tr. 1322:22-1323:11 (Frechette). Counties are sent a

list of persons that have been cancelled pursuant to this process so they may doublecheck the Secretary's work. Tr. 3597:16-25 (Harvey).

507.    Counties have an independent obligation to remove persons from the voter registration database they know to be deceased based on information from "obituaries published by local newspapers, death certificates, verifiable knowledge of the death, and information provided in writing and signed by a family member or members of the deceased person." O.C.G.A. § 21-2-231(e.1)

508.    To facilitate this process, in addition to the automatic cancellation of "tight" vitals matches, the Secretary of State's office also provides "loose" potential vitals matches to counties for manual review. Tr. 885:20-24; 886:5-7 (Hallman).

509.    A loose potential vitals match is flagged when either of the following sets of criteria match between records:(1) last name and date of birth; or (2) last name and social security number. Tr. 1323:12-21 (Frechette); PX. 800 at STATE-DEFENDANTS-00115952.

510.    As with the felon and duplicate matching processes, if eNet identifies a loose match, the potential match will be displayed on the county dashboard for review by county registrars. Tr. 1323:17-21.

511.     Also like these other matching processes, Ms. Frechette testified that the Secretary of State's office does not tell the county how to make the decision of whether a true match exists between death records and existing voter registration records. Tr. 1327:3-12; 1329:4-11. It is, again, the counties' responsibility to review the information in the potential match and make the ultimate decision if there is a true match and cancel the record. Tr. 1324:1-3, 10-12 (Frechette). Plaintiffs put forth no evidence from county officials to show that the criteria used by the Secretary of State to identify potential matches definitively led to errors occurring in counties' determinations, either due to the volume of the batches or otherwise.

512.     Counties are encouraged to perform audits on their vital records cancelled automatically by the system to ensure the files have been removed from their active voter files. Tr. 893:3-11; 894:13-15 (Hallman).

E.   Miscellaneous List Accuracy Witnesses

513.     Plaintiffs stated during trial that their List Accuracy claim is not challenging mere data entry mistakes. See, e.g., Tr. 3377:21-3378:2; Tr. 3379:4-11. At closing, Plaintiffs' counsel clarified that their List Accuracy claim was limited to the three matching processes described above:

> Let's remind ourselves what exactly is and is not being challenged at this point. Defendants have suggested that plaintiffs are challenging typographical errors in a voter's record. That is not true. So that the record is clear, plaintiffs are challenging the Secretary's policies that wrongfully remove or modify eligible voters' records on the basis of a purported match with another record, **whether another registration record or a vitals record or a felony conviction record**.

Tr. 4366:3-12 (Lawrence-Hardy) (emphasis added).

514.     Nevertheless, Plaintiffs put forth several witnesses whose testimonies are not clearly tied to one of the matching processes Plaintiffs are ostensibly challenging in this claim; in fact, some do not appear to be related to the state's voter registration list at all. Specifically, while the following voter witnesses may have offered some testimony regarding a burden experienced while trying to vote because of some unspecified issue, this Court does not find, as a matter of fact, that Plaintiffs have established their stories are relevant to the List Accuracy claim or any other claim in this case.

i.  *Antoinette Johnson*

515.     Antoinette Johnson testified that she registered to vote upon moving to Georgia from California. Plaintiffs' PX. 2105 (Johnson Dep. Tr.), Tr. 19:20-20:2.

516.     On Election Day, Ms. Johnson went to Largo-Tibet Elementary School to vote. PX. 2105, Tr. 20:11-15. Ms. Johnson stated that she went to vote at

that location because it is where her wife and daughter, who live at the same address as Ms. Johnson, had previously voted. PX. 2105, Tr. 21:4-8.

517.    Ms. Johnson also testified that she received a letter in the mail stating it was where she was supposed to vote but does not recall who the letter came from. PX. 2105, Tr. 21:4-13.

518.    Ms. Johnson did not provide further details or information about the letter and it was not offered into evidence. This court does not consider the content of the letter for its truthfulness regarding Ms. Johnson's polling place location because the letter is hearsay and no exception or non-hearsay purpose has been offered in support of its admission.

519.    According to Ms. Johnson, upon her arrival at Largo-Tibet Elementary School, she was told to go to a different location to vote. PX. 2105, Tr. 21:14-17. Ms. Johnson stated that she went to the location she was directed to but did not arrive before it closed. PX. 2105, Tr. 22:6-19. As such, she was not able to cast a ballot.

520.    Ms. Johnson's testimony that she was told to go to another location will not be considered for its truthfulness because it is hearsay. This Court disagrees with Plaintiffs' proffered hearsay exception that the statement is a present sense impression describing the poll worker's observation. First, the

171

statement itself is not descriptive of an event or condition as required by FRE 803(1). Moreover, Ms. Johnson's testimony contains no mention of a poll worker, nor any indication that the statement was made by a poll worker while or immediately after observing an event or condition, presumably about Ms. Johnson's polling location. Plaintiffs ask this Court to assume certain facts to satisfy the requisite elements of a present sense impression exception. This Court will not make such assumptions about the details of Ms. Johnson's particular experience.

521. This Court will, however, consider the statement for the non-hearsay purpose of explaining why Ms. Johnson departed the polling place for another location.

522. Nevertheless, Ms. Johnson's testimony is insufficient to allow this Court to draw any conclusion as to the cause of her experience attempting to vote. At the very least, Ms. Johnson's testimony does not establish that she was subject to an improper felon cancellation, vitals record cancellation, or duplicate merge by a county worker or, even if she was, that such was in any way the result of the "loose" match criteria set by the Secretary's office.

ii. *Nicole Freemon*

523.    Nicole Freemon is Georgia voter, originally from California, who moved to Woodstock, Georgia in 2017 and has lived there since. Tr. 1494:8-10; 20-25. Ms. Freemon registered to vote immediately upon moving to Georgia through the DDS. Tr. 1495:20-25.

524.    Ms. Freemon testified that her maiden name is Feeder and testified that she first registered to vote under this name. Tr. 1495:10-11; 1496:7-8. Historically, Ms. Freemon testified that she has not had any trouble voting. Tr. 1510:23-25. Indeed, Ms. Freemon voted in the 2018 gubernatorial election, under the name Feeder, and testified that she had no problems voting. Tr. 1496:21-25, 1497:1.

525.    She later got married in June of 2018. Tr. 1496:9-10. After getting married, Ms. Freemon formally changed her last name in 2019. Tr. 1496:11-14. Ms. Freemon then got a new license with her married name Freemon. Tr. 1496:15-20. And, in Spring of 2020, Ms. Freemon received mail from the Secretary of State's office with her last name of "Freemon" spelled correctly. Tr. 1497:23-25,1498:1-2.

526.    On the morning of the June 2020 presidential primary election, Ms. Freemon signed into her My Voter Page to confirm her polling place. Tr. 1498:9-

14. Ms. Freemon tried to access her My voter Page using both "Freemon" and "Feeder" as her last name but was unable to access her page. Tr. 1498:15-25. As a result, Ms. Freemon testified that she called the Cherokee County Registrar's Office. Tr. 1498:24-25.

527.    Ms. Freemon testified that an individual from the Cherokee County Registrar's Office fixed her name in the database while on the phone with Ms. Freemon. Tr. 1502:2-5. Later, however, when attempting to vote in person in the June 2020 primary election, a county poll worker scanned Ms. Freemon's license and an entry for an individual with the last name of "French," living in Fulton County, came up. Tr. 1502:23-25; 1503:1-2.

528.    After this occurred, Ms. Freemon then gave the poll worker her old driver's license that still displayed her maiden name of "Feeder." After scanning her license with her maiden name, Ms. Freemon's current information, with the last name Freemon, came up on the computer. Tr. 1503:7-13. Ms. Freemon was then able to vote without issue. Tr. 1503:14-15.

529.    Ms. Freemon testified that she is not aware of what could have caused the issue she experienced voting in the June 2020 primary election. Tr. 1513:4-8. Nevertheless, Ms. Freemon has voted successfully, using her current

174

driver's license and with her married name, since the June 2020 primary election. Tr. 1513:18-25.

530.    Ms. Freemon's testimony is insufficient to allow this Court to draw any conclusion as to the cause of her experience voting. At the very least, Ms. Freemon's testimony does not establish that she was subject to an improper felon cancellation, vitals record cancellation, or duplicate merge by a county worker or, even if she was, that such was in any way the result of the "loose" match criteria set by the Secretary's office.

### iii. *Alkhealasharteula Harrison*

531.    Alkhealasharteula Harrison testified that, when going to the polls on election day on June 9, 2020, the poll worker could not find her on the system when she provided a driver's license. Tr. 2670:5 – 2671:24.

532.    According to Ms. Harrison, the poll worker, after not finding her name on the system, called a supervisor upstairs for assistance. Tr. 2672:10-11. The supervisor then contacted the poll worker again and said she found Ms. Harrison in the system. Tr. 2674:18-19.

533.    The contents of the phone conversation with the supervisor, however, are not considered by this Court for the truth of the matter asserted as they constitute hearsay. Tr. 2672:17-2674:1

534.    Regardless, Ms. Harrison's testimony is insufficient to explain why the poll worker could not originally find her in the system. This Court does not consider what the supervisor said to the poll worker, and what Ms. Harrison heard the poll worker say, as that was found to be hearsay within hearsay. Tr. 2682:13-17; see also Doc. No. [826] at 9-10.

535.    Because of the limitations of Ms. Harrison's testimony regarding how the supervisor resolved her issue, this Court is unable to draw any conclusion as to the cause of her experience voting. At the very least, Ms. Harrison's testimony does not establish that she was subject to an improper felon cancellation, vitals record cancellation, or duplicate merge by a county worker or, even if she was, that such was in any way the result of the "loose" match criteria set by the Secretary's office.

536.    Moreover, Ms. Harrison testified that the entire process to vote and correct her issue after speaking to a poll worker took from 5 to 10 minutes. Tr. 2688:21-25. This Court does not find that such delay constitutes a burden on Ms. Harrison's right to vote.

537.    This Court also notes that Ms. Harrison's experience was isolated to June 9, 2020. Ms. Harrison testified that she had not had issues voting prior to the

June 2020 primary election. Tr. 2687:19-21. She has also been able to vote successfully in subsequent elections. Tr. 2689:4-6.

iv. *Emily Huskey*

538.    Emily Huskey is a Fulton County voter. Tr. 1142:12-15. Since the time she moved to Atlanta in 2015, Ms. Huskey has voted in all Georgia elections she wished to vote in. Tr. 1145:2-6.

539.    After moving to Atlanta in 2015, Ms. Huskey moved three times to addresses located within Fulton County. Tr. 1166:1-17. Her address changes in 2015 and 2017 were reflected correctly on her My Voter Page and she did not have any issues voting in the elections in Georgia from 2015 up through the November election in 2018. Tr. 1166:13-17.

540.    Ms. Huskey voted successfully in the November 2018 election. Tr. 1166:18-24. The sole issue Ms. Huskey had in the November, 2018 election was that she did not receive the absentee ballot she requested from Fulton County. Tr. 1166:18-24. Because she had not received her absentee ballot, she voted in person in the 2018 election. Tr. 1167:1219.[22]

---

[22]  In the 2018 election, Ms. Huskey was provided an affidavit to cancel her absentee ballot. Tr. 1167:23-1168:1. Once she completed her affidavit, she then voted successfully in person on the voting machine without any problems. Tr. 1167:23-1168:1. As it

541.    The entire voting experience from the time she reached the front of the line, registered, completed her affidavit and then voted in person took 20 minutes. Tr. 1151:14-18; 1167:15-1168:1. At no time was Ms. Huskey prevented from voting in any of the elections she chose to vote in. Tr. 1165:1-3.

542.    In July, 2020, Ms. Huskey moved to Peachtree Street, Northeast. Tr. 1161:7-13. She changed her address with the postal service and on her My Voter Page using Online Voter Registration in late July 2020. Tr. 1162:6-8.

543.    When she checked her My Voter Page in August, 2020, she noticed that her address was listed as Northwest or "NW" and not Northeast or "NE". Tr. 1161:17-13. The street name and number of her address were both correct in the voter registration database along with the designation of North Peachtree Street. The error was that her address was listed as northwest ("NW") not northeast ("NE") and was incorrect by one letter. Tr. 1161:11-13.

544.    Ms. Huskey called the Secretary of State and was referred to the Fulton County elections office to fix the error in her address from NW to NE. Tr. 1162:9-14, 1 1157:24-1158:3. The elections official in Fulton County quickly fixed the problem and confirmed that the correction in her address from NW to NE

---

appears the proper procedures were followed here, this Court does not consider Ms. Huskey's testimony to be relevant to Plaintiff's Absentee Ballot Cancellation Training claim.

was made by the time the conversation with Ms. Huskey was completed. Tr. 1162:8-22; 1161:11-16.

545. During the day or so following her conversation with the Fulton County Elections official, Ms. Huskey verified on her My Voter Page that that official had in fact corrected her address to reflect Peachtree Street, NE. Tr. 1163:25-1164:6.

546. Since the time the Fulton County official made the correction to her address in approximately September 2020, Ms. Huskey has had no problem voting in any election since that time including the November Presidential election. Tr. 1163:8-12, 21-22; 1163:23-1164:2, 17-19.

547. Ms. Huskey's testimony does not indicate that she was subject to an improper felon cancellation, vitals record cancellation, or duplicate merge by a county worker, let alone that such was in any way the result of the "loose" match criteria set by the Secretary's office. Rather, it appears far more likely that Ms. Huskey was affected by the precise type of "typographical error" that Plaintiffs indicate they are not challenging.

v. *Meredith Rose*

548. Meredith Rose testified that she had issues voting during the January 2021 Runoff Election. Tr. 2806:19-23. According to Ms. Rose, she

attempted to request an absentee ballot from the Georgia Secretary of State's website but was unable to do so due to a glitch that she experienced on the website. Ms. Rose, however, could not explain or offer testimony as to the cause of the glitch. Tr. 2807:6-22.

549.   Ms. Rose did not call the Secretary of State's office regarding the glitch she experienced. Tr. 2807:23-24. Instead, Ms. Rose called the Gwinnett County Board of Voter Registration and Elections Office, and during the call a representative let her know there was an issue with her voter registration. Tr. 2771:9 – 2772:3. This Court notes that the contents of the call are not taken for the truth of the matter asserted, as they were told for non-hearsay purpose of course of conduct. Tr. 2775:15-20.

550.   After the call, Ms. Rose was able to submit a request for an absentee ballot but testified that the absentee ballot was never received. Tr. 2776:4-11. She called the Gwinnett County Board of Voter Registrations and Elections Office again and cancelled her absentee ballot request, then requested that a new one to be mailed out. Tr. 2776:12-2777:10. Due to her knowing that the United States Postal Service was severely delayed, she prepared to vote in person. Tr. 2810:16-22.

551.    Ms. Rose then looked at her My Voter Page to verify her information and noticed that her precinct field was blank and her race was incorrectly listed as white, not of Hispanic origin. Tr. 2779:22-25.

552.    Ms. Rose called the Gwinnett County Board of Voter Registrations and Elections Office for a third time, and a representative stated that the race was a human error made by the County. Tr. 2811:12-15. However, the representative said that Ms. Rose would not have any problems voting in person, despite her race being listed incorrectly. Tr. 2784:11-14.

553.    On election day, Ms. Rose went to vote at her precinct, the poll worker scanned her license but told Ms. Rose that she could not be found in the system. Tr. 2789:18-24. This Court notes that what the poll worker read on the screen was not offered for the truth of the matter asserted and was only addressed for Ms. Rose's course of conduct that she called Fair Fight after her information was not found. Tr. 2790:8-17; 2791:17-25. In any case, a poll manager informed Ms. Rose that she could vote by provisional ballot, and she was able to successfully cast her ballot. Tr. 2812:21-2813:8. Ms. Rose's voting experience on Election Day took roughly 6 hours. This includes time to vote and time spent trying to ensure her provisional ballot was cured. Tr. 2803:20-24.

554.    This Court finds that the evidence presented regarding Ms. Rose's experience is insufficient to identify the cause of either (a) her difficulties in requesting an absentee ballot; or (b) why the poll worker informed Ms. Rose that she could not be found in the system. At the very least, Ms. Rose's testimony does not establish that she was subject to an improper felon cancellation, vitals record cancellation, or duplicate merge by a county worker or, even if she was, that such was in any way the result of the "loose" match criteria set by the Secretary's office.

vi. *Jayme Wills*

555.    Jayme Wills lives in Abu Dhabi, United Arab Emirates. PX. 2052 (Wills Dep. Tr.), Tr. 7:19-23. Ms. Wills's current address in the United States is 2202 Winston Way in Richmond County. PX. 2052, Tr. 10:15-20. She also maintains a Shop & Ship address in New York, but rarely uses it for mail due to the expense. PX. 2052, Tr. 34:19-23.

556.    Ms. Wills has voted successfully by absentee ballot for approximately ten years while living overseas (she had occasion in that span when she was able to vote in person). PX. 2052, Tr. 11:8 -11. Ms. Wills stated she has never had difficulty registering to vote. PX. 2052, Tr. 45:10-11.

557.    Ms. Wills voted successfully by absentee ballot for both the primary and the general election in Georgia in 2020 and on both occasions, she checked her My Voter Page and confirmed that her ballot was accepted. PX. 2052, Tr. 12:16-13:15.

558.    After hearing about the 2021 Runoff Election, Ms. Wills requested an absentee ballot for that election, by email as she had done in prior election, but never received it. PX. 2052, Tr. 13:22-14:3, 39:5-12. She later discovered that Richmond County had mailed an absentee ballot to her 2022 Winston Way address in Richmond County. PX. 2052, Tr. 34:24-35:2.

559.    When she did not receive her ballot, Ms. Wills downloaded an absentee ballot request form from the Federal Voting Assistance Program (FVAP) webpage, which she had learned about from a group called "Democrats Abroad." PX. 2052, Tr. 15:22-16:9; 16:12-13; 42:1-6. Ms. Wills then took her request form to the U.S. Embassy and, after doing so, checked her My Voter Page where it stated her ballot had been "canceled." PX. 2052, Tr. 18:22-19:2; 19:9-11.

560.    After that, on December 30, 2020, Ms. Wills called the Richmond County Board of Elections and explained that she had just taken her ballot to the U.S. Embassy but that her My Voter Page listed her ballot as having been cancelled. PX. 2052, Tr. 21:3-10; 23:2-9. The Richmond County worker "said

183

something about a change of address had been requested" and that they would email her another ballot. PX. 2052, Tr. 21:11-15. Ms. Wills had not requested a change of address. PX. 2052, Tr. 21:16-18.

561.   Ms. Wills received her new absentee ballot by email within an hour after contacting the Richmond County office. PX. 2052, Tr. 2052 at 42:7-12. Ms. Wills agreed that "as soon as [she] was able to talk to someone, they immediately fixed the issue that [she was] having." PX. 2052, Tr. 42:13:16.

562.   Believing that she did not have sufficient time to return the ballot through the U.S. Embassy at this point, Ms. Wills elected to send her ballot via expedited shipping with Aramex, a private parcel service, at a cost of roughly $80. PX. 2052, Tr. 23:17-24:18. Ms. Wills stated she was aware that, as a UOCAVA voter, Georgia law allows her ballot to be counted even if received after election day, so long as it is postmarked before election day, but decided it was better to handle it the way she did. PX. 2052, Tr. 43:17-44:3

563.   Ms. Wills later checked her My Voter Page and confirmed that her ballot had been accepted. PX. 2052, Tr. 24:22-25:8. Ms. Wills does not contend that Richmond County, or the Secretary of State, intentionally attempted to prevent her from voting. PX. 2052, Tr. 46:21-24; 48:20-49:7.

564. This Court finds that Ms. Wills's testimony is not related to Plaintiffs' List Accuracy claim as there appears to be no indication Richmond County mailed her absentee ballot to the wrong location because of an improper felon cancellation, vitals record cancellation, or duplicate merge; rather, they indicated it was for a "change of address" request that Ms. Wills stated did not occur. This error is outside the scope of Plaintiffs' List Accuracy claim as it was defined at trial and, moreover, clearly appears to be unrelated to any conduct by the Secretary of State.

vii. *Kelly Dermody*

565. Kelly Dermody is an attorney who lives in California. PX. 2101 (Dermody Dep. Tr.), Tr. 7:07–10, 7:13–17;13:18–20. Ms. Dermody has never lived in Georgia and has never been registered to vote in Georgia. PX. 2101, Tr. 16:10–15. She was a financial supporter of Ms. Abrams in the 2018 election. PX. 2101, Tr. 57:04–08.

566. Ms. Dermody was a poll watcher for the Democratic Party during the November 6, 2018 General Election, stationed at the Therrell High School polling place in Fulton County. PX. 2101, Tr. 28:14–17; 39:03–19. Ms. Dermody testified that the poll manager at that location, whom she believes is named Ms. Jackson, was causing a bottleneck at the polling location. PX. 2101, Tr. 28:14–

185

29:11; 30:18–21. It was Ms. Dermody's opinion that the polling place set-up and

Ms. Jackson's personal handling of issues that arose caused long lines. PX 2101,

Tr. 30:22–31:16.

567.   Ms. Dermody further testified that an unknown number of voters

told her that the polling place staff told them that their polling place had been

changed. PX. 2101 at Tr. 36:10–37:20. She opined, without offering evidence or

explaining her reasoning, that these unknown voters were "disenfranchised" due

to a "failure of training and interference with poll workers." PX. 2101, Tr. 46:21–

47:08. In her opinion, the "interference" and "training" concerned the offering (or

not offering) of provisional ballots to voters. PX. 2101, Tr. 47:09–18.

568.   Ms. Dermody also offered hearsay testimony regarding one

individual who told her that she was informed by a poll worker that she was

registered in another county. PX. 2101, Tr. 42:14–25. Ms. Dermody claimed that

this individual voted a provisional ballot. PX. 2101, Tr. 43:10–15. Ms. Dermody

could not, of course, testify as to the veracity of this hearsay statement or any

others upon which her testimony is based. PX. 2101, Tr. 41:04–41:15. Ms.

Dermody did state that a lot of the voters she observed had letters from election

officials with them, but she was unaware that these letters are sent by county

officials. PX. 2101, Tr. 49:24–50:08.

569.    In sum, Ms. Dermody's testimony consists almost entirely of repeating inadmissible hearsay and lay opinion. The few factual statements that might be considered as based on her own personal knowledge are either so clearly unrelated to the issues in this case (such as her complaints of long lines) or would require groundless speculation in order to make them potentially relevant (such as the contents and source of the letters she observed being held by voters in line). In any event, there is no evidence to suggest that any of the voters Ms. Dermody observed were affected by a felon cancellation, vitals record cancellation, or duplicate merge or, even if they were, that such was in any way related to the "loose" match criteria set by the Secretary of State to help counties identify such matches. Her testimony is entirely irrelevant to this case.

## VII.   Training on Absentee Ballot Cancellation Procedures

### A. Training Generally

570.    At the outset, based on the testimony provided in this lawsuit and the relevant testimony of the State's fact witnesses and the Plaintiffs' training expert (Mr. Kevin Kennedy), this Court finds that—as a matter of fact—the counties train poll workers and the State trains county election superintendents and registrars, including on the cancellation of absentee ballots. Tr. 3469:4-22 (Harvey); Tr. 2864:22-2865:4 (Kennedy).

187

571.     In Georgia, all "county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations" are required to become certified in election administration within six months of their appointment. O.C.G.A. § 21-2-101 (a); Tr. 1569:13-18, 24 (Germany).

572.     The Secretary's office provides the certification training materials. Tr. 1865:19-1866:12 (Harvey). Election officials who are certified do not have to become recertified, even if they move from one county to another. Tr. 3534:10-23 (Harvey). The Secretary also has a policy of trying to make the election certification materials accurate. Tr. 3538:23-25.

573.     The Secretary of State's office offers training in addition to the training that is required for county officials to become certified. Tr. 1569:16-24 (Germany). Georgia county election officials must also complete 12 hours of annual training as approved by the Secretary of State. O.C.G.A. § 21-2-100. The training is usually satisfied at the annual conferences. Tr. 3535:6-14 (Harvey); Tr. 1570:7-11 (Germany).

574.     The Secretary's office also makes a poll worker training manual online for counties to use (though it is available to anyone with internet access).

Tr. 3537:11- 3538:7. The Secretary tries to make the poll worker manual accurate. Tr. 3538:15-17 (Harvey). As Plaintiffs offered no evidence on the matter, however, this Court cannot make a finding or determination as to which counties use the poll worker manuals, which do not, and which use some but not all of the materials. Tr. 3538:8-14 (Harvey).

575.     Plaintiffs failed to provide any direct or circumstantial evidence that training was not important to the Secretary of State, and the Defendants provided affirmative evidence to the contrary. Tr. 3509:22-3510:2, 3511:2-5; PX. 994 at STATE-DEFENDANTS-0149713.[23] Indeed, during all relevant times to this lawsuit, the Elections Division maintained a group that focused on training. Tr. 3509:10-12 (Harvey). The training division would work with county election superintendents and registrars to provide information and training on topics ranging from changes in the law (by statute, regulation, or judicial decision), to technology, and other aspects of voting in Georgia. Id.; PX. 2054, Tr. 102:8-103:8.

576.     As part of the Secretary's ongoing training efforts, the training group within the Elections Division would provide webinars that utilized slide decks to county election officials. Tr. 3517:19-35:20:1. During the period between

---

[23]  Admission limited to the section on election division and cover email, remaining excluded. Tr. 2193:3-21.

2018 through 2020, the webinars would usually occur at least once a month. Tr.
3519:9-14. While the state trainers used slide decks and other visual aids, they
would not just read them aloud as part of the presentation. Tr. 3518:23-3519:4.

577.    Training efforts increased during Mr. Harvey's tenure as the
Director of the Elections Division. Tr. 3519:19-21. Similarly, county participation
in webinar attendance increased at the same time. Tr. 3519:22 -3520:1.

578.    During either late 2018 or early 2019, the Secretary hired Melanie
Frechette to become the training director. Tr. 3520:10-15. Ms. Frechette came to
the Secretary's office already quite familiar with Georgia elections and county
implementation of elections; prior to joining the Secretary's office, she served
with for the Gwinnett County election office for six to eight years and the Hall
County election office for a year or more before joining the Secretary's office. Tr.
3523:15-22 (Harvey).

579.    Mr. Rayburn would review all of Ms. Frechette's training documents
before they were presented or given to the counties, to make sure there was not
anything contrary to the Georgia Code. PX. 2054, Tr. 98:15-99:21.

B. Training Specific to Absentee Ballot Cancellation

580.    As part of HB 316, Georgia changed the way that absentee ballots
could be cancelled in person, meaning how a voter could request an absentee

190

ballot and still vote in person on a voting machine. See O.C.G.A. § 21-2-388; see also DX. 310 at 28-29.

581.    Prior to HB 316, of a voter received an absentee ballot and brought it to the polling place, they could write "spoiled" or "cancelled" on it and vote on a machine. Tr. 3532:4-9 (Harvey).

582.    They may still do so today. The difference arises if the voter received or requested the ballot and did not have it with them when they appeared at the polling location. In such cases, voters were instructed to go to the county registrar's office and sign an affidavit, then return to their polling place to cast a ballot on a machine. Tr. 3532:4-15 (Harvey); DX. 310 at 955-990.

583.    House Bill 316 changed the process for those voters who requested an absentee ballot and appeared at the polling place; specifically, it empowered the poll manager to check with the county registrar or election superintendent, and once the poll manager "satisfied themselves" that the ballot had not yet been received, the poll worker could cancel the absentee ballot in the State's system and allow the voter to vote in person and on a machine. O.C.G.A. § 21-2-388(b); see also Tr. 3532:16-3533:7 (Harvey)

i.   *Impact of the COVID-19 Pandemic on Training*

584.    Training efforts in 2020, after the changes to HB 316, were significant both in terms of frequency and quantity of topics to discuss. For example, the training division included providing information and training on the State's new Dominion Ballot Marking Devices, which represented the first time that Georgia returned to using paper ballots in over 15 years. Tr. 4192:15-4193:6 (Sterling); Tr. 3520:20-3521:3 (Harvey). The COVID-19 pandemic also necessitated significant training efforts, as many of the efforts to address the virus's impact on elections were unprecedented. Tr. 4193:2-16 (Sterling); Tr. 3521:13-17 (Harvey).

585.    Prior to the 2020 election, absentee ballot by mail was a method of voting in Georgia that "was not really growing." Instead, it seemed to peak around the 2008 election and "generally hovered around for or five percent of the votes." Tr. 3528:12-20 (Harvey); DX. 781.

586.    One consequence of the COVID-19 pandemic was the dramatic increase in the use of absentee ballots during the 2020 elections. Tr. 3524:21-3525:13; DX. 781 (Harvey). This was caused, in part, by the Secretary's decision to mail every active Georgia voter an absentee ballot request form. Tr. 3529:1-29 (Harvey).

587.    During the pandemic, and in addition to the webinars and other training that was taking place, communications between the Secretary's office and county election officials increased significantly: there were "at least weekly" conference calls between the two, and the calls were frequently divided between counties in North Georgia, South Georgia, and metro Atlanta counties independently. Tr. 3649:10-23 (Harvey).

588.    In the light of Secretary's decision to issue all active voters absentee ballot request forms, the Secretary's office increased training on absentee cancellation procedures. Tr. 3530:10-3531:3; 3649:24-3650:1 (Harvey).

589.    In 2020, Georgians were to have numerous elections: (1) a Presidential Preference Primary (slated for March); (2) a general primary of state elected officials, candidates for both seats to the United States Senate, and primaries for some congressional seats; (3) a general election; and (4) potential general runoff elections. Tr. 4190:12-13; Doc. Nos. [829-6], [829-7], [829-8]. These elections were in addition to any runoffs that may have (and in some cases did) arise from the general primary election, and special elections, including the special election to fill the Congressional seat vacated by the death of Congressman John Lewis. Tr. 4190:4-9 (Sterling).

590.    The 2020 elections also marked the first time that the State's new Dominion Ballot Marking Device technology would be utilized across the state in a statewide election. Tr. 3652:7-8 (Harvey).

591.    Because of the COVID-19 pandemic, the Secretary exercised his existing authority to postpone the presidential preference primary, then combine it with the general primary, and postponed both again to the latest possible time that would allow compliance with federal election laws. Tr. 4188:7-4190:9 (Sterling); Tr. 3647:13-17 (Harvey).

592.    One of the reasons for the postponement was the real concern that there would be an insufficient number of poll workers available to work during the pandemic. Tr. 3647:13-17; 3651:2-7 (Harvey). At that time, the Secretary's office began to understand that some county election offices were getting infected and could not administer the primary election. Tr. 3647:19-25 (Harvey).

593.    Fulton County was hit particularly hard; one of their employees died of COVID relatively early; the registration director was out with COVID for some time, and the office had to be shut down for three to four days for disinfecting after further spread of the virus. Tr. 3648:6-16 (Harvey). Adding to this was the crush of absentee ballot requests coming into Fulton County, which

led to jammed servers, and an inability to print and download applications and ballots. Tr. 3648:17-25 (Harvey).

594.   In response to the pending poll worker shortage, the Secretary began to undertake efforts to recruit poll workers by reaching out to varied groups like the ACLU, State Bar of Georgia, private businesses and others. Tr. 3651:8-3650:3 (Harvey). The end result was "a lot" of new poll workers in the 2020 election. Tr. 3652:4-6 (Harvey).

595.   As Elections Division Director, Mr. Harvey summed up the dire situation in the August 27, 2020 meeting of the State elections board. DX. 786; Tr. 3655:7-8; 3660:6-16 (Harvey). Indeed, Mr. Harvey was "legitimately concerned that we may not be able to have an election." Tr. 3661:24-25 (Harvey).

596.   When asked if there were anything regarding the three issues (including absentee ballot cancellations) that could have been done that were not, Mr. Harvey credibly testified that, but for the errors in the training materials discussed below, he believed the Secretary's office "did everything we could do." Tr. 3664:14-4 (Harvey).

597.   Testimony indicated, and this Court finds, that even the best trained superintendents can still make mistakes in the training of poll workers. Tr. 3511:6-15 (Harvey). This Court agrees with Mr. Harvey's testimony that not all

mistakes in elections are caused by poor or insufficient training. Tr. 3515:23-25

(Harvey). For this and other reasons, Plaintiffs' own expert acknowledged that

no election is perfect (Tr. 2897:2-4), and Gabriel Sterling, who testified about his

involvement in campaigns since the 1980s, said the same. Tr. 4178:7-14.

ii. *Errors in State Training Documents*

598.    The Secretary's office did not update the election certification

materials to reflect the change to the absentee ballot cancellation process after the

passage of HB 316 in 2019. Tr. 2118:13-2119:11 (Harvey). This means that a

county election superintendent appointed to the position between April 2019 and

through the January 2021 runoff may have been certified on incorrect materials.

Tr. 3538:15-3540:2 (Harvey).

599.    Plaintiffs did not, however, link any of the evidence about absentee

ballot cancelation issues to the election certification materials. Plaintiffs provided

no evidence establishing that in the counties where absentee ballot cancellation

issues occurred at the polls, those counties' respective superintendents were

trained on outdated information. In fact, as to 2020 voter witnesses Deborah

Allen, Aaron Karp, and Margaret Whatley, their counties' election supervisors—

Fulton, DeKalb, and Muscogee, respectively—were certified before the 2020

196

elections and would have no reason to see the erroneous materials. Tr. 3535:17–3537:11 (Harvey).

600.   The poll worker manual developed by the Secretary of State's office was also not updated to show the changes in absentee ballot cancellation procedures for the 2019 and 2020 elections. Tr. 2131:9-28. As stated above, however, Plaintiffs did not offer any evidence for this Court to be able to determine which Counties, if any, use the poll worker manual and to what extent. Tr. 3538:8-14 (Harvey). Accordingly, here again there is no evidence to link Plaintiffs' voter witnesses on this issue to improper training using the incorrect poll worker manual. See Tr. 3538:8-14.

601.   Regardless, the poll worker manual has since been updated with the correct information. Tr. 2131:9-28.

C.   Plaintiffs' Absentee Ballot Witnesses

602.   Plaintiffs offered seven voter witnesses to try to demonstrate that the Secretary provided inadequate training on absentee ballot cancellations. As explained below, however, this Court cannot determine from these witnesses' testimonies, as a matter of fact, that their experiences were caused by the Secretary of State's training of their respective county superintendents on this issue. Plaintiffs presented no testimony from any county election officials or poll

197

workers at trial or any other evidence sufficient for this Court to determine, as a matter of fact, that the actions taken were a result of county superintendent training by the Secretary of State.

603.    For context, this Court also takes judicial notice that, during the 2018 election (prior to the change in policy from HB 316), 223,576 Georgians voted absentee. Doc. No. [829-5] at 2.[24] In the 2020 general election, over 1.3 million voters voted by absentee ballot (and all 6.9 million active voters received an absentee ballot request form). Doc. No. [829-6] at 2. And, just under 1.1 million voters cast absentee-by-mail ballots in the January runoff election. Doc. No. [829-8] at 8; see also Section VIII. F., infra.

i.   *Saundra Brundage*

604.    Saundra Brundage lives in a senior living facility in Dekalb County. Tr. 1237:22-24; 1238:23-25. Ms. Brundage testified that she requested an absentee ballot for the first time in the 2018 general election Tr. 1239:16-1240:3.

605.    According to Ms. Brundage, she never received her absentee ballot. Tr. 1240:7-8. As such, she instead went to vote in person by taking the bus from her senior living facility. Tr. 1240:17-21; 1241:1-5.

---

[24] The Court takes judicial notice of Georgia's historical voting statistics. See infra Findings of Fact Section VIII (F).

606.   Ms. Brundage testified that the poll worker told her that she had requested an absentee ballot and that she was not "ready to let [Ms. Brundage] vote" but did not give a reason why. Tr. 1240:21-25; 1241:8-16; 1241:17-21.

607.   According to Ms. Brundage, the poll worker did not suggest that she cast a provisional ballot at that time but pointed out a man and said Ms. Brundage needed to talk to him. Tr. 1241:22-1242:5. The man pointed out to Ms. Brundage was walking up and down the aisle talking on the telephone. Tr. 1242:6-14.

608.   Ms. Brundage stated that she waited for the man to finish but was never able to talk to him. Tr. 1242:23-1243:2. Unfortunately, Ms. Brundage had to leave before the man apparently finished his phone call; she was at the polling location for about fifteen minutes before she had to leave to catch the bus that had taken her to the polling location. Tr. 1250:7-12.

609.   Though the poll worker's statements to Ms. Brundage are not admissible for the truth of the matter, only to explain Ms. Brundage's course of conduct, the distinction here is ultimately of no import. This Court cannot conclude from Ms. Brundage's testimony that the proper procedure for cancellation of an absentee ballot was not followed in her case.

610.    Specifically, this Court cannot conclude what the unidentified man on the phone would have done for Ms. Brundage had she been able to speak with him, let alone what he was trained to do by his county superintendent or, most importantly, what that county superintendent was trained to train him to do by the Secretary of State. While it is indeed unfortunate that Ms. Brundage did not get an opportunity to cancel her absentee ballot and vote in this instance, it would be purely speculative to conclude that such was in anyway related to the Secretary of State's training of county superintendents on absentee ballot cancellation procedures.

ii.  *Aaron Karp*

611.    Aaron Karp is a resident of DeKalb County who testified regarding his experience cancelling an absentee ballot and voting in the June 2020 primary. Tr. 601:19-25; 619:3-5. While originally intending to vote absentee, Mr. Karp testified that he misplaced his absentee ballot and subsequently elected to vote in person. Tr. 603:14-605:1; 619:15-17. Mr. Karp was never told that he could not vote or would not be able to cast a ballot. Tr. 619:18-20.

612.    Mr. Karp was able to successfully vote in the June 2020 primary by executing an affidavit to cancel his absentee ballot and then casting a provisional

ballot. Tr. 612:15-23; 619:6-8. Mr. Karp confirmed that he later received

notification by mail that his ballot was counted. Tr. 615:16-21; 619:9-14.

613.   Mr. Karp could not testify as to what type of training the poll

workers who assisted him received regarding how to handle the cancellation of

his absentee ballot, nor that of the poll manager, nor that of the DeKalb County

election superintendent. Tr. 620:7-17.

614.   While Mr. Karp testified that he observed poll workers consulting a

binder in response to his situation, he admitted that he did not know what this

binder was or what it contained. Tr. 619:21-620:3. Moreover, this Court ruled at

trial that the contents of this unidentified binder—whatever they may be—would

constitute inadmissible hearsay and this Court will not speculate as to their

origin or substance. Tr. 610:1-3. Similarly, Mr. Karp could not testify as to what

information was presented on the poll workers' screens when he went to vote.

Tr. 620:4-6.

615.   Mr. Karp testified that he never contracted the Secretary of State or

submitted a complaint to the State Elections Board regarding his voting

experience; instead, his only response was to fill out an online declaration form

on Fair Fight Action's website. Tr. 616:5-21; 621:11-16; 622:5-10. Mr. Karp testified

that he was on Fair Fight Action's mailing list and had previously received an

email from them soliciting stories of people's experiences voting. Tr. 616:7-11; 621:17-22.

616.    Based on this testimony, this Court is unable to conclude, as a matter of fact, that Mr. Karp's experience attempting to cancel his absentee ballot was caused, or in any way affected, by the training the DeKalb County superintendent received from the Secretary of State's office. Regardless, the fact that Mr. Karp was able to vote successfully minimizes any burden he may have suffered.

iii. *Deborah Allen*

617.    Deborah Allen requested an absentee ballot for the June 2020 primary election but could not remember when she received the absentee ballot request form in the mail, (Tr. 644:23-25), nor when she sent in her requests for an absentee ballot. Tr. 645:1-9. Regardless, Ms. Allen did not receive an absentee ballot and went to vote in-person on election day. Tr. 630:7-10.

618.    When Ms. Allen went to vote in-person on election day, she told the poll worker that she requested an absentee ballot and did not receive one. The poll worker then walked Ms. Allen through the process of signing an affidavit to cancel her requested absentee ballot. Tr. 635:20-24, 636:19-24. After completing

her cancellation affidavit, Ms. Allen voted a provisional ballot. Tr. 638:16-23, 639:1-7.

619.    Based on this testimony, this Court is unable to conclude, as a matter of fact, that Ms. Allen's voting experience, specifically having to use a provisional ballot versus voting on a machine, was caused, or in anyway affected, by the training the DeKalb County superintendent received from the Secretary of State's office. This Court further notes that Ms. Allen's concerns with voting a provisional ballot were assuaged by the Fulton County poll workers. Tr. 646:2-11. Thus, it does not appear that she was burdened by the experience.

620.    Ms. Allen never communicated her concerns about the voting process in the June 2020 primaries to the Secretary of State's office or the State Election Board. Tr. 646:13-18.

iv. *Patricia Andros*

621.    Patricia Andros is a resident of Cobb County who testified about her experience voting in the June 2020 primary election. Tr. 2691:2–3. Ms. Andros received an absentee ballot for the June 2020 primary, filled it out, but decided not to mail it due to the proximity of the election. Tr. 2694:3-17.

622.    Instead, Ms. Andros went to the polls to vote in person. When she arrived, she was told that she would need to fill out a provisional ballot and was

directed to a table to do so. 2695:7-11. She filled it out, submitted it, and her vote was counted. Tr. 2695:7-15, 22-24; 2698:21-22, 2699:14-17; 2701:21-22.

623.    Like Plaintiffs' other voter witnesses on this issue, Ms. Andros never testified that she had any knowledge about the as to what type of training the poll workers who assisted her received regarding how to handle the cancellation of her absentee ballot, nor that of the poll manager, nor that of the county election superintendent.

624.    Accordingly, this Court is unable to conclude, as a matter of fact, that Ms. Andros's experience attempting to cancel her absentee ballot was caused, or in any way affected, by the training the her county superintendent received from the Secretary of State's office.

625.    Ms. Andros has also since voted successfully by absentee ballot in the 2020 general election and 2021 runoff election. Tr. 2705:16-2706:3.

v. *Dayle Bennett*

626.    In the September 2020 election, when she went to the polls, Dayle Bennett learned she had been sent an absentee ballot to her home; the poll worker gave her the option of going home to retrieve the ballot. Tr. 2721:4-8.

627.   Ms. Bennett went home, discovered the ballot at her home just as the poll worker had informed her, and brought it back to her polling place. Tr. 2721:9-16.

628.   Ms. Bennett then gave the absentee ballot to the poll worker who cancelled the ballot and Ms. Bennett cast her vote on the voting machine. Tr. 2721:13-16.

629.   Ms. Bennett should not have had to retrieve her absentee ballot; Georgia law allow her to cancel a lost or missing absentee ballot by signing an affidavit attesting she has not already voted and will destroy the absentee ballot if later able to do so. O.C.G.A. § 21-2-388(b); <u>see also</u> Tr. 3532:16-3533:7 (Harvey). That said, this Court cannot conclude from Ms. Bennett's testimony that the poll worker's instructions for her to retrieve the ballot were caused, or in any way affected, by the Secretary of State's training of her county superintendent on this issue.

630.   Moreover, this Court notes that the entire process from the time the poll worker gave Ms. Bennett the option of retrieving her absentee ballot at her home, returning to the precinct, cancelling her absentee ballot and casting her vote on the voting machine took 15 minutes. Tr. 2721:17-23. Thus, Ms. Bennett's burden from the experience, if any, was limited.

631.   After successfully voting in the September 2020 special election, Ms. Bennett also voted without any issue in subsequent elections; namely, the November 2020 Presidential Election and the January 2021 runoff election. Tr. 2721:24-2722:5; 2722:13-15.

632.   At no time did Ms. Bennett report her issue to the Fulton County Elections officials, the Secretary of State's office or the State Board of Elections. Tr. 2722:16-22. Rather, Ms. Bennett wrote to the Fair Fight Action website and was then contacted by a Fair Fight attorney who assisted in her completing her declaration and giving her testimony in this case. Tr. 2722:23-2723:3

vi. *Margaret Whatley*

633.   Ms. Whatley requested and received an absentee ballot without any problems for the 2020 General Election. PX. 2050 (Whatley Dep. Tr.), Tr. 19:17-20, 23-25.

634.   Ms. Whatley updated her name and address on her My Voter Page after she got married before the 2020 election. PX. 2050, Tr. 20:8-17. When she logged into her My Voter Page, the information was always correct including after her name change to her married name. PX. 2050, Tr. 20:20-24.

635.   In the November 2020 general election, Ms. Whatley arrived at the polls with her absentee ballot sealed in the envelope. PX. 2050, Tr. 21:8-12, 24:24.

Rather than canceling her ballot, however, Poll workers informed Ms. Whatley that there was a drop box close to her home of which she was not aware. PX. 2050, Tr. 27:23-28:2.

636.   Ms. Whatley left the polling location and deposited her ballot in the drop box suggested by the poll worker. PX. 2050, Tr. 27:24-28:1, 11-13. She later learned that her ballot was received and accepted when she reviewed her My Voter Page the next day. PX. 2050, Tr. 28:21-29:6. Ms. Whatley has been further able to successfully in subsequent elections without issue. PX. 2050, Tr. 31:14-16; 32:25-33:1; 33:4-9; 33:22-25

637.   This Court cannot conclude from Ms. Whatley's testimony, as a matter of fact, that the poll worker's recommendation that she use the absentee ballot drop box was caused, or in any way affected, by the Secretary of State's training of her county superintendent regarding absentee ballot cancellations.

vii.   *Aria Aaron*

638.   Ms. Aaron originally registered to vote in Georgia in early 2015. PX. 2057 (Aaron Dep. Tr.), Tr. 13:12-13:18. The registration was done at a voter drive that occurred at a community event at a park. PX. 2057, Tr. 13:19-14:6.

639.   Since her registration, Ms. Aaron has voted in every mayoral, general and midterm election. PX. 2057, Tr. 14:7-14:20. Ms. Aaron had never had

207

a problem voting in Georgia prior to the June 9, 2020 primary. PX. 2057, Tr. 22:15-22:20. That election is the first time she attempted to vote by mail. PX. 2057, Tr. 22:15-22:20.

640.    For the June 9, 2020 primary, Ms. Aaron attempted to mail her absentee ballot, but it was mailed back to her. PX. 2057, Tr. 22:24-23:11. She testified that she is not sure why that occurred. PX. 2057, Tr. 23:6-23:7. Regardless, this issue is not relevant to any of the claims remaining in this case.

641.    On August 31, 2020, Ms. Aaron applied for an absentee ballot for the November 3, 2020 general election. PX. 2057, Tr. 23:20-23:24. Ms. Aaron was in Los Angeles, California at that time, and requested that her absentee ballot be sent there. PX. 2057, Tr. 25:21-26:1. Ms. Aaron visited her My Voter Page, which stated that her absentee ballot was issued on September 18. PX. 2057, Tr. 23:25-24:3. Afterward, she used BallotTrax to determine that her absentee ballot was mailed on September 24. PX. 2057, Tr. 24:4-24:7. Ms. Aaron apparently found BallotTrax to be helpful, and testified that being able to go see the status of her absentee ballot was convenient. PX. 2057, Tr. 24:8-25:2.

642.    When she did not receive her absentee ballot, Ms. Aaron flew to Atlanta to vote. PX. 2057, Tr. 27:3-27:7. When she arrived at her polling location,

the poll worker stated that Ms. Aaron had submitted for an absentee ballot and went to get her supervisor. PX. 2057, Tr. 29:17-30:14.

643.    The supervisor brought out the paperwork for the affidavit for Ms. Aaron to sign and properly cancel her absentee ballot. PX. 2057, 30:14-30:20. Once she signed the paperwork, Ms. Aaron was able to vote, and stated that "once I signed it, then it was totally fine, and I went through the process of, you know, being able to vote." PX. 2057, Tr. 30:21-30:23.

644.    The entire process to vote took about 5 minutes. PX. 2057, Tr. 31:9-31:12. At no time did anyone explicitly tell Ms. Aaron that she could not vote; she agreed that everyone at the polling location was helpful. PX. 2057, Tr. 31:18-32:14; 33:14.

645.    Based on this testimony, this Court does not find Ms. Aaron's testimony to be supportive of Plaintiffs' Absentee Ballot Cancellation Training claim. In addition to offering no testimony to link her experience to the training that her county superintendent would have received, like Plaintiffs' other voter witnesses on this claim, if further appears here that the correct procedures were followed. The issue that Ms. Aaron experienced was with the delivery of her absentee ballot, not it's cancellation, and that is not an issue remaining in this case.

viii.   *Webster County*

646.   Finally, while no voter witness was presented regarding the matter, the June 19 election in Webster County, Georgia was discussed by several other witnesses and is relevant to this claim. This local election was one of the first elections held after the change in the absentee ballot cancellation process by HB 316. Specifically, HB 316 became effective on April 2, 2019, and the Webster County election took place on or around June 20, 2019. PX. 1117.

647.   On June 20, 2019 a voter submitted a complaint to the Secretary's office stating that she was denied the right to vote three times in Webster County.  PX 1117.  The voter stated that she was told she had to return her absentee ballot before she would be allowed to vote in person.  DX 791 at 167; PX 1117.

648.   The Secretary's office conducted an investigation into the complaint, which revealed that the voter did attempt to vote on two separate occasions and that the voter was told both times that she needed to surrender her absentee ballot.  DX 791 at 167.  The investigation further revealed that the Webster County Elections Supervisor and Deputy Registrar indicated that they were unaware of the proper procedure to cancel an absentee ballot at the time of the incident and believed a voter had to surrender the ballot. DX 791 at 167-168.

210

They indicated that they were now aware of the proper procedure.[25]  DX 791 at 168.

649.    The investigation further showed that, because the voter was erroneously turned away, a special election for Clerk of Superior Court that had resulted in a tie was voided and held a second time.  DX 791 at 168.

650.    The case was presented to the SEB at a February 17, 2021 meeting. DX 791.  SEB member Matt Mashburn referred to a situation where a voter is wrongfully turned away as "the nightmare scenario" and made a motion to refer the case to the Attorney General's Office, which motion carried.  DX 791 at 170.

651.    The events in Webster County, while unfortunate, appear to be an anomaly, and the circumstances of the election also appeared relatively unique. Tr. 3553:6-9 (Harvey).

652.    While Mr. Mashburn testified that wrongfully turning away a voter is the "worst thing that can happen," he, like Mr. Harvey, characterized Webster County's absentee ballot cancellations issues as an isolated incident. 4130:1-5. Again, in his experience, Mr. Mashburn further testified that he is not aware that

---

[25]  Within days of receiving the complaint, the Secretary's office contacted the county to ensure they were made aware of the proper procedure. PX. 1117.

absentee ballot cancellation is a big or widespread problem for voters. Tr. 4097:17-25; 4103:15-22; 4116:18-24.

## VIII.  Other Evidence Considered.

653.    Plaintiffs' Equal Protection, Fifteenth Amendment, and Section 2 claims all permit, in some degree, for consideration of evidence not directly related to the specific underlying issues in Plaintiffs' claims. This Court addresses that evidence here.

### A.  Plaintiffs' Expert Witnesses

654.    In addition to the testimony of Dr. Mayer and Mr. Kennedy, Plaintiffs offered additional expert testimony in support of their claims: Dr. Adrienne Jones; Dr. Peyton McCrary; and Dr. Lorraine Minnite. Because the relevance of these witnesses' testimony overlaps with Plaintiffs' claims, this Court addresses them here.

#### i.  *Dr. Adrienne Jones*

655.    Dr. Adrienne Jones is an undergraduate Professor of Political Science at Morehouse College. Tr. 936:07–17. Plaintiffs offered Dr. Jones's testimony as an expert in the "history of voting and voter suppression." Doc. No. [80] at 3. Over Defendants' objection, this Court permitted Dr. Jones's testimony

but limited the scope of her expert testimony to only historical review. Tr. 950:03–10; see also Doc. No. [754] at 16 (excluding supplemental report of Dr. Jones and declining to expand the scope of Dr. Jones's testimony).

656.    Dr. Jones holds a bachelor's degree in Media and Modern Culture, Semiotics and a law degree. Tr. 944:16-22. Dr. Jones obtained a master's degree in political science in 2013 and a Ph.D., also in political science, in 2015, both from the City University of New York. Tr. 945:9-11; 946:7–9. After obtaining her Juris Doctorate, Dr. Jones did not engage in any legal work pertaining to elections. Tr. 944:23–945:01.

657.    Dr. Jones has been a professor in the field of political science for approximately 22 years at various institutions. Tr. 936:07-10; 936:20-937:02. Many of Dr. Jones's prior professorial positions were adjunct, or part-time positions. Tr. 949:04-11. She is currently in her sixth year as a Professor of Political Science at Morehouse, her first tenure-track position. Tr. 948:23-25. Dr. Jones has published two peer-reviewed articles in her academic career. Tr. 947:9-11. Both articles were in the field of political science. Tr. 948:20-22.

658.    Dr. Jones offers two opinions in her expert report:(1) From the beginning of its existence to present, the state of Georgia has continually suppressed the right of people of color to vote, PX. 1162 at 2; and (2) Georgia's

suppression of people of color's right to vote is consistent with the long history of Georgia and Southern states. PX. 1162 at 12. The temporal scope of Dr. Jones's report, including her opinions and analysis supporting those opinions, ended in 2013. Tr. 949:16–21.

659.    Defendants have argued repeatedly that they "do not contest that prior to the 1990s, Georgia had a long and sad history of racist policies in a number of areas including voting." Doc. No. [450-1] at 50 n.38. This Court has already taken judicial notice of this fact and does so again here. See Doc. Nos. [636] at 70–71; [636] at 41 (citing Wright v. Sumter Cty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018), aff'd, 979 F.3d 1282 (11th Cir. 2020)).

660.    Defendants do, however, contest Dr. Jones's review of matters occurring in the 1990s or later and Defendants elicited testimony from Dr. Jones concerning such matters that were addressed in her report. This Court thus addresses Dr. Jones's testimony in that regard.

661.    Dr. Jones was recruited to provide her expert testimony while she attended a forum hosted by Plaintiff Ebenezer concerning their involvement in this litigation. Tr. 973:12–25. Dr. Jones later worked through Fair Fight in an attempt to host hearings of the House Oversight Committee of the United States

Congress at Morehouse College, where she is a professor. Tr. 974:15–975:02.

Those hearings concerned an investigation of the Defendants in this case. Tr.

3958:22-3959:11 (Groh-Wargo).

662.    Dr. Jones testified that she is a supporter and admirer of Stacey

Abrams, the founder of Plaintiff FFA. Tr. 977:10–12. In non-academic writings,

Dr. Jones praised Ms. Abrams for her electoral strategy and work in general. Tr.

980:14–981:09; DX. 703.

663.    In contrast, Dr. Jones is not a fan of contemporary Republican

politicians, (Tr. 981:16–19), nor Governor Kemp, specifically. Tr. 984:23–25. She

testified that the 2018 gubernatorial election was stolen from Ms. Abrams, Tr.

975:03–06, and testified that the then-Secretary of State "waged a multi-pronged

suppression attack" in the 2018 elections that she projected would continue

under Secretary of State Raffensperger. Tr. 988:06–19, 999:03–12; DX. 9. Dr. Jones

does not dispute that between 2016 and 2020 Black voter registration rates

increased—during the terms of now-Governor Kemp and Secretary

Raffensperger as Georgia Secretary of State, whom she refers to as voter

suppression advocates. Tr. 998:06–998:24; DX. 9.

664.    Dr. Jones frequently authors non-academic opinion articles in the

Dubuque Telegraph-Herald. Defendants introduced several of Dr. Jones's articles

at trial and elicited testimony concerning those articles. <u>See</u> DXs. 703, 13, and 9. In addition to Dr. Jones's general support for Ms. Abrams and her belief that Secretary Raffensperger and Governor Kemp are voter suppression advocates, as discussed above, Dr. Jones further argued therein that Republicans were encouraging internment camps in 2018, Tr. 984:17–21.

665.   Dr. Jones did not dispute or contradict that her non-academic opinion pieces reflect her personal beliefs, other than to clarify that her use of the word "overthrow" in relation to President Trump was a "dramatic flourish," Tr. 979:06–16; DX. 703, and to explain that her opinion on Georgia's voting rights history "pre-exists" her and her personal beliefs and political opinions, such that her report is reliable. Tr. 1035:07–15.

666.   As to Dr. Jones's opinions and testimony concerning matters occurring in 1990 or later, this Court has already held that Dr. Jones's testimony is limited to a historical review and though these matters arguably do not constitute "history," they are referenced in Dr. Jones's report and testimony and therefore this Court will address those opinions. PX. 1162.

667.   Dr. Jones's report addresses four events occurring after 1990: (1) litigation concerning Georgia's majority vote requirement, PX. 1162 at 9; (2) reauthorization of the Voting Rights Act in 2006, <u>id.</u> at 9–10; (3) a controversy

concerning the provision of drivers' licenses to those relocating to Georgia from Puerto Rico, id. at 10–11; and (4) polling place closures occurring prior to the 2018 elections, id. at 11.

668.    With respect to litigation concerning Georgia's majority vote requirement, Dr. Jones argued that a "chief sponsor" of the bill instituting the majority vote requirement did so with discriminatory intent and that the plaintiffs in that litigation "provided evidence that the majority vote rule was enacted to ensure limits on black electoral power." PX. 1162 at 9.

669.    In reaching her opinions, Dr. Jones relied upon a book by Laughlin McDonald, Special Counsel and Director Emeritus of the Voting Rights Project of the ACLU. Tr. 1002:05–1003:09. Dr. Jones did not review any pleadings, district court orders, or appellate opinions in reaching her opinion on this litigation. Tr. 1002:17–20; 1031:13–23. On appeal in that litigation, the Eleventh Circuit Court of Appeals affirmed the district court's findings of fact which found that the individual identified by Jones was not a "chief sponsor" and that the majority vote requirement was not motivated by discriminatory intent. See Brooks v. Miller, 158 F.3d 1230, 1233–34 & 1236–37 (11th Cir. 1998). The Eleventh Circuit affirmed the district court's decision on the merits, finding the majority vote provision constitutional and compliant with the Voting Rights Act. Id.

670.    Dr. Jones's report next discusses reauthorization of the Voting

Rights Act in 2006, criticizing Republican representatives generally, and Georgia

Congressman Lynn Westmoreland specifically, for their legislative actions. PX.

1162 at 9–10. Dr. Jones points out that Rep. Westmoreland "refused to abide by

[an] agreement" to make no objection to reauthorization of the VRA "as is." Id. at

9.

671.    Dr. Jones acknowledged, however, that the lack of amendment

updating the Voting Rights Act coverage formula was a significant factor in the

Supreme Court's decision in Shelby Cty., Ala. v. Holder, 570 U.S. 529 (2013). Tr.

1013:11–15. Nonetheless, Dr. Jones asserts that Rep. Westmoreland's attempt to

amend the VRA (and any attempts to amend the coverage formula) were "poison

pills" which were problematic and designed to kill the legislation. Tr. 1011:12–21,

1013:16–19; PX. 1162 at 10. Dr. Jones further criticized Representative

Westmoreland's vote against reauthorization—without amendment, after

attempts to amend the legislation failed. Tr. 1004:14–17.

672.    In her previously published academic writing, Dr. Jones further

criticized Republican congressional representatives who, in 2006, voted yes on

reauthorization of the Voting Rights Act without amendment. Tr. 1010:08–

1011:11; DX. 15. Specifically, Dr. Jones opined that Republicans voting in favor of

reauthorization were, in reality, voting against the VRA because those Republicans knew reauthorization without amendment would increase the likelihood of a successful challenge to the pre-clearance regime. Tr. 1010:14–1011:11; DX. 15 at 3 (291 in original pagination).

673.   On cross-examination, Dr. Jones testified that, in her opinion, Republicans' attempts to amend the VRA, voting against reauthorization, and voting for reauthorization without amendment were all problematic. Tr. 1003:25–1004:17; 1009:09–14. Dr. Jones explained that there was no action, with respect to reauthorization of the voting rights act, taken by a Republican legislator that she would not take issue with. Tr. 1013:20–1013:23.

674.   Dr. Jones's report also addresses a controversy concerning the provision of drivers' licenses to individuals relocating from Puerto Rico to Georgia. PX. 1162 at 10–11. Dr. Jones equates the questioning of Puerto Rican citizens, as described in her report, to the use of literacy tests discriminating against black voters. Id. at 10. In reaching her opinion on this matter, Dr. Jones did not review any documentation from DDS concerning this issue and instead relied solely upon two news articles from the Atlanta-Journal Constitution and CNN. Tr. 1014:13–1014:18. Dr. Jones further acknowledged that this matter was

219

beyond the scope of her report and the research she conducted in developing her report. Tr. 1014:19–21.

675.    Dr. Jones's report likewise addresses controversy surrounding the closing and relocating of polling places in Georgia prior to the 2018 elections. PX. 1162 at 11. Like the Puerto Rican driver's license issue, Dr. Jones agreed that this matter was beyond the scope of research she conducted for her report. Tr. 1014:22–1015:06; 1032:16–18.

676.    Nevertheless, Dr. Jones opines that then-Secretary of State Kemp "provided a manual to counties" in which he "reminded counties twice that they were no longer required to preclear laws with the DOJ in order to close polling locations in areas with 'low incomes, small populations and substantial minority populations.'" PX, 1162 at 11.

677.    Dr. Jones's testimony at trial revealed that then-Secretary Kemp never sent a "manual" advocating for the closure of polling locations in areas with "low incomes, small populations and substantial minority populations," rather that quote comes from an attorney representing parties adverse to the Defendants in litigation. Tr. 1024:21–1025:01. In reaching her conclusion, Dr. Jones relied upon an article of the Atlanta Journal-Constitution, in which the

attorney's quote appears, and did not rely upon the actual "manual" provided to counties. Tr. 1031:06–1031:12; DX. 18.

678.    Finally, this Court notes that Dr. Jones's report offers no opinion regarding issues remaining in this case—Exact Match, citizenship verification, voter list accuracy, and training on absentee ballot cancellations. Dr. Jones confirmed at trial that she offered no opinion on those matters. Tr. 1032:19–1033:06.

679.    This Court credits the testimony of Dr. Jones inasmuch as Dr. Jones's expert report provides a historical backdrop pertinent to cases brought under Section 2 of the VRA. However, this Court ascribes only limited weight to Dr. Jones's testimony concerning the four matters addressed in her report which occurred after 1990. Likewise, this Court attributes limited weight to the other testimony Dr. Jones offered because neither she nor Plaintiffs' other evidence connected that historical backdrop to the present practices at issue.

680.    Specifically, this Court finds Dr. Jones's discussion of litigation concerning Georgia's majority vote requirement to be contradicted by the Eleventh Circuit's opinion in Brooks v. Miller, 158 F.3d 1230 (11th Cir. 1998). Moreover, Dr. Jones relied upon only a single secondary source for her opinion and did not review any pleadings, complaints, district court orders, or appellate

court opinions in the <u>Brooks</u> litigation, raising serious concerns about the reliability of her methodology in offering this opinion. Even still though, the district court in <u>Brooks</u> did not find the majority-vote requirement to be motivated by discriminatory intent and further held the majority-vote requirement constitutional and compliant with the VRA—findings and conclusions which were affirmed by the Eleventh Circuit.

681.   Consequently, Dr. Jones's testimony is unpersuasive here because (1) there is insufficient evidence of the discriminatory intent Dr. Jones describes; (2) the weight of that evidence was found, at that time, insufficient by the district court and appellate court; and (3) the legality of the majority-vote requirement is simply not at issue in this case and is unconnected to the matters which are at issue here.

682.   This Court further finds Dr. Jones's opinions concerning reauthorization of the Voting Rights Act to be of no evidentiary import and not credible. As Dr. Jones testified, there is no possible action a republican legislator could have taken with respect to VRA reauthorization in 2006, with which she would not take issue. This testimony, coupled with Defendants' strong showing of Dr. Jones's political bias against Republican officials (and Governor Kemp and Secretary Raffensperger, in particular) and in favor of Stacey Abrams, leads this

Court to conclude it cannot place any evidentiary weight upon the testimony of Dr. Jones concerning reauthorization of the VRA in 2006. Doing otherwise would mean that Defendants would be categorically unable to offer any defense concerning the matter because all defenses would be a problem in Dr. Jones's view.

683.    This Court will also disregard and not consider Dr. Jones's opinions concerning the Puerto Rican drivers' licenses and polling place closures. Dr. Jones testified that these matters were beyond the scope of her report and research for her report. Consequently, Dr. Jones cannot offer a reliable opinion on a matter she admits was not within the scope of her research and thus lacks a sound methodology undergirding that opinion. And this Court has already limited Dr. Jones's expert qualifications in this case to historical review, which cannot be said to include review of news articles published since 2018, the year this case began.

684.    Furthermore, Dr. Jones's political bias counsels strongly against the evidentiary weight of these more contemporary matters. Indeed, in reference to the polling place issue, Dr. Jones misattributed a statement asserting that Governor Kemp advocated for the closure of polling places and precincts in minority areas—something Dr. Jones admitted at trial he did not say. Never

223

mind that this Court has already found Plaintiffs lack standing to assert their polling place closure claims against the Defendants. Doc. No. [612] at 36–42.

685.    Finally, this Court addresses Dr. Jones's testimony that this Court has permitted: the historical review in her report, excepting the post-1990 matters discussed above. This Court agrees and takes judicial notice that prior to the 1990s Georgia had a long and sad history of discriminatory policies in a number of areas, including voting.

686.    However, this finding alone does not end the inquiry. Dr. Jones's report and testimony did not connect this discriminatory past to the present actions which remain in this case. And Dr. Jones offered no opinion or testimony as to whether racial discrimination motivated the enactment and enforcement of the practices remaining in this case. Indeed, she offered no opinion concerning those practices at all.

ii.  *Dr. Peyton McCrary*

687.    Dr. McCrary is an historian and was permitted to offer expert opinion testimony in history only. Tr. 289. Dr. McCrary was qualified by this Court to testify as an expert in history of HAVA and not as an expert in the legal requirements of HAVA. Tr. 215:19-21. Accordingly, Dr. McCrary's opinions on

the legal effect of HAVA were offered only as a lay person and not as an expert. Tr. 215:19-21.

688.    This case was the first one in which Dr. McCrary prepared an expert report regarding a state's efforts at HAVA voter verification. Tr. 197:1-5. Dr McCrary is not a political scientist and does not have any formal degrees in political science. Tr. 196:1-3 and 17-19.

689.    In preparing his report, Dr. McCrary never spoke to a single county registrar in Georgia. Tr. 268:24-269:3. Dr. McCrary also incorrectly believed that Georgia did not have automatic voter registration. Tr. 269:4-270:12. Dr. McCrary admitted that he was incorrect about Georgia's use of automatic voter registration and that Georgia does in fact use automatic voter registration. Tr. 269:15-25. Dr. McCrary did not consider the use or nonuse of automatic voter registration as part of his opinions. Tr. 270:9-12.

690.    In preparing his report, Dr. McCrary assumed, without evidence, that county registrars were not diligently checking information returned from DDS regarding the database matching process. Tr. 277:9-16. Dr. McCrary did not consider the operation of the DDS processes related to voter registration when preparing his report. Tr. 270:14-271:23. Dr. McCrary also did not investigate

whether DDS could run the algorithms he referenced in his report. Tr. 276:25-278:12.

691.    In preparing his report, Dr. McCrary did not consider any evidence regarding how the State utilized the SAVE system except for a Memorandum of Understanding he reviewed. Tr. 242:3-13.

692.    Dr. McCrary's lay opinion is that HAVA does not require states to use a particular method for matching. Tr. 214:7-10, 24-215:5. Dr. McCrary agreed, however, that HAVA requires states to implement a voter verification program that matches new registrants with the state's driver services database. Tr. 274:25-275:2. Dr. McCrary also agreed that part of the HAVA voter verification process is to confirm citizenship and that non-citizens should not be allowed to vote in Georgia. Tr. 214:2-5; 275:3-5; 292:25-293:2.

693.    Dr. McCrary did not conduct any analysis of racially polarized voting in Georgia apart from reviewing other expert reports for limited geographic areas and reviewing exit poll data. Tr. 290:4-16. Dr. McCrary testified nonetheless testified that, according to the Census Current Population Survey, Black turnout in Georgia was higher than white turnout in the 2008 and 2012 general elections. Tr. 293:9-16; 291:11-17.

694.    Dr. McCrary did not opine that any portion of Georgia's voter registration practices and systems were adopted with discriminatory intent. Tr. 266:5-12. Dr. McCrary further admitted that the methods of voter verification implemented or submitted for preclearance in 2009, 2010, 2016, and 2017 are not used in Georgia today. Tr. 278:13-279:16. Dr. McCrary also personally agreed that the 2020 election process was well-administered despite the COVID virus in 2020. Tr. 289:1-13.

695.    While Dr. McCrary cites certain Census socioeconomic data in his report, particularly regarding relative educational attainment and income along racial lines, he conducted no analysis beyond looking at and reporting the Census data. Tr. 284:20-285:5. While Defendants do not dispute the accuracy data cited nor did they offer countervailing evidence on these matters, the lack of meaningful testimony regarding its import significantly lessens the weight that this Court will give this evidence in its analysis. See generally PXs. 1007-1014.

696.    This Court notes that HB 316 altered the process for verifying citizenship in Georgia and had not been used in an election when Dr. McCrary prepared his report. Tr. 280:1-9. This too significantly decreases the utility and relevance of Dr. McCrary's opinions as to contemporary election practices in Georgia.

697.   This Court has already determined that Dr. McCrary is qualified to opine on historical matters and sees no reason to revisit this ruling based on the evidence produced at trial. As with Dr. Jones, however, this Court does not find that Dr. McCrary's historical testimony is particularly helpful in this action beyond again reaffirming, generally, what this Court has already determined it can take judicial notice of; that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting." Doc. No. [617] at 70–71.

698.   Beyond these uncontested conclusions, however, this Court finds that Dr. McCrary's testimony does not helpfully address the purpose or nature of Georgia's HAVA Match and citizenship verification policies; the only two matters for which the Gingles Senate Factors are at issue.

699.   Moreover, Dr. McCrary's lack of knowledge on how elections and voter registration operate in Georgia today, such as his ignorance of HB 316 and Georgia's automatic voter registration process, render his broader opinions on these topics unpersuasive. As such, and given the scope of testimony offered by other witnesses in this case with superior knowledge of how the HAVA process operates in Georgia, this Court will not rely on Dr. McCrary's testimony in this regard.

### iii. *Dr. Lorraine Minnite*

700.    Dr. Lorraine Minnite is an associate professor at Rutgers University where she is the chair of public policy and administration department. Tr. 2334:3-8. She was offered by Plaintiffs as an expert "in the area of political science, specializing in elections, the political process and voter fraud in American elections." 2344:17-24. Specifically, she was retained "to provide expert analyses and opinions regarding the incidence of voter fraud in elections in the United States, both nationally, and in Georgia." PX. 1038 at 1. Defendants did not contest Dr. Minnite's qualifications to testify as an expert on these issues. Id.

701.    In sum, Dr. Minnite offered two main opinions:(1) "that the empirical evidence makes clear that fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare, and that's both nationally and in Georgia (Tr. 2346:3-7); and (2) "that a review of the available evidence in Georgia finds no cases of voter impersonation at the polling place, and in addition there is minimal evidence of other forms of fraud intentionally committed by voters, such as what Georgia calls repeat voting or voting when knowing one is ineligible to vote" (Tr. 2346:10-15). See also PX. 1038 at 1. Dr. Minnite reaffirmed these opinions following the 2020 presidential election in Georgia. Tr. 2346:19-22; see also PX. 2098 at 1.

702.   As a related matter, Dr. Minnite also opined "that claims about a stolen election in Georgia are not evidence of fraud. And if anything, the recounts, audits, investigations conducted by election officials in Georgia in the wake of the 2020 presidential election, confirm that there is no evidence of fraud in Georgia elections as has been alleged." Tr. 2346:23-2347:3. More broadly, Dr. Minnite agreed that "[a]n allegation of something is not evidence of that thing being true." Tr. 2422:8-12.

703.   Dr. Minnite nevertheless acknowledged the impact that false or unfounded claims by prominent political officials or people in the public eye can have in undermining faith in elections among their supporters. Tr. 2425:19-24. According to Dr. Minnite, "the false narrative takes hold, [and] it can be hard to dislodge it." Tr. 2427:21-22.

704.   For their part, Defendants do not generally dispute Dr. Minnite's conclusions that voter fraud was not widespread in Georgia during either the 2018 or 2020 general elections nor that allegations of voter fraud (or anything else for that matter) are not evidence that such as actually occurred. For instance, Gabriel Sterling also testified to this fact as to the 2020 general election. Tr. 4197:6-10; 4253:9-22.

705.    In conducting her research, Dr. Minnite testified that she reviewed a variety of publicly available information, including government records, new articles, online research, and conducting interviews. Tr. 2353:3-2355:17. As one example, Dr. Minnite reviewed records of the Department of Justice Ballot Access and Voting Integrity Initiative which was started by Attorney General John Ashcroft in the aftermath of the 2000 presidential election, to look at instances of voter fraud and voter intimidation. Tr. 2355:18-2356:4.

706.    In looking at this effort by the Attorney General's office, Dr. Minnite reviewed a list of cases prepared for a congressional hearing on non-citizen voting in which identified 95 indictments were brought pursuant to this initiative between 2002 and 2004, which Dr. Minnitte agreed was a "very, very small percentage of the more than 200 million votes that were cast" in the elections during this time. Tr. 2356:12-2358:7.

707.    Dr. Minnite's research did not include, however, speaking to any Georgia elected officials or Government personnel, nor did it include speaking to any Georgians about voter fraud in Georgia. Tr. 2414:1-25. Dr. Minnite also did not submit any open records act request to the State or any local governments since 2006 for purposes of her report. Tr. 2415:1-4.

231

708.    Dr. Minnite also agreed that "social scientific research on fraud is difficult because there are no officially compiled national or state statistics." Tr. 2403:13-19; see also DX. 54.

709.    Dr. Minnite also agreed with the conclusions of the United States Government Accountability Office ("GAO") that "like other crimes, instances of in-person voter fraud may occur that are never identified by or reported to officials" and that such "is due in part to challenges associated with identifying this type of fraud as both successful fraud and deterred fraud may go undetected." Tr. 2417:5-16; DX. 730 at 63, n.91.

710.    Dr. Minnite further agreed with the GAO's assessment of her own work, and others like it, which stated that "while they provide information on efforts to estimate in-person voter fraud, limitations in the population studied and sources used make it difficult to use these studies to determine a complete estimate of the incidents of in-person voter fraud." Tr. 2418:4-15; DX. 730 at 64.

711.    Dr. Minnite's definition of "voter fraud" is narrow. For purposes of her research and opinions, Dr. Minnite specifically defines "voter fraud" as only "the process whereby voters intentionally corrupt the voting or the electoral process." Tr. 2350:13-15; see also PX. 1038 at 6.

712.     This definition is intentionally distinct from the broader category of election fraud, which Dr. Minnite did not analyze or attempt to quantify. Tr. 2350:20-2351:13; 2407:15-2408:1. Dr. Minnite agreed that her definition of voter fraud would not, for example, include fraud performed by individuals or groups that are not the voter themselves. Tr. 2408:4-7.

713.     Dr. Minnite conceded that she does not know whether any member of the Georgia General Assembly, the Secretary of State, or member of the State elections board was familiar with her work (Tr. 24:11:23-2412:9), and agreed that the terms "fraud" and "voter fraud" may be used differently by different people (Tr. 2413:18-20). Dr. Minnite also agreed that she has heard others use the terms to refer to things that she would not consider voter fraud. Tr. 2413:21-25.

714.     Moreover, Dr. Minnite agreed that the risk of voter fraud was real and that the State has an interest in preventing voter fraud from occurring. Tr. 2410:25-2411:5.

715.     Dr. Minnite's testimony also said nothing of the intent that Georgia policy makers or Defendants with regard to any of the issues in this case. Indeed, she admitted that "neither of [her] reports opines on Georgia legislators' motivations for passing election laws." Tr. 2403:23-2404:3. She also did not "opine on whether Georgia election officials have intentionally denied or

deprived someone the opportunity to vote in Georgia elections" or "whether Georgia law has disenfranchised voters" or "whether Georgia policymakers actually seek to disenfranchise voters." Tr. 2404:4-13.

716.    Dr. Minnite specifically offered no opinion on Georgia's HAVA Match policy or what would constitute a match under that policy. Tr. 2404:14-18; 2405:5-7.

717.    Dr. Minnite also offered no "opinion one way or the other about the voter registration process in Georgia" (Tr. 2405:9-12) and did not offer "an opinion on the efficacy of Georgia's election administration generally" (Tr. 2405:13-15). She admitted that she was "not offering an opinion on whether the Secretary maintains an accurate voter list in Georgia." Tr. 2405:21-23.

718.    Dr. Minnite stated that she did not "attempt to measure or quantify the amount of improper or invalid voter registration in Georgia" (Tr. 2406:8-10) and admitted that she was "not offering an opinion on whether the Secretary maintains an accurate voter list in Georgia" (Tr. 2405:21-24).

719.    Dr. Minnite agreed that improper or invalid voter registration is distinct from fraudulent voter registration and that she did not attempt to analyze or quantify improper voter registration. Tr. 2406:12-14; 22-25.

720.    Dr. Minnite further did not opine on the Secretary of State's training of absentee ballot cancellation procedures with county superintendents. Tr. 2405:16-19.

721.    Though she reviewed it as part of her research for her supplemental report, Dr. Minnite did not offer any opinion on House Bill 316 and did not opine on the purpose or intent of any legislation passed by Georgia General Assembly in 2019. Tr. 2405:25-2406-7.

722.    Dr. Minnite also agreed that anytime someone uses the terms "fraud" or "voter fraud," that they are necessarily making racist statement. Tr. 2401:24-2402:3.

723.    Dr. Minnite clarified during her testimony that her criticisms of the rhetoric and political commentary surrounding the 2020 presidential election and the legitimacy thereof were not directed at the Defendants in this action. Tr. 2421:1-18.

724.    In fact, Dr. Minnite commended the Secretary of State for repeatedly and publicly defending the integrity and legitimacy of Georgia's elections in 2020 despite his own personal preferences for candidates that did not prevail in those elections. Tr. 2422:2-7. Dr. Minnite agreed that the Secretary of State resisted significant political pressure from members of his own party, including former

President Donald Trump, to use the power of the state to alter or affect the outcome of the 2020 presidential election. Tr. 2421:19-25.

B. Dr. Dennard and Judge Vines

725.    Dr. Dennard is a former mayor of Cuthbert, Georgia, where she also served on the school board. Tr. 724:11-18. After growing up in several locations due to her father's military service, Dr. Dennard's family settled in Brooks County. Tr. 651:12-18. She graduated from Brooks County High School and Valdosta State University. Tr. 655:6-9; 650:10-11.

726.    Dr. Dennard is professionally trained as a speech pathologist, and Dr. Dennard has a master's degree in speech language, and an educational doctorate degree in educational leadership. Tr. 650:10-14, Tr. 650:2-3.

727.    In at least the time period of 2004 through 2012, the Brooks County School Board had seven members elected from five districts and two at large seats. Tr. 658:23-25. In 2004, the composition of the Brooks County School Board was two Black members and five White members. Tr. 658:23-25, Tr. 659:1.

728.    After having run for school board unsuccessfully for the Brooks County School Board in 2004 and 2006, Dr. Dennard won a seat on the school board in 2009 after a special election. Tr. 650:23-25, Tr. 651:1-2, Tr. 664:5-8.

729.    At no time during her campaigns for the school board did Dr.

Dennard retain paid legal counsel to advise her with the election laws of Georgia.

Tr. 736:24-737:1. Dr. Dennard testified that she contacted Chris Harvey in the

Secretary of State's office, but she could not testify as to how many times. Tr.

736:24-737:1. Nonetheless, she testified that she had "extensive" instructions

from Mr. Harvey in 2010. Tr. 673:12-13.

730.    When Dr. Dennard successfully ran for the school board seat in

2009, she utilized a strategy that focused on increasing her supporters' turnout

by the use of absentee ballots. Tr. 662:17-663:13. At that time, no-excuse absentee

ballots were relatively new in Georgia, having first been legalized by a 2006 act

of the General Assembly. Tr. 662:17-663:13. It is undisputed that there were an

increase in the number of absentee ballots cast in the 2010 school board election

versus other elections. 737:25-738:3.

731.    Dr. Dennard learned of what she called "concerns" in the

community about the use of absentee ballots. Tr. 661:23- 662:2. Dr. Dennard also

learned that investigators were in Brooks County and asking questions about the

use of absentee ballots or the election generally. Tr. 672:9-16.

732.    In response to these interviews, Dr. Dennard contacted the United

States Department of Justice about the interviews on or around August 12, 2010,

and she asked the Department to commence an investigation on the election. Tr. 673:17-673:6. Dr. Dennard did not know if the Department of Justice ever investigated the situation in Brooks County. 737:14-20.

733.   In 2010's primary election, Dr. Dennard won re-election, and two other Black and female candidates, Ms. Thomas and Ms. Troutman also defeated their Democratic opponents in the campaign. Tr. 673:16-24. As a consequence, and for the first time in at least Brooks County's modern history (as there were no Republican contenders for the School Board seats), there would be four Black members of the School Board. Tr. 675:3-8.

734.   The defeated candidates from the Democratic Primary attempted a campaign based on write-in votes against Ms. Thomas and Ms. Troutman, but they were unsuccessful. Tr. 676:1-9. In November 2010, Probate Judge who served as Brooks County's Election Superintendent declared Ms. Troutman and Ms. Thomas the victors of the campaign. Tr. 677:3-12.

735.   On December 21, 2010, officers from the Brooks County Sheriff's Office and others that Ms. Dennard did not recognize, came to her house and arrested her, took her to the Brooks County Jail, booked her for violations of Georgia's election laws, and retained her for about 12 hours. Tr. 679:12-682:23. She was ultimately released on bond. Tr. 697:10-15.

736.    Dr. Dennard was charged with violations of Code Sections 31-2-385 and 21-2-575 for the wrongful possession of absentee ballots. Tr. 706:22-707:5. Ms. Thomas and Ms. Troutman—as well as nine other Black residents of Brooks County—were charged with the same or similar violations of Georgia law. Tr. 683:11-22.

737.    Pursuant to Code Section 45-5-6, Governor Nathan Deal convened a panel of three school board members from outside of Brooks County to make a recommendation on whether Dr. Dennard's "indictment relate[d] to an adversely affect[ed] the administration of [her] office … [and] the rights and interest of the public [were] adversely affected thereby." O.C.G.A. § 45-5-6(b), DX. 738. The commission, which included at least one Black member, unanimously recommended suspension. Tr. 741:24-742:1; DX. 737. Based on the commission's unanimous recommendation, Governor Deal suspended Dr. Dennard, Ms. Thomas, and Ms. Troutman "from office under the provisions of O.C.G.A. § 45-5-6." DX. 737.

738.    The Brooks County District Attorney recused himself from the prosecution of Dr. Dennard, Ms. Thomas, and Ms. Troutman, and Mr. Joe Mulholland, a prosecutor from Bainbridge, Georgia, came to Brooks County to spearhead the prosecution. Tr. 743:4-16.

739.    The case against Dr. Dennard, Ms. Thomas, and Ms. Troutman were nolle prossed on or about December 9, 2014. PX. 2047. The same order nolle prossed the other persons who were indicted for the same or similar conduct in or around the same election. Id.

740.    At some point, the State Elections Board brought a case against Dr. Dennard for the same conduct at issue in the criminal prosecution. Tr. 717:23-718:5. Dr. Dennard was aware that other Georgians were brought before the State Election Board for similar allegations of improper use of absentee ballots. Tr. 743:17-744:14.

741.    On June 15, 2016, the Attorney General of Georgia issued Official Opinion 2016-2. DX. 736. It said that "[q]uestions have repeatedly been raised by cases before the State Election Board … whether possession of another voter's absentee ballot constitutes a violation of either O.C.G.A. § 21-2-385(a) or § 21-2-574." Id. (emphasis added). The Official Opinion goes on to state that "mere possession of another voter's absentee ballot does not constitute a violation of either statute." Id. The Official Opinion "changed the way a lot of" cases involving mishandling of absentee ballots were investigated and prosecuted. Tr. 3494:19-23. Indeed, Chris Harvey testified that he would not have recommended

charging Mayor Dennard had the Attorney General's Official Opinion been issued at the time of her arrest. Tr. 3507:16-25.

742.    Chris Harvey, the Chief Investigator of the Secretary's office at the time, explained that the Attorney General's conclusion that the issues "repeatedly" came before the SEB was accurate and that there were "a lot" of cases involving multiple races of respondents. Tr. 3495:10-23.

743.    One such example was Judge Carlton Vines of the Chattooga County State Court. Like Mayor Dennard, Judge Vines was brought before the State Election Board for violations of the statutes addressing the handling of absentee ballots. Tr. 3496:17-21. Judge Vines and Mayor Dennard were both criminally prosecuted, and the prosecutions were overseen by the same prosecutor. Tr. 3496:14-25.

744.    The State Selection Board concluded its handling of the Judge Vines matter in December 2011, and unlike its resolution of the matter involving Mayor Dennard, Judge Vines was fined about $15,000. Tr. 3497:5-8; 3506:14-17. This was roughly one year after Mayor Dennard was arrested. Tr. 683:11-18.

745.    At the first State Election Board meeting after the issuance of Official Opinion 2016-2, the State Election Board dismissed the charges against Dr. Dennard. Tr. 754:21-755:3.

746.   Dr. Dennard testified that she believed the laws of Georgia should be applied consistently and without regard to race. Tr. 744:15-745:2. As evidenced by the comparable treatment of Judge Vines by Secretary of State and the State Election Board, that appears to be the case here. The story of Dr. Dennard is indeed both troubling and powerful, but this Court cannot conclude based on the evidence presented that such weighs in favor of finding any discriminatory intent, at least by the Defendants in this case, and specifically as it relates to the claims at issue in this case.

C.   <u>The New Georgia Project Investigation</u>

747.   The New Georgia Project was originally a non-corporate entity of which Ms. Groh-Wargo was the executive director in 2014. Tr. 3851:21-3852:3 (Groh-Wargo). Ms. Stacey Abrams was on the Board of the New Georgia Project, and then Reverend Warnock became the head of the organization. Tr. 3852:4-3852:14 (Groh-Wargo).

748.   In May 2014, the Secretary's office commenced an investigation into the New Georgia Project. The investigation commenced after election officials in Butts County complained to the Secretary's office about a voter registration drive and the manner in which it was being conducted. Tr. 3622:21-3623:13 (Harvey). Specifically, based on the questions being asked—about personal identifiable

242

information, Social Security number, driver's licenses, etc.—the elections office and sheriff's office believed that there was an identity theft ring at work. Id.

749.    As the investigation developed, it became focused on forgery, making false statements on election documents, false voter registration, and providing fraudulent information on election documents. Tr. 3625:22-3626:3. The investigation received press coverage, which was abnormal for SEB cases. Tr. 3624:10-18 (Harvey).

750.    The SEB discussed the investigation in a specially-called September 2014 meeting. PX. 97. By the time of the meeting, the Secretary's office had received complaints from numerous county election officials, including: Butts, Henry, Fulton, DeKalb, Gwinnett, Cobb, Paulding, Bartow, Muscogee, Coweta, Terrell, Toombs, Tattnall, and Effingham. PX. 96 at 5-6, 9-10. At that time, the Secretary's office confirmed that there were 25 forgeries and another 26 that were undetermined. PX. 97 at 14.

751.    In addition to the forgeries, the New Georgia Project was "taking massive amounts of voter registration and dropping them off in Fulton County, even though they were for counties all over state." Tr. 3631:15-18 (Harvey).

752.    Prior to the September 2014 meeting, and while serving as Chief Investigator at the time, Chris Harvey met with officials from the New Georgia

Project at least five times, including: (1) then-CEO of the New Georgia Project, Stacey Abrams, on June 3, 2014 (PX. 97 at 6; Tr. 3626:11-13 (Harvey)); (2) Lauren Groh-Wargo, the Executive Director of the New Georgia Project (PX. 97 at 6; Tr. 3627:11-12 (Harvey); Tr. 3851:21-23 (Groh-Wargo); (3) attorneys for the New Georgia Project on August 11, 2014 (PX. 97 at 6); (4) Lauren Groh-Wargo again on August 11 (PX. 97 at 6); and (5) Lauren Groh Wargo again on August 22, 2014 (PX. 97 at 7).

753.    From this meeting, Mr. Harvey told the State Elections Board that he did not believe the "goal of the New Georgia Project [was] go commit voter fraud [but that it] is clear … that some elements in the New Georgia Project are doing just that. Where that begins and ends [he does not] know." PX. 97 at 17.

754.    In Georgia, it is illegal to pay persons per voter registration they complete. O.C.G.A. § 21-2-570; Tr. 3629:13-16 (Harvey). The New Georgia Project or its agents did not pay per registration, but they would invite back persons who turned in more registrations than others. Tr. 3629:21-3630:3 (Harvey).

755.    Mr. Harvey provided undisputed testimony that the New Georgia Project investigation represented one of the larger complaint issues involving forgeries that he saw during his time in the Secretary's office. Tr. 3639:4-13 (Harvey).

756.    Mr. Harvey explained the problems with false and fraudulent voter registrations being submitted. First, it created issues for voter signatures in the process; specifically, if a forged registration contained a different signature than the legitimate voter's, the county election official could reject the absentee ballot application or absentee ballot. Tr. 3634:6-11. Second, the false voter information could create false duplicates that would present the voter with a wrong ballot or no ballot. Tr. 3634:12-3635:2. Many of these issues would not be readily apparent, but would be "critical in two years, four years, six years in special elections." PX. 97 at 11.

757.    The State Election Board took up the issue of the New Georgia Project again in at least September 2017. DX. 722.[26] At that meeting, no one spoke on behalf of the New Georgia Project. DX. 722 at 11; Tr. 3641:11-21 (Harvey).

758.    At the September 2017 meeting, the SEB heard of additional complaints from Athens-Clark, Putnam, and Carroll counties. Tr. 3642:18-3643:23 (Harvey); DX. 722 at 38. Further, the Investigative Division "identified 25 New Georgia Project canvassers who were responsible for submitting the canvas

---

[26] Admission limited to the New Georgia Project section. Tr. 3640:15-16.

sheets with the fraudulent voter registration applications." Tr. 3644:13-15 (Harvey); DX. 722 at 39.

759.   The SEB also heard from Nancy Boren, who was the election director in Muscogee County for over 20 years. Tr. 3644:19-3645:16; DX. 722 at 40. Ms. Boren explained how the voter drive—with all of its problems and inaccuracies—caused the election office to work "for six weeks, seven days a week, 24 hours, around the clock … Duplicate registrations were received with the same demographical information, but with different signatures." Tr. 3645:17-22 (Harvey); DX. 722 at 41. Mr. Harvey credibly testified that this was an unusual amount of work for a voter registration drive. Tr. 3646:6-8.

760.   While Plaintiffs have argued that the SEB should have removed the New Georgia Project name from the investigation once it concluded that it could not demonstrate a link between the fraudulent voter registration forms and the New Georgia Project, no testimony that anyone from the New Georgia Project requested that the name of the matter be changed. Tr. 3646:24-3647:1 (Harvey).

761.   Chris Harvey also credibly testified, without dispute, that the investigation into the New Georgia Project was not motivated by racial animus or an intent to suppress the vote. Tr. 3647:2-7 (Harvey).

762.   Based on the evidence presented regarding its origin, scope, and the way it was conducted, this Court finds that the State's investigation into the New Georgia Project was legitimate and justified. At the very least, and more important for the purposes of this case, this Court finds no evidence to suggest that the investigation was racially motivated or constitutes evidence of intentional discrimination by the State.

D.   <u>Campaign Speeches of Governor Kemp</u>

763.   In a 2014 speech at a Gwinnett County Republican Party meeting, then-Secretary Kemp urged his supporters to register voters that would vote for Republican candidates and encourage them to vote in the same way that Democrats had previously done with minority voters. PX. 73, Tr. 86:9-17; 88:9-17; 92:18-22. Governor Kemp testified that he made the statements in the speech in his individual capacity as a candidate for office at a political function. PX. 73, Tr. 87:23-25.

764.   Plaintiffs do not dispute the basic premise of Governor Kemp's comments; that is, that minority voters are statistically more likely to prefer Democratic candidates. <u>See</u>, <u>e.g.</u>, DX. 103 at 6. In fact, one of Plaintiffs' experts, Dr. McCrary, repeatedly cites some variation of this point throughout his expert report as a basis for his conclusions offered in support of Plaintiffs' Section 2

claim. <u>See</u>, <u>e.g.</u>, PX. 1289 at 32 ("since 1992, Democrats have always taken at least 80 percent of the black vote while most whites invariably preferred Republicans"); 37-38 ("minority voters routinely support Democratic candidates").

765.    In 2018, then-Secretary Kemp spoke at a fundraiser for his campaign expressing concern about early voters primarily voting for Democrats and the number of absentee ballot requests. PX. 73, Tr. 108:2-8; 109:14-1; 110:1-4.

766.    Governor Kemp testified that the concerns expressed in his comments were again aimed at his opposition's extensive get-out-the-vote efforts and how to address those efforts to help his campaign win the election. PX. 73, Tr. 110:11-15. Governor Kemp testified his comments were to encourage his supporters to do the same. PX. 73, Tr. 110:25-111:2; 111:20-24.

767.    This Court finds Governor Kemp's comments in both instances to be of a purely political nature; at most, the constitute the type of partisan rhetoric one would normally expect from a candidate for public office seeking to motivate his or her supporters. This Court specifically does not find Governor Kemp's comments as evidence any discriminatory intent, particularly as to any of the issues remaining in this case, or otherwise suggestive of racial animus.

E.  Plaintiffs' additional documentary evidence

768.    At the conclusion of their case in chief, and again on rebuttal,

Plaintiffs proffered several documents they obtained online ostensibly to

demonstrate the use of explicit racial appeals in campaigns in Georgia.

769.    This Court notes that this evidentiary proffer was not accompanied

by testimony, expert or otherwise, from which this Court would ordinarily

derive the import of such evidence. Nonetheless, this Court notes for the record

here that it was received into evidence and will discuss the weight given to such

evidence, to the extent necessary, in relation to Plaintiffs' claims on the merits.

See PXs. 830; 831; 1207; 1651; 1652; 1653; 1655; 1659; 1661; 1666; 1669; 2164; 2165;

and 2172.

F.  Georgia voting and voter registration statistics

770.    Defendants moved this Court, pursuant to Rules 201(b)(2) and

201(c)(2) of the Federal Rules of Evidence, to take judicial notice of certain voter

registration statistics maintained by the Georgia Secretary of State. Doc. No.

[829]. As indicated during trial, that motion was granted by this Court in the

Docket Order entered June 13, 2022. Tr. 3297:10-12. Specifically, for purposes of

this order, this Court takes judicial notice of the following:

771.   As of the November 3, 2020 general election, there were 7,638,898 registered voters in Georgia. Doc. No. [829-9] at 4.

772.   As of the June 9, 2020 primary election, there were 7,340,261 registered voters in Georgia. Id.

773.   As of the November 6, 2018 general election, there were 6,935,816 registered voters in Georgia. Doc. No. Id.

774.   As of the May 22, 2018 primary election, there were 6,694,441 registered voters in Georgia. Id.

775.   As of the November 8, 2016 general election, there were 6,637,939 registered voters in Georgia. Id.

776.   In the January 2021 runoff election between former Senator David Perdue and now-Senator Jon Ossoff, 1,084,138 absentee by mail ballots were cast. Doc. No. [829-8] at 3.

777.   In the January 2021 runoff election between former Senator Kelly Loeffler and now-Senator Raphael Warnock, 1,084,021 absentee by mail ballots were cast. Doc. No. [829-7] at 3.

778.   In the November 2, 2020 presidential election between former President Donald Trump and now-President Joe Biden, 1,316,943 absentee by mail ballots were cast. Doc. No. [829-6] at 3.

779.    In the November 6, 2018 gubernatorial election between Governor Brian Kemp and Stacey Abrams, 223,576 absentee by mail ballots were cast. Doc. No. [829-5] at 3.

## ANALYSIS AND CONCLUSIONS OF LAW

### I.  Plaintiffs' Article III Standing

As discussed, standing is a three-part analysis. This Court begins with an examination of the Plaintiffs' alleged injuries, and then discusses how, collectively, these injuries (even if cognizable) are not traceable to the Secretary and not redressable by the relief Plaintiffs seek.

### A.  Injury-in-fact

780.    At the outset, this Court concludes that no Plaintiff has standing to challenge the State's vital records matching process as part of their "list accuracy" claim. Plaintiffs provided no admissible or material evidence that any voter was injured as a result of the State's efforts pursuant to O.C.G.A. §§ 21-2-231(d) and (e), nor of a diversion of resources intended to combat the vital records matching process.

i.   *Fair Fight Action*

781.    Fair Fight Action is a 501(c)(4) that was created after Stacey Abrams'

defeat in the 2018 gubernatorial election. Tr. 3848:4-5. In fact, Ms. Abrams

announced the creation of Fair Fight Action on November 16, 2018 during her

speech acknowledging that Georgians elected Brian Kemp as Governor. Tr.

3859:10-25; DX. 285.[27]

782.    At trial, Fair Fight Action was represented by Lauren Groh-Wargo

(Fair Fight's former CEO); Cianti Stewart-Reid (its current CEO); and Liza

Conrad (its current Deputy Director). These witnesses offered testimony as to the

history, operations, and purpose of Plaintiff Fair Fight Action.

783.    Consistent with Ms. Abrams's speech, Fair Fight set out to mitigate

what it alleged were tactics of "voter suppression," including through this

litigation. Tr. 3858:9-17; 3860:5-6 (Groh-Wargo). As indicated by a document

provided to new Fair Fight Action employees, Fair Fight Action's "Primary

Purpose" is precisely this lawsuit. DX. 110 at 3-4. This same document also only

identified information about the lawsuit as what volunteers would "need to

---

[27]  Admission limited to the last paragraph on page 5 and what goes on page 6. Tr.
3881:21-23.

know" about Fair Fight, and it provided a timeline of the lawsuit. DX. 110 at 3-4, 12; Tr. 3871:14-15; 3872:6-8; 3873:9-17; 3873:18-20.

784.    For purposes of standing, however, <u>Jacobson</u> instructs that the plaintiffs must identify what activities that they must "divert resources away *from* in order to spend additional resources" combatting the specific policy or law at issue. <u>Jacobson</u>, 974 F.3d at 1250 (emphasis in original). In other words, the Plaintiffs cannot claim that resources that were allocated toward and in furtherance of their stated mission, yet not identify what these allocations were *taken from*, and claim that such resources were diverted for purposes of standing. Further, the resources must have been diverted to "counteract [the Defendants'] illegal acts," <u>Fla. State Conf. of N.A.A.C.P. v. Browning</u>, 522 F.3d 1153, 1165 (11th Cir. 2008).

785.    Here, Fair Fight Action's new activities that were allegedly implemented to address the issues in this lawsuit was the work of their Organization Department and the creation of their Democracy Warrior Program and Fair Fight University. However, no testimony or evidence has been provided indicating what the resources for these activities were taken from or to show that these initiatives were not in furtherance of this lawsuit, Fair Fight Action's stated purpose.

786.    First, by 2019, every staff member and consultant of Fair Fight who is involved in the organization spent a majority of their time working on this litigation. Tr. 3861:19-24 (Groh-Wargo). In addition, Fair Fight Action's Organization Department was mainly focused on mitigation of the organization's perceived voter suppression. Tr. 3869:14-19 (Groh-Wargo). The work of the Organization Department can hardly be considered a new initiative to contend with the specific issues in this case because, from the time that the Voter Access Institute changed its name to Fair Fight, the majority of the organization's efforts were focused on this litigation. Any characterization of the Organization Department's work on this litigation as being something new that Fair Fight Action undertook is misplaced and is exceptionally glaring seeing that Fair Fight Action was created at the end of 2018 and was just beginning operations.

787.    Further, two other Fair Fight initiatives were created for the purpose of assisting this lawsuit and the general mission of addressing alleged voter suppression.  Specifically, the Democracy Warrior Program was stated to have been created to "counteract problems of alleged voter suppression," Tr. 3870:7-10, and Fair Fight University's main purpose was to "train people to address alleged voter suppression." Tr. 3870:15-17. Both initiatives undertaken by

Plaintiffs also assisted in Fair Fight Action's "Primary Purpose" by collecting voter stories for this litigation. Tr. 3952:6-8.

788.   Even if the work of these three initiatives were found to not solely be in furtherance of Fair Fight Action's purported general mission of fighting alleged voter suppression or to work on this litigation, Fair Fight Action has stated that it will continue these programs and will continue to spend its resources in similar ways as it has done even if this lawsuit is successful. Tr. 1460:9-1461:18; 1461:21-1462:12; 1476:17-22; 1480:3-11; 1492:7-11; see also Tr. 1064:5-6 (Conrad). Specifically, Fair Fight will continue to contact voters, monitor social media for information on problems with voting, collect voter stories, operate Democracy Warriors and Fair Fight U. Tr. 1460:9-1461:18; 1461:21-1462:12; 1476:17-22; 1480:3-11; 1492:7-11; see also Tr. 1064:5-6 (Conrad).

ii.  *Care in Action*

789.   Care in Action, Inc. ("Care in Action") was represented by Jessica Livoti, who was Care in Action's executive director from August 2017 to January 2021. Tr. 80:21-12. Ms. Livoti is also currently a Care in Action board member. Tr. 80:24-81:1.

790.   At trial, Care in Action could not identify anything beyond a general interest in helping domestic workers vote, which is insufficient to confer

standing. <u>Gardner</u>, 962 F.3d at 1341 (11th Cir. 2020); <u>see also</u> <u>Sierra Club v.</u>

<u>Morton</u>, 405 U.S. 727, 739 (1972) ("[A] mere 'interest in a problem,' no matter

how longstanding the interest and no matter how qualified [an] organization is

in evaluating the problem, is not sufficient by itself.").

791.   Similarly, Care in Action could not point to any specific post-

election activities that it undertook to combat the alleged practices in the

remaining three claims. This too falls short of the requirements established by

binding precedent. <u>See</u>, <u>e.g.</u>, <u>Fla. State Conf. of N.A.A.C.P. v. Browning</u>, 522 F.3d

1153, 1165 (11th Cir. 2008) ("organization has standing to sue on its own behalf if

the defendant's illegal acts impair its ability to engage in its projects by forcing

the organization to divert resources to counteract **those illegal acts**.") (emphasis

added).

792.   For example, Ms. Livoti's testimony highlighted Care in Action's

general goals and not any specific action taken with regard to the Challenged

Practices: here, as in other cases, Care in Action's goal "in this case and in all of

our work," is to "make sure that it is easy to vote," Tr. 130:3-4, 16-21; 162:2-3;

92:18-21, and to "reduce friction in the process and make voting easy." Tr. 162:2-

3.

793.    Care in Action's communications with voters is ongoing, so when an election comes around they will already be "in regular communication, in a regular relationship with them." Tr. 160:3-11. General communications regarding a step in the voting process can only be considered part of Care in Action's general voter outreach.

794.    If this were the appropriate standard for establishing standing, then any civil rights organization could challenge any state action, at any time, based solely on a generalized aspiration to reduce actual or theoretical burdens on voting. In the words of the Supreme Court, adopting Care in Action's basis of standing would preclude any "objective basis upon which to disallow a suit by any other bona fide 'special interest' organization however small or short-lived." Sierra Club v. Morton, 405 U.S. 727, 739 (1972).

795.    Even when Care in Action described its own particular acts, such as canvassing voters early in the voting process (which cost it money and time), Care in Action explained that this is representative of its general method of satisfying its overall mission. Tr. 116:4-5; 140:1-3. Participating in the digital voter protection hotline is an example of similar steps that Care in Action would do regardless of the Challenged Practices. While created after the 2018 elections, the hotline was only in pilot stages in Virginia, the only other state in which Care in

Action operates, in 2019. Tr. 150:17-25. It can hardly be stated that their hotline was created in response to the Challenged Practices given that the organization chose to test its efficacy in another state a year after.

796.    More specifically, Care in Action's response to alleged voter list accuracy claim demonstrated only a general "interest[] in making sure that the lists are accurate" because they want to make sure that names and addresses are accurate when the voter goes to vote. Tr. 130:7-12. This did not raise or highlight any act of the State or any aspect of the State's maintenance of the voter database.

797.    Likewise, in relation to Georgia's citizenship verification process, Care in Action stated that it is "focused on making sure that people are treated equally," Tr. 176:2-8, and that it hopes that "that assumptions are not being made about a voter based on their experience, based on their name, based on how they speak English." Tr. 177:8-11. Further, Care in Action wants to ensure that voters are not asked for something that they should not be asked for. Tr. 176:17-19. These concerns do not raise any act of the State, any challenged criteria selected by the Secretary, or any specific indication that the State was treating anyone differently.

798.    The same is true for Care in Action's concerns about the HAVA match process. Care in Action stated that it was not challenging HAVA as being

unconstitutional, Tr. 165:13-18, and also did not understand how Georgia

complies with HAVA by having MIDR status for eligible voters. Tr. 170:24-25;

171:1-13. A unilateral lack of understanding cannot convey standing for purpose

of Article III of the United States Constitution.

799.   Finally, in relation to absentee ballot cancellation training, Care in

Action's work of generally informing voters post-election on provisional ballots

and potential steps to cure provisional ballots was directed toward "[a]nybody

with provisional ballots," Tr. 154:14-17, not those who voted provisionally due to

issues with in-person absentee ballot cancellation. Nor did Care in Action's

testimony provide any express concerns about training or alleged deficiencies in

how the State trains local election officials.

800.   For all of these reasons, this Court finds that Plaintiff Care in Action

has not demonstrated an actionable injury, through the diversion of its resources

to address the harms specific to the three remaining claims at issue in this case, in

order to confer standing.

### iii. *Baconton Missionary Baptist Church*

801.   At trial, Baconton testified as to three efforts it undertook that it

contends constitute an injurious diversion of its resources for standing purposes:

(1) providing tablets at the church to allow interested church members to check

their voter registration status (Tr. 2575:19-2577:8); (2) speaking about "voting in some form or another" during church sermons and functions leading (Tr. 2559:1-7; 2560:7-12), with an increased focus on checking voter registration status only in the lead up to the 2018 elections (Tr. 2560:13-2561:6); and (3) hosting two Tuesday night prayer meetings using the church's facilities and promoted in its Sunday service bulletins (Tr. 2642:9-14).

802.    None of these injuries, however, are tied to the specific Challenged Practices and, accordingly, cannot confer standing upon Baconton in this case. Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017)

803.    First, as to Plaintiffs' Absentee Ballot Training Claim, Baconton admitted that it does not know what the Secretary of State does to train county superintendents on this issue. Tr. 2618:25-2619:2. While Pastor Scott testified that he expressed general concerns and caution to his congregants about the absentee ballot process as a whole (Tr. 2580:14-17), there was no testimony that such was related to the Secretary of State's *training* on *cancellation procedures*. Quite simply, this Court cannot conclude that Baconton was injured by, and diverted resources to combat, a practice it knew nothing about.

804.    Second, as to Plaintiffs' HAVA Match Claim, while Pastor Scott testified that he mentioned "exact match" at church functions (Tr. 2586:4-2587:1),

it was apparent at trial that he, like other Plaintiffs, misunderstood what "exact match," or HAVA Match, entailed. Tr. 2613:15-21. Rather, what Pastor Scott described as his concerns about "exact match"—that is, a fear of being denied a ballot because one's ID does not match what is listed on the rolls—are more akin to the type of poll worker error experienced by Dr. Del Rio. <u>Id.</u> This is not what HAVA Match is, nor is it a claim at issue in this case. Again, the disconnect precludes this Court from finding a cognizable injury due to HAVA Match.[28]

805.    Third, as to Plaintiffs' List Accuracy claim, while it might be true that Baconton exerted some nominal additional effort in encouraging people to check their voter registrations, this Court finds that such efforts were not in fact *caused by* the specific practices at issue in Plaintiffs' List Accuracy claim; that is, the felon match, duplicate match, and/or vitals matching processes. Indeed, Baconton offered no testimony about these practices and further admitted that it does not know what the Secretary of State itself does to maintain the accuracy of the voter registration database. Tr. 2619:25-2620:2

806.    It is clear to this Court that Baconton's encouragement of voters to check their registrations, like the other voting efforts it undertook in 2018, was in

---

[28] Baconton offered no testimony regarding the State's citizenship verification process.

fact due to the Church's, and its members', intense interest in the gubernatorial campaign of Stacey Abrams.[29] Tr. 2629:12-16; 2632:1-11; DX. 303 at 4. Baconton's Tuesday night prayer meetings, for instance, were very clearly partisan events, organized and co-sponsored by a local politician, designed to promote and support Ms. Abrams' campaign and those of other Democratic candidates. 2637:1-4; 15-17; 2638:22-25; 2639:23-2640:5.

807.   Alternatively, and to the extent there was any non-partisan motivation in Baconton's encouragement of voters to check their registration status, Baconton further admitted that its concerns about the need to check one's status stemmed from its fears about list maintenance, an issue that is no longer in this case. Tr. 2606:4-23.

808.   Moreover, Baconton offered no evidence that its Tuesday night prayer meetings and encouragement of voters to check their voter registrations in any way prevented it from carrying out its other missions as a church. See Ga. Republican Party v. SEC, 888 F.3d 1198, 1203 (11th Cir. 2018) (diversion must be

---

[29]  In finding that Baconton undertook its actions due to, at least in part, its political support of Stacey Abrams, this Court takes no position on the appropriateness of such acts, as the issue is not before this Court. This Court only views the statements and actions of the church supporting Ms. Abrams in the context of determining Baconton's alleged injuries and whether they were caused by state action, or whether Baconton was motivated by something else.

one that "impairs the Party."). Thus, even if Baconton had been motivated to undertake these actions due to the Challenged Practices, which again this Court has concluded it was not, such would still not be sufficient to establish a cognizable injury for standing purposes.

809.    The Eleventh Circuit has been unequivocal that a plaintiff must be more than a "concerned bystander" to have standing. Gardner v. Mutz, 962 F.3d 1329, 1343 (11th Cir. 2020). Pastor Scott's trial testimony confirms that Baconton is precisely that. While this Court does not doubt the sincerity of Baconton's interest in voting issues generally, such is not sufficient to confer standing to bring the specific claims in this case. See Arcia, 772 F.3d at 1342 ("[A]bstract social interest[s]" cannot establish a concrete injury in fact.

iv. *Ebenezer Baptist Church*

810.    Plaintiff Ebenezer is a church of great social and historical importance in the Atlanta community, and its spiritual and social-justice contributions reverberate nationwide. It is undisputed that voting rights and voting issues generally are key parts of Ebenezer's mission today and have been a part of the church's mission since 1935. PX. 2053 (Warnock Dep. Tr.), Tr. 16:2; 35:7-14; 41:3–12; 44:4-23; 55:6–8; 65:17-22. See generally (Trial Tr.), Tr. 2967:14-20.

811.    Ebenezer's active encouragement of voter (i) registration, (ii) verification, (iii) education, and (iv) development of individual voting plans clearly predate the 2018 election. Tr. 2945:17-2946:4, 2946:5-8, 2964:16-23; PX. 2053 (Warnock Dep. Tr.), Tr. 49:1-5. And those efforts, some of which were addressed in sermons and announcements, continued after Ebenezer joined this lawsuit as a Plaintiff in 2019. Tr. 2957:18-2958:16.

812.    This properly celebrated and continuing legacy does not confer upon Ebenezer constitutional standing to challenge the three at-issue practices before this Court, however, because the church's interest in those specific allegations remains generalized. See Gardner v. Mutz, 962 F.3d 1329, 1343 (11th Cir. 2020) (no injury when only generalized interest in preserving history). See also Arcia, 772 F.3d at 1342 ("[A]bstract social interest[s]" cannot establish a concrete injury in fact); Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996) ("abstract concern . . . does not impart standing."). "[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified [an] organization is in evaluating the problem, is not sufficient by itself." Gardner, 962 F.3d at 1341 (11th Cir. 2020) (quotations omitted) (quoting Sierra Club v. Morton, 405 U.S. 727, 739 (1972)). Put simply, it

has not been injured by any of the Challenged Practices (as opposed to generalized theories about voting in Georgia).

813.    Constitutional standing requires an actual injury, not a hypothetical one lacking "concreteness." <u>A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.</u>, 925 F.3d 1205, 1212 (11th Cir. 2019); <u>Arcia</u>, 772 F.3d at 1340; <u>Focus on the Family v. Pinellas Suncoast Transit Auth.</u>, 344 F.3d 1263, 1275 (11th Cir. 2003). <u>See</u> <u>Clapper v. Amnesty Int'l USA</u>, 568 U.S. 398, 422 (2013) (ruling "respondents lack Article III standing because . . . they cannot manufacture standing by incurring costs in anticipation of nonimminent harm"); <u>Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.</u>, 68 F.3d 409, 414 (11th Cir. 1995). <u>See generally</u> (explaining that "[t]he party invoking federal jurisdiction bears the burden of establishing standing") (quoting <u>Lujan</u>, 504 U.S. at 561).

814.    Specifically, Ebenezer lacks organizational standing because it has not proved a diversion of resources sufficient to confer organizational standing. <u>See generally</u> <u>Arcia v. Sec'y of Fla.</u>, 772 F.3d 1335, 1341 (11th Cir. 2014); <u>Common Cause of Ga. v. Billups</u>, 554 F.3d 1340, 1350 (11th Cir. 2009); <u>Fla. State Conf. of N.A.A.C.P. v. Browning</u>, 522 F.3d 1153, 1165 (11th Cir. 2008).

815.    Instead, Ebenezer continued to do what it always had done; encouraging voter (i) registration, (ii) verification, (iii) education, and (iv)

development of individual voting plans have long been a part of the church's mission. Tr. 2945:17-2946:4, 2946:5-8, 2964:16-23; PX. 2053, Tr. 49:1-5. That the church, in 2018, began emphasizing the verification component of its ongoing voter work is not a concrete injury that confers standing. PX. 2053, Tr. 49:1-5. Tr. 2945:17-2946:4; 2946:5-8.

816.    Indeed, the evidence shows that the increased emphasis on verification focused primarily on combatting "voter purges," and list-maintenance claim is not at issue in this case. PX. 2053, Tr. 61:13-17, 151:21-23. While Rev. Vaughn testified generally that the three challenged practices motivated the church's voting programs—registration, education, verify, and create a voting plan—in the 2020 and 2021 elections, he did not tie specific efforts to specific challenged practices or anything uniquely caused by the Defendants' conduct. T. 2945:13-16. See, e.g., Tr. 2952:7–13, 2953:18–23, 2956:6–16, 2957:1–11, 2966:23–2967:4; PX. 1944; PX. 1951 (showing that the church's communications encouraging voter (i) registration, (ii) verification, (iii) education, and (iv) development of individual voting plans did not mention any of the three challenged practices).

817.    Similarly, although the church dedicated more funds to voter registration in 2018, at least in part, because the church had additional funds to

spend, (PX. 2053, Tr. 56:13-18 (Warnock); (Trial Tr.), Tr. 1176:15), there are no

documents that show a line item for voter-related activities specific for the 2018

election under the social justice ministry budget, PX. 2053, Tr. 34:17–20, 55:1-6

(Warnock). <u>See also</u> Tr. 2967:6-13 (showing absence of knowledge of anyone who

was deprived of the right to vote due to any of the challenged practices in this

case or knowledge of anyone whose right to vote was burdened by any of the

challenged practices in this case). Rev. Vaughn also testified that the church will

continue to educate voters on how to participate in the voting process, including

efforts related to the Secretary's list-maintenance efforts dismissed at summary

judgment, regardless of the outcome of the lawsuit. Tr. 2964:9-15, 2967:21-24; PX.

2053, Tr. 60:17-61:1, 108:8-11, 189:16–22 (Warnock). None of this proves an injury

sufficient for constitutional standing.

818.   A shift in emphasis among Ebenezer's consistent efforts to

encourage voter (i) registration, (ii) verification, (iii) education, and (iv) develop

individual voting plans does not confer standing. <u>Cf.</u> <u>Georgia Ass'n of Latino</u>

<u>Elected Officials, Inc. v. Gwinnett Cty. Bd. of Registration & Elections</u>, 36 F.4th

1100 (11th Cir. 2022) (deciding organization had standing because it was

diverting resources <u>from</u> its generalized voter outreach efforts <u>to address specific</u>

<u>decisions of the defendants</u>).  The church's conduct and acts remain the same,

even if what is said to fulfill those aims may differs some. The lack of evidence tying any of these shifts to the three challenged practices reinforces this point. See, e.g., Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross. . . . To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief sought.") (citations and internal quotation marks omitted); Fla. State Conf. of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008) ("organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract **those illegal acts**") (emphasis added).

819.   And, whatever Ebenezer may have done in 2020 and 2021 to address the Challenged Practices is irrelevant to the standing inquiry, because the injury is measured from the time of a plaintiff's complaint. A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co., 925 F.3d 1205, 1212 (11th Cir. 2019); Arcia, 772 F.3d at 1340; Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003). A plaintiff without standing cannot acquire it later based on injuries occurring after the suit was filed. Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co., 68 F.3d 409, 414 (11th Cir. 1995).

v.  *Sixth District AME Church*

820.    Plaintiff Sixth District was represented by Bishop Reginald Jackson, who began serving the Sixth District in 2016 and remains Bishop of the Sixth District to this day. Tr. 2974:14-20.

821.    At trial, Bishop Jackson testified that the Sixth District "has not had to devote resources as a result of the 2018 election." Tr. 2994:2-4.

822.    However, it was not until Plaintiff's counsel asked Bishop Jackson to clarify that he stated "it did take resources." Tr. 2994:2-20.

823.    At trial, the Sixth District testified as to five general efforts it undertook that it believes caused it to divert resources for standing purposes: (1) sent a letter to its members stating "it is important to get out – to get as many of congregants as possible to vote." Tr. 2990:17-2991:2, (2) Bishop Jackson addressed voting at the pulpit Tr. 2998:23-2999:1, (3) had volunteers take people to their polling locations and pick them up from their polling locations Tr. 2995:5-8 , (4) engaging in the Personal Voter Plan Tr. 3023:3-9, and (5) engaging in Operation Voter Turnout. Tr. 3030:2-18. None of these efforts were caused by the Challenged Practices or otherwise cause the type of injury that would confer standing.

824.   Bishop Jackson's testimony highlighted the Sixth District's general goals and not any specific action taken with regard to the Challenged Practices remaining in this case. Gardner, 962 F.3d at 1341 (11th Cir. 2020); see also Sierra Club v. Morton, 405 U.S. 727, 739 (1972) ("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified [an] organization is in evaluating the problem, is not sufficient by itself.").

825.   For example, Bishop Jackson identified general communications with members regarding voting as part of his regular job duties. Specifically, he testified that "it's my responsibility in terms of superintending the Sixth District, number one, to make sure that every eligible voter, every eligible person in the Sixth District who is 18 and above is registered to voter, and not only to register but actually votes." Tr. 2982:11-18.

826.   Furthermore, in 2016, when Bishop Jackson became Bishop of the Sixth District, one of the church's priorities was social justice. Tr. 3026 20-23. Bishop Jackson testified that social justice included getting people to vote, get people registered to vote, and getting people to the polls. Tr. 3026:24 – 3027:15. In fact, Bishop Jackson stated that not voting is "a sin." Tr. 2982:11-18.

827.   Bishop Jackson testified that the Sixth District engaged in Operation Voter Turnout which entailed voter education, voter mobilization, voter

organization, and voter registration. Tr. 3029:13 -20. However, Bishop Jackson goes on to testify that Operation Voter Turnout was not a response to the 2018 election. Tr. 3030:15-18. Rather, it was initiated during the 2018 election (after the primary where the Bishop testified there were no issues (Tr. 3036:14-3037:1)) to ensure that Sixth District had "as great a turnout as [it] could have for the 2018 election." Id.

828.    As to Plaintiff's absentee ballot cancellation training claim, the Sixth District provided no testimony. Although the Sixth District testified that it had volunteers take members to drop of their absentee ballots, this does not relate to the Secretary of State's training on absentee cancellation procedures. Additionally, Bishop Jackson admitted that there was nothing in Personal Voter Plan that even addressed canceling an absentee ballot and voting in person. Tr. 3024:3-20.

829.    Second, as to Plaintiffs' HAVA Match claim, Bishop Jackson was only able to identify two people who "experienced difficulty": (1) James Uzcategui-Gaymon , and (2) his nephew. Tr. 2988:7-9; Tr. 3060:9-10. However, it was clear from his testimony that he was unsure what HAVA match was – referring to it as "perfect match" and he was unsure as to what the actual cause of the alleged issues were. Tr. 2989:5-20. As to his nephew, Bishop Jackson stated

that his nephew called the country to determine what had occurred but "they didn't give him a credible answer." Tr. 3060:19-24. Additionally, when it came to the alleged issues faced by Mr. Uzcategui-Gaymon, Bishop Jackson stated that he was unsure what led to the "issue" faced by this voter but that the voter was ultimately able to vote. Tr. 2989:18-20.

830.    Lastly, as to Plaintiffs' List Accuracy claim, Bishop Jackson could not identify one individual who face a challenged while trying to vote or was unable to voter due to the Secretary's' maintenance of the rolls. Bishop Jackson even acknowledged that in the declaration created by Bishop Jackson for this case, which outlined Sixth District A.M.E's concerns about the 2018 election, nowhere in the document does it discusses list accuracy of the voter rolls in Georgia. Tr. 3050 7-14.

831.    As to the Personal Voter Plan, Bishop Jackson testified that there was nothing in plan that was created in part because of the three alleged practices remaining in this case. Tr. 3025:10-17.

832.    As importantly, the evidence demonstrated that—at the time of the 2020 election—the Sixth District's efforts and communications to voters were focused on issues that are no longer part of this lawsuit.  See DX. 764;  PXs. 1908; 1909; 1919; 1970; and 1992 (communications encouraging voter turnout, early

voting, absentee voting, and how to check voter status online); PX 1911; 1951; Tr. 2966:13-19; Tr. 2966:23-2967:4.

833.   Bishop Jackson testified that regardless of what happens in this litigation, that getting people to vote, helping people register to vote, and getting people to the polls, will continue to be a part of the Sixth District's mission. Tr. 3027:12-21.

834.   In absence of any injury resulting from any of the three challenged practices at issue in this case, the Sixth District lacks standing to pursue the claims tried before this Court.

vi. *Virginia-Highland Church*

835.   Plaintiff VHC, like many of the other church plaintiffs brought into this case after Plaintiffs Fair Fight Action and Care in Action originally filed it in the immediate aftermath of Georgia's 2018 gubernatorial election, is, at most, a "concerned bystander" with a general interest in the original complaint's allegations. See Gardner v. Mutz, 962 F.3d 1329, 1343 (11th Cir. 2020) (no injury when only generalized interest in preserving history). See also Arcia, 772 F.3d at 1342 ("[A]bstract social interest[s]" cannot establish a concrete injury in fact); Nat'l Treasury Emps. Union v. United States, 101 F.3d 1423, 1429 (D.C. Cir. 1996) ("abstract concern . . . does not impart standing."). "[A] mere 'interest in a

273

problem,' no matter how longstanding the interest and no matter how qualified [an] organization is in evaluating the problem, is not sufficient by itself." Gardner, 962 F.3d at 1341 (11th Cir. 2020) (quotations omitted) (quoting Sierra Club v. Morton, 405 U.S. 727, 739 (1972)). Put simply, it has not been injured by any of the Challenged Practices (as opposed to generalized theories about voting in Georgia).

836.   VHC did not even begin efforts to determine and document whether anyone affiliated with VHC experienced voting difficulties until roughly six months after it joined the lawsuit. Tr. 549:13-16, 560:14-23. Consequently, at the time of lawsuit's filing, VHC could not quantify or show an actual injury as opposed to a hypothetical one that lacks the kind of "concreteness" the Supreme Court determined the Constitution requires. A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co., 925 F.3d 1205, 1212 (11th Cir. 2019); Arcia, 772 F.3d at 1340; Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003). See Clapper v. Amnesty Int'l USA, 568 U.S. 398, 422 (2013) (ruling "respondents lack Article III standing because . . . they cannot manufacture standing by incurring costs in anticipation of nonimminent harm"); Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co., 68 F.3d 409, 414 (11th Cir. 1995). See generally

(explaining that "[t]he party invoking federal jurisdiction bears the burden of establishing standing") (quoting Lujan, 504 U.S. at 561).

837.    More significantly, as part of its ongoing mission to educate and register Georgia voters, VHC did not assist anyone actually affected by any of the three challenged practices at issue in this case. Tr. 571:4-15, 573:4-574:11. Indeed, VHC has no knowledge of anyone unable to vote as a result of any of the three election practices at issue in this case. Tr. 575:9-576:1. And none of those three practices prevented VHC from communicating its voter-education message. Tr. 574:12-575:8.

838.    In addition, and because of its inability to demonstrate an injury traceable to the Secretary or the SEB, VHC lacks organizational standing because it has not proved a diversion of resources sufficient to confer organizational standing. See generally Arcia v. Sec'y of Fla., 772 F.3d 1335, 1341 (11th Cir. 2014); Common Cause of Ga. v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009); Fla. State Conf. of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008).

839.    First, driving political change is part of VHC's mission. Tr. 585:8-12. To that end, VHC's dedicated voter-outreach mission dates to 2008, well before the Plaintiffs expressed any concern about the three challenged practices at issue in this case. Tr. 564:10-12. By planning to continue with that mission in the

future, including addressing practices once but now no longer at issue in the case, regardless of the outcome of this case, VHC has not demonstrated that it has been forced to stray or divert resources from its longstanding mission.[30] Tr. 576:14-577:1, 577:10-15, 578:23-580:6, 580:23-581:16. This includes VHC's claims about diverting human resources. The evidence only reflects a single VHC volunteer, Jane Crain, who stopped working with another VHC mission to focus on the church's voting mission. Tr. 581:24-583:4.

840.    As with other Plaintiffs, standing is not conferred when a plaintiff diverts resources from one aspect of its mission to another based on generalized concerns. Cf. Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Registration & Elections, 36 F.4th 1100 (11th Cir. 2022) (deciding organization had standing because it was diverting resources from its generalized voter outreach efforts to address specific decisions of the defendants).

841.    And, there is no evidence tying Ms. Crain's decision to focus on VHC's voting mission—which she herself created in 2008—to the exclusion of her work with the other VHC mission to any of the challenged practices. See Tr.

---

[30] VHC admitted it has not diverted financial resources as a result of what it has alleged to be unconstitutional or unlawful acts of the Defendants at issue in this case. Tr. 577:16-19. Indeed, VHC is not even paying for its legal representation in this lawsuit. Tr. 554:23-25.

532:8-19, 581:24-583:4. See, e.g., Town of Chester v. Laroe Estates, Inc., 137 S. Ct. 1645, 1650 (2017) ("[S]tanding is not dispensed in gross. . . . To the contrary, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief sought.") (citations and internal quotation marks omitted); Fla. State Conf. of N.A.A.C.P. v. Browning, 522 F.3d 1153, 1165 (11th Cir. 2008) ("organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract **those illegal acts**") (emphasis added).

842.    In the absence of an injury resulting from any of the three challenged practices at issue in this case, VHC lacks standing to pursue the claims tried before this Court. Even if VHC had presented an injury tied to any of the three remaining challenged practices, the fact that it plans to continue its same voting-mission efforts, including by continuing to address practices dismissed from this case, regardless of the outcome of this case, shows that such an injury is not the sort that confers constitutional standing before this Court.

B. Traceability and Redressability

843.    Even if this Court concluded that Plaintiffs provided sufficient evidence to show an injury in the constitutional sense, "that does not end the standing inquiry. [This Court] now must address whether Plaintiffs satisfy

277

the traceability and redressability elements necessary for standing to pursue their claims." <u>Georgia Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. of Registration & Elections</u>, 36 F.4th 1100 (11th Cir. 2022).

844.   At summary judgment, this Court found that Plaintiffs' HAVA Match and Absentee Ballot Cancellation Training claims were traceable to Defendants. Doc. No. [612] at 34-36; 53-55. Based on the evidence produced at trial, this Court sees no reason to disturb its prior ruling as to these two claims.

845.   While this Court also found at summary judgment that Plaintiffs' List Accuracy claim could conceivably be traced to Defendants due to the language of HAVA (Doc. No. [612] at 42-44), this Court did not ultimately address the merits of Plaintiffs' List Accuracy claim. Doc. No. [617] at 45-46. And, as it has now been presented at trial, Plaintiffs have not shown that their List Accuracy claim is traceable to, or redressable by, Defendants.

846.   Specifically, the underlying injuries at issue in Plaintiffs' List Accuracy claim all rely, ultimately, on actions taken by county officials; namely, the counties' independent determinations regarding whether to cancel, merge, or otherwise alter a voter's record. Tr. 3568:2-19, 3569:14-25, 3572:21-3573:6 (Harvey) (felon match); Tr. 3576:14-19 (Harvey), Tr. 1315:23-1316:2 (Frechette) (duplicate match); Tr. 1324:1-3, 10-12 (Frechette) (vitals match). As this Court previously

278

held with respect to other county actions in its summary judgment order, actions

taken by counties that are outside the direct control of Defendants cannot be

traceable to Defendants. Doc. No. [612] at 37-38, 49; Doc. No. [617] at 44-49

(polling place selection and equipment); see also Swann v. Sec'y, Georgia, 668

F.3d 1285, 1288 (11th Cir. 2012) ("[A] plaintiff lacks standing to challenge a rule if

an independent source would have caused him to suffer the same injury.").

847.   Plaintiffs attempt to get around this problem by focusing their List

Accuracy challenges on actions that are accepted as those taken by the Secretary:

the selection of certain "loose" match criteria to identify potential felon,

duplicate, and vital record matches to be processed by counties. Tr. 885:20-24,

886:5-7 (Hallman) (vitals match); Tr. 3720:5-9 (Harvey) (felon match); Tr. 793:18-

794:9 (Hallman) (duplicate match). See Tr. 4366:3-12 (Lawrence-Hardy).

848.   But the selection of these criteria alone has no demonstrable impact

on voters. Regardless of what criteria the Secretary selects, no voter's record will

be impacted unless and until a county official makes the final decision to cancel

or merge the record in question. Tr. 765:19-766:1; 772:1-773:1; 773:11–14; 774:7-15;

873:3-5 (Hallman); Tr. 1296:14-15; 1297:14-15; 1324:1-3, 10-12 (Frechette); Tr.

3568:2-19; 3569:14-25; 3572:21-3573:6 (Harvey); Tr. 3576:14-19 (Harvey), Tr.

1315:23-1316:2 (Frechette) (duplicate match); Tr. 1324:1-3, 10-12 (Frechette) (vitals

279

match). In other words, there is no "injury" to be traced to anyone until the county takes its final action, which requires county discretion.

849.   Similarly, Plaintiffs cannot show that any voter was disenfranchised because the eNet screen did not display an "alert" message to the county official when presenting a potential match. And contrary to Plaintiffs' contention that the Secretary "chose" to have county officials process this information, the statutes delegate this duty to counties. See O.C.G.A. §§ 21-2-226(a) ("It shall be the duty of the county board of registrars to determine the eligibility of each person applying to register to vote in such county."); see also O.C.G.A. §§ 21-2-228(a); 21-2-229(c).[31]

850.   Indeed, Plaintiffs conceded in one of their mid-trial briefs that having county officials perform these functions (even if they were not statutorily mandated) would not be a *per se* violation and "would not necessarily result in undue burdens on voters." Doc. No. [795] at 25; see also Tr. 4387:18-20 ("More fundamentally, however, plaintiffs are not proposing that the division of responsibilities between the Secretary and the counties must change.") (Lawrence-Hardy). Rather, Plaintiffs argued that the Secretary had failed to

---

[31]  Plaintiffs did not challenge these statutes as unconstitutional under Anderson-Burdick or any other theory.

"equip[] county users to make accurate cancellation decisions; respond[] to inquiries about when and how to modify voter data; or address[] reports of database problems" following that delegation. Id.

851.   Such arguments, however, which challenge the breadth of information provided to counties, run afoul of the political question doctrine discussed herein. Infra Analysis Section III (E). Viewed at even its most charitable, Plaintiffs seek an impermissible remedy to "do more." See, e.g., Anderson, 497 F. Supp. 3d at 1332 (dismissing, as a matter of law, Plaintiffs' claims because their requested relief sought to require the Defendant Secretary to take actions that were "'adequate,' 'sufficient,' and 'reasonable.'"); see also Doc. No. [450-1] at 29 ("The Court agrees with Defendants that '[t]he law does not impose constitutional liability for governments because they do not *exceed* their statutory obligations.'") (emphasis in original).

852.   Plaintiffs seemingly acknowledge these shortcomings. As Plaintiffs admitted, their List Accuracy claim, in all its variations, still relies on "the Secretary's statutory **overall** responsibility for database maintenance." Doc. No. [795] at 25 (emphasis added). But this is precisely the type of control that the Eleventh Circuit rejected in Jacobson. See 974 F.3d at 1236.

281

853.   Plaintiffs put forth no evidence at trial to show that the Secretary's selection of "loose" match criteria or anything else it does directly caused any county official—an independent actor—to mistakenly cancel a voter's record or merge two records that should not have been merged. As such, Plaintiffs have failed to establish traceability and/or redressability for their List Accuracy claim.

## II.   HAVA Match and Citizenship Verification

854.   Plaintiffs also challenge the HAVA Match and citizenship voter verification procedures set forth in O.C.G.A. §§ 21-2-216(g)(7) (citizenship verification), 21-2-220.1 (HAVA match). <u>See also</u> Ga. Comp. R. & Regs. 183-1-6-.06, 590-8-1-.02. Plaintiffs pursue these claims under the First and Fourteenth Amendments, Section 2 of the Voting Rights Act, the Equal Protection Clause of the Fourteenth Amendment, and the Fifteenth Amendment.[32]

855.   Plaintiffs' evidence, however, shows only that the State follows federal law in its implementation of the HAVA match policy (including citizenship verification); any burden associated with the policy is outweighed by the State's interests in preventing voter fraud, accurate voter lists, and working

---

[32]  Defendants have argued, and the Court agrees, that the HAVA Match and citizenship verification processes are different.  They are addressed together in this Order because the applicable legal factors are the same, and because the two policies were often discussed together at trial.

to see that only eligible voters, including only United States citizens, cast ballot in Georgia; no evidence suggests that the policy was enacted for racially discriminatory reasons, and the Section 2 analysis weighs in favor of the State under the totality of the circumstances.

856.   As a matter of law, HAVA requires all individuals registering to vote in federal elections to provide their driver's license number (if they have one) or the last four digits of their Social Security Number. 52 U.S.C. § 21083(a)(5)(A)(i). Georgia law likewise requires prospective voters to provide the same information at the time of registration. O.C.G.A. § 21-2-220.1(a).

857.   HAVA further requires that state officials "verify the accuracy of the information provided on applications for voter registration" using driver-license information from the motor vehicle authority of the state.[33] 52 U.S.C. § 21083(a)(5)(B)(i).

858.   For voters who register to vote by mail and have not previously voted in a federal election in the state, HAVA requires that those voters provide either valid photo identification or another authorized form of identification, including a current utility bill, bank statement, government check, paycheck, or

---

[33]  While the Court cites HAVA in this and other portions of this order, HAVA itself cannot establish grounds for liability against the Defendants.  See Bellitto v. Snipes, 935 F.3d 1192, 1202 (11th Cir. 2019) (deciding HAVA creates no private right of action).

other government document that shows the name and address of the voter, the first time they vote. 52 U.S.C. § 21083(b)(1) and (2)(A). This includes first-time registrants who vote by mail. 52 U.S.C. § 21083(b)(2)(A)(ii). Georgia law likewise requires first-time registrants to provide either photo identification or the same forms of non-photo identification allowed under HAVA the first time they vote. O.C.G.A. § 21-2-417(c).

859.   Further, individuals who provide their driver's license number or Social Security Number that "matches the information submitted under clause (i) with an existing State identification record bearing the same number, name and date of birth as provided in such registration" are not required to show proof of identification under HAVA. 52 U.S.C. § 21083(b)(3)(B)(ii) (emphasis added). Likewise, under Georgia law, a voter whose name, date of birth, and either driver's license number or Social Security Number on their registration form matches the records of either the Georgia Department of Drivers Services or Social Security Administration are not required to provide photo identification or a non-photo identification option when voting the first time. O.C.G.A. § 21-2-220.1.

860.   Plaintiffs' expert, Dr. Mayer, agreed that HAVA requires a state to have a verification process that includes matching. Tr. 509:13-510:3. Dr. Mayer

further agreed that HAVA "doesn't specify how states use that information, and states use a variety of different practices." Tr. 509:18-510:1; see also Tr. 358:1-15.

861.   Georgia's process matches information entered into the voter database with information in the Department of Driver Services database including the first letter of the first name, the first 20 characters of the last name, the date of birth, and the driver's license number. Tr. 1197:16-1199:7.

862.   If the information from the voter registration matches the DDS records, the individual is then considered verified for purposes of HAVA and is placed into Active status with no MIDR flag. Tr. 356:20-357:1.

863.   If the information does not match, then the voter is placed into Active-MIDR status, Tr. 355:23-356:19, which means the voter is an active voter who receives a precinct card and is allowed to vote using the same list of photo and non-photo identification that is required by HAVA when records are not matched, 52 U.S.C. § 21083(b)(3)(B); O.C.G.A. §§ 21-2-220.1(b) and (c); 21-2-417(c), Tr. 4141:21-4142:11, 4145:8-25, 4146:13-17 (Germany).

864.   Once the voter votes for the first time, the voter is moved into Active status without the MIDR flag, and that voter then must, like any other Active voter, show photo identification when voting in person after that first time voting. O.C.G.A. § 21-2-417(a).

865.    Separately, Georgia also requires that individuals registering to vote be United States citizens. O.C.G.A. § 21-2-216(g). The Department of Driver Services (DDS) database contains information on citizenship, because that information is required by the federal REAL ID Act. 49 U.S.C. § 30301, note, Sec. 202(c)(2)(B), incorporated into 6 C.F.R. § 37.3; Tr. 1203:1-17. When a voter is matched through the citizenship verification process, any citizenship information in the DDS database is returned to the Secretary's office. Tr. 1200:12-18.

866.    HAVA also requires States who use the federal registration mail-in form to ask whether the applicant is a United States citizen.  52 U.S.C. § 21083(b)(4)(A)(i).

867.    If an individual has previously provided documentary proof to DDS that they were not citizens of the United States, but later registers to vote without providing further documentation, county election officials send a letter to the voter requesting additional information. Tr. 375:8-25; PX. 1231. As witnesses testified without contradiction, non-citizenship flags occur only when an applicant himself or herself provides some evidence of non-citizenship to the State (and typically DDS).  Tr. 3582:12-16.  This usually happens in the context of a non-citizen seeking a limited purpose driver's license, which acknowledges their citizenship status.

286

868.   Plaintiffs did not produce a single witness who was unable to understand the letter regarding what documentation was required to prove citizenship status.

869.   Based on decisions of the Secretary, and only at some point in 2019 and afterwards, the citizenship flag can be overridden by county election officials when a voter provides proof of citizenship. Tr. 386:9-19; 3590:6-3591:5. Proof of citizenship can be provided before showing up to vote or at the polling place. Tr. 375:21-25; PX. 1231.

870.   Further, the Secretary's office has utilized the Systematic Alien Verification for Entitlements (SAVE) administered by United States Citizenship and Immigration Services (USCIS) to verify citizenship of voter registration applicants having an Alien Registration Number on file. Tr. 1680:15-1681:24.

871.   Pursuant to O.C.G.A. § 21-2-216(g)(2)(D), satisfactory evidence of United States citizenship includes the alien registration number from the applicant's naturalization documents if it is verified with USCIS, confirming the applicant's United States citizenship.

872.   If only the alien registration number from an applicant's naturalization documents is provided as evidence of United States citizenship, the Secretary is required to attempt to verify the applicant's alien registration

number with USCIS utilizing the SAVE program. Ga Comp. R. & Regs. 590-8-1-.02(2)(b)(1).

873.    As Plaintiffs' expert, Dr. Mayer, testified, using SAVE in the citizenship verification process would decrease the number of voters in pending status for citizenship. Tr. 441:21-24; 510:9-15. And in fact, the Secretary's office moved everyone whose citizenship verified using SAVE into active status. Tr. 1690:1-14. After that audit, only 2,258 people remain in pending citizenship status out of more than seven million active registered voters in Georgia. Tr. 1684:6-13; Doc. No. [829-9] at 4. That means the number of registrants in pending status for citizenship following the audit is equal to 0.0296% of all registered voters.

874.    Plaintiffs agree with the State's decision to utilize the SAVE database, they would just prefer that it be implemented faster and perhaps used more frequently when checking for citizenship status.

A.   Plaintiffs First and Fourteenth Amendment Claim Against HAVA Match and Citizenship Verification Fails

875.    As to their Anderson-Burdick challenge to HAVA Match, the Plaintiffs have not shown a material burden on the right to vote caused by being in Active-MIDR status. In fact, Plaintiffs identified **no voter** who was actually in

Active-MIDR status, let alone one burdened by it. Consequently, Plaintiffs'

evidence on injury comes only from Dr. Mayer's general review of academic

literature that contends poll workers sometimes exercise discretion in

discriminatory manners. Tr. 403:14-405:13. This Court affords this evidence little

weight for several reasons. It is theoretical and hypothetical, despite Plaintiffs'

access to over 3,000 declarations from voters. Tr. 1098:21-1099:16. Dr. Mayer

explained that he did not research if this was the case in Georgia. Tr. 404:17-

405:13.

876.   The same is true of Plaintiffs' First and Fourteenth Amendment

challenge to the citizenship verification process.  While Plaintiffs provided

testimony from four individuals who had an issue with the citizenship process,

the two who sought to vote could with apparently little effort.  The remaining

two witnesses had the ability to demonstrate their citizenship but chose not to.

The injury alleged, therefore, is outweighed by the State's interest in having only

United States citizens exercise the franchise.

i.   *The Burden Imposed.*

877.   The evidence presented demonstrates that the Georgia matching

process, and identification requirement for voters who do not match, comports

with existing federal law. Voters who fail to match with DDS actually have more

forms of identification they may present when they first vote in person than voters who match, because those non-match (i.e., Active-MIDR) voters may present non-photo forms of identification the first time they vote. Thus, this Court cannot discern any appreciable burden imposed when being in the Active-MIDR status provides **more** opportunities to prove identification and not less.[34]

878.   This Court also concludes that Plaintiffs' concerns about the letter notifying voters of Active-MIDR status produces a minimal, if any burden. Plaintiffs' expert, Dr. Mayer, testified that the letter sent to voters in Active-MIDR status **might** confuse voters, but he did not conduct any research in Georgia to determine if there was any MIDR-related confusion among voters after HB 316 was enacted. Tr. 458:11-14.

879.   The Court reaches the same conclusion—that the burden associated with the State's policy is low—with regard to citizenship verification.

880.   First, establishing citizenship does not appear difficult in Georgia Dr. Kefeli did so with an email. PX. 2049, Tr. 33:20-23. Ms. Hamalainen and Dr. Ansa could have done so, but for personal reasons chose not to. PX. 2048, Tr. 17:23-25; 28:2-5,29:21-25 (Hamalainen); PX. 2096, Tr. 20:7-16 (Ansa). Ms. Ashling

---

[34]  It is well settled that having to show a photo identification to vote is not an unconstitutional burden. <u>Crawford</u>, 553 U.S. at 200-203.

testified that Ms. Tran resolved her potential issue at the Gwinnett County election office within 30 minutes. Tr. 316:9-13. Ms. Ozgunes would not have the same issue she did prior to the Secretary's change in policy in 2019. Tr. 3590:6-3591:5, PX. 89. And, Linyan Fu's situation was responded to in minutes and resolved in just over 48 hours. PX. 892.

881.    Similarly, the letter voters in pending citizenship status receive does not impose severe burdens on the right to vote. No witness testified that they were confused by the letter, and the three witnesses that received one—Ms. Hamalainen, Dr. Ansa, and Dr. Kefeli—each indicated they understood the letter. PX. 2048, Tr. 13:18-14:2, 14:22-24, 24:20-25, 27:17-19 (Hamalainen); PX. 2096, Tr. 20:6-7 (Ansa); PX. 2049, Tr. 33:15-24 (Kefeli). Individuals placed in Active-MIDR status are mailed a letter notifying them of the kinds of identification needed to vote. Tr. 399:21–24 (Mayer); PX. 1900. As with the letter sent for purposes of HAVA Match, Plaintiffs contend the notification letter could be enhanced or otherwise improved, but they offered no evidence that the letter was inaccurate. In addition, this Court deems changes to the text of an otherwise accurate letter, at best, falls into the types of ideas that may be "good" but not mandated by federal law.  See New Georgia Project, 976 F.3d at 1284.

882.   Third, the burden imposed on voters who are in the pending status for citizenship verification is the same as others who are obtaining a Georgia driver's license, which is how most Georgians register to vote. See Ga. Comp. R. & Regs. 183-1-6-.06, 590-8-1-.02.

883.   Fourth, the State's use of the SAVE database significantly mitigates any alleged burden with the citizenship verification program.

884.   These non-existent injuries, both in terms of HAVA Match and citizenship verification, are the kind of are the kind impose only the kind of "nominal effort of everyone [and] are not severe." Crawford, 533 U.S. at 205 (2008) (Scalia, J., concurring). And, they arise from the State's "reasonable, nondiscriminatory restrictions." Burdick, 504 U.S. at 434 (1992)).

ii.   *The State's Interest*

885.   These minimal (if any) burdens do not outweigh the State's articulated interests in the HAVA Match program and seeing that only Untied States citizens vote. See Timmons, 520 U.S. at 358. In addition to complying with federal law, State witnesses testified that the HAVA match program prevents the same person from registering with various aliases, demonstrates the voter is an actual person, and helps weed out false registrations. Tr. 3604:11-3606:24. The Eleventh Circuit has said that "deterring voter fraud is a legitimate policy on

which to enact an election law, even in the absence of any record evidence of voter fraud." <u>Greater Birmingham Ministries</u>, 992 F.3d at 1334. This record established substantiated concerns about voter fraud, <u>see</u>, <u>e.g.</u>, PX. 97 (discussing confirmed forgeries of voter registration), and vote dilution, which can be the same as vote denial. Tr. 3821:7-17.

886.   Under Georgia law, non-citizens are not allowed to vote in elections for public office. GA CONST Art. 2, § 1, ¶ II; O.C.G.A. § 21-2-216(a)(2). Plaintiffs went to great pains to say that they were not challenging this policy and agreed that pursuing this goal was a legitimate state interest. Tr. 4330:7-10 ("We are not asking that non-citizens be allowed to vote.  I know this Court knows that.  We have only ever agreed that Georgia has a legitimate interest in preventing non-citizens from voting.") (Lawrence-Hardy). If the State has an interest in only having citizens vote, it necessarily follows that the State has an interest in policies that seek to achieve that constitutional requirement.

887.   Consequently, to the extent HAVA Match poses any minimal burden on voters, such is sufficiently outweighed by the State's legitimate interests in facilitating compliance with HAVA's additional photo ID allowances and preventing voter fraud and vote dilution. In short, HAVA Match passes the

Anderson-Burdick analysis this Court finds that the State's implementation of

HAVA match is constitutional under the First and Fourteenth Amendment.[35]

888.   The need for these policies is supported by other evidence in the

record. Even Dr. Mayer, Plaintiffs' expert, testified that, according to data sources

tracking cases of election fraud that he reviewed, there have been cases of

noncitizens registering to vote over the past 20 years. Tr. 374:15-17. And, Dr.

Mayer agreed that non-citizens could be placed on the voter rolls if all of the

individuals in pending status were moved to active registered status. Tr. 439:25-

440:4.

889.   Accordingly, the Court finds that the minimal burdens imposed on

voters by the State's HAVA Match and citizenship verification process are

sufficiently outweighed by the State's legitimate interest in ensuring only citizens

can vote. Thus, neither practice violates the United States Constitution under the

Anderson-Burdick analysis.

---

[35] This Court has questioned why the State needs the Active-MIDR policy if it means that the voter will be treated the same (or better) than any other. This Court concludes, however, that this concern does not result in a judgment for the Plaintiffs for at least two reasons. First, Plaintiffs must show an injury and they have not. Second, the wisdom of policy decisions are not before this Court; the constitutionality of those policies is. See New Georgia Project, 976 F.3d at 1284.

B.  Plaintiffs' Section 2 of the Voting Rights Act Claim Fails As To HAVA
    Match and Citizenship Verification

890.   Plaintiffs' vote-denial challenges to Georgia's HAVA Match process
and citizenship verification are the only claim under Section 2 of the Voting
Rights Act that remains.  Doc. No. [636] at 4, n.2.

891.   "The key requirement [of Section 2 of the VRA] is that the political
processes leading to nomination and election (here, the process of voting) must
be 'equally open' to minority and non-minority groups alike." Brnovich, 141 S.
Ct. at 2337. "Unlike discrimination claims brought pursuant to the Fourteenth
and Fifteenth Amendments, which require proof of both discriminatory intent
and actual discriminatory effect, the language of Section 2(a) of the VRA requires
only proof of discriminatory 'results,' not of discriminatory intent." Greater
Birmingham Ministries, 992 F.3d at 1328–29.

892.   In Brnovich, the Supreme Court addressed the application of Section
2 in the context of vote-denial claims like Plaintiffs pursue here. Brnovich held
that, in vote denial claims arising under Section 2, "equal openness remains the
touchstone," id. at 2338, and the Court provided several circumstances or
guideposts found to have a "logical bearing on whether voting is 'equally open'
and affords equal 'opportunity'" under the totality of the circumstances. Id.

893.   <u>Brnovich</u> did not dispense entirely with the factors evaluated in <u>Gingles</u>, 578 U.S. 30, 36–37 (1986), but it did caution that the <u>Gingles</u> factors were "designed for use in vote-dilution cases," and may be inapplicable to vote-denial claims involving facially neutral time, place, and manner restrictions. <u>Brnovich</u>, 141 S. Ct. at 2340.

894.   Consequently, and as it did at summary judgment, this Court reviews the evidence on HAVA match and citizenship verification under the totality of the circumstances, in the light of both the <u>Brnovich</u> guideposts and the <u>Gingles</u> factors.

i.   *Applying the* Brnovich *Guideposts*

895.   The first <u>Brnovich</u> guidepost requires courts to consider the "size of the burden imposed by a challenged voting rule." <u>Id.</u> at 2338. In this regard, "mere inconvenience" will not suffice because "every voting rule imposes a burden of some sort." <u>Id.</u> However, the concepts of openness and opportunity as envisioned by Section 2 of the VRA do "connote the absence of obstacles and burdens that block or seriously hinder voting." <u>Id.</u>

896.   Based on the admitted evidence presented at trial, and as discussed more fully above in the <u>Anderson</u>-<u>Burdick</u> analysis, this Court concludes that any burdens imposed on voters by the citizenship verification procedure and the

296

HAVA Match process—specifically, being placed in Active-MIDR status—are slight. <u>See</u>, <u>e.g.</u>, Tr. 4141:7–25, Tr. 4142:1–11 (Germany); Tr. 3577:18–20 (Harvey).

897.    Also, as with the <u>Anderson-Burdick</u> analysis, Plaintiffs' alleged burdens on the HAVA-match aspect of the Section 2 challenge remain hypothetical: no voter testified they were impacted by an Active-MIDR "flag." Simply put, this is, at most, the type of mere inconvenience that <u>any</u> election regulation imposes and thus this Court concludes that this factor weighs against finding a Section 2 violation.

898.    Second, <u>Brnovich</u> suggests examination of the "degree to which a [challenged] voting rule departs from what was standard practice when § 2 was amended in 1982" since, after all, it is doubtful "that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." <u>Id.</u> at 2339.

899.    On this factor, this Court finds that the evidence is a mixed bag with the HAVA-match process but weighs in the State's favor on citizenship verification.

900.    On HAVA match, Congress enacted the law in 2002, some twenty years following congressional amendment of Section 2 in 1982. And HAVA essentially spurred the current HAVA Match process because it requires an

electronic comparison of voter rolls to information held by DDS, 52 U.S.C. §

21083(a)(5)(B)(i), and it necessitates a mechanism to indicate first-time registrants

that are subject to its expanded identification provisions, 52 U.S.C. §

21083(b)(2)(A).

901.    However, at the time of the 1982 congressional amendment to

Section 2 of the Voting Rights Act, Georgia law required registrants provide their

local registrar or deputy registrar "proper identification" at the time of

registration. 1981 Ga. L. p. 1719 (H.B. 405).[36] Such "proper identification" could

be satisfied by "exhibiting a valid driver's license, birth certificate, or any other

document as will reasonably reflect the true identity of the applicant." Id. Thus,

while not comparing records between government agency databases at the time

of the 1982 amendment to the VRA, this prior law did serve a similar purpose of

ensuring the registered voter is an actual person and protecting against false

registrations. Tr. 3604:11–19, 3605:20–3606:8 (Harvey).

902.    And, as it relates to citizenship verification, the Georgia Constitution

makes United States citizenship a requirement of voter registration.  See Ga.

Const. art. 2, sec. 1, par. 2.  This was at least the case in the 1976 Constitution.  Ga.

---

[36] This session law is available through the University of Georgia at:
http://neptune3.galib.uga.edu/ssp/cgi-bin/legis-
idx.pl?sessionid=7f000001&type=law&byte=420472739.

Const. art. II, sec. I, par. II (1976).  The use of a birth certificate as a means of establishing identification—and citizenship—speaks to the State's policy of trying to enforce the citizenship requirement prior to 1982.

903.    In the light of these facts, this Court finds that the statutorily required HAVA matching process is a departure from the standard practice of 1982, but it is one of relatively small degree. Compare 1981 Ga. L. p. 1719 (requiring registrant exhibit driver's license, birth certificate, or other documentation) with O.C.G.A. § 21-2-417(c) (providing that MIDR voters may resolve the issue by presenting a government identification or a copy of a utility bill, bank statement, government check, paycheck, or other government document). The opposite is true for the citizenship verification process. Consequently, this guidepost counsels slightly in Plaintiffs' favor as to HAVA-Match and for the Defendants on citizenship verification.

904.    Third, Brnovich points courts to the "size of any disparities in a rule's impact on members of different racial or ethnic groups." Brnovich, 141 S. Ct. at 2339. The Brnovich Court noted that "even neutral regulations, no matter how crafted, may result in some predicable disparities … but the mere fact there is some disparity in impact does not necessarily mean that a system is not

equally open or that it does not give everyone an equal opportunity to vote." Id.

For this reason, a "meaningful comparison is essential." Id.

905.    Plaintiffs' expert Dr. Mayer provided testimony on alleged racial disparities pertaining to the HAVA Match process. Specifically, Dr. Mayer's report indicates that there were 60,377 registrants in MIDR status as of January 2020. PX. 1278 at 16. Of those in MIDR status, 69.4% were African American; 11.4% were white non-Hispanic; 5.7% were Hispanic; 3.3% were Asian or Pacific Islander; 3.4% were other or two or more demographic categories; and 7% were unknown. Id. at 18. Consequently, HAVA Match does demonstrate disparate impact in this regard.

906.    The evidence showing a disparate impact with regards to the State's citizenship verification is less clear.  As shown above, Dr. Mayer's supplemental report and testimony showed a very small percentage of Georgia voters with pending citizenship status.  Tr. 365:17-366:5; 370:18-24; PX. 1999 at 6.  Much of the criticism was levied at the State's purported "error rate" of misidentifying naturalized (or otherwise) United States citizens as being non-citizens.[37]  Tr.

---

[37] The reason for this purported error rate, however, as discussed above, is that DDS records are based on what people reported when they last got their driver's license or I.D. card, so naturalized citizens who do not update their status with DDS still show as a noncitizen in DDS's database. Tr. 366:24-367:13 (Mayer).

365:12-14. Dr. Mayer could not, however, explain how many of the small voters in pending citizenship status were actually United States citizens, and neither can the Court.  Tr. 438:4-7; see also 504:3-12 (acknowledging some persons identified as citizenship pending were likely not United States citizens). Nor could Dr. Mayer explain how many people in the pending citizenship poll had actually offered proof of citizenship.  Tr. 438:4-10; 449:7-8. Under these circumstances, the Court cannot conclude that Plaintiffs have shown a disparate impact as it relates to citizenship verification.

907.    However, the analysis does not end on this point.  In Brnovich, the Supreme Court instructed courts to make a "meaningful comparison" when assessing the impact of a voting regulation and cautioned against the use of misleading statistics. 141 S. Ct. at 2339, 2345. The Court specifically rejected comparing evidence of disparate impact without consideration for the totality of the policy's impact, specifically including the percentage of voters that were unaffected by the policy in question. Brnovich, 141 S. Ct. at 2345 ("A procedure that appears to work for 98% or more of voters to whom it applies—minority and non-minority alike—is unlikely to render a system unequally open."). Viewed in this light, and even if the Court concluded the citizenship verification policy caused a disparate impact, the testimony at trial demonstrates a minimal

301

disparity for both HAVA match and citizenship verification, and one for which Plaintiffs have not provided evidence of statistical significance.

908.    Applying <u>Brnovich</u>'s command here, it is evident that the Active-MIDR flag represents the very rare exception and undermines Plaintiffs' contention that Georgia voting is not equally open to all.  Specifically, HAVA Match does <u>not</u> affect over 99.1% of voters in Georgia, including roughly 98% of African American registrants, 98.5% of Hispanic registrants, and 98.8% of Asian or Pacific Island registrants. PX. 1278 at 19. Even accepting the existence of <u>some</u> disparity in these numbers though, Plaintiffs' experts provided no evidence that the voters identified were incorrectly placed in Active MIDR status.

909.    In fact, even if some injury could be associated with Active-MIDR status, Dr. Mayer's analysis of voters in the Active-MIDR status can be explained by reasons other than race. This Court heard testimony about voter drives and registration efforts that focused on minority communities. Chris Harvey explained that voter drives utilizing paper registration forms can lead to more inaccuracies over registration occurring online (through DDS or otherwise). Tr. 3508:7-11. Considering the totality of the evidence, this is a more plausible explanation of the phenomenon identified by Dr. Mayer and further lessens the weight this Court will apply to Plaintiffs' assertion of disparate impact.

910.    Consequently, this Court finds that this <u>Brnovich</u> guidepost does not demonstrate the sort of disparate impact that indicates a lack of openness of the electoral process to all voters as Section 2 protects.

911.    Fourth, <u>Brnovich</u> instructed courts to "consider the opportunities provided by a State's <u>entire</u> system of voting when assessing the burden imposed by a challenged provision." 141 S. Ct. at 2339 (emphasis added). In other words, "where a State provides multiple ways to vote," any burden imposed by one of those available methods "cannot be evaluated without also taking into account the other available means." <u>Id.</u>

912.    This Court finds that this guidepost counsels in favor of the Defendants on both HAVA-match and citizenship verification. As discussed, and as a practical matter, the MIDR flag about which Plaintiffs complain arises most frequently with paper applications that misidentify a Georgia driver's license number, state identification number, or last four numbers of the registrant's social security number.  And, absent such misidentification, it arises only for first time registrants.  Because, in Georgia, the vast majority of voters register through automatic voter registration at DDS—not paper applications. Indeed, individuals who register to vote through the Department of Drivers Services—as is the case

303

with the vast majority of Georgia voters—are not affected by this process at all. Tr. 1950:12–1951:14; 4225:20–24 (Harvey).

913.    Moreover, as to HAVA match, voters' addresses and information are presumptively updated in the voter rolls each time they obtain a new driver's license from DDS unless they "opt-out" of doing so. And, for those who are placed in Active MIDR status, Georgia law provides numerous methods for them to resolve the issue. See Doc. No. [617] at 54 (noting the ease of re-registering to resolve a list-maintenance issue).

914.    On citizenship verification, individuals have several means of proving citizenship, including alien verification number, driver's license, passport, birth certificate, naturalization documents, and certain federal forms.[38] Ga. Comp. R. & Regs. 183-1-6-.06; 590-8-1-.02.  This prevents individuals from being locked into one document or another and opens up numerous opportunities to register to vote.

915.    Finally, "in determining 'based on the totality of circumstances' whether a rule goes too far, it is important to consider the reason for the rule."

---

[38]  Even if this were not the case, the Court would still conclude this factor weighs in Defendants' favor. Testimony demonstrated that citizens may register to vote using federal forms which require only an affirmation of citizenship. Tr. 359:24-360:18 (Mayer); see also PX 1313 at 7.

Brnovich, 141 S. Ct. at 2339–40. In other words, this Court must consider "the strength of a state's interests served by a challenged voting rule." Id.

916.    Here, as discussed above with regard to the Anderson-Burdick analysis, Defendants have offered several state interests in support of the HAVA Match and citizenship verification processes.  Each are all strong and legitimate state interests for Section 2 purposes as well.

917.    Consequently, this Court finds that this Brnovich guidepost counsels in favor of the Defendants. The State's interest in complying with the law as written is, alone, sufficient to justify the minimal or non-existent burden of Active MIDR status. And the State's additional interest only further support this finding. This Court will not insert itself into the minutiae of election administration to re-name an internal identifier which itself does not impose a burden in practice—especially in the absence of any concrete evidence of actual burdens occasioned upon voters by this Active MIDR Status.

ii.  *Applying the* Gingles *Factors to HAVA Match and Citizenship Verification.*

918.    Separate from the Brnovich guideposts, the Supreme Court previously identified a "non-exhaustive list of factors" to consider in a "totality of the circumstances" analysis, derived from the Senate Judiciary Committee Report accompanying the 1982 amendment to Section 2. Gingles, 478 U.S. 30.

These factors are: (1) the extent of any history of official discrimination in the state; (2) the existence of racially polarized voting; (3) the use of election practices like anti-single shot provisions, unusually large election districts, and majority-vote requirements; (4) the use of candidate slating processes denying access to minority candidates; (5) the effects of past discrimination in areas like health and education which persist and impact effective minority participation in elections; (6) whether campaigns have been characterized by overt or subtle racial appeals; and (7) the extent to which members of the minority group have been elected to public office. Gingles, 478 U.S. at 36–37.

919.    This Court in Brnovich noted, however, that the Gingles factors "grew out of and were designed for use in vote-dilution cases," rendering some apparently less relevant or inapplicable to a vote-denial case like this one. Brnovich, 141 S. Ct. at 2340; see also Greater Birmingham Ministries, 992 F.3d 1299, 1331–32 (11th Cir. 2021) (questioning applicability of Gingles factors in vote-denial cases). Moreover, the Plaintiffs in this case have presented no evidence that they have satisfied the Gingles preconditions.

920.    This Court agrees that the State of Georgia has a long and sad history of racial discrimination in its past. Notably, however, Plaintiffs and their experts have not offered any significant evidence of more contemporary matters

306

relevant to this factor and have proffered none occurring within the past thirty years.

921.    Nor have Plaintiffs or their experts credibly or otherwise opined that the current HAVA Match or citizenship verification processes are connected in any way to Georgia's history of racial discrimination. Consequently, this Court finds that this <u>Gingles</u> factor is satisfied, but notes that such unconnected historical evidence is not dispositive. <u>Greater Birmingham Ministries</u>, 992 F.3d at 1332 (cautioning against allowing unconnected historical matters to preclude a state's ability to enact voting legislation).

922.    As recognized by <u>Brnovich</u>, "[f]actors two, six, and seven (which concern racially polarized voting, racially tinged campaign appeals, and the election of minority-group candidates)," have a bearing on the opportunity of minority groups to elect candidates of their choice, but in vote-denial claims, their only apparent relevance is to bolster factor one (the history of discrimination) and factor five (persisting effects of discrimination). 141 S. Ct. 2340. With this in mind, this Court nonetheless address these factors as part of the totality of the circumstances inquiry. <u>Id.</u>

923.    Dr. McCrary provided evidence of racially polarized voting in his expert report and this Court credits this testimony. PX. 1289. This Court notes

however, that Dr. McCrary did not perform any analysis of his own to come to that conclusion, relying instead on the analysis of others. PX. 1289 at pp. 28–38.

924.   On the other hand, Plaintiffs did present several campaign videos, news articles, and social media postings to presumably demonstrate the existence of racial appeals in campaigns. See PXs 1653, 1655, 1669, 1666, 2165, 2164, 2172. However, Plaintiffs provided no testimony—expert or otherwise—to the effect or meaning of these postings and, standing on their own, this Court ascribes little weight to those exhibits.

925.   Further, Plaintiffs' offering of scattered examples over the span of several years does not demonstrate what this Gingles factor requires: whether Georgia political campaigns have been characterized by racial appeals. Gingles, 478 U.S. at 37 (emphasis added). Indeed, Plaintiffs offered such examples with respect to numerous unsuccessful and/or "fringe" campaigns and other instances that were not made in the course of any campaign.

926.   Given the absence evidence that can fairly support a conclusion that Georgia campaigns may be fairly "characterized" by racial appeals, this Court cannot find for the Plaintiffs on this factor. This Court further places only limited evidentiary value on these exhibits lacking any testimonial context.

927.    Plaintiffs also noted—through argument of counsel—that only three black candidates had been elected to non-judicial statewide office. However, Plaintiffs provided no testimony concerning their limitation to candidates of a non-judicial nature and this Court notes that several other Black candidates have been elected to statewide judicial office.

928.    This Court further notes that, while appointed and not elected, another Black individual held the Office of Secretary of State and was a Defendant in this suit in her official capacity: former-Secretary, now Commissioner of the Georgia Department of Revenue, Robyn Crittenden. Finally, this Court also notes that the Plaintiffs neglected to include another elected statewide Black official: Public Service Commissioner David Burgess, elected in 2000. See Ga. Public Service Comm'n to Hold Portrait Hanging Ceremony for Former Commissioner Burgess (Oct. 13, 2021), available at https://psc.ga.gov/site/assets/files/6341/news_release_burgess_picture_10-13-21.pdf. This Court takes judicial notice of this fact. United States v. Howard, 28 F.4th 180, 186 n.2 (11th Cir. 2022) ("[W]e can take judicial notice of . . . a publicly available state agency record.")

929.    This Court also takes judicial notice of the May 24, 2022 primary election results in that, regardless of the outcome of the general election, at least

the office currently held by Senator Warnock, and the office currently held by Public Service Commissioner Fitz Johnson (District 3), will be likely be filled by a Black candidate since the nominees of both major political parties, for both races, are Black.

930.   Separately, this Court also recognizes that while Plaintiffs seek statewide relief, their reliance solely upon statewide candidates fails to paint a full picture. Plaintiffs presented no evidence of minorities' lack of ability to elect candidates of their choice to congressional office, the Georgia General Assembly, or local offices.

931.   In light of these findings, and the lack of record evidence as opposed to argument by counsel, this Court again cannot find this factor weighs conclusively in Plaintiffs' favor. This Court finds that Plaintiffs are correct in that a small number of Black candidates have been elected to statewide, non-judicial office in Georgia. But without more, and without any connection to the HAVA Match or citizenship verification processes, this Court finds the weight of this evidence limited.

932.   With respect to factor three, this Court notes the existence of at least one form of the identified elections practices—the use of majority-vote requirements. However, this Court notes again that Georgia's majority vote

310

requirement is not in dispute and has been upheld by the Eleventh Circuit Court of Appeals. Brooks v. Miller, 158 F.3d 1230 (11th Cir. 1998).

933.   Likewise, this Court notes that Senator Warnock, one of the statewide Black elected officials identified by Plaintiffs' counsel, obtained office by winning a runoff election to the United States Senate and outpacing his fellow white Democrat running for the other Senate seat, thus calling into question whether Georgia's majority-vote requirement "enhance[s] the opportunity for discrimination against [minorities]." Gingles, 478 U.S. at 37.

934.   Finally, Dr. McCrary provided testimony concerning certain socioeconomic Census data in his report, particularly regarding relative educational attainment and income along racial lines, but he conducted no analysis beyond looking at and reporting the Census data. Tr. 284:20-285:5. Consequently, this Court credits the existence of health, educational, and income disparities along racial lines, but ascribes only limited weight to the factors when considering the weight of other evidence and actual testimony. With respect to the weight given to this Gingles factor, this Court also notes that Dr. McCrary did not identify any connection between the HAVA Match or citizenship verification processes and these lingering socioeconomic disparities.

iii. *Conclusions regarding HAVA Match and Citizenship Verification under Section 2.*

935.   In light of the analysis above, this Court finds Plaintiffs have failed to carry their burden in showing that the HAVA Match process violates Section 2 of the Voting Rights Act. Considering the totality of the circumstances, this Court concludes that Georgia's HAVA Match and citizenship verification processes do not result in the denial of the right to vote on account of race.

936.   Specifically, this Court finds that the MIDR flag imposed via the HAVA Match process occasions only a slight burden on voters — a burden which does not preclude them from registering to vote and requires no significant effort beyond that of any other Georgia voter to resolve. The same is true of pending citizenship status: testimony demonstrates that the voters either resolved the issue (and quickly) or could have and chose not to.

937.   This Court likewise concludes that the HAVA Match process represents only a minor departure from historical practice present in 1982 and, further, that the disparity of its impact is minor.  For citizenship verification, the process is a continuance of at least the 1976 Constitution; this is enough. Relatedly, this Court also credits (1) the numerous other avenues for voter registration provided in Georgia which do not implicate the MIDR flag; and (2)

the varied ways to establish United States citizenship for purposes of voter registration.

938.    And this Court also notes that there is no evidence in the record of less-burdensome alternative means which reduce any burden imposed beyond the scope necessary to vindicate the State's interests. Indeed, the State's interests of complying with federal law, confirming the identity of voters, and preventing voter fraud are more than sufficient to justify the process the State has chosen by which to identify voters who may utilize additional options to verify their identity.

939.    With respect to the Gingles factors, this Court finds that several have been met. But this Court also finds the Gingles factors to be of less direct relevance to this vote-denial case. See Brnovich, 141 S. Ct. at 2340 (2021) ("We do not suggest that these factors should be disregarded. After all, § 2(b) requires consideration of 'the totality of circumstances.' But their relevance is much less direct.").

940.    Further, and as discussed more fully below, the Plaintiffs' proposed remedies on HAVA match and citizenship verification are so detail oriented (e.g., redrafting a notice letter) that it falls outside the Court's expertise, or there is no evidence of efficacy, or there is no evidence that the Plaintiffs' preferred method

of election administration would result in comparatively better numbers and outcomes than the status quo while still working toward achieving the State's non-discriminatory and strong state interests.  This matters.  See Burton v. City of Belle Glade, 178 F.3d 1175, 1199 (11th Cir. 1999) (requiring a Section 2 plaintiff to provide a workable remedy to any alleged violation).

941.    In sum, this Court finds Plaintiffs have not met their burden under Section 2 of the VRA to demonstrate that the HAVA Match or citizenship verification processes renders Georgia's elections not "equally open" when considering the totality of the circumstances as required by VRA Section 2(b). 52 U.S.C. § 10301; see also Brnovich, 141 S. Ct. at 2338.

942.    As a result, there has not been any showing that the election system is not "equally open" by Georgia's compliance with federal law regarding matching processes. Brnovich v. Democratic Nat'l Comm., 141 S. Ct. 2321, 2337 (2021).

C. Plaintiffs' Fifteenth Amendment and Fourteenth Amendment Equal Protection Claim Fails As To HAVA Match and Citizenship Verification

943.    A successful equal protection claim under the Fourteenth Amendment requires proof of both an intent to discriminate and actual discriminatory effect. Greater Birmingham Ministries, 992 F.3d at 1321. As does a

314

Fifteenth Amendment claim. Id. ("[T]he Supreme Court has long recognized that evidence of a racially discriminatory motivation is required for Plaintiffs to prevail on a Fifteenth Amendment claim."). Here, Plaintiffs have not shown that State's decision to enact HAVA Match or its citizenship verification policy, and Defendants' implementation of those policies, was motivated by racial animus or that such has a discriminatory effect. See Greater Birmingham Ministries, 966 F.3d at 1225.[39]

944.   The only evidence Plaintiffs offer to demonstrate a discriminatory motivation are two campaign speeches by then-Secretary Kemp in 2014 and 2018. Then-Secretary Kemp urged his supporters to register voters that would vote for Republican candidates and encourage them to vote in the same way that Democrats had previously done with minority voters. PX. 73, Tr. 86:9-17; 88:9-17; 92:18-22.

---

[39] At summary judgment, the Court found that Plaintiffs' geographic equal protection claim survived because the evidence was unclear as to whether "county officials [were] guided by clear rules." Doc. [617] at 83.  Evidence changes this conclusion, specifically the Court's finding that counties play no role in HAVA Match (or Citizenship Verification); the process is carried out by the Secretary and DDS on a statewide basis. Tr. 3574:4-19 (Harvey); Tr. 1192:2-3 (McClendon).  Accordingly, Plaintiffs' geographic equal protection challenge to HAVA Match fails.  In addition, there is no evidence that HAVA Match has impacted voters differently in different parts of the State.

945.    At a 2018 campaign fundraiser, then-Secretary Kemp expressed concern about early voters primarily voting for Democrats and the number of absentee ballot requests, but the concerns expressed in his comments were again aimed at his opposition's extensive get-out-the-vote efforts and address those efforts by getting Republicans to also engage in get-out-the-vote and voter registration efforts (as opposed to blocking the efforts of political opponents). PX. 73, Tr. 108:2-8; 109:14-1; 110:1-4; 110:11-15. However, these statements were not contemporaneous with the adoption of the Challenged Policies. Greater Birmingham Ministries, 966 F.3d at 1225 (citing Arlington Heights, 429 U.S. at 267–68). They were campaign speeches, purely political in nature, and the type of rhetoric one would normally expect from a candidate for public office seeking to get out the vote of his or her supporters. More importantly, when viewed in their entirety, then-candidate Kemp's statements were plainly about efforts to encourage conservative voting and voting registration efforts in the light of effective work to do the same by political opponents.  Put differently, the Kemp campaign focused on increasing numbers, not decreasing them.  This Court specifically does not find Governor Kemp's comments as direct or circumstantial evidence any discriminatory intent behind the decision to enact and implement HAVA Match or citizenship verification.

946.    This Court also finds that the evidence of the impact of the challenged HAVA Match and citizenship verification laws does not support a finding of discriminatory intent under the <u>Arlington Heights</u> factors. According to Dr. Mayer, there were 60,377 registrants in MIDR status as of January 2020, which was about 0.88% of the 6,798,488 registered voters as of December 2019. PX. 1278 at 16; 18. But Dr. Mayer did not know what impact HAVA Match would have in a statewide election and did not analyze whether voters in MIDR status as of January 2020 subsequently voted in the statewide election that year. Tr. 456:6-11; 505:22–506:2. Further, as discussed above, only a very small number and percentage of Georgia voters of all relevant demographic groups find themselves on Active-MIDR status. <u>See, supra</u>, Analysis Section II (A); PX. 1278 at 16; 18.

947.    The impact of the citizenship verification policy is equally unavailing. After the citizenship audit of registrants in pending status, only 2,258 people remained in pending status for citizenship verification out of more than seven million active registered voters in Georgia. Tr. 1684:6-13. This shows that the number of registrants in pending status for citizenship following the audit is equal to 0.0296% of all registered voters.

948.    For comparison's sake, Dr. Mayer also provided statistics about the number of voting age naturalized citizens living in Georgia from the 2014-2018 5-year American Community Survey prepared by the U.S. Government. Of the voting-age foreign-born population in Georgia, the percentage of those people who identify as Hispanic (20.9%) is identical to the percentage of the people identified as non-white Hispanic in pending status for citizenship verification (20.9%). Tr. 450:24-451:8.

949.    In total, Dr. Mayer's report shows that the African-American registrants flagged as pending for citizenship verification represent about 0.9% of the African-American voting age naturalized citizens living in Georgia at approximately the same time; along with about 0.5% of white non-Hispanic voting age naturalized citizens; 0.7% 0.5% of Hispanic voting age naturalized citizens; 0.5% of Asian or Pacific Islander voting age naturalized citizens; and 0.4% or other or two or more demographic categories voting age naturalized citizens. PX. 1278 at 18-22.

950.    Dr. Mayer did not opine on whether Georgia's voter registration practices and systems, including HAVA Match, were adopted with a discriminatory intent. Tr. 423:9-12. Similarly, Dr. McCrary did not opine that any

portion of Georgia's voter registration practices and systems were adopted with discriminatory intent. Tr. 266:5-12.

951.    However, Mr. Harvey credibly testified that he had no reason to believe that either Secretaries Raffensperger or Kemp, or any members of their staff intended to discriminate against minority voters through the HAVA Match process. Tr. 3464:19-3465:1. SEB Members offered uncontroverted testimony that the SEB did not make any offers to increase the burden on Georgia voters through implementation of the HAVA match process or otherwise, and they had not witnessed any acts of intentional discrimination by any of the Defendants in this case. Tr. 3994:15-3995:4 (Sullivan); Tr. 4087:7-9 (Mashburn). Commissioner Sullivan also testified specifically that she was unaware of any efforts by then-Secretary Kemp or Secretary Raffensperger to use the HAVA Match policy to disenfranchise voters generally or voters of color specifically. Tr. 3994:21-3994:4.

952.    Other policies enacted by the Secretary (both Kemp and Raffensperger) also belie claims that the office sought to disenfranchise or otherwise burden voters.  During Governor Kemp's tenure as Secretary, the office introduced online voter registration; the "My Voter Page," which allows voters to check their registration data before voting; a phone app that allows persons to check their registration data, and as indicated, automatic voter

319

registration with the driver's license. Tr. 3558:6-21 (Harvey). This circumstantial

evidence of then-Secretary Kemp's contemporary actions belies Plaintiffs' claim

that the two voter registration policies being challenged—HAVA Match and

citizenship verification—were enacted or implemented with a discriminatory

purpose. For his part, Secretary Raffensperger introduced the BallotTrax

program (Tr. 4183:17-4187:17 (Sterling)) and mailed every active voter an

absentee ballot application during 2020 general primary, which occurred during

the worst days of the COVID-19 pandemic. Tr. 3529:1-29 (Harvey); 4189:14-21

(Sterling).

953.    This Court has "evaluat[ed] all available direct and circumstantial

evidence of intent in determining whether a discriminatory purpose was a

motivating factor in a particular decision." <u>Burton</u>, 178 F.3d at 1189. Having

weighed the evidence and made credibility determinations, this Court finds that

Plaintiffs did not meet their burden of establishing both intent [or purpose] and

effect necessary for their Fifteenth Amendment claim. As such, this Court does

not need to consider whether Defendants have demonstrated that the laws

would have been enacted without the racial discrimination factor. <u>Greater</u>

<u>Birmingham Ministries</u>, 966 F.3d at 1225 (citing <u>Hunter v. Underwood</u>, 471 U.S.

222, 228 (1985); <u>Johnson v. Governor of Fla.</u>, 405 F.3d 1214, 1223 (11th Cir. 2005).

III.    **Plaintiffs' List Accuracy Claim**

954.    This Court did not review the Plaintiffs' List Accuracy claims at summary judgment. Doc. No. [617] at 45–46. At trial, it became clear that Plaintiffs' List Accuracy claims (arising only under the First and Fourteenth Amendments to the United States Constitution and the <u>Anderson/Burdick</u> analysis) address three issues: (1) felon match; (2) vital records match; and (3) duplicate match. Tr. 4366:3–12 (Lawrence-Hardy).  As set forth above, the Secretary has a very limited role in each of these processes, as the discretion to cancel a voter's registration lies entirely with county election officials. Tr. 765:19-766:1; 772:1-773:1; 773:11–14; 774:7-15; 873:3-5 (Hallman); Tr. 1296:14-15; 1297:14-15; 1324:1-3, 10-12 (Frechette); Tr. 3568:2-19; 3569:14-25; 3572:21-3573:6 (Harvey); Tr. 3576:14-19 (Harvey), Tr. 1315:23-1316:2 (Frechette) (duplicate match); Tr. 1324:1-3, 10-12 (Frechette) (vitals match). And, Plaintiffs are not challenging this general framework of having counties make these final decisions. Tr. 4387:18–20 (Lawrence-Hardy).

955.    Consequently, this Court will consider only those actions that have been demonstrated to arise out of acts of the State, as opposed to decisions made by local election officials. These are: (1) the eNet criteria used to flag potential matches; (2) the State's "tight match" for vital records matches and "loose

matches" that flag potential matters for the counties to resolve; and (3) the eNet criteria used to flag potential duplicate matches.

956.    The division of labor between the State and the counties is not only compliant with Georgia law[40] but also, as a practical matter, a useful and necessary tool to handle the massive scale of Georgia's voter rolls. The Election Division of the Secretary of State's office employs only sixteen people and there were, as of 2020, 7,233,601 million registered voters in Georgia. DX. 781(9). Processing, updating, and editing the individual records for every voter in Georgia is a physically impossible task for the Secretary of State's office alone.

957.    As an initial matter, while Plaintiffs contend the criteria used by the State is overinclusive, this Court concludes that each of these State decisions are the type of decisions that are best left to state governments and fall outside of this Court's expertise. See, e.g., Coalition for Good Governance, 2020 WL

---

[40] At closing, Plaintiffs argued that, despite the fact that Counites handled individual voters' data, the Secretary of State is nonetheless responsible for them. The Eleventh Circuit has already rejected this argument in Jacobson. 974 F. 3d at 1255. Moreover, to the extent that Plaintiffs meant to argue that having the counties perform these functions itself violates Georgia law or HAVA, such are not the claims before this Court nor could they be. See Goble, 682 F.3d at 949 (court cannot order an "obey the law" injunction); Bellitto, 935 F.3d at 1202 ("HAVA creates no private cause of action."). Regardless, this Court finds that the division of labor between the counties and the Secretary of State with regard to the State's voter list to be appropriate under the law. See O.C.G.A. § § 21-2-231(c); 21-2-226(a), 21-2-228(a).

2509092, at *4 (declining "to micromanage the State's election process"). This Court also concludes that Plaintiffs have not shown that any of the State's policies or decisions are the proximate cause of a significant burden on the right to vote, and that the State's interest in maintaining an accurate voter list outweighs whatever burdens the Plaintiffs have identified.

A. Plaintiffs' list accuracy claim improperly challenges the administrative details of Georgia's elections

958.   At the outset, to the extent that Plaintiffs challenged the accuracy of Georgia's voter database generally, the claim suffers from a fatal flaw: it does not challenge *laws* or *rules* to which an Anderson-Burdick analysis can reasonably be applied. See Jacobson v. Fla. Sec'y of State, 974 F.3d 1236, 1261 (11th Cir. 2020) (Anderson-Burdick provides "the legal standards that apply to **laws** that burden the right to vote.") (emphasis added). Instead, the claim focuses entirely on the administrative minutiae of Georgia's elections, including how county parties not before this Court enter data into eNet, or how the state manages risks associated with human error.

959.   The Constitution does not govern such administrative details of election law implementation. States are empowered to run their own elections and Courts are not in a position to second guess the day-to-day operations of the

Secretary of State's office. See New Georgia Project v. Raffensperger, 976 F.3d 1278, 1283-84 (11th Cir. 2020) ("[T]he Constitution sets out our sphere of decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules."); see also id. at 1285 (Lagoa, J. concurring) ("[F]ederal courts must be chary of hearing challenges to a state's duly enacted election procedures.").

960.    As the Eleventh Circuit has explained, "[a]lthough federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to . . . supervise the **administrative details** of a local election." Curry v. Baker, 802 F.2d 1302, 1314 (11th Cir. 1986) (emphasis added); see also Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980) ("If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute . . . . Section 1983 did not create a delictual action for the torts of state officials, and it did not authorize federal courts to be state election monitors."); Coalition for Good Governance, 2020 WL 2509092, at *4 (declining to "micromanage the State's election process" and dismissing the case where the "laundry list of so-called 'Pandemic Voting Safety Measures'" bore "little resemblance to the type of relief plaintiffs typically seek in election cases aimed to redress state wrongs.").

324

961.    In addition to these decisions by the Eleventh Circuit and other courts in this district, this Court finds the Seventh Circuit's well-reasoned opinion of Hennings v. Grafton, later recognized by the Fifth Circuit in precedent binding on this Court, as particularly instructive:

> [T]he record here shows at most irregularities caused by mechanical or human error and lacking in invidious or fraudulent intent; it does not show conduct which is discriminatory by reason of its effect or inherent nature. Voting device malfunction, the failure of election officials to take statutorily prescribed steps to diminish what was at most a theoretical possibility that the devices might be tampered with, and the refusal of those officials after the election to conduct a retabulation, assuming these events to have occurred, fall far short of constitutional infractions, absent aggravating circumstances of fraud or other willful conduct found not to exist by the District Court and not shown by any evidence offered.
>
> Except for the overall supervision of the county clerk, or his counterpart, and appointed subordinates, the work of conducting elections in our society is typically carried on by volunteers and recruits for whom it is at most an avocation and whose experience and intelligence vary widely. Given these conditions, **errors and irregularities, including the kind of conduct proved here, are inevitable, and no constitutional guarantee exists to remedy them**. Rather, state election laws must be relied upon to provide the proper remedy.

523 F.2d 861, 865 (7th Cir. 1975) (emphasis added); see also Saxon v. Fielding, 614 F.2d 78, 80 (5th Cir. 1980) ("The decisions from other circuits have clearly indicated an unwillingness to become embroiled in suits attacking state elections on the grounds of administrative or technical irregularities. […] We think that

325

this unwillingness to intervene in the absence of aggravating factors . . . is appropriate.") (quotation and citations omitted) (collecting cases); Shipley v. Chicago Bd. of Election Commissioners, 947 F.3d 1056, 1062 (7th Cir. 2020) ("[A]llegations [of administrative misconduct] may state a claim for violation of the [state] Election Code. But that is a state law claim for a violation of state law, not a federal claim for a violation of constitutional rights. […] Plaintiffs may have other avenues available to raise their complaints, but federal court is not one of them.").

962.   Here, Plaintiffs have put forth no evidence at trial beyond, at most, administrative shortcomings or incidents of human error that caused unfortunate, but entirely inadvertent, burdens on individual voters. Even assuming that such evidence could conceivably give rise to state court action if the conduct is shown to be in violation of state laws, which is not at issue here, they do not demonstrate violations of the First and Fourteenth Amendment of the Constitution. See, e.g., Donald J. Trump for President, Inc. v. Boockvar, 493 F. Supp. 3d 331, 391 (W.D. Pa. 2020) ("[I]t is well-established that even violations of state election laws by state officials . . . do not give rise to federal constitutional claims except in unusual circumstances.").

963.    Further, this Court agrees with the State that the proper and constitutional reading of O.C.G.A. § 21-2-231(c), requires the State to provide information of possible matches to counties, but maintains the county role of using the information to fulfill its "duty of examining from time to time the qualifications of each elector of the county." O.C.G.A. § 21-2-228(a); see also Premier Healthcare Investments, LLC v. UHS of Anchor, 310 Ga. 32 (2020) (addressing the constitutional avoidance doctrine).  The uncontested testimony is that this has been the State's longtime understanding and practice, and this Court cannot conclude that this interpretation is unreasonable, incorrect, or provides a basis of establishing liability. Even still, this amounts to a classic Pennhurst problem that this Court has previously addressed in this case. Doc. No. [188] at 15 (declining to enter injunction where the "gravamen of the complaint" was alleged noncompliance with state law) (citing Pennhurst, 465 U.S. at 107). As before, this Federal Court will not entertain such a state law claim.

964.    In sum, this Court finds that Plaintiffs' possible generalized List Accuracy claim impermissibly challenges the administrative minutiae of Georgia's election process that this Court has neither the will nor the authority to alter by judicial decree, at least under the facts and theories presented at trial.

B. <u>Plaintiffs failed to demonstrate causation on their list accuracy claim.</u>

965.    Alternatively, Plaintiffs' List Accuracy Claims fail for a lack of evidence of causation.

966.    Plaintiffs' First and Fourteenth Amendment claims arise under 42 U.S.C. § 1983. "[Section] 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." Doc. [68] at 76 (quoting <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986)) (internal marks omitted).

967.    Section 1983 "focuses [a court's] inquiry on whether an official's acts or omissions were the cause—not merely a contributing factor—of the constitutionally infirm condition." <u>Buckman v. Halsey</u>, No. 20-13596, 2021 WL 4127067, at *3 (11th Cir. Sept. 10, 2021) (quotations omitted). This is consistent with the general rule that plaintiffs alleging a claim under Section 1983 must establish causation with more than a cause-in-fact analysis, as is the case with common law torts vote. <u>Smith v. City of Oak Hill, Fla.</u>, 587 F. App'x 524, 527 (11th Cir. 2014). The complained-of conduct must also be the proximate cause of the harm. <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1168 (11th Cir. 2000); <u>Smith</u>, 587 F. App'x at 527. An act or omission is a proximate cause of a harm if it appears from

the evidence that such harm was a reasonably foreseeable consequence of the act or omission. Jackson, 206 F.3d at 1168.

968.   Applying those principles to Plaintiffs' List Accuracy claims, this Court concludes that the claims fall short of establishing constitutional causation.

969.   First, other than with vital records, any discretion in deciding whether to remove a voter from the statewide voter database is found at the county level. And, without evidence demonstrating anything to the contrary, any irregularities shown by the Plaintiffs appear to have occurred as a result of human error at the county level. Even if these irregularities led to an undue burden on the right to vote, Plaintiffs have not proven they were at the hands of the State as opposed to the individual county actors conducting the day-to-day activities and decisions with respect to the voter registration list. This matters. Under Section 1983, the "causal relation does not exist when the continuum between [the] [d]efendant's action and the ultimate harm is occupied by the conduct of deliberative and autonomous decision-makers. A defendant's actions are not the proximate cause of a plaintiff's injury where there was an independent intervening cause." Buckman v. Halsey, No. 20-13596, 2021 WL 4127067, at *3 (11th Cir. Sept. 10, 2021) (quotations omitted).

970.   Second, no witness testified that an error with the statewide voter database is proximately caused by the State's criterion for felon, vital, or duplicate matching. Moreover, despite ample opportunity to do so, Plaintiffs **never presented a county election official** or other witness to substantiate Plaintiffs' speculative assertions that the issues experienced by voters were caused by the Secretary's selection of these criteria or other management efforts of the voter registration database. This Court will not make the presumption in Plaintiffs' favor, as it is Plaintiffs who bear the burden of proof.

971.   An example is the situation faced by Andre Smith, the sole witness for Plaintiffs' claim regarding felon match. Plaintiffs were unable to identify or explain—through county, voter, or other testimony or other evidence—that the cancellation of Mr. Smith's record had any connection to an action or inaction by the State. Indeed, Fulton County admitted that it was responsible for the mistake, and that such occurred because it had mis-identified him with another voter who had the same "first name, last name and date of birth" PX. 2089.

972.   Similarly, voters who may have had their registration record incorrectly merged with another voter (e.g., duplicate merger) could not testify that the merge occurred because of how potential matches are presented to county officials for processing.

C.  The burden imposed by list accuracy

973.    Even if Plaintiffs' claim were not barred by prudential and federalism considerations, and even if they had demonstrated a causal link, This Court finds, for the following reasons, that their Anderson-Burdick claim fails.

974.    This Court, again, begins with the first step of the Anderson-Burdick analysis: determining the "character and magnitude of the burden . . . on the right to vote." New Georgia Project v. Raffensperger, 976 F.3d 1278, 1280 (11th Cir. 2020) (quotation omitted).

975.    Here, these administrative policy decisions challenged by Plaintiffs (i.e., the lack of pre-programmed "alerts" in eNet to prevent improper merges, the selection of certain "loose" criteria for identifying potential felon, duplicate, or vitals matches to be processed by county election officials, etc.) do not burden the right to vote at all. Even if this Court were to presume causation (which, as discussed above, it does not), what is at issue here are sporadic and inadvertent burdens experienced by individual voters based on individualized circumstances.

976.    In other words, the burdens identified by Plaintiffs in support of their List Accuracy claim are precisely the type of burdens caused by "life's

vagaries" that the Supreme Court has already held do not show a constitutional violation. <u>Crawford</u>, 553 U.S. 181, 197 (2008).

977.    For example, in <u>Crawford</u>, the Supreme Court upheld a state's photo ID law even though an individual voter's ability to cast a ballot might be affected were he "not [to] resemble the photo in the identification because he recently grew a beard" and, presumably, mistakenly turned away by a poll worker. <u>Crawford</u>, 553 U.S. 181, 197 (2008). Similarly, in <u>New Georgia Project v. Raffensperger</u>, the prospect that delays in the postal service prevent some voters from meeting the state's deadline to return their absentee ballots did not render the rule unconstitutionally burdensome. 976 F.3d at 1281; <u>see also</u> <u>Duncan v. Poythress</u>, 657 F.2d 691, 699 (5th Cir. Unit B 1981) (the Constitution provides no guarantee against innocent irregularities in the administration of elections). The Supreme Court and Eleventh Circuit reached these decisions, even though the voter in the actual or hypothetical situation ultimately could not vote.

978.    The prospects that individual voters may be burdened if, for example, a county official mistakenly merges their voter record with another or they are forced to use a provisional ballot if a poll worker cannot find them on the rolls due to a typo, are no similar to the potential burdens considered in <u>Crawford</u> and <u>New Georgia Project</u>. As the Eleventh Circuit explained in the

332

latter, these types of inadvertent burdens "do[] not implicate the **right to vote** at all." New Georgia Project, 976 F.3d at 1281 (emphasis added).

979.    Indeed, a stay panel for the Eleventh Circuit recently explained that "the standard remedy for an election-administration error—whether human, analog, or digital—is to allow a voter to cast a provisional ballot that will ultimately be counted." Curling, et al. v. Raffensperger, et al., No. 20-13730 (11th Circuit, April 1, 2021) (denying motion to lift stay) (Brasher, J.). And that is precisely what the Secretary of State's office advises counties to do. See Tr. 1661:5-12 (Germany).

980.    Nevertheless, even if this Court were to look at the individualized burdens experienced by Plaintiffs' voter witnesses, these too would not demonstrate a significant burden.

981.    First, numerous state witnesses confirmed that inadvertent burdens due to list accuracy issues in Georgia's voter list are rare. See, e.g., Tr. 1628:13-18 (Germany) (Secretary's office very rarely receives email complaints about transferred voters with incorrect addresses in their voter registrations); Tr. 798:2-5, 12-14; 818:18-25 (Hallman) (not common for county officials to incorrectly merge duplicate voter records); Tr. 3542:1-4 (Harvey) (Secretary of State's office did not receive a particularly high number of complaints about list accuracy

issues in 2020); Tr. 3983:18-25 (Sullivan) (did not recall a significant number of cases brought before the SEB regarding list accuracy issues or any of the other claims in this case); Tr. 1806:20-23 (Le) (same).

982.    Plaintiffs' witnesses do not demonstrate anything to the contrary. At trial, Plaintiffs put forward only fourteen witnesses whose testimonies might be considered related to Plaintiffs' List Accuracy claim: Carlos Del Rio; Julian Grill; Antoniette Johnson; Nicole Freeman; Alkhealasharteula Harrison; Emily Huskey; Julian Grill; Meredith Rose; Jayme Wills; Brenda Lee; Dasia Holt; Kia Carter; Anthony McKissic; and Andre Smith.

983.    While Plaintiffs have suggested that these witnesses constitute only the "tip of the iceberg" of a broader issue, no evidence for this proposition was adduced at trial, and this Court will not make that leap for the Plaintiffs on this record that lacks any evidence on the significance of these events in a statistical sense. See Johnson v. DeSoto Cty. Bd. of Comm'rs, 204 F.3d 1335, 1342 (11th Cir. 2000) ("In a voting rights case … statistical evidence derived from a **sampling method, using reliable statistical techniques**, is admissible on the question of determining the relevant population.") (emphasis added); see also United States v. Rosin, 263 F. App'x 16, 29 (11th Cir. 2008); Hernandez v. Crown Equip Corp., 92 F. Supp.3d 1325, 1343 (M.D. Ga. 2015).

984.    This Court may only consider the evidence that was presented before it at trial and, of course, Plaintiffs' arguments on this point are not evidence. Springer v. Wal-Mart Associates' Grp. Health Plan, 908 F.2d 897, 901 (11th Cir. 1990) ("Counsel's closing argument, of course, is not competent evidence."); see also United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009) (statements and arguments of counsel are not evidence).

985.    Of these fourteen List Accuracy witnesses, only four were unable to vote: Dasia Holt in 2018 (PX. 2103, Tr. 21:20-22); Kia Carter in 2018 (Tr. 2501:24-2502:6; 2513:5-7); Anthony McKissic in 2018 (Tr. 2746:14-24 (voted in statewide races only)); and Antoinette Johnson in 2018 (PX. 2105, Tr. 22:6-19).  None were denied the right to vote in 2020.

986.    Three of these witnesses who could not vote had issues that were, or appeared to be, related to an issue with a county incorrectly identifying their voter record as a duplicate of another and merging the two: Dasia Holt, Kia Carter, and Anthony McKissic. Ms. Lee also had a duplicate merge issue caused by "human error," but she was able to cast a ballot after a phone call with DeKalb County resolved the issue. PX. 2095, Tr. 21:5-7; 23-22:4.  Indeed, the documentary evidence of Ms. Carter's and Mr. McKissic's eNet voting records confirmed that the decision was made at the county level.  PXs. 2046; 2709. The

335

evidence did not establish, however, that the duplicate merger was caused (in fact or proximately) by an act of the State as opposed to the erroneous exercise of county discretion.

987.    Similar gaps appear in the case of Andre Smith, the Plaintiffs' only witness on the felon match process.  Mr. Smith voted successfully in the June 2020 primary by provisional ballot and further voted in the November 2020 general election, the 2021 Senate runoff election, and the 2021 Atlanta mayoral election without issue. Tr. 2450:16–21; 2456:15–2457:09.  No evidence linked his mismatch, however, to State criteria challenged by the Plaintiffs.  Again, Fulton County explained in writing (not testimony) that the issue was a match of Mr. Smith's first and last name and his date of birth, which are criteria that Plaintiffs suggested they do not challenge. Compare PX. 2089 with Tr. 4377:13-18 ("[T]hey could take out the race and gender criteria, that criterion altogether.") (Lawrence-Hardy).

988.    Accordingly, and as with Plaintiffs' other List Accuracy witnesses, while Mr. Smith's experience is indeed unfortunate, but it is not indicative of a significant burden the State imposes on the right to vote across the board (e.g., burden on the right to vote versus a burden on an individual voter).  And, again, there was no evidence presented at trial to indicate that Defendants caused, by

336

its use of certain "loose" match criteria or otherwise, the county officials to incorrectly flag Mr. Smith as a felon in the first place.

989.   Finally, eight of these witnesses experienced issues that were either not fully explained at trial or are simply unrelated to the challenged practices encompassed in Plaintiffs' List Accuracy Claim. These include:

990.   Jayme Wills did not receive her absentee ballot due to an apparent mailing error by a Richmond County election worker, despite the fact that she had not requested a mailing address change from her overseas address. See PX. 2052, Tr. 21:11-18; 34:24-35:2. Ms. Wills was able to cast her absentee ballot regardless. PX. 2052, Tr. 24:22-25:8.

991.   Dr. Carlos Del Rio, whom Plaintiffs mistakenly believed to have been affected by the State's HAVA Match policy, also does not appear to have experienced a list accuracy issue. As he testified, all his information on his My Voter Page was "totally correct." Tr. 485:5-10. Dr. Del Rio's issue, whatever it was, does not appear to be related to any of the issues in this case. PX 2011 (never in MIDR status).

992.   Emily Huskey noticed an error in her address on her My Voter Page after updating her registration in July 2020; her street direction was listed as "NW" rather than "NE." Tr. 1162:6-8; 1161:17-13; 1161:11-13. After she reached

337

out to Fulton County, the matter was resolved and Ms. Huskey voted without issue. Tr. 1163:8-12, 21-22; 1163:23-1164:2, 17-19.

993.    Antoinette Johnson, one of the few voter witnesses presented by Plaintiffs who could not cast a ballot, first appeared at one polling location but was directed to another. PX. 2105, Tr. 21:14-17. Unfortunately, she did not arrive at the second polling location in time to cast a ballot. Id. at 22:6-19. From the limited testimony presented, this Court cannot determine why this occurred or even if the poll worker's instruction was improper.

994.    This Court finds that these issues, and the others like them,[41] are not tied to Plaintiffs' List Accuracy claim as presented at trial and, regardless, do not support a finding of a severe burden, or any burden, on the right to vote in Georgia due to list accuracy issues in Georgia's voter rolls.

995.    Furthermore, as alluded to above, in most cases the errors that affected these voters were either fixed or, if not, the voter was provided an opportunity to cast a provisional ballot. Thus, the most common burden experienced by these voters was simply a loss of time. See, e.g., Tr. 2688:21-25 (Harrison) (issue resolved in 5-10 minutes); Tr. 484:8-25 (Del Rio) (issue resolved

---

[41]  The other voter witnesses with irrelevant or unexplained list accuracy issues are Nicole Freeman, Alkhealasharteula Harrison, Julian Grill, and Meredith Rose.

in 8-10 minutes); Tr. 1167:23-1168:1 (Huskey) (issue resolved in 20 minutes). Under the circumstances presented with these voters, the time spent was not sufficient to establish a severe burden on the right to vote in the constitutional sense.

996.    In sum, Plaintiffs have not established that inaccuracies in the State's voter list are a widespread problem, that they are caused by the State's acts or omission, and where such inaccuracies do exist, they are not resolved with minimal burdens in most cases.  In other words, this Court finds that voter list inaccuracies do not pose a burden on the right to vote in Georgia or, if one does exist, it is exceedingly slight.

D.  The State's interest in its list accuracy process

997.    "Because the burden is [at most] 'slight,' the state interest need not be 'compelling ... to tip the constitutional scales in its direction.' Rather, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." Black Voters Matter Fund v. Raffensperger, 508 F. Supp. 3d 1283, 1301 (N.D. Ga. 2020) (quoting Burdick, 504 U.S. at 439, 434).

998.    Here, there can be no dispute that the State has a legitimate interest in preventing felons from voting or removing duplicate records and those of deceased individuals from the voter rolls. O.C.G.A. §§ 21-2-216(b), -231(d).  All

such efforts fall within the confines of ensure the ensuring the state's list of voters is accurate, which this Court has already concluded is a legitimate state interest. See Doc. No. [617] at 56 (Georgia's regulatory interest in "maintaining a reliable list of electors" was sufficient to justify its voter roll maintenance policy). And the State likewise has a legitimate interest in enforcing its laws as written, which delegate these decisions to local county officials.

999.   Accordingly, this Court finds the Secretary's use of the "loose" match criteria in the felon match process and vital records is supported by the State's legitimate interests in preventing felon voting and duplicate voter records.[42]  This is all that is required to overcome the, at most, slight burden addressed in Plaintiffs' List Accuracy claim. Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) (states have a legitimate interest "in protecting the integrity, fairness, and efficiency of their ballots and election process as means for electing public officials").

---

[42]  As explained, there is no evidence of a voter encountering a problem with the vital records match (or at least a problem that would not be resolved immediately with minimal effort).  That said, and in the alternative, this Court expressly concludes that the analysis applicable to the felon and duplicate matches applies to the vital records match and warrants judgment for the Defendants.

E.   <u>The Political Question Doctrine counsels against this Court's intervention into list accuracy.</u>

1000.  In addition to the reasons set forth above, and in the alternative, this Court concludes that the political question doctrine precludes a finding of liability against the State on the List Accuracy claims. Deciding which fields the State uses to flag **potential** matches represents the kind of minutiae of election law that are best left to states and other branches of the State government.

1001.  Similar disagreements as to election administration were raised not long ago in another case in this district, <u>Coalition for Good Governance</u>, 2020 WL 2509092, at *3. There, this Court dismissed the case prior to discovery, finding that Plaintiffs' demands that the State adopt a variety of practices and precautions in response to the Covid-19 Pandemic were the type of quintessential political questions not proper for resolution by this Court:

> Plaintiffs acknowledge that executive-branch officials at all levels have undertaken measures to slow the spread of the coronavirus. And obviously, Plaintiffs are unsatisfied with those efforts. But whether the executive branch has done enough is a classic political question involving policy choices. Thus, it is not properly before this Court.

> Even if this Court could address the question, answering it with any degree of certainty would be impossible, as there are no judicially discoverable and manageable standards for resolving it. This is why courts should not second-guess coordinate branches of government on matters explicitly committed to them. In this sense, this case is much like <u>Rucho v. Common Cause</u>, 139 S. Ct. 2484 (2019), in which the Supreme Court rejected efforts to have federal courts articulate the

definition of "fairness" and "how much is too much" in the context of partisan gerrymandering.

Id. at 3.

1002.  This Court finds this same reasoning to be applicable here to Plaintiffs' challenge to the criteria utilized by the State to flag potential matches. This Court cannot objectively discern how "loose" is too "loose" for potential matching criteria. Plaintiffs have not explained how this Court can decide, based on the evidence presented at trial, how many potential matches, that do not ultimately prove to be "true" matches, would show certain matching criteria to be overinclusive? Nor has the evidence established what size of group registrations are too large for a county to carefully evaluate such that it will definitely cause. These questions inherently "'lack [the] judicially discoverable and manageable standards'" necessary for resolution by this Court. McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1357 (11th Cir. 2007) (quoting Baker v. Carr, 369 U.S. 186 (1962)).

1003.  Accordingly, and certainly on this record, this Court defers to the Secretary's determination on what criteria best serves its needs and those of the State. See, e.g., Rucho v. Common Cause, 139 S. Ct. 2484, 2500 (2019) (a judgment made with "no legal standards discernible in the Constitution . . . would be an

'unmoored determination' of the sort characteristic of a political question beyond the competence of the federal courts.") (quoting <u>Zivotofsky ex rel. Zivotofsky v. Clinton</u>, 566 U.S. 189, 196 (2012)); <u>see also</u> <u>Jacobson</u>, 974 F.3d at 1242 ("[P]icking among the competing visions of fairness poses basic questions that are political, not legal.").

1004.  In sum, this Court finds that the State's conduct, as ultimately deduced at trial as part of Plaintiffs' List Accuracy claim, do not severely burden the right to vote, if at all. Moreover, Defendants have put forth valid and legitimate interests in support of their practices. Alternatively, Defendants' determinations on how best to pursue these interests are further granted great deference pursuant to the political question doctrine. Accordingly, Plaintiffs' List Accuracy claim fails its <u>Anderson</u>-<u>Burdick</u> analysis and judgment is entitled to Defendants on this claim.

## IV.   Training on Absentee Ballot Cancellation

### A. <u>Plaintiffs' First and Fourteenth Amendment Claim</u>

1005.  As with the List Accuracy claim, Plaintiffs' claim attacking the State's training efforts on absentee ballot cancellations is challenging to consider under the <u>Anderson</u>-<u>Burdick</u> analysis. Chris Harvey testified that the State's policy is to provide accurate training to county election officials. Tr. 3538:23-25.

Thus, there is no actual policy, statute, or regulation of the State that is allegedly causing Plaintiffs' purported burden. And generalized arguments about how training might be improved run into the same political question doctrine issues addressed above. See Section VI, supra.

1006.  Also like the List Accuracy claim, the training claim fails for insufficient evidence to establish causation under 42 U.S.C. § 1983.

1007.  Far from suggesting any lack in training, the evidence presented at trial actually suggests that county officials' training as to absentee ballot cancellations was exemplary. Over 6.9 million absentee ballots were issued in the 2020 election alone and over 1 million of those who received them ultimately elected to vote in person. Doc. No. [829-6]; [829-7]; and [829-8].

1008.  Yet Plaintiffs have presented at most nine witnesses in six counties who experienced an issue. This is not for lack of effort.  By their own admission, they collected over 3,300 of voter stories to potentially use in this litigation. Tr. 1098:21-1099:16; 1121:14-18 (Conrad).

1009.  Of those who experienced an issue, the witnesses could not testify as to what type of training the poll worker, manager, county superintendent, or county registrar received, who conducted their training, whether the training was inaccurate or insufficient, or whether such training affected their voting

344

experience. See, e.g., Tr. 620:7-17 (A. Karp). Indeed, no county official or poll worker provided testimony at trial at all. Consequently, this Court is left with significant missing links in the causal chain, and this Court will not fill those gaps for Plaintiffs without evidence.

1010. Plaintiffs rely heavily on what the State acknowledges are acknowledged mistaken and outdated county superintendent certification materials impacting some 2019 and the 2020 elections. The certification materials are not, however, dispositive for at least three reasons.

1011. First, Chris Harvey testified that certification materials are only reviewed once when the superintendents obtain their initial certification. Tr. 3534:10-23 (Harvey). These certification materials were not, and could not have been, used statewide for all county superintendents, and each county from which Plaintiffs presented isolated problems with absentee ballot cancellations involved superintendents who were initially certified long before the materials with incorrect information. Tr. 3535:17–3537:11. As a result, there is no causal evidence that any of the voter stories propounded by Plaintiffs was impacted by certification materials. In other words, there was no connection between the materials and an actual voter issue.

345

1012.  Second, there was no testimony at trial that any poll worker actually received improper training in 2020 due to the content of the certification materials.

1013.  And third, there was no evidence presented to show that any county superintendent did, in fact, train on flawed materials. Further, with the exception of Ms. Andros's situation in Cobb County, the State demonstrated that none of the county election superintendents in the counties where an incident with absentee ballot training occurred would have seen the erroneous certification materials before the 2020 election. Tr. 3535:17–3537:11.  Thus, there is affirmative evidence to counter Plaintiffs' theory in all but one case, and even in the case of Ms. Andros in Cobb County, the Court is left having to speculate as to possible exposure to incorrect materials and then how that theoretical exposure cause the problems Ms. Andros faced (but had quickly resolved).  The Court will not impose liability under these circumstances.

1014.  In the same vein, while this Court acknowledges that the Secretary's 2020 poll worker manual contained an error, there was no testimony or other evidence that the manual was actually used in any of the counties where a voter experienced an issue with absentee ballot cancellation. See Tr. 3538:8-14 (Harvey).

346

1015.  Thus, as with Plaintiffs' list accuracy claim, Plaintiffs' claim regarding insufficient training on absentee ballot cancellation simply presumes causation. This is not enough for a viable Section 1983 claim.

B. Fifteenth Amendment and Fourteenth Amendment Equal Protection Claims.

1016.  Plaintiffs seemingly abandoned their geographic Equal Protection Claim as to absentee ballot cancellation training at trial; they presented no evidence whatsoever on what training *any* specific county superintendent received, let alone sufficient evidence to demonstrate that such was materially distinct from another and that such resulted in a injury to voters. Wexler, 452 F.3d at 1231. Either way, there is insufficient evidence for the Court to conclude that the State's efforts to train local election officials on the procedure for cancelling absentee ballots violates, on a geographic or other basis, the Equal Protection Clause of the Fourteenth Amendment to the Constitution.[43]

1017.  Further, as discussed Analysis Section II. A-B, Plaintiffs have not established through evidence that Defendants took any action, let alone with

---

[43]  While Plaintiffs referenced a Fifteenth Amendment claim on training regarding absentee ballot cancellation at trial, this Court dismissed Plaintiffs' Fifteenth Amendment claim on "failure to train on election laws" at summary judgment. Doc. No. [617] at 77.

respect to training on absentee ballot cancellation training, with discriminatory intent.

## V.   **Plaintiffs' Proposed Remedies**

1018.   For all of their claims, Plaintiffs are limited to prospective injunctive relief. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 105-106 (1984). Rule 65 requires that the terms of an order for injunctive relief must be specific and describe with reasonable detail the act(s) restrained or required. FRCP Rule 65(d). And, "an injunction is to be narrowly tailored to remedy the specific action which gives rise to it." Valley v. Rapides Par. Sch. Bd., 646 F.2d 925, 942 (5th Cir.), on reh'g, 653 F.2d 941 (5th Cir. 1981); see also Califano v. Yamasaki, 442 U.S. 682, 702, 99 S. Ct. 2545, 2558, 61 L. Ed. 2d 176 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

1019.   As to Plaintiffs' Section 2 claim specifically, the Eleventh Circuit has "repeatedly construed the first Gingles factor as requiring a plaintiff to demonstrate the existence of a proper remedy." Burton v. City of Belle Glade, 178 F.3d 1175, 1199 (11th Cir. 1999).

1020.   As to Plaintiffs' Administrative Claims, the Eleventh Circuit has repeatedly cautioned that "federal courts must be chary of hearing challenges to

a state's duly enacted election procedures." <u>New Georgia Project v.</u>

<u>Raffensperger</u>, 976 F.3d 1278, 1285 (11th Cir. 2020) (J. Lagoa, concurring).

1021.  Accordingly, and as other courts in this district have noted, "[w]hen

courts do interfere, they must tread carefully and provide the minimum (and

least disruptive) relief necessary to redress the harm." <u>Andersoner</u>, 497 F. Supp.

at 1330; <u>see also</u> <u>Georgia Shift v. Gwinnett Cty.</u>, No. 1:19-CV-01135-AT, 2020 WL

864938, at *5 (N.D. Ga. Feb. 12, 2020) ("A federal court should not be 'the arbiter

of disputes' which arise in elections; it is not the federal court's role to 'oversee

the administrative details of a local election.'") (quoting <u>Curry v. Baker</u>, 802 F.2d

at 1315).

1022.  As such, this Court reviews Plaintiffs' claims in light of the remedies

proposed by Plaintiffs at trial and declines, as Plaintiffs suggest, to attempt to

independently develop alternative remedies or implement its own preferred

policies for how Georgia's elections might be run. Such is simply not the role of

this Court. <u>See</u>, <u>e.g.</u>, <u>Ohio Democratic Party v. Husted</u>, 834 F.3d 620, 633 (6th Cir.

2016) ("[O]ur task (especially with respect to minimally burdensome laws) is

neither to craft the 'best' approach, nor to impose our own idea of democracy

upon the [ ] state legislature."); <u>Rockford League of Women Voters v. U.S.</u>

<u>Nuclear Regulatory Comm'n</u>, 679 F.2d 1218, 1222 (7th Cir. 1982) ("Government

agencies have limited resources to perform their appointed tasks. This Courts cannot tell them how to allocate those resources so as to get the most value out of them. That calls for a managerial judgment.")

A. <u>Plaintiffs' HAVA Match Remedies</u>

1023.  Plaintiffs ask this Court to issue an injunction to eliminate the usage of MIDR. Pl's Remedies at 20. Alternatively, Plaintiffs proposed at closing that burdens could be removed if the *name* of MIDR were changed. Tr. 4352:20-22 ("If you want to remove the burdens, why don't you call it the -- you know, less ID required. No picture ID required. There are so many labels you could flag it." (Lawrence-Hardy)). Additionally, Plaintiffs proposed that this Court order the MIDR notification letter to be revised in a way that was less "confusing" and with larger font, similar to that of Defendants' website for absentee ballots. Tr. 4347:1-5; 4351:12-16; 4352:3-6

1024.  Plaintiffs have not demonstrated, however, that any of these proposed remedies would eliminate any burdens on voters, and their suggestions highlight the problem of judicial overreach.

1025.  First, Plaintiffs are not entitled to consideration of remedies, because they have not shown a constitutional injury or otherwise established liability on the part of the State.  Not one voter testified they could not vote due to MIDR or

were even burdened by being in the Active-MIDR status. And, because all voters must show a photo ID, a registrant in MIDR status is not saddled with doing anything more than any other voter; if anything, a voter in MIDR status has more options to verify their identification. 52 U.S.C. § 21083(b)(1) and (2)(A); O.C.G.A. § 21-2-417(c). In short, Plaintiffs' proposal to eliminate MIDR is a solution in search of a problem.

1026.  Second, Plaintiffs put forth no evidence that their alternative proposals of a different letter or different name for MIDR would have any effect on voters. Not a single voter testified that the notification letter, or the name MIDR, prevented them from voting or otherwise burden their exercise of the franchise. Plaintiffs further did not provide any expert testimony that changing the name of MIDR or the wording of the MIDR notification letter, in whatever form that might entail, would somehow prevent "avoid discouraging the voter" or lead to situations different from those described by Dr. Mayer found only in the academic literature. Tr. 4351:8 At best, these proposals fall within the scope of "good ideas" that the Eleventh Circuit has said do not warrant a court's interference with the State's right to run to its own elections. New Georgia Project, 976 F.3d at 1284. Thus, and for the additional reasons already stated herein, Plaintiffs' HAVA Match claim fails for lack of a viable remedy.

B. Plaintiffs' Citizenship Verification Remedies

1027.  For Citizenship verification, Plaintiffs have proposed, effectively, what Defendants are already doing: using SAVE to verify voters flagged as non-citizens. Pl's Remedies at 14-16. Thus, and in similarity to its HAVA Match proposal, Plaintiffs' proposed remedy solves no apparent issue.

1028.  At most, Plaintiffs appear to want to speed up the process and/or increase the frequency of the State's use of SAVE, again something that the State hopes to achieve. But Plaintiffs presented no evidence that doing things in their preferred fashion, or on their timeline, was technically or operationally feasible. This Court is not in a position, at least not with the evidence that was presented to it at trial, to mandate such procedural specifics for the State's use of SAVE.

1029.  This Court is cognizant of Plaintiffs' request for a judicial order to require the use of SAVE.  This Court notes, however, that at least one statute and one regulation require the use of SAVE or something like it. O.C.G.A. § 21-2-216; Ga. Comp. R. & Regs. 590-8-1-.02. This does not moot the issue, and the Court recognizes that, absent a judicial order, things may change.  But, SAVE is not dispositive of the Court's decision, and the Court has no doubt that, if the State changes it policy, this Court or another will hear about it and the issue can be addressed on another day. For this and other reasons identified in this Order,

this Court denies Plaintiffs request to effectively codify the status quo and require the use of SAVE through a federal judicial order in addition to the uncontested testimony of the Secretary's intent to do so, a statute, and a regulation.

1030.  Thus, and for the additional reasons already stated herein, Plaintiffs' Citizenship verification claim fails for lack of a viable remedy.

C. Plaintiffs' List Accuracy Remedies

1031.  For its List Accuracy claim, Plaintiffs ask this Court to order Defendants to program the voter registration database in a particular way, and to send out notices to affected voters before actions are taken. Pl's Remedies at 53, 57.

1032.  Specifically, as to its programming proposal, Plaintiffs demand that eNet be set up in such a manner that it prevents the merger, change, or cancellation of a voter's record unless: (1) the driver's license numbers or last four digits of the social security numbers match, and (2) at least six of the following seven identifiers match: date of birth, first name, middle name, last name, address, race, gender. Pl's Remedies at 53. These proposals, however, suffer from insurmountable defects.

1033.   First, this Court's interference into the specific programming of the Secretary's database, and decisions regarding which criteria should match, are intrusions that extend well into the realm of second-guessing the State's reasonable policy decisions and fly far afield of any authority of this Court. <u>See New Georgia Project</u>, 976 F.3d at 1283-84.

1034.   Second, Plaintiffs have not shown that their proposed match criteria would have any impact in reducing the number of mistaken cancellations and merges by county officials. The problem, again, is that Plaintiffs have put forth no evidence to show that a county official made the decision to cancel or merge a voter's record *because of* the potential match criteria set by the Secretary's office. Plaintiffs offer only speculation, or at best argument, that this is the case, which is an insufficient basis for this Court to make such a ruling. <u>Springer v. Wal-Mart Associates' Grp. Health Plan</u>, 908 F.2d 897, 901 (11th Cir. 1990) ("Counsel's closing argument, of course, is not competent evidence."). Accordingly, this Court concludes that Plaintiffs' proposal does not meet the requirement that an the relief they are seeking actually "remed[ies] the specific action which gives rise to it." <u>Valley</u>, 646 F.2d at 942

1035.   Moreover, Plaintiffs have also not shown how their proposal might not also have unintended consequences. Specifically, this Court has no way to

evaluate whether the Plaintiffs' proposal will result in either less erroneous matches or a voter database with less duplicates, ineligible felon voters, or deceased voters.  Instead, Plaintiffs simply ask this Court to meddle in the intricacies of election operations without offering any guarantee that doing so will not cause detrimental or unwanted downstream effects, both in terms of technical and operational utility. See Rockford, 679 F.2d at 1222 (7th Cir. 1982) ("Government agencies have limited resources to perform their appointed tasks. This Courts cannot tell them how to allocate those resources so as to get the most value out of them. That calls for a managerial judgment."). Would the new criteria proposed still sufficiently identify *real* felon, duplicate, and vitals record matches? Would adding additional criteria to the searches cause undue strain on the eNet system, as Mr. Hallman testified was a possibility? Tr. 848:11-849:2 (Hallman). Plaintiffs cannot say, and neither, so, can this Court.

1036.  As to the latter proposal to provide notices, here too Plaintiffs have offered a proposal with no evidence to demonstrate its necessity, utility, or feasibility. Plaintiffs presented no evidence that notices would have prevented *any* cancellation or merger of a voter's record, let alone in a meaningful way. Plaintiffs further presented no evidence to demonstrate that providing the notices would not impose an undue financial and/or operational burden on the

355

counties (or the State) who would have to send these notices. Plaintiffs offered no evidence as to how many duplicate merges occur, for example, or how much notice should or has to be given to avoid interfering with the State's other list maintenance activities. Plaintiffs' evidence is silent on these issues.

1037.  For these reasons, and for those already stated herein, Plaintiffs' List Accuracy claim further fails for lack of a viable remedy.

D. <u>Plaintiffs' Absentee Ballot Cancellation Training Remedies</u>

1038.  Finally, like Plaintiffs' List Accuracy claim, this Court also concludes that the remedies proposed by Plaintiffs for their Absentee Ballot Cancellation Training claim do not satisfy the requirements of a remedy that this Court has the authority to fashion.

1039.  Plaintiffs suggest that signs be posted at all polling places explaining that voters who requested an absentee ballot have the right to cancel it at the polling place even if they do not have the ballot with them. Pl's Remedies at 63. Plaintiffs further suggest that the Secretary incorporate mandatory training of county officials on absentee ballot cancellation, including on procedures when the voter does not have the absentee ballot with them at the poll, and train county officials to train their poll workers on the same. <u>Id.</u> at 64. Plaintiffs similarly suggest that the Secretary direct counties that voters must be allowed to

cancel their absentee ballots in person at their polling place, even when they do not have the ballot with them, and require county registrars and superintendents to certify they have a plan in place to teach this information to their personnel. Id. at 65. Lastly, Plaintiffs suggest that the SEB require county personnel to attend remedial training when they are found to have followed unlawful absentee ballot cancellation procedures. Id. at 66.

1040.  All of these proposals, however, fall squarely within the confines of, at most, "good ideas" that this Court cannot, and will not, order the State to undertake. New Georgia Project, 976 F.3d at 1284. There was no evidence presented that _any_ of these proposals could have, let alone would have, prevented a poll worker from making a mistake.  Nor is there any evidence that the State is not currently providing training on the cancellation of absentee ballots pursuant to the terms of HB 316.  In fact, Chris Harvey testified that the State did so before the 2020 election, and no one has brought evidence to counter that assertion. Tr. 2131:9-28; 3530:10-3531:3; 3649:24-3650:1 (Harvey). Under these circumstances, this Court will not issue an order to uphold the status quo for the same reasons discussed above.

1041.  Ultimately, Plaintiffs' proposals amount to policy arguments. These are the things that Plaintiffs would do if they held the Secretary of State's office.

Plaintiffs are, of course, welcome to make their case on campaign trail, but such arguments do not carry the day in this Court. Accordingly, and as with Plaintiffs' other claims, their Absentee Ballot Cancellation Training claim fails for lack of proper remedy.

## <u>CONCLUSION</u>

For the reasons stated herein, this Court hereby **FINDS IN FAVOR OF AND ENTERS JUDGMENT FOR DEFENDANTS** on all counts. The clerk is **ORDERED** to close this case.

So **ORDERED** this _____ day of _____, 2022.

_____

The Honorable Steven Jones,
U.S. District Court Judge,
Northern District of Georgia

*Prepared by:*

Christopher M. Carr
Attorney General
GA Bar No. 112505
Bryan K. Webb
Deputy Attorney General
GA Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
GA Bar No. 760280
State Law Department

40 Capitol Square, S.W.
Atlanta, Georgia 30334

/s/Josh Belinfante
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Brian E. Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Melanie L. Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Danielle M. Hernandez
Georgia Bar No. 736830
dhernandez@robbinsfirm.com
Javier I. Pico Prats
Georgia Bar No. 664717
jpicoprats@robbinsfirm.com
Robbins Alloy Belinfante Littlefield LLC
500 14th Street N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3255

/s/ Bryan P. Tyson

Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
Taylor English Duma LLP
1600 Parkwood Circle
Suite 200
Atlanta, Georgia 30339
Telephone: (678) 336-7249

*Attorneys for Defendants*